JAMES C. STURDEVANT (SBN 94551)
(jsturdevant@sturdevantlaw.com)
MONIQUE OLIVIER (SBN 190385)
(molivier@sturdevantlaw.com)
WHITNEY HUSTON (SBN 234863)
(whuston@sturdevantlaw.com)
THE STURDEVANT LAW FIRM
A Professional Corporation
354 Pine Street, Fourth Floor
San Francisco, California  94104
Telephone:(415) 477-2410
Facsimile: (415) 477-2420

ARTHUR D. LEVY (SBN 95659)
(arthur@yesquire.com)
445 Bush Street, Sixth Floor
San Francisco, California 94108
Telephone:(415) 702-4550
Facsimile: (415) 814-4080

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTA O'DONOVAN, EDUARDO DE LA TORRE, and LORI SAYSOURIVONG, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CASHCALL, INC., a California corporation, and DOE 1 through DOE 50, inclusive,<br><br>Defendants. | Case No.:  C 08-03174 MEJ<br><br>**CLASS ACTION**<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:     July 22, 2010<br>Time:    10:00 a.m.<br>Place:   Courtroom B<br>Judge:   Hon. Maria-Elena James |
| CASHCALL, INC., a California corporation,<br><br>Counterclaimant,<br><br>v.<br><br>LORIA SAYSOURIVONG and EDUARDO DE LA TORRE, individually and on behalf of all others similarly situated,<br><br>Counterdefendants. | |

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................... 1

I.     INTRODUCTION AND STATEMENT OF FACTS ............................................. 1

II.    LEGAL STANDARDS ................................................................................ 3

III.   PROPOSED CLASS DEFINITIONS .......................................................... 4

IV.   ARGUMENT ........................................................................................... 5

      A.    THE GENERAL CLASS CERTIFICATION STANDARDS
            OF RULE 23(A) ARE READILY SATISFIED ...................................... 5

            1.    The Class is Numerous under Rule 23(a)(1) ............................ 5

            2.    Common Questions of Law and Fact Exist under
                 Rule 23(a)(2) ............................................................................ 6

            3.    Plaintiffs' Claims Are Typical of the Class under
                 Rule 23(a)(3) ............................................................................ 7

            4.    Plaintiffs and Plaintiffs' Counsel Adequately
                 Represent the Class under Rule 23(a)(4) ............................... 8

      B.    COMMON ISSUES PREDOMINATE UNDER RULE 23(B)(3)
            FOR THE NATIONAL CLASS .......................................................... 8

            1.    EFTA Claims .......................................................................... 8

                 A.    *The Multiple Sweeps or "Double Dipping" Claim* ............. 8

                 B.    *The Conditioning Claim* ................................................. 11

            2.    Rosenthal Act Claims ......................................................... 12

                 A.    *Misleading and Deceptive Collection
                     Communications* ........................................................... 12

                 B.    *EFT Violations* .............................................................. 15

                 C.    *Telephone Harassment Claim* ...................................... 15

            3.    Claims of Unlawful, Unfair and Fraudulent Conduct
                 under the UCL .................................................................... 18

                 A.    *The Unlawful Prong of the UCL* ................................... 18

                       i.    Cal. Financial Code § 22302 and Cal.
                           Civil Code § 1670.5 ............................................ 18

i

ii.      California Financial Code § 22150 and
10 CCR 1452...........................................................................21

B.      *The Unfair Prong of the UCL* ........................................................22

4.      Class Member Damages Do Not Create Individualized Issues ....................23

C.      A CLASS ACTION IS A SUPERIOR MEANS FOR
ADJUDICATING THESE CLAIMS ........................................................24

V.      CONCLUSION...........................................................................................25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Armstrong v. Davis*,
  275 F.3d 849 (9th Cir. 2001) ...................................................................7

*Arnold v. United Artists Theatre Circuit*,
  158 F.R.D. 439 (N.D. Cal. 1994) ...........................................................5

*Blackie v. Barrack*,
  524 F.2d 891 (9th Cir. 1975) .............................................................4, 23

*California Rural Legal Assistance, Inc. v. Legal Services Corp.*,
  917 F.2d 1171 (9th Cir. 1990),
  *modified*, 937 F.2d 465 (1991) ...............................................................6

*Car Now Acceptance Co. v. Block*,
  2002 WL 32001272 (Ohio Com. Pl. 2002),
  *aff'd, North Shore Automobile Financing, Inc. v. Block*,
  2003 WL 21714583 (Ohio App. 8 Dist. 2003) ....................................19

*Christakos v. Intercounty Title Co.*,
  196 F.R.D. 496 (N.D. Ill. 2000) ...........................................................24

*Clomon v. Jackson*,
  988 F.2d 1314 (2d Cir. 1993) ...............................................................14

*DeMando v. Morris*,
  206 F.3d 1300 (9th Cir. 2000) ..............................................................11

*Dukes v. Wal-Mart Stores, Inc.*,
  603 F.3d 571 (9th Cir. 2010) ..............................................................4, 6

*Edwards v. Your Credit Inc.*,
  148 F.3d 427 (5th Cir. 1998) ................................................................11

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974) ...............................................................................4

*General Telephone Co. of Southwest v. Falcon*,
  457 U.S. 147 (1982) ...............................................................................7

*Gonzalez v. Arrow Finance Services, LLC*,
  233 F.R.D. 577 (S.D. Cal. 2006) ..........................................................12

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) .......................................................6, 8, 24

*Jones v. Dj Vu, Inc.*,
  419 F. Supp. 2d 1146 (N.D. Cal. 2005) ................................................20

*Kearns v. Ford Motor Co.*,
  567 F.3d 1120 (2009) ............................................................................22

iii

*Lockwood Motors, Inc. v. General Motors Corp.*,
    162 F.R.D. 569................................................................................................................23

*Lozano v. AT&T Wireless Services, Inc.*,
    504 F.3d 718 (9th Cir. 2007) ........................................................................................22

*McDonald v. Bonded Collectors, LLC*,
    233 F.R.D. 576 (S.D. Cal. 2005) ..................................................................................12

*Palmer v. Stassinos*,
    233 F.R.D. 546 (N.D. Cal. 2006)..................................................................................12

*Parra v. Bashas', Inc.*,
    536 F.3d 975 (2008)......................................................................................................23

*Pokorny v. Quixtar, Inc.*,
    601 F.3d 987 (9th Cir. 2010) ........................................................................................20

*Shroyer v. New Cingular Wireless Services, Inc.*,
    498 F.3d 976 (9th Cir.2007) .........................................................................................20

*Smith v. Chase Mortgage Credit Group*,
    653 F. Supp. 2d 1035 (E.D. Cal. 2009).........................................................................22

*Swanson v. Southern Oregon Credit Service, Inc.*,
    869 F.2d 1222 (9th Cir. 1988) ......................................................................................14

*Thomas v. Baca*,
    231 F.R.D. 397 (C.D. Cal. 2005) ..................................................................................23

*Ting v. AT&T*,
    319 F.3d 1126 (9th Cir. 2003) ......................................................................................19

*Tomlin v. Dylan Mortgage, Inc.*,
    2002 WL 32986130 (N.C. Super. Ct. Feb 1, 2002) .....................................................19

*Violette v. P.A. Days, Inc.*,
    214 F.R.D. 207 (S.D. Ohio 2003) .................................................................................19

*Yokoyama v. Midland National Life Insurance Co.*,
    594 F.3d 1087 (9th Cir. 2010) ......................................................................................23

## STATE CASES

*A & M Produce Co. v. FMC Corp.*,
    135 Cal. App. 3d 473 (1982) ........................................................................................20

*Carboni v. Arrospide*,
    2 Cal. App. 4th 76 (1991) .............................................................................................19

*Cel-Tech Communications Inc. v. L.A. Cellular Telegraph Co.*,
    20 Cal. 4th 163 (1999) ..................................................................................................18

*Clothesrigger Inc. v. GTE Corp.*,
    191 Cal. App. 3d 605 (1987) ..........................................................................................4

iv

*Discover Bank v. Superior Court,*
    36 Cal. 4th 148 (2005) ................................................................................................20

*Gatton v. T-Mobile USA, Inc.,*
    152 Cal. App. 4th 571 (2007) ......................................................................................20

*Little v. Automobile Stiegler, Inc.,*
    29 Cal. 4th 1064 (2003) ..............................................................................................20

