# Exhibit 16

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

KRISTA O'DONOVAN, and EDUARDO DE

LA TORRE, individually and on

behalf of all others similarly

situated,

         Plaintiffs,

   vs.               No. C 08-03174 MEJ

CASHCALL, INC., a California

corporation and DOE 1 through

DOE 3, inclusive,

         Defendants.

-------------------------------//

DEPOSITION OF EDUARDO DE LA TORRE

Tuesday, November 10, 2009

Pages 1 through 236

REPORTED BY:

YVONNE FENNELLY, CCRR, CSR NO. 5495

1   would call it an online contract.

2       Q.   But you understood that the terms that were

3   reflected in that online contract were the terms

4   that applied to your relationship with CashCall;

5   correct?

6       A.   Yeah.  Yes.

7       Q.   And tell me specifically what terms of your

8   contract with CashCall that you felt that CashCall

9   violated.

10      A.   I think that first and foremost was when

11  they would do ACH numerous times within a one-month

12  period.

13      Q.   Anything else?

14      A.   I would -- I would have to refer back to my

15  lawyer just to talk about further claims.

16      Q.   I -- but I'm here asking you questions

17  so --

18      A.   I understand.

19      Q.   -- you know, this is your lawsuit, it's not

20  your lawyer's lawsuit.  So I want to know from you,

21  in your own words, what terms of your contract that

22  you felt CashCall violated.

23      A.   Well, I gave you the first one.

24      Q.   Yes.

25      A.   I also felt that their method of trying to

1     Q.   So it's your best testimony, as you sit

2  here today, that those three contacts were, at some

3  point, within a two-month period that each of those

4  three were called; is that correct?

5     A.   Yes.

6     Q.   And that each of them was called one time

7  as far as you can recall?

8     A.   Right.

9     Q.   Okay.

10         Anything else other than contacting third

11  parties that you felt was harassment by CashCall in

12  trying to collect payments?

13     A.   Yes.  I would get numerous calls around --

14  at the rate of, like, ten times a day when there

15  would be numerous representatives from CashCall

16  calling me on my cellphone when I was at work, when

17  I was in class, and sometimes also, too, when I was

18  sleeping, because they would also call early,

19  sometimes.

20         I don't think that it was wrong for them to

21  contact me about the fact that I owed them money,

22  but I do think that once I told them that, like, I

23  wasn't going to be able to pay them until a certain

24  date, I felt that they should have stopped calling

25  me because nothing was going to change, at least

1   from my end.

2           And also, too, the fact that, you know, I

3   would say what was going on to one person, and they

4   would make note of it, and then I would get another

5   call pretty much the same day, or, like, a few

6   calls, and it was a different person calling for the

7   same reason but somehow didn't know that, like, I

8   had already talked to somebody else earlier in the

9   day.

10          So I felt that that was ineffective -- I

11  thought it was a waste of their time.  I thought it

12  was a waste of my time.

13          I told them numerous times that I was going

14  to be busy or that I was busy so that I could take a

15  phone call or that I could call them back during a

16  certain time period, but I was never listened to

17  because they would keep on calling back numerous

18  times, even right after I had gotten off the phone

19  with them.

20          And I would also get e-mails in my inbox,

21  and it was also written by different people.

22          And then I would also get written letters

23  to my home address.

24          So I felt that that was too much.

25      Q.    When you say you felt that was too much,

1  what do you mean by that?

2      A.    I felt that I was very open and clear as to

3  when I wasn't going to be able to make that monthly

4  payment.  So I felt that I was trying to make sure

5  that they wouldn't contact me further, whether

6  through phone or e-mail or letters.

7          I felt that it was harassment to have to

8  deal with so many people that seemed to not know,

9  you know, what I had just said, like, in the

10 previous hour or two hours.

11         So I felt that it was too much because I

12 couldn't go through my day without -- without having

13 to get a phone call in the middle of my class or

14 while I was at work, and, you know, wonder if I

15 should pick it up or not because I was going to say

16 the same thing that I had just said earlier --

17 earlier in the day.

18     Q.   So if -- I appreciate your answer and your

19 explanation of those things, and I just want to make

20 sure that I understand all the different elements of

21 that, because there's a lot of things that you said

22 in there.

23     A.    Sure.

24     Q.    So as I understand it, you earlier said you

25 felt that CashCall was harassing and they were

1   trying to collect payments from you and you talked

2   about contacting third parties, we went over that,

3   and then in this answer, the things that I

4   understand that you identified was, first of all,

5   that CashCall would make numerous calls in a single

6   day; is that correct?

7       A.   Correct.

8       Q.   You said up to ten calls in a single day;

9   is that right?

10      A.   I said at least ten.

11      Q.   What's the most number of calls you recall

12  receiving in a single day?

13      A.   I can't really say, and I don't want to

14  guess, so I'll just keep it at that.

15      Q.   Okay.

16           So the best you can say is at least ten; is

17  that right?

18      A.   Correct.

19      Q.   And when you say you received ten calls in

20  a day, that doesn't mean you actually spoke to

21  someone ten times from CashCall; is that right?

22      A.   Not all the time.

23      Q.   So there were ten calls that you might have

24  received that were -- that you didn't pick up or you

25  weren't there to pick it up or they were a voicemail

1    or something like that?

2         A.    Correct.

3         Q.    So ten calls means ten attempts by CashCall

4    to contact you in a single day; is that correct?

5         A.    Correct.

6         Q.    Okay.

7               And then you said you received calls while

8    you were sleeping.  What's the earliest time you

9    ever received a call from CashCall?

10        A.    I believe before 8:00 a.m.

11        Q.    When did they do that?

12        A.    That was -- well, I mean, I can't give you

13   an exact date, but it must have been when I was

14   unable to make a payment.

15        Q.    How many times do you recall receiving a

16   call from CashCall before 8:00 a.m.?

17        A.    A handful of times.  I can't give you an

18   exact figure, but a handful.

19        Q.    Did you receive a call from a live person,

20   or was that an automatic dialed call?  Could you

21   tell?

22        A.    I believe most of the times that I was

23   called before 8:00 a.m. it was an automated call.

24   And, you know, the reason I would know, too, is

25   because they would leave a message with a --

1    automated voice message.

2        Q.    Okay.

3            And then what's the latest time you

4    received a call from CashCall?

5        A.    Late evening.  I can't pinpoint the late

6    evening time.

7        Q.    Did you ever receive one after 9:00 p.m.?

8        A.    I don't recall.

9        Q.    What time did you typically wake up in the

10   morning?

11       A.    I usually woke up at around between 8:00

12   and 9:00

13       Q.    So you received numerous calls.  You

14   received a handful of calls before 8:00 a.m., and I

15   take it you regard that as harassment?

16       A.    I do.

17       Q.    You also had indicated that you talked to

18   different people at CashCall and one person wouldn't

19   know what you had told the other person; is that

20   correct?

21       A.    Correct.

22       Q.    And you considered that harassment?

23       A.    Yes.

24            I also considered that to be ineffective

25   and irresponsible on their behalf.

1    Q.   So let me just ask:  It wasn't so much that

2  you thought it was harassing you, it's just that the

3  people at CashCall didn't know what they were doing?

4    A.   No, I would say that I did feel like I was

5  being harassed because it was multiple people and

6  they were not nice people.  Ninety percent of the

7  time they were not nice.

8         I remember that, you know, just their tone;

9  they would scream, you know, like, not want to let

10  me get off the phone, even if I told them that I

11  couldn't be on the phone for long.  Very -- very,

12  very coercive at the very least verbally.

13    Q.   Tell me what you mean when CashCall people

14  would scream at you.

15    A.   They would say, you know, that I had to not

16  only pay them but that I would have to pay them

17  right away.  That I'd have to listen to them.  That

18  I had a loan to pay, you know, like this is what I

19  signed up for.  And that I should just -- should

20  pretty much make sure to -- you know, when I wasn't

21  able to, you know, like, give them new facts, I

22  guess -- I mean, that's when they seemed to hit a

23  wall because they realized that I wasn't going to be

24  able to make a payment within the timeframe that

25  they wanted me to.

1   questions about your experiences.

2       A.    Right.

3       Q.    So you've given me a general description of

4   your feeling that the CashCall representatives

5   weren't nice to you when they dealt with you.

6   You've given me specific examples, and what I'm

7   wondering is if we've exhausted all of that.

8           Is there anything else you can tell me

9   about how you felt that the CashCall representatives

10  were not being nice to you?

11      A.    Well, just on the -- I guess, like, on a

12  personable level, I wouldn't, like, add much else to

13  that.

14      Q.    Swearing?  Did that happen?

15      A.    I don't remember that, no.  I don't recall.

16      Q.    Threats?  Did those happen?

17      A.    Yes.

18      Q.    What kind of threats?

19      A.    Threats that they would actually -- that

20  they would actually try to garnish my wages, that

21  they would contact my workplace, which they did.

22  They would call the office line.  And that the ACH

23  would still go through even if I wasn't able to make

24  the payment.

25      Q.    Any other things that you can recall that

fbd87149-2d2e-4f1a-a82a-671bf57f0f7a

1      The way that I took it was just to, like,

2  pretty much like add another, how do you say it, to

3  add, like, another point of pressure where they can

4  maybe force me to make the payment.

5      So that's the way that I took it.

6  Q.   And did you tell the CashCall

7  representative that that's how you were taking their

8  statements about contacting your work?

9  A.   Well, I told them that I felt that calling

10  my workplace was not a method to force me to make

11  payment, and that they shouldn't contact my

12  workplace, which they didn't adhere to.

13  Q.   How many times did CashCall contact your

14  workplace?

15  A.   I know of a few times.  More than likely in

16  the high single digits.  But I can't tell whether

17  they contacted more when people didn't pick up.

18      I know as much because my boss would tell

19  me, or they would actually leave a message so I know

20  that it was a few times.

21  Q.   When they contacted your workplace, were

22  they calling for you?

23  A.   Yeah.  Yeah, they were.

24  Q.   So it's not that they were calling someone

25  else at your workplace and saying, Mr. De La Torre

1   you talked about, and CashCall harassing people --
2   harassing you in trying to collect a debt, I have
3   there are numerous calls, calls before 8:00 a.m.,
4   have multiple people calling you who didn't know
5   what the other person -- what you told the other
6   person, people were not nice to you.
7          You gave me a lot of reasons for that, and
8   we talked about threats that people had made, and we
9   went through all of those.
10         What other ways do you feel that CashCall
11  was harassing you in trying to collect your debt?
12     A.   Okay.
13         Did you mentioned when they went four times
14  into my checking account within a four-week period?
15  Which was in July 2007 through August 2007.
16         So if I didn't mention that, then you
17  should add it to the list.
18     Q.   I want to make sure I've got the whole
19  list.
20     A.   Yeah.
21     Q.   Okay.
22     A.   That's important.  Yes.
23         Let me --
24     Q.   Why don't we do this, Mr. De La Torre.
25  We've been going over an hour.  We'll take a break.

1          MR. SEILING:  Let me mark as

2     Exhibit 19 a one-page document.  It's an e-mail to

3     Mr. De La Torre's UC Davis account dated July 17th,

4     2007.  It's Bates labeled CashCall 000365.

