**Exhibit 24**


P.O. BOX 1098
NORTHRIDGE, CA 91328-1098

**This Statement Covers**
From: 07/12/07
Through: 08/09/07

Need assistance?
To reach us anytime,
call **1-800-788-7000**
or visit us at **wamu.com**

EDUARDO DE LA TORRE
639 9TH ST APT 3A
DAVIS CA 95616-2237
Ildluldlalllullullullullullullullullullull

WaMu® Debit MasterCard® - It's fast, easy and convenient to use! Experience the freedom of a faster checkout without the use of checks or cash and easily track your debit card purchases. Eliminate another stop - get cash back at participating retailers when completing debit card purchases (subject to funds availability and transaction limits.)

## Summary of All Accounts Included in This Statement

| Product Name | Account Number | Term | Maturity Date | APY | Balance As of 08/09/07 |
|---|---|---|---|---|---|
| WaMu Free Checking | ███████ | | | | ████ |
| **Total Deposit Balance:** | | | | | ████ |

*Deposits at Washington Mutual are FDIC Insured.*




CHASE ⬡
WaMu

## Your WaMu Free Checking Detail Information

EDUARDO DE LA TORRE    **Account Number:** ▇▇▇▇▇
**Washington Mutual Bank, FA**

For a fast, easy way to pay your bills, activate online bill pay today. You choose who, when and how much you pay. Most payments arrive in 2 business days and all are backed by our on-time guarantee. Log on to wamu.com/bills and click pay bills and loans to learn more about our on-time guarantee and get started paying bills online today.

### Your Account at a Glance

| Beginning Balance | | Next Anniversary Date | |
|---|---|---|---|
| Checks Paid | | Available OD/NSF Fee Waivers | |
| Other Withdrawals | | **WaMu Debit Rewards** | |
| Deposits | | This statement period | |
| **Ending Balance** | | Total since anniversary date | |

| Date | Description | Withdrawals (-) | Deposits (+) |
|---|---|---|---|
| 07/16 | Stop Pay Charge | $30.00 | |
| 07/16 | CASHCALL 866590CASH | $216.55 | |
| 07/17 | REV-CASHCALL 866590CASH | | $216.55 |
| 07/18 | Overdraft Charge | $27.00 | |
| 07/18 | CASHCALL 866590CASH | $30.00 | |
| 07/19 | Overdraft Charge | $27.00 | |
| 07/20 | Overdraft Charge | $27.00 | |
| 07/20 | Overdraft Charge | $27.00 | |
| 07/20 | CASHCALL 866590CASH | $216.55 | |
| 07/23 | Overdraft Charge | $27.00 | |
| 07/23 | REV-CASHCALL 866590CASH | | $216.55 |

### Checks Paid

*Indicates check out of sequence

| Check Number | Date | Amount Paid | Check Number | Date | Amount Paid |
|---|---|---|---|---|---|

Calendar Year-To-Date Overdraft/Non-Sufficient Funds Charges (excluding any charges which have been waived or refunded):
  Overdraft charges
  Non-Sufficient Funds charges

Overdraft/Non-Sufficient Funds Charges-this statement period:
  Overdraft charges
  Non-Sufficient Funds charges

As of the statement end date, the fee for any Non-Sufficient Funds transaction, whether paid or returned, was $27.00 per transaction.

**Exhibit 25**

# WaMu

## Transaction History

**Eduardo De La Torre Checking**

Available Balance :

| Date | Description | Check# | Debit(-) | Credit(+) | Running Balance |
|------|-------------|--------|----------|-----------|-----------------|
| 7/23/2007 | REV-CASHCALL 866590CASH | | -$27.00 | +$216.55 | ($794.90) |
| 7/23/2007 | *OVERDRAFT CHARGE | | -$27.00 | | ($1,011.45) |
| 7/20/2007 | Check - 000000371 | 371 | -$300.00 | | ($984.45) |
| 7/20/2007 | CASHCALL 866590CASH | | -$216.55 | | ($684.45) |
| 7/20/2007 | *OVERDRAFT CHARGE | | -$27.00 | | ($467.90) |
| 7/20/2007 | *OVERDRAFT CHARGE | | -$27.00 | | ($440.90) |
| 7/19/2007 | Check - 0000000253 | 253 | -$40.00 | | ($413.90) |
| 7/19/2007 | Check - 0000090118 | 90118 | -$50.00 | | ($363.90) |
| 7/18/2007 | *OVERDRAFT CHARGE | | -$27.00 | | ($323.90) |
| 7/18/2007 | CASHCALL 866590CASH | | -$30.00 | | ($296.90) |
| 7/17/2007 | *OVERDRAFT CHARGE | | -$27.00 | | ($266.90) |
| 7/17/2007 | REV-CASHCALL 866590CASH | | | +$216.55 | ($239.90) |
| 7/17/2007 | *FOREIGN TRANSACTION FEE | | -$3.14 | | ($456.45) |
| 7/17/2007 | KARAKOY SB.ISTANBUL_0717 M | | -$314.71 | | ($453.31) |
| 7/16/2007 | CASHCALL 866590CASH | | -$216.55 | | ($138.60) |
| 7/16/2007 | *STOP PAY CHARGE | | -$30.00 | | $77.95 |

Deposits are accepted by Washington Mutual Bank (WMB) and Washington Mutual Bank fsb and are FDIC insured.



REDACTED

EQUAL HOUSING LENDER

P0091

De La Torre
EXHIBIT NO. 2
DATE 11·10·09
Y. FENNELLY CSR5496

# Exhibit 26

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3

 4

 5

 6    KRISTA O'DONOVAN, and        )
      EDUARDO DE LA TORRE,         )
 7    individually and on behalf   )
      of all others similarly      )
 8    situated,                    )
                                   )
 9              Plaintiffs,        )
                                   )  Case No.
10         v.                      )  CV 08-3174-MEJ
                                   )
11    CASHCALL, INC., a California )
      corporation; and DOE 1       )
12    through DOE 50, inclusive,   )
                                   )
13                                 )
                Defendants.        )
14    _____)

