UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES  DISTRICT COURT

Northern District of California

| | |
|---|---|
| KRISTA O'DONOVAN, EDUARDO DE LA TORRE and LORI SAYSOURIVONG, individually and on behalf of all others similarly situated,<br><br>              Plaintiffs,<br><br>       v.<br><br>CASHCALL, INC., a California corporation,<br><br>              Defendant.<br>_____/ | No. C 08-03174 MEJ<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>**[Docket No. 60]** |

## I.  INTRODUCTION

Pending before the Court is Plaintiffs Krista O'Donovan, Eduardo De La Torre, and Lori Saysourivong's (collectively "Plaintiffs") Motion for Class Certification.  Dkt. No. 60.  After carefully considering the parties' arguments, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' Motion, as set forth below.

## II.  BACKGROUND

**A.     Factual Background**

The following factual allegations are taken from Plaintiffs' Fourth Amended Class Action Complaint ("FAC"), filed on February 25, 2010.  Dkt. No. 54.

Defendant CashCall is a California corporation engaged in the business of making unsecured personal loans to consumers at high interest rates.  *Id*. ¶¶ 4, 17, 18.

In October 2005, Plaintiff Krista O'Donovan borrowed $5,075 from CashCall.  *Id*. ¶ 20. Pursuant to the Promissory Note and Disclosure Statement that Ms. O'Donovan executed, the loan was based on an annual percentage rate of interest ("APR") of 59.83%, with the total payments to

UNITED STATES DISTRICT COURT
For the Northern District of California

1   amortize the debt listed as $30,161.86, or six times the principal. *Id.*[1]  According to O'Donovan,

2   CashCall made this loan despite it being "beyond her financial ability to repay [it] in the time and

3   manner provided in the CashCall Promissory Note and Disclosure Statement." *Id.* ¶ 21.

4   Particularly, she alleges that "CashCall did not conduct any assessment of [her] employment,

5   earnings capacity, her job security, her monthly expenses or her outstanding debt when it approved

6   her for the loan." *Id.* ¶ 23.  She avers that based on "the monthly expenses she was required to pay

7   in order to care for her family and maintain their basic living conditions, [she] could not afford her

8   CashCall loan payment each month." *Id.* ¶ 22.

9          In February 2006, Plaintiff Eduardo De La Torre borrowed $2,600 from CashCall with an

10  APR of approximately 98%. *Id.* ¶ 24.  The stated total payments required to amortize the debt was

11  over $9,000. *Id.*  De La Torre alleges that CashCall made this loan despite his financial inability to

12  repay it in the time and manner provided in the CashCall Promissory Note and Disclosure Statement.

13  *Id.* ¶ 25.  Particularly, at the time he received the loan from CashCall, De La Torre was a college

14  student whose income consisted of wages earned from part-time work and student loans and his

15  monthly living expenses exceeded his income. *Id.* ¶¶ 25, 26.  He alleges that "[p]aying CashCall

16  back for the loan in the time and manner required by CashCall was especially difficult because

17  repayment would require several years of regular payments, which was not realistic given De La

18  Torre's status as a student without significant earned income." *Id.* ¶ 26.  De La Torre also avers that

19  CashCall did not conduct any assessment of his employment, earning capacity, monthly expenses, or

20  outstanding debt when it approved him for the loan. *Id.* ¶ 27.

21         In May 2006, Plaintiff Lori Saysourivong executed a loan for $2,525 from CashCall at an

22  APR of 99.07%, according to CashCall's Promissory Note and Disclosure Statement. *Id.* ¶ 28.  The

23  stated total payments to amortize the debt was $9,149.51. *Id.*  Saysourivong alleges that CashCall

24  made this loan despite her financial inability to repay it in the time and manner set forth in the

25

26  ───────────────

27         [1]  Although the Fourth Amended Complaint refers to the Promissory Note as Exhibit A,
    Plaintiffs failed to attach it as an exhibit.  However, it is located in the record as Exhibit A to
28  Plaintiffs' Third Amended Complaint, Docket No. 38 at 22.

2

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Promissory Note and Disclosure Statement. *Id*. ¶ 29. She alleges that CashCall did not conduct any

2    assessment of her earning capacity, her job security, her monthly expenses, or her outstanding debt

3    when it approved her for the loan. *Id*. ¶ 31. In particular, she alleges that at the time she took out

4    the loan from CashCall, she had essential monthly expenses that exceeded her guaranteed income,

5    including credit card debt, commuting expenses, rent, and monthly living expenses. *Id*. ¶ 29.

6    Additionally, Saysourivong alleges that repaying the loan according to the schedule in the

7    Promissory Note and Disclosure Statement was especially difficult because it required several years

8    of regular payments, which was not feasible because of her expenses and her husband's inconsistent

9    income. *Id*. ¶ 30.

10        Pursuant to California Civil Code section 1781 and Rule 23 of the Federal Rules of Civil

11   Procedure, Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others

12   similarly situated as members of a proposed class. *Id*. ¶ 32. Plaintiffs define the putative class as,

13   "All individuals who borrowed money from CashCall, Inc., for personal, family, or household use at

14   any time from June 30, 2004 to the present." *Id*. On behalf of themselves and the putative class,

15   Plaintiffs assert claims for: (1) violation of the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. §

16   1693 *et seq*., and Federal Reserve Regulation E ("Regulation E"), 12 C.F.R. § 205 *et seq*.; (2)

17   violation of the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq*.; (3)

18   violation of the Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788 *et seq*.; (4)

19   unlawful business practices in violation of California Business & Professions Code section 17200;

20   (5) unlawful and unfair business practices in violation of Business & Professions Code section

21   17200; and (6) unlawful, fraudulent, and unfair business practices in violation of Business &

22   Professions Code section 17200. *Id*. at 8-18.

23        With respect to Plaintiffs' first claim for violation of the EFTA and Regulation E, Plaintiffs

24   allege that the Promissory Note and Disclosure Statements associated with Plaintiffs' and the

25   putative class members' loans "uniformly specify a particular day of the month when CashCall is

26   allowed to initiate and affect electronic fund transfers from customer accounts to collect installment

27   payments and other amounts from Plaintiffs and the Plaintiff Class." *Id*. ¶ 43. They allege that

28

3

1   CashCall has engaged "in the business practice of initiating and effecting  electronic funds transfers

2   from customer accounts to collect payments on days of the month other than those agreed to and

3   specified in the Promissory Note and Disclosure Statement." *Id*. ¶ 44.  Particularly, Plaintiffs allege

4   that when CashCall fails to collect a loan installment payment or other charge through an electronic

5   funds transfer ("EFT") on the agreed-upon day, it thereafter attempts to collect the installment

6   payment and other charges on later days during the same installment cycle that were not agreed to or

7   authorized by the customer, thereby violating the EFTA, 15 U.S.C. § 1693e(a), and Regulation E.

8   *Id*. ¶¶ 44-47.

9        Plaintiffs also allege that CashCall engages in the business practice of conditioning the

10  extension of credit on the customer's agreement to repayment by means of preauthorized EFTs, and

11  requires that customers agree to a provision permitting CashCall to make electronic debits from their

12  bank account, in violation of § 1693k(1) of the EFTA and Regulation E.  *Id*. ¶ 48.  Further, Plaintiffs

13  allege that CashCall has violated EFTA § 1693e(a) and Regulation E by limiting customers' rights

14  to cancel or stop payment of a preauthorized EFT.  *Id*. ¶¶ 50-51.

15       Plaintiffs' second claim is for violation of California's Consumer Legal Remedies Act, Cal.

16  Civ. Code § 1750.  *Id*. at 10-11.  Plaintiffs allege that CashCall violated section 1770(a)(5) of the

17  CLRA by representing that the services it provides have characteristics and benefits that they do not

18  have.  *Id*. ¶ 56.  Plaintiffs also allege that CashCall has violated section 1770(a)(14) of the CLRA by

19  representing that it has rights and remedies that are prohibited by law, including the right to collect

20  debts without providing notices required by law, and that it has the right to collect debts in a manner

21  prohibited by the EFTA and the Rosenthal Act.  *Id*. ¶ 57.  Further, Plaintiffs allege that CashCall has

22  violated CLRA section 1770(a)(19) "by including unfair and unconscionable loan terms, including

23  unconscionable usury rates and an unconscionable Internet presentation of the loans, in its loan

24  agreements."  *Id*. ¶ 58.  They allege that CashCall possesses bargaining power and strength superior

25  to Plaintiffs and the Class Members' and that, without discussion or negotiation, CashCall offered

26  standardized form contracts that it drafted on a take-it-or-leave-it basis, which amount to contracts of

27  adhesion and are therefore unlawful.  *Id*.

28

4

Plaintiffs' third claim is for violation of California's Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788, and the federal Fair Debt Collection Practices Act, 15 U.S.C. § 1692. *Id*. at 12. Plaintiffs allege that when they were late in making payments on their respective loans, CashCall employees called them multiple times during the day and aggressively demanded that they make payments on their loans, made misrepresentations, and yelled at and threatened Plaintiffs. *Id*. ¶ 68. Plaintiffs also allege that CashCall contacted third parties in an attempt to collect on Plaintiffs' debts, including family members, friends, and employers. *Id*. Plaintiffs further allege that CashCall claimed and collected amounts not authorized under the loan agreements, such as insufficient fund fees on electronic debit transactions made on unauthorized days of the month, and failed to include certain debt collection notices required by law. *Id*. ¶ 69(d), (e).

Plaintiffs' fourth through sixth claims are for violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200. *Id*. at 13-18. Plaintiffs allege that CashCall engages in the illegal and unfair business practice by making loans with unconscionable terms and interest rates, by failing to accurately and fairly represent the characteristics and benefits of the loans, and by making loans without regard to the customer's ability to repay the loan. *Id*. ¶¶ 75-91. Plaintiffs also allege that CashCall's business practices in making and collecting loans are unlawful business practices in violation of the UCL because they violate the EFTA, the Rosenthal Act, and the CLRA. *Id*. ¶ 96. Finally, Plaintiffs allege that CashCall's "marketing, sale, and collection of its loans are fraught with material misrepresentations and omissions that are likely to deceive consumers," thereby violating section 17200. *Id*. ¶¶ 100-02.

