James C. Sturdevant, SBN #94551
Email: jsturdevant@sturdevantlaw.com
THE STURDEVANT LAW FIRM
354 Pine Street, Fourth Floor
San Francisco, California 94104
Telephone: (415) 477-2410
Facsimile: (415) 477-2420

Arthur D. Levy, SBN #95659
Email: arthur@yesquire.com
445 Bush Street, 6th Floor
San Francisco, California 94108
Telephone: (415) 702-4550
Facsimile: (415) 814-4080

[Additional Counsel Appear on Signature Page]

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTA O'DONOVAN, EDUARDO DE LA TORRE and LORI SAYSOURIVONG, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> CASHCALL, INC., a California corporation, and DOES 1 through DOE 50, inclusive, <br><br> Defendants. <br>——————————————<br> CASHCALL, INC., a California corporation, <br><br> Counterclaimant, <br><br> v. <br><br> LORI SAYSOURIVONG and EDUARDO DE LA TORRE, individually and on behalf of all others similarly situated, <br><br> Counterdefendants. | NO. 3:08-cv-03174-MEJ <br><br> **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON UNCONSCIONABILITY CLAIM** <br><br> Complaint Filed: July 1, 2008 <br><br> Honorable Maria-Elena James <br><br> DATE: November 21, 2013 <br> TIME: 10:00 A.M. <br> LOCATION: Courtroom B, 15th Floor |

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION..........................................................................................................1

CASHCALL'S BUSINESS ..........................................................................................2

ARGUMENT ...............................................................................................................4

1.  There are Triable Issues of Material Fact on Procedural Unconscionability. ...............4

2.  There are Triable Issues of Fact as to Substantive Unconscionability. ........................8

    a. CashCall's $2,600 Interest Rates and Loan Terms Are Oppressive On Their Face ...............................................................................................................9

    b. CashCall's $2,600 Loan Products Are Not Affordable to 45% of its Borrowers.... 10

    c. CashCall Designs its $2,600 Loan Product Intending 4-in-10 Borrowers to Default ..........................................................................................................11

    d. CashCall's 2,600 Loan Product Harms Consumers .................................15

    e. CashCall Preys on Impulse Borrowing and Low Financial Literacy.....................16

3.  There are Triable Issues of Material Fact as to CashCall's Disclosures. ...................18

4.  CashCall's Economic Regulation Arguments are Without Merit ..............................21

5.  Neither the Abstention nor Primary Jurisdiction Doctrines Applies...........................23

# TABLE OF AUTHORITIES

Pages(s)

**Federal Cases**

*Amey, Inc. v. Gulf Abstract & Tittle, Inc.,*
(11th Cir. 1985) 758 F.2d 1486 ............................................................................... 1

*Anderson v. Liberty Lobby, Inc.,*
(1986) 477 U.S. 242 ............................................................................................... 1

*AT&T Mobility LLC v. Concepcion,*
(2011) 131 S.Ct. 1740 ............................................................................................ 5

*California CNG, Inc. v. Southern California Gas Co.,*
(9th Cir. 1996) 96 F. 1193 ................................................................................... 22

*Smith v. Americredit Financial Services, Inc.,*
2012 WL 834784 .................................................................................................. 5

*United States v. Western Pac. R.R. Co.,*
(1956) 352 U.S. 59 ............................................................................................... 25

*United Steelworkers of America v. Phelps Dodge Corp.*,
(9th Cir. 1989) 865 F.2d 1539 ............................................................................... 1


**California Cases**

*Alvarado v. Selma Convalescent Hospital*,
(2007) 153 Cal. App. 4th 1292 ........................................................................... 23

*Arce v. Kaiser Foundation Health Plan, Inc.,*
(2010) 181 Cal. App. 4th 471 ............................................................................. 23

*Armendariz v. Foundation Health Psychcare Svcs, Inc.,*
(2000) 24 Cal. 4th 83 ............................................................................................ 9

*California Grocers Ass'n v. Bank of America*,
(1994) 22 Cal.App.4th 205 ................................................................................. 22

*Carboni v. Arrospide,*
(1991) 2 Cal. App. 4th 76, 83 .................................................................... 9, 21, 22

*Cortez v. Purolator Air Filtration Products Co.*,
(2000) 23 Cal. 4th 163 ........................................................................................ 22

*Dean Witter Reynolds, Inc. v. Superior Court,*
(1989) 211 Cal.App.3d 758 .............................................................................. 5, 6

*Desert Healthcare Dist. v. PacifiCare FHP Inc.,*
(2001) 94 Cal. App. 4th 781 ........................................................................ 24, 25

*Gatton v. T-Mobile USA, Inc.,*
(2007) 152 Cal.App.4th 571 ................................................................................ 5

1  *Harris v. Capital Growth Inv.*,
      (1991) 52 Cal. 3d 1142 ........................................................................................ 23

2  *Klein v. Chevron U.S.A., Inc.*,
3      (2012) 202 Cal. App. 4th 1342 ............................................................................ 24

4  *Kraus v. Trinity Management Properties*,
      (2000) 23 Cal. 4th 116 ........................................................................................ 23

5  *Lazzareschi Inv. Co. v. San Francisco Fed. Sav. & Loan Ass'n*,
      (1971) 22 Cal. App. 3d 303 ................................................................................ 23
6
7  *Lona v. Citibank, N.A.*,
      (2011) 202 Cal.App.4th 89 ................................................................................ 1, 5
8  *McKell v. Washington Mutual, Inc.*,
      (2006) 142 Cal. App. 4th 1457 ............................................................................ 24
9
10  *Morris v. Redwood Empire Bancorp*,
      (2005) 128 Cal.App.4th 1305 ................................................................................ 5
11  *Shuts v. Covenant Holdco LLC*,
      (2012) 208 Cal. App. 4th 609 .............................................................................. 24
12
13  *Sonic-Calabasas A, Inc. v. Moreno*,
      2013 WL 5645378 ................................................................................ 1, 4, 5, 9
14  *Stop Youth Addiction v. Lucky Stores*,
      (1998) 17 Cal. 4th 553 ........................................................................................ 23
15
16  *Willard v. AT&T Comm'ns, Inc.*,
      (2012) 204 Cal. App. 4th 53 ................................................................................ 24

17  *Wolfe v. State Farm Fire & Cas. Co,*
      (1996) 46 Cal. App. 4th 554 ................................................................................ 23
18

**Statutes**

19  Cal. Bus. & Prof. Code, § 17203 ........................................................................ 21

20  Cal. Civ. Code Proc., § 1670.5 .................................................................... passim

21  Cal. Fin. Code, § 22302 ................................................................................ 22, 24

22  Cal. Fin. Code, § 22303 ........................................................................................ 16

**TABLE OF AUTHORITIES CONTINUED**

**Other Authorities**                                                                 **Page(s)**

7 J. PERRILLO, CORBIN ON CONTRACTS,
(2002) § 29.4 ......................................................................................................... 21

R. Mann, Bankruptcy Reform and the "Sweat Box" of Credit Card Debt,
2007 ILL. L. REV. 375 ............................................................................................. 12

# INTRODUCTION

Unconscionability is a fact-intensive issue. California's unconscionability statute provides that "the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose, and effect to aid the court in making the determination." Cal. Civ. Code § 1670.5(b); *Sonic-Calabasas A, Inc. v. Moreno*, __ Cal. 4th __, 2013 WL 5645378, *20 (Oct. 17, 2013) (Slip Op. at 36) (*Sonic II*) ("any evidence concerning the "commercial setting, purpose, and effect" of the agreement is pertinent to the inquiry"); *Perdue v. Crocker National Bank*, 38 Cal. 3d 913, 926 (1985), *appeal dismissed*, 475 U.S. 1001 (1986) ("A claim of unconscionability often cannot be determined merely by examining the face of the contract").