*McKell v. Wash. Mutual, Inc.,*
    142 Cal. App. 4th 1457 (2006) ....................................................................................23

*Perdue v. Crocker National Bank,*
    38 Cal. 3d 913 (1985), *appeal dismissed,*
    475 U.S. 1001 (1986) ..............................................................................................19,

*Stop Youth Addiction Inc. v. Lucky Stores, Inc.,*
    17 Cal. 4th 553 (1998) ................................................................................................18

## FEDERAL STATUTES

15 U.S.C.
    § 1692d..........................................................................................................................15
    § 1692(d)(5) ..................................................................................................................16
    § 1692e..........................................................................................................................14
    § 1692e(5) ....................................................................................................................15
    §1692f(1)........................................................................................................................15
    § 1692k..........................................................................................................................12
    § 1693 *et seq* ................................................................................................................2
    § 1693a(1) ....................................................................................................................10
    § 1693e(a) ..............................................................................................................10, 12
    § 1693k(1) ....................................................................................................................12
    § 1693m(a) ....................................................................................................................11
    § 1693m(a)(2)(B) ..........................................................................................................11

Federal Rules of Civil Procedure
    Rule 23(a) ......................................................................................................................1
    Rule 23(b)(2) ............................................................................................................1, 3
    Rule 23(b)(3) ................................................................................................1, 3, 8, 24

## STATE STATUTES

California Business & Professions Code
    § 17200, *et seq.* ......................................................................................................3, 18
    § 17203..........................................................................................................................3
    § 17208..........................................................................................................................18

California Civil Code
    § 1670.5......................................................................................................................18, 19
    § 1670.5, Legislative Committee Comments................................................................19
    § 1788 *et seq* ................................................................................................................3
    § 1788.11(d)..................................................................................................................15
    § 1788.11(f)..................................................................................................................15
    § 1788.17......................................................................................................................12

California Code of Regulations
        § 1452......................................................................................................................18, 21

California Financial Code
        § 22000 *et seq* ............................................................................................................5
        § 22150...........................................................................................................3, 18, 21
        § 22302.............................................................................................................18, 19
        § 22302(b)......................................................................................................................3
        § 22303..............................................................................................................18, 22

PLEASE TAKE NOTICE that on July 22, 2010 at 10:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom B of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, before the Honorable Maria-Elena James, Plaintiffs Krista O'Donovan, Eduardo De La Torre, and Lori Saysourivong, on behalf of themselves and all those similarly situated ("Plaintiffs"), will respectfully move this Court for certification of the National and California Classes defined below under Rule 23 of the Federal Rules of Civil Procedure.  Plaintiffs make this motion on the grounds that their claims meet the requirements of Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) as set forth in the accompanying brief. This Motion will be based on this Notice; the Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Class Certification, filed herewith; the supporting evidence submitted by Plaintiffs in support of their Motion for Class Certification, filed herewith; the Court's file in this action; and such other argument or evidence as may be presented at the hearing on the Motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.      INTRODUCTION AND STATEMENT OF FACTS

As CashCall's advertisements state, CashCall's business is to provide "cash tomorrow" "with no security of any kind, just your signature." (Ex. 1[1] at CDOC 292, 294; Ex. 2. at CDOC 462, 464.) CashCall sells "no collateral" loans, with extraordinarily high interest rates of 90% and higher. (Ex. 3 at CASHCALL ("CC") 796.)  CashCall generates high profits with its exorbitant interest rates that force consumers to sustain high loan balances and make high monthly payments for years at a time.  (Ex. 4 at CDOC 187; Ex. 6 at CC 1557.)  It continues to increase its profits by charging rampant fees and coercing continued payment through hard ball collection practices.

CashCall structures its loans so that the payments are effectively interest-only over much of the loan term.  (*See* Exs. 7-9.)  CashCall borrowers must pay extremely high interest charges for several years, without significantly reducing their loan balances.  (*Id.*)  For example, two of the Plaintiffs in this case, Eduardo De La Torre and Lori Saysourivong, each borrowed $2,600 from

---

[1]      All references herein to Exhibits ("Ex.") are to materials attached to the Declaration of Whitney Huston ("Huston Decl."), filed herewith.

CashCall at APRs of 98.95% and 99.07%, respectively. (Ex. 10 at CC 443-44; Ex. 11 at P0350.) To pay off their loans on these terms, they are required to pay CashCall over $9,000, or 3.5 times the actual amount they borrowed. (*Id.*) After making the monthly payments for two years, Plaintiff Lori Saysourivong, still owed over $2,200 of the $2,600 borrowed. (Ex. 8 at CC 6417-26.)

Each of CashCall's $2,600 borrowers are subjected to the same terms and conditions of the loans. All Plaintiffs were offered, on a take-it-or-leave-it basis, one of CashCall's loans with all of the terms and the conditions imposed unilaterally by CashCall. (Ex. 13 at 175:4-15; 236:12-237:1; 239:12-242:25.) They each received substantially the same promissory note and were required to sign their note electronically. (*Id.* at 174:24-175:3; Ex. 3 at CC 846-50; Ex. 14; *see also* Ex. 15.)

In order to ensure continued payments, CashCall employs aggressive and highly automated debt collection techniques throughout the life of the loan. All of the Plaintiffs were routinely, and similarly, subjected to CashCall's unfair and illegal practices in collecting their loan payments. CashCall withdrew unauthorized payments from their account multiple times in the same month. (*E.g.,* Ex. 16 at 17:7-12; 55:10-17; 160:8-21; 161:17-162:5; 204:8-11; Ex. 8 at CC 6427; Ex. 9 at CC 309-14, Exs. 24-25, 40-42.) CashCall's automated breach letters, received by Plaintiffs, demanded that they make payments by MoneyGram. (Exs. 17-19.) And each of the Plaintiffs was inundated by telephone calls from CashCall's automated dialer and subject to its hostile and harassing phone collection efforts. (Ex. 16 at 33:10-36:10; 37:7-39:12; 42:16-24; 46:13-20; Ex. 20 at 96:18-19, 103:1-5, 112:7-24; 113:11-115:24.)

Based on these alleged unlawful practices of CashCall, Plaintiffs herein seek class certification as follows:

Plaintiffs first seek certification of a National Class based on CashCall's violation of the Electronic Funds Transfer Act, 15 U.S.C. § 1693 *et seq.* ("EFTA") in withdrawing electronic payments from CashCall customers' accounts on multiple days in a single month without customer authorization. (Fourth Amended Complaint ("FAC") (Dkt. # 54) ¶¶ 41-53.) Additionally, Plaintiffs seek certification of a National Class for CashCall's violations of the EFTA by conditioning its loans on customers' agreements to payment by preauthorized electronic fund transfers ("EFT"s) and by instituting a cancellation policy in violation of the statute. (FAC ¶¶ 48 & 50.)

Second, Plaintiffs seek certification to prosecute a National Class for CashCall's numerous systemic violations of the Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788 *et seq.* ("Rosenthal Act").  (FAC ¶¶ 65-72.)  In violation of the Rosenthal Act, CashCall sent automatically generated collection letters and emails falsely informing customers that they had to make up payments with certified funds, most notably using MoneyGram, a wire service that charges the customer for the cost of the transfer.  CashCall also claimed and collected amounts not authorized in its loan agreements with the Class, including by violating the EFTA.  (FAC ¶ 69d.)  CashCall's automated telephone collection system CashCall also systematically annoys, abuses, and harasses its customers with excessive and unnecessary telephone calls to coerce and intimidate them into paying and continuing to pay CashCall.  (FAC ¶ 69a.)

Third, Plaintiffs seek certification to prosecute Defendant's violations of the Unfair Competition Law, California Business and Professions Code § 17200 *et seq.* ("UCL") for a class of California borrowers.  (FAC ¶¶ 73-94.)  Plaintiffs predicate the unlawful prong of the UCL claims on CashCall's violations of the EFTA and the Rosenthal Act, as alleged above.  They also invoke California Financial Code § 22302(b), which prohibits CashCall from making loans with unconscionable interest rates (FAC ¶ 75), and California Financial Code § 22150, which prohibits lenders from making loans without regard for the consumer's ability to repay the loan (FAC ¶ 91).  Plaintiffs also seek certification of CashCall's unfair business practice of making loans, with extraordinarily high interest rates, that take years to pay back and require repayment of over three times the cost of the loan.  (FAC ¶ 85.)