5          (Document marked Exhibit 19

6          for identification.)

7     BY MR. SEILING:

8     Q.    Have you seen Exhibit 19 before,

9     Mr. De La Torre?

10    A.    No.

11    Q.    So this is -- this e-mail is indicating

12    that CashCall will be debiting your account on

13    July 17th for $30.

14         MR. LEVY:  Excuse me.  July 18th.

15    BY MR. SEILING:

16    Q.    July 18th.

17         And July 18th was not one of the normal

18    days.  The 18th of the month was not one of the

19    normal days that you would have ACH debits taken by

20    CashCall; is that correct?

21    A.    Right, correct.

22    Q.    So is it your testimony that you don't

23    recall receiving -- and I take it there were some

24    days during your dealings with CashCall when

25    CashCall made an ACH debit on a day other than the

1    one that you were expecting; is that right?

2         A.    Right, correct.

3         Q.    And is it your testimony that you don't

4    recall receiving an e-mail prior to CashCall making

5    those debits on scheduled days?

6         A.    Right.  I do not recall that.

7         Q.    So you don't recall ever getting an e-mail

8    to that effect?

9         A.    About the ones that were going in on a date

10   other than my ACH date, no.

11        MR. SEILING:  I want to mark as Exhibit 20

12   a one-page e-mail that's dated June 21st, 2007,

13   Bates labeled CashCall 000360.

14        (Document marked Exhibit 20

15        for identification.)

16   BY MR. SEILING:

17        Q.    And this is dated June 21st, 2007,

18   Mr. De La Torre.

19        Have you seen Exhibit 20 before?

20        A.    No.

21        Q.    And this also is reflecting that CashCall

22   will be making a debit to your account on June 22nd,

23   2007.

24        Now, I take it June 22nd was not a

25   normally-scheduled debit date; is that correct?

fbd87149-2d2e-4f1a-a82a-671bf57f0f7a

1    A.    Right, correct.

2    Q.    And you don't recall receiving an e-mail

3 from CashCall in June telling you that it would be

4 making an ACH debit on a date other than the one

5 that had been scheduled; is that correct?

6    A.    Right.

7    Q.    How is it, Mister -- and I assume,

8 Mr. De La Torre, is it your belief that CashCall

9 could only make one ACH debit attempt on your

10 account in any given month?

11    A.    I can't answer that question.  I don't know

12 what the law is.

13    Q.    I'm not asking about the law.

14    A.    Right.  Right.

15          But you're -- you're like -- I didn't know

16 that they could do an ACH more than once a month.

17    Q.    You didn't have an understanding one way or

18 the other?

19    A.    Well, no.  I mean, until I actually saw for

20 the first time that they actually did try to go into

21 my bank account more than once per month, that's

22 when I found out, by force.  But previous to that,

23 no.

24    Q.    And my question is actually whether you had

25 an understanding of whether CashCall could make more

fbd87149-2d2e-4f1a-a82a-671bf57f0f7a

1       THE VIDEOGRAPHER:  We're back on the
2   record.  This is the end of tape three, and we're
3   going off the record now at 4:00 o'clock.
4       (Recess taken.)
5       THE VIDEOGRAPHER:  This is the beginning of
6   tape four.  We're on the record at 4:13 p.m.
7   BY MR. SEILING:
8       Q.   Mr. De La Torre, do you recall that two
9   payments were -- ACH debits were taken from your US
10  Bank bank account in October 2007?
11      A.   I believe that that's the case.
12      Q.   And then in December of 2007, you learned
13  that there was going to be some problem with getting
14  your financial aid; is that correct?
15      A.   Correct.
16      Q.   And what was the problem that you heard
17  about?
18      A.   Well, I don't have all the details with me,
19  but it was a type of a -- it was a type of delay on
20  there or -- I can't fully say.  Yeah.
21      Q.   And you knew at some point in December of
22  2007 that you were going to have problems with your
23  financial aid and that that was going to create
24  problems with you meeting your obligations,
25  including your obligation to CashCall; right?

1   STATE OF CALIFORNIA

2   COUNTY OF CONTRA COSTA

3

4        I, YVONNE FENNELLY, hereby certify that the

5   witness in the foregoing deposition was by me duly

6   affirmed to testify to the truth, the whole truth

7   and nothing but the truth, in the within-entitled

8   cause; that said deposition was taken at the time

9   and place herein named; that the deposition is a

10  true record of the witness's testimony as reported

11  to the best of my ability, by me, a duly Certified

12  Shorthand Reporter and disinterested person, and was

13  thereafter transcribed under my direction into

14  typewriting by computer; that the witness was given

15  an opportunity to read, correct and sign the

16  deposition.

17        I further certify that I am not interested

18  in the outcome of said action nor connected with nor

19  related to any of the parties in said action nor to

20  their respective counsel.

21

22

23        YVONNE FENNELLY, CCRR, CSR No. 5495

24

25

fbd87149-2d2e-4f1a-a82a-671bf57f0f7a

**Exhibit 17**

Windows Live™ 

🖶 Print                                                                                          ✖ Close window

## Your Payment was Returned
From: **custserv@cashcall.com**
Sent: Tue 8/07/07 5:26 PM
To: o_donovankrista@hotmail.com



Your Payment was Returned

August 07, 2007

RE: Loan # 103219

Dear Borrower,

Your scheduled payment to CashCall, Inc. set up through automatic debit in the amount of $250.31 was returned unpaid by your bank. Pursuant to the CashCall Promissory Note and Disclosure Statement, ("Note"), a returned item fee of $15.00 was charged to your loan.

Your loan is now past due and you must immediately replace this payment via a MoneyGram transaction in the amount of $265.31 (see instructions below). Failure to make good on this loan payment may negatively impact your credit standing and you may be subject to incur additional fees (please see the "Note" for clarification).

If you have any questions, you may reach CashCall, Inc. at (866) 899-1844.

Sincerely,

CashCall, Inc.

MONEYGRAM INSTRUCTIONS:

RECEIVE CODE: 3299
CITY, STATE: IRVINE, CA

To find a MoneyGram location near you, please visit MoneyGram.com or contact a CashCall agent at (866) 899-1844.

This communication is an attempt to collect a debt and any information obtained will be used for that purpose.

# Exhibits 18-19
# Submitted Conditionally
# Under Seal

# Exhibit 20

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

KRISTA O'DONOVAN, and EDUARDO DE

LA TORRE, individually and on

behalf of all others similarly

situated,

               Plaintiffs,

    vs.                   No. C 08-03174 MEJ

CASHCALL, INC., a California

corporation and DOE 1 through

DOE 3, inclusive,

               Defendants.

------------------------------//

VIDEOTAPED DEPOSITION OF KRISTA O'DONOVAN

Monday, November 9, 2009

Pages 1 through 245

REPORTED BY:

YVONNE FENNELLY, CCRR, CSR NO. 5495

1      A.    Correct.

2      Q.    And at some point during the conversation

3   that you had with a CashCall representative, you

4   advised the CashCall representative that you had

5   consulted with a lawyer; correct?

6      A.    I believe I had mentioned it.

7      Q.    And you mentioned at that point that you

8   were planning to sue CashCall; correct?

9      A.    No.

10      Q.    You didn't tell them that you were going to

11   be filing a class action lawsuit against CashCall?

12      A.    No, I did not.

13      Q.    You never said that?

14      A.    No.

15      Q.    What did you say in the conversation you

16   had with the CashCall representative when you

17   indicated that you had hired a lawyer?

18      A.    I didn't indicate I had hired a lawyer.  I

19   indicated I had spoken to one.

20      Q.    What did you -- what did you tell the

21   CashCall representative about that?

22      A.    Simply that I was looking into what my

23   rights were and what could be done.

24      Q.    How many conversations -- and how did that

25   come up in the conversation with the CashCall

35e8ab74-2b5e-4b13-abfd-6773139af648

Page 95

1    representative?  What was -- what was the call

2    that -- where that conversation came up?  Was that a

3    call you made or that CashCall made to you?

4        A.   I don't recall who initiated the

5    conversation, whether it was me calling them or them

6    calling me.

7             How it came up, I believe, was there was an

8    another CashCall representative basically making

9    threats to me, and at that point I had said, I'm

10   just in the process of finding out what my rights

11   are and I'd spoken to a lawyer.

12       Q.   Do you recall discussing on more than one

13   occasion the fact that you had -- with a CashCall

14   representative, that you had consulted with a lawyer

15   on more than one occasion?

16       A.   I don't recall.

17       Q.   You had testified earlier that some three

18   to five occasions, that you had tried to cancel your

19   ACH payment?

20       A.   Uh-huh.

21       Q.   And you talked about one in spring of 2006;

22   correct?

23       A.   Right.

24       Q.   And the upshot of that call from your

25   perspective was that CashCall had told you you

1  couldn't do it; right?

2     A.   Correct.

3     Q.   So why did you keep asking?

4     A.   I thought maybe I could find a

5  representative or a supervisor that had a difference

6  of opinion.

7     Q.   Okay.

8          When is the next time that you had a

9  conversation with a CashCall representative where

10 you indicated that you wanted to cancel the ACH

11 payment?

12    A.   The exact time, I can't recall.  I know it

13 was some time between then and September when I

14 finally found another job and was able to start

15 paying back on what I owed.

16    Q.   And how did that second call, how did that

17 come about?

18    A.   I'm assuming I answered one of the many

19 phone calls I received from them, and, again, told

20 my story to another representative, and asked if

21 there was something I could do about stopping,

22 again, the domino effect that was being caused.

23    Q.   And what was the response of the CashCall

24 representative?

25    A.   Same as the first.  Couldn't be done.

1    A.    At that point, again, I was receiving

2  multiple phone calls from them.  I'm sure I answered

3  one of the many phone calls after relaying my story,

4  asking, again, if there was something I could do

5  about the automatic payment going through.

6    Q.    And specifically, when you say if there was

7  something you could to about the automatic payment

8  going through, what -- what did you specifically

9  recall saying?

10    A.    Whether I could cancel the automatic

11  payment, set up a date when I knew I would have

12  money; if I could -- if there was any chance, I

13  mean, to cancel the payments until I had found

14  steady work.  Something to keep me where I could

15  actually pay it on better terms I could afford.

16    Q.    And what was the response?

17    A.    That I couldn't change it.

18    Q.    And did you specifically ask if you could

19  change the date on when the ACH payments came?

20    A.    No.  What I was asking is if I could set up

21  a specific day.  Say, I knew I was getting -- I knew

22  I was going to be getting some money on the 16th of

23  that month, if I could set up a payment ahead of

24  time for that day for the amount I was behind, and

25  the response was no.

35e8ab74-2b5e-4b13-abfd-6773139af648

Page 112

1      Q.    Okay.

2            Let's focus on August.

3      A.    Okay.

4      Q.    You were -- admittedly you were a month

5  behind on your loan; correct?

6      A.    I had missed one payment.

7      Q.    What did you expect CashCall to do?

8      A.    It's in their right to call me and ask for

9  the payment.  I believe that.