15

16    Deposition of:    SEAN BENNETT

17

18

19    Date and time:    Wednesday, March 17, 2010
                        9:33 a.m.
20

21

22    Location:         695 Town Center Drive
                        Costa Mesa, California
23

24    Reporter:

25    Patricia Tornell, CSR, RPR
```

1           COSTA MESA, CALIFORNIA

2           WEDNESDAY, MARCH 17, 2010

3                9:33 A.M.

4

5              SEAN BENNETT,

6        called as a witness, and having

7        been first duly sworn by the

8        Certified Shorthand Reporter, was

9        examined and testified as follows:

10

11              EXAMINATION

12    BY MR. LEVY:

13        Q    Good morning, Mr. Bennett.

14        A    Good morning.

15        Q    Could you state your full name for the

16    record, please.

17        A    Sean Michael Bennett.

18        Q    And what is your current business address?

19        A    My current business address is 1600 Douglas

20    Road, Anaheim, California, 92806.

21        Q    How long have you worked at that address?

22        A    At that address, since February of 2007.

23        Q    How long have you worked for CashCall?

24        A    A little over six years, since December of

25    2003.

1    Q    Have you worked for CashCall continuously

2    during that period?

3    A    Yes.

4    Q    Have you had employment with any other

5    employer during that period?

6    A    No, I've not.

7    Q    Have you been a full-time --

8    A    Yes.

9    Q    -- employee of CashCall?

10        One point I just wanted to reference with you

11   is that you should wait until I finish the question --

12   A    Okay.

13   Q    -- no matter how obvious it is what I'm going

14   to ask you --

15   A    All right.

16   Q    -- for a couple reasons.  One, the court

17   reporter can't take down both of us at once.

18   A    Okay.

19   Q    By the way, have you given a deposition

20   before?

21   A    Yes, I have.

22   Q    How many times?

23   A    Twice.

24   Q    Were any of those occasions in your role as a

25   CashCall employee?

1     Q   What's the basis -- well, strike that.

2        Let's look at the deposition notice.

3        These documents here are the exhibits that

4  have been marked, and here's Exhibit 1.

5        I'd like you to take a look at page 5 -- page

6  8 -- excuse me -- paragraph number 5.

7        My question for you is have you been

8  designated by CashCall to testify as its corporate

9  designee on CashCall's policies, procedures and

10  processes concerning loan servicing during the time

11  period from January 1st, 2002, to date?

12     A   Not to correct you, but July or January?

13     Q   July.  Excuse me.

14     A   I have for specific matters, yes.

15     Q   What specific matters?

16     A   My understanding is that matters that I will

17  be addressing will be matters of the ACH, the

18  Automated Clearing House, and Loss Mitigation.

19     Q   So you're not going to testify regarding

20  Customer Service representative practices in

21  general?

22     A   No, I'm not.

23  MR. SEILING:  We can talk about that.  I think it

24  depends on your questions.

25  MR. LEVY:  Why don't we go off the record a

1    generally in one place.

2    BY MR. LEVY:

3        Q   Do you know where they're stored?

4        A   It would really depend on the department

5    servicing ranges over different departments;

6    Collections, Customer Service, Loss Mitigation.

7        Q   Okay.  Do you have knowledge where any of

8    those documents are kept?

9        A   Yeah, I -- let's see.  Some of them are

10   stored on that same servicing drive.

11       Q   What other locations, to your knowledge, are

12   any of these documents kept?

13       A   They could be saved locally on a supervisor

14   or manager's individual drive.

15       Q   Is there someone at CashCall who is in charge

16   of maintaining the documents relating to employee

17   reviews in the Loss Servicing Department?

18       A   An individual person in charge of all of

19   them?

20       Q   Of the custody of the documents or the

21   records.

22       A   Not to my knowledge.

23       Q   Okay.  If you'd turn to page 3 of the

24   deposition notice, Exhibit 1, have you been designated

25   by CashCall as the corporate designee to testify

1    regarding CashCall's policies, procedures and

2    processes concerning electronic fund transfers during

3    the time period from July 1st, 2002, to date?

4        A    Yes, I have.

5        Q    So you will be testifying regarding all of

6    the items listed under there?

7        A    Yes.

8        Q    So is it correct that your designation to

9    testify here today includes subject matters 1(a)

10   through (i); 3 limited to subcategory (j); and 5

11   limited to subcategories (f), (g) and (h)?  Is that

12   correct?

13       A    I'm sorry?  You said --

14       MR. SEILING:  That is correct.  That's what we're

15   designating him for.  That's what I as the counsel am

16   designating him for, yes, that's correct.

17   BY MR. LEVY:

18       Q    Now, turning to page 11 of this exhibit,

19   under item 2 there are documents relating to subject

20   matter 2.  Do you see that there?

21       A    Yes, I do.

22       Q    Have you participated in any search for

23   documents --

24       MR. SEILING:  I think you want to ask about 1,

25   don't you?

1    THE WITNESS:  To my knowledge as far as a formal

2 training manual, it did not exist.  There was

3 documentation creating things such as a call model,

4 what we wanted to see in every phone call.  Whether

5 that was actually delivered to the associate via

6 writing, I'm not positive about that, --

7    MR. LEVY:  Okay.

8    THE WITNESS:  -- but it was conveyed verbally.

9    MR. LEVY:  Okay.  I'll reserve the questions on

10 the collector training for Mr. Klopstock.

11 BY MR. LEVY:

12    Q   Now, when you started at CashCall in 2003,

13 was there a division of the company known as the Loan

14 Servicing Division?

15    A   I don't believe it was referred to as Loan

16 Servicing.  There was approximately six or seven

17 Collections representatives with a manager and, I

18 believe, one supervisor; but I don't believe there was

19 Loan Servicing.  There was no Customer Service

20 Department at that point in time.

21    Q   When did the Customer Service Department

22 start?

23    A   I believe it was somewhere in the -- let's

24 see -- probably in the beginning to mid '05.

25    Q   Was there a separate Payment Processing

1    Department established at that time as well?

2        A    In 2005, yes, it would have been established.

3    That might have even come a little earlier than

4    Customer Service.

5        Q    And what -- by 2005 had the Collections

6    Department been brought under the Loan Servicing

7    Division as well?

8        A    Yes, it would have been all encompassed.

9        Q    I take it that there had been a Collections

10   Department before Loan Servicing was born or given an

11   official name?

12       A    There's been a Collections Department since

13   you know, Day 2, basically.

14       Q    And then there's a division of Loan Servicing

15   that they call Recovery; is that correct?

16       A    Correct.

17       Q    So were all four of those functions --

18   Customer Service, Payment Processing, Collections and

19   Recovery -- all subsumed under Loan Servicing as of

20   2005?

21       A    I don't have a definite answer on that date.

22   The Recovery -- I would say probably by the end of

23   2005 they were all under that same umbrella.

24       Q    When in 2005 were Customer Service, Payment

25   Processing, and Collections all placed under Loan

1      Q    All right.  Now, in 2005 were all of these

2   departments -- Customer Service, Payment, Collections,

3   Recovery -- were they all located in the same

4   building?

5      A    Yes, they were.

6      Q    And --

7      MR. SEILING:  Arthur, we're doing an awful lot of

8   just background and corporate structure sort of stuff,

9   and I guess if you want to do this with him, fine, but

10  I sure hope we don't get another PMK asking for the

11  same stuff, and I sure hope we don't ask every single

12  witness the same questions.  I mean I'm -- ask away,

13  but so far I've seen about three questions about what

14  he's designated to talk about.

15     MR. LEVY:  Well, he is designated to talk about

16  the Customer Service Department, and I'm tracing the

17  history of that department.

18     MR. SEILING:  I don't know that's that accurate.

19     MR. LEVY:  It's in 5(f).

20         I'll move on to another question.

21  BY MR. LEVY:

22     Q    Okay.  In terms of the Customer Service

23  Department, in 2005 was that located on Douglas -- is

24  it Douglas Road?

25     A    No, it was not.

1    Q    There was a prior location of the company?

2    A    Correct.

3    Q    Then you moved to Douglas; is that correct?

4    A    We have moved twice since the inception of

5    the company.

6    Q    Okay.  Well, then, regardless of the address,

7    all of the Customer Service functions were in one

8    location in California; is that correct?

9    A    For Customer Service, correct, yes.

10    Q    Okay.  And were there any Customer Service

11    locations outside of California?

12    A    No, there were not.

13    Q    And did the Customer Service Department

14    service all of the loans including those that were

15    extended by CashCall and those by the First Bank and

16    Trust of South Dakota?

17    A    I'm sorry.  You're asking if Customer Service

18    serviced both of those?

19    Q    Yes.

20    A    Yes, they did.

21    Q    Was there any time where Customer Service --

22    the Customer Service Department treated those loans

23    any differently -- that is, both the

24    CashCall-originated versus those that were originated

25    by others than CashCall that CashCall was servicing?

1    A    And to be specific, they didn't service loans

2    until CashCall took ownership of the loan.

3    Q    Correct.

4    A    And you're asking me if they serviced them

5    any differently?

6    Q    Yes.

7    A    I mean as far as having one representative

8    versus another representative, I would say I don't

9    have an answer to that.  As far as what should have

10    been happening in every situation, they should all be

11    serviced the same.

12    Q    And has that same Customer Service Division

13    serviced all of the CashCall and First Bank and Trust

14    loans to date?  In other words, has it all been done

15    by that same division?

16    A    It's all been done by the same Customer

17    Service Department.

18    Q    Located at the CashCall headquarters?

19    A    I don't know if -- I never referred to as

20    headquarters before.

21    Q    What do you call it?

22    A    I mean I guess now it would be -- we're all

23    centrally located, I mean aside from a second

24    Collections location, but I mean -- I guess I just

25    never referred to it as headquarters.  That's why.

1      Q   Is it called the Anaheim location?  Is that

2  okay?

3      A   Yeah.  Yeah.  We refer to it as the Anaheim

4  location.

5      Q   At the Anaheim location.  Okay.

6      And other than the loans that CashCall

7  originated and the loans that were originated by First

8  Bank and Trust of South Dakota which CashCall provides

9  servicing on, were there any other lenders whose loans

10  CashCall serviced?

11     A   I believe First Bank of Delaware was another

12  bank, but other than that, not to my knowledge, no.

13     Q   All handled by the same --

14     A   All handled by the same group.

15     Q   And all handled, at least, on a

16  policies-and-procedures basis in the same way; is that

17  correct?

18     A   You're speaking from a Customer Service

19  standpoint still?

20     Q   Yes.

21     A   Yes.

22      I'm sorry for interrupting.  Can I get a

23  break to use the restroom?

24    MR. LEVY:  Sure.  Let's go off the record.

25       (Whereupon a discussion was held

1    detailed.

2        MR. SEILING:  What do you mean by "the processes

3    of the Customer Service Department"?

4        MR. LEVY:  I mean what their practices, tasks,

5    functions are, what they do.

6        THE WITNESS:  In detail as far as everything that

7    they do, no.  That's one department that I've never

8    been affiliated with, so --

9    BY MR. LEVY:

10       Q    Fair enough.

11           Okay.  What is the relationship between the

12   Customer Service Department and the Collections

13   Department?

14       A    The relationship would be they're servicing

15   the same loans.  And just to be honest with you,

16   you're probably going to get a better answer out of

17   Steve Klopstock than me because he's the Director of

18   Collections, so he's going to know that affiliation a

19   lot better.

20       Q    Okay.

21       A    You know, it's a matter of they're all the

22   same.  They're all CashCall loans.  So I guess it

23   really depends on if they're late or if they're not

24   late.  That would be the connection between the two.

25       Q    So the Collections personnel are different

1    from the Customer Service personnel, I take it?

2        A    Yes, they are.

3        Q    But they also work at the Anaheim location;

4    correct?

5        A    The collectors?  Is that what you're

6    referring to.

7        Q    Yes.

8        A    We have two locations, so we have collectors

9    in Anaheim, and we have collectors in Las Vegas.

10       Q    Do you have any knowledge of how incoming

11   telephone calls are routed to Customer Service

12   representatives?

13       A    I do not.

14       Q    Why don't you turn to what has been marked as

15   Exhibit 3 in this pile here.

16            Have you seen this manual before?

17       A    Yes, I have.

18       Q    Can you tell us what it is?

19       A    This would be the training manual for

20   Collections.

21       Q    Can you say whether this is the first

22   training manual that was developed?

23       A    I would not know the answer to that.

24       Q    Were there --

25       MR. SEILING:  This is the Collections manual.

1   of CashCall regarding electronic fund transactions?

2        A    In general?

3        Q    Yes.

4        A    Yes.

5        Q    Where are those?

6        A    It would go back to the same question of the

7   policies and procedures of Loan Servicing.

8        MR. LEVY:  Let's mark this as the next in order.

9             Is that Number 19?

10       THE WITNESS:  I have 19 here.

11       MR. LEVY:  All right.  Here's 20.  Here's 21.

12             (The documents referred to above

13             were marked Plaintiffs' Exhibits 20

14             and 21 for identification by the

15             Certified Shorthand Reporter and are

16             bound separately and appended hereto.)

17   BY MR. LEVY:

18       Q    Can you tell us what Exhibit 20 is?

19       A    Exhibit 20 appears to be the CashCall Loan

20   Servicing Department policies and procedures.

21       Q    This particular one, if you'll look at the

22   second page, it's dated April 20th of 2006.

23       A    Correct.

24       Q    Have you ever seen this document before?

25       A    Yes, I have.

1    Q    When did it first come to your attention?

2    A    I don't know when it first came to my

3  attention.  I believe it would have been when I was

4  assisting with the creation of the Loss Mitigation

5  policies and procedures for this manual.  But date, I

6  have no idea.

7    Q    Did you participate in the preparation of any

8  part of it?

9    A    Yes, the Loss Mitigation portion.

10    Q    That's all?

11    A    Yes.

12    Q    Do you have any knowledge as to how, if at

13  all, this policies and procedures manual was

14  distributed within the company?

15    A    I have no knowledge of if or how.

16    Q    Have you used it at all in your work?

17    A    Used it?  I don't really understand.  "Use

18  it" meaning reference it or --

19    Q    Do you reference it in your work?

20    A    I don't tend to reference it, no.  I would

21  only -- if we are changing something, then it would be

22  to make sure that it gets updated.

23    Q    Have you used it at all in supervising

24  CashCall employees?

25    A    Not directly, no.

1     Q  Have you specified that this manual be

2 distributed to the employees that you supervise

3 directly or indirectly?

4     A  I have not, no.

5     Q  Do you have any knowledge as to whether

6 that's been done?

7     A  I do not.

8     Q  Who was the person in charge of preparing

9 Exhibit 20?

10    A  There was a third party that came in and used

11 the information provided by department managers, the

12 vice-president.  I don't know who -- what her name

13 was.

14    Q  Who at CashCall was the lead person on this

15 project in preparing a policies and procedures

16 manual?

17    A  I believe it was Louis Ochoa.

18    Q  Do you know whether there was a version of

19 the policies and procedures manual before April of

20 2006?

21    A  Not to my knowledge.

22    Q  Is there a process at CashCall by which the

23 manual is updated?

24    A  No formal process, no.

25    Q  Has it been updated?

1     A    Once again, it's a broad question.  What

2    aspect?

3     Q    Okay.  Is there a formal training program --

4     A    There is no. --

5     Q    -- that covers -- excuse me -- that covers

6    electronic funds transactions?

7     A    There is no formal training program, no.

8     Q    Is there any kind of informal guidance given,

9    say, on a one-to-one basis?

10     A    Yes, there's a one-to-one basis.  It can

11    either come from myself or the Payment Processing

12    supervisor.

13     Q    And these are the Payment Processing

14    representatives that are being trained; is that

15    correct?