**B.    Procedural Background**

Plaintiffs filed this action against CashCall on July 1, 2008. Dkt. No. 1. On October 10, 2008, Plaintiffs filed their First Amended Complaint (Dkt. No. 11), which CashCall moved to dismiss. On June 24, 2009, the Court granted CashCall's motion in part and denied it in part. Dkt. No. 34. Plaintiffs subsequently filed Second and Third Amended Complaints. Dkt. Nos. 35, 38. On February 25, 2010, Plaintiffs filed the operative Fourth Amended Complaint. Dkt. No. 54. On March 26, 2010, CashCall filed its Answer and Counterclaim for breach of contract against De la

**UNITED STATES DISTRICT COURT**
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1   Torre and Saysourivong.  Dkt. No. 57.

2          On June 3, 2010, Plaintiffs filed the instant Motion for Class Certification (Dkt. No. 60) and

3   supporting declarations (Dkt. Nos. 62, 63, 64, 65).  On June 24, 2010, CashCall filed its Opposition

4   (Dkt. No. 76) and supporting declarations (Dkt. Nos. 77-84), to which Plaintiffs filed their Reply

5   (Dkt. No. 87).  On September 2, 2010, the Court held a hearing on the Motion and took the matter

6   under submission.  Having carefully considered the parties' arguments and thoroughly reviewed

7   their supporting documents and cited authorities, the Court now rules as follows.

8                                   **III.  DISCUSSION**

9   **A.      Proposed Classes**

10         Plaintiffs move to certify the following National Class for claims based on the EFTA,

11  Rosenthal Act, and UCL claims (the "proposed National Class"):

12              All individuals who borrowed money from CashCall, Inc. for personal,
            family, or household use (a) from whose bank accounts CashCall withdrew or
13          attempted to withdraw monthly loan installment payments on multiple days of the
            same month; or (b) who received a collection communication from CashCall stating
14          that payment had to be made using money order, MoneyGram, or other certified
            funds; or (c) was late in making a payment and was telephoned by CashCall during
15          the first 59 days of delinquency in connection with the late payment, or (d) who
            signed CashCall's promissory note containing the electronic funds authorization, at
16          any time from June 30, 2004 to the present.

17  Mot. at 4.  Plaintiffs contend that this Class is nationwide in scope because the EFTA claims are

18  federal and apply nationally, and because the Rosenthal Act and related unlawful UCL claims apply

19  generally to CashCall because its conduct giving rise to the members' injuries that occurred in

20  California, where it is incorporated and headquartered.  *Id.*

21         Plaintiffs also move to certify the following class of California borrowers for UCL claims

22  based on CashCall's alleged practice of extending loans with unfair terms and its violations of

23  California's Finance Lenders Law (the "proposed California Class"):

24              All individuals who, while residing in California, borrowed from $2,500 to $2,600 at
            interest rate of 90% or higher from CashCall, Inc., for personal, family, or household
25          use at any time from June 30, 2004 to the present.

26  *Id.* at 5.

27

28

                                              6

**B.      Legal Standard**

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal–Mart Stores, Inc. v. Dukes*, ⸺ U.S. ⸺, 131 S. Ct. 2541, 2550 (2011) (citing *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)).  Federal Rule of Civil Procedure 23 ("Rule") provides the rubric for assessing whether a particular lawsuit may be certified as a class action.  Toward this end, the party seeking class certification bears the burden of establishing that the requirements of Rule 23(a) and (b) are satisfied.  *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union v. ConocoPhillips Co.*, 593 F.3d 802, 807 (9th Cir. 2010).

First, under Rule 23(a), the party seeking certification must demonstrate that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. Pro. 23(a)(1)-(4).  As the Supreme Court explained in *Dukes*:

> Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate.  The Rule's four requirements—numerosity, commonality, typicality, and adequate representation—effectively limit the class claims to those fairly encompassed by the named plaintiff's claims.

*Dukes*, 131 S. Ct. at 2550 (internal quotations and citation omitted).

If the party successfully establishes each of the elements under Rule 23(a), it must then demonstrate that the proposed class satisfies at least one of the three requirements listed in Rule 23(b).  *Id*. at 2548.  Here, Plaintiffs rely on Rule 23(b)(3), which provides that a class may be maintained where "questions of law or fact common to class members predominate over any questions affecting only individual members," and a class action would be "superior to other available methods for fairly and efficiently adjudicating the controversy."

"In determining the propriety of a class action, the question is not whether the plaintiffs have stated a cause of action or will prevail on the merits, but, rather, whether the requirements of Rule 23 are met." *Pablo v. ServiceMaster Global Holdings, Inc.*, 2009 WL 2524478, at *4 (N.D. Cal. Aug.

**UNITED STATES DISTRICT COURT**
For the Northern District of California

7

17, 2009) (citing *Staton v. Boeing Co.*, 327 F.3d 938, 954 (9th Cir. 2003)).  The district court is therefore obligated to conduct a "rigorous analysis" into the applicable Rule 23 factors before certifying a class action.  *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 161 (1982).  The Supreme Court has recognized that "the class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'"  *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (1978) (quoting *Mercantile Nat'l Bank v. Langdeau*, 371 U.S. 555, 558 (1963)).  Nevertheless, "[a]lthough some inquiry into the substance of a case may be necessary to ascertain satisfaction of the commonality and typicality requirements of Rule 23(a), it is improper to advance a decision on the merits at the class certification stage."  *Moore v. Hughes Helicopters, Inc.*, 708 F.2d 475, 480 (9th Cir. 1983) (citation omitted).  "Rather, the court's review of the merits should be limited to those aspects relevant to making the certification decision on an informed basis."  *Aho v. AmeriCredit Fin. Servs., Inc.*, 2011 WL 3047677, at *3 (S.D. Cal. July 25, 2011) (citing  Fed. R. Civ. P. 23 advisory committee notes).  If, after undertaking such a review, the court is not satisfied that the moving party has sufficiently demonstrated the requirements of Rule 23(a) and (b) are satisfied, certification should be denied.  *Falcon*, 457 U.S. at 161.  The Court therefore turns to the Rule 23 factors.

**C.      Rule 23(a) Factors**

       **1.      Whether the Action is Maintainable Under Rule 23(a)**

              *a.      Numerosity*

Rule 23(a)(1) requires that a class be so numerous that joinder of all members is impracticable.  "The numerosity requirement ensures that the class action device is used only where it would be inequitable and impracticable to require every members of the class to be joined individually."  *Celano v. Marriot Int'l, Inc.*, 242 F.R.D. 544, 548 (N.D. Cal. 2007) (citing Schwarzer, Tashima & Wagstaffe, *Federal Civil Procedure Before Trial* § 10:258).  However, courts have recognized that "impractical" does not mean "impossible."  *Id.*; *Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D. 439, 448 (N.D. Cal. 1994) (citing *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913 (9th Cir. 1964)).  To satisfy this requirement, Plaintiffs need not

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1   state the exact number of class members, nor is there a threshold number above which

2   impracticability is presumed.  *See In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 350-51

3   (N.D. Cal. 2005); *Aguayo v. Oldenkamp Trucking*, 2005 WL 2436477, at *12 (E.D. Cal. Oct. 3,

4   2005).  Rather, courts must examine the specific facts of each case.  *Gen. Tel. Co.*, 446 U.S. at 330.

5   In making this determination, courts may make common sense assumptions regarding whether

6   joinder is impractical.  *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. at 350 (finding that, as a

7   matter of common sense, evidence that purported class of over 1,000 individuals or business entities

8   dispersed throughout the United States was sufficient to establish that joinder of all class members is

9   impracticable).

10   Here, Plaintiffs assert that Rule 23(a)(1)'s numerosity requirement "is readily established."

11   Mot. at 5.  In support, Plaintiffs proffer that CashCall "has made several hundred thousand loans

12   since 2005 and in 2006 made over 75,000 loans of $2,600 at 96% interest." *Id.* (citing Whitney

13   Huston Decl. Ex. 23, Dkt. No. 65).  Regarding the proposed California Class, Plaintiffs submit that

14   CashCall made nearly 70,000 loans in 2005 to California borrowers.  *Id.*  Based on these figures,

15   Plaintiffs contend that Class membership is likely to number in the tens of thousands, making

16   joinder impracticable.

17   In its Opposition, CashCall does not present any argument regarding Plaintiffs' submission

18   on the numerosity element.  CashCall does, however, recognize that Plaintiffs' class definitions

19   "include every CashCall borrower from June 30, 2004 – more than 388,000 people."  Opp'n at 1.

20   As the foregoing summary illustrates, the parties gave short shrift to the numerosity element.

21   Although Plaintiff cites to the total number of borrowers who executed loan agreements with

22   CashCall, their national Class includes several subgroups for which Plaintiffs fail to provide any

23   estimate.  For instance, Plaintiffs seek to represent CashCall customers from whose accounts

24   CashCall made multiple EFT withdrawals and customers who received collection letters.  While

25   information about the precise number of CashCall customers who would comprise these subclasses

26   may be in CashCall's control and thus unavailable to Plaintiffs at this juncture, this does not relieve

27   Plaintiffs of their burden of providing some estimate of the potential class members in these

28

9

**UNITED STATES DISTRICT COURT**
For the Northern District of California

subclasses for purposes of seeking class certification.  However, to the extent that Plaintiffs' claims

rely on terms of CashCall's loan agreements, which all customers executed in order to receive a

loan, the Court finds that Plaintiffs have sufficiently demonstrated that the putative class members

are so numerous and are dispersed throughout the country, that joinder would be impracticable.  *See*

*In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. at 351.  Accordingly, the Court finds that Rule

23(a)(1)'s numerosity requirement is satisfied.

### b.   Commonality

Next, under Rule 23(a)(2), Plaintiffs must establish that there are "questions of law or fact

common to the class."  This element is satisfied if there exists a "common contention" that is of

"such a nature that it is capable of classwide resolution. . . ."  *Dukes*, 131 S. Ct. at 2551.  More

specifically, commonality requires the plaintiff to demonstrate that the class members have suffered

the same injury, not merely that they have all suffered a violation of the same provision of law.  *Id.*

To meet this requirement, even a single common question is sufficient.  *Id.* at 2556.  At the same

time, in order to establish that a common legal or factual question underlies the class, named

plaintiffs must adequately demonstrate that any dissimilarities between the putative class members

do not vitiate the common question(s) that bind the putative members and makes class treatment

appropriate.  *Id.*  As the Supreme Court summarized:

> What matters to class certification . . . is not the raising of common "questions" –
> even in droves – but, rather, the capacity of a classwide proceeding to generate
> common *answers* apt to drive the resolution of the litigation.  Dissimilarities within
> the proposed class are what have the potential to impede the generation of common
> answers.