As plaintiffs' Separate Statement shows, the evidence before the Court of "the commercial setting, purpose, and effect" of CashCall's $2,600 loan product is conflicting, and there are numerous genuine issues of fact. The Court should deny CashCall's motion and decide this important case on a full evidentiary record, with the opportunity to observe the demeanor of witnesses, at trial.

On summary judgment, all "justifiable inferences" must be drawn in plaintiffs' favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "justifiable inference is not necessarily the most likely inference or the most persuasive inference." *United Steelworkers of America v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989.) Rather, "an inference as to another material fact may be drawn in favor of the nonmoving party ... if it is 'rational' or 'reasonable.'" *Id.* "If reasonable minds differ on the inferences generated by undisputed facts, then summary judgment is inappropriate." *Amey, Inc. v. Gulf Abstract & Tittle, Inc.,* 758 F.2d 1486, 1502 (11th Cir. 1985).[1]

---

[1] While unconscionability is a "question of law for the Court," the Court must nevertheless hold a trial if there are genuine issues of material fact. *Lona v. Citibank, N.A.,* 202 Cal.App.4th 89, 110-11 (2011) (summary judgment reversed where there were genuine issues of material fact on unconscionability).

# CASHCALL'S BUSINESS

CashCall invented a niche market for small subprime unsecured installment loans. CashCall's "business thesis" was "to create a new unsecured loan product that is an alternative to credit cards." (Levy Dec. Ex. 13 at 340:6-21 & Ex. 14 at p. 25825.[2]) CashCall focuses on "quick loan approval allow[ing] the Company to capitalize on customers who need cash quickly." (*Id.*) CashCall combined marketing savvy, the internet, sophisticated performance analytical prowess, and access to Wall Street funding to grow CashCall from the ground in 2003 to $235 million in revenues and nearly $25 million in profits in 2006.

CashCall achieved rapid loan growth by *systematically* lending, on every ten loans, to four borrowers who are unable to repay. CashCall's shockingly high interest rates – 96% and 135% – are not compelled by economic necessity. They are the direct consequence of CashCall's strategic business decision to run saturation advertising to build market share, and the enormous collection expense and rampant loan losses that CashCall itself creates by lending to the 4-in-10 borrowers who are unable to repay.

As will be proven, CashCall's strategy to make money from its irresponsible lending scheme and its consequential huge loan defaults is simple: charging astronomically high interest rates for long periods of time, up to 42 months. CashCall has employed the 4-in-10 model for nearly ten years. If it were unprofitable, CashCall would have abandoned it. Instead, it is vigorously defending this case to perpetuate it. In 2011, CashCall had profits of $60 million. (Dkt. 170-1 at p. 60.)

There are real people in this Class. CashCall's toxic loan products have visited untold misery on tens of thousands of consumers. CashCall's antiseptic "acceptable default rate" of 35-40% obscures the human face of the personal, financial, and family stress, invasion of privacy, and credit turmoil that CashCall and its relentless collection process inflict on individuals who fall for CashCall's artfully presented bait.

---

[2] Unless otherwise indicated, all citations to "Ex." are to the exhibits in the accompanying Declaration of Arthur D. Levy.

1    CashCall preys on the low financial literacy and the vulnerability of people in financial

2    distress.  The Loan Unconscionability Class consists primarily of those with low credit scores

3    who lack access to conventional credit (*e.g.*, available credit on credit cards).  The Class as a

4    whole has low financial literacy, and the response of Class members to CashCall's promise of

5    "cash in a hurry" reflects their state of psychological stress.  CashCall's advertising artfully

6    plays on their financial anxieties with images of $100 dollar bills and promises of "cash now."

7    CashCall exploits its borrowers' distress, financial decision-making deficits, and cognitive

8    inabilities to understand and realistically evaluate CashCall's loans.

9    In 2004, CashCall began significant lending by obtaining an $80 million credit facility,

10   for which its cost of funds was 9.15% interest. (Dkt. 170 at pp. 33, 39; Ex. 13 at 188:25-189:4.)

11   CashCall first began making $2,600 loans that same year at 79% interest, 70% higher than its

12   cost of funds.  (Ex. 28 at p. 3.)

13   In 2005, CashCall tripled its revenues from $20 million in 2004 to $66 million.  (Dkt.

14   170 at pp. 31, 46, 57.)  During the same year, CashCall jumped the interest rate on its $2,600

15   loan product from 79% to 87% and then to 96%, 90% higher than its cost of funds.  (Ex. 28 at

16   p. 4.)

17   In 2006, CashCall exponentially increased its subprime lending scale by obtaining a

18   credit facility of $486 million from a syndicate of Wall Street banks and investors.  (Dkt. 170

19   at p. 73; Ex. 13 at 229:1-230:14; 357:19-358:1.)  This "A/B Loan Syndicate" eventually

20   expanded to a credit line of over $800 million in 2007.  (*Id.*)  CashCall's cost of funds to the

21   A/B Syndicate was 9.58%.  (Dkt. 170 at p. 4 (¶ 13) .)  That same year, CashCall's original

22   third-party lender increased its credit line to CashCall to $325 million.  (Dkt. 170 at p. 72, Ex.

23   13 at 243:20-244:10.)  And CashCall obtained another $50 million in credit.  (Dkt. 170 at p.

24   74, Ex. 13 at 239:16-240:25).

25   These increases elevated CashCall's total credit capacity to approximately $1.2 billion.

26   CashCall used this potential to expand lending in California and nationally.  (Ex. 13 at 229:2-

27   10, 246:14-247:3.)  In 2006, CashCall's loan volume nearly doubled in a single year, from

1  73,450 loans in 2005 to 135,098 loans.  (Ex. 28 at pp. 4-5.)  Over half of its loans in 2006 were

2  $2,600 loans at 96% interest.  (*Id.*)  CashCall quickly expanded its lending outside California,

3  nationwide to Nevada, New Mexico, Utah, Idaho, New York, Wisconsin, New Jersey, and

4  Maine.  (Dkt. 170 at p. 66, Ex. 13 at 246:14-247:3.)

5       CashCall's 2006 revenues quadrupled to $250 million, with income of $23.5 million.

6  (Dkt. 170  at p. 64.)  CashCall was bullish in the Spring of 2007, boasting to Wall Street

7  investors that it expected profits of $41 million for 2006, $100 million for 2007, $200 million

8  for 2008, and $300 million for 2009.  (Ex. 13 at 355:14-356:6 & Ex. 15 at p. 26147.)

9       The Great Recession intervened and delayed CashCall's vision of hundreds of millions

10  in profits.  In the spring of 2007, key members of the A/B Loan Syndicate withdrew, including

11  the large failed investment bank, Bear Stearns.  (Ex. 13 at 233:1-234:13; 236:20-238:1.)  The

12  A/B investors terminated their huge CashCall credit facility.  (*Id.*)  This catastrophic loss of key

13  financing significantly impacted CashCall's ability to make loans.  (Dkt. 170 at p. 6 (¶20);  Ex.

14  13 at 297:3-298:8.)  CashCall shrunk dramatically as the nearly unprecedented financial crisis

15  unfolded in 2007-08.  (Dkt. 79 at p. 2 (¶ 3); Dkt. 170 at p. 85, 106, Dkt. 170-1 at p. 6.)

16       CashCall recovered in 2010 and has shown substantial profits since then, including $60

17  million in 2011.  (Dkt. 170-1 at p. 60.)