## II.   LEGAL STANDARDS

Plaintiffs seek certification of all of their claims under Rule 23(b)(3).  This requires a showing that questions of law or fact predominate over individual questions and that a class action is the superior method of adjudicating the claims.[2]

---

[2]      Because Plaintiffs also seek injunctive relief arising under the Unfair Competition Law, Cal. Bus. &  Prof. Code § 17203, this Court may certify the injunctive relief claims sought under Rule 23(b)(2), however, Plaintiffs believe that all claims are suitable for certification under Rule 23(b)(3).  For certifying injunctive relief classes, Rule 23(b)(2) requires that the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. Rule (continued on next page)

In deciding a motion for class certification, the Court focuses on whether the requirements of Rule 23 have been satisfied. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974). The Court must avoid pre-judging the merits, and assume the truth of the substantive allegations of Plaintiffs' complaint. *Eisen*, 417 U.S. at 178; *Blackie v. Barrack*, 524 F.2d 891, 901 n.17 (9th Cir. 1975). As the Ninth Circuit recently reiterated, "the district court must analyze underlying facts and legal issues going to the certification questions regardless of any overlap with the merits. However, this does not mean a district court should put the actual resolution of the merits cart before the motion to dismiss, summary judgment, and trial horses by reaching out to decide issues unnecessary to the Rule 23 requirements." *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 586-87 (9th Cir. 2010).

To the extent the Court looks beyond the allegations of the complaint, it does so not to resolve any questions of the merits, but to determine issues of class treatment. *Id*. at 587. If the Court concludes that plaintiffs have met the requirements of Rule 23, then the Court has broad discretion to certify the class. *Id*. at 579.

## III.    PROPOSED CLASS DEFINITIONS

Plaintiffs moves to certify the following Class for the EFTA and Rosenthal Act and the UCL claims based on those statutes (the "National Class"):

> All individuals who borrowed money from CashCall, Inc. for personal, family, or household use (a) from whose bank accounts CashCall withdrew or attempted to withdraw monthly loan installment payments on multiple days of the same month; or (b) who received a collection communication from CashCall stating that payment had to be made using money order, MoneyGram, or other certified funds; or (c) was late in making a payment and was telephoned by CashCall during the first 59 days of delinquency in connection with the late payment, or (d) who signed CashCall's promissory note containing the electronic funds authorization, at any time from June 30, 2004 to the present.

This Class is nationwide because the EFTA claims are federal and apply nationally, and because the Rosenthal Act (and related unlawful UCL claims) apply generally to CashCall because the injury producing conduct occurred in California by CashCall, which is incorporated and headquartered in California. *Clothesrigger Inc. v. GTE Corp.*, 191 Cal. App. 3d 605, 612-13 (1987).

(footnote continued from previous page)
23(b)(2).

4

CashCall is a California corporation with its principal place of business in California, and is subject to California law.  (Answer (Dkt. # 57) ¶ 17.)   CashCall is headquartered in Anaheim, and all of its lending, loan servicing, and collection operations are conducted in California, except for one collection unit that operates in Las Vegas.  (Ex. 26 at 31:21-32:23; 35:22-38:21; 47:25-48:9; Ex. 21 at 20:13-20; 58:11-61:16.)

With respect to the UCL claims based on the unfair loan terms and violations of the California Finance Lenders Law, the proposed Class is limited to California borrowers (the "California Class"):

> All individuals who, while residing in California, borrowed from $2,500 to $2,600 at interest rate of 90% or higher from CashCall, Inc. for personal, family, or household use at any time from June 30, 2004 to the present.

CashCall is licensed as a California Finance Lender.  (FAC ¶ 18; Answer ¶ 18.)  Its loans to Californians are subject to the California Finance Lender Law.  Cal. Fin. Code § 22000 *et seq*.  The California Class is limited because different state laws may apply to loan originations in states other than California.

## IV.    ARGUMENT

### A.    THE GENERAL CLASS CERTIFICATION STANDARDS OF RULE 23(a) ARE READILY SATISFIED.

#### 1.    The Class is Numerous under Rule 23(a)(1).

Rule 23(a)(1) requires that the class be so numerous that individual joinder of all class members is impracticable.  Plaintiffs need not state the exact number of potential class members, nor is a specific number of class members required to demonstrate numerosity.  *Arnold v. United Artists Theatre Circuit*, 158 F.R.D. 439, 448 (N.D. Cal. 1994).

Here, numerosity is readily established.  CashCall maintains a huge portfolio of small loans.  According to CashCall's own records, it has made several hundred thousand loans since 2005 and in 2006 made over 75,000 loans of $2,600 at 96% interest.  (Ex. 23 at 3:11-5:6; 4:10-21.)  For the California Class, CashCall made nearly 70,000 loans in 2005 just to California borrowers.  (Ex. 4 at CC 194-98.)  This evidence is sufficient to prove that Class membership is likely to number in the tens of thousands.

### 2.   Common Questions of Law and Fact Exist under Rule 23(a)(2).

Rule 23(a)(2) requires that there be questions of law or fact common to all Class members. "Predominance" is not required under Rule 23(a); it is enough to satisfy the Rule 23(a) commonality requirement that Plaintiffs' situations "are 'sufficiently parallel to insure a vigorous and full presentation of all claims for relief.'" *Cal. Rural Legal Assistance, Inc. v. Legal Servs. Corp.*, 917 F.2d 1171, 1175 (9th Cir. 1990) (quoting *Sullivan v. Chase Inv. Servs.*, 79 F.R.D. 246, 257 (N.D. Cal. 1978)), *modified*, 937 F.2d 465 (1991).

In the Ninth Circuit, Rule 23(a)(2) has been permissively construed. "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). Importantly, "[a]ll questions of fact and law need not be common to satisfy the rule" because "[t]he commonality test is qualitative rather than quantitative – one significant issue common to the class may be sufficient to warrant certification." *Dukes,* 603 F.3d 571 at 599 (citations and internal quotation marks omitted).

Here, the common issues are clear:

| Claim | Common Issues |
|---|---|
| Electronic Funds Transfers and related UCL Claims | <ul><li>CashCall collects payments multiple times within a given month from borrowers who are delinquent, without authorization.</li><li>In its take-it-or-leave-it contract, CashCall requires borrowers to agree to make payments through EFTs and its cancellation policy violates the EFTA.</li></ul> |
| Rosenthal Act Claims and related UCL Claims | <ul><li>CashCall employs uniform and automated collection emails and letters would mislead and deceive the "least sophisticated consumer" into believing he/she has to make payments through MoneyGram or with other certified funds.</li><li>CashCall's standardized EFT practices (that is, multiple monthly withdrawals, conditioning) are unlawful debt collection methods in violation of the Rosenthal Act.</li><li>Whether CashCall's automated telephone collection system annoys, abuses, and harasses its customers with excessive and unnecessary telephone calls.</li></ul> |
| Unconscionable, Unfair and Unlawful Loan Terms | <ul><li>CashCall charges an interest rate of 90% or higher on its $2,600 loan products.</li><li>CashCall systematically fails to take into account the borrowers ability to repay the loan, requiring aggressive collection practices.</li><li>The terms of CashCall's loan, which are the same for each borrower, including the length of repayment, the interest only structure, and the high interest rate, are unfair.</li></ul> |

6

3.     **Plaintiffs' Claims Are Typical of the Class under Rule 23(a)(3).**

Rule 23(a)(3) requires that the claims of the representative plaintiff be typical of those of the class.  Commonality and typicality "tend to merge," such that factors that support a finding of commonality also support a finding of typicality.  *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 158 n.13 (1982).  A plaintiff demonstrates typicality by showing that the "unnamed class members have injuries similar to those of the named plaintiffs and that the injuries result from the same, injurious course of conduct."  *Armstrong v. Davis*, 275 F.3d 849, 869 (9th Cir. 2001) (citations omitted).

With respect to the EFTA claims, each of the three Plaintiffs were subjected to the identical practices as other members of the Class, i.e., multiple draws and conditioning.  (Exs. 7-9; *see also* Exs. 27-29.)  Plaintiffs and the Class thus are in a materially identical position vis-à-vis CashCall with respect to these practices.  Plaintiffs were also required to agree to make payments by EFT in order to have their loan funded.  (Ex. 10 at CC 445; Ex. 11 at P0352; Ex. 12 at P0238-39.)  Plaintiffs and the Class are in a materially identical position with respect to these practices as well.