10           However, when I've already talked to one

11  representative and told them I couldn't pay it, and

12  you talk to another one the same day, and the next

13  day you talk to another one and the next day you

14  talk to another one, you're getting a call every

15  single hour, I would -- I understand that they want

16  their payments but in excess of calling me so much,

17  I don't understand what else they expected me to do.

18     Q.    How many times -- what's the most number of

19  calls that you received in a day from CashCall?

20     A.    Thirteen.

21     Q.    And when was that?

22     A.    I can't tell you.  Honestly, multiple

23  times.  There were multiple days where it was 8:00

24  a.m. to 9:00 p.m., every hour on the hour.

25     Q.    Did you ever get a call before 8:00 a.m.?

35e8ab74-2b5e-4b13-abfd-6773139af648

1     A.    I don't remember exactly.  I couldn't tell

2  you.

3     Q.    Did you ever get a call after 9:00 p.m.?

4     A.    Again, I couldn't tell you.

5     Q.    Did any CashCall representative ever come

6  to your house?

7     A.    No.

8     Q.    Did any CashCall representative ever come

9  to the -- to your business?

10    A.    No.

11    Q.    Did you receive -- when you received these

12  13 calls in a day, and that's the most -- how do you

13  know that's the most?

14    A.    Because I remember 8:00 a.m. to 9:00 p.m.,

15  and like I said, every hour on the hour.

16    Q.    And did you pick up any of those calls?

17    A.    Yes.

18    Q.    How many did you pick up?

19    A.    Like I said before, you'd wait a few phone

20  calls, pick up one.  Wait a few more, pick up

21  another.

22          There were several days where I talked to

23  two representatives.  The one I talked to three was

24  the most, but several days.

25    Q.    Was that the day you received 13 calls?

35e8ab74-2b5e-4b13-abfd-6773139af648

1    A.    There were multiple days of 13 calls.

2    Q.    The day you talked to three

3    representatives, is that a day you received 13

4    calls?

5    A.    Yes.

6    Q.    Let's focus on the day you received 13

7    calls.

8          Well, how many days do you recall receiving

9    13 calls?

10   A.    Honestly, I couldn't tell you.

11   Q.    Now, I take it from reading your complaint,

12   and I'll use layman's terms, but I take that it's

13   your belief that CashCall stepped over the line in

14   trying to collect its debt from you; is that

15   correct?

16   A.    Correct.

17   Q.    How so?

18   A.    Multiple phone calls, obviously.  Multiple

19   e-mails, letters.

20         There were quite a few representatives that

21   I did talk to that were quite threatening; making

22   statements that were not only personal but uncalled

23   for.

24   Q.    Okay.

25         So receiving multiple phone calls, multiple

1    e-mails, and you indicated that some of the

2    representatives were threatening to you.

3        A.    Correct.

4        Q.    And some made personal remarks that you

5    felt were inappropriate; is that right?

6        A.    Correct.

7        Q.    Tell me about the threats.

8        A.    I have one representative that always

9    stands out.  And this, again, was in August of 2006.

10            Called me while I was at my mother's house,

11   and when I told her I just didn't have any money to

12   pay, she actually told me -- actually I told her I

13   didn't have any money and I was having to decide

14   between feeding my kids and paying them, and she

15   specifically said, We don't care if your kids eat;

16   we want our money either way.

17       Q.    What else did she say?

18       A.    That was at the point I hung up on her.

19       Q.    And you understand -- did you understand

20   that to be a threat?

21       A.    Very much, yes.

22       Q.    What was the threat?

23       A.    That CashCall was going to be taking money

24   away from my kids.

25       Q.    And did you have an understanding in that

1    Q.   Is sending two of the same e-mails, is that
2  over the line, in your view?
3       MR. LEVY:  Objection; it's vague.  Depends
4  on what the e-mail says.
5       You can answer.
6       THE WITNESS:  I believe sending the same
7  e-mail multiple times is over the line, yes.
8  BY MR. SEILING:
9    Q.   And in your mind, how many times is too
10 many?
11   A.   I believe sending -- I mean, if you're
12 going to send me a notice that my payment is late, I
13 believe one e-mail is sufficient in a matter of one
14 payment cycle.
15   Q.   Did you ever tell CashCall that just send
16 me one e-mail when my payment is late, that's all I
17 need?
18   A.   I'm sure I did at some point.
19   Q.   Do you have a specific recollection of a
20 conversation you can help me out with?
21   A.   No.
22   Q.   Did you ever -- I take it when you got some
23 of these calls that you regarded as threatening or
24 inappropriately personal, that they upset you?
25   A.   Yes.

1    Q.   How so?

2    A.   When I actually spoke to somebody, and like

3    I said, when they would make comments that were

4    personal that I thought were inappropriate, I felt

5    it was unprofessional.

6         I mean, there were times when I was at

7    family or friends' house when they would call.

8    There were times when I would be out with my friends

9    and, you know, I would get multiple calls and you

10   get to the point where you have to step away and

11   finally answer it.

12        I just felt like my privacy was being

13   interrupted.  I felt like no matter where I turned,

14   someone was going to, you know, give me a call and

15   pry into my personal business that was beyond what

16   they were trying to accomplish.

17   Q.   Explain to me how you felt that CashCall

18   was prying into your -- I assume when you say beyond

19   what they were trying to accomplish is trying to

20   accomplish getting payment for the debt; correct?

21   A.   Correct.

22   Q.   So how was it that CashCall was prying

23   beyond what they were trying to accomplish?

24   A.   Their excessive phone calls to me.  It just

25   seemed like they didn't care where I was, what I had

35e8ab74-2b5e-4b13-abfd-6773139af648

1  to do, whether I was at work or with my family or
2  anywhere.  They just assumed that at any given time
3  of the day, I would have the liberty of answering
4  their phone calls.
5      Q.   And on what do you base that, that they
6  just assumed that you'd have the liberty of
7  answering their phone calls any time?
8      A.   The loop, hour after hour of phone calls.
9      Q.   Do you have an understanding of whether
10  these calls were hand-dialed or whether they were
11  dialed by an automatic dialing machine?
12      A.   I was told by a couple of representatives
13  that I was on their automatic dial system.
14      Q.   When you say you felt your privacy was
15  being invaded, did that cause you any sort of
16  distress?
17      A.   It did.  I mean, it's really embarrassing
18  to be out at dinner with friends and them to hear
19  your phone ringing and you not answering and then
20  questions start, well, why aren't you answering your
21  phone?  Or even at home or when I was just, you
22  know, anywhere.
23          It was just incessant, constantly phone
24  ringing, phone ringing, phone ringing.  You get to
25  the point where you don't even want to look at your

1    phone.

2         Q.    Now, are you -- in the lawsuit, you

3    understand that one of your claims against CashCall

4    is related to CashCall's collection activities.

5         Do you understand that?

6         A.    I do.

7         Q.    And you're seeking some damages against

8    CashCall as a result of what you feel are

9    inappropriate collection activities.

10        Are you not?

11        A.    Correct.

12        Q.    And is one of the types of damages that

13   you're seeking compensation for the distress that

14   you suffered as a result of feeling your privacy was

15   being invaded?

16        A.    I believe my lawyers, I think, can

17   determine what that is.

18        Q.    Well, I want you to describe it for me.

19        I mean, you can tell me.  Your lawyers can

20   say things, but you're bringing this lawsuit.

21        So I want to know, are you seeking

22   compensation for that stress that you feel was

23   caused to you?

24        A.    I believe it's appropriate, yes.

25        Q.    Okay.

1    And describe for me the level of distress

2  you felt when you received these calls.

3    MR. LEVY:  By the way, I don't believe that

4  Ms. O'Donovan is making an emotional distress claim,

5  but I'll allow these questions to go forward.

6    MR. SEILING:  She seems to think she is.

7    MR. LEVY:  Well, I think it's a question of

8  whether there is a formal claim for it or whether

9  she feels that she is entitled to compensation for

10  that, or whether it's appropriate, and those are two

11  different questions.

12    But rather than arguing about it, I'm just

13  going to let her answer the question.

14    Do you have the question in mind?

15    THE WITNESS:  No.

16    Can you repeat the question?

17    MR. SEILING:  Could you read back the

18  question?

19    (Record read.)

20    THE WITNESS:  I would say it would go from

21  just hearing my phone ringing and being

22  uncomfortable, being unable to answer my phone

23  calls, or even, like I said, look at my phone, you

24  get to the point where you don't even want to know

25  who's calling, to actually answering the phone and

35e8ab74-2b5e-4b13-abfd-6773139af648

1  wondering what the person on the other end is

2  actually going to be saying; whether it's going to

3  be somebody who understands or somebody who's going

4  to threaten what you have.

5  BY MR. SEILING:

6      Q.    Did you ever seek any compensation -- or

7  any medical treatment for that?

8      A.    No.   At the time, I did not have any

9  medical insurance and I couldn't afford anything.

10     Q.    Ms. O'Donovan, I want to mark as Exhibit 20

11  a one-page document dated January 7th, 2008.  It's

12  to you from Felicia Perrie, that's P-E-R-R-I-E, of

13  CashCall.

14          (Document marked Exhibit 20

15          for identification.)

16  BY MR. SEILING:

17     Q.    Have you seen Exhibit 20 before,

18  Ms. O'Donovan?

19     A.    Yes.

20     Q.    And is this the settlement offer that we

21  talked about earlier that you received from

22  CashCall?

23     A.    Correct, this is the payment offer that I

24  accepted.

25     Q.    And had you spoken to Ms. Perrie before you

1   STATE OF CALIFORNIA

2   COUNTY OF CONTRA COSTA

3

4       I, YVONNE FENNELLY, hereby certify that the

5   witness in the foregoing deposition was by me duly

6   affirmed to testify to the truth, the whole truth

7   and nothing but the truth, in the within-entitled

8   cause; that said deposition was taken at the time

9   and place herein named; that the deposition is a

10   true record of the witness's testimony as reported

11   to the best of my ability, by me, a duly Certified

12   Shorthand Reporter and disinterested person, and was

13   thereafter transcribed under my direction into

14   typewriting by computer; that the witness was given

15   an opportunity to read, correct and sign the

16   deposition.

17       I further certify that I am not interested

18   in the outcome of said action nor connected with nor

19   related to any of the parties in said action nor to

20   their respective counsel.

21

22

23       YVONNE FENNELLY, CCRR, CSR No. 5495

24

25

35e8ab74-2b5e-4b13-abfd-6773139af648

# Exhibit 21

1

1                UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3

4

5

6    KRISTA O'DONOVAN, and          )
     EDUARDO DE LA TORRE,           )
7    individually and on behalf     )
     of all others similarly        )
8    situated,                      )
                                    )
9              Plaintiffs,          )
                                    )    Case No.
10        v.                        ) CV 08-3174-MEJ
                                    )
11   CASHCALL, INC., a California   )  (Volume I)
     corporation; and DOE 1         ) (Pgs. 1 - 70)
12   through DOE 50, inclusive,     )
                                    )
13                                  )
               Defendants.          )
14   _____)

15

16   Deposition of:    STEPHEN B. KLOPSTOCK (Volume I)

17

18
     Date and time:    Wednesday, March 17, 2010
19                     4:17 p.m.

20

21   Location:         695 Town Center Drive
                       Costa Mesa, California
22

23

24   Reporter:

25   Patricia Tornell, CSR, RPR

4

1          COSTA MESA, CALIFORNIA

2          WEDNESDAY, MARCH 17, 2010

3                4:17 P.M.