16     A    Correct.

17     Q    And have any written materials been used in

18    that informal training process?

19     A    Ordinarily, if someone is joining the

20    department, they would read through the Payment

21    Processing training manual, but that's going to go

22    hand in hand with the one-on-one training.  The reason

23    that it goes one-on-one with the -- or hand-in-hand

24    with the one-on-one training would be to make sure

25    that the current way that everything is being done is

1    being conveyed from one person to another.

2        Q    Okay.  Other than the Payment Processing

3    training manual, are any other document used in that

4    process?

5        A    I don't believe so, no.

6        Q    Have there ever been formal classes that have

7    covered electronic funds transfers with Payment

8    Processing representatives?

9        A    Not to my knowledge, no.

10       Q    How long have you had this responsibility for

11   supervising Payment Processing with regard to

12   electronic funds transactions?

13       A    I've been the Payment Processing manager for

14   approximately two years or so.

15       Q    So that was one of the responsibilities you

16   took on in October of 2006 or -- I'm sorry.  Is that

17   correct?

18       A    No.

19       Q    When did you first become Payment Processing

20   supervisor?

21       A    Approximately two years ago.

22       Q    So that's a formal title that you hold?

23       A    It's a formal title that I hold.

24       Q    And so that when you became Payment

25   Processing supervisor in early 2008?

1      A   I'm sorry if I misheard you before.  The

2  formal title that I hold is Payment Processing

3  manager, not supervisor.

4      Q   Okay.

5      A   And as far as when I took on the role, I

6  don't know exactly.  What I'm stating is approximately

7  two years is how long I've been in there.

8      Q   Who had that role before?

9      A   Jean Kohles.

10     Q   How long did she have that role?

11     A   I'm not entirely sure.

12     Q   And I take it that Ms. Davis as Payment

13  Processing supervisor reports to you; is that correct?

14     A   Correct.

15     Q   Are there any other Payment Processing

16  supervisors that have reported to you?

17     A   Yes, one.

18     Q   Who is that?

19     A   Linda Moreno, M-o-r-e-n-o.

20     Q   What was her -- her position was Payment

21  Processing supervisor?

22     A   Correct.

23     Q   And is she still a CashCall employee?

24     A   Yes, she is.

25     Q   Are there any Payment Processing supervisors

 1     that you know of who have left the company?

 2          A    Not to my knowledge.

 3          Q    During the period you've been Payment

 4     Processing manager, how many Payment Processing

 5     representatives or clerks have there been at one given

 6     time?

 7          A    At one given time?

 8          Q    Yes.

 9          A    The most, five.  The least, three.

10          Q    Have any of those individuals left?

11          A    Yes.

12          Q    Who?

13          A    Erika Cueva, E-r-i-k-a C-u-e-v-a.

14               When you say "left," do you mean voluntarily?

15          Q    Left employment with the company --

16          A    Okay.

17          Q    -- for any reason.

18          A    You want me to give you all the names of

19     everyone who has left Payment Processing since I've

20     been in charge?

21          Q    Yes.

22          A    Rhonda Lewis, R-h-o-n-d-a L-e-w-i-s.

23               I'm drawing a blank on one of the names, but

24     one is Siovhan Sanchez, S-i-o-v-h-a-n S-a-n-c-h-e-z.

25               Charles Pierce, P-i-e-r-c-e.

1          Jane Soakai, J-a-n-e S-o-a-k-a-i.

2          Shanita Payne, S-h-a-n-i-t-a P-a-y-n-e.

3          And there's one more, but I'm really drawing

4     a blank on that name.

5          Q    Well, thank you for your recollection.

6          Ms. Cueva, do you know where she works or

7     lives now?

8          A    Do not.

9          Q    How about Rhonda Lewis?

10         A    I do not.

11         Q    Siovhan Sanchez?

12         A    I do not.

13         Q    Charles --

14         A    Pierce.

15         Q    -- Pierce?

16         A    I do not.

17         Q    Jane Soakai?

18         A    No.

19         Q    Shakita Payne?

20         A    Shanita, no.

21         Q    Shanita.  Thank you.  Beg your pardon.

22         Okay.  And the Payment Processing unit covers

23    all loans that are serviced by CashCall whether they

24    were originated by CashCall, First Bank of Delaware,

25    First Bank of South Dakota; right?

1        A    Correct.

2        Q    And the Payment Processing covers the

3    unsecured personal loans and mortgage loans as well;

4    is that true?

5        A    That's not correct.

6        Q    Okay.  So this Payment Processing unit we're

7    talking about is just consumer loans, --

8        A    The consumer --

9        Q    -- unsecured consumer loans?

10        A    Yeah, unsecured consumer loans.

11        Q    And this is the only Payment Processing unit

12    in the company, the one at Anaheim, that is overseen

13    by you at the present time?

14        A    Yes.

15        Q    I may have asked this, but you referred to

16    using the Payment Processing training manual with

17    respect to your one-on-one training, if you will, of

18    Payment Processing representatives.

19            Have you used the Loan Servicing Department

20    policies and procedures that are marked as 20 or 21?

21        A    No, I have not, not in direct training.

22        Q    Are there provisions of the Payment

23    Processing training manual that relate to electronic

24    funds payments?

25        A    I believe so, yes.

 1      Q   Where is that training manual located?

 2      A   I have a hard copy of it.

 3      Q   Have you reviewed it to prepare to testify

 4   today?

 5      A   No, I've not.

 6      Q   Let's turn to Exhibit 20.

 7          If you would, look at the page number-stamped

 8   in the lower right-hand corner, 944.

 9      A   Okay.

10      Q   Can you give us your definition of what an

11   automated clearing house or ACH payment is?

12      A   My definition of it?

13      Q   Yes, so that we're talking about the same

14   thing.

15      A   A pre-authorized withdrawal from the

16   customer's approved -- authorized bank account by

17   CashCall for the purpose of payment.

18      Q   So throughout this deposition we might call

19   them automated clearing house payments or ACH payments

20   or electronic funds transfers, but we'll use that

21   terminology interchangeably.  Is that okay?

22      A   Yes.

23      Q   All right.  Is it correct as stated here that

24   the ACH payment is the primary and preferred method

25   for CashCall customer loan payments?

1    A    Correct.

2    Q    Why is that?

3    A    The ease to the company and the customer.

4    Q    Is it true that all loans that are funded

5    begin with electronic funds transfer as the mode of

6    payment?

7    A    Yes.

8    Q    Is it correct as stated here that maintaining

9    and/or returning customers to active, timely ACH

10   status is an ongoing, measurable objective for all

11   CashCall loan servicing personnel?

12   A    Yes.

13   Q    Why is maintaining customers on ACH an

14   objective for loan servicing?

15   A    Once again, the convenience or the ease for

16   the customer and the company.

17   Q    So the company goes to some length to make

18   sure the people stay on ACH status; is that correct?

19   A    That's a very vague question.  Define "some

20   length."

21   Q    The company puts significant energy into

22   seeing that people stay on ACH; is that correct?

23   MR. SEILING:  Same objection.  It's vague -- his

24   objection.  Can you answer the question?

25   THE WITNESS:  I -- not with full confidence in

1    A    Steve Klopstock, I believe, uses it.

2    Q    Do you know whether it's used at all in

3  evaluating Customer Service personnel?

4    A    I don't believe so.

5    Q    What about for evaluating Payment Processing

6  personnel?

7    A    No.

8    Q    Are you, as Payment Processing manager,

9  involved in the evaluation of Payment Processing

10 personnel's performance?

11   A    Yes.

12   Q    Okay.  Would you describe that, please.

13   A    My involvement in that actual performance

14 would be if I catch errors being made, if I am

15 reviewing accounts and see that something was done

16 either correctly or incorrectly, I can then --

17 ordinarily the process would be to have Ms. Davis, the

18 Payment Processing supervisor, address the employee

19 about that.  More broad evaluation terms would be they

20 receive monthly reviews from Ms. Davis based on her

21 efficiency percentage, different categories, and my

22 involvement would be more towards once they reach a

23 year worth of those monthly reviews would be working

24 with Ms. Davis to create an annual review for that.

25   Q    So -- you mentioned an efficiency percentage.

1     A    Uh-huh.

2     Q    What does that reflect?

3     A    It reflects the processes and which they are

4  doing in the system.  It mainly would be posting of

5  checks, reversing of NSF checks, posting of

6  corrections via Money Gram, posting of reallocation of

7  payment towards -- you know, per customers' requests,

8  responding to different information via the

9  centralized in-box for Payment Processing, so if a

10  manager requests a fee to be waived, making sure that

11  that fee is waived.  Completing -- I would have to go

12  through all my -- all of the representatives' job

13  responsibilities to kind of get it, but it's taking

14  all of their job responsibilities and it's basically

15  saying out of all these job responsibilities how many

16  errors were there.

17     Q    And how is the efficiency percentage

18  measured?  What numbers are taken into account?

19     A    An account of everything that they do, and

20  then we take a percentage based off of that.

21     Q    Well, what statistics are used to generate

22  the percentage?  What are you measuring?

23     A    That's what I was just listing to you.  Do

24  you want me to list everything we do in Payment

25  Processing or --

1      A    The pending ACH does not show up in the

2    transaction log or the payment history.  It is going

3    to show up on our servicing screen, our main servicing

4    screen.  Once we receive notification that this

5    payment is actually settled, that it is a good

6    payment, that's when it would appear in the payment

7    history, the payment transaction history.

8      Q    So is a record -- are the records kept on

9    which transactions are posted in the system by Ms.

10   Jecquinto?  Is that something that's recoverable?

11     A    Well, we have a -- we can get a record of any

12   ACH that's ever posted to the account, not

13   necessarily, like, through her, through reporting.

14     Q    And when she does post, is it coded in a

15   certain way to indicate that it is coming through the

16   daily ACH request queue, if you will?

17     A    Once it's actually posted to the account,

18   when the payment actually clears, or even if we're

19   doing our report it will be logged as a request ACH as

20   opposed to a scheduled ACH.

21     Q    And so the difference of the request ACH

22   would show up in your payment processing system,

23   correct?

24     A    It's not a payment processing system.

25   It's -- we use what's called the Cognos 8.  It's a

1  reporting system to pull any sort of reporting.

2      Q   And then once it's processed, if the ACH is

3  paid, then it would show up in the transaction log?

4      A   The payment transaction history, yes, it will

5  say "Request."

6          There's a comment log on every transaction

7  that we do.  In that comment log it would say that it

8  was a request.

9      Q   Okay.  That would be in the payment history;

10  correct?

11     A   The payment transaction history.

12     Q   And then what about the transaction log which

13  is the list of all contacts, the contact log?  Would

14  it show up there, too?

15     A   That would also be there.

16     Q   And it would be marked "Request"?

17     A   Right.  It will have the same comment that's

18  in that comment log on the payment transaction

19  history.

20     Q   Okay.  And what if the ACH fails, then

21  what?

22     A   It will state -- well, first of all, I didn't

23  know you were referring to the comment log, the

24  servicing log.  That's what -- my terminology for it

25  is the servicing log.  When the pending ACH is

1    created, it will actually say "Pending ACH created."

2    If it clears, it will say "Payment posted" with the

3    comment log of what it said.  If it were to come back

4    to us for whatever reason, the payment will actually

5    post and then reverse, --

6        Q    I see.

7        A    -- the reason being if it's a non-sufficient

8    funds, you know, posting in reverse we need to

9    recognize it as being a non-sufficient funds ACH.  And

10   it will state that.  It will tell you the reason

11   within the comment log and within the payment

12   transaction history of why it came back to us.

13       Q    So with respect to the payment transaction

14   history, once this request is -- ACH is processed, it

15   will come back and appear on the payment log as a

16   request ACH regardless of whether it gets money or

17   not.  If it gets money, it will be indicated as paid,

18   and, if not, it will be reversed?

19       A    The only difference would be -- you know,

20   when you're looking at a payment transaction history,

21   there's three different ways you can look at it.  You

22   can look at it where it's just looking at funds that

23   actually did come in.  There's another way you can

24   look at it where it's funds that came in along with

25   the receivables that were created.  And the last one

1    is all transactions.  So if it were to reverse for

2    whatever reason, you would have to go to the

3    all-transactions one to see that it was there and then

4    it came off.

5         Q    Okay.  And the request ACH would also appear

6    on the comment log when the request is made; correct?

7         A    By the collector.

8         Q    By the collector or by your payment

9    processing clerk?

10        A    Well, you're using -- the collector would be

11   documenting the request that was made, so the

12   collector would be documenting that in the

13   conversation they had with the customer themselves.

14   The Payment Processing rep would merely post the

15   payments which would create the pending ACH on the

16   account and would also log in the servicing log

17   "Pending ACH created."  There's no details behind the

18   "Pending ACH created."  It's just "Pending ACH

19   created."

20        Q    Okay.  I guess that's where I'm not following

21   you.  With respect to the servicing log, we're talking

22   about the comment log?

23        A    Right.

24        Q    Okay.  On the comment log the standard

25   procedure would be for the collector or Customer

1    Service representative, if it was that, to log in the

2    request; correct?

3         A    Correct.

4         Q    And what would there be?  Specific language

5    or a code that's used for that?

6         A    Now you're just discussing language as far as

7    how a collector documents the account.

8              Is there expectation as to what needs to be

9    in every documentation when speaking to the customer?

10   Yes.

11             Does everyone have a slightly different way

12   to do it?  Absolutely.

13        Q    Okay.

14        A    But you would see some sort of language that

15   should be similar to "Customer requested ACH" for this

16   amount, you know, for this date.  And ordinarily what

17   they will place in there is -- when they submit the

18   ACH request into the Access database itself, it

19   automatically generates what we call a ticket number,

20   and you usually see it reference the ticket number in

21   there as well because we always want to be able to --

22   if any changes to that request need to be made or you

23   need to cancel that request, we'd much rather use a

24   ticket number as opposed to a loan number because

25   there are situations where customers call in and say,

1    and -- I'm thinking about what you said, and I'm going

2    to tailor my questions accordingly.

3    BY MR. LEVY:

4        Q    Do you have knowledge as to how the

5    collectors are supposed to handle these special ACH

6    requests, what the procedure they're supposed to

7    follow is?

8        A    That would be a Steve Klopstock question.

9        Q    What about Customer Service reps who are

10   receiving them?

11       A    Once again, it's going to be basically

12   probably the same between the two, so it's Steve

13   Klopstock.

14       Q    How about Recovery personnel?

15       A    Same thing.

16       Q    Are there any other Access files that are

17   prepared for ACH processing other than the daily ACH

18   requests?

19       A    No.

20       Q    Does the Payment Processing Department

21   confirm the ACH request with the customer before

22   processing it?

23       A    No, they do not.

24       Q    Okay.  Returning to Exhibit 20, same page,

25   944, there's a third paragraph which says, "CashCall

1    loan payments are due on the 1st of each month."

2          Do you see that there?  That's the beginning

3    of it.

4       A    Yes, I do.

5       Q    Okay.  Is it correct that all loans that are

6    serviced by CashCall begin with a 1st of the month

7    payment date, periodic payment date?

8       A    You're asking for a due date?

9       Q    Yes.

10      A    Yes.

11      Q    Is there a different date on which the

12   periodic payment is due?