*Id.* (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L.

Rev. 97, 132 (2009)).  Thus, "where claims of the class are so factually and legally distinct as to be

completely separate, commonality is absent."  *Andrews Farms v. Calcot, Ltd.*, 2009 WL 1211374, at

*5 (E.D. Cal. May 1, 2009).

Here, Plaintiffs contend that issues common to the class are "clear," and proffer the

following chart:

UNITED STATES DISTRICT COURT
For the Northern District of California

| Claim | Common Issues |
|---|---|
| Electronic Funds Transfers and related UCL Claims | • CashCall collects payments multiple times within a given month from borrowers who are delinquent, without authorization.<br><br>• In its take-it-or-leave-it contract, CashCall requires borrowers to agree to make payments through EFTs and its cancellation policy violates the EFTA. |
| Rosenthal Act Claims and related UCL Claims | • CashCall employs uniform and automated collection emails and letters [that] would mislead and deceive the "least sophisticated consumer" into believing he/she has to make payments through MoneyGram or with other certified funds.<br><br>• CashCall's standardized EFT practices (that is, multiple monthly withdrawals, conditioning) are unlawful debt collection methods in violation of the Rosenthal Act.<br><br>• Whether CashCall's automated telephone collection system annoys, abuses, and harasses its customers with excessive and unnecessary telephone calls. |
| Unconscionable, Unfair and Unlawful Loan Terms | • CashCall charges an interest rate of 90% or higher on its $2,600 loan products.<br><br>• CashCall systematically fails to take into account the borrowers [sic] ability to repay the loan, requiring aggressive collection practices.<br><br>• The terms of CashCall's loan, which are the same for each borrower, including the length of repayment, the interest only structure, and the high interest rate, are unfair. |

Mot. at 6. Aside from the foregoing list, Plaintiffs provide no substantive discussion regarding the common factual and legal issues they have identified.

In its Opposition, CashCall does not directly address whether Plaintiffs have met the commonality requirement under Rule 23(a)(2), but argues at various points in its brief that individual issues pervade each of Plaintiffs' claims, thereby vitiating any commonality of issues or claims. *See* Opp'n at 1-3, 12, 16-23.

Looking first at the EFTA claims, Plaintiffs identify the common issues as: (1) "CashCall collects payments multiple times within a given month from borrowers who are delinquent without authorization"; and (2) "In its take-it-or-leave-it contract, CashCall requires borrowers to agree to make payments through EFTs and its cancellation policy violates the EFTA." Mot. at 6. As to the first issue, assuming that the putative class members did not authorize more than one EFT

11

1  withdrawal during a month, whether CashCall's alleged practice of attempting to collect a

2  delinquent loan payment through multiple EFT withdrawals in a single month violates the EFTA is

3  an issue that is shared by all similarly-situated class members.  Likewise, whether CashCall's

4  alleged practice of requiring customers to agree to EFT payments and whether its EFT cancellation

5  policy in effect before February 2007 violate the EFTA, also raise issues that are common to all

6  putative class members who executed loan agreements with those provisions.

7          Turning to Plaintiffs' Rosenthal Act claims, Plaintiffs assert that there are four common

8  issues among the class.  First, Plaintiffs assert that "CashCall employs uniform and automated

9  collection emails and letters [that] would mislead and deceive the 'least sophisticated consumer' into

10  believing he/she has to make payments through MoneyGram or with other certified funds."  *Id*.  The

11  Court queries whether this issue is common to the class.  As discussed in greater detail below,

12  whether a CashCall customer was mislead or deceived by statements made in CashCall's email

13  messages and letters is a highly fact-specific, individualized inquiry.  However, to the extent that

14  Plaintiffs are claiming that CashCall's email messages and letters contained patently false or

15  inaccurate information, for instance, stating that customers have no option other than to make

16  payments through MoneyGram or with certified funds, when in fact they have the option of making

17  payments through alternate forms (*e.g.*, cash payment), the falsity or inaccuracy of such

18  representations would be common among all customers who received the communications.

19          Second, Plaintiffs assert that "CashCall's standardized EFT practices (that is, multiple

20  monthly withdrawals, and conditioning loans on authorization of EFTs) are unlawful debt collection

21  methods in violation of the Rosenthal Act."  *Id*.  To the extent that Plaintiffs have identified

22  operating EFT practices that are uniformly applicable to CashCall's customers, the question of

23  whether such practices constitute unlawful debt collection methods under the Rosenthal Act is an

24  issue that is common to the class.

25          Third, Plaintiffs proffer, "[w]hether CashCall's automated telephone collection system

26  annoys, abuses, and harasses its customers with excessive and unnecessary telephone calls" is a

27  factual issue common to the class.  *Id*.  The Court, however, disagrees.  Particularly, a customer's,

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

12

UNITED STATES DISTRICT COURT
For the Northern District of California

1  individualized, personal reaction to a collection phone call from CashCall is not an injury, fact, or

2  legal question shared throughout the class.  Rather, because each class member's reaction is unique

3  and based on his or her own circumstance, the question of whether customers were either annoyed,

4  abused, or harassed by CashCall's collection calls is not an issue that lends itself to classwide

5  resolution.  *See Dukes*, 131 S. Ct. at 2551.

6       Finally, the Court turns to Plaintiffs' proffered issues associated with their claims that

7  challenge the legality and enforceability of the terms of the loan agreements.  The first issue

8  Plaintiffs identify is that "Cashcall charges an interest rate of 90% or higher on its $2,600 loan

9  products."  Mot. at 6.  Notably, the interest rates charged by CashCall were not uniform.  However,

10 Plaintiffs appear to draw the line at 90%, such that the issue would be whether a rate at that number

11 or above is unconscionable.  Framed in this way, whether an interest rate of 90% or above on a

12 $2,600 loan is unconscionable or otherwise illegal is a question of fact and law that is shared by all

13 class members who accepted loans with such terms and is therefore capable of classwide resolution.

14      Next, Plaintiffs assert that "CashCall systematically fails to take into account the borrowers'

15 ability to repay the loan, requiring aggressive collection practices."  *Id*.  To the extent that Plaintiffs

16 are asserting that CashCall failed to utilize any screening procedure to determine if the class

17 members who executed loan agreements qualified for such loans, the question of whether the lack of

18 such procedure was unfair or unlawful is common to all class members.

19      Lastly, Plaintiffs assert that "[t]he terms of CashCall's loan, which are the same for each

20 borrower, including the length of repayment, the interest only structure, and the high interest rate,

21 are unfair."  *Id*.  Again, to the extent that Plaintiffs are asserting that certain uniform terms of the

22 loan agreements violate some provision of law or are otherwise unenforceable, this would be an

23 issue that is common to all class members who executed a loan agreement.

24      In sum, Plaintiffs have identified common issues of fact and law as to each of their claims

25 that are sufficient to satisfy Rule 23(a)(2).

26 / / /

27 / / /

28

13

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1

              *c.*     **Typicality**

2

       Third, Rule 23(a)(3) requires Plaintiffs to demonstrate that "the claims or defenses of the

3

representative parties are typical of the claims or defenses of the class . . . ." "The test of typicality

4

is whether other members have the same or similar injury, whether the action is based on conduct

5

which is not unique to the named plaintiffs, and whether other class members have been injured by

6

the same course of conduct." *In re Tableware Antitrust Litig.*, 241 F.R.D. at 649 (citing *Hanon v.*

7

*Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). "Typicality refers to the nature of the

8

claim or defense of the class representative, and not to the specific facts from which it arose or the

9

relief sought." *Hanon*, 976 F.2d at 508 (internal citations omitted). "The purpose of the typicality

10

requirement is to assure that the interest of the named representative aligns with the interests of the

11

class." *Id.* Thus, "representative claims are 'typical' if they are reasonably co-extensive with those

12

of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020.

13

       Here, Plaintiffs argue that their claims arise from the same facts and legal theories as the

14

putative class members' and are therefore typical. Mot. at 7. Specifically, with respect to the EFTA

15

claims, Plaintiffs contend that each of them were subjected to the identical practices to which all

16

members of the proposed classes were subjected to — multiple draws from their bank accounts and

17

CashCall's practice of conditioning their loans upon the agreement to pay by EFT. *Id.* Regarding

18

the Rosenthal Act claims, Plaintiffs assert that they were subjected to the same collection practices

19

as the putative class members, including receiving misleading collection letters, being subjected to

20

illegal collection methods in violation of the EFTA, and being harassed by the same telephone

21

collection procedures. *Id.* Regarding claims based on the loan terms, Plaintiffs argue "each of the

22

Plaintiffs' loans was made at an unconscionably high interest rate, without CashCall acting in regard

23

for their ability to repay the loan and under consumer adhesion contracts that were unfair and one-

24

sided." *Id.* Plaintiffs maintain that "[n]o peculiar circumstances apply to the Plaintiffs which

25

distinguish their claims, or CashCall's treatment of them, from other class members." *Id.* at 7:25-26.

26

       In response, CashCall does not proffer any direct challenge to Plaintiffs' typicality argument.

27

Rather, throughout its Opposition, CashCall repeatedly asserts that the claims Plaintiffs seek to

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1   assert require individualized inquiries into the circumstances surrounding each customer's loan and

2   interactions with CashCall.  Such arguments, however, go to the question of whether individual

3   issues predominate, which the Court addresses at length, below.  Setting that issue aside, the Court

4   finds that, to the extent that Plaintiffs' claims stem from the same underlying conduct by CashCall –

5   namely, the terms of the loan agreements and CashCall's subsequent collection practices – there is a

6   sufficient nexus between Plaintiffs' claims and those of the putative class members.  Thus, Rule

7   23(a)(2)'s typicality requirement is satisfied.

8                    *d.      Adequacy of Representation*

9          The final requirement of Rule 23(a) is that Plaintiffs must be able to "fairly and adequately

10  protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "To satisfy constitutional due process

11  concerns, absent class members must be afforded adequate representation before entry of a judgment

12  which binds them."  *Hanlon*, 150 F.3d at 1020 (citing *Hansberry v. Lee*, 311 U.S. 32, 42-43 (1940)).