## ARGUMENT

### 1.  There are Triable Issues of Material Fact on Procedural Unconscionability.

20       This Court has already disposed of CashCall's legal arguments on pages 15-19 of its

21  brief in its class certification Order.  (Dkt. 100 at pp. 30-31.)  The Court rejected CashCall's

22  claim that plaintiffs must show both oppression *and* surprise.  (*Id*. at 30:6-24.)  The Court's

23  ruling that surprise need not be shown (*i.e.*, disclosure is no defense to procedural

24  unconscionablity) was clearly correct and, indeed, has just been reaffirmed by the California

25  Supreme Court.  *Sonic II*, at *8 (procedural unconscionability "focus[es] on oppression or

26  surprise) (Slip. Op. at 15).

27

The Court has already twice rejected CashCall's second argument, that a consumer adhesion contract does not establish "oppression." The Court rejected the same argument in denying CashCall's Motion to Dismiss (Dkt. 34 at 11:11-12:4), and a second time in granting class certification (Dkt .100 at 30:25-31:17). CashCall grudgingly acknowledges this fact in a footnote on page 19 of its brief, but cites no authority for the Court now to reverse itself, disregard *Gatton v. T-Mobile USA, Inc.*, 152 Cal.App.4th 571 (2007), or suddenly limit *Gatton* to arbitration clauses.[3] *Gatton* is clear:

> Appellate courts considering unconscionability challenges in consumer cases have routinely found the procedural element satisfied where the agreement containing the challenged provision was a contract of adhesion." *Id*. at 582.

> "More fundamentally, we reject the contention that the existence of market choice altogether negates the oppression aspect of procedural unconscionability." *Id*. at 583.

*Sonic II* reaffirmed this. *Sonic II*, at *8, *17 ("The procedural element of an unconscionable contract generally takes the form of a contract of adhesion") (Slip Op. at 15, 31). The California appellate courts have not restricted *Gatton* to arbitration clauses. *Lona,* 202 Cal.App.4th at 109 (*Gatton* applied to predatory loan transaction).

*Gatton* expressly distinguished CashCall's two principal "market choice" cases, which were not arbitration cases, without limiting its holding to the arbitration context. The Court held that neither *Dean Witter Reynolds, Inc. v. Superior Court,* 211 Cal.App.3d 758 (1989) nor *Morris v. Redwood Empire Bancorp*, 128 Cal.App.4th 1305 (2005) was controlling since, "because any substantive unconscionability was low, the sliding scale analysis did not provide a basis to refuse to enforce the provisions in light of the minimal procedural unconscionability." 52 Cal.App.4th at 584 *see also* p. 585, n. 8.

---

[3] CashCall's citation to *AT&T Mobility LLC v. Concepcion*, 131 S.Ct. 1740 (2011) is misplaced because there is no arbitration clause in the Class members' loan agreements. *Concepcion* applied the Federal Arbitration Act and did not address state law procedural unconscionability. *Sonic II* at *20 ("The unconscionability doctrine we have stated above is not preempted by the FAA") (Slip Op. at 37); *Smith v. Americredit Financial Services, Inc.*, 2012 WL 834784 (S.D.Cal.) ("the test for procedural unconscionability is the same as it was before Concepcion").

Although market alternatives are not controlling, this Court has ruled that consumer choice is "relevant, but not dispositive." (Dkt. 100 at 31:7-8.) Therefore, plaintiffs will show that there are triable issues of material fact whether class members had meaningful alternatives to CashCall's loans. Even under *Dean Witter*, there must be "*a meaningful choice* of reasonably available alternative sources of supply from which to obtain the desired goods and services *free of the terms claimed to be unconscionable.*" *Dean Witter*, *supra*, 211 Cal.App.3d at 797-98, emphasis added.

CashCall represented to investors in early 2006 that it had "no competitors" in the market for subprime installment loans. (Ex. 13 at 359:24-362:4 & Ex. 16 at p. 26059.) CashCall's CFO, Delbert Meeks, testified that even today, CashCall occupies a unique product "niche" and faces only "minor" competition:

> Q.   You state that, "It's a unique product offering with high customer demands. "Why did you feel it's a unique product offering?
>
> A.   There's still no other product out there that is an installment loan that's based on a simple interest calculation, no prepayment penalty.  It distinguishes itself amongst -- it's not a payday loan, it's not a normal bank loan, it's the niche in between.
>
> *Q.   What other companies have occupied that niche with CashCall?*
>
> *A.   I believe the last point of the page says, "No competitors."*
>
> *Q.   Oh, okay.  Is that still the case?*
>
> *A.   There --*
>
> *MR. COHEN:  Objection; calls for a legal conclusion and speculation.  You can answer.*
>
> *THE WITNESS:  There are some minor players in the space that are offering installment-based loans.*
>
> *Q.   When did they come into the space?*
>
> *A.   I don't recall.  It would have been after this point.  After the market came back.*
>
> *Q.   What percentage of the market do they occupy at the present time?*
>
> *A.   I don't know.*

1 (Ex. 13 at 362:21-363:22, emphasis added.)

2      Plaintiffs' expert Adam Levitin testified that other installment lenders did not supply

3 "reasonably available alternative" loans during the class period.  (Ex. 6  at pp. 10-11, 14; Ex. 7

4 at pp. 8-10.)  This testimony raises a triable issue of material fact, precluding summary

5 judgment.

6      Further, because of the dominance of advertising, consumers do not have a "meaningful

7 choice" among subprime installment loans.  Consumers do not shop; they respond impulsively

8 to the first ad they see, in this case, CashCall's message through its massive advertising

9 program was "call us" to "get cash fast."  (Ex. 6 at p. 11; Ex. 7 at pp. 2-3.)  "Make the CashCall

10 at 866-590-CASH."  (Ex. 37.)  Class members overwhelmingly confirm this: they saw the

11 CashCall ads and picked up the phone without "shopping around" for loans.[4]

12      The report of CashCall's expert, Dr. James, can at best raise triable issues of fact.  He

13 testifies that CashCall faced no competition from other installment lenders until 2009.  (Dkt.

14 172 at pp. 12 & n. 24, 27 (¶¶ 18, 56).)  However, 80% of CashCall's lending to the Class had

15 already occurred by 2008.  (Levy Dec. ¶  32.)  Thus, CashCall's evidence fails to establish that

16 CashCall faced any alternative installment loan competition during its 2005-2007 boom years.

17      Further, Dr. James has no specific historical data to base a claim that starting in 2009, or

18 at any other time during the class period, other installment lenders were offering loans that

19 were comparable to CashCall's subprime $2,600 loan product. (Ex. 7 at pp. 8-11.)  That the

20 California Department of Corporations reported other installment lenders does not establish

21 that their loans were comparable alternatives to the class members' loans in this case.

22      Dr. James bases his opinion on the DOC's annual reports that simply list the number of

23 loans issued in California within an interest rate range (40-100%) and loan amount range

24 ($2,500-$4,999).  (Dkt. 172 at pp. 19-20, 61; Dkt. 174 (containing the DOC reports).)

25

26 [4]  Ex. 22 at 20:20–21:15, 30:19–31:1; Ex. 21 at 7:8-19, 9:14 – 10:8, 15:13-16:8, 23:11-25; Ex. 23 at 15:16-24; Ex. 20 at 11:9–12:1, 14:10-15, 17:13-16, 20:15-22, 22:17-25, 90:20–92:13, 93:10-18; Ex. 24 at 38:3-39:6; Ex. 18 at 9:5-21; Ex. 19 at 85:3-9, 85:16-22.

27

1    However, as CashCall emphasizes, it occupies a market "niche," providing "credit that

2  other lenders may not have been willing to extend." (Brief at 3:14-15.) CashCall "offered a

3  unique product – unsecured term loans to borrowers with poor credit histories." (*Id.* at 4:24-

4  5:1.) CashCall catered to consumers whose "prior credit problems, including bankruptcies and

5  defaults, limited their credit options." (*Id.* at 4:24-5:1.)