With respect to the Rosenthal Act, Plaintiffs were subjected to the identical practices as the members of the Class, including receiving the sane misleading collection letters and emails (Exs. 17-19, 30-37), being subjected to the same illegal collection methods (that is, the violations of the EFTA), and being harassed by the same telephone collection system and procedures.  This is, in large part, because CashCall's debt collection methods are highly automated.  (*E.g.,* Ex. 22 at CC 946, 979, 989-90.)

With respect to the claims based on the loan terms, each of the Plaintiffs' loans was made at an unconscionably high interest rate, without CashCall acting in regard for their ability to repay the loan and under consumer adhesion contracts that were unfair and one-sided.  (Ex. 10 at CC 443; Ex. 11 at P0350; Ex. 12 at P0236; Ex. 13 at 175:4-15; 236:12-237:1.)

In sum, Plaintiffs' claims arise from the same facts and legal theories as the Classes and are, therefore, typical.  No peculiar circumstances apply to the Plaintiffs which distinguish their claims, or CashCall's treatment of them, from other class members.

//

//

#### 4. Plaintiffs and Plaintiffs' Counsel Adequately Represent the Class under Rule 23(a)(4).

The focus of the adequacy of representation inquiry is: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  *Hanlon*, 150 F.3d at 1020 (citation omitted).

As to these requirements, the law firms that Plaintiffs hired to represent them, The Sturdevant Law Firm and Arthur Levy, have extensive experience in prosecuting complex consumer protection class actions.  (Decl. of James C. Sturdevant ("Sturdevant Decl.") ¶¶ 3-20; Decl. of Arthur Levy ("Levy Decl.")  ¶¶ 4-12.)  Proposed Class Counsel are qualified, experienced and able to conduct the proposed litigation, as evidenced by the supporting declarations.  (*Id.*)

Second, Plaintiffs O'Donovan, De La Torre, and Saysourivong's interests are aligned with those of the Classes.  (*See generally* Decl. of Eduardo De La Torre ("De La Torre Decl."), filed herewith; Decl. of Lori Saysourivong ("Saysourivong Decl."), filed herewith; Ex. 20 at 94:2-95:11.)  As noted above, Plaintiffs' claims are the same as the Classes', and they seek identical relief sought for Class members.  Plaintiffs share the interests of the Classes and have pursued this by actively participating in the litigation.  (De La Torre Decl. ¶ 4; Saysourivong Decl. ¶ 8; Ex. 20 at 94:2-95:11.)  Further, they do not have any conflict of interest with the Classes.  Plaintiffs and proposed Class Counsel will therefore adequately represent the Classes.

### B. COMMON ISSUES PREDOMINATE UNDER RULE 23(b)(3) FOR THE NATIONAL CLASS.

Rule 23(b)(3) requires a finding that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

#### 1. EFTA Claims.

##### A. The Multiple Sweeps or "Double Dipping" Claim.

All CashCall loans begin with payments being made by preauthorized electronic fund transfers ("EFTs" or "ACHs") out of the customer's bank account.  (Ex. 26 at 68:10-22; 69:4-7.)

CashCall's standard form Promissory Note and Disclosure Statement contains an "Electronic Funds Authorization," which allows CashCall to process a scheduled EFT for monthly payments.  The authorization states as follows:

> I hereby authorize CashCall to withdraw my scheduled loan payment from my checking account on or about the FIRST day of each month.  I further authorize CashCall to adjust this withdrawal to reflect any additional fees, charges or credits to my account.  I understand that CashCall will notify me 10 days prior to any given transfer if the amount to be transferred varies by more than $50 from my regular payment amount.  I understand that this authorization and the services undertaken by CashCall in no way alters or lessens my obligations under the loan agreement.  I understand that I can cancel this authorization at any time (including prior to my first payment due date) by sending written notification to CashCall.  Cancellations must be received at least seven days prior to the applicable due date.

(Ex. 11 at P0352.)  Plaintiffs' promissory notes are all typical of this standard Promissory Note.  (*Compare* Exs. 10-12 *with* Ex. 38.)

All payments under CashCall loans are due on the first day of the month.  (Ex 22 at CC 944; Ex. 26 at 90:24-91:19; 93:6-8.)  However, CashCall generally permits the customer to change the scheduled EFT date from the first of the month as set in the standard contract to the 3rd, 5th, 10th, 15th, or 22nd day of the month.  (Ex 22 at CC 944, 956, 1021; Ex. 26 at 91:20-24; 92:10-21.)

If CashCall processes an EFT on the scheduled day of the month to collect a regular installment payment, and the EFT is returned unsatisfied, CashCall then attempts to collect the same installment a second or third time during the same month.  (Ex. 26 at 117:2-118:6; 119:22-120:1; 121:5-122:18; Ex. 22 at CC 981, 983, 984, 986.)  The second and third EFTs occur randomly according to a schedule that CashCall sets.  (Ex. 26 at 125:6-18; 130:16-131:14.)

During the first 30 days of delinquency, CashCall calls this double dipping a "Rerun ACH."  (*Id.* at 117:2-126:18*.*)  After 30 days of delinquency, the process is then called a "Backend ACH."  (*Id.* at 143:19-145:22; 147:17-148:11.)  These "Rerun ACHs" and "Backend ACHs" are identified as such in CashCall's Payment Transaction Histories and Customer Contact ("Servicing Transaction") Logs.  (*Id.* at 136:9-137:7; 145:23-146:1; Ex. 7 at CC 512-13; Ex. 8 at CC 6417, 6427-28; Ex. 9 at CC 309-13; Ex. 27 at CC 479, 482-83, 491; Ex. 28 at CC 6432-33, 6444, 6491; Ex. 29 at 19, 22, 26, 28-29, 37-41.)

The EFTA requires that "[a] preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer *only in writing*, and a copy of such authorization shall be provided to the consumer when made."  15 U.S.C. § 1693e(a) (emphasis added).   The only written customer authority for EFTs is in the Promissory Notes, which do not authorize CashCall to run multiple sweeps for the same payment.  The Promissory Notes permit withdrawals for the installment loan payment on or about the 1st of the month (or another single agreed scheduled date), but the Rerun and Backend ACHs are not run "on or about" the scheduled EFT date – instead, they are run later in the month on days of CashCall's choosing.  (Ex. 26 at 121:5-122:18, 125:21-126:9, 144:3-15.)

CashCall's authority to debit customer bank accounts is limited to collection of the customer's scheduled installment payment on or about a single specified, recurring day of the month, and does not allow multiple EFTs during a single month.  CashCall's Rerun and Backup ACHs are unauthorized raids on its customers' bank accounts according to a schedule that CashCall unilaterally sets, without customer consent.  These serial withdrawals can seriously disrupt a consumer's bank account.

Like the rest of the Class, Plaintiffs were subjected to multiple EFTs in the same month. CashCall conducted "Rerun" and/or "Backend" ACHs on all three Plaintiffs' accounts.  CashCall ran Rerun ACHs on Plaintiff De La Torre's bank account on June 21, 2007 and Backend ACHs on his account on August 2, August 9, and August 16, 2007.  (Ex. 7 at CC 512-13.)  CashCall ran Rerun ACHs on Plaintiff O'Donovan's account on May 11, May 18, May 25, August 4, August 10, November 9, and December 6, 2006, and on May 4, July 6, and August 9, 2007.  (Ex. 9 at CC 309-13.)  CashCall ran a Rerun ACH on Plaintiff Saysourivong's account on January 5, 2007 and Backend ACHs on January 13 and December 7, 2009 and January 11, 2010.  (Ex. 8 at CC 6417, 6427-28.)  As the Plaintiffs' experience demonstrates, the questions of law or fact arising from this claim are common to the Class.

CashCall's Rerun ACHs and Backend ACHs violate the requirement of § 1693a(1) that a customer give written authorization for a preauthorized EFT.  Accordingly, class members whose CashCall Loan Transaction History and Servicing Transaction Logs reflect these illegal "ACH"

1  transactions have a remedy under the EFTA to redress CashCall's common illegal practice and

2  common proof of this claim predominates.

3      The EFTA provides that "any person who fails to comply with any provision of this

4  subchapter with respect to any consumer, except for an error resolved in accordance with section

5  1693f of this title, is liable to such consumer" for "actual" and statutory damages.  15 U.S.C.