4

5          STEPHEN B. KLOPSTOCK,

6          called as a witness, and having

7          been first duly sworn by the

8          Certified Shorthand Reporter, was

9          examined and testified as follows:

10

11              EXAMINATION

12   BY MR. LEVY:

13        Q    Mr. Klopstock, please state your full name.

14        A    Stephen Barrett Klopstock.

15        Q    I'm sorry.  What's your middle name?

16        A    Barrett.

17        Q    How do you spell that?

18        A    B-a-r-r-e-t-t.

19        Q    And how do you spell your first name?

20        A    Stephen, S-t-e-p-h-e-n.

21        Q    I just want to make sure we spell your name

22   right.

23             How long have you worked for CashCall?

24        A    It will be two years next month.

25        Q    So you came in April of 2008?

5

1      A    Correct.

2      Q    And what positions have you held while you

3   were there?

4      A    The Director of Collections.

5      Q    Any other positions?

6      A    No.

7      Q    Have you taken steps to familiarize yourself

8   with CashCall's collection practices before April of

9   2008?

10      A    I'm not sure.  What do you mean?

11      Q    In getting ready to give this deposition,

12   have you made any inquiries as to what CashCall's

13   collection practices were before April of 2008?

14      A    No, not in preparation for this deposition.

15      Q    Do you have any basis for testifying as to

16   what those practices were for any period of time prior

17   to April of 2008?

18      A    I know generally what the processes, the

19   collection processes, were.

20      Q    How do you know that?

21      A    I've been --

22      MR. SEILING:  I think it's an overbroad question.

23   He's being designated as a PMK.  If you have specific

24   questions about specific policies, we can get into

25   them.  If he doesn't know -- I mean he's being

1        Module Two --

2        MR. SEILING:  You need to speak up so she can

3  take down what you're saying.

4        THE WITNESS:  Yes.  This is Module Two and Three

5  of what I looked at prior to coming here.

6  BY MR. LEVY:

7        Q   Okay.  So other than that document or parts

8  of it, Exhibit 3, and the contact logs and payment

9  logs, you haven't reviewed any documents to prepare to

10  testify; is that correct?

11        A   That is correct.

12         I read the Complaint.

13        Q   Anything else?

14        A   No.

15        Q   Why don't you turn to Exhibit 1, and turn to

16  page 6.

17        Q   Okay.  Are you testifying here as CashCall's

18  corporate designee regarding testimony on CashCall's

19  policies, procedures and processes concerning

20  collection of debts during the time period from

21  July 1, 2002, to date?

22        MR. SEILING:  We designated him on 3(a) through

23  (i), (k) (l) and (m), everything except loss

24  mitigation, which Sean Bennett -- which you just

25  covered with Sean Bennett.

1      MR. LEVY:  Okay.

2      MR. SEILING:  He's also talking about 5(a)

3   through (e), loan servicing.

4   BY MR. LEVY:

5      Q   Okay.  As the Director of Collections, to

6   whom do you report at the present time?

7      A   Louis Ochoa.

8      Q   Have you reported to Mr. Ochoa during the

9   entire two years you've been employed by CashCall?

10      A   Yes.

11      Q   And are there managers that report to you?

12      A   Yes.

13      Q   What are they called?  What's their title?

14      A   Department managers.

15      Q   How many are there?

16      A   One, two, three, four -- four.

17      Q   What are their names?

18      A   Andrew Coffey.  Star Silverthorne.  Brandon

19   Warden.

20      Q   How do you spell the last name?

21      A   W-a-r-d-e-n.

22      Sean Bennett?

23      Q   How do you spell the name?

24      A   B-e-n-n-e-t-t, I believe.

25      Q   Sean Bennett.  Okay.

20

1     A   No.

2     Q   Are you personal friends with any of the

3  managers who left?

4     A   No.

5     Q   Okay.

6     A   I guess maybe I should ask you what you mean

7  by "personal friends.

8     Q   Somebody who you would consider a personal

9  friend.  Someone you socialize with, stay in touch

10  with.

11     A   I've gotten a call from Raul, but I wouldn't

12  call him a personal friend.

13     Q   So I take it that some of these collection

14  operations are located here in Anaheim and some in

15  Las Vegas?

16     A   Correct.

17     Q   Which ones are located in Anaheim?

18     A   They're all located in Anaheim.

19     Q   Which ones are located in Las Vegas?

20     A   From 0-to-29 and Recovery.

21     Q   Okay.  And how many collectors are in the

22  0-to-29 group at the present time?

23     A   Approximately 30, maybe 32.

24     Q   And how many when you first started?

25     A   I'd say over 50.

35

1    That's my question.

2        A    I should be able to speak to it as far as as

3    long as they've had it.  I'm not sure what -- when it

4    came up.

5        Q    When did CashCall first start using a

6    predictive dialer?

7        A    I want to say it's '06, but it could be '05,

8    '06.

9        Q    Right.  And how do you know that?

10       A    That's as far back as my reports and the

11   person who runs it goes.

12       Q    And can you describe how this predictive

13   dialer worked when you -- when it was first

14   implemented, how did it work?

15       A    It worked like any other predictive dialer

16   that I've been on in my --

17       MR. SEILING:  So the answer to the question is

18   yes, he can describe it.

19       MR. LEVY:  Okay.  All right.

20       MR. SEILING:  Again, I think it would maybe be

21   more productive instead of going into these general

22   questions to start asking specific questions that you

23   want to know the answers to.

24       MR. LEVY:  Maybe.

25       MR. SEILING:  And if he doesn't know the answer,

1     Q    I don't know.  I can't tell from your answer.

2          Is your testimony that you don't know whether

3    or not Exhibit 20 was distributed to the Collections

4    personnel?

5     A    I'm saying that I haven't done it.

6     Q    Do you know whether anybody did it?

7     A    No.

8     Q    To your knowledge has any CashCall manual

9    concerning collection policies and procedures ever

10   been distributed to the CashCall collection teams?

11    A    Yes.

12    Q    Which manual has been distributed?

13    A    This one (indicating).

14    Q    You're referring to Exhibit 3, the training

15   manual?

16    A    Correct.

17    Q    When was the training manual first

18   distributed to the CashCall collection teams.

19    A    As soon as they walk in the door.

20    Q    And when did that practice start?

21    A    July of '06.

22    Q    Prior to July of '06 was there any manual,

23   whether it's a training manual or a policy and

24   procedures manual, that was distributed to new hires

25   in the Collections Department?

58

 1    training.

 2        Q    So when you were hired, you went through the

 3    program?

 4        A    I did.

 5        Q    And since you first went through the program,

 6    have you sat in again?

 7        A    I did.

 8        Q    So you're generally familiar with what's

 9    covered in that program?

10        A    Yes.

11        Q    Now, can you just briefly sketch for me as it

12    is today, you know, what the physical layout is in

13    Anaheim?  Are all the collectors, all the teams, in

14    one area?

15        A    Yes.

16        Q    So is it one floor?  More than one floor?

17        A    It's one floor.

18        Q    And since you've been working at CashCall,

19    has it always been one floor or have there been

20    multiple floors?

21        A    Multiple floors.

22        Q    And how are the collectors' stations laid

23    out?  Are they cubicles or --

24        A    They are.

25        Q    And approximately how many cubicles are on

1    the floor that's being used now?

2         A    I should know this.

3              Approximately a hundred and fifty.

4         Q    And when there were multiple floors, was

5    there a similar number?

6         A    Yeah, on each -- in each section.

7         Q    What's the maximum number of floors that the

8    collectors have used since 2004 at Anaheim?

9         A    Haven't been in Anaheim since 2004, but the

10   answer would be two in Anaheim.

11        Q    Okay.  And where -- when did the Collections

12   Department, California unit, move to Anaheim?

13        A    I believe it was three years ago.

14        Q    And where were they before?

15        A    Fountain Valley.

16        Q    And are the other loan processing divisions,

17   the Customer Service, Payment Processing and other

18   elements of Customer -- of loan servicing, they

19   also -- have they also been at the same location as

20   the Collections part, Collections Division?

21        A    Loan Servicing has always been with

22   Collections if that's your question.  Other than the

23   Vegas facility, I'm not sure that they had Customer --

24   they never had Payment Processing in Vegas, but I

25   think the answer to your question is yes.

60

1    Q    And Mr. Ochoa, has his office always been in

2    the same place where the collectors have been

3    located?

4    A    It has been at Anaheim.  I believe it was at

5    Fountain Valley as well as Irvine, a little bit

6    different layout.

7    Q    So during what years were the collectors at

8    Fountain Valley?

9    A    Directly -- right before Irvine -- or

10   Anaheim.

11   Q    I'm sorry.  Please refresh me.  When was the

12   move to Anaheim?

13   A    About three years ago.

14   Q    So how long -- do you know how long before

15   that they were at Fountain Valley?

16   A    I don't.

17   Q    And I take it that the Collections manager or

18   Director of Collections and Collections supervisors to

19   the extent that they were in California were on the

20   same floor -- located on the same floor as the

21   collectors at all times; is that correct?

22   A    I -- there's two floors and there's only one

23   of me, so I'm not with all of the collectors.

24   Q    Excuse me.  On one of the floors where the

25   collectors are?

61

1     A   Yeah, I was.  I was on the first floor; they

2  were on the second floor.  So there was -- the

3  supervisors are always sitting with their

4  collectors.

5     Q   So since you've worked there, have you been

6  on the same floor as the collectors, not necessarily

7  all of them but some of them?

8     A   Yes.

9     Q   And has Mr. Ochoa been on the same floor with

10  the collectors?

11     A   Yes.

12     Q   And has that been the case going back to the

13  beginning of the Anaheim days?

14     A   Yes.

15     Q   And during the Fountain Valley days?

16     A   To my knowledge, yes.

17     Q   Okay.  Are there periodic meetings of all or

18  a part of the Collections staff -- that is, scheduled

19  meetings -- that occur every week, every month or

20  every quarter?

21     A   Not recently.

22     Q   Was there a period of time when there were

23  scheduled meetings?

24     A   Yes.

25     Q   When was that?

DECLARATION UNDER PENALTY OF PERJURY


I hereby declare under penalty of perjury that the foregoing is my deposition under oath; are the questions asked of me and my answers thereto; that I have read same and have made the necessary corrections, additions or changes to my answers that I deem necessary.

In witness thereof, I hereby subscribe my name this 29 day of April, 2010.


_____
STEPHEN B. KLOPSTOCK
(Volume I)

70

                          CERTIFICATE

1

2                            OF

3                CERTIFIED SHORTHAND REPORTER

4

5          The undersigned Certified Shorthand Reporter,

6     licensed in the State of California, does hereby

7     certify:

8          That the foregoing deposition was taken

9     before me at the time and place therein set forth, at

10    which time the witness was duly sworn by me;

11         That the testimony of the witness and all

12    objections made at the time of the examination were

13    recorded stenographically by me and were thereafter

14    transcribed, said transcript being a true copy of my

15    shorthand notes thereof;

16         That the dismantling of the original

17    transcript will void the reporter's certificate.