13      A    The payment is due on the 1st on all CashCall

14   loans.

15      Q    There might be a first payment that's on an

16   odd day of the month, but the periodic payments are

17   due on the 1st?

18      A    Every payment is due on the 1st even if it is

19   the first payment?

20      Q    And is this correct, what it says here, that

21   CashCall offers six ACH date options?

22      A    You make me count them in my head.

23          It's the 1st, 3rd, 5th, 10th, 15th and 22nd

24   so, yes, six.

25          Q    And so how is that option -- how are those

1   options made known to customers?

2       A    I believe those options are conveyed through

3   the welcome call, but I cannot confirm that 'cause I'm

4   not sure if that's exactly true.  The word-of-mouth

5   option would be the primary way, you know, speaking to

6   the customers themselves.  I can't confirm it, but I

7   believe it's also on our -- for those customers who

8   opt to receive payment reminders or statements, it

9   will be on there as well.

10      Q    So this reference here to the six ACH date

11  options is a reference to the periodic day of the

12  month when the ACH is processed; correct?

13      A    I don't quite understand your question.

14      Q    The payment options refer to the day of the

15  month on an ongoing basis where the ACH is

16  processed?

17      A    Yes.

18      Q    So if a customer calls up and says, "I want

19  to change my ACH from the 1st to the 5th," CashCall

20  will do that; --

21      A    Yes.

22      Q    -- correct?

23          And so then the ACH is processed on the 5th

24  rather than on the 1st?

25      A    Their scheduled ACH for their monthly payment

1    is processed on the 5th within the month that it is

2    due for.

3        Q   And that continues on an ongoing basis;

4    correct?

5        A   Provided the customer remains current.

6        Q   And that does not change the due date,

7    though, the 1st?

8        A   That does not change the due date.

9        Q   So if the customer has elected the 15th of

10   the month, if the customer's ACH doesn't yield the

11   payment, then there's a late fee due as well;

12   correct?

13       A   A late fee is assessed on our loans after the

14   15th, so if they were scheduled for the 15th and it

15   came back to us non-sufficient funds, yes, a late

16   charge would become due.

17       Q   So it's all loans have a payment date of the

18   1st and a late date of the 15th; correct?

19       A   Correct.  After the 15th.  I'm sorry.

20   Payment received after the 15th.

21       Q   Here it talks about Money Gram as the

22   preferred payment method.

23           Is that a Collections issue or --

24       A   Issue?

25       Q   I'll just ask you --

1    A    No, it doesn't generate it.  It generates

2  information used for it.

3    Q    Okay.  So the information -- the data is

4  logged into Cognos?

5    A    I'll give you an example.  I need to pull

6  every loan that's due for 3/1, 2010, but I don't want

7  to sit there and go through a servicing system and

8  just try to find every loan that's due for 3/1, 2010.

9  I can go to Cognos and say, "Give me every loan for

10  3/1, 2010.  Give me what the principal balance is,"

11  that information.

12    Q    So Cognos is --

13    A    It's a reporting tool.

14    Q    Is reporting and managing out of the loan

15  servicing --

16    A    Yes.

17    Q    -- system?

18         Thank you.

19         Okay.  Turn to page 956.  Under "Policy" it

20  states:

21             "Representatives shall make every

22        attempt to convince customers to maintain

23        active ACH payment status."

24             Is that a correct statement of the policy of

25  CashCall?

1    A    I would say so, yes.

2    Q    Has that been the case since you've been

3    employed by the company?

4    A    I would not say that, no.

5    Q    When did that become the policy?

6    A    I couldn't tell you.  I have no idea.

7    Q    Okay.

8    A    I don't know.

9    Q    Did -- when you started in 2003, --

10   A    Uh-huh.

11   Q    -- was the default payment mode ACH?

12   A    Yes.

13   Q    Now, the representatives who communicate with

14   the customers in an effort to maintain their active

15   ACH payment status, those would include Customer

16   Service representatives and collectors; correct?

17   A    Correct.

18   Q    And others.  Who would the others be?

19   Recovery?

20   A    Recovery, but probably less on the Recovery

21   side.

22   Q    Do you have any knowledge as to what training

23   is provided to Customer Service representatives with

24   respect to convincing consumers to maintain active ACH

25   payment status?

1    ACH.

2        Q   And with respect to collectors, I should talk

3    to Steve Klopstock; is that correct?

4        A   Yeah.  That's your best bet, to talk to Steve

5    on that one.

6        Q   So my question was -- I mean you can answer

7    it or defer.  I don't really care.  I just don't want

8    to get caught between two schools here.

9        A   Right.

10       Q   In the Collections Department is there any

11   monitoring of collectors' performance in maintaining

12   people on ACH?

13       A   They're monitored to make sure that they are

14   asking the customer to -- like, if a customer's not on

15   ACH, they are monitored to say -- as part of their

16   call model to say -- you know, to ask them or solicit

17   the ACH to them.

18           Does it weigh on their performance in any

19   way?  The only way would be if they're not asking.  It

20   doesn't have to be a specific answer from the

21   customer's side.  It just has to be soliciting and

22   asking for it, as long as that piece is done.

23       Q   So you mentioned earlier that there are, you

24   know, statistics that can be generated for delinquent

25   loans on how many of them are on ACH and how many are

1      A    Okay.

2      Q    The customer's payment, let's say for

3    simplicity, is due the 1st of the month.  The ACH is

4    returned.  A scheduled ACH is run, and it comes back

5    there wasn't the money in the account to cover it.

6    What happens?

7      A    The loan will then be forwarded to our

8    front-end Collections Department.  Our front-end

9    Collection Departments will make the collection phone

10   calls.  The details as far as what takes place in

11   those collection phone calls would probably be

12   something better suited for Mr. Klopstock.

13     Q    Okay.

14     A    Go ahead.

15     Q    Well, with respect to ACH or electronic

16   funds, what policies does CashCall have once the

17   account is forwarded to Collection?

18     MR. SEILING:  Vague.

19     THE WITNESS:  It depends on why the payment was

20   returned.  Different situations for different return

21   types.

22          In the sense of non-sufficient funds, if it

23   came back to us non-sufficient funds and the collector

24   was unable to reach some sort of payment arrangement

25   to satisfy that payment, we can rerun that ACH up to

1    two additional times throughout the remainder of the

2    month.

3    BY MR. LEVY:

4        Q    Now, is that during the first 30 days of

5    collection?

6        A    Correct.

7        Q    Okay.  And you'll have to pardon my

8    ignorance, but what are the other reasons why an ACH

9    could be returned?

10       A    An ACH can be returned -- we could try to

11   submit an ACH and it can come back that the account's

12   closed.

13            It could come back that the account's frozen.

14            It could come back "Unable to locate."  The

15   bank information might have changed in some way so

16   that it doesn't locate.  That happens a lot when your

17   larger banking institutions purchase your smaller

18   banking institutions.  There's a change in routing

19   number, account number.

20            It can be returned -- I mean there's a myriad

21   of reasons.  I'm giving you the most common ones.

22       Q    Okay.  Let's just stick with the most common

23   ones.

24            If the ACH comes back indicating the

25   account's closed, frozen, unable to locate the

1  account, then I take it there's no further ACH

2  activity until the ACH can be re-established through

3  contact with the customer; is that correct?

4      A   On the account closed and the account frozen,

5  absolutely, you are correct.

6      Q   And --

7      A   On the "Unable to locate," there's a service

8  which our ACH vendor -- TSS, ACHWorks -- provides in

9  which they can -- and I have no idea how it's done,

10  but they can locate, like, what the correct banking

11  information is on those situations where a bigger

12  bank's taken over a smaller bank, things like that.

13  Those are automatically updated into our system, so

14  those can be ran with the correct information.

15      Or it could be contact from -- a Collections

16  representative could contact them and say, "This is

17  what I have as your bank information on file, but for

18  some reason it's coming back to us 'Unable to

19  locate,'" and things like a zero looked like an 8,

20  something like that might have occurred.

21      Q   I see.

22      So if CashCall is able to determine a correct

23  bank account number, then the process would be the

24  same during the first 30 days as for NSF returns with

25  respect to ACH?

 1      A    Right.  That is correct.

 2      Q    Okay.  And when an ACH is returned, is the

 3   CashCall payment log or comment log notated?

 4      A    Yes, it is.

 5      Q    And is there a special notation for whether

 6   the return is NSF?

 7      A    Yes, it will state why the payment

 8   returned.

 9      Q    Okay.  And so are there separate reasons for

10   closed -- are there separate indications for whether

11   the return was for closed, frozen or unable to

12   locate?

13      A    Yes.

14      Q    And how are those generated?  Are those

15   generated automatically?

16      A    It's systematically.  It's the developer that

17   worked on a lot of the ACH stuff, which is the

18   gentleman I mentioned earlier, Mr. Forteza, automated

19   a lot of these processes.

20      Q    So with respect to NSF returns and returns

21   where you're able to locate a correct account number,

22   the first step would be some kind of contact by a

23   Collections personnel; right?

24      A    We always attempt to contact first if contact

25   hasn't already happened.  In some cases you'll get the

 1    customer the day that it hit the bank.  You know, we

 2    don't know that it's coming back non-sufficient funds

 3    yet, but the customer might know and may call us and

 4    tell us this is what's happening.

 5        Q    Under what circumstances would the ACH be run

 6    two additional times during that first 30 days?

 7        A    Failure to reach payment commitment whether

 8    that be through no contact or any other means.

 9        Q    And do those two additional reruns of the

10    ACH, do they occur automatically, or how are they

11    initiated?

12        A    No, it's a -- monthly there's a different

13    schedule set up in those situations to know when we're

14    going to hit those accounts the second, third time,

15    whatever it may be.

16        Q    Can you describe that process as to how --

17        A    I don't set up that process.  I receive a

18    calendar.

19            I'm sorry for interrupting.

20        Q    No, that's okay.

21            So what personnel initiates that process for

22    the two additional ACH runs?  Is it the collector?

23    Customer Service?

24        A    No.  It comes from a management level.

25    Could -- usually it stems from the front-end

1    collections manager who creates it in the prior month,

2    and then it goes through an approval process of Steve

3    Klopstock.  I do review it upon receiving it just to

4    make sure that it makes sense and falls into all the

5    right guidelines.

6        Q    So the front-end collections manager

7    prepares -- what is it?  A report or --

8        A    It's a schedule.

9        Q    A schedule.

10            And what does the schedule show?

11       A    The schedule shows what days we're going to

12   be debiting which customers.

13       Q    And how frequently is the schedule

14   prepared?

15       A    Once a month.

16       Q    What time during the month or what date?

17       A    Usually it's during the last week of the

18   month for the following month.

19       Q    I see.

20            So is it correct that for customers who are

21   less than 30 days delinquent, the effort will be made

22   to collect through contacts by the collector, and if

23   that does not yield a result then that account will

24   appear on the schedule at the end of the month; is

25   that correct?

1      A    No, that's not correct.

2      Q    Okay.

3      A    The schedule is set forth during the -- I'll

4  just give it to you in an example form.  It's probably

5  a lot easier to understand that way.

6           The last week of February we got a calendar

7  for March, so it's telling us that, you know, March

8  1st all the scheduled ACHs or are going to run for the

9  people who have the date of the 1st.

10          Then it tells us on which dates the second or

11 third attempt will happen if those happen to be

12 non-sufficient funds from the 1st.

13     Q    So under this practice -- during the first

14 month -- let's call it February -- okay? -- for

15 customers who are delinquent during that month, there

16 are no reruns done during the month of February for

17 those customers who are, you know, less than 30 days

18 delinquent?

19     A    Yes, there are.

20     Q    There are?

21     A    Yes.

22     Q    Okay.  So let's confine ourselves to the

23 situation where we're just looking at the month of

24 first delinquency.  We'll call it February.

25     A    Okay.

1     Q   Under what circumstances will there be reruns

2   of an account -- ACH on an account during that

3   month?

4     A   The circumstances that I just explained to

5   you, non-sufficient funds.  The payment goes -- I'll

6   try to give it to you in example form just the best

7   that I possibly can.

8     Q   I appreciate this.

9     A   The payment on February 1st comes back to us,

10   so Day 1 is February 1st.  That's when the payment

11   becomes due -- right? -- for the sake of your example.

12   It comes back to us non-sufficient funds.

13         The collector will then attempt to try to

14   collect on that, whether it be no contact or whatever

15   situation might be that the customer's not making

16   arrangements for payment.  According to the calendar

17   that was given to us in January -- okay? -- we'll

18   say -- for example's sake, let's say the calendar said

19   if the first ACH came back to us non-sufficient funds

20   and we were unable to collect a payment on the 5th, we

21   will then send a second ACH.

22     Q   But if the customer had been current until

23   February the 1st, that customer wouldn't show up on

24   that schedule, would they?

25         A   Shows up as delinquent.  But it's not a list

1    of loans.  It's these situations scheduled -- the

2    1st -- the 1st, 3rd, 5th scheduled ACHs, if those are

3    returned, on this date we will be running them again.

4         Q    And let's just take the 1st for convenience.

5         A    Okay.

6         Q    In the ordinary practice, when would an ACH

7    that's returned NSF on the 1st be rerun?

8         A    It's depending on whatever the calendar says.

9         Q    And how is the calendar determined?

10    MR. SEILING:  He just testified to that.

11    MR. LEVY:  I'm not understanding.

12    THE WITNESS:  Okay.

13    MR. SEILING:  He just testified at length that

14    they decide in advance, the month before, when they're

15    going to do reruns for things that are returned NSF.

16    He just said that.

17    BY MR. LEVY:

18         Q    Okay.  So that would be decided during

19    January?

20         A    Correct.

21         Q    And the front-end Collections manager and

22    Mr. Klopstock and you would make that decision; is

23    that correct?

24         A    The front-end Collections manager will lay

25    out the dates in which it's supposed to be done, and

1  it will go through Mr. Klopstock and myself for an

2  approval, Mr. Klopstock to make sure it's all the

3  dates he would like it to match up to, for mine to

4  make sure that everything falls correctly into place

5  according to the schedule of when things are returned

6  and when things are sent.

7       Q   And so the date for the second rerun can

8  change on a monthly basis; correct?

9       A   They can, yes.

10      Q   And what factors influence what date you'll

11  choose?

12      A   You'll have to speak to Steve Klopstock about

13  that.  I don't choose the dates.

14      Q   Based on your experience, I mean typically

15  what day of the month do the reruns start?

16      A   You're asking me to say something that's

17  typical.  I'm telling you that a schedule can change

18  on a monthly basis.

19      Q   And the schedule is, did you say, a

20  spreadsheet or what?

21      A   No.  It's a Word document.

22      Q   A Word document.  Okay.

23          And it doesn't have accounts listed;

24  correct?

25      A   No.

1    A certain number of accounts are rerun.  Is there a

2    report of which accounts those are?

3        A    A report that's automatically generated?  I

4    don't know what you're asking.

5        Q    Is there a periodic report of which accounts

6    were rerun?

7        A    There is no periodic report.  There's reports

8    that can always be pulled for certain dates, but

9    nothing that just says, "Here's this information for

10   everyone."

11       Q    Okay.  Let's suppose that -- okay.