13  To determine whether representation is adequate under Rule 23(a)(4), the Court must assess

14  whether: (1) the named plaintiffs and their counsel have any conflicts of interest with other class

15  members; and (2) the named plaintiffs and their counsel will prosecute the action vigorously on

16  behalf of the class.  *Id.*

17         In their Motion, Plaintiffs contend that their claims are reflective of those of the putative

18  class members' and the relief they seek is identical to that sought for the Classes.  Mot. at 8.

19  Plaintiffs thus assert that their interests are aligned with those of the Classes.  *Id.*  In its Opposition,

20  CashCall has not identified any conflict between Plaintiffs and the Classes they seek to represent.

21  Based on this Court's review, there is nothing in the record indicating that any actual or potential

22  conflict exists between the named Plaintiffs and the putative class members.

23         As to the second inquiry, Plaintiffs contend that they have been pursuing the interests of the

24  Classes by actively participating in this litigation.  *Id.*  Further, Plaintiffs submit that their counsel,

25  The Sturdevant Law Firm and Arthur Levy, have extensive experience in prosecuting consumer

26  protection class actions and that counsel is qualified to represent Plaintiffs and the Classes in this

27  litigation.  *Id.*  The Court finds that Plaintiffs' have adequately demonstrated their commitment to

28

                                              15

UNITED STATES DISTRICT COURT
For the Northern District of California

1    pursing this case on behalf of the Classes and counsel's ability to competently represent them in this

2    litigation.

3           Taken together, the Court finds that Plaintiffs have established that they will fairly and

4    adequately represent the interests of the class, as required by Rule 23(a)(4).

5    **D.     Rule 23(b)(3) Requirements**

6           Having found that Plaintiffs have made a sufficient showing as to the Rule 23(a)

7    requirements, Plaintiffs next must demonstrate that the action can be certified under any of the three

8    categories listed in Rule 23(b).  In their Motion, Plaintiffs seek certification of their claims pursuant

9    to Rule 23(b)(3),[2] which provides that a class action may be maintained if:

10          the court finds that the question of law or fact common to class members predominate
            over any questions affecting only individual members, and that a class action is
11          superior to other available methods for fairly and efficiently adjudicating the
            controversy.

12

13          Rule 23(b)(3)'s predominance and superiority requirements were added "to cover cases 'in

14   which a class action would achieve economies of time, effort, and expense, and promote . . .

15   uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or

16   bringing about other undesirable results." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615

17   (1997) (quoting Fed. R. Civ. P. 23(b)(3) Adv. Comm. Notes to 1966 Amend).  Thus, "a central

18   concern of the Rule 23(b)(3) predominance test is whether 'adjudication of common issues will help

19   achieve judicial economy.'"  *Vinole v. Countrywide Home Loans*, 571 F.3d 935, 944 (9th Cir. 2009).

20    "This analysis presumes that the existence of common issues of fact or law have been established

21   pursuant to Rule 23(a)(2); thus, the presence of commonality alone is not sufficient to fulfill Rule

22   23(b)(3)." *Hanlon*, 150 F.3d at 1022.  Instead, "Rule 23(b)(3) focuses on the relationship between

23   the common and individual issues," and "tests whether proposed classes are sufficiently cohesive to

24   warrant adjudication by representation."  *Id.*  Accordingly, "[w]hen common questions present a

25

26   ───────────────

27          [2]  In a footnote, Plaintiffs state that their claims for injunctive relief based on UCL violations,
     are also suitable for class certification under Rule 23(b)(2).  Mot. a t3 n.2.  Plaintiffs, however,
28   present no argument in support of this request.

                                                        16

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1   significant aspect of the case and they can be resolved for all members of the class in a single

2   adjudication, there is clear justification for handling the dispute on a representative rather than on an

3   individual basis." *Id.* (internal quotations omitted).  "Because no precise test can determine whether

4   common issues predominate, the Court must pragmatically assess the entire action and the issues

5   involved."  *Romero v. Producers Dairy Foods, Inc.*, 235 F.R.D. 474, 489 (E.D. Cal. 2006).  For

6   instance, "[c]ommon questions may predominate where the resolution of a question common to the

7   class would significantly advance the litigation."  *Id.*

8          In addition to establishing the predominance of common questions, Plaintiffs must establish

9   that a class action is superior to alternative methods of resolving the claims.  Fed. R. Civ. P.

10  23(b)(3).  To guide this assessment, Rule 23(b)(3) sets forth a list of factors relevant to the

11  superiority inquiry:

12         (A)  the class members' interests in individually controlling the prosecution or
           defense of separate actions;

13

14         (B) the extent and nature of any litigation concerning the controversy already begun
           by or against class members;

15         (c) the desirability or undesirability of concentrating the litigation of the claims in the
           particular forum; and

16

17         (D) the likely difficulties in managing a class action.

18  Fed. R. Civ. P. 23(b)(3).  "This inquiry 'requires the court to determine whether maintenance of this

19  litigation as a class action is efficient and whether it is fair,' such that the proposed class is superior

20  to other methods for adjudicating the controversy."  *Aho v. Americredit Fin. Servs., Inc.*, 2011 WL

21  3047677, at *12 (S.D. Cal. Jul. 25, 2011) (quoting *Wolin v. Jaguar Land Rover N. Am., LLC*, 617

22  F.3d 1168, 1175-76 (9th Cir. 2010)).

23         1.     Whether Common Questions Predominate

24         To determine whether common questions predominate, the Court must examine each of the

25  claims and defenses at issue in this case and assess whether generalized evidence would prove those

26  elements on a class-wide basis, or whether individual proof is needed to establish each class

27  member's entitlement to relief based on the facts and law of the case.  *See* Joseph M. McLaughlin,

28

*McLaughlin on Class Actions: Law and Practice* § 5:23(7th ed. 2011).  "If the evidence needed to make a prima facie showing on a given question requires members of the proposed class to present evidence that varies from member to member, then it is an individual question.  If the same evidence will permit each class member to make a prima facie showing, a question is common."  *Id.*

a.      EFTA Claims

Plaintiffs' first claim is for violation of the EFTA, 15 U.S.C. § 1693, and Federal Reserve Regulation E, 12 C.F.R. § 205.  Compl. at 8-10.  Section 1693e addresses preauthorized transfers and provides, in relevant part:

> (a) A preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made.  A consumer may stop payment of a preauthorized electronic fund transfer by notifying the financial institution orally or in writing at any time up to three business days preceding the scheduled date of such transfer.  The financial institution may require written conformation to be provided to it within fourteen days of an oral notification if, when the oral notification is made, the consumer is advised of such requirement and the address to which such confirmation should be sent.

15 U.S.C. § 1693e(a).  In this action, Plaintiffs' EFTA claim is based on three theories: (1) that CashCall initiated unauthorized EFTs in an attempt to collect loan installment payments from Plaintiffs' and the putative class members' bank accounts (the "multiple sweeps" or "double dipping" claim); (2) that CashCall illegally conditioned the extension of credit on a customer agreeing to electronic payment (the "conditioning" claim); and (3) that CashCall required customers to submit a written request for cancellation of their EFT authorization seven days before the EFT withdrawal date (the "cancellation" claim).  Mot. at 8-12.  The Court will evaluate each theory in turn.

Plaintiffs first assert that CashCall violated § 1693e(a) by initiating unauthorized EFTs from Plaintiffs' and class members' accounts after a scheduled EFT for a regular monthly loan payment was returned unsatisfied due to insufficient funds.  Mot. at 8-11.  Specifically, Plaintiffs contend that CashCall's standard Promissory Note and Disclosure Statement contains an "Electronic Funds Authorization" provision which authorizes CashCall to withdraw a scheduled monthly loan payment

1   from the customer's checking account on a specified day each month.[3]  Mot. at 9 (citing to Huston

2   Decl., Ex. 11 at P0352).  According to Plaintiffs, "[i]f CashCall processes an EFT on the scheduled

3   day of the month to collect a regular installment payment, and the EFT is returned unsatisfied,

4   CashCall then attempts to collect the same installment a second or third time during the same

5   month."  *Id.*  Plaintiffs state that during the first 30 days of delinquency, CashCall refers to its

6   practice of multiple EFTs as "Rerun ACH,"[4] and after 30 days of delinquency, it refers to the

7   multiple sweeps as "Backend ACH."  Mot. at 9 (citing to Huston Decl., Ex. 26 at 117:2-126:18,

8   143:19-145:22, 147:17-148:11).  CashCall documents Rerun and Backend ACHs in its Payment

9   Transaction Histories and Customer Contact ("Servicing Transaction") Logs.  Mot. at 9 (citing

10  Huston Decl., Ex. 26 at 136-137; Ex. 7 at CC512-13; Ex. 8 at CC6417, 6427-28; Ex. 9 at CC309-13;

11  Ex. 27 at CC 479, 482-83; Ex. 28 at CC 6432-33, 6444, 6491; Ex. 29 at 19, 22, 26, 28-29, 37-41).

12      Plaintiffs assert that the written authorization in the Promissory Notes only allows CashCall

13  to initiate an EFT to withdraw the scheduled loan payment on the single, specified, recurring day of

14  the month (usually the first day), and does not authorize CashCall to run multiple sweeps for the

15  same payment on later days of the month of CashCall's choosing.  Mot. at 10.  Plaintiffs thus charge

16  that "CashCall's Rerun and Backend ACHs are unauthorized raids on its customers' bank accounts .

17

18      [3]  Specifically, the Electronic Funds Authorization states:

19

20      I hereby authorize CashCall to withdraw my scheduled loan payment from my
        checking account on or about the FIRST day of each month.  I further authorize
21      CashCall to adjust this withdrawal to reflect any additional fees, charges or credits to
        my account.  I understand that CashCall will notify me 10 days prior to any given
22      transfer if the amount to be transferred varies by more than $50 from my regular
        payment amount.  I understand that this authorization and the services undertaken by
23      CashCall in no way alters or lessens my obligations under the loan agreement.  I
        understand that I can cancel this authorization at any time (including prior to my first
24      payment due date) by sending written notification to CashCall.  Cancellations must
25      be received at least seven days prior to the applicable due date.

26  Huston Decl., Ex. 11 at P0352.

27

28      [4]  "ACH" stands for Automatic Clearing House.  Huston Decl., Ex. 22 at CC944.