6    CashCall was engaged in making *$2,600 subprime* loans. Dr. James has no basis for

7  comparing the actual loan amounts, lending criteria (prime or subprime), or interest rates for

8  the DOC's reported loans. (Ex. 7 at pp. 8-11.) Dr. James assumes without evidence that all

9  loans in the DOC's "Loans of $2,500 to $4,999" band are $2,600 loans like CashCall's, and not

10 for significantly more; that all reported loans in the DOC's "40% or more APR" were at

11 interest rates substantially lower than CashCall's; and that all such loans would be subprime

12 loans like CashCall's, for which the subprime borrowers could qualify.

13   Dr. James identifies some payday lenders who now apparently make $2,500 installment

14 loans in California. (Dkt. 172 at pp. 21-22, 63.) However, he *assumes*, without support, that

15 these lenders were lending during the class period. (Ex. 7 at pp. 8-9.)

16   There are triable issues as to whether Dr. James's "alternative loan products" – payday

17 loans, tax refund anticipation loans, auto title loans, and pawnshops – are "meaningful choices"

18 for the Class members of loans comparable to CashCall's subprime $2,600 installment loans.

19 (See Plaintiffs' Separate Statement, Fact Nos. 37-40, and evidence cited.)

20   CashCall has failed to meet its burden to demonstrate that there are no triable issues of

21 material fact on the question of whether Class members had a meaningful choice of loans

22 comparable to CashCall's.

23   **2.  There are Triable Issues of Fact as to Substantive Unconscionability.**

24   Substantive unconscionability is a holistic, fact-intensive issue: "the parties shall be

25 afforded a reasonable opportunity to present evidence as to [the] commercial setting, purpose,

26 and effect to aid the court in making the determination." Cal. Civ. Code § 1670.5(b).

27

Substantive unconscionability turns on whether the loans are "unduly harsh," "unreasonably one-sided" or "oppressive." *Armendariz v. Foundation Health Psychcare Svcs, Inc.,* 24 Cal. 4th 83, 114 (2000), cited with approval in *Sonic II*, at *9 (Slip Op. at 15). "[T]he core concern of unconscionability doctrine is the 'absence of meaningful choice on the part of one of the parties together with contract terms which are *unreasonably favorable* to the other party." *Sonic II*, at *17 (Slip Op. at 31), emphasis added.

Judicial review of excessive pricing has long been recognized within the purview of the unconscionability doctrine. *E.g., Perdue*, 38 Cal. 3d at 928 ("NSF" fees unconscionably high); *Carboni v. Arrospide,* 2 Cal. App. 4th 76, 83 (1991) ("we have little trouble concluding that an interest rate of 200% on a secured $99,000 loan is substantively unconscionable: i.e. that it imposes a cost on the borrower which is overly harsh and was not justified by the circumstances in which the contract was made").

### a. CashCall's $2,600 Interest Rates and Loan Terms Are Oppressive On Their Face

CashCall's loan products to the Unconscionability Class fall into two groups, the 96% loans and the 135% loans. CashCall began making $2,600 loans at 96% in August 2005. (Dkt. 170 at p. 3 (¶ 8).) CashCall increased the interest rate from 96% to 135% in July 2009. (*Id.*) The financial terms of these loans are as follows:

|  | 96% Loan [Dkt. 171-5 at p. 93] | | 135% Loan [Ex. 20 (Depo. Ex. 4)] | |
|---|---|---|---|---|
| APR | 99.07% | Times Loan Amount | 138.43% | Times Loan Amount |
| Loan Amount | $2,525 | | $2,525 | |
| Total interest & Fees | $6,625 | 2.62 | $8,393 | 3.32 |
| Total Payments | $9,150 | 3.62 | $10,918 | 4.32 |

For the 96% loan, the actual APR was over 99%, with total loan payments of $9,150, or 3.6 times the amount borrowed. For the 135% loan, the APR is over 138%, with total loan payments of nearly $11,000, or 4.3 times the amount borrowed.

According to CashCall, half of the Class members paid their loans in full:

| | | |
|---|---|---|
| Loans Paid Off At Maturity | 8,858.00 | 6.5% |
| Loans Paid Off After More Than 6 Months, But Before Maturity | 35,129.00 | 26.0% |
| Loans Paid Off in Less Than 6 Months | 23,728.00 | 17.5% |
| Total (Loans Paid in Full) | 67,715.00 | 50.1% |

(Dkt. 171 at p. 2 (¶ 4).)

Substantially all Class Members paid the high interest rates. About 1/3 of the Class paid in full more than six months after taking out the loans, including 6.5% at maturity and 26% after more than six months. All of these borrowers made CashCall's high interest payments for a substantial period of time, 8,858 for as long as 42 months.

**b. CashCall's $2,600 Loan Products Are Not Affordable to 45% of its Borrowers.**

CashCall lends to subprime borrowers. Subprime borrowers are often identified by individuals having a FICO credit score below 640. (Dkt. 172-1 at p. 32; "Investopedia: Dictionary: Subprime Borrower, available at http://www.investopedia.com/terms/s/subprime-borrower.asp as of 10/26/13.)

The FICO scores for CashCall borrowers range as low as 500 and average barely above 600, with about ¾ below 640. (Ex. 14 at 25825, 25842; Ex. 15 at 26103, 2612, Ex. 16 at 26074-75; Dkt. 172-1 at pp. 32-33.)

Borrower FICO scores are the primary predictor of loan defaults. (Dkt. 170 at p. 5 (¶ 15).) Borrowers have struggled to repay CashCall's $2,600 loans; nearly half have defaulted, and CashCall's dollar write-offs are astoundingly high.

CashCall acknowledges that the default rate on these loans is 45%. (Dkt. 170 at p. 5 (¶ 15); see also Ex. 29 (Int. No. 28) (reporting 42% default rate as of October 2012).) "Default" means that these loans were delinquent for at least 150 days and CashCall wrote them off as uncollectible. (Ex. 13 at 71:7-72:9.) Further, CashCall does not measure default rate in terms of numbers of loans, but instead, financially, as the total dollars written off as a ratio of the total amount loaned: "[t]he amount of the charged-off principal balance divided by the amount of the original loans." (Ex. 13 at 88:20-89:6.)

Thus, CashCall wrote off as uncollectible 45% of the amount it loaned, or $1,260 on average out of every $2,600 it loaned. In class-wide dollar terms, CashCall wrote off more than $170,000,000 on the 135,288 class member loans. CashCall deducts these loan losses from income and takes a tax benefit for them. (Dkt. 170 at p. 85 (deducting $168 million in loan losses from income); Ex. 17 at pp. 27-28.)

By comparison, credit card charge off rates historically average less than 5% and never reached 10% even during the Great Recession. (Ex. 17 at p. 23.)

### c. CashCall Designs its $2,600 Loan Product Intending 4-in-10 Borrowers to Default

CashCall's loan product is toxic, and unconscionable, because CashCall's irresponsible lending is *by design*. CashCall builds a 35-40% default rate into its loan products, knowing that nearly half of the individuals and families it lends to will unable to repay, will suffer increased personal, financial, and family stress, will be subjected to CashCall collections, and will be set back even further in establishing their worthiness for future credit. This is akin to knowingly selling a food or drug product that makes half of the people sick.

How does CashCall make money? CashCall strategically lends to create massive loan defaults, but makes its $2,600 loans profitable by charging 96% and 135% interest to the borrowers who do pay -- and even those who don't pay, but whom CashCall's collectors prod to pay for as much as they can, for as long as they can.

CashCall has a "break even" point where it recoups all its costs – about 15 months into the 42-month loan. (Ex. 13 at 155:12-156:9.) CashCall meets its profit target of 15-20% at about 20 months into the loan. (*Id.* 157:22-158:3.) If CashCall can keep the borrower paying until month 15, CashCall will recoup its costs; if it can keep the borrower paying for another five months, it will make its target profit. (Ex. 17 at pp. 24-30;Dkt. 172-1 at pp. 8-13.) Since CashCall's expects the loans to last, on average, 20 months, CashCall meets and exceeds its profit goal, regardless of whether the borrower eventually defaults. (Ex. 13 at 92:16-93:18.)