6  § 1693m(a).  Here, actual damages include funds unlawfully collected and bank NSF fees if the

7  collection EFTs are returned unsatisfied.

8      Statutory damages under the EFTA are recoverable without regard to any showing of harm or

9  actual damages.  *DeMando v. Morris*, 206 F.3d 1300, 1303 (9th Cir. 2000) ("[i]n a class action, a

10  lender liable for a TILA violation is subject to statutory damages even in the absence of any actual

11  damages"; construing similar provision of the Truth in Lending Act, 15 U.S.C. § 1640(a)(2));

12  *Edwards v. Your Credit Inc.*, 148 F.3d 427, 441 (5th Cir. 1998) (same).  The EFTA specifically

13  authorizes class-wide statutory damages awards.  15 U.S.C. § 1693m(a)(2)(B).

14      The common questions of the existence and legality of CashCall's automated and routine

15  EFT practice predominate over any individualized issue of the amount of each class member's actual

16  damages.

17              **B.    *The Conditioning Claim.***

18      Likewise, common issues predominate Plaintiffs' claim that CashCall illegally conditioned

19  the extension of credit on customer agreements to electronic payment.  CashCall engaged in the

20  classwide practice of requiring loan applicants to click on a box below "ELECTRONIC FUNDS

21  AUTHORIZATION AND DISCLOSURE," stating "I understand CashCall's payment collection

22  policy[3] and authorize electronic debits from my bank account." (Ex. 11 at P0352.)

23      Each class member was required to sign the standard Promissory Note containing this

24  requirement.  (Exs. 10-12, 38; Ex. 13 at 175:4-15, 236:12-237:1; Ex. 26 at 69:4-7.)  CashCall would

25  not fund a loan unless the customer clicked the box agreeing to EFT payments.  (Ex. 3 at CC 846-

26  50.)

27  _____

   [3]      This refers to the authorization of EFTs for the recurring monthly payment on the first

28  or other scheduled day of the month.

Section 1693k(a) flatly forbids this practice:  "No person may – (1) condition the extension

of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund

transfers."  15 U.S.C. § 1693k(1).  Therefore, the entire Class has uniform claims for actual and

statutory damages under section 1693k(1).  Common issues, again, predominate.

### C.     The Cancellation Claim.

CashCall's policy of requiring customers to submit a written request for cancellation of their

authorization for CashCall to deduct an EFT seven days prior to the withdrawal date is universal to

the Class because it is included in the promissory note and the notes signed by each of the Plaintiffs.

(Exs. 10-12, 38.)  This requirement is a violation of the EFTA on its face, which permits a consumer

to stop payment of a preauthorized electronic fund transfer by notifying either orally or in writing up

to three business days prior to the scheduled date of the transfer.  15 U.S.C. § 1693e(a).

Accordingly, this claim is appropriate for class certification.

### 2.     Rosenthal Act Claims.

California Civil Code § 1788.17 subjects creditors to the federal remedies under § 1692k,

including statutory damages[4] and class actions.  The courts have accordingly interpreted the

Rosenthal Act as allowing class actions, and have certified Rosenthal classes.  *Gonzalez v. Arrow*

*Fin. Servs., LLC*, 233 F.R.D. 577 (S.D. Cal. 2006) (certifying class under Rosenthal Act); *Palmer v.*

*Stassinos,* 233 F.R.D. 546 (N.D. Cal. 2006) (granting certification motion in part); *McDonald v.*

*Bonded Collectors, LLC*, 233 F.R.D. 576 (S.D. Cal. 2005) (class certified).

### A.     Misleading and Deceptive Collection Communications.

CashCall has an automated collection system that generates form collection letters and emails

depending on the nature of a delinquency.  Plaintiffs challenge four standardized CashCall collection

communications under the Rosenthal Act.  Each of these communications would lead the least

sophisticated consumer to believe he/she was obligated to pay CashCall using certified funds, and

---

[4]     The FDCPA includes a statutory damages provision that is parallel to the similar provisions under the EFTA and the TILA.  15 U.S.C. § 1692k.  This is incorporated into the Rosenthal Act.  Cal. Civ. Code § 1788.17.  Therefore, as noted above, actual damages need not be shown to establish a claim for statutory damages under the federal or Rosenthal Acts.

would be in further violation and subject to adverse consequences if he/she paid with a personal check or cash.

EFTs are CashCall's "primary and preferred" method of payment.  (Ex. 22 at CC 944, 956; Ex. 26 at 68:23-69:12.)  Customers, of course, may use other forms of payment, including personal checks.  (Ex. 21 at 169:2-170:25; Ex. 26 at 73:8-74:16.)  However, when a loan is delinquent, CashCall's presses customers for payments by MoneyGram or other certified funds.   (Ex. 26 at 84:4-21; 97:21-98:1; 101:10-22; Ex. 21 at 170:22-25; Ex. 22 at CC 984.)  Certified funds benefit CashCall while costing the customer time, inconvenenience and fees – about $7.00 in the case of a MoneyGram.

CashCall uses standardized emails and letters that falsely suggest to customers that they *must* make up their payments with certified funds.  These communications violate the Rosenthal Act.

CashCall sends a form letter and/or email to customers whenever an EFT is returned unpaid by the customer's bank.  This form states:

> Your loan is now past due and you must immediately replace this payment via a MoneyGram transaction in the amount of [$ ---] (see instructions below).

(Ex. 17; Ex. 26 at 164:9-165:8.)  The instructions state:  "To find a MoneyGram location near you, please visit MoneyGram.com or contact a CashCall agent at [telephone number]."  (*Id.*)  CashCall sent several of these notices to Plaintiffs.  (*E.g.,* Exs. 17-19.)

CashCall also uses a form "breach" letter and/or email, which it sends to borrowers when the account is more than 30 days delinquent.  This form states:

> You have breached your contract and your [Loan #] with CashCall, Inc. is now in default.  You must bring the loan current by sending the amount shown below to CashCall, Inc. in the form of a Moneygram, money order or certified check.

(Ex. 30; Ex. 21 at 164:3-16.)  CashCall likewise sent several of these notices to Plaintiffs.  (*E.g.,* Exs. 30-32.)

Similarly, CashCall uses a form "breach of promise to pay" letter and/or email asserting the same standard MoneyGram demand, which it sends to borrowers if they have not paid according to a promise to pay ("PTP") a CashCall collector has entered into the CashCall automated collection system.  (Ex. 33; Ex. 21 at 165:6-166:4; 167:6-17.)  CashCall sent these notices to Plaintiffs, as well.

13

1   (*E.g.,* Exs. 33-34.)  Additionally, CashCall uses a form "every opportunity" letter/email, which it

2   sends to borrowers when the loan becomes 60 days delinquent.  This form letter also demands

3   payment by MoneyGram, stating "Please note that payments must be made with certified funds only

4   (cashier's check payable to CashCall or a money transfer via MoneyGram Express Payment,

5   Receiver code 3299)."  (Ex. 35; Ex. 21 at 167:24-168:23.)   CashCall sent several of these notices to

6   Plaintiffs.  (*E.g.,* Exs. 35-37.)

7          Title 15, section 1692e prohibits "any false, deceptive, or misleading representation or means

8   in connection with the collection of any debt."  15 U.S.C. § 1692e.  A statement is false, deceptive or

9   misleading under the Act if it is likely to mislead the least sophisticated consumer.  *Clomon v.*

10  *Jackson*, 988 F.2d 1314, 1318 (2d Cir. 1993) ("The basic purpose of the least-sophisticated-

11  consumer standard is to ensure that the FDCPA protects all consumers, the gullible as well as the

12  shrewd.  This standard is consistent with the norms that courts have traditionally applied in

13  consumer-protection law.").

14         The Ninth Circuit has adopted the least sophisticated consumer standard.  *Swanson v. S. Or*

15  *Credit Serv., Inc.*, 869 F.2d 1222, 1225 (9th Cir. 1988).  The standard is objective.  *Id.* ("[a]lthough

16  this standard is objective, the standard is lower than simply examining whether particular language

17  would deceive or mislead a reasonable debtor").  Because CashCall's practice in sending the

18  communications is uniform and the likelihood to deceive is a single objective, class-wide

19  determination, common issues predominate on the Rosenthal Act deception claims.