18         I further declare that I have no interest in

19    the outcome of the action.

20         In witness whereof, I have subscribed my name

21    this date: _____.

22

23                          _____

24                          Certificate Number 2974

25

71

1

2                   UNITED STATES DISTRICT COURT

3                 NORTHERN DISTRICT OF CALIFORNIA

4

5    KRISTA O'DONOVAN, and EDUARDO DE      )
     LA TORRE, individually and on         )
6    behalf of all others similarly        )
     situated,                             )
7                                          )
                       Plaintiffs,         )
8                                          )
             vs.                           )   CASE NO.
9                                          )CV 08-3174-MEJ
     CASHCALL, INC., a California          )
10   corporation; and DOE 1 through DOE    )
     50, inclusive,                        )
11                                         )
                       Defendants.         )
12   _____)

13

14

15                       PAGES 71 - 211

16

17   Deposition of:  STEPHEN KLOPSTOCK (VOLUME II)

18   Date and time:  Thursday, March 18, 2010, 9:44 A.M.

19   Location:       695 Town Center Drive
                     Costa Mesa, California
20

21

22    Reporter:

23    Pamela Cotten, CSR, RDR
      Certificate No. 4497
24    Certified Realtime Reporter

25

1    A    If a collector is unable to resolve the

2    situation, they are supposed to look for a supervisor

3    or a second voice to maybe -- to help them.

4    Q    And what is considered a resolution of the

5    situation that would not require transfer for a

6    talk-off?

7    A    Arrangements.

8    Q    Payment arrangements?

9    A    Generally speaking.  Not all calls are --

10    that's why there's an N/A column, I guess, if I'm

11    calling you about loan document -- or modification

12    documents, I'm not necessarily making a payment

13    arrangement, but I can have a success or not a success

14    that might or might not require it to be transferred.

15    Q    Okay.  But when it is a collection call,

16    too, --

17    A    A standard collection call.

18    Q    -- a standard collection call, a resolution is

19    some arrangement by the customer to pay --

20    A    Yes.

21    Q    -- by a certain date; right?

22    A    Yes.

23    Q    And is that what you were referring to when

24    you referred to a positive solution --

25    A    Yes.

92

1    there?

2        A    Yes.

3        Q    Does the supervisor assign the rating, or is

4    that generated some other way?

5        A    I'm not sure I'm tracking on that.

6        Q    Okay.  Then I'll ask it a different way.

7             How is the rating O down to U, how is that

8    assigned?

9        A    I suppose that comes from me.

10       Q    So you as the director of collections assign

11   that?

12       A    I mean this hasn't changed, so --

13       MR. SEILING:  I think his question is as to an

14   individual who is being evaluated, who makes the

15   determination of whether their performance fits within

16   an O or any of the other criteria?

17            Is that your question, Arthur?

18       MR. LEVY:  Yes.

19       THE WITNESS:  The Q stats.

20   BY MR. LEVY:

21       Q    So it is automatically generated depending on

22   the queue stats.

23       A    Depending on what they collect.

24       Q    Then turn the page, that's the success factor

25   goal, that relates to the number of calls handled;

1  right?

2      A     Uh-huh.  This is number of calls made.

3      Q     Made.  And does that refer to completed calls

4  or --

5      A     Attempted calls.

6      Q     Attempted calls.

7            Does it include calls that are on the

8  predictive dialer or just those that are manually made?

9      A     It is dependent upon the department in the

10  front end on this, it is -- it includes predictor

11  dialer calls.  They all call from the dial-in.  In the

12  back end it does not.

13      Q    Is it also the case the rating is assigned

14  based upon whether the collector met the number of

15  calls target?

16      A     Yes.

17      Q    And where it says in the box, say, 30 to 32,

18  what does 30 to 32 refer to?  Is that the number of

19  calls, attempted calls, per hour?

20      A     That is.

21      Q    For the back end collection groups -- which I

22  think are 30 to 59, 60 to 89, and 90 to 120 or 119;

23  right?

24      A     And 120 to 150.

25      Q    Are they also -- do they have the same

94

1   numbers?  In other words, is -- for, say, 30 to 59, is

2   30 to 32 a B and 36 to 38 an E?

3        A    No.

4        Q    Okay.  Can you give me some sense for that

5   group, what the, you know, expected -- what the range

6   of calls per hour is in order to get, say, an M, meets

7   expectations?

8        A    They are done on a daily, not an hourly.

9   Currently it is 30 days at 190.

10       MS. HUSTON:  I'm sorry, I didn't hear that answer.

11       MR. SEILING:  Thirty days at 190.

12  BY MR. LEVY:

13       Q    So does that mean 190 calls per day for 30

14  days?

15       A    Yes.

16       Q    And what about the second back end group, we

17  call them the 60-day group.

18       MR. SEILING:  Is that what you call them?

19       THE WITNESS:  Yeah.

20       MR. SEILING:  Okay.

21       MR. LEVY:  I learned something.

22       THE WITNESS:  I believe I have them at 175.

23  BY MR. LEVY:

24       Q    Okay.  And the 90-day?

25       A    160.

1    Q    And is the next group the 150?

2    A    120.

3    Q    120.

4    A    140.

5    Q    And there's a 150 group, too?

6    A    No.  It charges off at 150.

7    Q    Okay.  And so you have given the kind of

8    expected call volume for these groups.  Has that

9    remained the same --

10   A    No.

11   Q    -- since the beginning of 2006?

12   A    No.  That number -- I just changed that number

13   this month actually.

14   Q    Okay.  Well, let's talk about -- let's go back

15   and talk about the front end group.  Has this grid

16   that's appearing under the success factor goal that

17   shows the expected call volumes, actually the call

18   volume ratings, has that remained the same since the

19   beginning of 2006?

20   A    Most likely not, but I -- there are different

21   groups within the front end that have different

22   expectations, so this is standard for one of those

23   groups in the front end, but as -- they are different

24   groups and they have different goals or different smart

25   goals.  I haven't changed the front end calls per hour

1   matrix in the last two years, but I would be surprised

2   if it has remained the same since '06.

3        Q    Okay.

4        A    Well, again, I'll clarify that.  To the -- to

5   the, say, the ACH collectors in the front end group.

6        Q    Okay.  So these refer to the ACH collectors;

7   is that correct?

8        A    Well, there's a problem that I have, I guess,

9   with this is that this is -- this contradicts itself,

10  so I'm not sure if Ron -- if this is for the training

11  purposes is a good -- this says it is 28 calls per

12  hour.

13       Q    Yes.

14       A    But if you look at the box it says 29 or less

15  is unsatisfactory.

16       Q    I understand.

17       A    So.

18       Q    I'm referring to the box.  Let me see whether

19  I can't simplify this a little bit.  You know, at least

20  for the period you have been there, since the beginning

21  of 2008, has this rating box applied to the ACH front

22  end collectors?

23       A    Not this box, but a box with the right numbers

24  in it has, yes.

25       Q    Okay.  Have you applied this box to any group

1 within the front end?

2  A Do you have a calculator?  It should be 210

3 for 7-1/2 hours is what it breaks down to.  I think it

4 is 32 calls, but I don't know.

5  Q Okay.  All right.  So maybe you can summarize

6 what the call expectation is for the different groups

7 in the front end at the present time.  Can you list the

8 groups and tell me what the call expectation is?

9  MS. HUSTON:  I did the math for you if it is

10 helpful.  210 divided by 7-1/2 hours is 28.

11  THE WITNESS:  Twenty-eight.  Okay.  So it is 28 an

12 hour for the front end ACH and manual collectors.  I

13 believe it is -- the limit is 24 for the specialty

14 state collectors.  I think I have the first payment

15 default at 24 as well.  Mod should be at the 28.

16 Manual, ACH, mod.  I think that's it.

17 BY MR. LEVY:

18  Q Okay.  So the ACH collectors are the

19 collectors who are making calls for people whose ACH

20 is -- didn't pay?

21  A Didn't clear.

22  Q Okay.  And what is specialty?

23  A They are in states that have different

24 collection rules.

25  Q Outside California?

98

1     A    Correct.

2     Q    And first pay is, you know, where the loan is

3  made and the borrower doesn't even make the first

4  payment; correct?

5     A    Correct.

6     Q    And mod, is that loan modifications?

7     A    Correct.

8     Q    All right.  Let's just stick with the ACH.

9  Has the ACH call expectation of 28, has that been the

10  same back to the beginning -- the beginning of your

11  tenure?

12     A    Yes.

13     Q    And do you know what it was before that?

14     A    It was -- it was that as far as when I

15  started.

16     Q    Do you know what it was before then?

17     A    No.

18     Q    Okay.  Let's briefly go through the 30 days.

19  You said 190 calls daily.  How far back in time has

20  that gone?  Earlier than when you started?

21     A    The 190 number?

22     Q    Yeah.

23     A    It goes back to the beginning of maybe the 9th

24  of this month.

25     Q    Okay.  And what was it before then?

99

1     A    Oh, man.  I just changed it, so it was -- I

2    want to say 140, but I could be -- I could be wrong on

3    that.

4     Q    That's your best estimate?

5     A    Yes.

6     Q    You are not exactly certain, but that's your

7    best estimate?

8     A    Correct.

9     Q    That's fair.  Okay.  How long was it at around

10   140?

11     A    Since I -- well, it is possible that I changed

12   that, but I don't recall changing it.  I look at those

13   every month we go through that stuff, so I -- if I said

14   it has been that way since I've been there, I can't say

15   that for certain.

16     Q   Okay.  Do you have any -- what's your best

17   testimony as to what it was before you arrived?

18     A    It might have been 130, but it was real close

19   to that.  It hasn't changed significantly.

20     Q   Okay.  That's really what I'm asking for from

21   you is just your best estimate.  Obviously if you can't

22   give it and you really don't know, you should say that

23   you don't know, but if you have an estimate as to what

24   it was, that's acceptable.

25        So is it fair to say that the daily call

1  expectation for the front end group from 2006 to date

2  has been at least 130?

3      A    For the 30-day group?

4      Q    Yeah.

5      A    Yes.

6      Q    Okay.  What would be the comparable number for

7  the 60-day group from the beginning of 2006 to date?

8  Can you give that testimony, or is that something --

9      A    Somewhere around 130.

10     Q    And the 90-day group?

11     A    120.

12     Q    And the 120-day group?

13     A    110.

14     Q    Okay.  And when was the 60-day group raised to

15  175?

16     A    Beginning -- first week of this month, maybe

17  the second week of this month.

18     Q    Okay.  And before that was it somewhere in the

19  range of 130?

20     A    Yes.

21     Q    Okay.  And then the 90-day group was the 160

22  just at the beginning of this month?

23     A    Yes.  All of those changed the beginning of

24  this month.

25     Q    And then before that change, was it about 120?

101

1    A    Yes.

2    Q    And the 120-day group, before this recent

3  change, was around 110?