12            Let me just ask a more general question.

13   Okay?

14            And then there will be a second rerun during

15   the month typically as well; correct?

16       Q    Is it typical that there are two reruns a

17   month?

18       A    Once again, you're asking me to state on

19   something that's typical on a schedule that's made

20   monthly.  You know, it's not a -- here's my best way

21   of explaining it to you.

22            You get a non-sufficient funds payment on the

23   1st of the month.  You've got 30 days for reruns.  You

24   get a non-sufficient funds payment from the 15th of

25   the month, you only have 15 days then.

1      Q    I see.

2      A    So I can't tell you that -- and this is just

3  the best way I can explain it to you -- I can't tell

4  you there is a typical way in which these things are

5  done.

6      Q    So it's a calendar-month program?

7      A    It's a calendar month.

8      Q    So a customer whose payment date is the

9  1st is going to stand a greater chance of being run

10  more than once than someone whose ACH date is the

11  15th?

12      A    I'm not stating that as well.  I'm just

13  giving you an example of why there is no typical

14  answer to your question.

15      Q    So how long has this system been in effect?

16      A    I don't know the exact length of which it's

17  been in effect because I don't know how things -- when

18  I first started at CashCall, I had no knowledge of how

19  the ACH process worked.

20      Q    Well, when you were still a collector -- when

21  you were Collections supervisor from 2005 to 2006, was

22  this system in place?

23      A    I don't have a recollection of whether that

24  system was in place at that point in time.

25      Q    When did you first become aware that system

1    Q    But the customer's ACH date is the 15th.

2    A    But the due date is the 1st.

3    Q    But you'll nevertheless run the ACH on the

4    1st?

5    A    We could.  I'm not telling you that we do.

6    I'm saying that we could.

7    Q    Well, has it happened in practice?

8    A    Yes.

9    Q    Now, if a rerun is made, what entries are

10   made on the payment history?

11   A    Similar to the requests.  It would be -- once

12   the rerun is, you know, sent to the bank, it would go

13   on as a pending ACH, put in the comment log "Pending

14   ACH created."  Nothing would go in the payment

15   transaction history or the payment history at that

16   point in time.

17        Once it either comes back to us, however it

18   comes back to us, or if it's returned as a good

19   payment, it will be logged into the payment

20   transaction history as whatever type it was rerun, you

21   know, on that situation.  Would log it in the

22   servicing log as well that the payment posted with the

23   comment in there.

24   Q    So if it's a scheduled ACH, it's logged in as

25   scheduled?

1    A    Yes, it will say "scheduled."

2    Q    If it's an ACH request, it's logged in as a

3  request?

4    A    Correct.

5    Q    And if it's a rerun, it's logged in as a

6  rerun?

7    A    Correct.

8    Q    Are there any other types of ACH transactions

9  other than those three?

10   A    Back-end.

11        You want the other ones right now, too?

12   Q    No.  I'm going to ask you those later.

13   A    Okay.

14   Q    So at least as far back as you have been

15  Payment Processing manager, what you've described as

16  the company's practice with respect to reruns of ACH

17  has been the general practice of the company; is that

18  correct?

19   A    Correct.

20   Q    And in terms of its implementation,

21  Mr. Coffey, Mr. Klopstock, and you have been the

22  personnel involved; is that correct?

23   A    We've been the personnel involved in the

24  calendar.

25   Q    Yes.

1    on "Send ACH."

2          I will then receive a confirmation e-mail

3    that says this many payments were sent for this dollar

4    amount to ACHWorks.

5    BY MR. LEVY:

6          Q    Okay.  And does the e-mail have a listing of

7    the accounts?

8          A    No, it does not.

9          Q    Are the accounts listed anywhere?

10         A    If I run every port, I can pull the accounts.

11         Q    How are the account numbers transmitted when

12   you send the request that the ACH has to be rerun?

13         A    How are the account numbers submitted to

14   ACHWorks?  Is that what you're asking?

15         Q    Yes.

16         A    It is specific details.  I don't know.  I

17   know that it's through something that's called SOAP,

18   which is, I believe, similar to an SFTP server.

19         Q    Okay.  So this rerun practice, how long does

20   it go on?  How many periods or months does it go on?

21         A    The rerun practice?

22         Q    Yes.

23         A    Happens in the first 30 days.

24         Q    What happens in the next 30 days?

25         A    If they're still delinquent?

1     Q    Yes.

2     A    The back-end process would begin.

3     Q    All right.  And what is the back-end

4  process?

5     A    The back-end --

6     MR. SEILING:  This is getting into collections;

7  right?

8     THE WITNESS:  The back-end ACH process?

9     MR. LEVY:  Yes.

10    THE WITNESS:  It's also set forth on the schedule

11 that is sent out on which days to run the back-end

12 ACH, which would be for the payment that has now

13 become due.  They're due for two payments now, but a

14 new payment has become due, so it would set forth when

15 we were going to attempt to ACH that payment.

16 BY MR. LEVY:

17    Q    And is the ACH for two payments at that

18 point?

19    A    No.

20    Q    Does the rerun schedule continue in addition

21 to the back-end schedule?

22    A    No.  The rerun schedule only goes within the

23 course of the month where the initial scheduled

24 payment was sent.

25    Q    Okay.  Now, the back-end schedule, is that

1    put together the same way by Mr. Coffey and

2    Mr. Klopstock and you?

3         A    Correct.

4         Q    And is there a difference between the process

5    that you've just described for the rerun ACHs from the

6    back-end ACHs?

7         A    I'm sorry.  Can you -- I apologize.  Can you

8    repeat the question.

9         Q    Is there any difference in the way that the

10   practice is conducted between the back-end ACHs and

11   the rerun ACHs?

12        A    It's all set forth in the schedule.

13             It all depends on what the schedule tells me

14   to do.

15        Q    You testified earlier that a rerun ACH would

16   be reflected on the payment history as such, as a

17   rerun?

18        A    Correct.

19        Q    And you also indicated that there's a

20   designation on the payment history of back-end ACHs;

21   is that correct?

22        A    Correct.

23        Q    So if you looked at a payment history and you

24   saw "Back-end ACH," you would know that that's at the

25   back-end period and not the rerun period; correct?

1       A    Correct.

2       Q    And how long does the back-end schedule

3   continue?  Is it only for one month?

4       A    No, because -- let's say we go through Month

5   1, still no payment.  Month 2, still -- you know, we

6   started the back-end in Month 2, still no payment.

7   You now have Month 3, so a new payment becomes due.

8   So the back-end process continues from there.  So the

9   back-end process realistically could go all the way

10  through charge-off if it came to that.

11      Q    And has the back-end process been the general

12  practice of CashCall for at least the period that

13  you've been the Payment Processing manager?

14      A    Yes.

15      Q    And you have no knowledge of how long before

16  that it was in place?

17      A    I -- I believe that it was in place, but I

18  don't have any knowledge of how long it was.

19      Q    And is there -- for a customer whose payment

20  date is the 1st but the ACH date is the 15th, can the

21  back-end process result in an ACH before the 15th of

22  the second month?

23      A    Repeat your question.

24      Q    Let's say the customer's payment is due

25  February the 1st, the ACH is run and returned NSF on

1  the 15th -- okay? -- and maybe there's a rerun during

2  that first month, maybe there isn't.  But once it

3  becomes Month 2 and the back-end ACH process starts,

4  does the -- is it CashCall's practice, on occasion at

5  least, to run back-end ACHs before the 15th which is

6  the next ACH scheduled date?

7       A    It can happen, yes.

8       Q    And you testified earlier with respect to

9  reruns that you really couldn't say how many reruns a

10 month there would -- during the month there would be

11 in a typical month?

12      A    I can't tell you what can happen typical, but

13 I can tell you how many we can do.

14      Q    How many is that?

15      A    Two additional, two on top of the original

16 one.

17      Q    So is your testimony the same with respect to

18 the back-end, you can't say what's typical?

19      A    I couldn't tell you what's typical because

20 it's all based on the schedule, but I can tell you

21 that on each ACH transaction, whether it be, you know,

22 scheduled, whatever it may be, for the scheduled

23 transaction, you can only attempt three times

24 within -- you know, three times for that payment

25 itself.  Okay?

1      So if you've got an ACH -- scheduled ACH for

2  the 1st and it's non-sufficient funds, we can attempt

3  two more times for that transaction itself.

4      So when you go into Month 2 and still have no

5  payment, you can attempt -- you have your first

6  attempt on that new payment, and then you can add two

7  additional ones to that.

8      Q    Okay.  So it's the scheduled plus two --

9      A    Basically.

10      Q    -- reruns or scheduled plus two back-ends?

11      A    Basically, yes.

12      Q    Thank you.

13      A    I'm not saying that is what we do every

14  month.  I'm saying that is what we can do every month.

15      Q    Okay.  Is there a practice at CashCall that a

16  delinquent customer will have his or her ACH scheduled

17  date reverted to the 1st of the month?

18      A    I know that there was a process as such at

19  one point in time.  I'm not sure if it's still in

20  effect.

21      Q    When was that in effect?

22      A    I remember it from when I was a collector,

23  but I know that at one point in time we felt it to be

24  counterproductive, so it wasn't done any longer.

25      As far as whether it's still done, I -- it's

1    not of my knowledge.

2        Q    Can you describe the practice, please.

3        A    The practice as I know it that was in effect

4    when I first started at CashCall?

5        Q    Yes.

6        A    The customer chooses to have an ACH date set

7    for the 15th, but his -- I believe it was -- it was

8    either two or three months consecutive that their

9    payment returned non-sufficient funds, we were

10   notifying the customer that we were reverting the ACH

11   date back to the 1st because of the fact of these

12   non-sufficient funds, and then it was switched back to

13   the 1st.

14       Q    And how long was that practice in effect?

15       A    I don't really know the term of that.

16       Q    ACHs -- are there any other circumstances at

17   CashCall other than you've testified to where the --

18   an ACH will be run in the absence of either a

19   scheduled request -- a scheduled ACH or a request

20   ACH?

21       A    Aside from the back-end and the rerun?

22       Q    Yes, that's what I'm asking.

23       A    Okay.  So we have scheduled, back-end -- or

24   scheduled, rerun, back-end, request.  And there's a

25   fee ACH.

1        Q    All right.  And what at the present time is

2    the current practice with respect to fee ACHs?

3        A    Once again, it goes on the schedule but it is

4    based off of the schedule to say we will submit an ACH

5    for accounts who had their scheduled ACH, it cleared

6    so they are current, but they still owe us fees up to

7    $50.  Fees owed up to $50 would then be ACH'd

8    according to the schedule.

9        Q    And what's the -- how is the ACH date

10   determined?

11       A    It's based off of the schedule.

12       Q    Okay.  Would it be a schedule similar to --

13       A    It's on the same schedule.

14       Q    As the rerun or back-ends?

15       A    Right.

16       Q    So there's a separate part of the schedule

17   that relates to fees?

18       A    No.  It just says -- it will say on this date

19   we want the rerun for this date to be sent, you know,

20   the back-end to be sent, and the fees to be sent.

21       Q    Okay.  Okay.  So have we covered all of the

22   ACH types; fees, back-ends, reruns, requests,

23   scheduled?

24       A    And there's only one more, which would be the

25   Recovery ACH.

1      MR. LEVY:  Here's another one that was marked --

2  has not been marked.

3              (The document referred to above

4          was marked Plaintiffs' Exhibit

5          22 for identification by the

6          Certified Shorthand Reporter and is

7          bound separately and appended hereto.)

8  BY MR. LEVY:

9      Q   Are you familiar with this notification?

10     A   Yes, I am.

11     Q   How is it used?

12     A   It is used on a non-sufficient funds ACH, a

13  return.  Upon a return of an ACH non-sufficient funds,

14  this letter will be sent to them.

15     Q   And it was -- would be sent by e-mail if

16  there is e-mail?

17     A   Yes.

18     Q   And if there is no e-mail address, who would

19  it be sent?

20     A   I would have to reference someone else to see

21  about the schedule via regular mail.

22     Q   And is it CashCall's general business

23  practice to send a notification in this form when an

24  ACH payment is returned unpaid by the bank?

25     A   I don't know if on all ACHs.  I believe it

1    might just be the scheduled ACHs.

2         Q    On scheduled ACHs?

3         A    To my knowledge, yes.

4         Q    At least.  Okay.

5              And how long has this notification been used?

6         A    I would say probably since the beginning of

7    the use of the proprietary system as well, so over

8    four years or above.

9         Q    This is Exhibit 23.  Are you familiar with

10   Exhibit 23?

11        A    Yes, I am.

12                  (The document referred to above

13                  was marked Plaintiffs' Exhibit 23

14                  for identification by the Certified

15                  Shorthand Reporter and is bound

16                  separately and appended hereto.)

17        Q    How is it used at CashCall?

18        A    It is used for a customer who is past due but

19   not past the 15th as of yet to notify them that they

20   are past due on their payment and if the payment is

21   not received by the 15th they will be accessed a $15

22   late charge.

23        Q    And is that e-mailed when there's an e-mail

24   address?

25             A    This can be e-mailed.  I don't know that it's

1          (The document referred to above

2          was marked Plaintiffs' Exhibit 24

3          for identification by the Certified

4          Shorthand Reporter and is bound

5          separately and appended hereto.)

6    BY MR. LEVY:

7        Q    Have you ever seen this form before?

8        A    I'm not familiar with this form.

9        Q    Okay.  All right.  Here's one that's been

10   previously marked as De La Torre Exhibit 20.

11          Have you seen this one before?

12       A    Yes, I have.

13          (The document referred to above

14          previously marked De La Torre

15          Exhibit 20 for identification

16          is bound separately and appended

17          hereto for reference purposes.)

18       Q    How is it used at CashCall?

19       A    This is the ACH notification for the reruns

20   or the back-end runs or the fees, so the ACHs that

21   aren't scheduled or a request.

22          I would have to verify the request.  I'm not

23   sure if this is sent on the request or not, but it is

24   sent on the rerun, back-end fees.

25       Q    And is it normally sent by e-mail when

1    there's an e-mail address?

2        A    Yes.

3        Q    Do you know how it's sent when there is not

4    an e-mail address?

5        A    I don't believe it's sent when there is not

6    an e-mail address.

7        Q    Do you have any knowledge of what percentage

8    of CashCall customers have an e-mail address?

9        A    I don't have any knowledge, but they have to

10   have one when they get the loan.

11       Q    But there are people who probably drop out,

12   but you don't have any of knowledge of what the

13   percentage is?

14       A    No.

15       Q    I didn't expect so.

16            Okay.  And how long has the notification in

17   the form of De La Torre Exhibit 20 been used?

18       A    I don't know exactly.

19       Q    Can you say that it's been approximately a

20   four-year period at least?

21       A    I -- I cannot say it's been approximately

22   four years.  It's not of my knowledge how long it's

23   been used.

24       Q    Do you have any estimate for how long it's

25   been used?

1    that we needed to hit on the 1st the day before that

2    on the 1st, we would have sent the ACH for the 2nd

3    which would have generated this payment.

4         Q    My question is when during the payment cycle

5    would Exhibit 25 normally be sent out?

6         A    The day before it's debited.

7         Q    But when relative to the --

8         A    The day after the scheduled ACH, which is

9    what I previously testified to.

10        Q    Is this different from a fee ACH, this

11   practice?

12        A    No, this is the same as a fee ACH, but our

13   fee ACH practices have changed.  In the past six

14   months our fee ACH practices have changed.