19

1  . . ." *Id.*

2      With respect to the specific instances of unauthorized EFTs, Plaintiffs assert that CashCall

3  conducted Rerun and Backend ACHs on all three of their accounts, and cite to their respective Loan

4  Transaction History reports documenting such transactions in support.  Mot. at 10 (citing Huston

5  Decl., Ex. 7 (De La Torre report); Ex. 8 (Saysourivong report); Ex. 9 (O'Donovan report)).

6  Plaintiffs argue that this evidence demonstrates that factual and legal issues exist that are common to

7  the Class.  Particularly, Plaintiffs advance that "class members whose CashCall Loan Transaction

8  History and Servicing Transaction Logs reflect these illegal 'ACH' transactions have a remedy

9  under the EFTA to redress CashCall's common illegal practices and common proof of this claim

10  predominates."  Mot. at 10-11.  Thus, Plaintiffs contend that common issues predominate this claim.

11      In its Opposition, CashCall argues that determining whether a borrower authorized a

12  particular EFT transaction raises numerous individual questions.  Opp'n at 9.  First, it argues that

13  111,000 borrowers never had an ACH rerun due to insufficient funds in the borrower's account.  *Id.*

14  (citing Bennett Decl. ¶ 26, Dkt. No. 82).  Second, CashCall argues that beginning in February 2007,

15  the Electronic Funds Authorization and Disclosure was amended to state: "I also authorize you to

16  withdraw funds from my account on additional days throughout the month in the event that I am

17  delinquent on my loan payments."  *Id.* (citing Post Decl. ¶ 21 & Ex. F, Dkt. No. 77).  It therefore

18  argues that not all class members are similarly situated because every borrower since February 2007

19  expressly authorized multiple EFT debits.  *Id.*  Third, CashCall argues that Plaintiffs "ignore the

20  numerous individual questions that impact whether an ACH rerun is authorized."  *Id.* at 9-10.

21  Particularly, it contends that if an EFT payment is returned for insufficient funds, it attempts to

22  contact the customer to work out a resolution, which may lead to the customer authorizing a second

23  ACH run on a specific date or making alternate payment arrangements, including making their

24  regular payment in two installments. *Id.* at 10 (citing Bennett Decl. ¶¶ 10, 21, 24).  Finally, CashCall

25  argues that Plaintiffs cannot establish a uniform claim for damages, which they have identified as the

26  funds unlawfully collected and fees imposed by the bank if the collection EFT was returned

27  unsatisfied.  *Id.*  CashCall contends that Plaintiffs' proposed class would include individuals who

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

20

1   had an EFT rerun, but had sufficient funds on the rerun, as well as individuals who still lacked

2   sufficient funds.  *Id.*  As to the first group, it asserts that there is no actual damages, while as to the

3   second group, it claims that they may have suffered damages, but the amount of damages would

4   depend on the fees charged.  *Id.*  Accordingly, CashCall submits that "[d]etermining the amount of

5   damage and whether it resulted from CashCall's alleged conduct necessarily would involve

6   individual issues."  *Id.*

7           The Court has carefully considered the parties' arguments and supporting materials, and

8   agrees with CashCall that individual issues predominate this claim.  While Plaintiffs have

9   demonstrated that a common issue exists as to CashCall's multiple sweeps practice, CashCall has, in

10  turn, demonstrated that there are sufficient individual issues that would come to the forefront in

11  litigating this claim.  In particular, while Plaintiffs contend that the Court would only need to

12  examine CashCall's transaction logs to determine whether a delinquent borrower was subjected to

13  an unauthorized sweep, CashCall has identified evidence indicating that in some instances the

14  delinquent borrower consented to CashCall initiating an EFT withdrawal on a date other than that

15  specified in the loan agreement or an alternate payment arrangement.  Thus, to determine whether an

16  EFT withdrawal or attempted withdrawal was unauthorized, the Court would need to examine more

17  than simply the transaction logs.  Rather, it must also consider any evidence CashCall may have that

18  shows a specific borrower authorized or consented to the EFT.  Further, if Plaintiffs successfully

19  established that the multiple EFT withdrawals violated the EFTA, neither Plaintiffs nor the putative

20  class members sustained uniform damages.  Instead, as CashCall points out, Plaintiffs contend that

21  the damages for this claim include funds unlawfully collected and any bank NSF fees that each

22  delinquent borrower incurred.  As a result, the issue of damages not only presents an issue that

23  would need to be evaluated on a case-by-case basis, but makes class treatment of this class

24  unmanageable.  Accordingly, the Court finds that individual issues outnumber the common issues

25  involved with this claim.  The Court therefore finds that it fails to meet Rule 23(b)(3)'s requirement.

26          Plaintiffs' second theory for the EFTA claim is that CashCall illegally conditioned the

27  extension of credit on each customer agreeing to electronic payment by preauthorized EFTs, in

28

21

UNITED STATES DISTRICT COURT
For the Northern District of California

1   violation of the EFTA.  Compl. ¶ 48; Mot. at 11.  Pursuant to 15 U.S.C. § 1693k(1), "No person may

2   . . . condition the extension of credit to a consumer on such consumer's repayment by means of

3   preauthorized electronic fund transfers."  In their Motion, Plaintiffs argue that "CashCall engaged in

4   the classwide practice of requiring loan applicants to click on a box at the conclusion of the

5   Electronic Funds Authorization and Disclosure stating, 'I understand CashCall's payment collection

6   policy and authorize electronic debits from my bank account.'"  Mot. at 11 (citing Huston Decl., Ex.

7   11 at P0352).  According to Plaintiffs, each class member was required to sign the standard

8   Promissory Note containing this EFT payment provision and CashCall would not fund a loan unless

9   the customer checked the box agreeing to EFT payments, thereby violating § 1693k(1) and giving

10  rise to a class-wide claim.  *Id*. at 11-12 (citing Huston Decl., Ex. 3 at 846-50).

11       In its Opposition, CashCall denies that it conditioned loans on a customer's consent to EFT

12  payments and proffers various arguments in support.  Opp'n at 8.  It argues that the Promissory Note

13  disclosed that a customer could opt-out of EFT payments at any time – even prior to their first

14  payment – and that it routinely honors requests to cancel or change EFT authorizations.  *Id.* (citing

15  Bennett Decl. ¶¶ 8, 10, 14, 15 & Exs. A, B).  CashCall further argues that it was not the lender on

16  tens of thousands of loans originated outside of California, but rather purchased those loans from

17  third-party banks.  Opp'n at 8-9.  As to those loans, it contends that "[n]o out-of-state borrower can

18  assert a claim that CashCall conditioned their loan on signing an EFT authorization."  Opp'n at 9.

19  Notably, CashCall does not proffer any discussion as to what individual issues exist and how they

20  compare to any common issues.

21       The Court has considered the parties' arguments and agrees with Plaintiffs that common

22  issues predominate this claim.  Whether CashCall's practice of requiring borrowers to consent to

23  EFT payments is common to all borrowers who executed a CashCall Promissory Note, and CashCall

24  has not articulated what individual issues would need to be addressed to resolve this claim.

25  However, the Court agrees with CashCall that only borrowers whose loans originated with CashCall

26  are proper members of this class.

27       Plaintiffs' third theory for the EFTA claim is that CashCall's policy of requiring customers

28

22

1   to submit a written request for cancellation of their EFT authorization seven days before the EFT

2   withdrawal date violated § 1963e(a).  As set forth above, § 1963e(a) provides that "[a] consumer

3   may stop payment of a preauthorized electronic fund transfer by notifying the financial institution

4   orally or in writing at any time up to three business days preceding the scheduled date of such

5   transfer."  Plaintiffs argue that because the promissory note that each of them, as well as each

6   putative class member, signed contained this provision, the issue of whether the seven-day

7   cancellation requirements violated § 1963e(a) is "universal to the Class."  Mot. at 12.

8          CashCall counters that "[n]ot all putative class members are commonly situated because their

9   promissory notes differed."  Opp'n at 10.  Specifically, CashCall indicates that while from July 2004

10  to February 2007 its standard promissory note stated that requests must be received seven calendar

11  days before the due date, after February 2007, it amended the promissory note to state that requests

12  must be received three business days in advance of the due date.  Opp'n at 10 (citing Bennett Decl. ¶

13  15 & Ex. A, B.).  Further, CashCall argues that, regardless of the terms of the EFT Authorization, its

14  practice has been to always promptly process cancellation requests and that it typically could cancel

15  an EFT as long as the request was received before the next scheduled transaction.  Opp'n at 10.

16  Thus, it argues that requests to cancel EFT authorization "necessarily involve individual issues and

17  will depend on the borrower's interaction with the CashCall customer service representative."

18  Opp'n at 11.

19         The Court, however, is unpersuaded by CashCall's argument.  As Plaintiffs have pointed out,

20  at least prior to February 2007, the EFT Authorization in CashCall's standard Promissory Note

21  expressly stated that to cancel an EFT, CashCall must receive the cancellation at least seven days

22  before the payment due date.  Because this provision uniformly appeared in its Promissory Notes,

23  the issue whether the seven-day advance cancellation requirement violates § 1693e(a) is common to

24  Plaintiffs and all class members who executed promissory notes prior to February 2007, and the

25  evidence necessary to establish this claim – which consists mainly of the express language in the

26  Promissory Note – is uniform to all class members.  CashCall has failed to identify any individual

27  issues or evidence that would be necessary to address this claim.  Thus, the Court agrees with

28

1   Plaintiffs that common issues predominate this claim.

2           *b.      Rosenthal Act Claims*

3           Plaintiffs' third claim is for violation of California's Rosenthal Fair Debt Collection

4   Practices Act, codified at California Civil Code section 1788.  Compl. at 12-13.  Again, Plaintiffs

5   allege several discrete violations by CashCall.

6           First, Plaintiffs allege that when a customer's loan becomes delinquent, CashCall's

7   automated collection system generates form collection letters and email messages that falsely

8   suggest to customers that they must make up their payments with certified funds.  Mot. at 12-13.

9   Plaintiffs allege that CashCall sends a form letter and/or email to customers whenever an EFT

10  installment payment is returned unpaid by the customer's bank, which states, in pertinent part:

11          Your loan is now past due and you must immediately replace this payment via
            MoneyGram transaction in the amount of [$—] (see instructions below).
12          [. . . .]
            MONEYGRAM INSTRUCTIONS:
13          [. . . .]
            To find a MoneyGram location near you, please visit MoneyGram.com or contact a
14          CashCall agent at [telephone number]."