After 20 months, CashCall's collections are pure profit. As lending expert Adam Levitin explains:

> The combination of the high interest rate with the long amortization period enables CashCall to operate a "sweatbox" business model. The "sweatbox" business model of consumer lending involves a lender extracting enough in interest and fees before the borrower stops paying to outweigh the losses of principal. … The principal balance is in essence a loss leader for a sweatbox lender that it is willing to sacrifice because it enables such a high return via interest and fees.

(Ex. 6 at p. 16 (¶ 93); *see also* R. Mann, Bankruptcy Reform and the "Sweat Box" of Credit Card Debt, 2007 ILL. L. REV. 375, 386 (Borrower financial distress "suggests imminent profit for the [credit card] issuer because the decision to carry a balance leads immediately to interest charges on the cardholder's account, which accrue at a rate far exceeding the lender's cost of funds").)

CashCall CFO Meeks uses a paperless software "profitability model" to set CashCall's interest rates. (Ex. 13 at 60:23-63:6.) Even though this litigation has been pending since 2008, CashCall has not kept any copy, printout, or "freeze" of the computations used in its actual rate determinations. (*Id.* at 62:3-8.) CashCall has rendered its rate process unaccountable and irretrievable.

CashCall claims that its target profit is 15-20%. (Ex. 13 at 66:17-67-1.) However, the profitability model template CashCall produced reflects profit targets consistently over 40%, and as high as 53%. (Ex. 13 at 311:21-22, 329:14-331:23; Levy Dec. ¶ 34 & Ex. 32.) Mr.

1 Meeks testified at deposition that the $2,600 loan product was profitable, but would not say

2 what the actual profit was. (*Id.* at 333:7-16 ("I'd be guessing").)

3       In his declaration, Mr. Meeks offers no testimony as to the profitability of the $2,600

4 loan product, only CashCall's overall "consumer lending business" for the seven year period

5 from 2004 to 2011. (Dkt. 170 at p. 9 (¶34). This overall average includes CashCall's losses due

6 to losing its financing in 2007, and its significant profits since 2010. It includes CashCall's

7 non-$2,600 loans, non-California loans, and mortgage loans. It is not a reflection of the

8 profitability of the loans made to the Class.

9       CashCall's profitability model starts with inputting the loan amount (here $2,600), loan

10 term, and the expected number of loans. (Ex. 13 at 83:24-86:25.) Mr. Meeks then inserts

11 CashCall's costs. These include (a) 25% of the $2,600 loan amount for production

12 ("origination"); (b) 8% for "servicing" costs; and (c) the cost of funds from CashCall's

13 financiers. (Ex. 13 at 50:12-51:12.) He then inputs the expected defaults and prepayments to

14 account for risk of non-payment due to default, and prepayments. This generates a cashflow

15 analysis, which yields an expected profit as the output. (*Id.* at 70:1-17.)

16       CashCall builds the cost of its advertising campaigns into its interest rates. (Ex. 13 at

17 56:4-57:18; 134:16-135:2.) Advertising accounts for more than half of the 25% origination

18 costs input into the model. (*Id.* 135:3-17.) CashCall's ad expenditures are high, running over

19 $28 million per year in the boom years of 2006 and 2011 and over $17 million in 2005, 2007,

20 and 2010. (Dkt. 172 at p. 56; Dkt. 168 at p. 82 (2007).) Historically, advertising expense has

21 accounted for nearly 20% of CashCall's total operating costs. (*Id.*; Levy Dec. ¶ 33 & Ex. 31.)

22       Thus, CashCall sets its interest rates to recoup roughly 12-1/2% of the loan amount

23 ($325) from each customer to pay for CashCall's ad campaigns to attract borrowers, including

24 the 45% who can't afford to pay and default.

25       CashCall also builds it collection costs into its high interest rates. CashCall's 8%

26 servicing cost represents collections. (Ex. 13 at 58:15-17, 136:4-6.) Thus, CashCall's high

27

1  interest rates are intended to recoup the cost of maintaining CashCall's collections unit to

2  collect loans from those same defaulting borrowers.

3      CashCall's cost of funds is input based on what is charged by the financing investors.

4  (Ex. 13 at 58:11-14.)  For the pre-2008 boom period, that was less than about 9.5% per year.

5  (Dkt. 170 at p. 3 (¶ 13).)  Thus, for 75% of the class member loans, CashCall borrowed money

6  at less than a tenth of what it charged the Class.  (Levy Dec. ¶ 32.)

7      Mr. Meeks then inputs a "default curve" to reduce the projected cashflow from the loan

8  product based on assumed non-payments due to loan defaults.  (Ex. 13 at 59:17-61:12; 69:4-

9  71:6.)  CashCall builds an "assumed acceptable default rate" of 35-40% into its interest rate

10  determinations in order to figure its profit and set the interest rate.  (*Id.* 74:2-76:2; 82:25-

11  83:17.)  Mr. Meeks testified:

12          Based on the models that we build and the profitability models of each
           individual product,   there's an assumed acceptable default rate which will then
13          generate the target, or the ROI ["return on investment," i.e., profit], that we
           accept as to what our goal or expectations of this product to be.
14
15  (*Id.* 74:8-12.)

16      FICO score and CashCall's internal "CDS" score (which is derived from credit report

17  data) are the drivers of the 35-40% default rate CashCall uses in setting interest rates.  (Ex. 13

18  at 79:15-80:19.)  CashCall selects a "default curve" based on the FICO and CDS scores

19  CashCall will use in underwriting the actual loans.  (*Id.* 86:14-25; see also 74:2-75:16.)

20      By designing its loans based on a "curve" with a 35-40% cumulative default rate,

21  CashCall deliberately applies underwriting standards so porous that 4-in-10 borrowers will

22  default and have their loans written off.  If CashCall tightened its underwriting guidelines

23  (required higher credit scores), defaults would be lower, and so would interest rates.  (*Id.*  98:4-

24  99:2.)  Instead, by loosening underwriting (lending to lower credit-scoring borrowers),

25  CashCall systematically increases the default risks and drives up its interest rates.  (*Id.* 99:3-

26  100:11.)

27

1    Mr. Meeks acknowledges that CashCall's underwriting guidelines determine its loan

2 volume: "The way you offset that [increased defaults] is you will tighten underwriting

3 guidelines, meaning trying to tighten it up, which means *you will loan out less product*, but you

4 will have better performing product." (Ex. 13 at 92: 5-8, emphasis added; *see also* 78:2-13.)

5 Loosening underwriting to achieve higher loan volume leads to higher defaults: "If the

6 underwriting guidelines, for example, are lowered or a lowered quality scored or quality

7 credited borrower is allowed to have a loan, then the default rate will go up." (*Id.* at 314:15-

8 316:24.)

9    CashCall makes the strategic business decision how lax its underwriting guidelines will

10 be in order to achieve its desired loan volumes. CashCall's target loan volumes and profits

11 dictate its "acceptable default rate" of 35-40%, not vice-versa. As Plaintiffs' expert Bruce

12 McFarlane testifies and illustrates in his chart on page 20 of his report, CashCall uses

13 advertising and lax underwriting standards to *achieve sales volume and scale*: "CashCall's

14 efforts to increase loan originations through increased advertising and marketing activities and

15 the use of broad underwriting standards to increase the pool of qualified borrowers increases

16 CashCall's expenses which CashCall must ultimately recover through higher APRs charged

17 borrowers." (Dkt. 172-1 at p. 20.)