20         Plaintiffs intend to show at trial that CashCall's communications would lead the least

21  sophisticated consumer to believe that he/she had to respond to these letters by paying with certified

22  funds, most notably MoneyGrams.  By insisting on certified funds, CashCall left the misleading

23  impression that a borrower who failed to pay with certified funds would suffer adverse

24  consequences, such as rejection of the payment and legal action.

25         The CashCall Promissory Notes do not require certified payments.  (Exs. 10-12, 38.)

26  CashCall borrowers are legally entitled to pay with personal checks, or cash if they choose, and

27  CashCall accepts these forms of payment from a borrower.  (Ex. 21 at 169:2-170:25; Ex. 22 at

28  CC 984.)

1    CashCall has the right to prefer MoneyGram.  But CashCall has no right to insist that "you

2  *must immediately replace* this payment via a MoneyGram transaction."  (Exs. 17-19.)  That is a

3  misleading and deceptive collection communication in violation of the Rosenthal and federal Acts.

*B.    EFT Violations.*

5    The claim based on multiple EFTs in a single month (double dipping) is also actionable

6  under the Rosenthal Act because it is an illegal collection practice.  *E.g.*, 15 U.S.C. §§ 1692e(5) &

7  1692f(1).  Common issues therefore also predominate on the parallel claim under the Rosenthal Act.

*C.    Telephone Harassment Claim.*

9    Plaintiffs seek to certify a class under the Rosenthal Act based on CashCall's

10 systematic use of telephone collection calls to coerce customers to pay and keep on paying.

11 CashCall's automated telephone system is designed to generate a huge and repeating volume of

12 annoying collection calls.  Plaintiffs contend this system generates so many and such frequent calls

13 that it violates the fair debt collection laws.

14    CashCall's telephone collection practices are automated and systematized, so they apply

15 uniformly to the National Class.  CashCall's Servicing Transaction Logs for the three Plaintiffs show

16 a shocking number of outgoing CashCall telephone calls.  For example, on December 15, 2006,

17 CashCall dialed Mr. De La Torre eight times in the space of about four hours.  (Ex 27 at CC 505.)

18 This call volume is repeated and not unusual.  (*Id.* at CC 463, 481-96; 499-500.)  The logs of

19 Plaintiffs O'Donovan and Saysourivong show similar volumes of outgoing call activity.  (Exs. 28-

20 29.)  Plaintiffs testified to the painful and disruptive consequences of the CashCall telephone

21 collection system on customers.  (Saysourivong Decl. ¶ 7; Ex. 20 at 112:7-24; 113:11-115:24;

22 153:22-156:1; 157:20-158:4; Ex. 16 at 33:10-36:10; 42:16-22; 46:13-20.)

23    The Rosenthal Act bars a creditor from "[c]ausing a telephone to ring repeatedly or

24 continuously to annoy the person called" and from "[c]ommunicating, by telephone or in person,

25 with the debtor with such frequency as to be unreasonable and to constitute harassment to the debtor

26 under the circumstances."  Cal. Civil Code §§ 1788.11(d) & (f).  The federal Act likewise prohibits

27 "engag[ing] in any conduct the natural consequence of which is to harass, oppress, or abuse any

28 person in connection with the collection of a debt."  15 U.S.C. § 1692d.  This includes "[c]ausing a

15

telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number." 15 U.S.C. § 1692d(5).

CashCall's Loan Servicing Manual states CashCall's collection philosophy of using frequent and repeated customer contact, not only to effect payments that are due, but also to deter customers from even considering not paying in the future:

> The operating philosophy of the Cash Call Loan Servicing Department is to protect company investments *by maintaining frequent and continued contact with the customer in order to effect timely and accurate payment*, resolve customer questions and inquiries, remedy delinquencies, *discourage future delinquencies*, prevent charge-offs, and where necessary, recover funds through the legal process in a manner that is consistent with the customer-service oriented mission of CashCall, Inc. and the guidelines established by the Fair Debt Collections Practices Act.

(Ex. 22 at CC 941 (emphasis added); Ex. 21 at 132:15-25.)

CashCall has put this philosophy into practice using a "predictive dialer," a pre-programmed automated dialing system that broadcasts calls to customers and then blindly routes the answered calls to the next available CashCall collection agent. CashCall then allows the collector only a minute or two to wrest a "promise to pay" out of the customer.

A predictive dialer is an automated dialer system that is programmed to call a queue of delinquent customers. (Ex. 21 at 35:5-8; 144:9-145:14.) The predictive dialer repeatedly dials a given customer until a human being answers, and then routes the call to a random available collector. (*Id*. 150:10-23.) The customer's account information and status then pop up on the collector's screen. (*Id*. 154:10-16.) The collector has no prior familiarity with the customer's account; during the collector's 15-20 seconds of introductory comments to the customer, the collector must familiarize him/herself with the customer's account and delinquencies. (*Id*. at 155:17-156:20.)

The touchstone of this system is that CashCall collectors must handle an extremely high volume of two-minute collection calls in which collectors pressure the customer to make a "promise to pay." A "PTP" (promise to pay) is a "promised pay date from each delinquent customer." (Ex. 22 at CC9 948; Ex. 21 at 130:21-131:4.) CashCall collectors are required to establish a PTP for each delinquent account and to follow up to ensure that the promise is kept. (*Id*.) CashCall considers obtaining a promise to pay of the utmost importance, the "successful resolution" of a collection call. (Ex. 21 at 83:15-25; 139:24-141:23; 152:4-9; 169:22-25; Ex. 22 at CC 979.)

1    Collectors are not only expected to have a high percentage of PTPs to calls made; they are
2    compensated for their success in obtaining PTPs.  (Ex. 21 at 111:22-114:11.)

3         CashCall allows collectors only a very short time for each call.  Front-end collectors (who
4    handle loans that are less than 30 days delinquent) must attempt an average of about 30 calls per
5    hour, or one every two minutes.  (Ex. 21 at 92:24-101:10.)   "Backend" collectors who handle
6    accounts 30-59 day delinquencies must average 150 or more calls per day.  (*Id.*)  Based on a 7-1/2
7    hour day, this is about 20 calls per hour, or one every three minutes.  (Ex. 21 at 96:25-97:17.)

8         During a call, the collector gives an introductory explanation of the call, which lasts about
9    15-20 seconds.  (Ex. 21 at 154:10-156:20.)  At the end of the call, he/she has 30 seconds to "wrap"
10   the call by making necessary notes in the loan servicing system.  (*Id.* at 102:8-13; 103:23-25.)
11   Therefore, the evidence is that CashCall front-end collectors are only allowed roughly two minutes
12   per call to talk with the customer about the situation and get the PTP.  The backend 30-59 day
13   collectors are allowed an average only about 3-1/2 minutes per call to deal with more seriously
14   delinquent accounts.

15        During the dialer campaigns conducted by CashCall's "front-end" and 30-59 day teams,
16   customers have no practical means of calling the same collector back.  (*Id.* at 156:21-158:6; 160:5-
17   16: 161:13-24.)  Therefore, during the first 60 days of delinquency, the customer will generally
18   speak with a different collector each time, each new collector beginning the call with scarcely any
19   knowledge of the customer's situation.

20        If the collector succeeds in getting a PTP from the customer, the PTP is logged into the
21   CashCall loan servicing system.  (*Id.* at 129:21-131:11.)  If no PTP is obtained or if the customer
22   does not pay a PTP, then the entire autodial procedure is rerun to compel a new PTP.  (*Id.* at 103:12-
23   22; 152:22-153:11.)  The CashCall collection system barrages the customer with telephone calls.
24   This uniform telephone collection system is not designed to collect; it is designed to annoy, abuse,
25   and harass customers into paying and to keep them paying to avoid another episode of innumerable
26   calls and abuse.  (*See, e.g.,* Huston Decl. ¶ 3 & Exs. 44-47.)  The system is geared to discouraging
27   delinquency by letting the customer know that missing a CashCall has the serious consequence of a
28   more rounds of repeated, annoying, and disruptive telephone calls that can only be ended by

17

scraping together a payment.

### 3.   Claims of Unlawful, Unfair and Fraudulent Conduct under the UCL.

The UCL prohibits businesses from engaging in "any unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.  Business practices violate the UCL if they are unlawful, unfair *or* fraudulent.  *Cel-Tech Commc'ns Inc. v. L.A. Cellular Tel. Co.,* 20 Cal. 4th 163, 180 (1999); *Stop Youth Addiction Inc. v. Lucky Stores, Inc.,* 17 Cal. 4th 553, 560 (1998).  Plaintiffs have alleged violations of the unlawful and unfair prongs of the UCL as independent bases for class-wide relief.  Each of these claims for violations of the UCL claim should be certified.