4    A    Yes.

5    Q    Okay.  That's fair.  Thank you.

6         And I take it that there is, you know, a

7  tracking mechanism at CashCall where the individual

8  calls are tracked and also the statistics necessary to

9  do these evaluations.  Is that correct?

10   A    Yes.

11   Q    Okay.  Let's move on to the next item,

12  promises kept.  For the front end group, on this form

13  at any rate, it says 60% or greater.  Is that -- is

14  that a real number?  I mean is that the number that has

15  been used to -- as an expectation for the front end

16  group?

17   A    That is a real number for -- one of the

18  groups, I think, was at 55.

19   Q    Let me make this easy -- easier for you.  It

20  is hard, but let me try to make it a little easier.

21  Let's just talk about the ACH.

22   A    Okay.

23   Q    Front end.  Let's throw out everybody else for

24  just a second.  Just the ACH group.

25   A    All right.

1     Q    Since you have been there, what has been the

2   promise to pay kept percentage expectation for the

3   front end ACH group?

4     A    It has been between -- it has been between 55

5   and 65%.

6     Q    And was it in that same range back to 2006?

7     A    Yes.

8     Q    Okay.  What about the average wrap time under

9   30 seconds?  Has that statistic remained the same, the

10   30 seconds?

11     A    Yes.

12     Q    Back to 2006?

13     A    Yes.

14     Q    And the third matrix is daily average of not

15   ready time under 1.75 hours.  Has that metric remained

16   the same back to 2006?  For the ACH front end is what

17   I'm talking about.

18     A    Probably.  I don't -- I don't even know if

19   that's all our current --

20     Q    Okay.

21     A    -- evaluation to be honest with you.  I know

22   we watch it, but I don't know that it is specific to a

23   smart goal right now.

24     Q    Okay.

25     A    I would have to check.

103

1     Q    On the promise to pay kept percentage, how is

2  that calculated?  What numbers go in to determining it?

3     A    Take the -- hmm.  I shouldn't hesitate here.

4  My hesitation is whether it is the dollars that's

5  promised versus the dollars that's paid or the number

6  of promises versus -- I believe it is dollars promised

7  versus dollars paid.

8     Q    Okay.

9     A    Over dollars paid.

10     Q    And --

11     A    Or dollars paid over dollars promised.

12     Q    So when the collector puts a promise to pay

13  for a specific dollar amount into the system, that gets

14  tracked?

15     A    Yes.

16     Q    And then when the money comes in, it is

17  compared --

18     A    Correct.

19     Q    -- to that promise.  And if the promise is not

20  kept, that's also tracked and this percentage is --

21     A    Yes.

22     Q    -- calculated.

23     Okay.  What is average wrap time?

24     A    It is an average of the time a collector

25  spends putting in their notes after the call-ins.

111

1    A   No.

2    Q   So that isn't -- that isn't tracked?

3    MR. SEILING:  What isn't tracked?

4  BY MR. LEVY:

5    Q   My question is for purposes of determining,

6  you know, whether, you know, the back end collectors

7  meet their, you know, requirement of 30 days.  Say, at

8  140 if a collector is there for 12 hours instead of

9  eight, are the last four hours counted towards that or

10  not?

11    A   Yes.

12    Q   They are?

13    A   They are.

14    Q   Okay.

15    MR. SEILING:  Just to make sure, does that happen?

16  Do they work overtime periodically?

17    THE WITNESS:  They do.

18    MR. SEILING:  Okay.

19  BY MR. LEVY:

20    Q   All right.  Thank you for your testimony on

21  this.

22       Maybe now you can tell me a little bit about

23  compensation of the collectors.  I take it that all the

24  collectors have -- what? -- an hourly rate?

25    A   Yes.

112

1     Q    That applies to all of the groups.  Is that

2  correct?

3     A    Yes.

4     Q    And are there any -- at the present time is

5  there any incentive --

6     A    Yes.

7     Q    -- compensation?  Can you explain that to me?

8     A    Explain -- they vary -- they vary between the

9  groups.

10     Q    Okay.  Let's talk about front end ACH.

11     A    Front end ACH has a queue goal.  It is based

12  on the smart goal number one that was on there.

13     Q    Right.  I'm with you.

14     A    The percent of the accounts that they collect

15  that were assigned to them at the beginning of the

16  month, and they get paid a bonus if they reach that

17  target.

18     Q    So that's for the smart target number one?

19     A    Yeah.

20     Q    Okay.  How long has -- well, is that the only

21  incentive compensated?  By incentive I'm referring to

22  compensation that the collector gets in addition to the

23  hourly rate but not excluding, you know, special

24  bonuses or bonus programs, but not including those.

25     A    That last part threw me.  I was following you

113

1  up to that.

2      Q    Okay.  Let me say it again.  When I talk about

3  incentive compensation, I'm talking about what they're

4  contractually entitled to.  In other words, they get

5  their rate.  Are they contractually entitled to this

6  queue goal incentive compensation, or is that

7  discretionary?

8      A    Huh.  I don't --

9      Q    Yeah.

10     A    I don't think it is in their offer letter.

11     Q    Let me back off that.  Let's scrap that

12  distinction.

13         At the present time they get their hourly

14  rate, they get some incentive incentive compensation --

15     A    Yes.

16     Q    -- for meeting their queue goal.  Any other

17  incentive?

18     A    Front end ACH have a number of promises that

19  we incentivize for the month.

20     Q    How does that work?

21     A    They need to set and keep a certain number of

22  promises for the month.

23     Q    You are talking about promises to pay by

24  customers?

25     A    Correct.

114

1    Q    Okay.  And what other incentive elements are

2    there?

3    A    Those are the only two.

4    Q    Okay.  And has -- have those two front end ACH

5    incentives, queue goal and number of promises, has that

6    been standard incentive for that group --

7    A    Yes.

8    Q    -- going back to the beginning of your tenure?

9    A    Yes.

10   Q    How far back before that?  Can you say?

11   A    For certain, I can't.  Beginning of time.

12   Q    Well, let's kind of establish this convention

13   because I'm going to ask this question a lot during

14   this deposition.  What's the earliest you can say that

15   these two incentives were part of the front end ACH

16   compensation, earliest that you can testify?

17   A    The queue goal back to the beginning of '06.

18   For sure the payment goal as long as I've been there.

19   Q    Okay.  Are there also periodic, you know,

20   special bonus programs in addition to the incentives

21   for front end ACH collectors?

22   A    Periodic bonus programs?

23   Q    Here is what I have in mind.  If you look at

24   the bottom of 363, do you see that there's, in addition

25   to the queue stats getting a $500 bonus, there's an

129

1  contacts.  Is that correct?

2      A    That's correct.

3      Q    And how long has that -- the system had that

4  capacity?

5      A    For as long as the system has been

6  operational.

7      Q    How long has that been?

8      A    I don't know when they -- when they started

9  it.

10     Q    Does that go back to the beginning of 2006 --

11     A    Yes.

12     Q    -- at least?

13     A    At least.

14     Q    And so a servicing transaction log or comment

15  log or contact log, I use the terms interchangeably,

16  can be generated for each count?

17     A    Yes.

18     Q    Okay.  Now, the automated dialer, that refers

19  to the predictive dialer system?

20     A    Correct.

21     Q    Okay.  Let's turn the page to the next page.

22  There's some definitions here.  I just wanted to check

23  with you.  One is broken promise, that's on page 947.

24     A    Yes.

25     Q    Defined as, "A delinquent customer's failure

1　to make a past due payment by a specific time and date

2　that he/she has agreed upon with a CashCall collector."

3　　　　Is that an accurate definition of "broken

4　promise"?

5　　A　We don't -- I don't consider it a broken

6　promise on their matrix.  We give them a couple days

7　after the time -- it says specific time and date, but

8　if you promised it for today and I pay it tomorrow, I

9　don't count that as a broken.  They get a two-day

10　window.

11　　Q　Okay.

12　　A　But, yes, generally.

13　　Q　So the loan servicing system will not generate

14　a broken promise entry on the transaction log?

15　　A　Yeah.  I think it does break it that day, but

16　as far as going to the collector's matrix, we give them

17　an extra two days.

18　　Q　Okay.

19　　A　So I guess maybe for the purpose of this, that

20　is accurate.

21　　Q　Okay.  And next the promise to pay, PTP, does

22　this correctly state that CashCall collectors are

23　required to establish a promised pay date from each

24　delinquent customer and follow up to ensure that the

25　promise is kept?  Does that accurately state CashCall's

131

1   practice?

2       A    Yes.

3       Q    That has been the case since at least 2006?

4       A    Yes.

5       Q    The collector is required or customer service

6   representative is required to put a PTP notation in the

7   servicing transaction log?

8       A    Yes.

9       Q    And that in turn will trigger a broken promise

10  determination if the PTP is not kept?

11      A    Yes.

12      Q    The RFD, the reason for delinquency, is it

13  true that the collectors are required to obtain from

14  the customer the reason for the delinquency?

15      A    They are supposed to try it.

16      Q    At the time that the promise to pay is

17  obtained?

18      A    Yes.

19      Q    And is that required to be recorded in the

20  loan servicing transaction loan?

21      A    Yes.

22      Q    Is that put in a comments section by the

23  collector ordinarily, or is there a code?

24      A    Both.

25      Q    And do you recall what the codes are for the

132

1    RFD?

2        A    At the time that this was written, there

3    weren't codes so -- but do I recall what the codes are?

4    I think there's about 12 or 13 of them.

5        Q    Okay.  When were the codes implemented?

6        A    More than a year ago.

7        Q    Okay.  So before then, the reason for

8    delinquency would be put in the comment --

9        A    Yes.

10       Q    -- section, written in by the --

11       A    Correct.

12       Q    -- collector, but afterward they were able to

13   input codes for each type of RFD?

14       A    Yeah.  There's a drop-down required to select.

15       Q    All right.  Would you turn to page 966.

16   There's a statement of philosophy here.  "The operating

17   philosophy of the Collections Division is to maintain

18   frequent and continued customer contact utilizing all

19   available collection tools in order to effect payment,

20   discourage future delinquency, and prevent charge-offs

21   within the confines of the Fair Debt Collections

22   Practices Act."

23            Has that been the philosophy of the CashCall

24   Collections Division since the beginning of 2006?

25       A    Yes.

139

1      Q    Okay.  Let's turn to the front end collections

2    team.  That's at age 979 in Exhibit 2 -- Exhibit 20.

3    Okay.  Why don't you take out Exhibit 3, the training

4    manual, because there's some reference to some things

5    here that I found in the training manual, so maybe you

6    can cross-reference things.

7           In this section of Exhibit 20 regarding front

8    end collections it states, "This team's primary goal is

9    to resolve delinquency by instituting Collections 101

10   practices and following the Collectors Call Model."

11          If you would turn to page 280 of the training

12   manual, Exhibit 3, there's a reference to Collections

13   101.  Do you see that?

14     A    Yes.

15     Q    Does this section of the training manual set

16   out the Collections 101 practices?

17     A    I'm sorry, can you say that again?

18     Q    I'm trying -- bottom line question is I'm

19   trying to figure out what Collections 101 practices

20   are.