15        Q    Okay.

16        A    Actually, it's probably more along the lines

17   of the past nine months our ACH fees practices have

18   changed.

19        Q    Let's just try that out.  Okay?

20             So today -- okay? -- at what point is a fee

21   ACH conducted?

22        A    As previously testified, it's set up on a

23   schedule that is developed in the last week of the

24   prior month as to when we're going to be running a fee

25   ACH, and, as previously testified, it is ACH'd

1   on accounts that have settled scheduled ACHs on them,

2   and the fee ACH can only go up to $50 in outstanding

3   fees that they owe us.

4       Q    And how is that different from what was done

5   before the change?

6       A    The way that that differs from how it was

7   done before the change is before the change, as

8   stated, the fee was debited the day after the

9   scheduled ACH went.  The scheduled ACH is for the 1st.

10  The fee ACH would be sent to hit the bank on the 2nd,

11  which is what Exhibit 25 tells you.

12      Q    Okay.  And today if the ACH is scheduled to

13  hit on the 1st, when is the fee ACH run?

14      MR. SEILING:  Asked and answered.

15      THE WITNESS:  It's based off of the schedule.

16  BY MR. LEVY:

17      Q    So before, it was automatically the day after

18  the scheduled ACH?

19      A    Correct.

20      MR. SEILING:  Asked and answered.

21  BY MR. LEVY:

22      Q    And that was for a -- what kind of fee?  Any

23  outstanding fees?

24      A    Any outstanding fees.

25      Q    And today the practice is the same except

1    Shorthand Reporter and is bound

2    separately and appended hereto.)

3  BY MR. LEVY:

4    Q   Okay.  This is a servicing transaction log

5  for Mr. De La Torre.  Since it goes in reverse

6  chronological order, I want to ask you some questions

7  about entries that appear on page 507.  That's

8  number-stamped page 507.

9    A   Okay.

10    Q   Do you see any entries just below

11  September 28, 2006, "For a payment type 700 Scheduled

12  ACH for 2006-10-01."  You see that there?

13    A   Uh-huh.  Yes.

14    Q   And is that generated by an automated

15  system?

16    A   That's generated by the payment posting in

17  the system.

18    Q   Okay.  And what does it mean, "Payment type

19  Scheduled ACH"?

20    A   It means it's the scheduled ACH for the 1st

21  of October.

22    Q   And would a similar entry be entered for a

23  request ACH?

24    A   Yes.

25    Q   Saying a request ASH for such-and-such a

1  date?

2      A   Yes.

3      Q   And for a rerun ACH, would it be indicated as

4  a rerun ACH?

5      A   To my knowledge, yes.

6      Q   And for a back-end ACH, would it also be?

7      A   To my knowledge, yes.

8      Q   And for a fee ACH, it would be an entry like

9  this but saying "Fee"?

10     A   Once again to my knowledge, yes.

11     Q   What does "Type 700" refer to?

12     A   Type 700 is a transaction code in our payment

13 transaction history, which I'm sure you've seen, which

14 sometimes appears as Greek to some people that look at

15 it.  We have transaction codes for everything.  700 is

16 a payment via ACH.

17     Q   Okay.  So the Type 700 would appear for these

18 other types of ACHs as well in the servicing

19 transaction log?

20     A   Even if there was a rerun ACH, it would still

21 be Type 700.

22     Q   Okay.  Thank you.

23         Directing your attention to page 504,

24 December 26, 2006, at six o'clock p.m.

25     A   I'm sorry?  What was that date again?

1    Q    December 27, 2006, at six o'clock.  It

2    says -- the entry is "Updated ACH day."

3    A    Okay.

4    Q    I take it that that is an entry showing a

5    customer request being fulfilled to change the ACH day

6    from the 1st to the 3rd of the month?

7    A    That is a documentation of the change

8    actually being made in the system.

9    Q    And that would be manually input by the

10   Customer Service representative ordinarily; is that

11   correct?

12   A    Ordinarily, this should be handled by the --

13   a supervisor.

14   Q    Okay.  Directing your attention to page 490,

15   June 23, 2007, 1:21 p.m. -- I'm sorry -- June 23,

16   1:21, payment -- "Money Gram express payment."  See

17   that there?

18   A    Yes.

19   Q    So Money Gram payments are also logged into

20   the servicing transaction logs?

21   A    Yes.

22   Q    And what -- how does that -- that's system

23   generated, so how is that automatically generated?

24   A    Our Money Gram transactions are set up to

25   automatically post every hour.

DECLARATION UNDER PENALTY OF PERJURY

    I hereby declare under penalty of perjury that the foregoing is my deposition under oath; are the questions asked of me and my answers thereto; that I have read same and have made the necessary corrections, additions or changes to my answers that I deem necessary.

    In witness thereof, I hereby subscribe my name this __5__ day of __MAY__, 2010.



_____
SEAN BENNETT

206

1                          CERTIFICATE

2                              OF

3               CERTIFIED SHORTHAND REPORTER

4

5          The undersigned Certified Shorthand Reporter,

6      licensed in the State of California, does hereby

7      certify:

8          That the foregoing deposition was taken

9      before me at the time and place therein set forth, at

10     which time the witness was duly sworn by me;

11         That the testimony of the witness and all

12     objections made at the time of the examination were

13     recorded stenographically by me and were thereafter

14     transcribed, said transcript being a true copy of my

15     shorthand notes thereof;

16         That the dismantling of the original

17     transcript will void the reporter's certificate.

18         I further declare that I have no interest in

19     the outcome of the action.

20         In witness whereof, I have subscribed my name

21     this date: _____.

22

23                        _____

24                        Certificate Number 2974

25

# Exhibits 27-29
# Submitted Conditionally
# Under Seal

**Exhibit 30**



November 1, 2007

Krista Odonovan
6420 Stoneridge Mall Rd M204
Pleasanton, CA 94588

Dear Krista Odonovan,

You have breached your contract and your Loan #103219 with CashCall, Inc. is now in
default. You must bring the loan current by sending the amount shown below to
CashCall, Inc. in the form of a MoneyGram, money order, or certified check.

The total amount due as of 11/01/2007 is **$ 530.62**

| | |
|---|---|
| Principal and Interest | $ 500.62 |
| Fees | $ 30.00 |
| **Total Amount Due** | **$ 530.62** |

You must include any additional payments or late charges that become due, along with
the amount shown above, to bring your account current. CashCall, Inc.'s acceptance of
less than the total amount due does not waive our right to demand the entire balance due
under the terms of your contract.

If you fail to bring your account current within 15 days of the date of this letter, we may
exercise acceleration of the loan and demand the entire balance outstanding under the
terms of your loan agreement. This amount includes, but is not limited to, principal,
interest, and all other outstanding charges. We may also pursue all actions afforded to
CashCall under the terms of your contract to collect these amounts. You will have the
right to bring your loan current even after these actions have begun.

We want to work with you to resolve the problem and help you bring your account into
good standing. We urge you to contact our collections department at the toll free number
(866) 899-1844; we will be happy to discuss possible solutions to the delinquency.

Sincerely,
Richard Vargas

*This communication is an attempt to collect a debt and any information obtained will be
used for that purpose. As required by law, you are hereby notified that a negative credit
report reflecting on your credit record may be submitted to a credit reporting agency if
you fail to fulfill the terms of your credit obligations.*

# Exhibits 31-34
# Submitted Conditionally
# Under Seal

**Exhibit 35**

**Date:** Fri, 28 Dec 2007 14:08:11 -0800 (02:08:11 PM PST)
**From:** Krista O'Donovan <o_donovankrista@hotmail.com>
**To:** "krista@kristaodonovan.com" <krista@kristaodonovan.com>
**Subject:** FW: IMPORTANT MESSAGE FROM CASHCALL

> From: Do.Not.Reply@cashcall.com
> To: o_donovankrista@hotmail.com
> Date: Wed, 28 Nov 2007 09:44:33 -0800
> Subject: IMPORTANT MESSAGE FROM CASHCALL
>
> November 28th 2007
>
> KRISTA ODONOVAN
> 6420 Stoneridge mall rd m204
> pleasanton, CA 94588
>
> RE: Loan ID 103219
>
> Dear KRISTA ODONOVAN:
>
> We have given you every opportunity to arrange for payment without the possibility of legal action.  You have failed to
> satisfy your repayment obligations under the terms and conditions of the CashCall Promissory Note & Disclosure Statement
> (the �Note�).  The total amount due and owing on the loan as of today�s date is $4,996.09. This sum includes the unpaid
> principal balance, accrued interest, and any late fees or NSF charges assessed to your loan.
>
> Accordingly, we now must make a final demand for payment of the total amount past due, which is listed below. Please
> note that payments must be made with certified funds only (cashier�s check payable to CashCall or a money transfer via
> MoneyGram Express Payment, Receiver code 3299).
>
> Past Due Amount : $545.62
>
> If arrangements have not been made to pay all sums due within Forty-Eight (48) hours of this letter, we will review this
> account for litigation proceedings. This could result in additional expenses for which you would be liable.
>
> If you have any questions or would like to discuss other possible arrangements, please contact CHRISTOPHER HARRELL at
> (877) 860-2274, ext. 6571.
>
> Sincerely,
>
> CHRISTOPHER HARRELL
> CashCall, Inc
>
> This communication is an attempt to collect a debt and any information obtained will be used for that purpose.

P0137

Don't get caught with egg on your face. Play Chicktionary!
http://club.live.com/chicktionary.aspx?icid=chick_wlhmtextlink1_dec

P0138

# Exhibits 36-38
# Submitted Conditionally
# Under Seal

# Exhibit 39

1  JAMES C. STURDEVANT (SBN 94551)
   (jsturdevant@sturdevantlaw.com)
2  MONIQUE OLIVIER (SBN 190385)
   (molivier@sturdevantlaw.com)
3  WHITNEY HUSTON (SBN 234863)
   (whuston@sturdevantlaw.com)
4  THE STURDEVANT LAW FIRM
   A Professional Corporation
5  354 Pine Street, Fourth Floor
   San Francisco, California  94104
6  Telephone:(415) 477-2410
   Facsimile: (415) 477-2420
7
   ARTHUR D. LEVY (SBN 95659)
8  (arthur@yesquire.com)
   Three Embarcadero Center, Suite 1650
9  San Francisco, California  94111
   Telephone: (415) 702-4550
10 Facsimile:  (415) 814-4080

11 Attorneys for Plaintiffs

12                 UNITED STATES DISTRICT COURT
13                 NORTHERN DISTRICT OF CALIFORNIA

14

15 | KRISTA O'DONOVAN, and EDUARDO DE | Case No.:  CV 08-3174-MEJ |
   | LA TORRE, individually and on behalf of all |
16 | others similarly situated, | **CLASS ACTION** |
17 |     Plaintiffs, | **NOTICE OF DEPOSITION OF** |
18 |     v. | **DEFENDANT CASHCALL, INC. AND** |
   | | **REQUEST FOR PRODUCTION OF** |
19 | CASHCALL, INC., a California corporation, | **DOCUMENTS** |
   | and DOE1 through DOE 50, inclusive, |
20 |     Defendants. | **[Fed. R. Civ. P. 30(b)(6) & 34]** |
21
22
23
24
25          Δ⟨π⟩EXHIBIT ___1___
26          Deponent McCarthy V. I
27          Date 3/15/10  Rptr. PTC
            WWW.DEPOBOOK.COM
28

---

1     **PLEASE TAKE NOTICE** that, pursuant to Rule 30 of the Federal Rules of Civil Procedure,

2 Plaintiffs will take the deposition of Defendant CashCall, Inc. ("CashCall"), through its designated

3 officers, directors, managing agents, employees or other individuals, on the matters described below.

4 The deposition will be taken at the date, time, and place specified below or such other date, time, and

5 place as is mutually agreed upon by the witness, parties, and counsel, and shall continue after the

6 specified date until completed. The deposition shall be taken by an officer authorized to administer

7 oaths under the laws of the United States, in accordance with Rule 28(a) of the Federal Rules of

8 Civil Procedure. The deposition shall be recorded by stenographic and by audiovisual means, and

9 will be conducted in accordance with Rule 30(b) of the Federal Rules of Civil Procedure. The

10 deposition will take place pursuant to Federal Rules of Civil Procedure 30(b)(6), which requires that

11 the deponent designate and produce one or more officers, directors, or managing agents, or other

12 persons who consent to testify on its behalf as to those matters described below as the subject of the

13 deposition.

14     In addition, the witnesses designated to testify by CashCall are required to produce

15 documents at deposition, as described below, pursuant to Federal Rules of Civil Procedure, rule 34.

16     **THE LOCATION, DATE AND TIME OF THE DEPOSITION IS AS FOLLOWS:**

17     PLACE:     The Sturdevant Law Firm

18                 354 Pine Street, Fourth Floor
                    San Francisco, CA 94104

19     DATE:     December 30, 2009

20     TIME:     9:30 a.m.

21                       **DEFINITIONS**

22     1.     As used in this request, the words "DOCUMENT" or "DOCUMENTS" shall mean

23 the full scope of DOCUMENTS and things discoverable under the Federal Rules of Civil Procedure

24 and is used herein in its broadest sense to include, without limitation, all written, printed, typed,

25 recorded or graphic matter of any kind, including drafts, originals, copies and all non-identical

26 copies, whether different from the originals by reason of any notation made on such copies or

27 otherwise, including, without limitation, correspondence, employment records, contracts,

28

1

examination and investigation reports, agreements, cancelled or uncancelled checks, memoranda,
notes, minutes of meetings, diaries, calendars, reports, studies, checks, statements, sales agreements,
negotiable instruments, invoices, receipts, tax returns, financial statements, summaries, pamphlets,
books, prospectuses, inter-office and intra-office communications, offers, notations of any sort of
conversations (including, without limitation, telephone conversation or meeting notes), bulletins,
computer printouts, teletypes, telefax, worksheets and all drafts, alterations, modifications, changes
and amendments of any of the foregoing, graphic or manual records or representations of any kind
(including, without limitation, photographs, charts, microfiche, microfilm, videotape, records,
motion pictures), and electronic, mechanical or computerized records or representations of any kind
(including writings, drawings, graphs, charts, photographs, phone records, and other data
compilations from which information can be obtained, translated, if necessary, through detection
devices into reasonably usable form), regardless of the manner in which the record has been stored.
This definition is specifically intended to include information and all data stored electronically, as
well as information and data printed on paper. This definition specifically includes any information
and data, including databases and e-mails, recorded on or retrievable from any computer or
electronic media, and further includes, without limitation, originals and all non-conforming copies,
no matter how prepared, and all drafts prepared in connection with such DOCUMENTS whether or
not used, in the possession, custody, or control of defendant, its agents, attorneys, or any other
persons acting on their behalf, regardless of where located.

    2.    "PERSON" includes natural persons, corporations, firms, partnerships,
proprietorships, associations, limited liability corporations or partnerships, professional corporations,
government entities or organizations, and any other organization or entity, and their predecessors,
successors, subsidiaries, affiliates, assigns, assignors, employees, officers, directors, agents and
attorneys including CashCall, Inc.

    3.    The terms "YOU" and "YOUR" and "DEFENDANT(S)" include the defendant to
whom this Request for Production is directed, *i.e.*, CashCall, Inc. (individually or collectively)
together with any co-workers, employees, representatives, staff, investigators, inspectors, agents,

2

1   attorneys, or any other persons who are in possession of or who may have obtained information for
2   defendant or on defendant's behalf, any other person known or reasonably known by them to be
3   acting or purporting to act for defendant or on defendant's behalf, and any persons in active concert
4   and participation with them, and each of its or his predecessors, successors, subsidiaries, affiliates,
5   assigns, assignors, employees, officers, directors, agents and attorneys, whether past or present,
6   without regard to whether or not the relationship currently exists or has been terminated.

7       4.     "COMMUNICATION" means any actual or attempted contact, or any transmittal or
8   exchange of information by which meanings are exchanged, between or among any two or more
9   persons or entities and shall include, but not be limited to, written contacts by such means as letters,
10   memoranda, faxes, e-mail or other electronic exchange, reports, correspondence, and other
11   DOCUMENTS or electronic media, or oral contacts by such means as face-to-face meetings,
12   telephone conversations, and voicemail, and/or any other process.

13       5.     "EVIDENCE, REFER, OR RELATE TO" and "EVIDENCING, REFERRING, OR
14   RELATING TO" mean to in any way or manner refer to, reflect, pertain to, substantiate, support,
15   form the basis of, arise out of, embody, concern or logically or factually connect with the matter
16   discussed.

17       6.     "And" and "or" are to be considered both conjunctively and disjunctively. The
18   singular form of a noun or pronoun includes the plural form and vice versa; the word "all" also
19   includes "each" and vice versa; "any" is understood to include and encompass "all."