15  Mot. at 13 (citing Ex. 17).

16          Plaintiffs contend that CashCall also uses a form "breach" letter and/or email, which it sends

17  to borrowers when the account is more than 30 days delinquent, which provides in relevant part:

18          You have breached your contract and your [Loan #] with CashCall, Inc. is now in
            default.  You must bring the loan current by sending the amount shown below to CashCall, Inc  in t
19
    *Id*. (citing Ex. 30).
20
            Plaintiffs further submit that CashCall also included the "standard MoneyGram demand" in
21
    its "breach of promise to pay" letters and/or emails that it generated and sent to customers who
22
    failed to pay in accordance with a promise to pay ("PTP").  *Id*. (citing Ex. 33).  This communication
23
    stated in relevant part:
24
25          In our recent telephone conversation, you promised to pay $____ on (date).  We have
            not received your payment at this point and you are past due on your loan with
26          CashCall, Inc.  You must bring the loan current immediately by sending this agreed
            upon amount to CashCall in the form of a money order, money gram, or certified
27          check.

28  *Id*.

1    Finally, Plaintiffs contend that CashCall uses a form "every opportunity" letter and/or email

2   that it sends to customers when a loan becomes sixty days delinquent, which demands payment by

3   MoneyGram, stating: "Please note that payments must be made with certified funds only (cashier's

4   check payable to CashCall or a money transfer via MoneyGram Express Payment, Receiver code

5   3299)." *Id*. at 14 (citing Ex. 35).

6    Plaintiffs assert that, "[b]ecause CashCall's practice in sending the communications is

7   uniform and the likelihood to deceive is a single objective, class-wide determination, common issues

8   predominate on the Rosenthal Act deception claims." *Id*. at 14. Particularly, Plaintiffs indicate that

9   they "intend to show at trial that CashCall's communications would lead the least sophisticated

10   consumer to believe that he/she had to respond to these letters by paying with certified funds, most

11   notably MoneyGrams. By insisting on certified funds, CashCall left the misleading impression that

12   a borrower who failed to pay with certified funds would suffer adverse consequences, such as

13   rejection of the payment and legal action." *Id*.

14    CashCall, however, maintains that individual issues predominate this claim because not all

15   borrowers received the same collection letters. Opp'n at 12. Rather, CashCall asserts that neither

16   Plaintiffs nor all borrowers received each of the four emails/letters. *Id*. CashCall also asserts that

17   individual issues predominate because not all borrowers who received one of the emails or letters

18   wold interpret it the same way; instead, a borrower's interpretation of the emails would necessarily

19   depend on their interactions with CashCall. Opp'n at 12-13. For example, CashCall argues that

20   after receiving the letters/emails, Plaintiff O'Donovan made payments by personal check. *Id*. at 13.

21    Further, CashCall argues that the cases Plaintiffs cite where courts have certified Rosenthal

22   Act class actions – namely *Gonzales v. Arrow Financial Services LLC*, 233 F.R.D. 577 (S.D. Cal.

23   2006), and *Palmer v. Stassinos*, 233 F.R.D. 546 (N.D. Cal. 2006) – "all involved one specific

24   unlawful practice that could be determined from the collection letter itself." *Id*. CashCall, however,

25   does not proffer any argument expanding on this assertion. In their Reply, Plaintiffs argue that

26   although there are four different collection letters/emails that may have minor factual variations,

27   they all conveyed the same message: that payment with MoneyGram or other certified funds was

28

25

1   required.  Reply at 10, Dkt. No. 87.  They also argue that, contrary to CashCall's assertion, all three

2   named Plaintiffs responded to these letters by making numerous MoneyGram payments.  *Id.*

3           The Court has carefully considered the parties' arguments and finds that CashCall has

4   sufficiently demonstrated that individual issues predominate Plaintiffs' Rosenthal Act claim based

5   on CashCall's collection letters and email messages.  As CashCall points out, not all borrowers

6   received each of the four letters/email messages at issue.  Rather, the correspondence a delinquent

7   borrower received depended on that borrower's particular circumstances (*e.g.*, installment payment

8   returned unpaid, breach of promise to make payment).  While the letters and email messages contain

9   similar language regarding the means of payment, the language is not identical, but varies between

10  each of the four letters/email messages.  As a result, litigation of this claim requires a determination

11  of which class members received which of the four letters/email messages and an assessment of each

12  of the communications separately.  Thus, the Court agrees with CashCall that the instant claim is

13  different from those addressed in the cases Plaintiffs' rely upon where a single representation was at

14  issue and applied to all class members.  Moreover, to the extent that a borrower's conduct in

15  response to the correspondence is admissible to show how the communications were interpreted, this

16  requires borrower-specific information.  Accordingly, the Court finds that individual issues

17  predominate this claim.

18          Plaintiffs next charge that CashCall's systematic use of automated telephone collection calls

19  to coerce consumers to make a payment on a delinquent loan violates the Rosenthal Act and the

20  FDCPA.  Mot. at 15.  The Rosenthal Act bars a creditor from "[c]ausing a telephone to ring

21  repeatedly or continuously to annoy the person called" and from "[c]ommunicating, by telephone or

22  in person, with the debtor with such frequency as to be unreasonable and to constitute harassment to

23  the debtor under the circumstances."  Cal. Civ. Code §§ 1788.11(d) & (f).  Concurrently, the federal

24  FDCPA prohibits "engag[ing] in any conduct the natural consequence of which is to harass, oppress,

25  or abuse any person in connection with the collection of a debt."  15 U.S.C. § 1692d.  Particularly,

26  this includes "[c]ausing a telephone to ring or engaging any person in telephone conversation

27  repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number."

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

15 U.S.C. § 1692d(5).

According to Plaintiffs, "CashCall's automated telephone system is designed to generate a huge and repeating volume of annoying collection calls. Plaintiffs contend this system generates so many and such frequent calls that it violates the fair debt collection laws." Mot. at 15. In support, Plaintiffs cite to CashCall's Servicing Transaction Logs for each of the three Plaintiffs, arguing that each log shows "a shocking number of outgoing CashCall telephone calls." *Id*. (citing Exs. 27, 28, 29). Plaintiffs also proffer a lengthy description of how CashCall's predictive dialer system operates. *Id*. at 16-17.

Plaintiffs submit that because CashCall's telephone collection practices are automated and systematized, they apply uniformly to the class, and thus common issues predominate. *Id*. at 15. CashCall, however, asserts that the critical question is how CashCall used its predictive dialer system in specific situations and how each borrower who received a call reacted. Opp'n at 14. CashCall further submits that, contrary to Plaintiffs' assertion, not all of its collection calls are made by the predictive dialer and the type of call depends on the length of a borrower's delinquency. Opp'n at 14 (citing Klopstock Decl. ¶¶ 13, 15, 17, 19). Additionally, CashCall argues that, to the extent that Plaintiffs base their claim on call volume, each Plaintiff – and each putative class member for that matter – received a different number of phone calls, thereby raising individual issues.

The Court has carefully considered the parties' arguments and agrees with CashCall that individual issues dominate this claim. In particular, the frequency of calls is not uniform among the Plaintiffs or potential class members and the issue of whether the phone calls were harassing, annoying, or abusive requires an individualized analysis. Thus, Plaintiffs have failed to meet the 23(b)(3) predominance requirement as to this claim.

Plaintiffs also assert that CashCall's alleged unauthorized EFTs in a single month amounts to an illegal collection practice in violation of the Rosenthal Act. Mot. at 15 (citing 15 U.S.C. §§ 1692e(5) & 1692f(1)). Thus, they argue that common issues also predominate on the parallel claim under the Rosenthal Act. However, as discussed above, the Court finds that individual issues

27

1    predominate any common issues associated with Plaintiffs' double-dipping claim.  Accordingly, this

2    claim is not suitable for class treatment.

3                                    c.     *Plaintiffs' UCL Claims*

4            Plaintiffs bring three claims for violation of California's UCL.  Compl. at 13-18.  The UCL

5    prohibits "any unlawful, unfair or fraudulent business act or practice . . . ."  Cal. Bus. & Prof. Code §

6    17200.  This section "establishes three varieties of unfair competition — acts or practices which are

7    unlawful, or unfair, or fraudulent.  In other words, a practice is prohibited as unfair or deceptive

8    even if not unlawful and vice versa."  *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20

9    Cal. 4th 163, 180 (1999) (internal quotations and citations omitted).

10           Plaintiffs allege violations of the unlawful and unfair prongs of their UCL as independent

11   bases for class-wide relief.  Mot. at 18.

12                                   i.     *The "Unlawful" Prong*

13           Plaintiffs allege that CashCall has engaged in unlawful business practices based on its

14   alleged  violations of the EFTA, the Rosenthal Act, California Financial Code section 22303,

15   California Civil Code section 1670.5, and California Financial Code section 22150 and its

16   accompanying regulation, Title 10 of the California Code of Regulations, section 1452.

17                            (a)      EFTA and Rosenthal Act Violations

18           Plaintiffs argue that because their claims for violation of the EFTA and Rosenthal Act are

19   appropriate for class treatment, their UCL claim under the unlawful prong based on underlying

20   violations of these laws, are also suitable for class treatment.  Mot. at 18 n. 5.  In its Opposition,

21   CashCall argues that this UCL claim cannot be certified for the same reasons that the underlying

22   claims cannot be certified.  Opp'n at 16 n. 20.  As discussed above, Plaintiffs have sufficiently

23   shown that their EFTA claim based on CashCall's alleged conditioning of loans on consent to EFT

24   payments and the seven-day cancellation policy in CashCall's Promissory Note meet the criteria for

25   class treatment.  Because Plaintiffs' UCL claim under the unlawful prong may premised on the same

26   underlying violations, it is also appropriate for class treatment.

27

28

UNITED STATES DISTRICT COURT
For the Northern District of California

28

(b)      Cal. Fin. Code § 22302 and Cal. Civ. Code § 1670.5

Pursuant to California Financial Code section 22302(a), "Section 1670.5 of the [California] Civil Code applies to the provisions of a loan contract that is subject to [the California Finance Lenders Law]." Cal. Fin. Code § 22302(a). Section 22302(b) further provides that "[a] loan found to be unconscionable pursuant to Section 1670.5 of the Civil Code shall be deemed to be in violation of this division and subject to the remedies specified in this division." Civil Code section 1670.5, in turn, provides that if a court finds, as a matter of law, that a contract, or any provision thereof, is unconscionable at the time it was made, it may "refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result."