18    In sum, the expenses and default risks CashCall uses to justify its high interest rates are

19 not thrust upon CashCall or inherent in its business. As McFarlane explains, these costs and

20 risks are self-imposed, the byproduct of CashCall's chosen aggressive strategy to advertise,

21 attract, and lend to 4-in-10 people who can't pay the loan back. (Dkt. 172-1 at pp. 14-23.)

22    **d.  CashCall's 2,600 Loan Product Harms Consumers**

23    Plaintiff consumer protection expert Margot Saunders has reported in detail how

24 CashCall's loans are damaging to consumers. (Ex. 17.) The loans harm consumers through (1)

25 inordinately high loan costs, (2) subjecting delinquent borrowers to the stresses of CashCall's

26 collections process, and (3) harm to future creditworthiness. (*Id.* at p. 9.)

27

Saunders acknowledges the availability of credit as a benefit to consumers, and it surely is. The appropriate question for the Court, though, is "At what cost?" Here, the financial and human costs are enormous.

The cost of credit is high, 3.5-4.5 times the amount borrowed. (*Id.* at pp. 10-11.) California caps interest at 28% for loans of $2,500. (*Id.*; Financial Code § 22303.) By evading California's rate ceiling by increasing its loan amount slightly above $2,500, CashCall increases the borrower's interest burden over the life of the loan by $5,000 to 7,000, four to six times the amount that would be due on a $2,500 loan. (*Id.* at p. 10.)

CashCall's strategic 35-40% default rate results in tens of thousands of defaulted loans. In the certified class alone, there are 61,000 people in this category. The outright defaults are not the whole story; there are missed payments ("delinquencies") that do not mature into defaults. (*Id.* at pp. 13-14.) Over 74,000 class members, over half of the class, were late with at least one payment and fell into CashCall's collection process. (*Id.* at 14; Ex. 30 (Nos. 29-33).)

As CashCall knew and foresaw by building a 35-40% default rate into its profitability model, CashCall's aggressive collection process and endless "autodialing" came to inflict personal and family stress, humiliation, life disruption, and invasion of privacy on all of these borrowers. (Ex. 17 at pp. 15-18; *see also* Plaintiffs' Separate Statement, Fact Nos. 52-56.)

Finally, CashCall's adverse credit reporting further damages the delinquent and defaulting borrowers' credit standing and makes it even harder for them to obtain credit. (Ex. 17 at pp. 18-19.)

### e. CashCall Preys on Impulse Borrowing and Low Financial Literacy

CashCall reaches prospects primarily through TV advertising. In the ramp-up of 2005-07, CashCall spent $2-3 million *per month*, mostly on TV ads. (Ex. 15 at p. 26131.) This ad volume resumed as CashCall recovered in 2010-11, to the point where CashCall was spending $27.5 annually, or over $2.0 million each month. (Dkt. 172 at p. 56 & Ex. 31.)

CashCall is a "direct response" TV advertiser. (Dkt. 169 at p. 2 (¶ 4).) It advertising objective is to get TV viewers to pick up the telephone immediately and call for a loan. (Ex. 4 at 57:6-14.) CashCall's ad agency focuses on "low-involvement programming," where the viewer would have little reluctance to abandon the program in mid-stream and go to the phone to call. (*Id.* 98:9-99:12.) The ad agency coordinates ad times with CashCall so CashCall can adequately staff its call centers to field incoming calls in the immediate wake of the ad broadcasts. (*Id.* 90:18-91:6; 93:10-24; 122:16-122:8; 166:15-24; Ex. 5 at 20:10-15; Ex. 8 at 124:16-125:21.)

CashCall's ad strategy is to focus on people's "need of needing money fast to get past a problem." (Ex. 4 at 115:4-116:18; 113:21-114:11 ("there were thousands of different reasons that people would have for needing cash in a hurry").) CashCall "capitalizes" on that desperate need. (Ex. 13 at Ex. 14 at p. 25825.)

*Ad Exemplar 1*:

Background rap music: "CashCall! Give us a ring! Call 866 – CHA – CHING!"

Gary Coleman: "I got approved in minutes, and they wired the money right into my account!"

Background rap music: "CashCall! Get ten k! Make a call now! It's the easy way!"

*Ad Exemplar 2*:

"Here's a no nonsense fact about getting cash and getting it fast. CashCall can put ten thousand dollars in your checking account by tomorrow just based on trusting you. No security of any kind. Just your signature. You do not have to own a house and you do not need collateral. It only takes a five minute CashCall to get the thousands you need. And pay back is affordable, only about two hundred bucks a month. Just make a CashCall at 866-590-CASH. That's 866-590-CASH, anytime!"

(Ex. 33-37.)

According to the head of CashCall's ad agency, the ads highlight the low monthly payment because "many Americans make financial decisions based upon what they can afford each month, what is that monthly payment as opposed to an interest rate or APR…. They are looking at what's the monthly payment and can I afford it." (Ex. 4 at 125:23-126:10.)

Plaintiffs' neursopsychology expert, Stacey Wood, testifies on the cognitive ability of the typical class member to evaluate CashCall's presentations in its ads and application process and to make a well-informed decision in his/her own best interest. CashCall designs its advertising to appeal to the viewer's immediate need for money and the ease of quickly satisfying that need, while minimizing information about the cost of the loans. (Wood Dec. ¶13). The ability of the typical class member to understand and process loan disclosures is even less than the low financial literacy of consumers generally. (*Id.* ¶¶ 10, 11.) The financial literacy deficits of the typical class member are compounded by anxiety and worry over money; individuals facing financial stress have reduced cognitive capacity overall and tend to make poor financial decisions. (*Id.* ¶ 12.) CashCall's practice of not providing written loan disclosures until late in the application process capitalizes on the psychological bias against losing "sunk costs;" having already invested in the application process and been "approved," now counting on getting his/her need filled, the borrower is predisposed to either ignore the disclosures or unfairly discount their significance. (*Id.* ¶ 15.)

**3. There are Triable Issues of Material Fact as to CashCall's Disclosures.**

CashCall places principal reliance on disclosures. There are triable issues of fact relating to: (1) the content of the disclosures; (2) the timing of the disclosures; (3) changes in CashCall's disclosure practices over the class period; and (4) the capacity of class members to understand information provided them in the disclosures.

First, CashCall suggests that its loan agents uniformly disclose loan terms during incoming initial phone calls from consumers responding to TV advertisements. CashCall designated Myles McCarthy at its "deponent most knowledgeable" on loan agent practices. (Ex. 8 at 11:8-12:17; 188:2-9.) Mr. McCarthy denied any such general practice; a consumer can complete the entire loan application process without any oral disclosure of terms. (*Id.* 197:15-198:4.)

1    In his declaration submitted in opposition to class certification, Mr. McCarthy detailed

2    the training and hiring of CashCall loan agents.  (Dkt. 83 at pp. 2-4.)  He testified that:

3
         Cash Call has never employed a standard script that its loan agents must follow
         verbatim.  Subject to policies and procedures regarding required disclosures,
4        loan agents have discretion in how they handle a particular call. Cash Call does
         have expectations of its loan agents, but it does not tell them exactly what to say
5        on every Cash Call has never employed a standard script that its loan agents
         must follow verbatim. Subject to policies and procedures regarding required
6        disclosures, loan agents have discretion in how they handle a particular call.

7    (*Id.* at p. 3 (¶ 11).)

8        CashCall's 80-page "New Hire Training Manual" for loan agents confirms that

9    CashCall has no general policy or practice to volunteer loan term disclosures during phone

10   calls. (Ex. 8 at 25:20-26:14, 181:10-22 & Ex. 9.)  The manual's "Frequently Asked Questions"

11   does not address mandatory loan term disclosures.  (*Id.* at pp. 796-800.)  The section on

12   "Borrower Questions" addresses questions about rates, but instructs the agent to speak in

13   generalities without requiring the agent inform the borrower of the rate specific to his/her loan.