### A.   The Unlawful Prong of the UCL

Plaintiffs allege that CashCall has engaged in unlawful business practices based on their violations of the EFTA, the Rosenthal Act,[5] California Financial Code § 22302, California Civil Code § 1670.5, and California Financial Code § 22150 and its accompanying regulation, 10 C.C.R. § 1452.

### i.   Cal. Financial Code § 22302 and Cal. Civil Code § 1670.5.

Plaintiffs allege that CashCall makes loans with unconscionable annual percentage rates of 90% or higher,[6] in violation of California Financial Code § 22302, California Civil Code § 1670.5, and the UCL.  As with Plaintiffs' other claims, a determination of CashCall's liability may be made on a classwide basis based upon common proof.

It is CashCall's conduct in making loans at these unconscionable interest rates – not the individual conduct or situation of each class member who borrowed from CashCall – that will be the focus of the Court's inquiry in determining the legality of this practice.  Because CashCall's conduct

---

[5]    Plaintiffs' claims for violation of the EFTA and the Rosenthal Act, as described above in section IV.B. are appropriate for class treatment.  As such, the UCL claims, under the unlawful prong, predicated on the EFTA and the Rosenthal Act, are also suitable for class treatment.  Because the National Class claims alleging violations of these statutes are predicated on the unlawful prong of the UCL, the class runs four years prior to the filing of this case (on July 1, 2008).  Cal. Bus. & Prof. Code § 17208.  Other than this longer statute of limitations periods, there is no difference in the analysis of these claims under the UCL unlawful prong.

[6]    According to CashCall's website, its current interest rate for loans of $2,600 is 139.34%.  CashCall Rates Page, http://www.cashcall.com/General/Rates.aspx, last visited June 1, 2010.

is identical for each class member, the determination of CashCall's liability under § 22302 and

§ 1670.5 will be made as to all class members based upon common proof and a common ruling.  *See,*

*e.g., Tomlin v. Dylan Mortg., Inc.*, 2002 WL 32986130, at *2 (N.C. Super. Ct. Feb 1, 2002)

(certifying class action challenging usury rates and finding "[n]either the interpretation of the statute,

which is hotly disputed, nor the methodology of the application" of the remedy will change between

class member); *Violette v. P.A. Days, Inc.*, 214 F.R.D. 207, 215 (S.D. Ohio 2003) (finding that

"liability will be analyzed in terms of its standard policies and procedures, which affected each class

member" in case alleging interest charges violate consumer protection statutes); *Car Now*

*Acceptance Co. v. Block*, 2002 WL 32001272, at *5 (Ohio Com. Pl. 2002) (question of whether

interest charged of class member violated law raised questions common to the class), *aff'd*, *N. Shore*

*Auto. Fin., Inc. v. Block*, 2003 WL 21714583 (Ohio App. 8 Dist. 2003).

California imposes the usury limit on CashCall's loans of "unconscionable."  Cal. Fin. Code

§ 22302.  California Financial Code § 22302 states:  "A loan found to be unconscionable pursuant to

§ 1670.5 of the Civil Code shall be deemed to be in violation of this division and subject to the

remedies specified in this division."  Section 1670.5 of the Civil Code permits a court to void or

rescind a contract which it finds to be unconscionable at the time the contract was made.  Cal. Civ.

Code § 1670.5.  That determination can be made on a class-wide basis because it is premised on

CashCall's interest rate, which was applied uniformly to all class members.

Ultimately, at the merits stage of this case, whether 90% or higher is an unconscionable

interest rate will be a judicial determination.  *See* Legislative Comm. cmts, Cal. Civ. Code § 1670.5

("[s]ection 1670.5 is intended to make it possible for courts to police explicitly against contracts or

clauses which they find to be unconscionable"); *Carboni v. Arrospide,* 2 Cal. App. 4th 76 (1991)

(court found interest rate charged on a home loan was unconscionable); *see also Ting v. AT&T*, 319

F.3d 1126, 1151 (9th Cir. 2003) (fee-splitting provision in telecommunication carrier's contract was

unconscionable; *Perdue v. Crocker Nat'l Bank*, 38 Cal. 3d 913, 928 (1985) (the California Supreme

Court, citing numerous price unconscionability cases, found that "NSF" fees could be

unconscionably high), *appeal dismissed*, 475 U.S. 1001 (1986).

The unconscionability analysis will turn on the standard interest rate that CashCall charged in

each of its transactions with class members who purchased the $2,600 loan product and were charged an interest rate of 90% or higher.  Courts look both at procedural unconscionability (this "generally takes the form of a contract of adhesion, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it") and substantive unconscionability (this "may take various forms, but may generally be described as unfairly one-sided").  *Discover Bank v. Super. Ct.*, 36 Cal. 4th 148, 160 (2005) (citation and internal quotation marks omitted).

Here, both of these components can be proven on a class-wide basis.  The procedural component of unconscionability will be proven by establishing that CashCall's promissory notes are adhesion contracts, offered on a take-it-or-leave-it basis.  *Id.*; *Gatton v. T-Mobile USA, Inc.*, 152 Cal. App. 4th 571, 583 (2007); *Little v. Auto Stiegler, Inc.*, 29 Cal. 4th 1064, 1071 (2003).  This will be the same inquiry for all class members.  (*See* Ex. 13 at 175:4-15, 236:12-237:1, 239:12-242:25.) Similarly, the substantive unconscionability analysis looks at the fairness of the terms in dispute – here whether that interest rate was unfairly one-sided – which also requires a single determination for all class members.  *Pokorny v. Quixtar, Inc.,* 601 F.3d 987, 997-98 (9th Cir. 2010); *see also A & M Produce Co. v. FMC Corp.,* 135 Cal. App. 3d 473, 487 (1982) (stating that substantive unconscionability is also reviewed by considering whether the contract terms are an overly harsh allocation of risks or costs that are unjustified).  Courts routinely find substantive unconscionabilty by focusing on the fairness of contract terms, without regard to the particular circumstances of the individual who signed the contract.  *See, e.g.*, *Shroyer v. New Cingular Wireless Servs., Inc.*, 498 F.3d 976, 986 (9th Cir.2007) (determining the unconscionability of a class action waiver based on the terms of the waiver); *Perdue*, 38 Cal. 3d at 926-27 (finding that the cost of NSF fees could be substantively unconscionable by reviewing the basis and justification for the price"); *Jones v. Déjà Vu, Inc.*, 419 F. Supp. 3d 1146, 1150 (N.D. Cal. 2005) (determining that a contract provision which shortened a statute of limitation to less time than provided by statute was unconscionable based on that conflict with public policy).

Common evidence of substantive unconscionability will show that CashCall offered its standard $2,600 loan product at 90+% interest uniformly on a class-wide basis.  Plaintiffs will prove

on a class-wide basis that CashCall's high interest rate was one-sided and well outside of industry norms.  (Decl. of Gregory Pinsonneault ("Pinsonneault Decl."),[7] filed herewith, ¶¶ 5, 10-16 (showing that data exists to compare CashCall interest rates to other lenders.))  This proof will be based on CashCall's common practice in imposing these interest rates and the unfairness of the loan terms common to the California Class.  (*See, e.g., id.*)  Thus, because CashCall offers this interest rate on this loan product across the board, common issue predominate.

ii.     California Financial Code § 22150 and 10 CCR 1452.

Plaintiffs allege that CashCall violates California Financial Code § 22150 with its practice of funding loans without regard for the borrowers' ability to repay the loan.  Section 1452 of Title 10 of the California Code of Regulations, which was promulgated pursuant to California Financial Code § 22150, provides that:

> When making or negotiating loans, a finance company shall take into consideration, in determining the size and duration thereof, the financial ability of the borrowers to repay the same, to the end that the borrowers should be reasonably [sic] to repay said loans in the time and manner provided in the loan contracts.

Cal. Code Regs. tit. 10, § 1452.

This claim – that CashCall routinely makes its loans beyond the customer's ability to repay loans – examines CashCall's common conduct in making loans without attention to whether the consumer could or could not repay the loan.  The proof of this claim does not demand an inquiry into each individual customer's specific financial situation, or a determination of whether individual class members actually could afford the loan, because the law requires that the *finance company* consider the borrower's ability to repay.  Proof of this claim will thus be a centralized inquiry unto CashCall's process (or lack thereof) for evaluating a borrower's ability to repay his/her loan prior to its funding.