21     A    Yes.

22     Q    Okay.

23     A    Yes.

24     Q    Okay.  So the Collections 101 practices are

25   set forth in this -- page 280 of Exhibit 3, and the

1    following pages.

2        A    Yes.

3        Q    Okay.  So that includes -- does the

4    Collections 101 include the phone etiquette --

5        A    Yes.

6        Q    -- guidance?

7        A    Yes.

8        Q    FDCPA?

9        A    Yes.

10       Q    To be complete, the introduction, their

11   purpose is collectors?

12       A    Yes.

13       Q    How they serve their purpose as collectors?

14       A    Yes.

15       Q    When the perfect world of collections goes

16   bad, is that included?

17       A    Yes.

18       Q    And the eight steps?

19       A    Yes.

20       Q    And improving techniques?

21       A    Yes.

22       Q    So if we were to go through and find those

23   sections in the pages that follow, that would be all

24   covered within Collections 101 practices; right?

25       A    Yes.

1    Q    Can you by looking at the training manual tell

2  us, you know, what the pages are that include all of

3  those -- all of those provisions?  It is not clear to

4  me.

5    A    281 is going to be your phone etiquette.

6         (Interruption in proceedings.)

7         (Recess taken.)

8         (Ms. Huston is not present.)

9  BY MR. LEVY:

10   Q    Okay.  So during the break you have had an

11 opportunity to review the training manual, and is it

12 correct that the Collections 101 section extends from

13 page 281, number stamped 281, through 341?

14   A    Correct.

15   MR. SEILING:  Just one second here.

16        (Off-the-record discussion.)

17 BY MR. LEVY:

18   Q    And the eight steps section is at page 321; is

19 that correct?

20   A    It -- yes.  The -- 324 as well.

21   Q    Okay.  So 321 is the eight steps to a

22 successful collection call; correct?

23   A    Correct.

24   Q    And you refer to 324.  This page, 324, is the

25 CashCall collection call model?

144

1    A    I can't say that there's a document like this

2    distributed prior to that.

3    Q    Okay.  That's fine.  That's really, you know,

4    all I have at the moment on Exhibit 3.  I want to go

5    back to Exhibit 20 and follow through regarding the

6    front end collections team.

7    A    Make sure I put this back right.

8    Q    Okay.  Back on Exhibit 20 on page 979, that

9    first paragraph, there is a reference to the dialer

10   system.  Do you see that there?

11   A    Yes.

12   Q    That's what I -- is that the same system I've

13   referred to as the predictive dialer?

14   A    Yes.

15   Q    And can you describe what a dialer campaign

16   is.

17   A    A campaign is what is referred to as -- I

18   guess the best way to put it is the list of accounts

19   and numbers for those accounts that the predicter will

20   call for the campaign.

21   Q    So each campaign is a list of accounts that

22   will be called during the campaign?

23   A    Yes.

24   Q    There's a reference here to the dialer

25   manager.  What is the job of the dialer manager?

1     A    His job is to make sure that the campaigns are

2    run with accordance to the schedule and provide

3    reporting back to the results.

4     Q    When you refer to the schedule, what do you

5    mean?

6     A    The campaigns are -- we schedule what's going

7    to be called when and how, so there's a collection

8    team, the management team, provides the dialer manager

9    and his staff with what those campaigns should look

10   like every day.

11     Q    And then what does the dialer manager do with

12   that information?

13     A    He puts it into the machine and lets it start

14   dialing.

15     Q    Okay.  And is there a dialer manager at

16   CashCall at the present time?

17     A    Yes.

18     Q    Who is that?

19     A    Chris Wenger.

20     Q    And how long has Mr. Wenger been the dialer

21   manager?

22     A    Hmm.  Early '07.  I'm not sure when he was

23   hired in.  He was hired in as the dialer manager.

24     Q    Do you know who the manager was before

25   Mr. Wenger?

1    A    I suppose it depends on what time they start.

2    Q    Okay.  Well, let's -- let me back up.  What's

3  the first thing that a collector does once the

4  collector is participating in a dialer campaign?

5    A    Once they are in a campaign, the calls are

6  presented to them.

7    Q    Okay.

8    A    So they don't do anything but be ready, stay

9  off and ready, take the next call.

10    Q    So is it correct that the dialer automatically

11  starts dialing a number of calls and then when there

12  isn't a call answered with a human voice, that call is

13  routed to a particular collector who is participating

14  in the campaign?

15    A    Yes.  When -- when we are running a campaign,

16  yes.

17    Q    So the -- in a dialer campaign, a collector

18  doesn't know what calls they are going to receive.  It

19  depends on how they are assigned by the system?

20    A    Correct.

21    Q    What happens if, you know, there's an answer

22  to one of the auto-dialed calls and there's no

23  collector available, then what happens?

24    A    There's a message played that says, "Please

25  hold for the next available" -- I don't know exactly

1    collector, then the collector follows the call model.

2    Is that correct?

3        A    Correct.

4        Q    And a successful resolution would be obtaining

5    a promise to pay.  Is that correct?

6        A    Successful resolution, generally speaking, is

7    a promise to pay.  You could be confirming a promise or

8    validating an ACH that's pending, which would be

9    considered successful but not necessarily a promise.

10        Q    All right.  And so is it correct that the

11    campaigns are prioritized according to the priorities

12    listed on page 980 with broken promises being the

13    highest priority and promises to pay confirmation being

14    the lowest?  My question is is this priority followed

15    in practice, or is this somebody's bright idea that is

16    not really followed by the Collections Department in

17    terms -- just in terms of the priorities?

18        A    This is the priorities.  The -- broken promise

19    campaign wouldn't necessarily be in the same promise to

20    pay confirmation campaign.  These could be separate

21    campaigns in fact.

22        Q    That was my understanding is that these are

23    separate campaigns.  Is that the case?  There's one

24    campaign for broken promises and there's another

25    campaign for recent NSFs and there's another campaign

153

1   for promise to pay confirmations.  Is that correct?

2       A    It is just not really that simple, but these

3   would be -- these could be different campaigns.

4       Q    Okay.  Or, as I hear your testimony, that

5   sometimes they could be combined so that a single

6   campaign could include broken promises and recent NSFs?

7       A    Yes.

8       Q    So broken promises are where there's been a

9   promise to pay entered in the servicing system that has

10  not been met?

11      A    Correct.

12      Q    Okay.  Recent NSFs are people who -- includes

13  people who had ACH transactions that were returned

14  unsatisfied?

15      A    Correct.

16      Q    No contact is where there hasn't been contact

17  for a period of time?

18      A    Correct.

19      Q    Is that correct?

20          And a promise to pay confirmation would be in

21  advance of a promise to pay date that a call is made?

22      A    Correct.

23      Q    How does the -- when the call is routed to the

24  collector, does the customer's account come up on the

25  screen?

154

1    A    It does.

2    Q    So the collector knows that it is a broken

3   promise or a recent NSF; is that correct?

4    A    If it is a separate campaign, they would see

5   the campaign that they are in, and if it was a broken

6   promise campaign, yes, even if it was a regular

7   campaign, it wouldn't be the first and most obvious,

8   but you would still be able to tell by looking at the

9   account.  So it would be, I guess, a matter of timing.

10    Q    Okay.  So can you describe once a call is

11   routed to a front end collector by a dialer, what is --

12   what comes up on the collector's screen?

13    A    There's a dialer window that comes up with the

14   information that the dialer has in the dialer system to

15   be the customer's name, the campaign that they are on,

16   the amount that's due, probably the demographic

17   information, the dialer screen, and then shortly

18   thereafter, a second, maybe two seconds later, the

19   actual servicing system screen comes up behind it.

20    Q    And what's on the servicing screen?

21    A    The loan information, the demographic

22   information, a portion for the recent collection notes,

23   priority notes, promise window, general loan

24   information, past due amount.

25    Q    On a recent NSF, for example, the telephone

155

1   rings, there's a call coming in to the collector from

2   the dialer, I mean how does the collector figure out

3   that this is a recent NSF and what date it was and how

4   much?

5       A    They would have to look at the payment

6   transaction screen.

7       Q    And how much time do they have to do that

8   before they are on the call with the customer?

9       A    How much time do they have to do -- to look at

10  the --

11      Q    Payment transaction history.

12      A    It is a click away.  It generally -- you can

13  do it before you -- the first part of the call is you

14  are identifying who you are speaking to and identifying

15  yourself, so as you are -- as the introduction.  Call

16  goes, it is right there.

17      Q    I see.  So during standard introductory

18  comments, the collector will be orienting himself or

19  herself --

20      A    Yes.

21      Q    -- as to what the situation is?

22      A    Yes.

23      Q    Figuring out whether it is a broken promise or

24  NSF?

25      A    Yes.

1    Q    And then if it is a broken promise, focusing

2    on that part of the history showing it.  Is that

3    correct?

4    A    They should be focusing on resolving the

5    account, so I -- I guess I would be particular to say I

6    don't know that they necessarily -- I wouldn't say that

7    they need to focus on that.  They need to be aware of

8    it.

9    Q    Okay.  How long do those introductory comments

10   usually take, how many seconds?

11   A    Fifteen to 20, 25 seconds.

12   Q    Okay.  And once a call has been resolved, is

13   the collector -- there's been a call connection and a

14   resolution, is the collector required, then, to log

15   that into the servicing log?

16   A    Yes.

17   Q    And so the collector will put whatever

18   comments and codes are necessary to indicate the result

19   of the call?

20   A    Yes.

21   Q    And if the customer calls in again, is that

22   call routed to that same collector?

23   A    Could be.

24   Q    Is there a system for routing an incoming

25   customer call to the same collector who the customer

1    spoke with?

2         A    No.

3         Q    If -- is there a general collections number

4    for customers to call?

5         A    Yes.

6         Q    And if they call, is that just answered by the

7    next available collection representative?

8         A    It goes through the IVR first.

9         Q    Okay.

10        A    They look for where to send it.

11        Q    Okay.  What are the choices on the IVR?

12        A    The IVR asks for your account number, I

13   believe.  You might -- I think you can also put in your

14   Social as far as a customer interface, but it also

15   looks for -- it also looks for the -- I think they call

16   it antimatch.  They look for the caller ID, and then

17   look for it in our system and send it to the department

18   that that -- that that call is in -- I mean that

19   account is in.

20        Q    You mean front end or 30, 60, 90?

21        A    Yes.

22        Q    Once it is routed there, if it is on front

23   end, it goes to -- what? -- the next available

24   collector.?

25        A    (Nods head.)

158

1    Q    Front end collectors have extensions?

2    A    No.

3    Q    So if a customer calls in and wants to get

4  back to a particular collector, there's -- is there a

5  way of doing that?

6    A    Not without going through a supervisor.

7    Q    Okay.  All right.  Let's turn to the 30-day

8  team.  That's at page 983.  By the way, just, you know,

9  so I can recap this.  The practices with respect to the

10  front end team, those have been in place since the

11  beginning of 2006; is that correct?

12    A    Yes, what we just described.

13    Q    Okay.  Yeah.  Okay.

14        Let's turn to the 30-day team.  Okay.  Is

15  this -- this overview states that this is a manual

16  environment.  That means that the dialer is not used.