20       7.     "COLLECTION" includes the definition set forth at California Civil Code § 1788.2,
21   and also refers to the taking, seizure, or offset of any monies by or on behalf of CashCall to satisfy
22   any outstanding debt, obligation, bill, or amount owed by a consumer.

23                  **SUBJECT MATTER OF DEPOSITION**

24      1.     CashCall's policies, procedures, and processes concerning electronic fund transfers
25   during the time period from July 1, 2002 to date, including but not limited to the following:

26          a.   CashCall's policies, procedures, and processes concerning electronic fund transfers
27             for the purpose of obtaining payments from loan customers' bank accounts, including

28

3

1      but not limited to their development, philosophy, purpose, and the software and

2      technology programs employed.

    b. CashCall's policies, procedures, and processes concerning customer authorization for

       CashCall to obtain preauthorized electronic fund transfers for the purpose of

       obtaining payments from loan customers' bank accounts.

    c. CashCall's policies, procedures, and processes concerning customer requests to

       terminate preauthorized electronic fund transfers from loan customers' bank accounts.

    d. CashCall's policies, procedures, and processes concerning changing the date of the

       month for preauthorized electronic fund transfers from loan customers' bank

       accounts.

    e. CashCall's policies, procedures, and processes concerning effecting electronic fund

       transfers after an electronic fund transfer has been returned unpaid.

    f. All automated and computerized systems used by CashCall in the electronic fund

       transfer process.

    g. CashCall's written policies and guidance to employees regarding the electronic fund

       transfer process, including but not limited to CashCall manuals, bulletins, telephone

       scripts, memorandum, forms, disclosures, and other standardized documentation used

       in the electronic fund transfer process.

    h. The training provided to CashCall employees regarding the preauthorized electronic

       fund transfer process.

    i. CashCall's policies, practices, and processes and written documentation related to its

       efforts to respond to customer complaints regarding CashCall's electronic fund

       transfer process.

2.     CashCall's policies, procedures, and processes concerning loan underwriting during

the time period from July 1, 2002 to date, including but not limited to the following:

    a. CashCall's loan underwriting policies, procedures, and processes, including but not

       limited to their development, philosophy, purpose; the software and technology

4

1  programs employed; documentation required of loan applicants in order to apply for

2  and receive a CashCall loan; and the qualifications, factors, and documents reviewed,

3  considered and weighted by CashCall.

b.  All automated and computerized systems used by CashCall in the underwriting
process.

c.  CashCall's policies, practices, and process for reviewing, analyzing, evaluating, and
using financial information regarding CashCall loan applicants and customers,
including, but not limited to, the information used to determine a candidate's financial
ability to repay in the time and manner provided in the CashCall Promissory Note and
Disclosure Statement.

d.  The policies, procedures, and processes by which CashCall sets and determines its
loan terms, including, but not limited to the development and setting of loan amounts,
interest rates, amortization schedules, and payment schedules.

e.  CashCall's written policies and guidance to underwriting employees, including but
not limited to CashCall manuals, bulletins, telephone scripts, required disclosures,
and other standardized documentation used in the loan underwriting and/or
application process.

f.  CashCall's management policies and practices for underwriting employees, including
but not limited to supervision, performance reviews, call monitoring, periodic
meetings of collection personnel, and employee discipline.

g.  The training provided to CashCall employees regarding underwriting CashCall loans.

h.  CashCall's compensation and incentive policies and practices for underwriting
employees, including but not limited to base compensation, incentive compensation,
performance-based compensation, bonuses, awards, contests, and recognitions.

i.  The use of a "pledge" during CashCall's underwriting process.

j.  CashCall's policies, practices, and processes and written documentation related to its
efforts to respond to customer complaints regarding CashCall's loan underwriting
process.

5

k.  The development, process and use of written and/or email correspondence in CashCall's underwriting process.

3.  CashCall's policies, procedures, and processes concerning collection of debts during the time period from July 1, 2002 to date, including but not limited to the following:

a.  CashCall's telephone collection call and telephone messaging policies and practices, including but not limited to the development of these policies and practices; CashCall's autodialer system; voicemail messaging used during the collection process; policies and practices relating to the frequency, timing, and content of collection calls; employee training, standards, and scripts relating to these policies and practices; and the effectiveness of these policies and practices.

b.  CashCall's collection policies and practices with respect to contacting persons other than the debtor, including but not limited to the development of these policies and practices; policies and practices relating to the frequency, timing, and content of third party contacts; employee training, standards, and scripts relating to these policies and practices; and the effectiveness of these policies and practices.

c.  CashCall's collection policies and practices with respect to the use of the prospect and/or fact of wage garnishment during the collection process, including but not limited to the development of these policies and practices; policies and practices relating to the frequency, timing, and content of the use of the prospect and/or fact of wage garnishment during the collection process; employee training, standards, and scripts relating to these policies and practices; policies and practices relating to the actual use of wage garnishment as a means of collection; and the effectiveness of these policies and practices.

d.  CashCall's collection policies and practices with respect to the use of written notices, including emailed, faxed, and mailed notices, used in the collection process; the development of these policies and practices; policies and practices relating to the frequency, timing, and content of such notices; employee training, standards, and

6

scripts relating to these policies and practices; and the effectiveness of these policies and practices.

e. All automated and computerized systems used by CashCall in the collection process.

f. CashCall's written policies and guidance to collection employees, including but not limited to CashCall manuals and periodic bulletins.

g. CashCall's training program for collection employees.

h. CashCall's management policies and practices for collection employees, including but not limited to supervision, performance reviews, call monitoring, periodic meetings of collection personnel, and employee discipline.

i. The CashCall's compensation and incentive policies and practices for collection employees, including but not limited to base compensation, incentive compensation, performance-based compensation, bonuses, awards, contests, and recognitions.

j. CashCall's loss mitigation department, including, but not limited to, the process by which loans are assigned to the loss mitigation department, the process by which loans are serviced in the loss mitigation department, and the relationship between CashCall's collection department and loss mitigation department.

k. CashCall's processes and written documentation related to its efforts to respond to customer complaints regarding debt collection.

l. CashCall's use of any non CashCall agencies in an effort to collect debts owed to CashCall.

m. CashCall's processes and written documentation related to skip tracing.

4. CashCall's policies, procedures, and processes concerning loan portfolio performance during the time period from July 1, 2002 to date, including but not limited to the following:

a. The performance of CashCall's portfolios for unsecured consumer loans, including but not limited to, on an annual and quarterly basis: (a) the volume of loans, (b) rates of default, (c) length of time to default, (d) aging of defaults (*e.g.*, 30-, 60-, or 90-days unpaid), (e) collection actions filed, and (f) loan principal, interest, and fees written off or deemed uncollectible.

7

b. Studies, analyses, and reports prepared for any purpose concerning the performance of CashCall's portfolios for unsecured consumer loans, including but not limited to, on an annual and quarterly basis: (a) the volume of loans, (b) rates of default, (c) length of time to default, (d) aging of defaults (*e.g.*, 30-, 60-, or 90-days unpaid), (e) collection actions filed, and (f) loan principal, interest, and fees written off or deemed uncollectible.

c. Marketing by CashCall to promote lending its programs to lenders and potential investors in order to obtain funding for CashCall loan programs.

d. Arrangements between CashCall and lenders and potential investors in order to obtain funding for CashCall loan programs.

e. Arrangements between CashCall and any debt collection agency concerning any arrangement for a debt collection agency to collect CashCall loans.

f. Arrangements by which CashCall has sold or transferred CashCall loans to any third party.

g. CashCall's policies and practices regarding settling defaulted loans, including but not limited to all internal policies and criteria for settlement, manuals, guidance to employees, employee training, scripts, and forms.

5. CashCall's policies, procedures, and processes concerning loan servicing during the time period from July 1, 2002 to date, including but not limited to the following:

a. CashCall's loan servicing policies and practices, including but not limited to the development of these policies and practices; employee training, standards, and scripts relating to these policies and practices; and the effectiveness of these policies and practices.

b. All automated and computerized systems used by CashCall in the loan servicing process.

c. CashCall's written policies and guidance to loan servicing employees, including but not limited to CashCall manuals and periodic bulletins.

d. CashCall's training program for loan servicing employees.

8

e. CashCall's management policies and practices for loan servicing employees, including but not limited to supervision, performance reviews, call monitoring, periodic meetings of collection personnel, and employee discipline.

f. CashCall's customer service department, including, but not limited to, the process by which loans are assigned to and serviced by the customer service department, the process by which loans are serviced in the loss mitigation department, and the relationship between CashCall's customer service department, collection department and CashCall's other departments.

g. CashCall's correspondence department, including, but not limited to, the activities and automated processes of the correspondence department and the relationship between CashCall's correspondence department CashCall's other department.

h. CashCall's policies, procedures, and processes concerning obtaining Automated Clearing House (ACH) payments, including the procedure for change and cancellation requests.

## DOCUMENTS TO BE PRODUCED AT THE DEPOSITION

Pursuant to Federal Rules of Civil Procedure, rules 30(b)(6) and 34, the designated witnesses are required to produce the documents listed below generated at any time during the period from July 1, 2002 to date at deposition, to the extent that such DOCUMENTS have not been previously produced in this litigation.

## INSTRUCTIONS

You are requested to produce not only those DOCUMENTS in your own possession, custody, or control, but also those DOCUMENTS reasonably available to you, including those in the possession, custody, or control of your present and former attorneys, agents, or other persons acting on your behalf, and those DOCUMENTS that you can request from others.

If you object to a portion of a request or subpart thereof, produce all DOCUMENTS called for by that portion of the request or subpart to which you do not object.

With respect to each DOCUMENT that is withheld on a claim of privilege, state in your

9

written response:

    (a)    The identity of the person(s) who prepared the DOCUMENTS, who signed it, and over whose name it was sent or issued;

    (b)    The identity of the person(s) to whom the DOCUMENT, or any copies thereof, was directed;

    (c)    The nature and substance of the DOCUMENT with sufficient particularity to enable the Court and parties hereto to identify the DOCUMENT;

    (d)    The date of the DOCUMENT;

    (e)    The identity of the person(s) who has custody or, or control over the DOCUMENT and each copy thereof;

    (f)    The identity of each person to whom copies of the DOCUMENT were furnished.

    (g)    The number of pages;

    (h)    The basis on which any privilege or other protection is claimed; and

    (i)    Whether any non-privileged or non-protected matter is included in the DOCUMENT.

If you are unable to identify or produce fully any of the DOCUMENTS responsive to these requests, you must provide them to the fullest extent possible, specifying in your response the reason(s) for your inability to provide the remainder and stating whatever information, knowledge or belief you have concerning the DOCUMENTS not produced. An evasive or incomplete answer or failure to produce may be deemed to be a failure to answer or produce, and may render you and your attorneys liable for the expenses of a motion to compel a responsive or complete answer or production, including reasonable attorneys' fees.

All of the following requests for production call for continuous production and, as such, require timely supplemental production by you in the event that, prior to final disposition of this action, additional relevant information or DOCUMENTS come to the attention of, or become available to you, your attorneys, consultants, representatives, agents or any other person acting on

10

1 your behalf. Without being requested by plaintiffs, you must promptly amend any response and
2 produce DOCUMENTS if you learn your response hereto to have been incomplete or incorrect in
3 some material respect and if the additional or corrective information has not otherwise been made
4 known to the other parties during the discovery process or in writing.

5     Wherever appropriate, in connection with these DOCUMENT requests, definitions and
6 instructions, the use of the singular includes the plural and the use of the plural includes the
7 singular.

8 DOCUMENT REQUESTS

9    1.   DOCUMENTS relating to Subject Matter 1, above:

10      a.  All manuals, instructions, memoranda, training materials, policies, scripts, or other
11        DOCUMENTS provided to CashCall employees regarding CashCall's electronic
12        funds transfer process for the purpose of obtaining payments from loan customers, to
13        the extent not already produced.

14      b.  All DOCUMENTS, which EVIDENCE, REFER, OR RELATE to CashCall's
15        policies or procedures relating to electronic funds transfer process for the purpose of
16        obtaining payments from loan customers, to the extent not already produced.

17    2.   DOCUMENTS relating to Subject Matter 2, above:

18      a.  All manuals, instructions, memoranda, training materials, policies, scripts, or other
19        DOCUMENTS provided to CashCall employees regarding CashCall's underwriting
20        process, to the extent not already produced.

21      b.  All DOCUMENTS, which EVIDENCE, REFER, OR RELATE to CashCall's
22        policies or procedures relating to underwriting loans for consumers, including but not
23        limited to the review, evaluation, and/or assessment of a loan applicant's credit score,
24        assets, income, and/or employment.

25      c.  All DOCUMENTS which EVIDENCE, REFER, OR RELATE to the information that
26        CashCall requires from loan applicants, including but not limited to all forms of loan
27        agreement, application forms, and forms the consumer is required to sign as a

28

11

1     condition of the loan or loan funding.

2     d.   All DOCUMENTS which EVIDENCE, REFER, OR RELATE to the review of

3         CashCall employees related to the underwriting of CashCall loans including account

4         reviews, call monitoring reviews, SMART goals, scorecards, and audio tapes.

5     e.   All DOCUMENTS which EVIDENCE, REFER, OR RELATE to the total yearly

6         number of CashCall's loans funded by CashCall.

7     f.   All DOCUMENTS which EVIDENCE, REFER, OR RELATE to any profiles or

8         studies developed by YOU or at YOUR request of potential CashCall customers.

9     g.   All DOCUMENTS which EVIDENCE, REFER, OR RELATE to internal procedures,

10        policies or practices of CashCall regarding COLLECTION of debts between July

11        2002 and the present, to the extent not already produced.

12     h.   All DOCUMENTS, including agreements, correspondence, memoranda, and emails

13        between YOU and any lending bank regarding the underwriting of loans between July

14        2002 and the present, to the extent not already produced.

15     i.   All DOCUMENTS which EVIDENCE, REFER, OR RELATE to any

16        COMPLAINTS against CashCall regarding its underwriting, made either orally or in

17        writing, by CashCall customers to CashCall between July 2002 and the present.

18    3.      DOCUMENTS relating to Subject Matter 3, above:

19     a.   All manuals, instructions, memoranda, training materials, policies, scripts, or other

20        DOCUMENTS provided to CashCall employees regarding collecting loan payments.

21     b.   All training materials, including manuals, tests, scripts, or other DOCUMENTS

22        provided to CashCall employees regarding collecting on delinquent loans.

23     c.   All DOCUMENTS which EVIDENCE, REFER, OR RELATE to the review of

24        CashCall employees efforts to collect a debt, including account reviews, call

25        monitoring reviews, scorecards, and audio tapes.

26     d.   All DOCUMENTS which EVIDENCE, REFER, OR RELATE to the performance

27        rating of CashCall employees in the collections department.

28

12

e.   All forms and form letters and communications that CashCall has used in debt

collection, including emails, form letters, and automated audio messages.

f.   All DOCUMENTS which EVIDENCE, REFER, OR RELATE to internal procedures,

policies or practices of CashCall regarding COLLECTION of debts between July

2002 and the present, to the extent not already produced.

g.   All manuals, instructions, memoranda, scripts, or any other DOCUMENTS provided

to CashCall employees regarding training or policies on COLLECTION of debts

between July 2002 and the present, to the extent not already produced.

h.   All DOCUMENTS, including agreements, correspondence, memoranda, and emails

between CashCall and any debt collection agency concerning COLLECTION of

debts between July 2002 and the present, to the extent not already produced.

i.   All DOCUMENTS which EVIDENCE, REFER, OR RELATE to any

COMPLAINTS against CashCall regarding debt collection, made either orally or in

writing, by CashCall customers to CashCall between July 2002 and the present.

4.   DOCUMENTS relating to Subject Matter 4, above:

a.   All studies, analyses, and reports prepared for any purpose concerning the

performance of CashCall's portfolios for unsecured consumer loans, including but not

limited to an annual and quarterly basis: (a) the volume of loans, (b) rates of default,

(c) length of time to default, (d) collection actions filed, and (e) loan principal,

interest, and fees deemed uncollectible.

b.   All studies, analyses, and reports provided to the California Department of

Corporations concerning the performance of CashCall's portfolios for unsecured

consumer loans

c.   CashCall's annual financial statements for the period 2002 through 2008.

d.   CashCall's quarterly financial statements for the period 2002 through 2008.

e.   All marketing materials prepared or used by CashCall to promote lending its

programs to lenders and potential investors.

1      f.   All agreements between CashCall and lenders and potential investors in order to

2          obtain funding for CashCall loan programs.

3      g.   All agreements between CashCall and any debt collection agency concerning any

4          arrangement for a debt collection agency to collect CashCall loans.

5      h.   All agreements by which CashCall has sold or transferred CashCall loans to any third

6          party.

7      i.   All manuals, instructions, memoranda, training materials, policies, scripts, or other

8          DOCUMENTS regarding settling defaulted loans, including but not limited to all

9          internal policies and criteria for settlement, manuals, guidance to employees,

10         employee training, scripts, and forms, to the extent not already produced.

11    5.   DOCUMENTS relating to Subject Matter 5, above:

12      a.   All manuals, instructions, memoranda, training materials, policies, scripts, or other

13         DOCUMENTS provided to CashCall employees regarding CashCall's loan servicing

14         process, to the extent not already produced.

15      b.   All DOCUMENTS which EVIDENCE, REFER, OR RELATE to the review of

16         CashCall employees related to the servicing of CashCall loans including account

17         reviews, call monitoring reviews, SMART goals, scorecards, and audio tapes.

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28

14

1    c.   All DOCUMENTS which EVIDENCE, REFER, OR RELATE to any

2         COMPLAINTS against CashCall regarding its loan servicing, made either orally or in

3         writing, by CashCall customers to CashCall between July 2002 and the present, to the

4         extent not already produced.

5    d.

6    DATED: November 24, 2009                    Respectfully submitted,

7                                                THE STURDEVANT LAW FIRM
                                                 A Professional Corporation
8
                                                 ARTHUR D. LEVY
9

10

11

12                        By:   _____

13                                               Whitney Huston
                                                 Attorneys for Plaintiffs
14

15   Z:\434 - O'Donovan v CashCall, Inc\Discovery\Notice of Deposition - 30b6 CashCall - draft 1.doc

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 40



YOUR COMBINED STATEMENT OF ACCOUNTS

P.O. BOX 1098
NORTHRIDGE, CA 91328-1098

**This Statement Covers**
From: 12/12/06
Through: 01/10/07

Need assistance?
To reach us anytime,
call **1-800-788-7000**
or visit us at **wamu.com**

EDUARDO DE LA TORRE
639 9TH ST APT 3A
DAVIS CA 95616-2237

Need help finding the perfect gift? Give a Washington Mutual Mastercard® Gift Card to friends, family and business associates. It allows the gift recipient to buy what they want. Go to wamu.com/giftcard and purchase one today. Check website for details. Gift Card is not FDIC insured.

## Summary of All Accounts Included in This Statement

| Product Name | Account Number | Term | Maturity Date | APY | Balance As of 01/10/07 |
|---|---|---|---|---|---|
| Free Checking | | | | | |
| Statement Savings | | | | | |
| **Total Deposit Balance:** | | | | | |

*Deposits at Washington Mutual are FDIC Insured.*

REDACTED
3  150400000045153 06-S-83          Page 1 of 3          P0064

Form CS50004A 0000006262  **X**



## Your Free Checking Detail Information

**EDUARDO DE LA TORRE**     Account Number: ████████

**Washington Mutual Bank, FA**

Pay bills online from a WaMu checking account at wamu.com . It's Fast, Easy and FREE. You can pay one bill or set up recurring payments, even view payment history online. Log-in today and click on Pay Bills and Loans.

### Your Account at a Glance

**Beginning Balance**
Checks Paid
Other Withdrawals
Deposits
**Ending Balance**

| Date | Description | Withdrawals (-) | Deposits (+) |
|------|-------------|-----------------|--------------|
| 12/15 | CASHCALL 866590CASH | $216.55 | |
| 12/18 | Overdraft Charge | $27.00 | |
| 01/03 | CASHCALL 866590CASH | $216.55 | |

REDACTED

P0065
Deposits are FDIC Insured

EQUAL HOUSING LENDER

00671257337   Form CS50004A 0000006263   X



| Date | Description | Withdrawals (-) | Deposits (+) |
|------|-------------|-----------------|--------------|
|      |             |                 |              |

|  | Checks Paid | | *Indicates check out of sequence |
|--|-------------|--|----------------------------------|
| Check Number | Date | Amount Paid | Check Number | Date | Amount Paid |
|              |      |             |              |      |             |

Calendar Year-To-Date Overdraft/Non-Sufficient Funds Charges
(excluding any charges which have been waived or refunded):
Overdraft charges
Non-Sufficient Funds charges

Overdraft/Non-Sufficient Funds Charges-this statement period:
Overdraft charges
Non-Sufficient Funds charges

Your Overdraft Limit as of the statement end date:
*Please note that this may be changed at any time without notice (see reverse for more information).*
As of the statement end date, the fee for any Non-Sufficient Funds transaction, whether paid or returned, was $27.00 per transaction.

## Your Statement Savings Detail Information

**EDUARDO DE LA TORRE**     **Account Number:**

Renting? You may be vulnerable to loss of your personal property in case of fire, theft and some natural disasters without Renters Insurance. Just visit the Washington Mutual Insurance Services, Inc.'s web site at www.wamuins.com or call 1-866-720-3213 and protect yourself from covered losses today.

| Your Account at a Glance | |
|--------------------------|--|
| **Beginning Balance** | |
| Other Withdrawals | |
| Deposits | |
| **Ending Balance** | |

| Date | Description | Withdrawals (-) | Deposits (+) |
|------|-------------|-----------------|--------------|
|      |             |                 |              |

As of the statement end date, the fee for any Non-Sufficient Funds transaction, whether paid or returned, was $27.00 per transaction.

REDACTED

P0066
Deposits are FDIC Insured
00671257337   Form CS50004A 0000006264   X

**Exhibit 41**

# Your Bank of America Combined Account Statement

**Statement Date: March 25, 2009**

**At Your Service**
Call: 760.630.3220

**Written Inquiries**
Bank of America
Jefferson/78
PO Box 37176
San Francisco, CA 94137-0176

LORI D SAYSOURIVONG
601 S TREMONT ST APT B
OCEANSIDE  CA  92054

Customer since 2008
Bank of America appreciates your
business and we enjoy serving you.

Our free Online Banking service allows you to check balances, track account activity, pay bills and more. **With Online Banking you can also view up to 18 months of this statement online and even turn off delivery of your paper statement.** Enroll at www.bankofamerica.com.

## ❑ Summary of Your Deposit Accounts

| Account | Account Number | Your Balance |
|---|---|---|
| MyAccess Checking | ▮▮▮▮ | $ 35.77 |
| Regular Savings | ▮▮▮▮ | .00 |
| Total Balances | | $ 35.77 |

## ❑ Bank of America News

Please read Bank of America Privacy Policy for Consumers 2009 carefully for important information. If you have other accounts with Bank of America you may receive more than one 2009 privacy policy notification. For more information, visit www.bankofamerica.com/privacy.

## ❑ Your MyAccess Checking Account

**Account Number:** ▮▮▮▮▮▮
Statement Period: February 24 through March 25, 2009

| | |
|---|---|
| Beginning Balance on 02/24/09 | $24.06 |
| Total Deposits | + 6,909.48 |
| Total Checks, Withdrawals, Transfers, Account Fees | - 6,897.77 |
| Ending Balance | $35.77 |

| | |
|---|---|
| Number of ATM withdrawals and transfers | 1 |
| Number of purchase transactions | 21 |
| Number of 24 Hour Customer Service Calls | |
| Self-Service | 0 |
| Assisted | 0 |

## ❑ Branch/ATM Deposits

| Number | Date Posted | Amount |
|---|---|---|
| | 03/02 | $1,500.00 |

## ❑ Checks Paid

\* Gap in sequential check numbers.

| Date Paid | Number | Amount | | Date Paid | Number | Amount |
|---|---|---|---|---|---|---|
| 02/27 | | $ 39.00 | | 03/03 | 2427 | 500.00 |
| 03/20 | * | 39.00 | | 03/03 | 2428 | 1,927.19 |
| 03/03 | * 2423 | 30.00 | | 03/06 | * 2431 | 150.00 |
| 03/03 | 2424 | 15.00 | | 03/11 | 2432 | 100.00 |
| 03/05 | 2425 | 3.00 | | **Total of 10 Checks Paid** | | **$3,753.19** |
| 03/03 | 2426 | 950.00 | | | | |

Continued on next page

REDACTED                              CONFIDENTIAL                                              P0488

## ☐ **Account Activity**

| Date Posted | Description | Reference Number | Amount |
|---|---|---|---|
| | **Deposits and Credits** | | |
| 02/27 | ATM deposit on 02/27, Bank of America ATM #ICAD5711 (Card #407252329) | 001836 | $1,380.00 |
| 02/27 | ATM deposit on 02/27, Bank of America ATM #ICAD5711 (Card #407252329) | 001590 | 3,100.00 |
| 03/03 | ATM deposit on 03/03, Bank of America ATM #ICAD5711 (Card #407252329) | 002795 | 705.00 |
| 03/09 | ATM deposit on 03/08, Bank of America ATM #ICAD1005 (Card #407252329) | 009047 | 100.00 |
| 03/23 | ATM deposit on 03/23, Bank of America ATM #ICAD3200 (Card #407252329) | 007831 | 100.00 |
| 03/25 | ATM deposit on 03/25, Bank of America ATM #ICAD3200 (Card #407252329) | 008412 | 24.48 |
| | Total Deposits and Credits | | $5,409.48 |
| | **Withdrawals, Transfers and Account Fees** | | |
| 02/25 | Purchase on 02/25 (Card #407252329), Pappy's Market Oceanside CA | 763380 | $6.30 |
| 02/26 | Check Card Purchase on 02/26 (Card #407252329), Round Table Pizza #467 San Diego CA Ref #24492159057207644700058 | | 7.54 |
| 02/27 | Check Card Purchase on 02/24 (Card #407252329), Urbane Cafe San Diego CA Ref #24013399057004176532005 | | 9.21 |
| 02/27 | Purchase on 02/27 (Card #407252329), Arco Paypoint Cardiff By Th CA | 365736 | 17.00 |
| 02/27 | Cash withdrawal on 02/27, Bank of America ATM #ICAD5711 (Card #407252329) | 001591 | 100.00 |
| 02/27 | Capital One     DES:Online Pmt ID:905839910579774 INDN:7280529053saysourivong  Co ID:9279744991 WEB Ref:009058009602913 | | 321.97 |
| 03/02 | Check Card Purchase on 02/27 (Card #407252329), Starbucks USA 00103143 Oceanside CA Ref #24164079059355438840120 | | 4.50 |
| 03/02 | Check Card Purchase on 02/28 (Card #407252329), Mic*renters Insurance 888-485-5525 CA Ref #24692169059000538898624 | | 17.75 |
| 03/02 | Check Card Purchase on 02/27 (Card #407252329), Martha Stewart Living 800-999-6518 FL Ref #24692169058000513214319 | | 60.00 |
| 03/02 | Check Card Purchase on 03/01 (Card #407252329), Tony's Sports Bar & Gri Oceanside CA Ref #24055229061207003201007 | | 80.55 |
| 03/02 | Check Card Purchase on 02/27 (Card #407252329), Cox*comm San Diego 619-262-1122 CA Ref #24692169058000523346564 | | 143.62 |
| 03/02 | IRS          DES:Usataxpymt ID:221946102408397 INDN:Andy & L Saysourivong  Co ID:3387702000 PPD Ref:009061002647635 | | 150.00 |
| 03/02 | AT&T         DES:Payment    ID:Xxxxx4199pac INDN:Lori Saysourivong Co ID:9991300000 WEB Ref:009061001347523 | | 168.66 |
| 03/02 | Check Card Purchase on 02/27 (Card #407252329), Twx*people Magazine 800-541-9000 NY Ref #24692169058000513204948 | | 221.54 |
| 03/02 | Purchase on 02/28 (Card #407252329), Sou The Home Depo Oceanside CA | 077548 | 296.98 |
| 03/02 | Purchase on 02/28 (Card #407252329), Costco Whse #0046 Carlsbad CA | 278185 | 322.12 |
| 03/02 | 21st Century Ins DES:Insurance  ID:0287354 INDN:Lori D *saysourivong Co ID:0000919613 WEB Ref:009061000633569 | | 366.00 |
| 03/03 | Sd Gas Elec    DES:Paid Sdge  ID:8258573276 INDN:1235873566064 Co ID:5951184800 WEB Ref:009062008314267 | | 37.66 |
| 03/03 | Cashcall      DES:866590cash ID: INDN:Saysourivong, Lori     Co ID:Rpp7211677 WEB Ref:009062008441043 | | 111.50 |
| 03/04 | Cashcall      DES:866590cash ID: INDN:Saysourivong, Lori     Co ID:Rpp7211677 WEB Ref:009063003156100 | | 15.00 |

Continued on next page

CONFIDENTIAL

P0489

## ❏ Account Activity   Continued

| Date Posted | Description | Reference Number | Amount |
|---|---|---|---|
| | **Withdrawals, Transfers and Account Fees** | | |
| 03/04 | Purchase on 03/04 (Card #407252329), | 639321 | 96.92 |
| | Nordstrom 360 699 San Diego CA | | |
| 03/05 | Sd Gas Elec      DES:Paid Sdge  ID:9834749833 INDN:1236178379286 | | |
| | Co ID:5951184800 WEB Ref:009064008185798 | | 23.71 |
| 03/06 | Check Card Purchase on 03/04 (Card #407252329), | | 389.20 |
| | United Air 01621887612 Rosemont IL | | |
| | Ref #24792629064683000163695 | | |
| 03/09 | Check Card Purchase on 03/05 (Card #407252329), | | 15.00 |
| | United Air 01645186829 San Diego CA | | |
| | Ref #24792629065683000042401 | | |
| 03/09 | Check Card Purchase on 03/05 (Card #407252329), | | 30.00 |
| | Circle K Oceanside CA | | |
| | Ref #24129429065100002853072 | | |
| 03/09 | Check Card Purchase on 03/05 (Card #407252329), | | 30.26 |
| | Compass Books 80700024 San Francisco CA | | |
| | Ref #24164079065496310809759 | | |
| 03/12 | Purchase on 03/12 (Card #407252329), | 265587 | 20.11 |
| | Costco Gas #00124 Vista CA | | |
| 03/16 | Purchase on 03/16 (Card #407252329), | 453202 | 12.40 |
| | Ralphs 1702 Ocean Oceanside CA | | |
| 03/17 | Purchase on 03/17 (Card #407252329), | 913471 | 6.23 |
| | Ralphs 1702 Ocean Oceanside CA | | |
| 03/23 | Overdraft Item Fee | | 35.00 |
| 03/25 | Purchase on 03/25 (Card #407252329), | 146934 | 27.85 |
| | Arco Paypoint San Diego CA | | |
| | Total Withdrawals, Transfers and Account Fees | | $3,144.58 |

## ❏ Your Regular Savings Account

Account Number: ███████
Statement Period: February 24 through February 26, 2009

| | |
|---|---|
| Beginning Balance on 02/24/09 | $0.00 |
| Ending Balance | $0.00 |

## ❏ Important Information About Your Account

Total interest paid to your account in 2008 : $.32

## ❏ ATM Information

This period, you visited the following ATM locations:

**Bank of America's ATM Network**
- #ICAD1005 Bank Of America, Redding, CA
- #ICAD3200 Bank Of America, San Diego, CA
- #ICAD5711 Bank Of America, Oceanside, CA

REDACTED                    CONFIDENTIAL                    P0490

Account Number: ▮▮▮▮▮▮

REDACTED                    CONFIDENTIAL                    P0491

**Exhibit 42**

*Other withdrawals -continued*

| Date | Description | $ Amount |
|------|-------------|---------|



| Date | Description | $ Amount |
|------|-------------|---------|
| 07/02 | Cashcall 866590Cash 070629 Odonovan, Krista | 250.31 |
| 07/03 | NSF Return Item Fee | 34.00 |
| 07/03 | Cashcall 866590Cash 070702 Odonovan, Krista | 0.31 |

*Continued on next page*

**REDACTED**

## Withdrawals
*Checks*

| Number | Date | $ Amount | Number | Date | $ Amount | Number | Date | $ Amount |
|--------|------|----------|--------|------|----------|--------|------|----------|
| 07/09 | Cashcall 866590Cash 070706 Odonovan, Krista | | | | | | | 250.31 |

*Continued on next page*

REDACTED

*Other withdrawals -continued*

| Date | Description | $ Amount |
|------|-------------|----------|

[black redacted block]

| 08/03 | Cashcall 866590Cash 070802 Odonovan, Krista | 250.31 |

[black redacted block]

*Continued on next page*

**REDACTED**

## Withdrawals

*Checks*



| Number | Date | $ Amount | Number | Date | $ Amount | Number | Date | $ Amount |
|--------|------|----------|--------|------|----------|--------|------|----------|
| | 08/10 | Cashcall 866590Cash 070809 Odonovan, Krista | | | | | | 250.31 |
| | 08/13 | Cashcall 866590Cash 070810 Odonovan, Krista | | | | | | 15.00 |

*Continued on next page*

**REDACTED**

### Other withdrawals -continued

| Date | Description | $ Amount |
|------|-------------|----------|
| 09/04 | Cashcall 866590Cash 070831 Odonovan, Krista | 250.31 |

*Continued on next page*

**REDACTED**