Here, Plaintiffs assert that CashCall makes loans with unconscionable interest rates of 90% or higher, in violation of Financial Code section 22302, Civil Code section 1670.5, and the UCL. Mot. at 19-20. Plaintiffs argue that a determination of CashCall's liability may be made on a classwide basis based on common proof. *Id.* at 18. According to Plaintiffs, "[i]t is CashCall's conduct in making loans at these unconscionable interest rates – not the individual conduct or situation of each class member who borrowed from CashCall – that will be the focus of the Court's inquiry in determining the legality of the practice." *Id.* Specifically, Plaintiffs argue that "[t]he unconscionability analysis will turn on the standard interest rate that CashCall charged in each of its transactions with class members who purchased the $2,600 loan product and were charged an interest rate of 90% or higher." Mot. at 19-20.

In California,

> [T]he law has clearly established that the term ["unconscionable"] has both a procedural and a substantive element. The former takes into consideration the parties' relative bargaining strength and the extent to which a provision is 'hidden' or unexpected, while the substantive element requires terms that 'shock the conscience' or at the least may be described as 'harsh or oppressive.' Both elements must be present, but 'the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.

*Trend Homes, Inc. v. Superior Court*, 131 Cal. App. 4th 950, 956 (2005) (internal citations omitted).

29

1   Further, the terms "harsh," "oppressive," and "shocks the conscience" are "not synonymous with

2   'unreasonable,'" and "it is important that courts not be thrust into the paternalistic role of

3   intervening to change contractual terms that the parties have agreed to merely because the court

4   believes the terms are unreasonable." *Aron v. U-Haul Co. of Cal.*, 143 Cal. App. 4th 796, 809

5   (2006); *see Camillo v. Wash. Mut. Bank, F.A.*, 2009 WL 3614793, at *7 (E.D. Cal. Oct. 27, 2009).

6         Plaintiffs argue that both the procedural and substantive components can be proven on a

7   class-wide basis. Mot. at 20. With respect to procedural unconscionability, Plaintiffs argue that it

8   will be proven by establishing that CashCall's promissory notes are adhesion contracts that were

9   offered on a take-it-or-leave it basis, without any opportunity for negotiation of the loan terms. *Id.*

10  (citing Huston Decl., Ex. 13 at 175: 4-15, 236:12-237:1, 239:12-242:25). Plaintiffs assert that

11  because all class members were in this position, whether the contract is a contract of adhesion, and

12  therefore procedurally unconscionable, is a common question for all class members. *Id.*

13        CashCall, on the other hand, argues that the procedural unconscionability element raises

14  individual issues. Opp'n at 18-23. CashCall argues that the procedural unconscionability analysis

15  focuses on all of the circumstances surrounding contract formation and requires a finding of surprise

16  or oppression, which are individual questions. Opp'n at 18. It argues that Plaintiffs cannot establish

17  surprise because it disclosed the interest rates, and that any determination of surprise would require

18  the Court to examine testimony from each class member about whether he or she read the contract or

19  whether they were aware of the interest rate from some other source. Opp'n at 19-20. CashCall also

20  contends that during its "fluid" loan process, each borrower receives different disclosures about the

21  loans and has different interactions with CashCall through which they get information about the

22  loan. Opp'n at 20-21. However, as Plaintiffs point out, they do not base their procedural

23  unconscionability argument on a surprise theory. Reply at 11. Thus, the Court agrees with Plaintiffs

24  that CashCall's arguments are inapposite.

25        Alternatively, CashCall asserts that individual issues predominate the issue of alleged

26  oppression. Opp'n at 23. Particularly, CashCall contends that to determine whether the loan

27  agreements were oppressive the Court must examine whether a borrower attempted to obtain a loan

28

UNITED STATES DISTRICT COURT
For the Northern District of California

30

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1  on more favorable terms.  Opp'n at 23.  It asserts that "the potential availability of other lending

2  sources renders a class-wide determination of oppression improper."  *Id*.  However, as Plaintiffs

3  point out, California courts "have routinely found the procedural element satisfied where the

4  agreement containing the challenged provision was a contract of adhesion."  *Gatton v. T-Mobile*

5  *USA, Inc.*, 152 Cal. App. 4th 571, 582 (2007).  As the *Gatton* court held: "absent unusual

6  circumstances, use of a contract of adhesion establishes a minimal degree of procedural

7  unconscionability notwithstanding the availability of market alternatives."  *Id*. at 585.  Consumer

8  choice is therefore relevant, but not dispositive, to an assessment of procedural unconscionability

9  *Id*. at 583.  More importantly, CashCall has not shown that the question whether the loan agreements

10  were oppressive is incapable of being determined on a classwide basis.  *See, e.g., Shroyer v. New*

11  *Cingular Wireless Servs., Inc.*, 498 F.3d 976, 981-84 (9th Cir. 2007) (class action finding class

12  arbitration waiver procedurally unconscionable); *Laster v. T-Mobile USA, Inc.*, 407 F. Supp. 2d

13  1181, 1188-1190 (finding arbitration provision procedurally unconscionable in putative class

14  action). As Plaintiffs note, the putative class members all stood in the same position in relation to

15  CashCall when applying for their loans and all were foreclosed from negotiating any of the terms of

16  the Promissory Notes.  Thus, the procedural unconscionability assessment, which analyses contract

17  formation, would apply across the board to all class members.

18        CashCall also asserts that it has modified 51,581 loans and granted 102,251 deferments.

19  Opp'n at 23.  Without any meaningful explanation, it argues that its "willingness to modify loans is

20  another factor cutting against certifying the unconscionability claim."  *Id*.  However, whether

21  CashCall subsequently modified loans does not go to the issue of whether the loan agreement was

22  oppressive at the time it was entered into by the borrower.

23        As to substantive unconscionability, Plaintiffs argue that the issue whether the interest rate

24  was unfairly one-sided requires a single determination for all class members, without regard to the

25  particular circumstances of each class member who signed the contract.  Mot. at 20.  Specifically,

26  Plaintiffs argue that "[c]ommon evidence of substantive unconscionability will show that CashCall

27  offered its standard $2,600 loan product at 90+% interest uniformly on a class-wide basis."  *Id*.

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1    They further attest that they will proffer evidence on a class-wide basis that CashCall's high interest

2    rate was one-sided and "well outside of industry norms." *Id*. at 21.  In its Opposition, CashCall

3    asserts that high interest rates alone cannot establish unconscionability and that its loans are exempt

4    from California's usury restrictions.  Opp'n at 17-18 & fn 21.  CashCall also argues that Plaintiffs

5    have failed to cite any California decision certifying a class action based on an allegedly

6    unconscionable interest rate.  *Id*. at 17.

7            In *Carboni v. Arrospide*, 2 Cal. App. 4th 76, 83-86 (1992), the California Court of Appeal

8    held that a secured loan with an interest rate of 200% was both procedurally and substantively

9    unconscionable.  In analyzing whether the loan was substantively unconscionable, the court first

10   evaluated the interest rate of the loan as compared to the prevailing rate charged for similar loans in

11   the credit market, and found that it was uncontested that the 200% interest rate was approximately

12   ten times that charged in the credit market for comparable loans.  *Id*. at 84.  Next, the court analyzed

13   the circumstances of the transaction  *Id*.  In particular, in making this inquiry, the court noted that

14   "substantive unconscionability turns not only on a one-sided result, but also on an absence of

15   justification for it."  *Id*. at 850 (internal quotations omitted) (citing *A&M Produce Co. v. FMC

16   Corp.*, 135 Cal. App. 3d 473, 484 (1982)).  The lender in *Carboni* argued that the high interest rate

17   was justified because no other charges were made for the loan and, if the borrower would have paid

18   it off as scheduled, the loan would have been cheaper to alternatives available to the borrower.  *Id*.

19   The court, however, was unpersuaded by these arguments and found that they failed to justify a

20   200% rate on the amount borrowed.  *Id*. at 85.

21           In this case, the same issues relating to substantive unscionability could be determined on a

22   class wide basis without raising individual issues.  Evidence regarding the 90% and above interest

23   rates CashCall charged on its loans could be compared to those of similar loans in the credit market

24   and any finding would be uniformly applicable to all class members whose loan had an interest rate

25   at or above that amount.  Additionally, any justification CashCall has for charging interest rates

26   above 90% would not trigger any individual, borrower-specific questions of fact or law.

27           Taken together, the Court finds that both procedural and substantive unconscionability can

28

1   be determined on a classwide basis.  It therefore finds that common issues predominate Plaintiffs'

2   UCL claim for violation of California Finance Code section 22303 and Civil Code section 1670.5

3   based on the interest rate charged to borrowers.

(c)   Cal. Fin. Code § 22150 and California Code of Regulations,
                      Title 10, § 1452

6   Plaintiffs also assert that CashCall violated California Financial Code section 22150 through

7   its practice of funding loans without regard to the borrower's ability to repay the loan.  Compl. ¶ 88;

8   Mot. at 21.  Section 1452 of Title 10 of the California Code of Regulations was promulgated

9   pursuant to Financial Code section 22150, and provides:

> When making or negotiating loans, a finance company shall take into consideration,
> in determining the size and duration thereof, the financial ability of the borrowers to
> repay the same, to the end that the borrowers should be reasonably able to repay said
> loans in the time and manner provided in the loan contracts.

13  Cal. Code Regs. tit. 10, § 1452.

14  Plaintiffs argue that common issues predominate this claim because the claim "examines

15  CashCall's common conduct in making loans without attention to whether the consumer could or

16  could not repay the loan."  Mot. at 21.  They contend that "[p]roof of this claim will thus be a

17  centralized inquiry into CashCall's process (or lack thereof) for evaluating a borrower's ability to

18  repay his/her loan prior to its funding."  *Id*.  In particular, Plaintiffs intend to proffer evidence

19  concerning CashCall's business model and its underwriting process, which Plaintiffs characterize as

20  "inadequate."  *Id*. at 21-22.  CashCall responds that its "entire underwriting process involves an

21  individual evaluation of each prospective borrower's financial condition," and proffers testimony

22  from Thomas Morgan describing its procedures.  Opp'n at 24.  CashCall further argues that

23  Plaintiffs' own testimony undermines their theory, as all three Plaintiffs testified that they could

24  initially afford their monthly payments and intended to pay off their loans early.  *Id*. (citing Seiling

25  Decl., Exs. H at 39:5-21, 230:11-17; Ex. I at 144:17-145:16; Ex. J at 86:14-17, Dkt. No. 84).

26  Additionally, CashCall proffers evidence that 33% of all borrowers paid off their loans early.  Opp'n

27  at 25 (citing Ethan Post Decl. ¶ 12, Dkt. No. 77).