14   (*Id.* at pp. 812.)

15       The manual's only general requirement for loan term disclosure occurs when the agent

16   discusses a "triggering term" with the applicant.  (Ex. 8 at 185:1-186:22; Ex. 9 at pp. 804-05.)

17   A triggering term is payment amount, number of payments, loan term, or finance charge.  Only

18   then is the agent required to orally disclose loan terms. However, disclosure is required only if

19   the agent or the borrower mentions a "triggering term;" there is no requirement for the agent to

20   mention such a term.  "Not every prospective borrower mentions a triggering term, which

21   prompts disclosure of loan terms, including the APR."  (Dkt. 83 at p. 7 (¶ 20).)

22       An agent has a direct financial incentive not to trigger a discussion of loan terms.

23   Agents are compensated based on the number of applications they handle that close as loans.

24   (Ex. 8 at 141:7-142:16, 146:8-22; 149:17-150:4.)  This conflict of interest incentivizes loan

25   agents to conceal or "mis-sell" the loan terms.  (Ex. 3 at 12:8-14:1, 36:25-39:18.)

26       Moreover, loan agents only talk with about half of the applicants during the application

27   process. (Ex. 8 at 51:23-52:9.)  Borrowers can apply online as well as over the telephone.  (*Id.*

45:4-48:12; 79:20-80:23 & Ex. 12.)  Internet applicants can complete the entire loan process without ever talking with a loan agent.  (*Id.* at 45:4-18; 47:19-48:12.)  As early as 2006, 60% of CashCall's loan applications came over the internet and not over the phone.  (Ex. 13 at 340:6-21 & Ex. 14 at p. 25851.)

CashCall agents may be on the phone when the applicant is actually signing the promissory notes.  However, a phone "walk through" is not required.  (Ex. 8 at 42:13-43:9; 197:15-198:3.)  All applicants must access the loan agreement on line; CashCall sends an email with a link to the loan agreement.  (*Id.* 179:8-180:1.)  Many applicants directly access the promissory note on their computers without the loan agent present; the number where the loan agent is on the phone is unknown.  (Ex. 8 at 50:17-24.)

Finally, the CashCall Loan Servicing Manual specifies in detail the subjects to be covered in a standard "Welcome Call" after loan funding.  (Ex. 8 at 50:18-52:17 & Ex. 2 at pp. 953-54.)  There is no requirement to mention loan terms.

There is a triable issue as to the degree to which Class members understood the TILA disclosures in the CashCall promissory notes and their financial ramifications. Due to cognitive deficits in numeracy and financial literacy, and due to stress, the typical class member could not reliably extract, process, and fairly evaluate the costs of financial products in his/her self-interest.  (Wood Dec. ¶¶ 10-15; Saunders Report at pp. 31-36.)

CashCall expert Bruce Carlin acknowledges that "Financial literacy … is in short supply in the United States."  (Ex. 3 at 224:3-23.)  The "keystone" of Dr. Carlin's disclosure opinions for CashCall is his reliance on "how do they service their loans ex-post, and that's what led me to make my conclusions."  (Ex. 3 at 27:1-28:2.)  However, his "ex-post" study of early loan prepayments assumes what he is seeking to prove:  that the "driver" of early repayment is "a decision to repay debt that has high interest costs as opposed to others that have low."  (*Id.* at 151:20-152:13.)  By failing to test for alternative explanations of

prepayments, Dr. Carlin assumed what he was trying to prove, and his ex-post study fails to support his conclusions.[5]

### 4. CashCall's Economic Regulation Arguments are Without Merit

As this Court has already ruled, the Unfair Competition Law vests the Court with jurisdiction to apply Financial Code section 22302 (which incorporates § 1670.5), rule on unconscionability, enjoin CashCall's violations, and order restitution to the Class. (Cal. Bus. & Prof. Code § 17203; Dkt. 100 at p. 28.)

"'Unconscionable' is a word that defies lawyer-like definition. It is a term borrowed from moral philosophy and ethics. As close to a definition as we are likely to get is 'that which 'affronts the sense of decency.''" (7 J. PERRILLO, CORBIN ON CONTRACTS § 29.4 at p. 387 (2002), hereafter "CORBIN".)

Unconscionability is a matter of conscience, not economic policy. The Legislature has expressly assigned unconscionability determinations to the courts. "Section 1670.5 is intended to make it possible for *courts to police explicitly against contracts or clauses which they find to be unconscionable*. . . [t]his section is intended to allow *the court* to pass directly on the unconscionability of the contract." *See* Legislative Comm. cmts, Cal. Civ. Code § 1670.5 (emphasis added).

While the California Department of Business Oversight or Department of Corporations (for simplicity, the "DOC") may have regulatory and financial expertise, they have no expertise in ethics or decency; section 1670.5 assigns that province to the courts. The Courts historically have been the decision-makers of unconscionability. *See, e.g., Carboni v. Arrospide*, 2 Cal. App. 4th 76 (1991) (interest rate found unconscionable); *Ting v. AT&T*, 319

---

[5] Dr. Carlin assumes that borrowers prepaid because of the high interest rates, and lacks any empirical basis for rejecting the alternative explanation – that without necessarily knowing the interest rate or understanding the loan terms, the prepaying borrowers simply intended their loans to be short-term. He admits that prepaying borrowers would not necessarily be responding to the high interest rates if they simply intended short term loans. (*Id.* at 152:14-154:4.)

F.3d 1126, 1151 (9th Cir.), *cert denied*, 540 U.S. 811 (2003) (fee-splitting provision in telecommunication carrier's contract was unconscionable); *Perdue,* 38 Cal. 3d at 928 ("NSF" fees unconscionably high).

CashCall's "economic regulation" arguments are merely an invitation to this Court to walk away from its Orders upholding plaintiffs' claims and certifying the class, and leave CashCall unfettered in pursuing its irresponsible lending practices. CashCall makes no claim that the DOC has ever actually considered or determined whether CashCall's $2,600 90+% interest loans are unconscionable, or ever will. To the contrary, CashCall's argument based on the DOC's *inaction* establishes that the DOC has never addressed whether CashCall's loans violate section 22302, and has no intention of doing so. (*California CNG, Inc. v. Southern California Gas Co.*, 96 F.3d 1193, 1202 (9th Cir. 1996) ("[i]naction normally does not reflect any agency desire to approve"). CashCall's cases provide no authority that the Court cannot or should not apply the UCL to CashCall's loans, and *Carboni*, *Ting*, and *Perdue* hold just the contrary:

In *California Grocers Ass'n v. Bank of America*, 22 Cal.App.4th 205 (1994), the Court *applied* the unconscionability doctrine to bank fee pricing, holding that a $3.00 bank fee assessed against merchants was not unconscionable. In an alternative holding, the Court ruled that even if the fee were unconscionable, the trial court had erred in issuing, as the sole remedy, an injunction to prevent the bank from charging in excess of $1.73 for ten years. By determining the appropriate charge and requiring the bank to charge it prospectively, the trial court had impermissibly regulated the bank's business.

Plaintiffs do not ask the Court to set an "appropriate" interest rate. They ask the Court to enjoin CashCall's lending practices and award equitable restitution to the Class. This Court has broad discretion in applying "equitable factors" in awarding restitution under the UCL. *Cortez v. Purolator Air Filtration Products Co.*, 23 Cal. 4th 163, 173 (2000).

Plaintiffs' experts have simply provided the Court a preliminary interest rate "benchmark" (36%) and a financial model for computing the resulting restitution to the Class.