Plaintiffs will establish that CashCall violates this law through common proof that focuses entirely on CashCall's practices.  For example, Plaintiffs will show that CashCall's business model assumes and relies upon its extensive collection efforts to make a profit because CashCall knows

---

[7]    The declaration of Gregory Pinsonneault is intended to provide this Court with an example of one of the means by which this claim can be proven on a class-wide basis, based on the data produced in discovery to-date, and not intended to prove the merits of the underlying claim.

1   that its borrowers will likely have difficulty paying back the loan.  *See generally* section IV.B.a.3.ii.

2   above.  Additionally, evidence of CashCall's systematic failure to comply with this requirement in

3   making its loans will be shown through a review of its inadequate underwriting practices.  (Ex. 3 at

4   CC 784, 796-98, 827; Ex. 48 at 28:2-29:11; 42:17-43:4; 81:14-19; 137:9-23; 166:14-23.)  This claim

5   thus turns on the common issue of CashCall's practices with regard to its financing of loans.

6                           B.       The Unfair Prong of the UCL

7          Plaintiffs allege that CashCall's business practices in offering loans with grossly one-sided

8   terms[8] (including the charging of excessively high interest rates, requiring repayment of 4-6 times

9   the original loan amounts, the extended loan maturities, charging of unfair and excessive fees

10  designed to extend the length of repayment) are unfair.  "Each prong of the UCL is a separate and

11  distinct theory of liability; thus, the 'unfair' practices prong offers an independent basis for relief."

12  *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (2009) (citing *S. Bay Chevrolet v. Gen. Motors*

13  *Acceptance Corp.*, 72 Cal. App. 4th 861, 886 (1999)); *see generally Smith v. Chase Mortg. Credit*

14  *Group*, 653 F. Supp. 2d 1035, 1045-46 (E.D. Cal. 2009) (an unfair claim need not be based on a

15  violation of a statute or a tort).  Although there is significant overlap between the claims asserted by

16  Plaintiffs alleging violations of the unlawful prong, violation of the EFTA and the Rosenthal Act, the

17  analysis under the unfair prong allows the Court to look at these practices cumulatively and

18  expansively to determine if CashCall's standardized loan terms are unfair in violation of the UCL.

19  Any one of CashCall's loan terms may be determined to be unfair in violation of the UCL, but,

20  Plaintiffs allege that, at a minimum, collectively the terms of CashCall's loans are unfair.

21         The legal test for the UCL's unfair prong is unsettled.  *Lozano v. AT&T Wireless Servs., Inc.,*

22  504 F.3d 718, 735-36 (9th Cir. 2007).  According to the Ninth Circuit, *id.* at 736, in consumers cases

23  the test may require that a UCL claim tied to a legislatively declared policy, *id*.; or be based on an

24  alleged act that "violates established public policy or if it is immoral, unethical, oppressive or

25

26         [8]       Plaintiffs' claim that CashCall's interest rate is unconscionable, in violation of
    California Financial Code Section 22303, alleges that the interest rate charged by CashCall is
27  unconscionable, standing alone.  With this unfair allegation, Plaintiffs allege that *all* of the terms of
    the loan, including, but not limited to, the interest rate are unfair.
28

1  unscrupulous and causes injury to consumers which outweighs its benefits," *McKell v. Wash. Mut.,*
2  *Inc.*, 142 Cal. App. 4th 1457, 1473 (2006) (citations omitted).

3         This claim is suitable for certification regardless of which test this Court uses to determine
4  the unfairness of CashCall's practices because the primary focus of both is on the practices of
5  CashCall.  If the unfair practices of defendants are sufficiently uniform, as is the case here, a
6  determination under the UCL unfair prong can be made on a classwide basis.

7         The common issues under the UCL unfair prong are CashCall's uniform practices in making
8  90+% interest loans on a take-it-or-leave-it basis that cost multiple times the amount of the loan and
9  take years to repay.  CashCall's practices of offering loans at exceptionally high interest rates of
10  nearly 100% (and higher), the length of repayment of the loan, the structure of the payments (e.g.,
11  interest only for nearly two years) are all common acts of CashCall that do not require an individual
12  inquiry into class members' circumstances.  (*See, e.g.*, Pinsonneault Decl. ¶¶ 15-16.)  The terms of
13  the loan are all non negotiable and offered on a take-it-or-leave it basis by CashCall.  (Ex. 13 at
14  175:4-15; 236:12-237:1; 239:12-242:25.)  Whether CashCall's business practices are unfair in
15  violation of the UCL can therefore be resolved on a class-wide basis.

16         **4.      Class Member Damages Do Not Create Individualized Issues.**

17         It is well-established that damages issues, standing alone, are insufficient to warrant denial of
18  class certification.  *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010)
19  (overturning a district court decision denying class certification because its concern that individual
20  damage issues predominated misinterpreted "this circuit's precedent regarding the significance of
21  individualized damages calculations in the context of class certification"); *Blackie*, 524 F.2d at 905
22  ("[t]he amount of damages is invariably an individual question and does not defeat class action
23  treatment").  Predominance "rests not on whether individualized damages determinations will be
24  necessary but on 'legal or factual questions that qualify each class member's case as a genuine
25  controversy.'"  *Thomas v. Baca*, 231 F.R.D. 397, 402 (C.D. Cal. 2005) (quoting *Amchem Prods.,*
26  *Inc. v. Windsor,* 521 U.S. 591, 623 (1997)); *see also Parra v. Bashas', Inc.*, 536 F.3d 975, 979
27  (2008) ("[t]he claimed difficulties in the calculations of damages, as they affected the various class
28  members, do not preclude class certification"); *Lockwood Motors, Inc. v. Gen. Motors Corp.*, 162

23

F.R.D. 569, 582 (D. Minn. 1995 ("[c]ourts routinely find Rule 23 (b)(3)'s predominance requirement satisfied despite the need for individualized damage determinations when the 'fact' of injury is common" (citations omitted)).

Accordingly, because damages issues cannot create such individualized issues that they predominate over the common class claims, this Court should grant class certification.

## C.   A CLASS ACTION IS A SUPERIOR MEANS FOR ADJUDICATING THESE CLAIMS.

Rule 23(b)(3) requires the Court to determine whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3). Superiority is established when class members would otherwise be unable to pursue relief because of the relatively high cost of litigation and the relatively low amount of recovery expected.  *Hanlon,* 150 F.3d at 1023*; see also Christakos v. Intercounty Title Co.,* 196 F.R.D. 496, 502 (N.D. Ill. 2000) ("this is a classic Rule 23(b)(3) class, with small or statutory damages brought by plaintiffs who allege similar mistreatment by a comparatively powerful defendant, one that, if the facts alleged were proved, otherwise might get away with piecemeal highway robbery by committing many small violations that were not worth the time and effort of individual plaintiffs to redress or were beyond their ability or resources to remedy").

Here, the stake of an individual Class member is insufficient to support individual litigation. The monetary recovery for an individual Class member is small relative to the cost and burden of individual pursuit of the claims.  (Levy Decl. ¶¶ 9-12.)  As the vigorous defense of this litigation of this case has already revealed, individual cases for these recoveries are unsustainable.  (*Id.*) Development of the evidence and legal issues, discovery, and expert witness requirements combine to pose costs and risks that are prohibitive for an attorney and client in the non-class setting.

//

//

//

//

//

1

**V.      CONCLUSION**

2

For all the foregoing reasons, the Court should certify the Classes, appoint Plaintiffs as Class

3

representatives, and appoint The Sturdevant Law Firm and Arthur D. Levy as Class Counsel.

4

Respectfully submitted,

DATED:   June 3, 2010

5

THE STURDEVANT LAW FIRM
A Professional Corporation

6

7

ARTHUR D. LEVY

8

By:   _/s/  Arthur D. Levy_____

9

ARTHUR D. LEVY
Attorneys for Plaintiffs

10

Z:\434 - O'Donovan v CashCall, Inc\Pleadings\Class Certification\Mtn Class Cert - MPA - FINAL.doc

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' MEM. OF POINTS AND AUTH. IN SUPPORT OF MOTION FOR CLASS CERTIFICATION      NO. CV 08-3174 MEJ