17  Is that correct?

18    A    We do use the dialer.  The back end does have

19  campaigns that are run maybe throughout the day; maybe

20  not.  Yeah.  I'm sorry, what was your question?

21    Q    You are answering it.

22    A    They do use the dialer.

23    Q    They do use the dialer.  Okay.  Let me just go

24  back.  With respect to the front end team, once they

25  have finished the auto dialer campaign, do they have a

1    predictive campaign mode all the time.

2       Q   I see.  So the dialer includes the predictive

3    and the manual on the front end?

4       A   Yes.

5       Q   Okay.  Let's talk about the 30-day team.  How

6    is the auto dialer, the predictive dialer, used in the

7    30-day environment?

8       A   Load to -- load a campaign, everybody signs

9    in, we will go through the -- it is basically all their

10    accounts loaded and called.  Again, the strategy varies

11    and depends on what strategy you are running, how it

12    was set up, when it was going to be run.  It varies.

13       Q   So on those campaigns, it is, like, the

14    30-day -- the calls are assigned as a collection agent

15    is available?

16       A   Yes.

17       Q   And is there also a manual component of the

18    30-day -- for the 30-day team where they are, you know,

19    selecting the numbers to dial rather than just

20    receiving them from the predictive dialer?

21       A   Most of the time in the 30-day they are in the

22    manual world.  70, 80% of their day is manual.

23       Q   Okay.

24       A   And, you know, the difference between the two

25    is the front ends, when they are in their manual time,

161

1    they are making their calls through the dialer.  Once

2    the back end gets done with their campaign, they go off

3    the dialer and just make their calls with their phones

4    through the system.

5        Q    Okay.

6        A    That's really the difference, I guess.

7        Q    Okay.  And when the 30-day team makes a call,

8    a manual call, do they leave a message with a

9    particular extension to call back?

10       A    Yes.

11       Q    So the 30-day team does have extensions?

12       A    Yes.

13       Q    And when it is an auto dialer campaign, the

14   same thing -- I'm sorry -- and a call is routed, does

15   the -- does the 30-day collection rep at the close of

16   the call leave an extension -- name and extension

17   number with a customer so the customer can call that

18   particular collection agent back at 30 days -- in the

19   30-day team?

20       A    They really shouldn't be leaving messages on a

21   predictive campaign in the back end.

22       Q    Okay.

23       A    They could, but they generally won't run

24   messages on those campaigns.

25       Q    Okay.  So on the back end messages will be

164

1    identification and is bound separately.)

2  BY MR. LEVY:

3    Q    My question for you is is Exhibit 30 the

4  standardized breach letter that is referenced on

5  page 983 on Exhibit 20 under guidelines?

6    A    I believe it is.

7    Q    Okay.  And is it correct that this letter is

8  sent out at the point when the account is 30 days

9  delinquent?

10   A    Yes.

11   Q    So if we assume that the payment is due the

12  1st of the month, the letter would go out ordinarily on

13  or about the first day of the following month?

14   A    Correct.

15   Q    And has this form of letter, this Exhibit 30,

16  is this form of letter still in use at CashCall?

17   A    I don't know that it is this same verbiage,

18  but there's a letter.

19   Q    Okay.  Do you know the period during which

20  this particular form of breach letter was used by

21  CashCall?

22   A    I don't.  I couldn't say with certainty.

23   Q    Okay.  Do you know how long CashCall has sent

24  out a breach letter at the 30-day delinquency point?

25   A    I don't.

1       Q    Okay.

2            (The document referred to below was

3       marked Plaintiff's Exhibit 31 for

4       identification and is bound separately.)

5    BY MR. LEVY:

6       Q    Let's mark this one the next in order,

7    Exhibit 31.  Is this a breach of promise to pay

8    notification from CashCall?

9       A    I don't know that I've actually heard it

10   called that, but this is a broken promise notification.

11      Q    That's what you would call it, a broken

12   promise notification?

13      A    (Nods head.)

14      Q    Okay.  Has it been CashCall's standard

15   practice to send the customer a broken promise

16   notification when a promise to pay date passes and

17   payment has not been made?

18      A    Say that again, has it been our --

19      Q    Has it been CashCall's standard process to

20   send a customer a broken promise notification when

21   there's a promise to pay in the system?

22      A    Yes.

23      Q    And that --

24      A    Breaks.

25      Q    -- promise is not kept.

166

1    A    Yes.

2    Q    Okay.  And does that go out shortly after the

3    promise to pay date passes?

4    A    Yes.

5    Q    Okay.  And how long has that been CashCall's

6    practice?

7    A    You know, I'm trying to -- I don't know that

8    this was automated.  I think this was supposed to be

9    sent by the collector, and then it could be automated

10   at this point, but I believe at the time that this was

11   sent it wasn't automated.

12   Q    Okay.

13   A    But I could be wrong.

14   Q    Do you know when it was automated?

15   A    The letter automation was complete just before

16   I got there, so it should have been maybe sometime

17   early '08, maybe end of '07.

18   Q    And before that, the letters were sent out --

19   A    With the collectors who were requesting the

20   letters, I believe.

21   Q    Who at the company would know?

22   A    Sean worked on the letter automation.  I

23   thought that was part of the -- was going to be part of

24   his testimony as far as the correspondence goes.

25   Q    Okay.  So let's leave the automation out of it

167

1    for a second and I'll ask you is this the form of

2    broken promise letter that is currently in use at

3    CashCall?

4        A    Something similar to this, I would say yes.

5    Word for word, I would have to look at it.

6        Q    Okay.  And how long has a broken promise

7    notification that's substantially this form been used

8    at CashCall?  Does that go back to 2006?

9        A    Yes.

10       Q    During the period when -- before the broken

11   promise letters were automated, would a request by a

12   collector to have one sent be notated in the servicing

13   transaction log?

14       A    If it is not -- if it is not in the notes, it

15   would be in -- it would be in e-mail history.  It might

16   be in a different screen, but it is notated in the

17   servicing system.

18       MR. LEVY:  Okay.  All right.  I have one more of

19   these.  This is Exhibit 32.

20           (The document referred to above was

21       marked Plaintiff's Exhibit 32 for

22       identification and is bound separately.)

23   BY MR. LEVY:

24       Q    Have you seen the letter in the form of

25   Exhibit 32 before?

1      A      Yes.

2      Q      Okay.  At what point in the collection process

3  is a letter in this form sent out?

4      A      This used to be -- generally it was sent out a

5  couple of days left in the -- towards the end of the

6  month, before the end of the month.

7      Q      Which month are you referring to?

8      A      The month of -- that they are past due, in the

9  back end.

10      Q      Was that within the first 30 days?

11      A      Not within the first 30 days, no.

12      Q      So would that be within the first 60 days?

13      A      Yes.

14      Q      And was this letter ever automated to your

15  knowledge?

16      A      I -- I don't know.  I don't believe it was,

17  but it could have been prior to me getting there.

18      Q      You don't know --

19      A      I don't know.  I don't believe it was.

20      Q      Okay.  So, to the best of your knowledge, on

21  Exhibit 32 the collector would have to ask that that

22  letter be sent out -- or direct that it be sent out?

23      A      The collector or his supervisor of the team.

24      Q      So this letter would normally be sent out

25  by -- what is it? -- the 30-day team?  Is that correct?

1    A    Yes.

2    Q    Okay.  All right.  Directing your attention to

3  page 984, again back on Exhibit 20 under "Procedures,"

4  Item 2, it says, "If collector is successful in making

5  contact with the customer, the collector shall obtain

6  the reason for delinquency and attempt to make proper

7  and qualified arrangements to collect the total amount

8  due."

9         What are proper and qualified arrangements?

10    A    Proper and qualified refers to the collector

11  being able to -- should be listening to the reason for

12  delinquency.  As far as why they became past due,

13  making qualified arrangements for a reasonable

14  solution, somebody is $900 past due and says I'll pay

15  you tomorrow, the collector should qualify that with

16  where the money is coming from, why they didn't have it

17  yesterday.  So when you say proper and qualified, they

18  should be able to -- they should be able to reasonably

19  expect the arrangements to be made.

20    Q    Okay.

21    A    Or kept.

22    Q    And I take it that a proper and qualified

23  arrangement would include a definite promise to pay

24  date.  Is that correct?

25    A    Yes.

170

1     Q    And would a proper and qualified arrangement

2    also require that the payment be via certified funds?

3     A    Would a -- say that again.

4     Q    It states here in the same section, "Those

5    arrangements must include payment via certified funds,

6    i.e., Money Gram, certified check, personal delivery of

7    cash to the CashCall offices."

8          Is that a correct statement of the company's

9    policy and practice with respect to proper and

10   qualified arrangements, at least for the 30-day team?

11    A    I would prefer it, but I don't -- proper and

12   qualified could be an ACH or check by phone.

13    Q    Okay.

14    A    But we would first ask for a certified check

15   or Money Gram or cash to the office, but if that's --

16   you can still put in -- you can still make the

17   arrangement with a post-dated check.

18    Q    You mean a personal check?

19    A    Uh-huh.

20    Q    Yes?

21    A    Yes.

22    Q    Okay.  But is it correct that collectors are

23   encouraged to get the money versus by Money Gram,

24   certified check, cash, ACH, or check by phone?

25    A    They are expected to ask for that first, yes.

DECLARATION UNDER PENALTY OF PERJURY

    I hereby declare under penalty of perjury that
the foregoing is my deposition under oath; are the
questions asked of me and my answers thereto; that I
have read same and have made the necessary corrections,
additions or changes to my answers that I deem
necessary.

    In witness thereof, I hereby subscribe my name
this __29__ day of __April__, __2010__.




                              _____

                              STEPHEN KLOPSTOCK

## CORRECTIONS

| Page | Line | Is | Should Be | Reason for Change |
|------|------|-----|-----------|-------------------|
| 86 | 8 | Matrix | Metrics | not what I said |
| 87 | 4 | Matrix | Metrics | |
| 89 | 16, 17, & 24 | Matrix | Metrics | |
| 103 | 25 | Call-ins | Call ends | |
| 105 | 21 | Matrix | Metrics | |
| 106 | 1 & 9 & 15 | Matrix | Metrics | |
| 117 | 19 & 23 | Matrix | Metrics | |
| 130 | 16 | Matrix | Metrics | |
| 159 | 23 | Matrix | Metrics | |

Signature of witness _____

211

1

2

CERTIFICATE

3

OF

4

CERTIFIED SHORTHAND REPORTER

5

6

7          The undersigned Certified Shorthand Reporter

8     of the State of California does hereby certify:

9          That the foregoing proceeding was taken before

10     me as the time and place therein set forth, at which

11     time the witness was duly sworn by me;

12          That the testimony of the witness and all

13     objections made at the time of the examination were

14     recorded stenographically by me and were thereafter

15     transcribed, said transcript being a true and correct

16     copy of my shorthand notes thereof;

17          That the dismantling of the original

18     transcript will void the reporter's certificate.

19          In witness thereof, I have subscribed my name

20     this date:_____.

21

22

23                          _____

24                          Certificate No. 4497

25

# Exhibits 22-23
# Submitted Conditionally
# Under Seal