28

UNITED STATES DISTRICT COURT
For the Northern District of California

33

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1    On its face, Plaintiffs' argument that the Court would only need to examine, generally,

2    whether CashCall has some procedure in place to assess a borrower's ability to repay the loan has

3    some traction.  However, in order to resolve whether CashCall violated section 1452, the Court will

4    need to examine how CashCall's loan application and underwriting process actually operated to vet

5    individual borrowers.  Specifically, CashCall has identified evidence that both its automated and

6    manual underwriting process screens potential borrowers for creditworthiness, and routinely reject a

7    significant percentage of applicants because they do not meet its underwriting criteria.  Opp'n at 24

8    (citing Thomas Morgan Decl. ¶¶ 5-23, Dkt. No. 81).  The question then becomes whether these

9    procedures are sufficient to satisfy CashCall's obligation under section 1452.  If, as Plaintiffs

10   contend, the procedures provided no meaningful review of the borrower's ability, Plaintiffs may

11   have a meritorious claim.  On the other hand, if the procedures were sufficient in analyzing a

12   borrower's financial status and ability to successfully repay the loan, CashCall may prevail.  Either

13   way, the generalized inquiry Plaintiffs propose will ultimately lead to a more particularized

14   examination of CashCall's underwriting process vis-a-vis individual borrowers to determine whether

15   CashCall engaged in any meaningful consideration of their ability to repay the loans in the time and

16   manner specified in the loan agreement.  As a result, the Court finds that common questions do not

17   predominate this claim and it is unsuitable for class treatment.

18                              *ii.    The "Unfair" Prong*

19        Plaintiffs allege that "CashCall's business practices in offering loans with grossly one-sided

20   terms (including the charging of excessively high interest rates, requiring payment of 4-6 times the

21   original loan amounts, the extended loan maturities, charging of unfair and excessive fees designed

22   to extend the length of repayment) are unfair," and give rise to a claim under the unfair prong of the

23   UCL.  Mot. at 22.  According to Plaintiffs, "[t]he common issues under the UCL unfair prong are

24   CashCall's practices in making 90+% interest loans on a take-it-or-leave-it basis that cost multiple

25   times the amount of the loan and take years to repay."  *Id*. at 23.  They further assert "CashCall's

26   practices of offering loans at exceptionally high interest rates of nearly 100% (and higher), the

27   length of repayment of the loan, the structure of the payments (*e.g*., interest only for nearly two

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1   years) are all common acts of CashCall that do not require an individual inquiry into the class

2   members' circumstances." *Id*.  Additionally, they submit that "[t]he terms of the loan are all non

3   negotiable and offered on a take-it-or-leave-it basis by CashCall." *Id*.  CashCall fails to present any

4   argument in response in its Opposition.

5         Looking at this claim, California appellate courts disagree on how to define an "unfair" act

6   or practice in the context of a UCL consumer action.  *See Rubio v. Capital One Bank*, 613 F.3d

7   1195, 1204-05 (9th Cir. 2010); *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 735-36 (9th Cir.

8   2007).  One test California courts have applied "requires that the public policy which is a predicate

9   to a consumer unfair competition action under the 'unfair' prong of the UCL must be tethered to

10  specific constitutional, statutory, or regulatory provisions."  *Drum v. San Fernando Valley Bar*

11  *Ass'n*, 182 Cal. App. 4th 247, 256 (2010) (internal quotations omitted) (citing *Bardin v.*

12  *Daimlerchrysler Corp.*, 136 Cal. App. 4th 1255, 1260-61 (2006)).  A second test formulated by the

13  California courts examines "whether the alleged business practice 'is immoral, unethical,

14  oppressive, unscrupulous or substantially injurious to consumers and requires the court to weigh the

15  utility of the defendant's conduct against the gravity of the harm to the alleged victim.'"  *Id*.

16  (quoting *Bardin*, 136 Cal. App. 4th at 1260).

17        Plaintiffs argue that the claim is suitable for certification under either test because the focus

18  is CashCall's practices of charging interest rates above 90% and the structure and length of

19  repayment – all of which are sufficiently uniform and do not require individual assessments of each

20  class member.  Mot. at 23.  The Court, however, disagrees.  To determine whether the terms of

21  CashCall's loan agreements are "immoral, unethical, oppressive, unscrupulous or substantially

22  injurious to consumers" under the UCL, the Court must examine the utility of CashCall's practices

23  in including each provision and the affect on borrowers.  Thus, the circumstances surrounding each

24  loan agreement, including each borrower's financial circumstances, would come into play, requiring

25  individualized examinations.  The Court therefore finds that this claim is inappropriate for class

26  treatment.

27

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1    2.    Whether the Class Action Device is Superior

2    The final factor the Court must consider under Rule 23(b)(3) is whether "a class action is

3    superior to other available methods for fairly and efficiently adjudicating the controversy."  Because

4    the Court has found that only Plaintiffs' EFTA claim and their UCL claim under the unlawful prong

5    based on the EFTA violations and on violations of California Financial Code section22302 and Civil

6    Code section 1670.5 meet the foregoing requirements for class action treatment, the Court's analysis

7    is focused on whether class action is superior as to those claims.

8    In support, Plaintiffs first argue that "the stake of an individual Class member is insufficient

9    to support individual litigation."  Mot. at 24.  Particularly, they assert that "the monetary recovery

10   for an individual Class member is small relative to the cost and burden of individual pursuit of the

11   claims," and that "[d]evelopment of the evidence and legal issues, discovery, and expert witness

12   requirements combine to pose costs and risks that are prohibitive for an attorney and client in the

13   non-class setting." *Id.*

14   CashCall, however, argues that the proposed Class is not manageable.  Opp'n at 4.  It

15   contends that "Plaintiffs' unwieldy class definition . . . creates insurmountable case management

16   challenges," and charges that Plaintiffs have not even attempted to explain how the Court could sort

17   out these issues or resolve their claims in a single trial.  *Id.*

18   With respect to the class members' interests in individually controlling the prosecution of

19   separate actions, the Court agrees with Plaintiffs that the relatively small amount of damages that

20   may be recovered from the EFTA and related UCL claims as compared to the costs of litigating an

21   individual suit weighs in favor of class treatment of the claims.

22   As to the extent and nature of any litigation concerning CashCall's practices already begun

23   by class members, the parties have not identified any similar class actions involving the same claims

24   or putative class or any individual actions that are currently pending.

25   With respect to the desirability or undesirability of concentrating litigation of the claims in

26   the particular forum, because CashCall is a California corporation and has made loans to consumers

27   throughout the state of California, the Northern District is both a convenient and appropriate forum

28

36

1   for litigating this case.

2       Finally, the Court must assess the likely difficulties in managing a class action.  CashCall

3   argues that a class action would not be manageable for several reasons.  First, it argues that

4   Plaintiffs' class definition is vague and because Plaintiffs' claims involve distinct factual and legal

5   issues, creating subclasses would splinter the case into a myriad of predominant individual issues.

6   Opp'n at 5.  Next, CashCall argues that because more than 175,961 putative class members are

7   currently in default, it would need to file compulsory counterclaims or seek offsets, creating

8   additional manageability problems.  *Id*.  Third, CashCall argues that Plaintiffs' requested remedy of

9   rescission of the loans "is an inherently individual remedy that is ill-suited for class adjudication."

10  *Id*.

11      The Court, however, is unpersuaded by CashCall's concerns.  As set forth in this Order, only

12  two of Plaintiffs' claims are appropriate for class treatment.  Thus, this significantly limits the

13  factual and legal issues in play and makes for a more refined putative class.  As to these claims,

14  because they rely on documentary evidence, namely loan agreements, the putative class members

15  who executed the agreements are ascertainable.  As to the remedies Plaintiffs seek on behalf of the

16  putative class, the Court does not see any issues determining which class members would be entitled

17  to damages or other relief if they prevail on their claims.  Accordingly, the Court finds that class

18  action is superior to individual litigation of Plaintiffs' claims and, as to those claims, there are no

19  obvious manageability problems.

20                          **IV.   CONCLUSION**

21      In sum, the Court finds that Plaintiffs have met their burden of demonstrating that the

22  following claims are suitable for class treatment under Rule 23(a) and (b)(3): (1) the claim for

23  violation of the EFTA based on CashCall's cancellation policy in its pre-February 2007 Promissory

24  Notes; (2) the claim for violation of the EFTA based on CashCall's alleged conditioning of loans on

25  a borrower's consent to EFT payments; (3) the UCL claim premised on the EFTA violations; and (4)

26  the UCL claim based on violation of California Financial Code section 22303 and Civil Code

27  section 1670.5.  The Court therefore **GRANTS** Plaintiffs' Motion as to these claims and certifies the

28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

following National Class under Rule 23(b)(3):

> All individuals who borrowed money from CashCall, Inc., between June 30, 2004 and February 2007, who signed CashCall's promissory note containing an electronic funds authorization indicating that cancellations of such authorization must be received at least seven days prior to the applicable payment due date.

The Court also certifies the following California Class:

> All individuals who, while residing in California, borrowed from $2,500 to $2,600 at an interest rate of 90% or higher from CashCall, Inc., for personal, family, or household use at any time from June 30, 2004, to the present.

The Motion is **DENIED** in all other respects.

The Court retains the inherent power to review class certification decisions at any time.  Fed. R. Civ. Pro. 23(c)(1)(C); *Officers For Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 633 (9th Cir. 1982).  Should future circumstances demonstrate that individual issues in this case either predominate or render the case less manageable than anticipated, the Court can revisit its certification decision at that time.

IT IS FURTHER ORDERED that this matter is set for a case management conference on January 19, 2012 at 10:00 a.m.  At the conference the Court will discuss issues not addressed by the parties in the certification motion, including appointment of class counsel pursuant to Rule 23(g) and a briefing schedule for Plaintiffs' motion for class notice.  The parties shall file a joint case management statement no later than January 5, 2012 outlining any other issues that will need to be addressed at the conference.  After the hearing, the Court will issue a supplemental class certification order resolving these issues.

**IT IS SO ORDERED.**

Dated: November 14, 2011

_____
Maria-Elena James
Chief United States Magistrate Judge