1    (Ex. 17 at pp. 37-39; Dkt.172 at pp. 139-140.)   Plaintiffs offer this testimony to assist the

2    Court if, in exercising equitable discretion, the Court decides to allow CashCall a setoff for the

3    class members' use of the loan funds,[6] instead of complete forfeiture of all interest.  Financial

4    Code § 22751(a) (providing for interest forfeiture for loans violating the Finance Lenders Law).

5          If the loans are unconscionable, that CashCall may not be able to make a profit at 36%

6    is irrelevant.  Restitution is not intended to leave the wrongdoer's profits in its pocket.  *Stop*

7    *Youth Addiction v. Lucky Stores,* 17 Cal. 4th 553, 579-80 (1998), ("Compelled disgorgement of

8    profits earned by unlawful sales deters future violations of the law and levels the playing field

9    on which the business activity occurs") (Baxter, J., concurring).

10         None of the cases CashCall cites holds that a court is disabled from determining

11   unconscionability under section 1670.5: *Lazzareschi Inv. Co. v. San Francisco Fed. Sav. &*

12   *Loan Ass'n*, 22 Cal. App. 3d 303, 311 (1971) (dicta, offering a "remark" that limitations on

13   charges of banks could be better accomplished by statute or regulation); *Wolfe v. State Farm*

14   *Fire & Cas. Co,* 46 Cal. App. 4th 554, 564-68 (1996) (finding only "no specific statutory

15   prohibition" on failing to provide insurance, noting "the Legislature's attempt to grapple" with

16   the issue);  *Harris v. Capital Growth Inv.*, 52 Cal. 3d 1142, 1168 (1991) (holding only that the

17   Unruh Act did not prohibit landlords' ability to use minimum income standards in the absence

18   of clear legislative direction).

19         **5.   Neither the Abstention nor Primary Jurisdiction Doctrines Applies.**

20         Some courts have recognized judicial abstention in UCL cases "in which the requested

21   relief would require a trial court to assume the functions of an administrative agency" or to

22   "assume a regulatory power … the Legislature has entrusted exclusively" to a regulatory

23   agency.  *Alvarado v. Selma Convalescent Hospital*, 153 Cal. App. 4th 1292, 1298-99 (2007);

24   *Arce v. Kaiser Foundation Health Plan, Inc.*, 181 Cal. App. 4th 471, 496 (2010) (recognizing

25

26

27   [6] *See Kraus v. Trinity Management Properties*, 23 Cal. 4th 116, 139 (2000).

1  abstention where the court must "assume the functions of an administrative agency, or to

2  interfere with the functions of an administrative agency").

3        This is not such a case.  Here, the Legislature has entrusted unconscionability

4  determinations to the courts, not to the DOC.  That an administrative agency *might* act, at some

5  future time, does not warrant abstention.  *Klein v. Chevron U.S.A., Inc.*, 202 Cal. App. 4th

6  1342, 1367 (2012).

7        In *McKell v. Washington Mutual, Inc.*, 142 Cal.App.4th 1457, 1473-74 (2006), the

8  plaintiffs challenged the bank's markup of underwriting charges.  Although there are strict

9  regulations governing lending practices, the economic abstention doctrine did not apply

10  because a "legislative determination as to the propriety" of the defendant's actions was already

11  conducted through the "enactment of applicable laws."  *Id.*  Thus, "by addressing plaintiffs

12  UCL claims, we are doing no more than enforcing already established economic policies."  *Id.*;

13  *see also Shuts v. Covenant Holdco LLC*, 208 Cal. App. 4th 609, 621 (2012) ("A court should

14  not abstain from deciding a case when the Legislature already made the relevant policy

15  determinations").

16        Here, plaintiffs invoke the UCL to enforce statutes for which the Legislature has already

17  determined the underlying policy: section 22302 expressly bans unconscionable loans.  This

18  Court should apply the unconscionability principles the courts have enforced for decades.

19        *Willard v. AT&T Comm'ns, Inc.*, 204 Cal. App. 4th 53 (2012) is clearly distinguishable.

20  The regulator had already acted. The Public Utilities Commission had previously issued a 291-

21  page decision expressly deregulating the challenged $1.00 and $1.25 monthly fees for unlisted

22  phone numbers.  The Court refused to entertain plaintiffs' direct challenge to the PUC's report

23  and findings.

24        In *Desert Healthcare Dist. v. PacifiCare FHP Inc.*, 94 Cal.App.4th 781, 786, 796

25  (2001), there was no direct legislative mandate, as here, for courts to apply the

26  unconscionability doctrine.  The Court held that the defendant HMO's "capitation"

27  compensation agreements are "standard in the industry and … specifically approved of by the

Knox–Keene Act. As such, there was nothing unlawful, unfair, or fraudulent about those agreements." *Id.* at 793-96. Based on the abstention doctrine, the Court refused to allow plaintiff to amend its complaint to challenge "capitation" payment practices in the absence of any statutory prohibition.

Nor does the primary jurisdiction doctrine apply here. "Primary jurisdiction . . . applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body . . .." *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 63-64 (1956). Here, as noted, the DOC has no special competence in determining unconscionability. This Court does.

The primary jurisdiction doctrine permits a discretionary stay pending proceedings before an administrative agency. CashCall has neither identified any pending administrative proceedings nor any likelihood that there will be any. There is no regulatory justification for a stay, and therefore no indication of what the stay would prevent or how long it would last. This case is already five years old and should not be placed in indefinite limbo, as CashCall requests.

RESPECTFULLY SUBMITTED AND DATED this 31st day of October, 2013.

TERRELL MARSHALL DAUDT & WILLIE PLLC

By:    /s/ Whitney B. Stark, SBN #234863
      Whitney B. Stark, SBN #234863
      E-mail: whitneystark@tmdwlaw.com
      936 North 34th Street, Suite 300
      Seattle, Washington 98103-8869
      Telephone: (206) 816-6603
      Facsimile: (206) 350-3528

James C. Sturdevant, SBN #94551
Email: jsturdevant@sturdevantlaw.com
THE STURDEVANT LAW FIRM
354 Pine Street, Fourth Floor
San Francisco, California  94104
Telephone: (415) 477-2410
Facsimile: (415) 477-2420

Arthur D. Levy, SBN #95659
Email: arthur@yesquire.com
445 Bush Street, 6th Floor
San Francisco, California  94108
Telephone: (415) 702-4550
Facsimile: (415) 814-4080

Damon M. Connolly, SBN #139779
Email:  damon@damonconnollylaw.com
601 Montgomery Street, Suite 1150
San Francisco, California  94111
Telephone:  (415) 391-4200
Facsimile: (415) 989-4739

Steven M. Tindall, SBN #187862
Email:  steventindall@rhdtlaw.com
Melinda Fay Pilling, SBN #274929
Email:  mpilling@rhdtlaw.com
RUKIN HYLAND DORIA AND TINDALL
100 Pine Street, Suite 2150
San Francisco, California  94111
Telephone:  (415) 421-1800
Facsimile:  (415) 421-1700

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Whitney B. Stark, hereby certify that on October 31, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

> Brad W. Seiling, SBN #143515
> Email: bseiling@manatt.com
> Lydia Michelle Mendoza, SBN #247916
> Email: lmendoza@manatt.com
> Noel Scott Cohen, SBN #219645
> Email: ncohen@manatt.com
> MANATT PHELPS & PHILLIPS LLP
> 11355 West Olympic Boulevard
> Los Angeles, California 90064-1614
> Telephone: (310) 312-4000
> Facsimile: (310) 312-4224

> *Attorneys for Defendants*

Dated: October 31, 2013.          TERRELL MARSHALL DAUDT & WILLIE PLLC

By:   /s/ Whitney B. Stark, SBN #234863
Whitney B. Stark, SBN #234863
E-mail: whitneystark@tmdwlaw.com
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
Telephone: (206) 816-6603
Facsimile: (206) 350-3528

*Attorneys for Plaintiffs*