# Exhibit 1

```
 1                  UNITED STATES DISTRICT COURT

 2                 NORTHERN DISTRICT OF CALIFORNIA

 3

 4

 5

 6    KRISTA O'DONOVAN, and         )
      EDUARDO DE LA TORRE,          )
 7    individually and on behalf    )
      of all others similarly       )
 8    situated,                     )
                                    )
 9               Plaintiffs,        )
                                    )   Case No.
10          v.                      ) CV 08-3174-MEJ
                                    )
11    CASHCALL, INC., a California  )
      corporation; and DOE 1        )
12    through DOE 50, inclusive,    )
                                    )
13                                  )
                 Defendants.        )
14    _____)

15

16    Deposition of:   SEAN BENNETT

17

18

19    Date and time:   Wednesday, March 17, 2010
                        9:33 a.m.
20

21

22    Location:        695 Town Center Drive
                       Costa Mesa, California
23

24    Reporter:

25    Patricia Tornell, CSR, RPR
```

DEPOSITION OF SEAN BENNETT - 3/17/2010

1    of CashCall regarding electronic fund transactions?

2         A    In general?

3         Q    Yes.

4         A    Yes.

5         Q    Where are those?

6         A    It would go back to the same question of the

7    policies and procedures of Loan Servicing.

8         MR. LEVY:  Let's mark this as the next in order.

9              Is that Number 19?

10        THE WITNESS:  I have 19 here.

11        MR. LEVY:  All right.  Here's 20.  Here's 21.

12             (The documents referred to above

13             were marked Plaintiffs' Exhibits 20

14             and 21 for identification by the

15             Certified Shorthand Reporter and are

16             bound separately and appended hereto.)

17   BY MR. LEVY:

18        Q    Can you tell us what Exhibit 20 is?

19        A    Exhibit 20 appears to be the CashCall Loan

20   Servicing Department policies and procedures.

21        Q    This particular one, if you'll look at the

22   second page, it's dated April 20th of 2006.

23        A    Correct.

24        Q    Have you ever seen this document before?

25        A    Yes, I have.

DEPOSITION OF SEAN BENNETT - 3/17/2010

1     Q    When did it first come to your attention?

2     A    I don't know when it first came to my

3  attention.  I believe it would have been when I was

4  assisting with the creation of the Loss Mitigation

5  policies and procedures for this manual.  But date, I

6  have no idea.

7     Q    Did you participate in the preparation of any

8  part of it?

9     A    Yes, the Loss Mitigation portion.

10    Q    That's all?

11    A    Yes.

12    Q    Do you have any knowledge as to how, if at

13  all, this policies and procedures manual was

14  distributed within the company?

15    A    I have no knowledge of if or how.

16    Q    Have you used it at all in your work?

17    A    Used it?  I don't really understand.  "Use

18  it" meaning reference it or --

19    Q    Do you reference it in your work?

20    A    I don't tend to reference it, no.  I would

21  only -- if we are changing something, then it would be

22  to make sure that it gets updated.

23    Q    Have you used it at all in supervising

24  CashCall employees?

25    A    Not directly, no.

1      Q    Have you specified that this manual be

2   distributed to the employees that you supervise

3   directly or indirectly?

4      A    I have not, no.

5      Q    Do you have any knowledge as to whether

6   that's been done?

7      A    I do not.

8      Q    Who was the person in charge of preparing

9   Exhibit 20?

10      A    There was a third party that came in and used

11   the information provided by department managers, the

12   vice-president.  I don't know who -- what her name

13   was.

14      Q    Who at CashCall was the lead person on this

15   project in preparing a policies and procedures

16   manual?

17      A    I believe it was Louis Ochoa.

18      Q    Do you know whether there was a version of

19   the policies and procedures manual before April of

20   2006?

21      A    Not to my knowledge.

22      Q    Is there a process at CashCall by which the

23   manual is updated?

24      A    No formal process, no.

25      Q    Has it been updated?

# Exhibit 2
# Submitted Conditionally
# Under Seal

# Exhibit 3

CONFIDENTIAL DEPOSITION OF BRUCE IAN CARLIN - 10/3/2013

1

1

2                    UNITED STATES DISTRICT COURT

3                  NORTHERN DISTRICT OF CALIFORNIA

4

5    EDUARDO DE LA TORRE and LORI          )
     KEMPLY (formerly known as LORI        )
6    SAYSOURIVONG), individually and on    )
     behalf of all others similarly        )
7    situated,                             )
                                           )
8                      Plaintiffs,         )
                                           )
9         vs.                              )  CASE NO.
                                           )CV 08-3174-MEJ
10   CASHCALL, INC., a California          )
     corporation; and DOE 1 through DOE    )
11   50, inclusive,                        )
                                           )
12                     Defendants.         )
     _____)

13

14

15

16   Deposition of:  BRUCE IAN CARLIN

17   Date and time:  Thursday, October 3, 2013, 9:07 A.M.

18   Location:       11355 West Olympic Boulevard
                     Los Angeles, California
19

20

21

22

23    Reporter:

     Pamela Cotten, CSR, RDR
24   Certificate No. 4497
     Certified Realtime Reporter

25

CONFIDENTIAL DEPOSITION OF BRUCE IAN CARLIN - 10/3/2013

Page 12

1    producer or the -- or the intermediary who distributed

2    and advised, and, of course, we take into account the

3    fact that the intermediary earns money from

4    distributing the product and the producer earns a

5    profit as well.  And so the optimal law will split the

6    blame between two potentially culpable parties.

7    BY MR. LEVY:

8         Q     How in this paper you wrote, "Legal Protection

9    in Financial Retail Markets," do you take into account

10   that an advisor, you know, has personal interest in the

11   transaction?

12        MR. BROWN:   Objection.   Lacks foundation.

13        THE WITNESS:   What -- just to check, what does it

14   mean when it lacks foundation?   What does that -- what

15   does that mean?

16        MR. LEVY:   That means that Mr. Brown is making an

17   objection to the form of my question.

18        THE WITNESS:   Okay.

19        MR. LEVY:   Under the rules you are required to

20   answer it unless it is a question that you don't

21   understand or --

22        THE WITNESS:   But what does that "foundation" mean?

23   What is that objection?   I know there's lots of

24   different objections.   I just want to know what he

25   means when he says "lacks foundation."

CONFIDENTIAL DEPOSITION OF BRUCE IAN CARLIN - 10/3/2013

Page 13

1      MR. LEVY:   Perhaps Mr. Brown should explain it to

2  you.

3      MR. BROWN:   Yes.   I guess I can do it on the record

4  or off the record.

5          On the record.   I would say that the question

6  contains a premise that isn't necessarily -- hasn't

7  necessarily been established.

8      THE WITNESS:   Okay.   Okay.

9          I mean this paper is a theoretical paper.   The

10  advisor gets paid for -- you know, for getting the sale

11  to occur.   So they have an incentive to sell.   So they

12  might mis-sell a product and of course, if the consumer

13  is harmed, well then, you know, was it their advice or

14  was it something that the financial institution did.

15  BY MR. LEVY:

16      Q    When you say "mis-sell," what do you mean?

17      A    Put them in something that they didn't need

18  or, you know, when they understood what their needs

19  were and they gave them something they didn't need.

20      Q    Okay.   And would the incentives include, for

21  example, commission compensation to the advisor?

22      A    Sure.

23      Q    What other incentives other than the

24  commission compensation would you consider affecting

25  the analysis of an advisor?

Page 14

1      A      In that paper, I think that's pretty much it.

2      Q      Are there any others that come to mind that --

3   incentives that might cause an advisor to mis-sell?

4      A      Well, actually, reputation is something that's

5   usually a discipline device.  So, you know, if you are

6   always getting into trouble and, you know, you are

7   getting your clients into trouble, then word spreads

8   and that's a discipline device.  And, of course, the

9   regulation itself is a discipline device.

10     Q      Okay.  So in any of the three papers you

11  identified as within this area of financial education,

12  number 11, number 12, and the virality work-in-progress

13  paper, did any of those involve consumer lending?

14     A      Yes.  All three.

15     Q      Okay.  With respect to paper number 11 on your

16  list of finance publications, how did that involve

17  consumer lending?

18     A      As I recall, the subjects were asked -- you

19  know, they had a loan regarding home improvement, and

20  they were asked to allocate funds in their budgets to

21  decide how fast to pay off the home loan.

22     Q      So was this an empirical study?

23     A      It was an empirical study.

24     Q      Okay.  How large was the sample size?

25     A      I can't recall the -- I can't recall the

Page 27

1     Q     So do your opinions in this case rely upon the

2   advice or educational process you just described?

3     A     Actually, my opinions rely on an analysis of

4   how consumers behaved in servicing their loans once

5   they got them.  The consumers could see advertising,

6   they could go to a website, they had phone calls,

7   interactions, most of which, you know, through a

8   discovery process cannot be observed.  However, what we

9   can observe is how do they service their loans ex-post,

10  and that's what led me to make my conclusions.

11     Q     I understand what you are saying.  My question

12  is:  Leaving aside what you referred to as ex-post,

13  which I understand to be how they behaved after they

14  got the loan, do your opinions in this case rely on

15  what we might call an ex-ante educational process; that

16  is, either education or advice prior to taking out the

17  loan?

18     A     So in the section of my report "Background,"

19  where I go through the loan application process, I --

20  you know, I'm able to write about how terms of the loan

21  were disclosed during the process.  I also listened to

22  some telephone conversations of members of the class

23  getting that information.  So it appears that the

24  information was given to consumers.  But, again, the

25  question that I want to know is do people get it after

CONFIDENTIAL DEPOSITION OF BRUCE IAN CARLIN - 10/3/2013

Page 28

1    they get the loans, and that's why the ex-post analysis

2    really is the keystone.

3        Q    Okay.  So if I understand your testimony

4    correctly, you are saying that you definitely are

5    relying on the ex-post analysis of how the consumers

6    behaved; is that correct?

7        A    Well, it depends on how you use the word

8    "definitely."  I'm for sure doing that, but I'm also

9    considering the disclosures that were made in

10   promissory notes, the interactions that consumers had

11   with people at CashCall, and, you know, other things in

12   the discovery process.

13       Q    Okay.  Well, my question for you is:  Leaving

14   aside the consumer behavior after the loans and the

15   disclosures that are in the promissory notes as such,

16   are you relying, in your opinions, on the information

17   and disclosures that were provided to borrowers by loan

18   agents in the process leading up to signing the loan?

19       MR. BROWN:  Objection.  Asked and answered and

20   vague and ambiguous.

21       THE WITNESS:  I feel that I've answered that

22   question.

23   BY MR. LEVY:

24       Q    Well, you said you considered it, but are you

25   relying on it?  I haven't got a clear answer on that.

Page 36

1    there was an advisor or financial education process in

2    the form of the information that was provided by the

3    loan advisors; correct?  Information that was provided

4    by the loan agents.  Was that correct?

5        A    Well, there was no formal advisor, because

6    they weren't hired on as an advisor, but the agents

7    that dealt with the borrowers conveyed information that

8    was important regarding the loan, and you could

9    consider that to be educative.

10       Q    Do you consider that to be financial education

11   as you used that term in Paragraph 2 of your report?

12       A    Well, it is not formal education, like a

13   didactic thing.  However, whenever the terms are

14   clearly disclosed and a recommendation is made, for

15   example, to pay off a loan early, that would be -- I

16   would consider that to be educative.

17       Q    Okay.  What about advice, do you consider that

18   the process of providing information by the CashCall

19   loan agents before signing a loan to be advice

20   within -- as you have used that term in Paragraph 4 of

21   your report?

22       A    Well, specifically recommending to pay it off

23   quickly and to try to do that.  I would constitute that

24   as an advisory statement, yeah.

25       Q    Okay.  Are there any other advisory statements

Page 37

1   other than to pay it off quickly?

2      A      I'd have to look back.   I mean in some of the

3   telephone conversations they helped people compute what

4   their interest payment would be given different pay-off

5   scenarios.   So in discussing that with them, I could

6   imagine that providing, you know, information that's

7   important to make their decision.

8      Q      Do you have any information as to how the loan

9   agents were compensated?

10     A      Yes.   My understanding in talking with Hilary

11  Holland was that they were compensated based on dollar

12  volume.

13     Q      Dollar volume of what?

14     A      The amount of dollars of loans that they would

15  sell in a month basically.

16     Q      Okay.

17     A      Or -- so let's suppose I was able to sign up

18  ten people at $2,600.   That would be 26,000.   That

19  would be my loan dollar volume.   So based on that, my

20  understanding is that there were compensation and

21  incentives and bonuses for performance --

22     Q      Okay.

23     A      -- on that.

24     Q      So your understanding that the more loans that

25  got placed by a loan agent, the higher the compensation

CONFIDENTIAL DEPOSITION OF BRUCE IAN CARLIN - 10/3/2013

Page 38

1   would be?

2       A      The higher the dollar volume, yes.  If the

3   dollar volumes coordinated with more loans, yes.

4       Q      And did you consider that to be a conflict of

5   interest in the education or advice process?

6       A      You know, it has a potential to be a conflict.

7   I didn't -- I didn't see any evidence that it actually

8   caused a conflict of interest, but certainly paying

9   people a bonus for placing loans could.

10      Q      Did you take that into account in your

11  analysis?

12      A      Yeah.  I thought about that.

13      Q      Okay.  How did you think about it?

14      A      Well, I wanted -- when I listened to some of

15  the calls, I wanted to see, you know, what was the tone

16  of the agent's voice, what -- you know, were they

17  pushy, were they trying to obscure information from the

18  potential borrower, you know, were they acting like a

19  used-car salesman would act to hide things or were they

20  forthright and reasonable, and they appeared to be

21  reasonable.  I haven't heard a recording where somebody

22  was outwardly deceptive.

23      Q      Okay.  Would you agree that the commission

24  compensation would create an incentive that a loan

25  agent might mis-sell the loan to a consumer?

Page 39

1      MR. BROWN:   Objection.   Incomplete hypothetical.

2      THE WITNESS:   Hypothetically, it could, but I

3   didn't see any evidence for it in this case.

4   BY MR. LEVY:

5      Q      Any evidence to the contrary that you saw was

6   the recordings that you listened to?

7      A      Yes.   And -- I'm trying to think of other

8   things.

9      Q      Go ahead.

10     A      I mean the training manual -- I think -- I'm

11  trying to recall, but I believe that it was the

12  McCarthy -- it was Myles McCarthy who he said that

13  people would be fired if they didn't go over the loan

14  terms and that this was made clear in the training.

15     Q      Okay.

16     A      I am not exactly sure if it was Myles McCarthy

17  or if it was Ethan Post.   I think it was Myles

18  McCarthy.

19     Q      Okay.   I --

20     MR. BROWN:   We have been going about an hour.   Is

21  this a good time?

22     MR. LEVY:   Could I just -- you know, I wanted to

23  finish up this little segment in terms of Professor

24  Carlin's work.   I think this will take maybe five

25  minutes.   If we go more than that, we will take a

CONFIDENTIAL DEPOSITION OF BRUCE IAN CARLIN - 10/3/2013

Page 151

1   understand the terms of the loan or that they just

2   appeared to understand them?

3       A    Well, the only way you would know if they

4   understood them is to interview each one of them, but,

5   you know, looking at, you know, some of the class

6   members, you know, their -- you know, their phone calls

7   and so forth and also looking at their behavior, the

8   behavior was consistent with a good understanding.

9       Q    And how was the behavior consistent?

10      A    Well, one of the main messages from the

11  disclosures was that CashCall strongly encourages their

12  borrowers to pay off the loan as soon as possible, and

13  they say it is because of a very high interest rate.

14  So the idea here is if people didn't really understand

15  that, they didn't understand that it was a high

16  interest rate and that, you know, they were paying a

17  lot of interest charges, they would just hold these

18  loans for long periods of time, but they repaid them

19  very fast.  It seems like they understood that.

20      Q    Okay.  What, in your opinion, are the

21  principal drivers of the prepayments of these loans?

22      A    Well --

23      MR. BROWN:  Objection.  Vague and ambiguous.

24      THE WITNESS:  Drivers meaning the causes of whether

25  someone could repay a loan or the reasons -- maybe you

Page 152

1    can ask again.

2    BY MR. LEVY:

3       Q      I believe you use the term in your report.

4       A      Drivers are typically the main causes.

5       Q      I'm willing to live with that.

6       A      Okay.   So first and foremost is that they have

7    money, that, you know, they are not constrained.

8              Second of all, they make a decision to repay

9    debt that has high interest costs as opposed to others

10   that have low.

11             And so to the degree they have the cash to

12   basically pay back a loan with high interest costs,

13   they will do it.

14      Q      Okay.   Is the -- strike that.   I'll just

15   direct you to another paragraph of your report.

16             If you look at Paragraph 50.   Okay.   You

17   state:

18             "The fact that borrowers who took

19        out multiple loans repaid their loans

20        even more quickly than the rest of the

21        class indicates that a subset of the

22        class correctly understood the loans

23        were a source of temporary financing."

24             Do you see that there?

25      A      Yes.

Page 152

1   can ask again.

2   BY MR. LEVY:

3     Q    I believe you use the term in your report.

4     A    Drivers are typically the main causes.

5     Q    I'm willing to live with that.

6     A    Okay.  So first and foremost is that they have

7   money, that, you know, they are not constrained.

8           Second of all, they make a decision to repay

9   debt that has high interest costs as opposed to others

10  that have low.

11         And so to the degree they have the cash to

12  basically pay back a loan with high interest costs,

13  they will do it.

14    Q    Okay.  Is the -- strike that.  I'll just

15  direct you to another paragraph of your report.

16         If you look at Paragraph 50.  Okay.  You

17  state:

18         "The fact that borrowers who took

19    out multiple loans repaid their loans

20    even more quickly than the rest of the

21    class indicates that a subset of the

22    class correctly understood the loans

23    were a source of temporary financing."

24         Do you see that there?

25    A    Yes.

Page 153

1    Q    When you say "correctly understood," are you

2  saying that your understanding of this 2600-dollar loan

3  product was that it was intended as temporary

4  financing?

5    A    Yes.

6    Q    Also, in Paragraph 55 on page 19, okay, you

7  refer to a short-term liquidity solution.

8         Do you see that there?

9    A    Yes.

10    Q    Is that the same as temporary financing?

11    A    Yes.

12    Q    So is another driver of repayments whether the

13  borrowers understood that these loans were temporary

14  financing as opposed to meet long-term needs?

15    A    I guess I don't understand the question.

16    Q    Okay.  So you mentioned drivers first and

17  foremost, they had to have the resources, and,

18  secondly, another driver was a high interest rate.

19    A    Uh-huh.

20    Q    My question for you:  Isn't a third driver the

21  borrower's understanding that this was a temporary fix

22  and not a long-term solution?

23    A    Yeah.  I would say.

24    Q    So, for example, somebody could take out one

25  of these loans expecting a tax refund or a bonus or

Page 154

1    something like that and expect to pay it back in a

2    short period of time; correct?

3        A    Yes.   And there's evidence that people did

4    that.

5        Q    So if you could turn to Exhibit 4 of your

6    report.

7        A    Okay.

8        Q    I take it the statistics here were generated

9    from the -- mostly Excel spreadsheets that Cornerstone

10   provided you?

11       A    Yes.

12       Q    Okay.   And I think you testified earlier that

13   Cornerstone analyzed these under your direction?

14       A    Yes.   And these were spreadsheets that were

15   given to us by CashCall.

16       Q    I'm sorry?

17       A    Given to Cornerstone by CashCall.   CashCall

18   gave the data to Cornerstone; Cornerstone provided it

19   to me.

20       Q    Did Cornerstone generate this Exhibit 4?

21       A    With me.

22       Q    Okay.

23       A    Yeah.

24       Q    And why did you break this down by

25   modification status?

Page 224

1      A     So if they ask me to do things, I will, but

2   what I've done is what I've done.

3      Q     All right.   In your paper, "What Does

4   Financial Literacy Training Teach Us," you state:

5            "Financial literacy is defined as

6       'the ability of people to make financial

7       decisions in their own best short- and

8       long-term interest' (Mandell" --

9       M-a-n-d-e-l-l -- "2008).   Unfortunately,

10       this skill is in short supply in the

11       United States."

12            Do you still agree with that statement?

13      A     Yes.

14      Q     In your paper entitled "Legal Protection in

15   Retail Financial Markets," you state:

16            "Given the large size of retail

17       markets, protecting consumers who are

18       'unable to fend for themselves' is not

19       only an important duty of the law, but

20       also a key driver of participation in

21       the market and economic growth."

22            Do you still agree with that statement?

23      A     Yes.

24      Q     In your paper entitled "Strategic Price

25   Complexity in Retail Financial Markets," you considered

# Exhibit 4

```
                                                      1
 1

 2                 UNITED STATES DISTRICT COURT

 3               NORTHERN DISTRICT OF CALIFORNIA

 4

 5   EDUARDO DE LA TORRE and LORI        )
     KEMPLY (formerly known as LORI      )
 6   SAYSOURIVING), individually and on  )
     behalf of all others similarly      )
 7   situated,                           )
                                         )
 8                    Plaintiffs,        )
                                         )
 9          vs.                          )   CASE NO.
                                         )CV 08-3174-MEJ
10   CASHCALL, INC., a California        )
     corporation; and DOE 1 through DOE  )
11   50, inclusive,                      )
                                         )
12                    Defendants.        )
     _____)
13

14

15

16   Deposition of:  JOHN STEPHEN FULLER

17   Date and time:  Friday, August 9, 2013, 10:05 A.M.

18   Location:       445 South Figueroa Street
                     Los Angeles, California
19

20

21

22

23     Reporter:

24     Pamela Cotten, CSR, RDR
       Certificate No. 4497
25     Certified Realtime Reporter
```

Page 43

1    BY MR. CONNOLLY:

2        Q    You can answer the question.

3        MR. COHEN:  You can answer.

4        THE WITNESS:  Depending on how you define

5    competition.  If -- if you are saying competition in

6    terms of obtaining cash in order to meet a need, yes.

7    There's various competitors.

8            (Off-the-record discussion.)

9        THE WITNESS:  I guess -- yeah, so if they're --

10   sources for people that need money for a short-term

11   need, yes, there are sources out there.

12   BY MR. CONNOLLY:

13       Q    What makes it unique in your view?

14       A    Well, the -- unfortunately, banks in the past

15   ten years are not interested in lending people money

16   unless it is for a house or something like that.

17           One of the other alternatives are payday

18   advance operations, and the problem with those is

19   that -- or the way they differ from CashCall is that

20   they provide a much lower amount of money that doesn't

21   always completely solve the problem of the short -- or

22   it is not able to fix the short-term need, and so

23   CashCall, when it came out, you know, looked at the

24   ability to repay as opposed to just the credit profile.

25       Q    You talked a little bit about some of the

Page 90

1  business, and a way to do that is to utilize national

2  media that reaches more states, more markets.

3      Q    In fact, it might go without saying, there's a

4  direct correlation between the amount of advertising

5  money you are spending and the number of calls

6  generated.  Is that right?

7      MR. COHEN:  Object.  That's vague and ambiguous and

8  overbroad.

9          You can answer.

10     THE WITNESS:  It seems like common sense that if

11  you are spending more money, you expect more results.

12  BY MR. CONNOLLY:

13     Q    And in fact, with the spike in annual

14  advertising budget that was experienced during that

15  time period starting with '05, did CashCall see a

16  measurable increase in cash -- call center volume?

17     A    I believe so.

18     Q    Was there direct coordination between your

19  agency and the call center operation of CashCall?  By

20  that I mean that you would alert them to when ads were

21  running so that they could expect additional calls?

22     A    Yes.  We would -- once the buy was made, they

23  would be cc'd on the media summary as to what was going

24  to take place the following week.

25     Q    Who would you coordinate with at CashCall in

Page 91

1    that regard?  Was it Ms. Holland?

2       A    Yeah.  Typically it was -- during that time

3    period it was Ms. Holland was cc'd on those by summary,

4    those media buy summaries, so the assumption was she

5    was aware and could see what the activity was so she

6    could do what was appropriate.

7       Q    Okay.

8       A    That's my assumption, but did we ever

9    coordinate directly with her and tell her that you need

10   to have, you know, more people?  No.  It was just a

11   matter of informing her as to what the planned activity

12   was.

13      Q    Would there ever be any accompanying estimate

14   of "And you are likely to experience X number of

15   additional calls"?

16      A    Periodically we say based on the cost-per-call

17   last week, then at that same cost per call with this

18   many dollars being spent with this assumed clearance

19   rate, then this would be the call volume that you would

20   expect.

21      Q    And clearance rate means when the ads are

22   actually shown?

23      A    Yes, because in direct response, all of the

24   ads don't actually run.

25      Q    Right.  We touched on this a little bit

DEPOSITION OF JOHN STEPHEN FULLER - 8/9/2013

Page 93

1   a station or a network, and in order to get the best

2   pricing, you are buying daytime, which may run from

3   10:00 A.M. until 5 P.M., or you may be buying early

4   morning, which is 5:00 A.M. to 10:00, or you might be

5   buying overnights which is, you know, 11:30 or midnight

6   until 5:00 A.M.  And what you are doing is you are

7   getting a number of spots that the station or the

8   network then have the latitude to run whenever they

9   want.

10      Q     Did CashCall purchase ad time during all the

11   time frames, or was it limited to day parts or other

12   time frames?

13      A     We would run -- in the initial years, because

14   the call center was not manned 24 hours a day, seven

15   days a week, we would limit airings until about 8:00

16   P.M.  After a few years, we could go ahead 24-7, and so

17   therefore then spots did air at all times of the day

18   and night.  For example, in cable TV many of the cable

19   networks if you buy a spot in Discover and it is in --

20   what's that gold mining show or something like that.

21   But what happens is they rerun that show at two o'clock

22   in the morning, and your spot is in it there, too.  Not

23   that that spot is worth much, but it is there.  So

24   advertising was running all the time.

25      Q     Is the buy based on time frame and show?

DEPOSITION OF JOHN STEPHEN FULLER - 8/9/2013

Page 98

1      A     No.  We never did studies or research on

2   CashCall because, as I said, research is -- provides

3   you with indications of reality, indications of

4   potential reality.  Direct response and CashCall, we

5   had actual reality day after day after day, so the --

6   you would say, okay, we are going to try this stuff

7   this week.  How does it work.  And you got the actual

8   numbers.

9      Q     As an advertising professional for a long

10  time, did you develop any opinions or theories as to

11  why certain kinds of shows were working better than

12  others in terms of generating higher volumes of calls

13  for CashCall?

14     A     I'd say rather than higher volumes of calls,

15  calls at a better cost per call.

16     Q     Okay.

17     A     Because, you know, you got a network program

18  versus a spot station.  This may generate a nice cost

19  per call.  This may generate a higher cost per call.

20  This is more attractive.  It is lower call volume, but

21  it is at a better cost per call.

22            I would say that the -- not just with CashCall

23  but with direct response in general, the best typically

24  television programming is low-involvement programs, and

25  that means that things like reruns of sitcoms, reruns

DEPOSITION OF JOHN STEPHEN FULLER - 8/9/2013

Page 99

1    of movies, reruns of game shows, judge shows which

2    tended to be reruns as well, they are programs that the

3    TV is on, the program is there, but you don't have a

4    problem walking away from the TV set for a little bit

5    because you've either seen the movie before, you have

6    seen I Love Lucy before, you kind of know what's going

7    on.

8              On the flip side, live sporting events are

9    horrible because people are paying attention to what's

10   going on.  They are not going to walk away from the TV

11   unless it is to go to the bathroom or grab a glass of

12   water or another beer.

13       Q    Have you seen or done any specific analyses or

14   studies around the concept you just described where

15   high-involvement programs tend to generate a better

16   return rate on calls?

17       A    No.  The only evidence is empirical in terms

18   of actual numbers.

19       Q    Let's turn to radio, and I believe we have

20   been focused on TV with regard to the last series of

21   questions and answers.

22             Are there any additional factors or

23   considerations at work in the placement of radio ads,

24   or are they the same basic concepts that we have been

25   talking about?

Page 113

1    Q    If you could look at page 19 of the chart

2    entitled "Applicant Demographics."

3         Have you ever seen this type of chart before

4    from CashCall?

5    A    Wow.  No.

6    Q    Any familiarity with the type of information

7    that CashCall has placed into the chart, namely

8    percentages of consumers who fall into certain

9    categories or demographics?

10   A    Is -- okay.  I'm not sure what you just

11   described is what this chart describes.

12   Q    It looks like it provides different

13   percentages based on the stated need for the money from

14   the customers.

15   A    Okay.  From applicants, not consumers.  Okay.

16   Q    Right.  Have you ever seen any information

17   like this from CashCall?

18   A    No.  I've never seen information like this,

19   although in discussions that we had periodically, we

20   talked about things like this.

21   Q    Could you elaborate on that.  What kind of

22   things did you talk about?

23   A    Well, for example, when it comes to debt

24   consolidation, what does that mean?  And it ranges from

25   I got too many small bills and I want to put them into

Page 114

1    one, which is what people think it logically means, but

2    other ways of looking at this was that I kept getting

3    these over -- these late fees and these overdraft --

4    not overdraft, what do you call it on a credit card or

5    something -- overlimit fees and everything else, so we

6    needed to bring those things down, so.

7            As I said, it -- the need varied.  In fact,

8    that's why very seldom did we talk about specific needs

9    in advertising because there were thousands of

10   different reasons that people would have for needing

11   cash in a hurry.

12       Q    You do recall specific conversations around

13   the concept that the money could be used for debt

14   consolidation?

15       A    Well, not that -- in fact, we would never --

16   we were very careful.  We never said debt consolidation

17   because the discussion we had was the same one that I

18   just made, which was to the rational person, debt

19   consolidation means you are consolidating your debt in

20   one thing, and that's not necessarily why the majority

21   of people were doing that.  They were trying to get out

22   from under situations in certain parts of their debt

23   that were causing them discomfort.

24       Q    Including being overdrafted on their credit

25   cards?

Page 115

1    A    Yeah.  Quite possibly.  Like I said, it was

2  just a discussion as to there is no one definition of

3  why anyone is getting a loan from CashCall.

4    Q    I get that, but I also am hearing that there

5  were specific discussions around reasons specifically

6  that the cash was being sought, one of which you just

7  testified to.  Another of which, in this chart, is

8  called emergency.  Did you ever have any discussions

9  with CashCall along those lines, that people in

10  emergency situations would seek out these loans?

11    A    Only in the sense that when we would ask,

12  okay, so why are people getting a loan, for what

13  purposes are they using it, and we would get anecdotal

14  stories as to, "Well, I had a caller that her mom died

15  and she didn't have the cash to buy a plane ticket and

16  go back to Minnesota for the funeral and pay for the

17  funeral" to the guy that said, you know, he has a

18  gardening business and his transmission just blew up,

19  and he can't make money if he doesn't have his truck

20  fixed.  Now, I don't know whether those are one-time

21  expenditures or whether those are emergencies or where

22  one is one and one is the other.  I don't know because

23  I haven't seen this before, but that was the kind of

24  thing that we would talk about, and it -- oftentimes it

25  would come up because I think, just as you are trying

DEPOSITION OF JOHN STEPHEN FULLER - 8/9/2013

Page 116

1    to think, many new creative people at the agency would

2    say, "I think it is much more -- we got to get, like, a

3    consumer and say I had this problem, and I got the

4    money from CashCall and it fixed the problem."  And the

5    discussion we would have with the client each time was,

6    but you talk about one specific instance.  There's 999

7    other instances that are not that.  So 99% of the

8    people don't have that problem.  So to the extent that

9    you talk about a problem or even a type of problem, you

10   are excluding the vast majority of the consumers.

11       Q    Was that advice that you gave back to CashCall

12   when they would discuss specifically reasons why the

13   money was being sought?

14       A    It was kind of in discussion that we would all

15   agree upon that it made no sense to focus on specific

16   uses or need but rather than the over -- the general

17   need of needing money fast for -- to get past a

18   problem.

19       Q    To ask the question more directly, was there

20   ever a situation where as a result of the discussions

21   between K/F and CashCall relating to that you were

22   hearing the consumers were using the money for

23   emergencies or because they were maxed out on their

24   credit cards, did that information translate into

25   decision making about what kind of media to purchase?

DEPOSITION OF JOHN STEPHEN FULLER - 8/9/2013

Page 121

1    BY MR. CONNOLLY:

2        Q    It is no mere accident how ads are worded.

3            So one common statement in the ads is, you

4    know, "If you run into trouble and need cash, make the

5    call."

6        A    Yeah, I don't think that's a recurring theme.

7    That might have been in one or two.

8        Q    Okay.  So that implies that the target there

9    would be -- and you can correct me if I'm wrong -- but

10   it certainly implies that the target would be people

11   who have financial trouble.  Is that right?

12       A    Well, I don't know whether they have financial

13   trouble, but they have the need.  The trouble that they

14   have is that they don't have the cash in hand that they

15   need for some purpose.

16       Q    Another statement is, "Call anytime day or

17   night."

18       A    Uh-huh.

19       Q    Meaning that there's no obstacle.  The phones

20   are ready.  You need the cash fast, you can call us

21   anytime.

22            Is that what's being stated there?

23       A    No.  What's being stated there is that if you

24   see this commercial at eleven o'clock at night, you

25   don't think you have to wait until business hours, you

Tornell & Cotten Professional Court Reporters
(714) 543-1600

Page 122

1   know, conventional business hours, nine o'clock the

2   next morning when you might forget or forget the

3   number.   So, again, it is direct response TV, direct

4   response radio.   You want them to respond as quickly as

5   possible, so you are trying to reassure them that if it

6   is 2:00 in the morning, there's still somebody there

7   who will answer the call.   You don't have to wait until

8   tomorrow.

9        Q    Does that tend to suggest -- and you alluded

10   to this earlier -- that CashCall does attract impulsive

11   customers?

12        MR. COHEN:  Calls for speculation.

13            You can answer.

14        THE WITNESS:  Yeah.  I don't -- I don't believe

15   that what I said -- I don't think I ever used the word

16   "impulsive customers."  I think that 24-7 is the same

17   reason that CVS has a big sign on the outside of their

18   buildings that says they are open 24 hours a day, seven

19   days a week, so that if you are driving by, you can

20   come in and purchase at that time as opposed to trying

21   to remember to come back at some other time where you

22   might be diverted into a Rite Aid instead of going to

23   them.

24   BY MR. CONNOLLY:

25        Q    Your earlier testimony was that the -- at

DEPOSITION OF JOHN STEPHEN FULLER - 8/9/2013

Page 125

1    over time across ads -- really emphasizes the

2    affordable monthly payments.  Is that consistent with

3    your recollection?

4        A     For a period of a couple of years, yes.

5        Q     Did that change at some point?

6        A     It hasn't been in all of the advertising, and

7    I don't believe it has been in the advertising for the

8    last few years.

9        Q     Okay.  Quote, "Just over $200 per month."

10             Did you have any input into setting the

11   monthly repayment amount?

12       A     No.

13       Q     Was there a specific marketing decision made

14   around an emphasis being placed on "affordable monthly

15   payments," quote-unquote?

16       A     Could you ask that again.

17       Q     Sure.

18             (Record read as follows:

19             "Question:  Was there a specific

20       marketing decision made around an

21       emphasis being placed on 'affordable

22       monthly payments,' quote-unquote?")

23   BY MR. CONNOLLY:

24       Q     Or was there a specific decision to highlight

25   the monthly payment amount?

Tornell & Cotten Professional Court Reporters
(714) 543-1600

Page 126

1      A      That was the result of a discussion that many

2    Americans make financial decisions based upon what they

3    can afford each month, what is that monthly payment as

4    opposed to an interest rate or APR.   It is true in the

5    mortgage business and in car payments and everything

6    else.   And so that was a decision that said, okay,

7    let's treat this just as the consumers treat car

8    payments, mortgage payments, rent, phone bills,

9    everything else.   They are looking at what's the

10   monthly payment and can I afford it.

11      Q      So your belief is that the customers do not

12   focus on the interest rate level --

13      MR. COHEN:   Object.

14   BY MR. CONNOLLY:

15      Q      -- relative to the monthly payment level?

16      MR. COHEN:   Objection.   Mischaracterizes testimony.

17      THE WITNESS:   Yeah.   I don't know that fact.   I'm

18   talking to the fact of the affordable monthly payments,

19   that that is what consumers look at.   I didn't say to

20   the exclusion of other things.

21   BY MR. CONNOLLY:

22      Q      Was a decision made in, I will say, before

23   2007 to emphasize what are called affordable monthly

24   payments while not mentioning at all or deemphasizing

25   interest rate level?

DEPOSITION OF JOHN STEPHEN FULLER - 8/9/2013

Page 130

1    BY MR. CONNOLLY:

2        Q    Exhibit 77, let's flip back to that.

3        MR. COHEN:   You can use this.

4    BY MR. CONNOLLY:

5        Q    Going back to page 14.  Below the first bullet

6    it states:

7             "The company works with an outside

8        advertising agency that manages

9        placement of advertisements and tracks

10       and interprets response and conversion

11       rates."

12            I want to talk to you now about what kind of

13   steps were taken to track and interpret response and

14   conversion rates as part of the CashCall advertising

15   program.  How would you measure response and conversion

16   rates?

17       A    First of all, I had no input in writing that

18   line, and I've not seen this document before.  So what

19   I'll respond to is what we did --

20       Q    Okay.

21       A    -- which is we track response.

22       Q    How do you do so?

23       A    By cost per call on a daily basis.  How much

24   money was spent yesterday, how many calls came in,

25   divide one by the other and you get a cost per call.

Page 140

1      Q     I agree.  So, therefore, did you factor that

2   into account in determining that those genres might be

3   the most cost effective to drive results?

4      A     No, not really.  What we are looking at is if

5   you look -- is the cost per call.  You get, like, a

6   four dollar -- I mean a cost per thousand,

7   three-or-four-dollar cost per thousand, that's going to

8   work whether you are selling Time Warner records or

9   books or, you know, Lime Away, you know, bathroom

10  cleaners, whatever it is.  If you can get the spots

11  cost effectively enough, you are going to be able to

12  generate enough business to make it cost effective on a

13  results basis.

14     Q     And that's without any regard to the kind of

15  audience that would naturally be attracted to certain

16  types of genres?

17     A     Correct, because the audience we were

18  interested in is right here, adults 25 to 49.

19     Q     Page 4, bullet point entitled "Call Spike

20  Factors."

21           What is referred to by that?

22     A     Classic direct response in the old days when

23  they were two-minute commercials or a minute commercial

24  at least, individual programs, individual networks,

25  individual stations would have specific phone numbers

DEPOSITION OF JOHN STEPHEN FULLER - 8/9/2013

Page 141

1    so that you would be able to track exactly what that

2    program, how many calls it generated.  With CashCall,

3    we used one phone number, the (866) 590-CASH, so all we

4    could do would be to take a look at call volume and

5    look for spikes in calls and then try to match that up

6    with what aired, you know, within, you know, ten

7    minutes ahead of time of that group of calls.  So we

8    would -- that's -- we were trying to identify what was

9    driving the calls.  It's imperfect because it is one

10   phone number, and very often you would find out that

11   there were three different things that aired in the ten

12   minutes preceding.  So you don't know so you just kind

13   of look over time and make some -- make some

14   assumptions and some educated guesses.

15        Q    What does BET refer to?

16        A    Black Entertainment Television.

17        Q    Why is that specified or targeted in terms of

18   a specific show on a specific network?

19        A    It was -- again, this is what we learned.  It

20   was not targeted.  That is where we identified some

21   call spikes after spots ran.  So what this says here is

22   that we identified spike in call volume associated with

23   spots that had aired on Black Entertainment Television.

24   We also identified that there were call spikes after

25   movies, typically reruns of movies ran on networks, and

DEPOSITION OF JOHN STEPHEN FULLER - 8/9/2013

Page 142

1  to the extent that some of the more popular syndicated

2  shows that I was referring to before, when they aired

3  at about the same time, we could kind of assume and see

4  that it looks like that syndicated show caused the call

5  spike, so.   That's what this says is that we learned

6  that these three kinds of things seemed to be

7  generating call volume.

8      Q      Did you ever further analyze why call spikes

9  were occurring when ads ran on BET?

10     A      No.

11     Q      What about same question with regard to

12 movies?

13     A      No.  This says that this is what happened.

14     Q      I'm asking did you ever ask why.

15     A      Well, the answer, in my opinion, is that, as

16 I've said before, these programs tend to be

17 low-involvement type of programs or networks so that

18 people are able to go ahead and pick up the phone

19 because they don't need to see how this thing turns out

20 because they have already seen it three times in the

21 past.

22     Q      Is it also possible, to your knowledge, that

23 viewing audiences associated with those networks or

24 genres are more inclined to utilize a CashCall

25 unsecured loan product?

DEPOSITION OF JOHN STEPHEN FULLER - 8/9/2013

Page 166

1  well as real modern-day soap opera type things.  So you

2  reached a variety of people.

3      Q      And what was the term you used again for those

4  shows as to why you felt they would be higher

5  generators of calls?

6      A      Well, I -- it may not be these, but I'm saying

7  in general low-involvement programming tends to do

8  better than high-involvement programming, because if it

9  is high involvement you don't even want your wife to

10  ask you a question.  If it is low involvement, she can

11  ask away.  You still don't listen, but -- I got to quit

12  playing to you.

13          (Off-the-record discussion.)

14  BY MR. CONNOLLY:

15      Q      Page 9 notes, "Saturday and Sunday are now

16  strong call volume days."

17      A      Uh-huh.

18      Q      What was that attributed to?

19      A      I assume that that's attributed to the fact

20  that we were actually advertising more on Saturday and

21  Sunday whereas originally we weren't because the call

22  center wasn't open or staffed 24-7 in the first couple

23  years, and so it said that if you spend money on

24  Saturday and Sunday, you get calls.

25      Q      And page 10 notes that with regard to learning

# Exhibit 5

1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KRISTA O'DONOVAN, EDUARDO DE       )
LA TORRE, individually and on      )
behalf of all others similarly     )
situated,                          )
                                   )
                Plaintiffs,        )
        vs.                        )
                                   ) CASE NO.
                                   ) CV 08-3174-MEJ
CASHCALL, INC., a California       )
corporation; and DOE 1 through     )
DOES 1 - 50, inclusive,            )
                                   )
                Defendants.        )
_____)

Deposition of:  HILARY E. HOLLAND

Date and time:  Tuesday, July 9, 2013, 9:15 a.m.

Location:       625 Town Center, 14th Floor
                Costa Mesa, California

 Reporter:

 Deborah L. Chadwick, CSR
 Certificate No. 4146

DEPOSITION OF HILARY E. HOLLAND - 7/9/2013

20

1      A.   What do you mean by "responsible"?

2      Q.   We're going to get into more of a discussion

3  of that.

4      A.   Uh-huh.

5      Q.   But at this point, just so I'm understanding

6  you correctly, and, perhaps, I should ask it this way:

7  Do you personally have any involvement in the

8  advertising program within CashCall?

9      A.   To a small extent, yes.

10      Q.   What is your role in the advertising process?

11      A.   Sometimes when they feel like it, they ask for

12  my opinion on a commercial, as far as creative goes or,

13  you know, basic tasks.  I also get e-mailed spot times

14  of when advertisements are running so I can properly

15  staff.

16      Q.   If you know, who would you say within CashCall

17  is more directly responsible for the advertising

18  program?

19      A.   Responsible in what way?

20      Q.   Who is the main contact within CashCall for

21  any outside ad agencies that CashCall uses?

22      MR. COHEN:  Objection; vague and ambiguous.

23          You can answer.

24      THE WITNESS:  Yeah, I mean, it's -- you know, it's

25  divided among a lot of people.

# Exhibit 6

*Krista O'Donovan et al. v. Cashcall, Inc.*

U.S. District Court Northern District of California No. 3:08-cv-03174-MEJ

# EXPERT REPORT

**Adam Levitin**

**GEORGETOWN LAW**

**600 New Jersey Avenue N.W.**

**Washington, DC 20001**

## EXPERT REPORT OF PROFESSOR ADAM J. LEVITIN

### Introduction

1.  My name is Adam Jeremiah Levitin.  I was retained by the Sturdevant Law Firm ("Counsel"), on behalf of the executive committee representing the plaintiff class (the "Plaintiff Class") in *O'Donovan v. CashCall, Inc.*, No. C-08-03174 MEJ (N.D. Cal.) to provide expert testimony regarding the consumer finance industry in relation to the question of unconscionability of certain loans made by defendant CashCall, Inc. ("CashCall") and Does 1-50 (collectively with CashCall, the "Defendants").

2.  I have read the Fourth Amended Complaint (the "Complaint") in this litigation and am so acquainted with the allegations in this case regarding the conduct of the Defendants.

3.  I have also read the Court's decision on class certification and am so familiar with the definition of the Plaintiff Class, namely all California residents who "borrowed between $2,500 and $2,600 at an interest rate of 90% or higher from CashCall, Inc., for personal, family, or household use at any time from June 30, 2004, to the present." I am also informed by Counsel that the class period closed on July 10, 2011, when CashCall adopted a provision in its loan contracts that required that disputes be resolved via arbitration and waived borrowers' right to class-wide claim resolution.

### Professional Background and Qualifications

4.  I am a tenured Professor of Law at the Georgetown University Law Center in Washington, D.C., where I have taught since 2007.   I teach courses in consumer finance, contracts, commercial finance, bankruptcy, payment systems, and structured finance.  Among the topics I cover in my consumer finance course are unsecured consumer installment loans ("signature loans"), antitrust issues in financial services, unconscionability (including under California law), and unfair and deceptive acts and practices, including California Business and Professions Code section 17200 *et seq*.

5.  I also currently serve as a Directorial appointee to the statutory Consumer Advisory Board of the Consumer Financial Protection Bureau ("CFPB"), created under 12 U.S.C. § 5494. The views expressed in this opinion are solely my own and not those of the Consumer Advisory Board or the CFPB.

6.  From 2008-2010 I served as Special Counsel to the Congressional Oversight Panel that supervised the Troubled Asset Relief Program (TARP).  In that position I was in charge of the Oversight Panel's extensive reporting on the government's response to the mortgage crisis.

7.  I have also previously served as the Bruce W. Nichols Visiting Professor of Law at Harvard Law School; as the Robert Zinman Scholar in Residence at the American Bankruptcy Institute; as a faculty member for the Practicing Law Institute's Consumer Financial Services program; and as the faculty instructor for the Federal

Trade Commission's training program for its Division of Financial Practices personnel.

8.     Since 2008, I have testified twenty times before Congress regarding consumer finance regulation.  I have also testified regarding consumer finance before the Financial Crisis Inquiry Commission and twice before the Government Accountability Office.

9.     I have served as an expert for the Federal Deposit Insurance Corporation and for the Federal Trade Commission in litigation involving subprime credit cards and for the New York Attorney General in relation to the National Mortgage Servicing Settlement, as well as a Volunteer Deputy Attorney General for the State of Delaware unfair and deceptive acts and practices litigation.  I have also served as an expert in several private litigations relating to consumer finance.

10.    I have presented on consumer finance topics at CFPB, Federal Reserve, FDIC, FTC, and industry conferences, and I consult informally with members of Congress, the CFPB, the Federal Reserve, International Monetary Fund, World Bank, and non-profit policy groups on various aspects of financial regulation.

11.    The consumer finance industry is a major focus of my academic research.  I have authored over fifty academic articles and book chapters and encyclopedia entries, the majority of which deal with aspects of consumer finance.  I am also a co-author of the National Consumer Law Center's treatise on CONSUMER BANKING AND PAYMENTS LAW.

12.    My work has been published in leading law and real estate journals and has been awarded prizes from the American College of Consumer Financial Services Lawyers, the *American Bankruptcy Law Journal*, the George Washington University Center for Law, Economics and Finance, and the *Yale Journal on Regulation*.

13.    In 2013, I received the American Law Institute's Young Scholar's Medal, which is awarded to "one or two outstanding early-career law professors whose work is relevant to the real world and has the potential to influence improvements in the law."

14.    A complete list of my academic publication may be found as part of my curriculum vitae, which is attached as Appendix A to this report.

15.    I hold a J.D., *cum laude* from Harvard Law School.  I also hold a Bachelor of Arts (A.B.) degree *magna cum laude with highest honors in field* from Harvard College, as well as both Master of Arts (A.M.) and Master of Philosophy (M.Phil) degrees in history from Columbia University.

16.    I have served as law clerk to Judge Jane R. Roth on the United States Court of Appeals for the Third Circuit.  I am admitted to practice before the bars of the State of New York, the Third Circuit, the Southern District of New York, and the Eastern District of New York.

17.    Based on the foregoing experiences as well as my research following my engagement in this case, I am familiar with the consumer finance industry and with signature lending in general.  Additionally, I have been acquainted with CashCall as a business prior to my engagement in this case, as I have previously used some of CashCall's

advertising materials (television commercials featuring the late actor Gary Coleman) in my consumer finance class.

18. My compensation for preparing this report and for any testimony in this case is at the rate of $700/hour. A list of the sources I consulted in preparing this report, as required by Federal Rule of Civil Procedure 26(a)(2)(B)(ii) may be found in Appendix B to this report.

19. As required to be disclosed per Federal Rule of Civil Procedure 26(a)(2)(B)(v)-(vi), my other testimonies as an expert at trial or by deposition in the past four years were in *In re Chase Bank USA, N.A. "Check Loan" Contract Litigation*, MDL 2032 (N.D. Cal.), *In re Washington Mutual Mortg. Backed Sec. Litig.*, No. C09-037 MJP (W.D. Wash.), *In the matter of the application of The Bank of New York Mellon*, No. 651786/2011 (N.Y. Sup. Ct.), *Tamburri v. Suntrust Mortgage, Inc. et al.*, No. C-11-2899 JST (N.D. Cal.), and before the Financial Crisis Inquiry Commission.

## Summary of Opinions Offered

20. Counsel has requested that I prepare this report to address the procedural and substantive unconscionability of CashCall's $2600 signature loan product (the "$2600 Signature Loan"). A signature loan is an unsecured consumer installment loan that is not accessed via a payment device like a credit card.

21. It is my opinion that the CashCall $2600 Signature Loan is both procedurally and substantively unconscionable under the California legal standard for unconscionability.

22. The CashCall $2600 Signature Loan is procedurally unconscionable because it involves a contract made without meaningful negotiation or choice, as CashCall had little or no direct competition for $2600 signature loans during the class period, and there is no evidence of price competition in the $2600 signature loan market.

23. CashCall's $2600 Signature Loan is not in direct competition with other consumer financial products such as payday loans, auto title loans, or credit cards. These products are only partial and imperfect substitutes for each other and do not compete directly with signature loans. Instead, unsecured signature loans like CashCall's $2600 Signature Loan occupy a unique consumer finance market niche. In this niche, CashCall had little competition of note during the class period (June 30, 2004 to July 10, 2011). CashCall had no competition prior to February 8, 2007. During the remainder of the class period, CashCall had only between one and four competitors, all "minor players" in the market. Meeks Deposition Transcript, Vol. II at 363:14-15.

24. The advent of the competitors in the signature loan space in California had no effect on the pricing of CashCall's $2600 Signature Loan or other product features. Instead, it appears that CashCall has the market power to dictate the terms on which it lends, including shockingly high interest rates. To the extent CashCall competes with other signature lenders, the competition is on the basis of advertising to generate consumer traffic.

25.   Based on the position of the CashCall $2600 Signature Loan in the consumer finance market, it is my opinion that a reasonable finder of fact could find that the terms of the CashCall $2600 Signature Loan satisfied California's standard for procedural unconscionability.

26.   The CashCall $2600 Signature Loan is substantively unconscionable because of its extraordinarily high interest rate in conjunction with its long term and amortization period and lack of underwriting ascertaining the borrower's ability to repay.  The CashCall $2600 Signature Loan is an overly harsh and one-sided contract that shocks the conscience because its design enables CashCall to frequently obtain significant benefits from the loan transaction even when the borrower defaults.  This transaction structure incentivized CashCall to lend to consumers whom it could not reasonably expect to be able to pay off the loan, with the result that nearly one out of every two CashCall $2600 Signature Loans defaulted before its maturity date—a result completely in line with CashCall's expectations when making the loans.  In other words, CashCall was making loans that it expected nearly half of its borrowers to be unable to repay.

27.   Based on the terms of the CashCall $2600 Signature Loan, it is my opinion that a reasonable finder of fact could find that the terms of the CashCall $2600 Signature Loan satisfied California's standard for substantive unconscionability.

## I.  CASHCALL AND ITS PRODUCTS

28.   CashCall, Inc. is a California licensed California finance lender.  While CashCall Inc., makes mortgage and small business loans, CashCall's core product is a signature loan—an unsecured consumer installment loan.  According to a CashCall investor pitchbook, the signature loan is "a new unsecured consumer loan product that is an alternative to credit cards".  CASHCALL 025825, CASHCALL 026103.

29.   While CashCall offers a variety of signature loan products, the product at issue in this litigation is CashCall's $2600 signature loan.  This product typically has a 42-month term, minimal amortization, simple (rather than compound) interest, and no prepayment penalty.  The $2600 signature loan comes with an origination fee of $75 (taken out of the loan proceeds) and with an interest rate of either 96% or 135%.

30.   As CashCall is not a depository, it must look to outside sources for funds.  CashCall has been obtaining its financing from a consortium of lenders led by Deutsche Bank AG and CIGPF, a Citigroup subsidiary. CASHCALL 023981, CASHCALL 023988. CashCall is entirely owned by its CEO, J. Paul Reddam.

## II. UNCONSCIONABILITY UNDER CALIFORNIA LAW

31.   It is my understanding that the standard for unconscionability in California involves a showing of both a procedural and substantive element. *Pinnacle Museum Tower Ass'n v. Pinnacle Market Development (US), LLC*, 55 Cal. 4th 223, 247 (Cal. 2012). The California Supreme Court has explained that:

> [P]rocedural unconscionability requires oppression or surprise. Oppression occurs where a contract involves lack of negotiation and meaningful choice, surprise where the allegedly unconscionable provision is hidden within a prolix printed form.   Substantive unconscionability pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided.   A contract term is not substantively unconscionable when it merely gives one side a greater benefit; rather, the term must be so one-sided as to shock the conscience.

    *Id.*  (internal quotation marks and citations omitted).

32.    It is similarly my understanding that under California law, while both procedural and substantive unconscionability must be shown, "they need not be present in the same degree" and are evaluated on a "sliding scale" such that the stronger the showing of procedural unconscionability than the lesser of a showing must be made regarding substantive unconscionability and vice-versa. *Armendariz v. Foundation Health PsychCare Services, Inc*., 24 Cal. 4th 83, 114 (Cal. 2000); *Pinnacle Museum Tower Ass'n v. Pinnacle Market Development (US), LLC*, 55 Cal. 4th 223, 247 (Cal. 2012) (quoting *Armendariz*).

33.    It is also my understanding that while California law recognizes that a competitively set price term is unlikely to be unconscionable, "a price within the range of general market prices may still be held unconscionable if the market is oligopolistic." *Wayne v. Staples, Inc.*, 135 Cal. App. 4th 466, 482-83 (Cal. App. 2d Dist. 2006).  *See also Perdue v. Crocker National Bank*, 38 Cal. 3d 913, 927 (Cal. 1985); *Morris v. Redwood Empire Bancorp*, 128 Cal. App. 4th 1305, 1323 (Cal. App. 4th Dist. 2005).

34.    "Oligopolistic markets are characterized by high market concentration. Usually the four largest producers of a good account for over half the domestic shipments." *California Grocers Ass'n v. Bank of America*, 22 Cal. App. 4th 205, 216 (Cal. App. 1st Dist. 1994) (citing HYMAN, ECONOMICS (2d ed. 1992) p. 356.) This definition, invoking what is known as the "four-firm concentration ratio," is a standard benchmark for evaluating the competitiveness of industries.  If the four largest competitors in the market have over half the market share, the market is an oligopoly. It is important to underscore that an oligopoly does not depend on the number of competitors in the market; rather it is about the market share of the largest competitors.

### III. PROCEDURAL UNCONSCIONABILITY

35.    Applying the California unconscionability standard to the litigation at hand, a reasonable trier of fact could find that the CashCall $2600 Signature Loan was procedurally unconscionable based on any of three factors:  lack of negotiation of terms; lack of competitors for the $2600 Signature Loans; and lack of any discernible price or term competition among the few minor competitors that emerged in the second half of the class period.  I address each basis sequentially below.

36.     While the following discussion does use terms that resonate of antitrust analysis, it bears emphasis that my analysis here is not an antitrust market power analysis, as this is not an antitrust lawsuit. Instead, it is an analysis informed by California unconscionability law.

**Lack of Negotiation**

37.     There was no negotiation regarding the terms of the CashCall loans entered into by class members. The CashCall product is a contract of adhesion—a take-it-or-leave-it contract. Consumers apply for a loan and based on their credit characteristics are told what loan terms they qualify for. These terms were not negotiated with class members.

38.     Moreover, CashCall understands itself as lending to consumers who are experiencing financial emergencies—consumers in duress situations. Thus CashCall's CEO, J. Paul Reddam stated in a press release "The reticence of banks to make consumer loans has really affected many people who need short-term financing for emergencies. CashCall has stepped up to fill that void". BUSINESS WIRE, *While Banks Continue to Restrict Consumer Lending, CashCall Makes It Easier and Less Expensive for Families To Get the Money They Need*, Sept. 4, 2009. Because CashCall's borrowers are experiencing financial emergencies they are in no position to negotiate terms.

39.     The lack of negotiation alone provides the basis on which a reasonable finder of fact could conclude that the CashCall $2600 Signature Loan is procedurally unconscionable, particularly when combined with the strong case for substantive unconscionability based on the extremely harsh and one-sided loan terms.

**Lack of Direct Competitors**

40.     CashCall lacked direct competition in California for $2600 signature loans for roughly the first three years of the class period. For the remainder of the class period there was only limited direct competition from "minor players". Meeks Deposition Transcript, Vol. II at 363:14-15.

41.     This is consistent with CashCall having at first a monopoly and subsequently being part of an oligopoly for $2600 signature loans in California. On this basis alone a reasonable finder of fact could find that CashCall's $2600 Signature Loans were procedurally unconscionable because of a lack of meaningful choice in the market place.

42.     By direct competitors, I am referring to business entities offering products that are perfect or near-perfect substitutes for the CashCall $2600 Signature Loan Product. To illustrate by example, Honda and Toyota are direct competitors in the minivan market as the Honda Odyssey minivan and Toyota Sienna minivan both products perform the same minivan function and are understood by consumers to substitute for each other. By contrast, butter producers are only in indirect competition with the

producers of oleomargarine and olive oil because the products are not accepted as complete substitutes for each other.

43. The degree of substitutability can sometimes be quite subjective: some coffee aficionados would be unlikely think of Dunkin Donuts' products and Starbucks' products as acceptable substitutes, while others might think of them as interchangeable coffee-flavored beverages.

44. The differences in function and terms of $2600 signature loans from other consumer financial products are such that they do not fall within this subjective zone; the $2600 signature loan is substantially different from every other major consumer financial product: payday, auto title, secured credit cards, unsecured credit cards, and unsecured charge cards.

45. The CashCall $2600 Signature Loan differs in significant ways from other types of high-cost, small dollar consumer financial products, such as payday and auto title loans and is not interchangeable with them from a consumer perspective. CashCall's signature loans are substantially larger than a typical payday loan. The standard payday loan is $100-$200, and is typically less than $400. *See* Michael A. Stegman, *Payday Lending*, 21 J. ECON. PERSPECTIVES 169 (2007) (noting that eighty percent of payday loans are for less than $300 and has a term of seven to thirty days).

46. Many of the payday loans made to California residents are by state-licensed entities. For California state-licensed payday lenders, the maximum loan amount is $300, and the average loan size was between $254 and $263 between 2006 and 2011. State of California, Department of Corporations, 2011 Annual Report, Operation of Deferred Deposit Originators Licensed under the California Deferred Deposit Transaction Law, Oct. 31, 2012, *at* http://www.dbo.ca.gov/Licensees/Payday_Lenders/pdfs/CDDTL2011ARC.pdf at 5. The average term of a payday loan from a California licensed payday lender during 2006-2011 was 16-17 days. *Id.*

47. In contrast, CashCall's signature loans start at $1000, with the $2600 Signature Loan product (at issue in this litigation) being CashCall's most common product. Payday loans are also of extremely short duration, generally two or four weeks, in keeping with a typical pay cycle. *See* Todd J. Zywicki, *Consumer Use and Government Regulation of Title Pledge Lending*, 22 LOYOLA CONS. L. REV. 425, 449 (2010) (two weeks as standard payday loan term); Stegman, *supra* at 169 (seven to thirty day term common for payday loans). CashCall signature loans are for substantially longer periods, typically 42 months. While payday loans are frequently "rolled over," roll-overs are only for a few months and involve rollover fees. Stegman, *supra* at 170.

48. CashCall's signature loan also differs from the typical payday loan because it is not "collateralized" by a post-dated check that the payday lender can use to draw on the borrower's bank account if not repaid by borrower voluntarily. Stegman, *supra* ¶ 45, at 169. Moreover, during at least part of the class period, CashCall did not require non-self employment for its signature loans, instead, underwriting "stated income" loans. *See* CASHCALL 025838. A payday loan, in contrast requires non-self employment, as it is an advance against a payment from a third-party. *See* Stegman, ¶ 45, at 169.

49. Recognizing the significant differences between the products, California in fact licenses payday lenders under a distinct license from signature lenders. Payday lenders require a "deferred deposit originator" license, while signature lenders require a "California finance lender" license. CAL. FIN. CODE §§ 23001(a), 23001(f), 23005(a), 23035 (requiring payday lenders to obtain a "deferred deposit originator" license); CAL. FIN. CODE §§ 22009, 22100(a), 22203 (requiring persons engaged in making consumer loans to obtain a finance lender license).

50. CashCall's signature loan is roughly comparable in size to some of the largest auto title loans. *See* Zywicki, *supra* ¶ 45, at 433-434 (collecting studies of title loan size). A CashCall signature loan, however, does not require the pledge of an automobile title as security for the loan, and the term of a CashCall signature loan is substantially longer than the typical one-month term for an auto title loan. Todd J. Zywicki, *Money to Go*, 33 REGULATION 32 (2010).

51. The CashCall signature loan also differs significantly from credit card and charge card loans and is not a meaningful substitute for them. While the loan amount for a CashCall signature is comparable to the lines of credit on many credit and charge cards, a credit or charge card combines a payment device with a line of credit. The combination of a payment instrument with a line of credit tremendously enhances the value of a credit, as it facilitates non-cash purchases, which are a critical convenience for consumers. In contrast, a CashCall signature loan does not offer any payment device. Instead, the loan proceeds are merely deposited in the customer's bank account.

52. Moreover, credit cards (as opposed to charge cards) involve revolving lines of credit, and charge cards are automatically renewed lines of credit; both vitiate the need to reapply for credit at the conclusion of the loan term. By contrast, there is no automatic rollover for CashCall loans.

53. Similarly, all consumer credit and charge cards are subject to a federal ability-to-repay requirement under the Credit Card Accountability, Responsibility, and Disclosure Act. 15 U.S.C. § 1665e. The underwriting of the $2600 Signature Loan by CashCall is not subject to this federal ability to repay requirement. In fact CashCall's underwriting guidelines for a portion of the class period for the $2600 Signature Loan required income verification (itself only a first step in calculating ability to repay) only for borrowers with extremely low FICO (credit) scores. No income verification was necessary for borrowers with a FICO score of 520 or above. CASHCALL 025838. Only a small percentage (less than 5%) of CashCall's loan portfolio has FICO scores below 520. CASHCALL 025842. As of 2006, only 45% of CashCall's signature loans were income verified. CASHCALL 025856.

54. While the $2600 Signature Loan product was marketed primarily to consumers with poor credit it differs meaningfully from secured credit cards—another product marketed to consumers with poor credit—both because it does not require the consumer to pledge as collateral a deposit generally substantially to the line of credit extended and because most secured credit cards have a maximum credit limit of $2000, with the typical secured card having a much lower limit.

55.    CashCall's CFO, Delbert O. Meeks, III, testified that CashCall offered a "unique product" because "There's still no other product out there that is an installment loan that's based on a simple interest calculation, no prepayment penalty.  It distinguishes itself amongst—it's not a payday loan, it's not a normal bank loan, it's the niche in between."  Meeks Deposition Transcript, Vol. II at 362:21-363:4.

56.    The CashCall $2600 Signature Loan is not in direct competition with payday loans, auto title loans, secured credit cards, regular unsecured credit cards, or charge cards.  Instead, the only product directly competing with the CashCall $2600 Signature Loan are other $2600 signature loans.[1]  Therefore, a direct competitor for CashCall in the $2600 signature loan market would only be another firm offering a $2600 signature loan.

57.    To the best of my knowledge, no federally chartered financial institution of any size has ever offered $2600 signature loans in California as one of its standard product offerings.  Signature loans are simply too unseemly of a product for federal chartered depository institutions to offer themselves.

58.    Instead, the $2600 signature loan business is comprised solely of state chartered entities.  State chartered firms require a California finance lender license from the California Department of Business Oversight ("CDBO").

59.    The CDBO operates a website on which one can look up both active and inactive license information, including date of issue.  California Dep't of Business Oversight, Financial Services Licensee, *at* http://www.dbo.ca.gov/FSD/Licensees/default.asp (last visited Sept. 11, 2013 at 10:33pm).  Based on my search in the CDBO license registry against an Internet search for lenders making $2600 signature loans in California, I have been able to identify seven other firms that currently offer $2600 signature loans in California.  Three were licensed only after the close of the class period.  Another three were licensed in 2007 (QuickClick Loans on Feb. 8, 2007; S.O.S. Loans on Aug. 13, 2007; and Speedy Cash Installment Loans on Aug. 29, 2007), and one was licensed in 2009 (CashNetUSA on July 6, 2009).  This indicates that from the beginning of the class period until February 8, 2007, CashCall lacked any real competition for $2600 signature loans in California, and that for the remainder of the class period CashCall had relatively few competitors.

60.    Market share statistics for the $2600 signature loan market are not available, but CashCall's CFO testified that CashCall's competitors are "minor players."  Meeks Deposition Transcript, Vol. II at 363:14-15.

61.    The lack of direct competitors for roughly the first half of the class period is confirmed by an April 27, 2006 pitchbook for a financing facility for CashCall prepared by Deutsche Bank Securities, Inc., "from information supplied by or on behalf of CashCall Inc." informed potential investors in CashCall that CashCall was the "**Market leader** — three year first mover advantage, no direct competitors, strong brand recognition".  CASHCALL 025824, CASHCALL 025887 (bold in original).

---

[1] For my analysis, I would consider a signature loan in a similar amount to $2600 to be a directly competing product, but not a signature loan for $1000 or less, and the existence of other sizes of signature loans is immaterial to my analysis.

This statement is repeated verbatim in a March 2007 pitchbook.  CASHCALL 026160.  A 2005 pitchbook states simply as a "Key Investment Consideration" that CashCall has "No competitors".  CASHCALL 026059.

62.    For the remainder of the class period, CashCall did have some competitors for the $2600 Signature Loan market, but I have been able to identify only three as of 2007 and a fourth as of 2009.  Thus for roughly the first three years of the class period, CashCall had a monopoly on the $2600 signature loan market, while for the remainder of the class period when some other "minor players" emerged, the $2600 signature loan market fits the description of an oligopolistic market provided by the California Court of Appeal in *California Grocers Association*.


**Lack of Price and Product Term Competition**

63.    The lack of price competition in the $2600 signature loan market is also by itself a basis on which a reasonable finder of fact could find that the CashCall $2600 Signature Loan is procedurally unconscionable.

64.    CashCall does not appear to have changed the terms of its $2600 Signature Loan product in response to the emergence of competition beginning in 2007.  This strongly indicates that there is not price competition in the market for $2600 signature loans.

65.    In simple economic terms, the entry of competitors into the market expanded the potential supply of $2600 signature loans.  If there were price competition in the California $2600 signature loan market, an expansion of supply (visually, this would be a rightward shift of the supply curve) should have resulted in a decline the cost of the loans, assuming the static and negative sloping (not vertical) demand curve one finds in most markets (meaning that consumer demand declines as price rises).[2]

66.    Yet no price drop was observable in the California $2600 signature loan market following the entry of additional competitors.  CashCall's pricing did not budge nor did its modeling assumptions of a 15-20% profit margin change with the emergence of competition in the $2600 signature loan market.  Meeks Deposition Transcript, Vol. I at 66:15-67:1. 67:20-22, 122:19-21.  Instead, these assumptions—based and refined on historical performance—remained constant throughout the class period.  Meeks Deposition Transcript, Vol. I at 69:4-7; 75:11-76:8.  Indeed, CashCall's pricing is done without any reference to competitors, Meeks Deposition Transcript, Vol. I at 47:12-20, 67:25-70:10, and CashCall does not consider itself to have any

---

[2] A standard economics method for illustrating demand for a product is to plot demand as a curve on a graph in which the *x*-axis indicates the quantity of a product or service consumed, and the *y*-axis indicates the price of the product or service.  In most markets, the demand curve has a negative slope, meaning it that the quantity demanded will increase as price decreases and vice-versa.  In simpler terms, the demand curve typically goes from the upper left to the lower right of the graph.  If the demand curve is vertical, however, it is not a diagonal line, but instead goes straight up and down.  This means that the quantity demanded (the *x*-axis coordinate) will remain constant irrespective of changes in the price on the *y*-axis.  A vertical demand curve need not continue indefinitely, however.  Instead, even a vertical demand curve presumable has a discontinuity at some price (the "reservation price"), at which point demand drops to zero.  Until that reservation price is reached, however, the consumer's demand is insensitive to price.

10

competitors of note even now.  Instead, other signature lenders are merely "minor players."  Meeks Deposition Transcript, Vol. II at 363:14-15.

67.  Competition in the $2600 signature loan market also does not appear to exist on any product terms.  Those competitors that did exist for the latter part of the class period offered loan products on virtually identical terms to CashCall.  I have been unable to identify any meaningful product differentiation between the CashCall $2600 Signature Loan product and those of its competitors.  The interest rates and other terms on $2600 signature loans are interchangeable among the competitors in the market.  This means there was no price competition for $2600 Signature Loans.

68.  Nor does there appear to be competition in the $2600 signature market based on service factors like convenience.  There is also little ability to compete based on convenience in the $2600 signature loan market because Internet-based applications enable all competitors to provide equal convenience to consumers.  Thus, there is little basis for lenders to compete other than through efficiency of advertising:  those competitors that target their advertisements better and have more memorable ads are the ones more likely to gain customer traffic.  Not surprisingly, CashCall spends very heavily on advertisement.  CASHCALL 025852.

69.  CashCall's own advertisements featuring the late former child star Gary Coleman are consistent with it having a market of desperate borrowers who do not shop around on price, but simply respond to the first advertisement they see.  In some ads Coleman says that he turned to CashCall because  "No one else would lend me money, not even my relatives!".   http://www.youtube.com/watch?v=JJMS5OrdAcg.   In another ad, Coleman states, "I auctioned off my clothes.  I even tried to auction off my car, but   when   you   need   cash   fast,   make   the   Cash   Call." http://www.youtube.com/watch?v=OyMOlfDwE-I.   In a third ad, Coleman says "Recently, I needed some cash, *fast*. I saw a commercial for CashCall and called 866-590-CASH.  $10,000 was in my account the next day.  So if you get into a tight spot and need cash fast, try CashCall." http://www.youtube.com/watch?v=pjwvKXcvJgI. These ads indicate that CashCall is a product for truly desperate borrowers:  those in a "tight spot," who are unable to tap financial sources of last resort, such as family, and who are so desperate for funds that they are selling their personal belongings.[3]  The borrowing process CashCall suggests is:  see the commercial, make the call, and don't worry about the cost.

70.  It is well established in the economics literature that if consumers do not observe prices but simply choose the first product they hear about, then prices will settle ("equilibrate") at the monopoly level, even in a market with multiple competitors. Each firm will in essence be a monopolist.  *See, e.g.*, Peter A. Diamond, *A Model of Price Adjustment*, 3 J. ECON. THEORY 156 (1971); Steve Salop & Joseph E. Stiglitz, *The Theory of Sales:  A Simple Model of Equilibrium Price Dispersion with Identical Agents,* 72 AM. ECON. REV. 1121 (1982).  Indeed, unless consumers believe that the costs savings resulting from a search for better prices will outweigh the search costs, they will not even bother to search.  *Id.*

---

[3] Coleman's plight was immortalized in the recent Broadway musical *Avenue Q*.

71. The apparent explanation for the lack of price or term competition in the $2600 Signature Loan market is that it is an unusual market with highly price inelastic consumer demand, represented by a vertical or nearly vertical demand curve. This means that consumer demand levels are not very sensitive to price differentials.

72. Price inelasticity necessarily precludes price competition.  If the demand curve is vertical up to a maximum reservation price (at which point demand discontinuously disappears), then the price will be at that maximum level no matter how many competitors there are in the market.  Every firm will price as if it is a monopolist. Steve Salop & Joseph E. Stiglitz, *The Theory of Sales:  A Simple Model of Equilibrium Price Dispersion with Identical Agents,* 72 AM. ECON. REV. 1121 (1982).

73. Obviously not all consumers are price inelastic regarding the cost of credit.  Rather, the consumers of the $2600 Signature Loan are a unique subset of consumers with highly inelastic demand.  Savvier, less desperate, and more price sensitive consumers with better credit scores are likely to have substituted other, cheaper consumer financial products for their financial needs, even though these products are imperfect substitutes.

74. In such a price inelastic market, the number of competitors is ultimately beside the point.  The terms that are offered to consumers are not being shaped by the normal laws of supply and demand, which assume a reasonable degree of price elasticity of demand.  There is no meaningful consumer choice in a price inelastic market, only monopolist terms.

75. A vertical or nearly vertical demand curve is strongly indicative of a market comprised of desperate borrowers who are willing to take any terms offered.  This is exactly how CashCall understands its borrowers. CashCall's sole owner and CEO, J. Paul Reddam stated in a press release "The reticence of banks to make consumer loans has really affected many people who need short-term financing for emergencies. CashCall has stepped up to fill that void". BUSINESS WIRE, *While Banks Continue to Restrict Consumer Lending, CashCall Makes It Easier and Less Expensive for Families To Get the Money They Need*, Sept. 4, 2009.

76. CashCall is lending to consumers in financial duress.  Such consumers are likely to have inelastic demand up to a relatively high reservation price.  Indeed, that some consumers took out a loan at nearly or greater than 100% annual interest is itself substantial evidence of price inelastic demand.  Signature loans are a product designed and marketed for consumers with poor credit histories and a desperate need for credit.  They are a product for consumers who cannot obtain credit from other more reputable sources. Only a desperate or non-comprehending consumer would borrow on such onerous and shocking terms as interest rates of 96% or 135%.[4]

---

[4] One might reasonably ask why CashCall does not charge *higher* interest rates.  One possible answer is the problem of adverse selection, as borrowers who would be willing to accept higher rates would be riskier borrowers, but might not be identifiable in advance.  A solution to this is to keep rates lower, but ration the availability of credit based on factors believed to relate to risk, rather than to have pricing vary by perceived risk ("risk-based pricing"). Joseph E. Stiglitz & Andrew Weiss, *Credit Rationing in Markets with Imperfect Information*, 71 AM. ECON. REV. 393 (1981).  The Stiglitz-Weiss credit rationing theory appears to be confirmed by the testimony of CashCall's CFO, who stated that "They way you offset [the higher default rates resulting from higher interest rates] is you will tighten

77.    Indeed, the extraordinarily high default rates on CashCall loans indicates that most consumers are not making a considered gamble when taking out a CashCall signature loan. CashCall reported a 44% cumulative default rate as of November 2009 on $2600 Signature Loans with 96% APRs originated after June 30, 2004. Defendant CashCall, Inc.'s Responses to Plaintiffs Krista O'Donovan and Eduardo de la Torre's Interrogatories Set One (Interrogatory No.2).

78.    The 44% cumulative default rates only track the percentage of dollars loaned that were charged off as uncollectible after 150 days without payment. Meeks Deposition Transcript, Vol. I at 71:7-23; 87:14-19. This metric is less than the percentage of CashCall loans that defaulted because in most cases (other than those loans on which no payments were ever made), the charged off amount will be less than the full principal of the loan. Using the figures provided in the same interrogatories, there were charge-offs of 97,776 of the 206,338 loans CashCall reports having made for $2600 at 96% APR between June 30, 3004 and November 30, 2009. Defendant CashCall, Inc.'s Responses to Plaintiffs Krista O'Donovan and Eduardo de la Torre's Interrogatories Set One (Interrogatories No. 1 and No. 3). Thus, the cumulative percentage of loans (by number, not dollar amounts) charged-off is 48%.

79.    Both the 44% loan amount charge-off figure and the 48% loan number charge-off figures actually understate the ultimate cumulative default rates because loans made from June 2006 onwards had not yet reached maturity, so final cumulative default rates on these loans were not available. Moreover, no charge-offs would have been reported on loans originated from June 30, 2009-November 30, 2009 as these loans would not yet have been able to run 150-days delinquent. *See* Meeks Deposition Transcript, Vol. I at 87:25-88:16. An even higher percentage of borrowers were delinquent at some point on the loans because not all delinquencies run to the 150-days necessary for a charge-off.

80.    The 44% and 48% cumulative default rate reported as of November 2009 is roughly consistent with the 35%-40% default rate that CashCall uses in its internal models, which are in turn based on historical cumulative default rates. Meeks Deposition Transcript Vol. I at 75:24-76:5. For some loan vintages on the $2600 Signature Loan, the cumulative default rates were as high as 70%. Meeks Deposition Transcript, Vol. I at 96:19-24.

81.    These cumulative default rates only track "[t]he amount of the charged-off principal balance divided by the amount of the original loans", meaning the percentage of dollars loaned in a particular pool that were charged off as uncollectible after 150 days without payment. Meeks Deposition Transcript, Vol. I at 71:7-23; 87:14-19, 88:20-25. This particular method of measuring cumulative default rates necessarily produces a lower default rate than if one measures the percentage of the *number* of loans were charged off, because in most cases (other than those loans on which no payments were ever made), the charged off amount will be less than the full principal

---

underwriting guidelines, meaning trying to tighten it up, which means you will loan out less product, but you will have better performing product." Meeks Deposition Transcript, Vol. I at 91:21-92:8. CashCall never considered risk-based pricing for the $2600 Signature Loan product, although it did for other products. Meeks Deposition Transcript, Vol. I at 110:9-13, 111:9-112:14.

of the loan. Therefore, it is reasonable to assume that at least half of $2600 Signature Loans made by CashCall defaulted and resulted in a charge-off.

82.    I have never seen default rates anywhere close to these in consumer financial products, even on higher APR payday loans or adjustable-rate subprime mortgages.Payday loans made in California by California Deferred Deposit Originators (California licensed payday lenders) had a default rate (measured by number of loans or dollar of loans) between 7% and 8% from 2006-2011. State of California, Department of Corporations, 2011 Annual Report, Operation of Deferred Deposit Originators Licensed under the California Deferred Deposit Transaction Law, Oct.           31,           2012,           *at* http://www.dbo.ca.gov/Licensees/Payday_Lenders/pdfs/CDDTL2011ARC.pdf at 6. The default rate measured relative to the number of borrowers was even lower, at 4%-5%, *id.* at 4, 6 (author's calculations), while the charge-off rate was even lower (2%-3%) because of partial recoveries on defaults. *Id.* at 8. For adjustable-rate subprime mortgages, the national default rate peaked at 29.63% in the 3d quarter of 2010. Mortgage Bankers Association, National Delinquency Survey. Only in Puerto Rico in 2009-2010 was the peak default rate on adjustable rate subprime mortgage loans (49%) equivalent to that on the $2600 Signature Loan. Mortgage Bankers Association, National Delinquency Survey.

83.    CashCall is very profitable despite very high default rates. While profit margins alone are not determinative of unconscionability, in this case they are consistent with such a finding. The relevance of CashCall's profit margin is that it shows CashCall's lack of competition in the $2600 signature loan market; in a competitive market, such profit margins should be competed away. CashCall's internal models—based on historical performance—consistently assumed profits of 15%-20%. *See, e.g.*, Meeks Deposition Transcript, Vol. I at 66:15-67:1. 67:20-22, 122:19-21. Some product-specific models assume "profit margins" of 34% or 40%. CASHCALL 009017, Tab 2011-10; CASHCALL 009017, Tab Original. These profitability levels are relatively high for what I have seen in other areas of consumer financial services. One would have expected them to have been eroded with the entry of competition into the $2600 signature market, but CashCall's profit expectations did not change during the class period.[5]  Meeks Deposition Transcript, Vol. I at 69:4-7; 75:11-76:8.

84.    Solely on the basis of a lack of price competition in the $2600 signature loan market, a reasonable finder of fact could find the CashCall $2600 Signature Loan to be procedurally unconscionable. When the lack of price competition is considered in tandem with the lack of negotiation and the complete lack of direct competitors in the market place for the first three years of the class period and an oligopoly situation thereafter, a reasonable finder of fact would conclude that there was no meaningful choice available to class members regarding the terms of their loans and that their loans were therefore clearly procedurally unconscionable.

---

[5] Given CashCall's use of services from other firms owned by CashCall's sole shareholder, J. Paul Reddam, these "profit" calculations may in fact understate CashCall's true profitability for Mr. Reddam. If CashCall paid above-market rates for services from other Reddam entities, the effect would be to reduce CashCall's profit, not Mr. Reddam's.

## IV. SUBSTANTIVE UNCONSCIONABILITY

85. Applying the California unconscionability standard to the litigation at hand, a reasonable trier of fact could find that the CashCall $2600 Signature Loan was substantively unconscionable given the combination of the $2600 Signature Loan's high interest rate, long amortization period, and lack of underwriting ascertaining the borrower's ability to repay.

86. The CashCall $2600 Signature Loan had an annual percentage rate ("APR")—an annualized measure of the finance charge (roughly interest and fees)—relative to the loan amount) of either 96% or 135% during the class period.  As consumer financial products go, this rate is shockingly high and harsh.

87. There are other consumer financial products, such as payday loans, that frequently have higher APRs, but the APRs on these products are not properly comparable to the $2600 Signature Loan as a cost measure.   APRs are a very poor measure for comparing the cost of loans of significantly different duration or for comparing very small dollar loans to larger dollar loans.  To calculate the APR for a loan of less than a year, an annualization factor must be applied to the ratio of the finance charge to the amount financed.   On a two-week loan the annualization factor is approximately 26, while on a four-week loan it is approximately 13.  In contrast, for a 42-month loan like the $2600 Signature loan, the annualization factor is 0.29.  Thus much of the difference in APRs between a two- or four-week payday loan and a $2600 Signature Loan is explained by the annualization factor, which has nothing to do with the actual cost of the credit.

88. Similarly, the small size of payday loans ($200-$400 usually) makes the APR a poor measure of comparison with larger loans like the $2600 Signature Loan.  Irrespective of the size of a loan, there will be a certain amount of fixed or semi-variable costs, such as salaries and overhead expenses, that a lender has to recapture in the finance charge in order to break even.  This means that holding all else constant, the finance charge will necessarily be greater relative to the loan amount than for a large dollar loan.  Accordingly the APR, which is an annualized ratio of the finance charge to the loan amount will be higher.  To illustrate, if a lender's cost of making a one-year loan includes a fixed charge of $20, that $20 as a finance charge for a $100 loan would result in a 20% APR, while for a $1000 loan would result in a 2% APR.  This means that the APR is not a measure of how profitable the loan is for the lender relative to loans of different sizes.

89. While payday loans are expensive as consumer credit goes, they also have features that compensate for their high rates unlike the $2600 Signature Loan.  Payday loans are for relatively small loan sizes ($200-$400) and very short (two-to-four week) loan terms.  This means that the borrower has less ability to get into trouble with a payday loan because the amount of debt that is incurred from any single loan is quite limited, and the short repayment window means that the consumer is not paying interest over an extended period on any single loan.

90. The high annual percentage rate on the $2600 Signature Loan is itself indicative of substantive unconscionability, especially when operating in tandem with the long amortization period on the $2600 Signature Loan. The $2600 Signature Loan is only amortized over a 42 month term with straightline amortization. This means that every monthly payment is applied partially to interest and partially to principal. For most of the loan's term, the payments are applied first and primarily to interest, rather than principal. Most of the principal is repaid only in the final months of the loan.

91. To illustrate, at 96% APR, a straightline amortization schedule on a 42-month $2600 loan results in monthly payments of $216.55. With straightline amortization, the borrower pays off only $162.17 of the loan principal during the first year of the loan. The borrower pays off an additional $408.39 by the end of the second year and $1028.37 during the third year. The remaining $1001.07 of principal is paid off in the last six months of the loan. In other words, with straightline amortization, the principal repayment is heavily backweighted, so there is still a significant principal balance outstanding on the loan even after months of repayment.

92. Marginal amortization over a relative long period would not alone make the $2600 Signature Loan substantively unconscionable. Many other consumer financial products, such as standard fixed-rate mortgages and car loans have similar or longer amortization terms. These products differ from the $2600 Signature Loan in a critical way, however: the marginal amortization is not combined with a sky-high interest rate, so the lenders are incentivized to lend responsibly because if they do not, the borrower may fail to repay the principal of the loan, and for most the loan the paid up interest and fees will not be sufficient to offset the loss of the principal.

93. The combination of the high interest rate with the long amortization period enables CashCall to operate a "sweatbox" business model. The "sweatbox" business model of consumer lending involves a lender extracting enough in interest and fees before the borrower stops paying to outweigh the losses of principal. *See* Ronald J. Mann, *Bankruptcy Reform and the "Sweat Box" of Credit Card Debt*, 2007 ILL. L. REV. 375. *See also* WILLIAM FAULKNER, *THE HAMLET*, Book 1, Ch. 3 (1940) (A black sawmill worker relates that "[Old Man Snopes] lent me five dollars over two years ago and all I does, every Saturday night I goes to the store and pays him a dime. He aint even mentioned that five dollars."). The principal balance is in essence a loss leader for a sweatbox lender that it is willing to sacrifice because it enables such a high return via interest and fees.

94. To illustrate how the sweatbox model works with CashCall, assume that CashCall has a 10% cost of funds and a 4% cost of servicing—as CashCall itself assumes in its investor pitchbook, CASHCALL 025876.[6] Under these conditions (ignoring for the purposes of illustration CashCall's other costs such as corporate overhead and advertising and not adjusting for net present value), CashCall turns a profit on a

---

[6] CashCall's actual cost of servicing was 8-9%. Meeks Deposition Transcript, Vol I. at 50:25-51:1 (cost of servicing at 8%-9%), 58:15-17 (cost of servicing at 8%-9%). CashCall's actual cost of funds varied considerably over time. *See, e.g.,* Meeks Deposition Transcript, Vol I. at 168:22-169:3 (cost of funds on insider loan at 2%); CASHCALL 023996 (cost of funds at LIBOR + 350 basis points); CASHCALL 023985 (cost of funds at LIBOR + 770 basis points); CASHCALL 023988 (cost of funds at LIBOR + 1275 basis points).

$2600 Signature Loan if a consumer makes approximately 11 monthly payments at 135% APR. The 11-month mark would be CashCall's "breakeven point." Making 11 payments would result in the consumer having repaid an amount greater than the principal (although not credited as such in the amortization schedule) plus the origination fee plus CashCall's cost of funds and servicing. Therefore, if the consumer defaulted after month 11, CashCall may still make a profit on the loan despite there still being almost all of the principal outstanding because of the long amortization period discussed above, in paragraphs 90-91.

95.     While CashCall does not use the "sweatbox" terminology, the sweatbox business model is apparent from some of CashCall's internal financial metrics. CashCall tracks a metric it calls "Vintage Cash Collection (As a Percent of Loan Amt adjusted for Fees)". CASHCALL 009587-009594. This metric graphs the "Cumulative Cash Collection ($)" against the "Age" (in months) of the loan. The Cumulative Cash Collection ($) is expressed as a percentage rate. CashCall explains that the "Rate was calculated based on interest and principal payment including recovery vs. net investment (origination fee was removed from funding amount)". The graph indicates the performance of loans of different monthly vintages. They show that for the $2600 Signature Loan, the cash collected exceeds 100% of the amounts funded (excluding origination fees) by month 9. CASHCALL 009589; Meeks Deposition Transcript, Vol. I at 153:23-156:9 (providing illustration of breakeven analysis).

96.     The illustration above does not account for all of CashCall's costs. When all of CashCall's other costs, such as corporate overhead, advertising, and loan origination expenses are considered, CashCall has an actual break-even point at around 15-16 months. Meeks Deposition Transcript, Vol. I at 155:13-157:21.

97.     To be sure, some of CashCall's borrowers will default before CashCall makes a profit on their loans, but others will default at some point after break-even point for CashCall. Given that the term of the $2600 Signature Loan is 42 months, all payments made after month 15 or 16 are essentially "gravy."

98.     The problem with the sweatbox business model is that it incentivizes CashCall to behave differently from a traditional lender. The traditional lender is a partner with the borrower—the borrower's default represents a loss to the lender, so the lender wants to make sure that the borrower has a reasonably likely chance of succeeding in repaying the loan.

99.     In the CashCall sweatbox model, the borrower's default does not necessarily represent a loss to the lender. Only a default prior to month 15 or 16 represents a loss to the lender. A loss thereafter represents a failure to maximize profits, but a profit nonetheless. CashCall obtains significant benefits from the $2600 Signature Loan transaction even when the borrower defaults, just as long as the default is not too soon—before the first quarter or third of the loan's term. This means that the $2600 Signature Loan transaction is almost by definition a "one-sided" contract. The sweatbox creates an incredibly lopsided contract, unlike the traditional lending arrangement.

100.    CashCall would, of course, benefit if its borrowers continued to make payments at 96% or 135% APR. But continued payments beyond the sweatbox break-even point

are not necessary for CashCall to make a profit, and to the extent CashCall vetted it borrowers more carefully to ensure that they all could pay off the loan per its original terms, it would be sacrificing lending volume.  This means that CashCall is not concerned about ensuring that all of its borrower can repay the loan in full over 42 months, only that CashCall can get 15 or 16 months of repayment out of a sufficiently high percentage of its borrowers.  The mismatch between the break-even point and the $2600 Signature Loan's amortization period means that CashCall's borrowers end up paying far more in interest than they would with a shorter loan term that more closely matched CashCall's breakeven point.

101.   The sweatbox model of high interest rates and low amortization enables CashCall to operate an extremely profitable business despite default rates that are significantly higher than anything I have seen in any sector of the consumer finance industry. These rates not only "shock the conscience"—they would shock any experienced consumer finance professional.

102.   A consumer financial product that "explodes" nearly half the time is a product that is *per se* substantively unconscionable; no consumer product would be permitted to go to market with a similar failure rate from a consumer perspective.  *See* Elizabeth Warren, *Unsafe at Any Rate*, DEMOCRACY (Summer 2007).

103.   The result of this sweatbox business model is that CashCall is incentivized to loan to consumers who whom it could not reasonably expect to be able to pay off the loan, with the result that nearly one out of every two CashCall $2600 Signature Loans defaulted before its maturity date.  Not surprisingly, CashCall's underwriting process does not require it to ascertain whether the borrower in fact has an ability to repay the loan; borrowers without verified income or assets can obtain a $2600 Signature Loan. CASHCALL 025838.

104.   Notably, CashCall is making loans of a type that some of its investors—Citibank and DeutscheBank among them—could make, but are unwilling to make themselves, presumably because the CashCall $2600 Signature Loan with its high interest rates and high default rates is too unseemly. *See* Gretchen Morgenson, *Find the Loan Behind the Loans*, N.Y. TIMES, Sept. 8, 2013 at BU1.  Indeed, then California Attorney General Jerry Brown stated in a press release regarding the state's settlement with CashCall for violations of various California consumer protection statutes, "CashCall preyed on consumers desperate for cash, charging triple digit interest rates and using loan shark tactics to collect on their debts."  Peggy Lowe, *CashCall Must Halt "Loan Shark Tactics"*, ORANGE COUNTY REGISTER, Aug. 26, 2009 at A.

105.   CashCall's $2600 Signature Loan is a product that is "doomed to failure"—but only for the borrower, not for CashCall. *See Commonwealth v. Fremont Investment & Loan,* 452 Mass. 733, 751 (Mass. 2008) (finding that loans that were "doomed to foreclosure" violated the Massachusetts unfair and deceptive acts and practices statute).  CashCall wins even if the consumer loses with the $2600 Signature Loan. This is the epitome of a one-sided contract, and lopsided nature of the contract is made possible by the overly harsh combination of high interest rates and long amortization period.

106. CashCall's $2600 Signature Loan is substantively unconscionable, not simply because it is expensive, but because of the combination of costs plus amortization and lack of underwriting ascertaining the consumer's ability to repay the entire loan per its original terms.

## CONCLUSION

107. Based on the forgoing analysis, it is my opinion that a reasonable finder of fact could find that the CashCall's $2600 Signature Loans made to plaintiff class members during the class period were both procedurally and substantively unconscionable.

108. I reserve the right to amend and supplement this report and to submit a rebuttal report.

109. Under the pain and penalty of perjury, I declare the foregoing to all be correct and true to the best of my knowledge.

EXECUTED on the 16 th day of September 2013, in Washington, in the District of Columbia.

**APPENDIX A.**

**Curriculum Vitae of**

**Adam J. Levitin**

**(including complete list of publications)**

# ADAM J. LEVITIN

600 New Jersey Ave., NW
Hotung 6022
Washington, DC 20001
(202) 662-9234
adam.levitin@law.georgetown.edu

## LEGAL EMPLOYMENT & APPOINTMENTS

**GEORGETOWN UNIVERSITY LAW CENTER** 2007-present
*Professor of Law (2011-present)*
*Associate Professor of Law (2007-2011)*

**HARVARD LAW SCHOOL** 2012-2013
*Bruce W. Nichols Visiting Professor of Law*

**CONSUMER FINANCIAL PROTECTION BUREAU, CONSUMER ADVISORY BOARD** 2012-2014
*Chair, Mortgage Committee*

**CONGRESSIONAL OVERSIGHT PANEL FOR TROUBLED ASSET RELIEF PROGRAM** Nov. 2008-Dec. 2010
*Special Counsel*

**AMERICAN BANKRUPTCY INSTITUTE** Fall 2009
*Robert Zinman Scholar in Residence*

**FEDERAL TRADE COMMISSION** Summer 2008
*Faculty, Division of Financial Practices Academy*

**WEIL, GOTSHAL & MANGES LLP,** New York, New York 2006-2007
*Associate, Business Finance & Restructuring Department*

**HON. JANE R. ROTH, THIRD CIRCUIT COURT OF APPEALS,** Wilmington, Delaware 2005-2006
*Judicial Clerk*

## EDUCATION

**HARVARD LAW SCHOOL**, J.D., *cum laude,* 2005
– Notes Chair, *Harvard Journal on Legislation*

**COLUMBIA UNIVERSITY**, M.PHIL. IN HISTORY, 2001, A.M. IN HISTORY, 2000
– Mellon Fellowship in Humanistic Studies
– President's Fellow of the University
– Richard Hofstader Fellow of the Faculty in History

**HARVARD COLLEGE**, A.B. IN NEAR EASTERN LANGUAGES & CIVILIZATIONS AND HISTORY, *magna cum laude with highest honors in field*, 1998
– Thomas Temple Hoopes Prize for Outstanding Senior Honors Thesis

## LEGAL PUBLICATIONS

**Articles**

• *Bankruptcy Law and the Cost of Credit:  The Impact of Cramdown on Mortgage Interest Rates* (with Joshua Goodman) (revise & resubmit with J. L. & ECON.)

• *The Politics of Financial Regulation and the Regulation of Financial Politics,* 127 HARV. L. REV. (forthcoming 2014)

• *The Paper Chase:  Securitization, Foreclosure, and the Uncertainty of Mortgage Title,* 63 DUKE L.J. (forthcoming 2013)

• *A Transactional Genealogy of Scandal from Michael Milken to Enron to Goldman Sachs*, 86 S. CAL. L. REV. 783 (2013) (with William Bratton)

• *The Consumer Financial Protection Bureau:  An Introduction*, 32 REV. BANKING & FIN. L. 321 (2013)

• *The Commercial Real Estate Bubble*, 2 HARV. BUS. L. REV. 801 (2013) (with Susan Wachter)

• *The Public Option in Housing Finance*, 46 U.C. DAVIS L. REV. 1111 (2013) (with Susan Wachter)

• *Skin-in-the-Game:  Risk Retention Lessons from Credit Card Securitization*, 81 GEO. WASH. L. REV.  813 (2013)

• *The Tenuous Case for Derivatives Clearinghouses*, 101 GEO. L.J. 445 (2013)

• *Why Housing?* 23 HOUSING POL'Y DEBATE 5 (2013) (with Susan Wachter) (peer reviewed)

• *Bankrupt Politics and the Politics of Bankruptcy*, 97 CORNELL L. REV. 100 (2012)

• *Explaining the Housing Bubble*, 100 GEO. L.J. 1177 (2012) (with Susan Wachter)
        –Discussed in THE ECONOMIST ("Bricks and Slaughter," Mar. 3, 2011)

• *The Dodd-Frank Act and Housing Finance:  Can It Restore Private Risk-Capital to the Securitization Market?* 29 YALE J. ON REG. 101 (2012) (symposium volume) (with Andrey D. Pavlov & Susan M. Wachter)

• *Rate Jacking: Risk-Based and Opportunistic Pricing in Credit Cards*, 2011 UTAH L. REV. 339 (2011) (invited theme issue on the Credit C.A.R.D. Act)

• *Private Disordering? Payment Card Fraud Liability Rules*, 5 BROOK. J. OF CORP., FIN. & COMM. LAW 1 (2011) (symposium issue)

• *Mortgage Servicing*, 28 YALE J. ON REG. 1 (2011) (with Tara Twomey)

• *In Defense of Bailouts*, 99 GEO. L.J. 435 (2011)
        –Winner, 2011 C-LEAF Junior Faculty Scholarship Prize

• *Rewriting Frankenstein Contracts:  The Workout Prohibition in Residential Mortgage Backed Securities*, 82 S. CAL. L. REV. 1075 (2010) (with Anna Gelpern)
        –Accepted for the 2009 Stanford-Yale Junior Faculty Forum

• *Bankruptcy Markets:  Making Sense of Claims Trading*, 4 BROOK. J. OF CORP., FIN. & COMM. LAW 64 (2010) (symposium issue)

• *Resolving the Foreclosure Crisis:  Modification of Mortgages in Bankruptcy,* 2009 WISC. L. REV. 565 (2009)
        –Accepted for the American Law and Economics Association Annual Convention
        –Accepted for Third Annual Conference on Empirical Legal Studies
        –Accepted for Harvard-Texas Conference on Commercial Realities

• *Hydraulic Regulation:  Regulating Credit Markets Upstream*, 26 YALE J. ON REG. 143 (2009)
        –Winner, Walton H. Hamilton Prize for Outstanding Scholarship, Yale Journal on Regulation
        –Accepted for University of Connecticut Workshop on Banking and Consumer Financial Services Law

• *Priceless?  The Costs of Credit Cards*, 55 UCLA L. REV. 1321 (2008)
        –Winner, American College of Consumer Financial Services Lawyers Annual Writing Competition

• *Priceless?  The Social Costs of Credit Card Merchant Restraints*, 45 HARV. J. ON LEGIS. 1 (2008)

- *Payment Wars:  The Merchant-Bank Struggle for Control of Consumer Payment Systems*, 12 STAN. J. L., BUS. & FIN. 425 (2007)

- *Finding <u>Nemo</u>:  Rediscovering the Virtues of Negotiability in the Wake of <u>Enron</u>*, 2007 COLUM. BUS. L. REV. 83 (2007)

- *Toward a Federal Common Law of Bankruptcy: Judicial Lawmaking in a Statutory Regime*, 80 AM. BANKR. L.J. 1 (2006) (double-blind peer-reviewed journal, published by National Conference of Bankruptcy Judges) –winner of American Bankruptcy Law Journal's 2007 Editors' Prize

- *The Limits of <u>Enron</u>:  Counterparty Risk in Bankruptcy Claims Trading*, 15 J. BANKR. L. & PRAC. 389 (2006) (peer-reviewed journal)

- *The Merchant-Bank Struggle for Control of Payment Systems*, 17 J. FIN. TRANSFORMATION 73 (2006) (peer-reviewed applied finance journal)

- *The Antitrust Super Bowl:  America's Payment Systems, No-Surcharge Rules, and the Hidden Costs of Credit*, 3 BERKELEY BUS. L.J. 265 (2005)

**Book Chapters**

- *Duties to Serve After the Fall:  Rethinking Community Reinvestment and Housing Goals*, Harvard Joint Center of Housing working paper, 2013 (with Janneke Ratcliffe) (forthcoming in volume published by the Brookings Institute)

- *Electronic Transfers from the Consumer's Account*, in CONSUMER BANKING AND PAYMENTS LAW (Nat'l Consumer Law Center, 5th ed. 2013)

- *Deregulation and the Financial Crisis of 2008,* in REGULATORY BREAKDOWN? THE CRISIS OF CONFIDENCE IN U.S. REGULATION, Cary Coglianese, ed. (University of Pennsylvania Press 2012) (with Susan M. Wachter)

- *Fiscal Federalism and the Limits of Bankruptcy*, in WHEN STATES GO BROKE: ORIGINS, CONTEXT, AND SOLUTIONS FOR THE AMERICAN STATES IN FISCAL CRISIS, Peter Conti-Brown, ed. (Cambridge University Press 2011)

- *Information Asymmetries in the U.S. Mortgage Crisis*, in THE AMERICAN MORTGAGE SYSTEM:  RETHINK, RECOVER, REBUILD, Susan M. Wachter & Martin M. Smith, eds. (University of Pennsylvania Press 2011) (with Susan M. Wachter)

- *Modification of Mortgages in Bankruptcy*, LESSONS FROM THE FINANCIAL CRISIS: INSIGHTS AND ANALYSIS FROM TODAY'S LEADING MINDS, Richard W. Kolb, ed. (Wiley 2009)

**Shorter Articles and Research Papers**

- *An Analysis of the Proposed Interchange Fee Litigation Settlement*, *at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2133361

- *Clearing the Mortgage Market Through Principal Reduction:  A Bad Bank for Housing (RTC 2.0),* Pew Charitable Trusts Strategies to Improve the Housing Market Research Paper (2012), *available at* http://www.pewstates.org/uploadedFiles/PCS_Assets/2012/Clearing_the_Mortgage_Market.pdf.

- *What Next for Housing Finance?*  15 WHARTON REAL ESTATE REV. (forthcoming 2012) (with Susan Wachter)

- *Cross-Routing:  PIN and Signature Debit Interchangeability Under the Durbin Amendment,* 2 LYDIAN J.16 (Dec. 2010)

- *Interchange Regulation:  Implications for Credit Unions*, Research Brief #224, The Filene Research Institute, November 2010

- *Back to the Future with Chapter 13:  A Reply to Professor Scarberry*, 37 PEPPERDINE L. REV. 1261 (2010).

- *Overdraft Regulation:  A Silver Lining to the Regulatory Clouds?*, Research Brief #211, The Filene Research Institute, April 2010

- *The Credit C.A.R.D. Act:  Opportunities and Challenges for Credit Unions*, Research Brief #202, The Filene Research Institute, Dec. 2009

- *Critique of Evans and Wright's Study of the Consumer Financial Protection Agency Act*, white paper, Oct. 22, 2009, *available at* http://ssrn.com/abstract=1492471

- *Bad and Good Securitization*, 13 WHARTON REAL ESTATE REV. 23 (2010) (with Andrey Pavlov and Susan Wachter), *available at* http://papers.ssrn.com/abstract=1462895

- *The Consumer Financial Protection Agency*, Policy Analysis, Pew Charitable Trusts Financial Reform Project, Research Brief #2, July 2009
    – The "best one-stop paper for understanding why CFPA needs to pass." Baseline Scenario, *at* http://baselinescenario.com/2009/08/17/a-cfpa-research-brief/

- *The Crisis Without a Face:  Emerging Narratives of the Financial Crisis*, 63 U. MIAMI L. REV. 999 (2009) (invited foreword to themed volume)

- *Remote Deposit Capture:  A Legal and Transactional Overview*, 126 BANKING L.J. 115 (2009) (peer-edited journal)

- *Helping Homeowners:  Modification of Mortgages in Bankruptcy,* 3 HARV. L. & POL'Y REV. (online) (Jan. 19, 2009) (invited contribution), *at* http://www.hlpronline.com/Levitin_HLPR_011909.pdf

- *Reforming Mortgage* Servicing, Research Brief, American Association of Retired Persons, Dec. 2008

- *All But Accurate:  A Critique of the American Bankers Association Study on Credit Card Regulation*, white paper, December 6, 2007, *at* http://papers.ssrn.com/abstract=900444

- *Gifting Plans and Absolute Priority*, 124 BANKING L.J. 722 (2007) (peer-edited journal)

- *The Problematic Case for Incentive Compensation in Bankruptcy*, 155 UNIV. PA. L. REV. PENNUmbra 88 (2007)

- *Health Care Privacy Issues in Corporate Reorganizations*, Materials Presented Before the American Bankruptcy Institute 2007 New York City Bankruptcy Conference, May 7, 2007 (co-authored with Arthur R. Cormier & Andrew M. Troop)

## Encyclopedia Entries

- *Mortgage Market Character and Trends:  USA*, in THE HOUSING ENCYCLOPEDIA, Susan Smith, ed., (Cambridge University Press 2012) (with Susan Wachter)

- *American Mortgages,* in THE HOUSING ENCYCLOPEDIA, Susan Smith, ed., (Cambridge University Press 2012) (with Susan Wachter)

## LEGAL SCHOLARSHIP AWARDS AND GRANTS

- American Law Institute, Young Scholar's Medal, 2013

- Pew Charitable Trusts, Grant for Strategies for Reviving the Housing Market, 2012

- George Washington University, Center for Law, Economics & Finance, Junior Faculty Scholarship Prize, 2011

- Walton H. Hamilton Prize for Outstanding Scholarship, Yale Journal on Regulation, 2009

- Best Professional Article, American College of Consumer Financial Services Lawyers Annual Writing Competition, 2009

- American Bankruptcy Law Journal's 2007 Editors' Prize

## LEGISLATIVE TESTIMONY AND BRIEFINGS

- Testimony Before the House Financial Services Committee, July 18, 2013, ("A Legislative Proposal to Protect American Taxpayers and Homeowners by Creating a Sustainable Housing Finance System") (hearing on the PATH Act)
- Testimony Before the House Judiciary Committee, Subcommittee on Intellectual Property, Competition, and the Internet, July 10, 2012 ("The Dodd-Frank Act's Effects on Financial Services Competition")
- Testimony Before the House Financial Services Committee, Subcommittee on Capital Markets and Government Sponsored Institutions, June 7, 2012 ("Investor Protection:  The Need to Protect Investors from Government")
- Testimony Before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit, May 9, 2012 ("Rising Regulatory Compliance Costs and Their Impact on the Health of Small Financial Institutions")
- Testimony Before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit & Subcommittee on Capital Markets and Government Sponsored Enterprises, Nov. 16, 2011 (Joint Hearing on "H.R. 1697: The Communities First Act").
- Testimony Before the Senate Committee on Banking, Housing, and Urban Affairs, Sept. 13, 2011 ("Housing Finance Reform: Should There Be a Government Guarantee?").
- Testimony Submitted to the House Committee on the Judiciary, Sept. 8, 2011 (H.R. 2533, the "Chapter 11 Bankruptcy Venue Reform Act of 2011").
- Testimony Before the House Committee on Small Business, Subcommittee on Oversight, Investigations & Regulation, July 28, 2011 ("Open for Business:  The Impact of the CFPB on Small Business").
- Testimony Before the Senate Committee on Banking, Housing, and Urban Affairs, July 19, 2011 ("Enhanced Consumer Financial Protection After the Financial Crisis").
- Testimony Before the House Government Oversight and Reform Committee, Subcommittee on TARP, Financial Institutions, and Bailouts of Public and Private Institutions, May 24, 2011 ("Who's Watching the Watchmen? Oversight of the Consumer Financial Protection Bureau").
- Testimony Before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit, Apr. 6, 2011 ("Legislative Proposals to Improve the Structure of the Consumer Financial Protection Bureau").
- Testimony Before the House Financial Services Committee, Subcommittee on Housing and Community Opportunity, Nov. 18, 2010 ("Robo-Signing, Chain of Title, Loss Mitigation, and Other Issues in Mortgage Servicing").
- Testimony Before the Senate Committee on Banking, Housing, and Urban Affairs, Nov. 16, 2010 ("Problems in Mortgage Servicing from Modifications to Foreclosures").
- Testimony Before the Financial Crisis Inquiry Commission, Oct. 28, 2010, *at* http://fcic.law.stanford.edu/interviews/view/421.
- "Future of Housing Finance," Center for American Progress Mortgage Finance Working Group Presentation to the U.S. Department of Treasury, August 2, 2010.
- Testimony Before the House Judiciary Committee, Subcommittee on Commercial and Administrative Law, December 11, 2009 ("Home Foreclosures:  Will Voluntary Mortgage Modification Help Families Save Their Homes?  Part II?").
- Testimony Before the Senate Judiciary Committee, Subcommittee on Administrative Oversight and the Courts, July 23, 2009 ("The Worsening Foreclosure Crisis:  Is It Time to Reconsider Bankruptcy Reform?).
- Testimony Before the House Judiciary Committee, Subcommittee on Commercial and Administrative Law, April 2, 2009 (re: Consumer Debt — Are Credit Cards Bankrupting Americans?).
- Testimony Before the Senate Judiciary Committee, Subcommittee on Administrative Oversight and the Courts, Mar. 24, 2009 ("Abusive Credit Card Practices and Bankruptcy," re: Consumer Credit Fairness Act, S.257).

- Testimony Before the Senate Committee on Banking, Housing and Urban Affairs, Feb. 12, 2009 (re: Modernizing Consumer Protection in the Financial Regulatory System: Strengthening Credit Card Protections).
- Testimony Before the House Judiciary Committee, Jan. 22, 2009 (re:  Helping Families Save Their Homes in Bankruptcy Act, H.R. 220, and the Emergency Homeownership and Equity Protection Act, H.R. 225).
- Testimony Before the Senate Judiciary Committee, Nov. 19, 2008 (re: Helping Families Save Their Homes in Bankruptcy Act, now S.61).
- "Bankruptcy Modification of Mortgages," Democratic Staff Briefing, United States House of Representatives, November 14, 2008.
- Testimony Before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit on March 13, 2008 (re: Credit Cardholders' Bill of Rights).
- Testimony Submitted to the Economic Matters Committee, Maryland State House of Delegates, March 6, 2008.
- "Credit Card Regulation," Democratic Staff Briefing, United States House of Representatives, March 5, 2008.

## EDITORIALS AND BLOGGING

- "Hands Off Detroit's Final Treasures!" SALON, Aug. 20, 2013.
- "Don't Take My Pension:  The Looming Public Worker Nightmare," SALON, Aug. 12, 2013.
- "Make the Banks Pay," SALON, Oct. 27, 2011.
- "Fed's Feeble Swipe Fee Rule Is an Unauthorized Sop to Big Banks," AMERICAN BANKER, July 8, 2011.
- "More Openness on Mortgages," N.Y. TIMES, Mar. 8, 2010.
- Letter to the Editor, WASHINGTON POST, July 6, 2010.
- Letter to the Editor, WASHINGTON TIMES, June 22, 2010.
- "Swipe Fee Reform Benefits Consumers and Businesses Large and Small," HUFFINGTON POST, June 18, 2010.
- "Rein in the Credit Card Games," DETROIT FREE-PRESS, Nov. 28, 2008 (reprinted as "Consumer Pay High Price for Credit Cards," SAN DIEGO UNION-TRIBUNE, Nov. 30, 2008) (reprinted as "Credit cards on Santa's naughty list," ATLANTA JOURNAL CONSTITUTION, Dec. 7, 2008).
- "Bailout Bill Must Include Help for Homeowners," WASHINGTON INDEPENDENT, Sept. 26, 2008.
- "The Card Industry Still Has a Chance to Reform," AMERICAN BANKER, Aug. 8, 2008.
- "The Flaws in the FHA Housing Bill", op-ed, WALL ST. JOURNAL, July 11, 2008.
- Letter to the Editor, WALL ST. JOURNAL, April 3, 2008.
- "Complex Pricing of Credit Cards Should be Simplified," op-ed, CHICAGO TRIBUNE, Dec. 27, 2007, at A21 (reprinted in THE BALTIMORE SUN)
- "Conglomerate Master" guest blogger on The Conglomerate, 2010-2011
- Guest blogger, PrawfsBlawg, May 2008
- Guest blogger, Warren Reports at TPM Café, Jan. 2007
- Blogger, Credit Slips, www.creditslips.org, Dec. 31, 2007-present

## SCHOOL SERVICE

- Appointments Committee (2013-14; 2011-12, chair; 2009-10)
- Finance Committee (2010-11)
- Financial Aid Committee (2013-2014)
- Tax Appointments Committee (2013-14, chair; 2010-11)
- Legal Profession Committee (2008-2009; 2007-2008)

## PROFESSIONAL SERVICE AND ACTIVITIES

- Reporter, Advisory Committee on Multiple Debtor Cases, American Bankruptcy Institute Commission to Study the Reform of Chapter 11
- World Bank Insolvency and Debtor/Creditor Regime Task Force
- Fellow, Center for Law, Economics and Finance (C-LEAF) at George Washington University Law School
- Editorial Board, AMERICAN BANKRUPTCY INSTITUTE LAW REVIEW
- Center for American Progress, Mortgage Finance Working Group
- Manuscript reviewer for AMERICAN BANKRUPTCY LAW JOURNAL; Cambridge University Press; CITYSCAPE; Conference on Empirical Legal Studies; Cornell University Press; GEORGETOWN LAW JOURNAL; HOUSING POLICY DEBATE; JOURNAL OF EMPIRICAL LEGAL STUDIES; LAW & SOCIETY REVIEW; Netherlands Organization for Scientific Research; Oxford University Press; YALE LAW JOURNAL; Yale University Press
- Area Organizer for Bankruptcy, American Law and Economics Association (2009)
- Executive Committee Member, AALS Section on Financial Institutions & Consumer Financial Services (2009)
- United States Court of Appeals for the Third Circuit (2006)
- United States District Court for the Southern District of New York (2006)
- United States District Court for the Eastern District of New York (2006)
- New York State Courts (2006)

# APPENDIX B.

## List of Documents Consulted

- Third Amended Complaint, *O'Donovan v. CashCall, Inc.*, No. C-08-03174 MEJ (N.D. Cal.)

- Fourth Amended Complaint, *O'Donovan v. CashCall, Inc.*, No. C-08-03174 MEJ (N.D. Cal.)

- Answer to Fourth Amended Complaint and Counterclaim for Breach of Contract, *O'Donovan v. CashCall, Inc.*, No. C-08-03174 MEJ (N.D. Cal.)

- Order Granting in Part and Denying in Part Plaintiffs' Motion for Class Certification, *O'Donovan v. CashCall, Inc.*, No. C-08-03174 MEJ (N.D. Cal.)

- Order re: Class Notice/Definition, *O'Donovan v. CashCall, Inc.*, No. C-08-03174 MEJ (N.D. Cal.)

- Defendant's Amended Response to Interrogatory No. 8 (Set Two)

- Defendant's Amended Response to Interrogatory Nos. 11 and 13 (Set Two)

- Defendant's Amended Response to Interrogatories, Set No. 3 (inc. Exhibit A)

- Defendant's Amended Responses to Request for Production of Documents, Set Six

- Transcript of Deposition of Delbert Orien Meeks, III (June 13, 2013)

- 15 U.S.C. § 1665e.

- CAL. FIN. CODE §§ 22009, 22100(a), 22203, 23001(a), 23001(f), 23005(a).

- California Department of Business Organizations, Financial Licensees *at* http://www.dbo.ca.gov/FSD/Licensees/default.asp

- State of California, Department of Corporations, 2011 Annual Report, Operation of Deferred Deposit Originators Licensed under the California Deferred Deposit Transaction Law, Oct. 31, 2012, *at* http://www.dbo.ca.gov/Licensees/Payday_Lenders/pdfs/CDDTL2011ARC.pdf

- Mortgage Bankers Association, National Delinquency Surveys (Excel file).

- *Perdue v. Crocker National Bank*, 38 Cal. 3d 913, 927 (Cal. 1985)

- *California Grocers Ass'n v. Bank of America*, 22 Cal. App. 4th 205 (Cal. App. 1st Dist. 1994)

- *Armendariz v. Foundation Health PsychCare Services, Inc.*, 24 Cal. 4th 83 (Cal. 2000)

- *Morris v. Redwood Empire Bancorp*, 128 Cal. App. 4th 1305 (Cal. App. 4th Dist. 2005)

- *Trend Homes, Inc. v. Superior Court*, 131 Cal. App. 4th 950 (Cal. App. 5th Dist. 2005)

- *Wayne v. Staples, Inc.*, 135 Cal. App. 4th 466 (Cal. App. 2d Dist. 2006)

- *Aron v. U-Haul Co. of California*, 143 Cal. App. 4th 796 (Cal. App. 2d Dist. 2006)

- *Commonwealth v. Fremont Investment & Loan,* 452 Mass. 733 (Mass. 2008)

- *Pinnacle Museum Tower Ass'n v. Pinnacle Market Development (US), LLC*, 55 Cal. 4th 223 (Cal. 2012)

- *State of West Virginia ex rel. McGraw, Jr. v. CashCall, Inc. and J. Paul Reddam*, Final Order on Phase I of Trial:  the State's Debt Collection Claims, No. 08-C-1964 (Cir. Ct. of Kanawha County, West Virginia, Sept. 10, 2012)

- *State of West Virginia ex rel. McGraw, Jr. v. CashCall, Inc. and J. Paul Reddam*, Final Order on Phase II of Trial:  the State's Usury and Lending Claims, No. 08-C-1964 (Cir. Ct. of Kanawha County, West Virginia, Sept. 10, 2012)

- *O'Donoghue v. Superior Court of San Francisco,* 2013 Cal. App. Lexis 695 (Cal. App. 1st Div. 2013)

- *Kilgore v. KeyBank, N.A.*, 718 F.3d 1052 (9th Cir. 2013)

- http://www.youtube.com/watch?v=JJMS5OrdAcg.

- http://www.youtube.com/watch?v=OyMOlfDwE-I.

- http://www.youtube.com/watch?v=pjwvKXcvJgI

- BUSINESS WIRE, *While Banks Continue to Restrict Consumer Lending, CashCall Makes It Easier and Less Expensive for Families To Get the Money They Need*, Sept. 4, 2009

- Peter A. Diamond, *A Model of Price Adjustment*, 3 J. ECON. THEORY 156 (1971)

- WILLIAM FAULKNER, *THE HAMLET* (1940)

- Peggy Lowe, *CashCall Must Halt "Loan Shark Tactics"*, ORANGE COUNTY REGISTER, Aug. 26, 2009 at A

- Ronald J. Mann, *Bankruptcy Reform and the "Sweat Box" of Credit Card Debt*, 2007 ILL. L. REV. 375

- Gretchen Morgenson, *Find the Loan Behind the Loans*, N.Y. TIMES, Sept. 8, 2013 at BU1

- Steve Salop & Joseph E. Stiglitz, *The Theory of Sales:  A Simple Model of Equilibrium Price Dispersion with Identical Agents,* 72 AM. ECON. REV. 1121 (1982)

- Michael A. Stegman, *Payday Lending*, 21 J. ECON. PERSPECTIVES 169 (2007)

- Joseph E. Stiglitz & Andrew Weiss, *Credit Rationing in Markets with Imperfect Information*, 71 AM. ECON. REV. 393 (1981)

- Elizabeth Warren, *Unsafe at Any Rate*, DEMOCRACY (Summer 2007)

- Todd J. Zywicki, *Money to Go*, 33 REGULATION 32 (2010)

- Todd J. Zywicki, *Consumer Use and Government Regulation of Title Pledge Lending*, 22 LOYOLA CONS. L. REV. 425 (2010)

- CASHCALL 009017 (Exhibit 71 & Exhibit 72)

- CASHCALL 009524-009594 (Exhibit 56)
- CASHCALL 023981 (Exhibit 79)
- CASHCALL 023988 (Exhibit 83)
- CASHCALL 025812-025916 (Exhibit 75)
- CASHCALL 026058-026090 (Exhibit 77)
- CASHCALL 026091-026199 (Exhibit 76)
- CASHCALL 024148 (Exhibit 81)
- CASHCALL 023985-023987 (Exhibit 82)
- CASHCALL 023988-023999 (Exhibit 83)

# Exhibit 7

**EXPERT REBUTTAL REPORT OF PROFESSOR ADAM J. LEVITIN**

**Introduction**

1.      My name is Adam Jeremiah Levitin.  I was retained by the Sturdevant Law Firm ("Counsel"), on behalf of the law firms representing the plaintiff class (the "Plaintiff Class") in *O'Donovan v. CashCall, Inc.*, No. C-08-03174 MEJ (N.D. Cal.) to provide expert testimony regarding the consumer finance industry in relation to the question of unconscionability of certain loans made by defendant CashCall, Inc. ("CashCall") and Does 1-50 (collectively with CashCall, the "Defendants").

2.      I have prepared this rebuttal report after having read the report submitted by CashCall's expert, Professor Christopher M. James.  Unless otherwise defined, capitalized terms in this rebuttal report refer to terms as defined in my initial expert report dated September 15, 2013.  An appendix contains a listing of the additional documents I consulted in preparing this report.

**I. JAMES REPORT**

3.      Mr. James posits in his report among other claims that:

a.   Class members were in a position to compare interest rates[1];

b.   Class members could have obtained credit through Alternative Loan Products if they did not like the terms offered by CashCall;[2]

c.   CashCall faced direct competition for other California Finance Lenders from 2009 onward.

d.   CashCall loans were "affordable to most Class members."[3]

4.      Mr. James is incorrect.  His claims are either contrary to the evidence or speculative and unsupported by evidence or narrowly true, but presented in a misleading manner.

**A.  Mr. James Erroneously Claims that Class Members Were In a Position to Compare Interest Rates**

1.      Mr. James asserts that because CashCall allegedly disclosed the terms of the $2600 Signature Loan product adequately, "Class members were in a position to compare interest rates charged by CashCall throughout most of the Class Period to those charged by other consumer financial lenders…and to make informed decisions about whether to accept a CashCall loan."[4]

---

[1] James Report, ¶ 19.
[2] James Report, ¶¶ 38-55.
[3] James Report, ¶¶ 66-67
[4] James Report, ¶ 19.

2.      Mr. James is incorrect.  His assertion ignores the fundamental nature of borrowing in the market for $2600 signature loans, the limited substitutability and availability of other financial products, as well as academic research on consumer financial decisions-making.

3.      The $2600 Signature Loan market is a duress lending market.  Only consumers in financial distress would consider taking out a loan at 96% or 135% APR.  CashCall's advertising underscores the duress nature of the market.  Mr. John Fuller, who handled CashCall's account at an outside advertising firm described the target audience for CashCall's commercials:  "It turned out that the target…is all adults who have a need for cash and—which, as I said, as often as not was they were stuck in a jam and needed cash in order to get out of a jam".[5]  Such a "jam" might include "fixing a car"—necessary to get to work and have income or for child or elder car—or "going home for a funeral of a parent", an event that cannot be readily delayed.[6]  Thus, CashCall's advertisements featuring Gary Coleman emphasize that CashCall is for when "you get into a tight spot and need cash fast" or when you've already auctioned off your clothes and vehicle and no one will lend you money, not even relatives.[7]

4.      One of CashCall's competitors in the $2600 signature loan market is even named "S.O.S. Loans."  The name says it all.  The $2600 Signature Loan market is a duress lending market.

5.      In a duress lending market, consumers do not engage in careful comparison-shopping for the best price.  Instead, they take the first deal that comes along that satisfies their financial needs as long as the cost is below some very high "reserve price" (i.e. they might balk if the price were "a pound of flesh").

6.      Borrower disregard of price beneath a reserve price in duress markets is confirmed by a recent Pew Charitable Trusts study.  The Pew study found that 37% of payday loan borrowers say they have been in such a difficult situation that they would take a payday loan on any terms offered.[8]  Presumably some additional percentage of payday borrowers were unwilling to admit to the extent of their desperation out of embarrassment.

---

[5] Fuller Deposition Transcript, 45:22-46:1.

[6] Fuller Deposition Transcript at 44:15-16.

[7]      CashCall      TV      advertisements,      *available      at* http://www.youtube.com/watch?v=pjwvKXcvJgI ("Recently, I needed some cash, *fast*. I saw a commercial for CashCall and called 866-590-CASH.  $10,000 was in my account the next day.  So if you get into a tight spot and need cash fast, try CashCall."); http://www.youtube.com/watch?v=JJMS5OrdAcg.  ("No one else would lend me money, not even my relatives!");  http://www.youtube.com/watch?v=OyMOlfDwE-I ("I auctioned off my clothes.  I even tried to auction off my car, but when you need cash fast, make the Cash Call.").

[8] Pew Charitable Trusts, *How Borrowers Choose and Repay Payday Loans*, Payday Lending in America, Report #2, Feb. 2013, at 19-20, *at* http://www.pewstates.org/uploadedFiles/PCS_Assets/2013/Pew_Choosing_Borrowing_Payday_Feb2013.pdf.

7.     Applying for a loan without comparison shopping is the very borrowing process urged in CashCall's commercials by spokesman Gary Coleman: "Recently, I needed some cash, *fast*. I saw a commercial for CashCall and called 866-590-CASH. $10,000 was in my account the next day. So if you get into a tight spot and need cash fast, try CashCall."[9]

8.     The message being sent to consumers in CashCall's advertising is "Don't bother looking around. Just pick up the phone and call us, and we'll get you the money you need."[10] Prior to 2007, CashCall's television advertisements did not disclose the cost of a CashCall loan.[11]

9.     Mr. James assumes that there were other financial products available to Class members at the time they took out their CashCall loans that would have met their financial needs. As discussed below in ¶¶ 15-31 and in my initial expert report, ¶¶ 44-54, other consumer financial products such as payday loans, pawnbroker loans, tax refund anticipation loans, and auto title loans, are imperfect substitutes for the CashCall $2600 Signature Loan and may not have met consumers' financial needs. Moreover, as discussed below, Class members might not have qualified for these products (¶¶ 23-31) or for other $2600 signature loan products (¶¶ 36-37). Thus, Class members may not have had a viable choice, and to find out would have necessitated application for the other products, a luxury that consumers who "need cash fast" do not have.

10.    Mr. James's assertion also ignores the overwhelming weight of academic research in consumer finance over the past decade. The academic understanding of consumer financial behavior has been completely reshaped by the insights of "behavioral economics." Whereas classical economics posits completely rationale actors, behavioral economics recognizes that consumer behavior is often irrational, albeit in somewhat predictable ways.

11.    Among the findings of behavioral economics research on consumer finance is that consumers frequently make poor financial decisions, such as borrowing on higher cost financial products, when lower cost products are available. Thus, payday loan borrowers frequently have liquidity available on credit cards that carry substantially lower interest rates.[12]

---

[9]    CashCall    TV    advertisement,    *available*    *at* http://www.youtube.com/watch?v=pjwvKXcvJgI.

[10] *See* Fuller Deposition Transcript, 98:9-99:12 (hypothesizing consumer making call to apply for loan after seeing advertisement); Fuller Deposition Transcript, 140:19-143:14 (describing call spikes in near immediate response to airing of CashCall ads).

[11] Declaration of Hilary Holland in Support of CashCall, Inc.'s Opposition to Plaintiffs' Motion for Class Certification, ¶5.

[12] Sumit Agarwal et al., *Payday Loans and Credit Cards: New Liquidity and Credit Scoring Puzzles?* 99 AM. ECON. REV. PAPERS & PROCEEDINGS, 412 (2009); Susan Payne Carter et al., *Pecuniary Mistakes? Payday Borrowing by Credit Union Members*, in RETIREMENT SECURITY AND THE FINANCIAL MARKETPLACE (Olivia S. Mitchell & Annamaria Lusardi, eds.) (2011).

12. When consumer irrationality is combined with a duress market where consumers have limited, if any, alternatives, the mere disclosure of terms, no matter how clear, is ineffective to enable consumers to protect their interests.  Instead, in such a market, consumers are at the mercy of the lender, who has the ability to impose harsh one-sided terms on the consumer, just as CashCall did with the Class members.

**B.  Mr. James Erroneously Claims that Class Members Could Have Obtained Credit Through Alternative Loan Products If They Did Not Like the Terms Offered by Cashcall**

13. Mr. James claims that certain "Alternative Loans Products"—payday loans, auto title loans, tax refund anticipation loans, and pawnbroker loans—although only indirectly competing with CashCall "were comparable to CashCall's loans in many respects" and were available to Class members.[13]

14. He is wrong.  The Alternate Loan Products described by Mr. James are poor substitutes for a CashCall $2600 signature loan and not meaningfully comparable.  Moreover, Mr. James has not established that these products were generally available to Class members.

*Alternate Loan Products Had Substantially Shorter Maturities than the CashCall $2600 Signature Loan*

15. All of the Alternate Loan Products are for substantially shorter terms than a CashCall $2600 loan. The maturity figures presented in Mr. James's report are misleading because he compares the "actual" maturities of CashCall loans to those of Alternate Loan Products.[14]  A comparison of "actual maturities" is not meaningful because borrowers do not know actual maturities when choosing a financial product.  Instead, they may only know the formal maturity. Actual maturities relate to things like the option to prepay or rollover, but many borrowers for short-term credit products like payday loans do not believe that they will be using the product beyond the formal maturity.[15]

16. Mr. James's figures are also misleading because they are based on national averages that reflect different regulatory regimes than California's.[16]  Thus, Mr. James states that the "actual maturity" of payday loans is 6 months.  This statement is incorrect concerning California payday loans. The maximum legal length of a payday loan in California is 31 days.[17] California law expressly prohibits rollover fees or the

---

[13] James Report, ¶ 39.

[14] James Report, Exhibit 10.   It is not clear how Mr. James is computing "actual maturity" for CashCall $2600 Signature Loans.

[15] Pew Charitable Trusts, *How Borrowers Choose and Repay Payday Loans*, Payday Lending in America, Report #2, Feb. 2013, at 19-20, *at* http://www.pewstates.org/uploadedFiles/PCS_Assets/2013/Pew_Choosing_Borrowing_Payday_Feb2013.pdf.

[16] For example, Mr. James obtains his payday loan data from a 2005 FDIC study that used national data.

[17] CAL. FIN. CODE § 23035(a).

repayment of one payday loan with another.[18]  As a result, a payday loan in California cannot actually be extended beyond its maximum 31-day maturity unless the lender is willing to do so for free.  The actual average length of a California payday loan is a 16-17 days.[19] Maturities on California payday loans are substantially shorter than those of the CashCall $2600 Signature Loan.

17.     Similarly, Mr. James cites pawnbroker loan information from *Texas* despite this being a California case.  Pawnbroker regulation varies considerably by state, and the Texas data reported by Mr. James is not reflective of California's regulatory regime for pawnbrokers.  Mr. James reports that pawnbrokers charge an average 240% APR (the maximum allowed by Texas law), and that actual pawn maturities are up to 4 months.

18.     California has a different and more complex usury cap for pawnbrokers.[20] More critically, California requires that pawnbroker loans be for 4 months plus a 10-day statutory redemption period.[21]  In any event, the maturities on pawnbroker loans are substantially shorter than those of the CashCall $2600 Signature Loan.

19.     Auto title loans are frequently 1-month loans.[22]  These loans may often be rolled over, but the formal maturity is 1-month, and the consumer is not guaranteed the rollover. The maturities on auto title loans are substantially shorter than those of the CashCall $2600 Signature Loan.

20.     Tax refund anticipation loans are 1-2 week loans, with an average maturity of 11 days.   These loans are made by affiliates of major tax preparers based on a consumer's anticipated tax refund (usually based on an Earned Income Tax Credit). They cannot be rolled over.   The maturities on tax refund anticipation loans are substantially shorter than those of the CashCall $2600 Signature Loan.

21.     Table 1, below, summarizes the maturities of these different loan products and shows that the Alternate Loan Products identified by Mr. James are not comparable to CashCall loans in terms of maturities.

| Table 1:  Maturity Comparison between CashCall and Alternate Loan Products | |
| --- | --- |
| **CashCall** | **42 months** |
| Auto Title Loans | 1 month |
| Pawnbroker Loan | 4 months and 10 days |
| Payday Loan (California) | 31 days |
| Tax Refund Anticipation Loan | 7-14 days |

---

[18] CAL. FIN. CODE §§ 23036(b) (prohibiting fees for extensions of time to repay); 23037(a) (prohibiting use of proceeds of one payday loan to pay off another).

[19] California Dept. of Business Oversight, *2011 Annual Report:  Operation of Deferred Deposit Lenders* 5 (2011).

[20] CAL. FIN. CODE §§ 21000(a)(1); 21200.5.

[21] CAL. FIN. CODE § 21201.

[22] *See* Todd J. Zywicki, *Money to Go*, 33 REGULATION 32 (2010).

22.    The differences in maturities make the Alternate Loan Products poor substitutes for the $2600 Signature Loan.  A borrower who wanted to roll over these shorter-term forms of credit to achieve a maturity similar to that on the CashCall $2600 Signature Loan would face the risk of not being able to obtain new credit or roll-over the existing credit because of changes in his/her own credit profile (e.g., depreciation in value of collateral or loss of employment) or because of changes in the national economy—a very real problem for borrowers during the Class Period.

*Alternate Loan Products Were Not Available to All Class Members*

23.    Mr. James asserts that the Alternate Loan Products were available to Class members.[23]  He is wrong and has no basis for making this assertion.

24.    Mr. James's assertion implies that the Alternate Loan Products have similar underwriting characteristics to CashCall's $2600 Signature Loan Product.  Mr. James, however, does not know the underwriting criteria and eligibility guidelines used by lenders offering Alternate Loan Products.  Indeed, whereas Mr. James claims that other signature lenders' products "involved similar underwriting criteria and a similar application process,"[24] he makes no parallel assertion about the Alternate Loan Products.  Accordingly, he has no basis for asserting their similarity to CashCall's for the $2600 Signature Loan, much less their availability to Class members. (The same applies to Mr. James's assertions regarding the availability to Class members of signature loans from other California Finance Lenders, discussed below, ¶¶ 36-37.)  Mr. James simply has no basis for his assertions regarding the availability of alternative financing sources for Class members.

25.    CashCall had complex and selective underwriting guidelines, based not solely on verified income or on credit scores.[25]  For example, CashCall's Underwriting August 18, 2005 Underwriting Guidelines for the $2600 Signature Loan had four different "programs" or sets of criteria on which a borrower could be approved.[26]  All borrowers in all programs had to meet a minimum bankruptcy score,[27] and not have filed for bankruptcy within the past 7 years or be in a debt reduction or credit counseling program.[28]  Beyond this, underwriting requirements varied based on program.  Only one program permitted borrowers to have bad debts (collections, liens, etc.) that exceeded loan amount.[29]  Minimum FICO scores varied by program,

---

[23] James Report, ¶ 49.

[24] James Report, ¶ 59.

[25] *See, e.g.*, CASHCALL 006015; CASHCALL 006018; CASHCALL 006028; CASHCALL 006033; CASHCALL 006036; CASHCALL 006040; CASHCALL 006118; CASHCALL 006150; CASHCALL 006151; CASHCALL 023775.  *See also* Marchand Depo. Transcript, 90:10-94:10.

[26] CASHCALL 006018.

[27] CASHCALL 006018.   Marchand Depo. Transcript, 94:1-6 (discussing analogous provisions in CASHCALL 006015, the June 30, 2005 Underwriting Guidelines).

[28] CASHCALL 006018.

[29] CASHCALL 006018.   Marchand Depo. Transcript 94:7-10 (discussing analogous provisions in CASHCALL 006015, the June 30, 2005 Underwriting Guidelines).

as did the requirement of a minimum residual income (if any was required).[30]  All programs required a minimum number of "tradelines," but the number and the requirement that these tradelines be seasoned varied by program.[31]  Programs varied regarding what could be counted as a tradeline.[32]  Whether income verification was required varied,[33] and self-employment was permitted only under some programs.[34]

26.    Mr. James has no knowledge of how the Alternate Loan Products' underwriting requirements compared to CashCall's, and the complexity of CashCall's underwriting guidelines (as well as their constant evolution) show that comparability of the Alternate Loan Products' underwriting requirements cannot be blithely assumed.

27.    Given that some of the Alternate Loan Products, such as auto title loans, pawnbroker loans, and tax refund anticipation loans are collateralized, the underwriting and eligibility guidelines are necessarily dissimilar to CashCall's.

28.    Without knowing the underwriting and eligibility guidelines for the Alternate Loan Products, Mr. James has no basis to assume that they would be "available" for Class members, as Mr. James cannot know whether Class members would qualify for and receive the Alternate Loan Product, much less whether that Alternate Loan Product would meet the Class member's financial needs in terms of loan amount, maturity, and price.  Without knowing who would qualify for these products, Mr. James's assertion that these Alternate Loan Products were "available" to Class members is only speculation.

29.    In fact it is clear that many, if not all of the Alternate Loan Products would not be available to Class members.  All of the Alternate Loan Products require something beyond a simple signature.  Car title loans require clear title to a vehicle of sufficient value.  Auto title lenders will only lend for a small fraction of the vehicle's value; loans are rarely for more than a third of car value.[35]  This would mean that to get a $2,600 loan, a consumer would have to have clear title to a car worth at least $7,800. Few consumers are likely to have clear title to a car of such value.

30.    Pawnshops require an item of sufficient value for the pawnbroker to take as a pledge.  Payday loans require proof of a job that is not self-employment.  Tax refund anticipation loans require that an approved tax preparer conclude that the consumer is entitled to a tax refund and a consumer can only receive one once a year.   Class members might not have been able to take advantage of some, if not all of these

---

[30] CASHCALL  006018.   *See also* Marchand Depo. Transcript, 91:8-11 (discussing analogous provisions in CASHCALL 006015, the June 30, 2005 Underwriting Guidelines).

[31] CASHCALL 006018.   Marchand Depo. Transcript 93:21-25 (discussing analogous provisions in CASHCALL 006015, the June 30, 2005 Underwriting Guidelines).

[32] CASHCALL 006018.

[33] CASHCALL  006018.   Marchand Depo. Transcript 93:7-16 (discussing analogous provisions in CASHCALL 006015, the June 30, 2005 Underwriting Guidelines).

[34] CASHCALL  006018.    Marchand Depo Transcript 93:17-20 (discussing analogous provisions in CASHCALL 006015, the June 30, 2005 Underwriting Guidelines).

[35] Kristin Arnold, *Car Title Lending:   Short-Term Fix with Long-Term Expense*, Bankrate.com (Nov. 18, 2005).

Alternate Loan Products because of these restrictions on their availability based on requirements beyond a simple signature.

31.    All of the Alternate Loan Products other than Tax Refund Anticipation Loans typically involve substantially smaller loans than a CashCall $2600 loan.  Even if Class members could have obtained credit from these Alternative Loan Products, they would have had to take out multiple loans to obtain the same volume of credit, and when combined with the short terms of these Alternate Loan Products, they would have to be juggling multiple short-term loans to achieve something close to the CashCall $2600 Signature Loan product.  The Alternate Loan Products identified by Mr. James are not meaningfully comparable to CashCall's $2600 Signature Loan and are only indirect substitute for it.  Even to the extent a Class member found the Alternate Loan Products a sufficient substitute, there is no evidence that the Alternate Loan Products were truly available to Class members (in terms of qualifying for the loans) at the time they obtained their CashCall $2600 Signature Loans.

### C.  Mr. James Claims Without Evidence that CashCall Truly Had Direct Competition from Other California Finance Lenders from 2009, and the Information Mr. James Presents Is Misleading

32.    Mr. James claims that CashCall faced direct competition for other California Finance Lenders from 2009 onward. Mr. James, however, does not adduce any evidence that these lenders were in fact in direct competition with CashCall for the same borrowers. The evidence Mr. James presents is about the *current* products offered by these California Finance Lenders, which Mr. James *assumes* is historically accurate for the Class Period.

33.    Mr. James claims that as of 2009, CashCall faced direct competition from other consumer lenders.[36]   He notes that "some of those lenders, including Dollar Loan Center, Plain Green Loans, Great Plains Lending, KwikCash, Quick Click Loans, and SOS Loans, had begun offering loan products with principal amounts, interest rates, and maturities comparable to those of CashCall's $2,600 loans during the Class Period.  (*See* Exhibit 11)".  Mr. James's support for this claim is found in Exhibit 11. Exhibit 11, however, does not in fact support Mr. James's claims.

### There is No Evidence That Other California Finance Lenders Actually Made $2600 Signature Loans During the Class Period

34.    Mr. James's report contains no evidence that these other California Finance Lenders ever made $2600 signature loans during the Class Period.  The fact that these lenders make such loans today is not evidence that they did so during the Class Period.  Indeed, one of the other California Finance Lenders has had a California Finance Lender license since 1999, but CashCall was telling its investors as late as 2007 that its $2600 Signature Loan was a unique product with no competition.[37]  This indicates that the fact that another California Finance Lender which currently offers a $2600

---

[36] James Report ¶ 56.

[37] CASHCALL 025824, CASHCALL 025887; CASHCALL 026160; CASHCALL 026059.

signature loan was in existence during the Class Period is not evidence of that Lender having offered $2600 signature loans during the Class Period.

*There Is No Evidence That Class Members Qualified for Other California Finance Lenders' $2600 Signature Loan Products During the Class Period*

35.     Even if these other California Finance Lenders were offering $2600 signature loans during the Class Period, it is impossible to say that they were actually in competition with CashCall without knowing their underwriting and eligibility criteria for signature loans for $2600.   Mr. James's report indicates that at least some of these other California Finance Lenders had different underwriting requirements than CashCall, such as not making $2600 loans to first-time borrowers.[38]   It is possible that the other California Finance Lenders that made $2600 signature loans were making loans to borrowers who would not qualify for CashCall loans or would not have made loans to Class members.  Indeed, I am informed by counsel that none of the named plaintiffs obtained signature loans from other California Finance Lenders.

36.     Mr. James *assumes* that the underwriting and eligibility criteria for $2600 signature loans from other California Finance Lenders was equivalent to CashCall's, such that they would actually be competing for the same borrowers.[39]   Yet he presents no evidence of this. Instead, Mr. James merely notes that other signature lenders use the same general kinds of criteria in their underwriting, "such as credit score and income"[40] and that two of signature lenders "have minimum requirements and qualifications such as borrower income and credit history that determine whether a borrower is eligible for a loan."[41]

37.     The similarities Mr. James cites in underwriting criteria among signature lenders are on such a high level of generality that they fail to providing a meaningful basis for his assumption that CashCall and other signature lenders were directly competing for the same customers.  Indeed, the fact that Mr. James notes that these are the same type of "criteria [that] are used throughout the lending industry—even by mortgage lenders such as Fannie Mae" indicates what a level of generality his comparison is on. Just because two lenders used credit scores in their underwriting does not mean that they would be willing to lend to the same borrowers.  One might be lending to borrowers only with higher scores than the other.   As Mr. Robert Marchand, CashCall's underwriting manager from 2003-2007 underwriter and one of two underwriters at CashCall thereafter observed, underwriting requirements for "every loan do[] not pertain to every borrower."[42]   Absent some indication of the actual underwriting guidelines, rather than general categories of inputs into underwriting, there is no evidence to support either of Mr. James's assumptions.

---

[38] James Report, Exhibit 11, Footnotes 4-5.
[39] James Report, ¶ 59.
[40] James Report, ¶ 59.
[41] James Report, ¶ 59.
[42] Marchand Depo. Transcript 83:13-19.

*Mr. James's Report Does Not Address the Evidence That CashCall Did Not Believe That It Had Anything Beyond "Minor Competition" During the Class Period*

38.   Neither CashCall's CFO nor the outside advertising executive in charge of CashCall's advertising could name any CashCall competitors even as of the date of their depositions.   CashCall's CFO Delbert Meeks other signature lenders are merely "minor players."[43]  Mr. Meeks was unable to identify any of CashCall's competitors by name at his deposition.

39.   Similarly John Fuller, who handled CashCall's advertising was unable to identify anything but indirect competitors such as payday lenders.[44]  Instead, Fuller noted that "CashCall was a totally unique kind of product."[45]

40.   Mr. James's report does not address this evidence of lack of direct competition.

*Mr. James's Report Is Misleading In Its Presentation of CashCall's Alleged Direct Competitors*

41.   Mr. James's report is misleading in its presentation of CashCall's alleged direct competitors.   I express no opinion on whether the information is intentionally or merely accidentally misleading.

42.   Exhibit 11 to Mr. James's report presents a comparison of the CashCall with these other lenders.   Buried in footnotes to the Exhibit in a scarcely legible 6-point font, however, are critical details not mentioned by Mr. James in his report.   I have reproduced one of the James footnotes in its original 6-point font to underscore just how his report is misleading:

Loan profiles are as of September 17, 2013. All competitors were founded before the end of the Loan Unconscionability Class Period, July 10, 2011, though Great Plains Lending and Plain Green Loans were founded within 3 months of the end of the Loan Unconscionability Class Period.

43.   Two of the lenders, Great Plains Lending and Plain Green Loans, only received their California Finance Lender's License within the last three months of the Class Period.[46]  It is not clear whether they made *any* loans in California during the Class Period.   It is highly unlikely, however, that either made any $2600 signature loans in California during the Class Period.

44.   Great Plains Lending and Plain Green Loans both cap first time borrowers at no more than $1000/loan.[47]  Presumably, these firms want to see if a first time borrower repays before extending a greater amount of credit.   This means it highly unlikely that either company made any loans for $2500-$2600 in California during the Class Period, because two or three months time in the California market during the Class Period would not provide enough time to make a loan to an individual borrower and adequately evaluate repayment behavior before making a larger loan for $2500-$2600.[48]

---

[43] Meeks Deposition Transcript, Vol. II at 363:14-15.

[44] Fuller Deposition Transcript, 42:18-43-24.

[45] Fuller Deposition Transcript, 41:1.

[46] *See* James Report, Exhibit 11, Footnote 1.

[47] *See James*, Exhibit 11, Footnotes 4-5.

[48] *See* Marchand Depo. Transcript 83:7-12 (discussing when a tradeline is considered "seasoned".).

45. In addition, Mr. James notes that the average term length on Great Plains Lending loans being a mere 9 months and those on Plain Green Loans being 18 months. The average term length on a CashCall loan is 42 months. Great Plains Lending and Plain Green Loans' late entry into the California market combined with their initial loan cap of $1000 and their significantly shorter maturities means that contrary to Mr. James's report, these companies had not in fact "begun offering loan products with principal amounts, interest rates, and maturities comparable to those of CashCall's $2,600 loans during the Class Period." To suggest so on the facts presented by Mr. James in Exhibit 11 to his report is misleading.

46. Mr. James has not presented evidence that CashCall ever had direct competition in the $2600 Signature Loan market during the Class Period, and his report makes no claim that CashCall had any competition in the $2600 Signature Loan market prior to 2009. This suggests that CashCall was a monopolist in the $2600 Signature Loan market for much, if not all of the Class Period, meaning that Class Members did not have a "meaningful choice" in the $2600 Signature Loan market.[49]

### D. *Mr. James Wrongly Asserts that CashCall Loans Were "Affordable" to Most Borrowers*

47. Mr. James claims that CashCall's $2600 loans were affordable to most borrowers.[50] He is wrong.

48. CashCall loans were made to borrowers with poor credit scores, indicating that these borrowers had difficulty repaying their obligations on time in the recent past. (Activity in the past 2-3 years reputedly has the greatest impact on FICO scores.)

49. CashCall understood that FICO scores were a prime determinant of default rates.[51] As Mr. James notes, CashCall borrowers were "subprime" and thus posed "a relatively high credit risk for CashCall's borrower pool".[52] Mr. James observes that CashCall thus charged a correspondingly high price for its loans.[53] This observation is in tension with the Mr. James's claim that CashCall loans are affordable.

50. CashCall designed the loans to have 35%-40% default rates (as computed using CashCall's default rate measurement methodology; I note that on a per borrower, rather than per loan basis, the default rate is in fact higher, and closer to 50%).

51. CashCall had no ability to guarantee the affordability of the $2600 Signature Loan to its 42-month maturity. Consumers often have volatile financial lives, particularly cash-strapped borrowers like those who CashCall targets. This is why there are very few sources of long-term unsecured consumer credit; almost all other lenders are reluctant to assume repayment risk based solely on consumers' income projected out beyond a month. Thus credit card and payday loans have very short maturities.

---

[49] *See Pinnacle Museum Tower Ass'n v. Pinnacle Market Development (US), LLC*, 55 Cal. 4th 223, 247 (Cal. 2012) ("[P]rocedural unconscionability requires oppression or surprise. Oppression occurs where a contract involves lack of negotiation and meaningful choice".).

[50] James Report, ¶ 64-66.

[51] Meeks Depo. Transcript, 79:15-80:19.

[52] James Report, ¶¶ 24-25.

[53] James Report, ¶¶ 23-25

52.   The only source Mr. James cites for the proposition that "CashCall looked at the ability to repay as opposed to just the credit profile" is an executive from CashCall's outside advertising, Mr. John Fuller.[54]  Mr. Fuller had no involvement in CashCall's underwriting, however, and would not be in a position to opine on CashCall's underwriting with any authority.

53.   Finally, if CashCall loans were as affordable as Mr. James contends, the high rates of prepayment become difficult to explain.  The high rates of prepayment indicate that consumers did not think that CashCall loans were affordable and instead would pay off the loan whenever they in fact had the financial capacity to do so, such as after receiving a tax refund.[55]

54.   Mr. James's assertion that CashCall loans were affordable to most borrowers defines affordable to mean nothing beyond lack of default.  This is not a reasonable view of affordability.  CashCall loans clearly placed a major financial strain on a large percentage of its borrowers, such that nearly half defaulted.  Others managed to pay, but struggled and made sacrifices to do so.  And others were lucky enough to have the financial capacity to prepay and did so to escape the onerous terms of the CashCall loan.  To pay 96% or 135% annual interest for a $2600 loan for 42 months defies any meaningful concept of affordability.

## CONCLUSION

55.   Based on the forgoing analysis, it is my opinion that Mr. James's report errs in its fundamental methods and ultimate opinions regarding:  the justification of CashCall's interest rates; the ability of Class members to readily shift their consumption from CashCall to Alternate Loan Products or other signature loans; the extent of CashCall's alleged direct competition; and the affordability of the CashCall loans to Class members

56.   I reserve the right to amend and supplement this report and to submit a rebuttal report.

57.   Under the pain and penalty of perjury, I declare the foregoing to all be correct and true to the best of my knowledge.

EXECUTED on the 15th day of October 2013, in Chevy Chase, Maryland.

---

[54] James Report, ¶ 65.
[55] James Report, ¶ 40.

**Appendix:  List of Documents Consulted**

- Expert Report of Christopher M. James, Sept. 18, 2013

- Expert Report of Bruce Carlin, Sept. 18, 2013

- CASHCALL 006015

- CASHCALL 006018

- CASHCALL 006028

- CASHCALL 006033

- CASHCALL 006036

- CASHCALL 006040

- CASHCALL 006118

- CASHCALL 006150

- CASHCALL 006151

- CASHCALL 023775

- CASHCALL 025824

- CASHCALL 025887

- CASHCALL 026160

- CASHCALL 026059

- Sumit Agarwal et al., *Payday Loans and Credit Cards: New Liquidity and Credit Scoring Puzzles?* 99 AM. ECON. REV. PAPERS & PROCEEDINGS, 412 (2009)

- Lawrence M. Ausubel, *The Failure of Competition in the Credit Card Market*, 81 AM. ECON. REV. 50 (1991).

- Susan Payne Carter et al., *Pecuniary Mistakes? Payday Borrowing by Credit Union Members*, in RETIREMENT SECURITY AND THE FINANCIAL MARKETPLACE (Olivia S. Mitchell & Annamaria Lusardi, eds.) (2011)

- Todd J. Zywicki, *Money to Go*, 33 REGULATION 32 (2010).

- Pew Charitable Trusts, *How Borrowers Choose and Repay Payday Loans*, Payday Lending in America, Report #2, Feb. 2013, *at* http://www.pewstates.org/uploadedFiles/PCS_Assets/2013/Pew_Choosing_Borrowing_Payday_Feb2013.pdf.

- Transcript of Deposition of Robert Marchand (May 29, 2013)

- Transcript of Deposition of Delbert Orien Meeks, III (June 13, 2013)

- Transcript of Deposition of John Stephen Fuller (August 9, 2013)

- Declaration of Hilary Holland in Support of CashCall, Inc.'s Opposition to Plaintiffs' Motion for Class Certification

- Kristin Arnold, *Car Title Lending:  Short-Term Fix with Long-Term Expense*, BANKRATE.COM (Nov. 18, 2005)

- CAL. FIN. CODE §§ 21000; 21200.5; 21201 22002; 22304-05; 22334; 23035-37

- California Dept. of Business Oversight, *Annual Report:  Operation of Deferred Deposit Lenders* (2005-2011)

- California Dept. of Business Oversight, *Annual Report:  Operation of Finance Companies Licensed Under the California Finance Lenders Law* (2001-2011).

- *Pinnacle Museum Tower Ass'n v. Pinnacle Market Development (US), LLC*, 55 Cal. 4th 223 (Cal. 2012)

- CashCall TV commercials:  http://www.youtube.com/watch?v=JJMS5OrdAcg; http://www.youtube.com/watch?v=OyMOlfDwE-I; http://www.youtube.com/watch?v=pjwvKXcvJgI

# Exhibit 8

DEPOSITION OF BRENDAN MYLES McCARTHY - VOL. I - 3/15/2010

1

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4    KRISTA O'DONOVAN, and EDUARDO DE      )
     LA TORRE, individually and on         )
5    behalf of all others similarly        )
     situated,                             )
6                                          )
                      Plaintiffs,          )
7                                          )
          vs.                              )   CASE NO.
8                                          )CV 08-3174-MEJ
     CASHCALL, INC., a California          )
9    corporation; and DOE 1 through DOE    )
     50, inclusive,                        )
10                                         )
                      Defendants.          )
11   _____)

12

13

14                   PAGES 1 - 163

15

16   Deposition of:  BRENDAN MYLES MCCARTHY (VOLUME I)

17   Date and time:  Monday, March 15, 2010, 1:04 P.M.

18   Location:       695 Town Center Drive
                     Costa Mesa, California
19

20

21

22

23    Reporter:

24    Pamela Cotten, CSR, RDR
      Certificate No. 4497
25    Certified Realtime Reporter

DEPOSITION OF BRENDAN MYLES McCARTHY - VOL. I - 3/15/2010

11

1      A     I believe the owner of the company.

2      Q     Who was your supervisor when you were a loan

3  agent?

4      A     Tony Gaeta.

5      Q     Was his job at the time, the production

6  manager?

7      A     Correct.

8      Q     What are your general responsibilities as the

9  production manager at CashCall?

10     A     Generally I -- it is my responsibility to hire

11  agents, oversee their training, oversee and evaluate

12  their job performance and production, and just in

13  general hiring and terminating as I see fit.

14     Q     Do you do any of the same work that loan

15  agents do?

16     A     No.

17     Q     Okay.  I'd like to mark -- off the record.

18          (Off-the-record discussion.)

19          (The document referred to below was

20      marked Plaintiff's Exhibit 1 for

21      identification and is bound separately.)

22  BY MS. HUSTON:

23     Q     So if you could take a look at the document in

24  front of you?

25          MR. SEILING:  Do I get one?

Tornell and Cotten Professional Court Reporters
(714) 543-1600

DEPOSITION OF BRENDAN MYLES McCARTHY - VOL. I - 3/15/2010

12

1      MS. HUSTON:  I'm sorry.  I knew I brought enough

2   copies.

3   BY MS. HUSTON:

4      Q   You don't have to read it cover to cover, but

5   can you tell me if you recognize that document.

6      A   No.  I don't believe I have seen this before.

7      Q   Okay.  I'll state for the record this is the

8   notice of deposition of CashCall's person most

9   knowledgeable and request for production of documents.

10         Do you know what you are called to testify

11   about today?

12      A   It is my understanding I'm testifying about

13   production-based issues at CashCall.

14      Q   And you do believe that you are the person

15   that's most qualified to speak to those issues at

16   CashCall?

17      A   I do.

18      Q   Did you look at any other documents in

19   preparation for your deposition today?

20      A   Yes.

21      Q   Which documents did you look at?

22      A   When I met with our attorneys, they asked me

23   to look at several memos, documents, and so forth.

24      Q   Did you look at any other documents that were

25   on pleading paper like this?  Any documents that your

DEPOSITION OF BRENDAN MYLES McCARTHY - VOL. I - 3/15/2010

25

1    Q    Okay.  And, to the best of your knowledge,

2    neither of the other production managers primarily rely

3    on it either; correct?

4    A    As far as I know, correct.

5    Q    Okay.  Are there any written documents that

6    you rely on during the training process?

7    A    No.

8    Q    Are there any written documents that you

9    can -- that you know of the other production managers

10   using during the training process?

11   A    No.

12   Q    Are loan agents given any kind of script?

13   A    No.

14   Q    Go through a couple of exhibits.  While I'm

15   pulling all those out, just take a quick spin through

16   those because I'm going to be asking you some questions

17   about it.

18   A    Sure.

19        (Off-the-record discussion.)

20        (The document referred to below was

21   marked Plaintiff's Exhibit 2 for

22   identification and is bound separately.)

23   BY MS. HUSTON:

24   Q    I just handed you a couple documents.  I'm

25   going to go through each one and have you look at them

DEPOSITION OF BRENDAN MYLES McCARTHY - VOL. I - 3/15/2010

26

1    and ask a couple questions about them.  The first one

2    is marked Exhibit 2, and it starts as CashCall 782, the

3    Bates number, ends at CashCall 862 and it says on the

4    front, "New Hire Training Manual."  Do you recognize

5    that document?

6        A    I do.

7        Q    Can you -- have you seen it before?

8        A    I have.

9        Q    Does it look like a training manual that has

10   been used at CashCall at some point in time or you have

11   seen around the office?

12       A    Yes.

13       Q    In what capacity have you seen this?

14       A    Capacity of training new-hires.

15       Q    Were you trained with this document?

16       A    I don't remember.

17       Q    You don't remember seeing this document during

18   your training?

19       A    I don't.

20       Q    You weren't given a copy of it?

21       A    I could have been.  I don't remember.  It was

22   five years ago.

23       Q    Okay.  Do you remember if you were given a

24   copy of a training manual during your training?

25       A    I don't remember.

DEPOSITION OF BRENDAN MYLES McCARTHY - VOL. I - 3/15/2010

28

1        identification and is bound separately.)

2    BY MS. HUSTON:

3        Q    And then turning to Exhibit 4, which is marked

4    CashCall 1633 to 1635, it is titled "CashCall Loan

5    Agent Reference Tool."  What is this?

6        A    I believe this was the reference tool that was

7    available to production employees through a link in our

8    database that we use.

9        Q    Is it currently available through a link in

10   your database or it was previously?

11       A    I'm not certain, but I believe it is currently

12   available.  I'm not certain.

13       Q    Is it something that you use in your

14   day-to-day work?

15       A    No.  I don't have to refer to this on a

16   day-to-day basis.

17       Q    Do you use this in training loan agents, this

18   document?

19       A    I have, yes.

20       Q    Do you know who produced this document?

21       A    I do not.

22       Q    Do you know -- have you seen other loan agents

23   using it during their day-to-day work?

24       A    I have seen it used, yes.

25            (The document referred to below was

DEPOSITION OF BRENDAN MYLES McCARTHY - VOL. I - 3/15/2010

29

1      marked Plaintiff's Exhibit 5 for

2      identification and is bound separately.)

3  BY MS. HUSTON:

4      Q      And what's marked as Exhibit 5, which is

5  CashCall 1636 to 1638, this is also called a Loan Agent

6  Reference Tool.   The text on the cover is slightly

7  different.   Do you -- or text on the first page rather.

8  Do you know what this document is used for?

9      A      Similar capacity as Exhibit 4.

10     Q      It is available through a link in your

11 database?

12     A      I'm not certain to that, but it is very

13 likely.

14     Q      Okay.   Do you also use this document in

15 training?

16     A      I have.

17     Q      If you wanted to get this document, where

18 would you get it?

19     A      The first place I would look is in our

20 database.

21     Q      Does your database have a name?

22     A      Method.

23     Q      Is your database where you keep, for example,

24 any agency or larger department-wide documents such as

25 the manual, would the manual be in the --

DEPOSITION OF BRENDAN MYLES McCARTHY - VOL. I - 3/15/2010

42

1      A    I don't know if it is in writing.

2      Q    Is it -- what I'm trying to understand is if

3   it is a requirement or just a practice that CashCall

4   follows.

5      A    I wouldn't say it is a requirement.

6      Q    So -- but it is generally done by loan agents?

7      A    Depending on how the application was

8   submitted.

9      Q    Just talking about phone-in applications here.

10     A    Yeah.  If it is a phone-in application, then

11  the agent would call the borrower and update them on

12  the status.

13     Q    Okay.  Once that phone call is made to the

14  borrower, again, just sticking with phone-in

15  applications, what's the next step as far as production

16  is concerned?

17     A    Assuming it is fully approved, the next step

18  would be for the borrower to go online and sign their

19  promissory note.

20     Q    Does Production -- is Production involved in

21  that process ever?  Do they --

22     A    Yes.

23     Q    And how are they involved?

24     A    They can be on the phone with the borrower

25  during the actual online signing process.

DEPOSITION OF BRENDAN MYLES McCARTHY - VOL. I - 3/15/2010

43

1    Q    Is there any requirement that they be on the

2  phone --

3    A    No.

4    Q    -- with the borrower -- let me just finish

5  that question.

6         Is there any requirement that the loan agent

7  be on the phone with the borrower during the signing

8  process?

9    A    No.

10   Q    Once the borrower has signed the promissory

11 note, is there any further steps in the Production

12 Department?

13   A    Yes.

14   Q    Okay.  What happens next?

15   A    Next the application would go to our Funding

16 Department for review.

17   Q    Okay.  So the Production Department, the loan

18 agent, sends the file to Funding Department.  Is that

19 done manually or -- I'm sorry.  Is that done on paper

20 or electronically?

21   A    Electronically.

22   Q    Is it -- okay.

23        Is that the end of the loan as far as

24 Production is concerned, or does Production have any

25 further steps after it goes to the Funding Department?

DEPOSITION OF BRENDAN MYLES McCARTHY - VOL. I - 3/15/2010

45

1       Q      Absolutely.

2              (Recess taken.)

3    BY MS. HUSTON:

4       Q      Okay.  So we were talking about the general

5    process for loan applicants.  If the applicant [sic] is

6    done online versus over the phone, again, assuming that

7    the application is going to be approved -- I know you

8    don't know that when you get the application in, but we

9    are pretending that that's the case here.  The

10   application is going to be approved.  If the

11   application is submitted online, what's the next step?

12   What does a loan agent do with an application that's

13   submitted online?

14      A      It depends.  If the internet applicant had

15   already faxed in their documents, then the agent would

16   just submit the file to Underwriting.  If they don't

17   have the documents yet, then they would probably

18   attempt to contact the applicant.

19      Q      Okay.  Is the application that is filled out

20   by the loan agent on a phone-in application the same as

21   the application that's filled out by an internet

22   applicant?

23      A      That initial application?

24      Q      Uh-huh.

25      A      Yes.  That would be the same.

DEPOSITION OF BRENDAN MYLES McCARTHY - VOL. I - 3/15/2010

45

1        Q     Absolutely.

2              (Recess taken.)

3    BY MS. HUSTON:

4        Q     Okay.  So we were talking about the general

5    process for loan applicants.  If the applicant [sic] is

6    done online versus over the phone, again, assuming that

7    the application is going to be approved -- I know you

8    don't know that when you get the application in, but we

9    are pretending that that's the case here.  The

10   application is going to be approved.  If the

11   application is submitted online, what's the next step?

12   What does a loan agent do with an application that's

13   submitted online?

14       A     It depends.  If the internet applicant had

15   already faxed in their documents, then the agent would

16   just submit the file to Underwriting.  If they don't

17   have the documents yet, then they would probably

18   attempt to contact the applicant.

19       Q     Okay.  Is the application that is filled out

20   by the loan agent on a phone-in application the same as

21   the application that's filled out by an internet

22   applicant?

23       A     That initial application?

24       Q     Uh-huh.

25       A     Yes.  That would be the same.

DEPOSITION OF BRENDAN MYLES McCARTHY - VOL. I - 3/15/2010

46

1    Q    The main difference is that the loan agent is

2    doing the data entry in the phone-in situation?

3    A    Correct.

4    Q    There is no recorded disclosure at that point

5    either; correct?  I'm sorry.  In an internet

6    application there is no -- they are not on the phone so

7    they can't make a recorded tape disclosure; correct?

8    A    The same disclosure is written on the

9    application.

10   Q    Okay.

11   A    So it would be written as opposed to verbal.

12   Q    Is the -- and we will go over the application

13   at some point and then I'll ask you that.

14       Is the disclosure that's on the application,

15   is it something that a borrower has to check or

16   interact with in any way, or is it just written on the

17   document?

18   A    Yes.  I believe there's three boxes they have

19   to check.  At least two, possibly three.  They have to

20   physically check the boxes in order to submit the

21   application.

22   Q    Okay.  That are the similar disclosures that

23   are read in a tape on a phone-in application?

24   A    Correct.

25   Q    Then in an internet application, once it is

DEPOSITION OF BRENDAN MYLES McCARTHY - VOL. I - 3/15/2010

47

1    sent to Underwriting, understanding that it may need to

2    go to the Fraud Department, it may need to go to

3    Funding for further verification or they may ask for

4    additional information, but assuming that those don't

5    happen and the loan is approved or okayed by

6    Underwriting, the next step in an internet

7    application -- what happens after the loan file is

8    returned from Underwriting?  I guess they are notified

9    by e-mail; correct?  So once they are notified by

10   e-mail in an internet application, what's the next

11   step?

12        A    Well, any application is notified by e-mail.

13   The internet apps. -- internet applicants are more

14   likely to respond to the e-mail in a faster fashion

15   than a phone-in app., so it depends whether the

16   applicant gets the e-mail right away and responds to it

17   right away and then moves forward or if the agent

18   actually calls the borrower.

19        Q    Okay.  I think I understand, but let me back

20   up and ask a couple questions.  So once Underwriting

21   has said that the loan is approved by Underwriting, do

22   all applicants get an e-mail from CashCall?  Both

23   phone-in and internet applicants, do they get an e-mail

24   from CashCall at that stage?

25        A    Yes.

DEPOSITION OF BRENDAN MYLES McCARTHY - VOL. I - 3/15/2010

48

1     Q    And in the case of phone-in, an agent is more

2  likely to call right away at that stage; correct?

3     A    Yes, more likely.

4     Q    But both the phone and internet applicants,

5  both of them can complete their -- the whole

6  application process by responding to the e-mail from

7  CashCall following the steps in the e-mail from

8  CashCall?

9     A    Correct.

10     Q    Okay.  The next step for an Internet applicant

11  is that they need to sign the promissory note?

12     A    Yes.

13     Q    Correct?  Okay.

14          Is it fair to say, and I'm not talking about

15  differences in the person's application and what may be

16  required, but is it fair to say that loan applications

17  generally all go through the process we have just

18  walked through?

19     A    It is hard for me to say that's generally the

20  case because, as we have discussed, there is various

21  other reviews, departments, they could go through and

22  different ways the borrower and the agent could have

23  communicated or CashCall and the agent -- or CashCall

24  and the borrower could have communicated, so it is hard

25  for me to say it is generally true because there's a

DEPOSITION OF BRENDAN MYLES McCARTHY - VOL. I - 3/15/2010

47

1    sent to Underwriting, understanding that it may need to

2    go to the Fraud Department, it may need to go to

3    Funding for further verification or they may ask for

4    additional information, but assuming that those don't

5    happen and the loan is approved or okayed by

6    Underwriting, the next step in an internet

7    application -- what happens after the loan file is

8    returned from Underwriting?  I guess they are notified

9    by e-mail; correct?  So once they are notified by

10   e-mail in an internet application, what's the next

11   step?

12       A    Well, any application is notified by e-mail.

13   The internet apps. -- internet applicants are more

14   likely to respond to the e-mail in a faster fashion

15   than a phone-in app., so it depends whether the

16   applicant gets the e-mail right away and responds to it

17   right away and then moves forward or if the agent

18   actually calls the borrower.

19       Q    Okay.  I think I understand, but let me back

20   up and ask a couple questions.  So once Underwriting

21   has said that the loan is approved by Underwriting, do

22   all applicants get an e-mail from CashCall?  Both

23   phone-in and internet applicants, do they get an e-mail

24   from CashCall at that stage?

25       A    Yes.

DEPOSITION OF BRENDAN MYLES McCARTHY - VOL. I - 3/15/2010

48

1    Q    And in the case of phone-in, an agent is more

2    likely to call right away at that stage; correct?

3    A    Yes, more likely.

4    Q    But both the phone and internet applicants,

5    both of them can complete their -- the whole

6    application process by responding to the e-mail from

7    CashCall following the steps in the e-mail from

8    CashCall?

9    A    Correct.

10   Q    Okay.  The next step for an Internet applicant

11   is that they need to sign the promissory note?

12   A    Yes.

13   Q    Correct?  Okay.

14        Is it fair to say, and I'm not talking about

15   differences in the person's application and what may be

16   required, but is it fair to say that loan applications

17   generally all go through the process we have just

18   walked through?

19   A    It is hard for me to say that's generally the

20   case because, as we have discussed, there is various

21   other reviews, departments, they could go through and

22   different ways the borrower and the agent could have

23   communicated or CashCall and the agent -- or CashCall

24   and the borrower could have communicated, so it is hard

25   for me to say it is generally true because there's a

DEPOSITION OF BRENDAN MYLES McCARTHY - VOL. I - 3/15/2010

50

1  general flow for a loan application and the requirement

2  of the borrower.

3       A    That would be a common flow, yes.

4       Q    Okay.  Can you tell me roughly how -- what

5  percentage of the applicants are phone applicants,

6  phone-in versus internet applicants?

7       A    I would -- I would have to guess.

8       Q    Okay.  What about from your personal

9  experience when you were a loan agent, do you have any

10  sense of how many of the applicants that you man- --

11  the applicants that you managed were phone-in versus

12  internet.

13      MR. SEILING:  When you say phone-in versus

14  internet, are you asking exclusively what does that

15  mean?

16  BY MS. HUSTON:

17      Q    For clarity, what I mean is where the -- how

18  many of the loans that you handled in your time period

19  as a loan agent did you actually fill out the

20  application with a caller on the phone?  What

21  percentage of the loans you handled were done that way?

22      A    You know, it has been over four years since

23  I've been a loan agent, and it is not something I kept

24  track of, so I could only guess at that answer.

25      Q    Okay.  What about when you were a loan agent,

DEPOSITION OF BRENDAN MYLES McCARTHY - VOL. I - 3/15/2010

50

1    general flow for a loan application and the requirement

2    of the borrower.

3        A    That would be a common flow, yes.

4        Q    Okay.  Can you tell me roughly how -- what

5    percentage of the applicants are phone applicants,

6    phone-in versus internet applicants?

7        A    I would -- I would have to guess.

8        Q    Okay.  What about from your personal

9    experience when you were a loan agent, do you have any

10   sense of how many of the applicants that you man- --

11   the applicants that you managed were phone-in versus

12   internet.

13       MR. SEILING:  When you say phone-in versus

14   internet, are you asking exclusively what does that

15   mean?

16   BY MS. HUSTON:

17       Q    For clarity, what I mean is where the -- how

18   many of the loans that you handled in your time period

19   as a loan agent did you actually fill out the

20   application with a caller on the phone?  What

21   percentage of the loans you handled were done that way?

22       A    You know, it has been over four years since

23   I've been a loan agent, and it is not something I kept

24   track of, so I could only guess at that answer.

25       Q    Okay.  What about when you were a loan agent,

DEPOSITION OF BRENDAN MYLES McCARTHY - VOL. I - 3/15/2010

51

1    can you tell me roughly how many loans you handled in a

2    day?

3         A    Loans or applications?

4         Q    Applications.

5         A    A lot of that depends on the day, how heavy

6    the advertising was, my shift.  There was a lot of

7    variables on how many applications I would take.  I

8    mean it could be a huge difference from day to day.

9         Q    What would a smaller day be, then?  Five?

10   Ten?  A hundred?  I have no idea.  How many that a loan

11   agent would handle on a smaller day?

12        A    On a smaller day, I would guess it would be

13   less than five applications.

14        Q    On a day where there's been heavy advertising

15   or larger influx, how many applications might a loan

16   agent handle?

17        A    Over ten.

18        Q    Okay.  And do you know what percentage of time

19   when you were -- in your experience as a loan agent you

20   were on the phone with a borrower after you had heard

21   from Underwriting?

22        A    I'm sorry, can you repeat that?

23        Q    Sure.  If you don't understand, ask me and

24   I'll try and clarify my question.

25             So once a loan has been -- received all the

DEPOSITION OF BRENDAN MYLES McCARTHY - VOL. I - 3/15/2010

51

1    can you tell me roughly how many loans you handled in a

2    day?

3         A    Loans or applications?

4         Q    Applications.

5         A    A lot of that depends on the day, how heavy

6    the advertising was, my shift.  There was a lot of

7    variables on how many applications I would take.  I

8    mean it could be a huge difference from day to day.

9         Q    What would a smaller day be, then?  Five?

10   Ten?  A hundred?  I have no idea.  How many that a loan

11   agent would handle on a smaller day?

12        A    On a smaller day, I would guess it would be

13   less than five applications.

14        Q    On a day where there's been heavy advertising

15   or larger influx, how many applications might a loan

16   agent handle?

17        A    Over ten.

18        Q    Okay.  And do you know what percentage of time

19   when you were -- in your experience as a loan agent you

20   were on the phone with a borrower after you had heard

21   from Underwriting?

22        A    I'm sorry, can you repeat that?

23        Q    Sure.  If you don't understand, ask me and

24   I'll try and clarify my question.

25             So once a loan has been -- received all the

DEPOSITION OF BRENDAN MYLES McCARTHY - VOL. I - 3/15/2010

52

1    documentation that's needed, Underwriting, assuming

2    they are approving it, has informed you that they are

3    approving it, e-mail has been sent to a borrower, what

4    percentage of the loans that you managed did you

5    actually talk to the borrower after the loan -- that

6    e-mail was sent out from Underwriting -- from CashCall?

7        A    I don't know what percentage it would be.

8        Q    Would you guess if it was more than half?

9        A    Probably more than half, yes.

10       Q    Okay.  You are talking about the time period

11   when the borrower is signing the promissory note and

12   trying to get an understanding of how many borrowers,

13   roughly, just using your best estimate, want an agent

14   to walk them through that process or an agent reaches

15   out to them to help them through that process.  In your

16   experience you said it was probably more than half?

17       A    Yeah.  That would be a fair assessment, more

18   than half.

19       Q    Okay.  Could you give a similar assessment

20   of -- regarding the amount of people who want help in

21   walking through the loan application process?  More or

22   less than half of them?  This is the initial part when

23   they are doing the application.

24       A    Probably more than half, yes.

25       Q    Okay.  Does CashCall document whether or not a

DEPOSITION OF BRENDAN MYLES McCARTHY - VOL. I - 3/15/2010

79

1    for two references.  We -- that is something that has

2    changed over time, gone from two references to three

3    references to currently a total of six.  So today's

4    application would have space for six references as

5    opposed to the two that are on here.

6         Q    Okay.  Any other subtle differences?

7         A    I believe the -- what's under the credit

8    agreement section on page 1342 has actually been

9    expanded currently.

10        Q    Do you know what the additional statement

11   might include -- I'm sorry, the additional credit

12   agreement includes?

13        A    I do not.

14        Q    Any other differences?

15        A    That's all that I notice.

16             (The document referred to below was

17        marked Plaintiff's Exhibit 7 for

18        identification and is bound separately.)

19   BY MS. HUSTON:

20        Q    Can you look at Exhibit 7.   These are

21   documents produced by CashCall marked 1148 through

22   1180.  It starts with a web page, looks like it goes to

23   an application.  And if you look through this, it looks

24   to me like it actually -- it seems to me it's documents

25   a customer would receive all the way through the

DEPOSITION OF BRENDAN MYLES McCARTHY - VOL. I - 3/15/2010

80

1    process when a loan is funded or denied.  Can you look

2    through this and see if that is an accurate reflection

3    of what the documents are.

4        A    Correct.

5        Q    Okay.  Is there anything that you see missing,

6    any -- is there any communication or piece of

7    information that's not included in here that an

8    applicant would receive?

9        A    There's nothing that pops out to me that's

10   missing, no.

11       Q    Okay.  This is the same application that is

12   used for every applicant; correct?  There's no --  is

13   that correct?

14       A    Well, it is asking the same information.

15   There's a subtle difference.  What you are looking at

16   here in Exhibit 7, this application is for the internet

17   applicant.  The one difference, for whatever reason, it

18   is broken up by page where you see they have to click

19   "Next" to get to the next section of the application.

20   The agents don't have that on their screen when they

21   enter the data themselves, but it appears to be the

22   same fields and the same information that's being

23   asked.

24       Q    So the application in Exhibit 6 is the

25   application that an agent fills out?

DEPOSITION OF BRENDAN MYLES McCARTHY - VOL. I - 3/15/2010

141

1    there for five years, but this isn't something -- this

2    is used by, I'm assuming, by our quality control agents

3    in our Fraud Department.  It is not something that's

4    really part of production --

5         Q    Okay.

6         A    -- on my end.

7         Q    Okay.  What are loan agents' compensation?

8         A    Can you be more specific?

9         Q    Are they paid salary or are they paid hourly?

10        A    Currently?

11        Q    Currently.

12        A    They are paid hourly.

13        Q    What's their hourly starting salary?

14        A    You know, I don't know the exact hourly rate.

15   I believe that it starts at, I believe, 10.75 an hour,

16   but that's give or take a buck or two.

17        Q    Okay.  Do they receive bonuses?

18        A    Not currently, no.

19        Q    Do they receive any kind of commission?

20        A    No.  They are hourly employees.

21        Q    Do they receive any kind of monetary incentive

22   payments?

23        A    Sure.  Yes.

24        Q    What are those?

25        A    Well, their hourly rate is determined by their

DEPOSITION OF BRENDAN MYLES McCARTHY - VOL. I - 3/15/2010

142

1    performance.

2        Q    And what, in their performance, sets their

3    hourly rate?  Is it your discretion, or is there some

4    automatic calculation of what their hourly rate is?

5        A    It is not in my discretion.  There's a --

6    basically tier structure based on their performance.  A

7    certain performance level would qualify for a certain

8    hourly rate.

9        Q    What is the performance -- what are the

10   performance levels?  What is required at each

11   performance level?  Is that the volume of calls that

12   they handle?

13       A    Not directly, no.  No.  It is based on a

14   combination of loans that they process.

15       Q    The volume of loans that they process?

16       A    Yes.

17       Q    And it is a combination of volume of loans

18   they process?

19       A    I would say in combination because it covers

20   both on the personal loan side along with mortgage

21   loans as well.

22       Q    The same loan agents handle mortgage loans and

23   personal loans?

24       A    Currently, yes.

25       Q    Okay.  So there is a -- let's see if I

DEPOSITION OF BRENDAN MYLES McCARTHY - VOL. I - 3/15/2010

146

1  changed since I started at CashCall?

2      Q    Did it used to be salary?

3      A    No.

4      Q    It has always been hourly?

5      A    Actually, I believe when I started there was a

6  base salary, and then there was compensation based on

7  your production as well.

8      Q    So as long as you have been there the

9  compensation has been tied to the production?

10     A    Sure.

11     Q    Since 2005?

12     A    Production has been at least a factor, yes.

13     Q    Okay.  Has there been any time when CashCall

14  gave bonuses based on production?

15     A    Yes.

16     Q    When was that?

17     A    Over the course of the five years I've been

18  there.  Periodically there would be bonuses offered for

19  a certain production.

20     Q    So are the bonuses announced ahead of time

21  that if you meet the production you get the bonus?

22     A    Yes.

23     Q    And this isn't something that you as a manager

24  decides.  This is something that comes down from

25  somebody above you?

DEPOSITION OF BRENDAN MYLES McCARTHY - VOL. I - 3/15/2010

149

1    that they fund are actually paid back?

2         A    Again, on a shorter time frame, yes.

3         Q    Okay.  So you take into account whether or not

4    there's a default or a fraud or something in the first

5    month?

6         A    Correct.

7         Q    Correct?  But beyond that you don't take that

8    into your account of your evaluation of your loan

9    agents?

10        A    I don't personally.  I don't personally, no.

11        Q    Does CashCall take into account in its

12   compensation for the loan agents the number of loans

13   that they decline or reject to send through?

14        A    And you are specifically asking about --

15        Q    Compensation?

16        A    I know, but about declining or sent to --

17        Q    The -- we discussed earlier today you

18   testified about how production employees will review a

19   loan and immediately disqualify it based on a trigger

20   there, but -- so they have taken some time without loan

21   application, does that count at all toward their units?

22        A    Do they get credit for loans that they turn

23   away?

24        Q    Yes.

25        A    No.

DEPOSITION OF BRENDAN MYLES McCARTHY - VOL. I - 3/15/2010

150

1    Q    It doesn't count in their compensation?  It is

2    not -- they are not given any form of compensation for

3    those loans?

4    A    They are not paid on denied loans, no.

5    Q    Okay.  How -- I think I asked you a little bit

6    about this earlier, so I apologize if it is repetitive,

7    but how often do you monitor any given -- one of your

8    loan agent's calls?

9    A    How often do I do any call monitoring?

10   Q    Yeah.

11   A    On a weekly basis.

12   Q    And do you monitor a given employee once a

13   week, or do you monitor somebody once a week?  You have

14   50 agents.  Do you monitor all 50 of them once a week,

15   or do you monitor a couple calls once a week?

16   A    More than a couple calls per week.

17   Q    Are all the calls at CashCall recorded?

18   A    Yes.

19   Q    All the loan agent calls.  Okay.

20   A    Currently they are.

21   Q    Do you have an expected call or agent volume

22   for your agents?

23   A    Volume --

24   Q    Of personal loans.

25   A    Calls they take or loans that fund?

164

1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3

4

5

6     KRISTA O'DONOVAN, and          )
      EDUARDO DE LA TORRE,           )
7     individually and on behalf     )
      of all others similarly        )
8     situated,                      )
                                     )
9               Plaintiffs,          )
                                     )    Case No.
10          v.                       ) CV 08-3174-MEJ
                                     )
11    CASHCALL, INC., a California )   (Volume II)
      corporation; and DOE 1         )
12    through DOE 50, inclusive,    )(Pgs. 164 - 249)
                                     )
13                                   )
                Defendants.          )
14    _____)

15

16    Deposition of:   BRENDAN MYLES McCARTHY (Volume II)

17

18

      Date and time:     Tuesday, March 16, 2010
19                        9:57 a.m.

20

21    Location:          695 Town Center Drive
                         Costa Mesa, California
22

23

24    Reporter:

25    Patricia Tornell, CSR, RPR

DEPOSITION OF BRENDAN MYLES McCARTHY - VOL. II - 3/16/2010

175

1    the computer?

2         A    I can't recall any applications being

3    submitted via fax.

4         Q    Okay.  Have you ever seen an application, a

5    loan application, with handwritten modifications on

6    it?

7         A    No.

8         Q    Does CashCall have any policy regarding

9    whether or not it would allow a consumer to make any

10   changes to the application?

11        MR. SEILING:   Changes to the questions?

12        MS. HUSTON:   Yeah.

13        THE WITNESS:   Can they change the application?

14        MS. HUSTON:   That's correct.

15        THE WITNESS:   No.

16   BY MS. HUSTON:

17        Q    Let's look at Exhibit 6 or Exhibit 7.  If

18   you'd turn to Exhibit 6, about halfway through, it's

19   the promissory note and disclosure statement.

20        A    Page 1354?

21        Q    Yeah.

22        A    Okay.

23        Q    Is that promissory note -- and take a look at

24   it.  Is that promissory note and disclosure statement

25   the same promissory note and disclosure statement that

DEPOSITION OF BRENDAN MYLES McCARTHY - VOL. II - 3/16/2010

179

1    note, --

2         MS. HUSTON:  I see.

3         THE WITNESS:  -- through our website.

4    BY MS. HUSTON:

5         Q    I did not understand that.

6              So a consumer receives an e-mail -- let's see

7    in Exhibit 6.

8              Assuming their application is approved -- is

9    it accurate that a consumer receives an e-mail if

10   their application is approved?

11        A    Yes.

12        Q    And does that e-mail send them to CashCall's

13   website to log in?

14        A    That e-mail gives them steps and directions

15   on how to go to our website and view the promissory

16   note, yes.

17        Q    If you'd turn to page 1346 in this Exhibit 6,

18   it looks like that would be the log-in screen a

19   consumer would see.

20        A    This appears to be part of the log-in

21   process, yes.

22        Q    So they log in to CashCall's website, go

23   through some steps seemingly, and then they -- on

24   CashCall's website they see this document, this

25   promissory note and disclosure statement document?

DEPOSITION OF BRENDAN MYLES McCARTHY - VOL. II - 3/16/2010

180

1        A    Correct.

2        Q    Okay.  Do you know who at CashCall is

3   responsible for the information included in the

4   promissory note and disclosure statement?

5        A    I do not.

6        Q    In your time at CashCall has there -- have

7   you been notified of any changes regarding information

8   that's included in the promissory note and disclosure

9   statement?

10       A    I don't recall being notified, no.

11       Q    Have you been told or heard of any?

12       A    I can't recall being told.  I do remember

13   seeing differences in the promissory note over the

14   course of time.

15       Q    Do you know what those differences are?

16       A    I can't recall specific examples.

17       Q    Can you -- do you recall when you noticed a

18   change in the promissory note and disclosure?

19       A    No, not a specific time.

20       Q    Was it when you were a loan agent?  So that

21   would have been about 2005 to 2007.

22       A    It's possible that those changes both as a

23   loan agent and a production manager.

24       Q    But you have no specific memory of what those

25   changes are; correct?

DEPOSITION OF BRENDAN MYLES McCARTHY - VOL. II - 3/16/2010

181

1      A   Correct.

2      Q   And you have no memory of even the year when

3   those changes happened; correct?

4      A   No.  I seem to remember possibly multiple

5   changes over the course of time, so I don't remember

6   one specific year.

7      Q   Okay.  What is CashCall's practice for

8   explaining the terms of loans to applicants?

9      A   Can you be more specific?

10      Q   Does CashCall have any written guidelines for

11   information that must be disclosed to applicants?

12      A   Yes.

13      Q   Where are those guidelines?

14      A   I believe they're in some of the other

15   exhibits we covered yesterday.

16      Q   Okay.  How are they distributed to loan

17   agents?

18      A   I can't recall specifically how they were at

19   least initially distributed.  I believe some of the

20   reference tools we looked at yesterday, as I

21   mentioned, are available at any time through a link in

22   our database.

23      Q   Okay.  Do you -- what information, if any, is

24   a CashCall loan agent required to -- by CashCall to

25   inform a potential applicant about the loan?

DEPOSITION OF BRENDAN MYLES McCARTHY - VOL. II - 3/16/2010

185

1    Q    Do you train them on -- do you train them to

2    do anything else related to those disclosures other

3    than simply disclose that list of items that we

4    discussed?

5    A    Yes.

6    Q    What is that?

7    A    We also have a policy we refer to as our

8    triggering terms, and if potential applicants were to

9    ask one of the -- about one of the terms of the loan

10   then that would then trigger a response from the agent

11   to disclose all of the terms that we have listed now.

12   Q    Okay.  I'm a little confused.

13       If a person -- I'm sorry.  If a loan

14   applicant calls and is talking to an agent and they

15   ask things, it apparently triggers this list of items

16   that must be disclosed; correct?

17   A    If they ask about one of the main terms of

18   the loan, then, yes, that triggers a response from the

19   agent to cover all the main terms of the loan.

20   Q    But you previously testified that they have

21   to disclose those regardless.  You previously

22   testified that that list of disclosures is mandatory

23   no matter what; right?

24   A    Right.  And what I'm referring to for the

25   triggering terms is really something that -- I mean at

DEPOSITION OF BRENDAN MYLES McCARTHY - VOL. II - 3/16/2010

186

1    any time of the conversation if one of the terms is

2    asked, they should disclose all of the terms; but it's

3    really intended at the beginning of the call before

4    the application even begins, if one of those main

5    terms are asked, that they must disclose all of the

6    terms.

7         Q    I see.

8              So the triggering-term training is that

9    certain -- I'm sorry, not certain -- all of the

10   disclosures that we have discussed -- I'll call it the

11   list of disclosures so we don't have to keep resaying

12   it -- but when I refer to the list, just for our

13   reference, I'm referring to the loan amount, the APR,

14   the minimum monthly payment, the term of the loan, the

15   origination fee and interest rate.   Okay?

16             So, if the triggering terms -- I'm sorry.

17             Loan agents are trained that if somebody at

18   any point in a call asks a question about any of the

19   terms of the loan, they have to make those disclosures

20   at that time -- is that correct? -- make the

21   disclosures of the list of items.

22        A    Correct.

23        Q    Your testimony is also that it is mandatory,

24   it's CashCall's policy, that any phone call with a

25   loan applicant, a loan agent -- during any phone call

DEPOSITION OF BRENDAN MYLES McCARTHY - VOL. II - 3/16/2010

188

1    BY MS. HUSTON:

2        Q    In every phone call with a potential loan

3    applicant before their application is submitted, is it

4    mandatory for CashCall loan agents to disclose the

5    list of loan terms?

6        A    In every phone call before or regardless if

7    an application is filled out or submitted?

8        Q    Correct.

9        A    No.

10       Q    Is it mandatory for a loan agent to disclose

11   the list of loan terms in every call in which they are

12   helping an applicant with an application?

13       A    Helping an applicant with an application?

14       Q    Filling out the application for them, doing a

15   phone-in application.

16       A    So the application is actually being

17   submitted?

18       Q    That's the intention, yeah.

19       A    Okay.  Yes, the application is submitted.

20   Then they need to cover the list of disclosures.

21       Q    Regardless of whether or not a person -- the

22   phone applicant asks or states a triggering term,

23   that's required?

24       A    Can you repeat that.

25       Q    The requirement by CashCall that a loan agent

197

1      A   I can't think of one that I make sure to

2   cover with each one.

3      Q   Do you cover the triggering terms in every

4   quiz?

5      A   It's definitely a key component to the

6   training, but it's possible I've quizzed a new hire

7   and not asked them about that.

8      Q   What about the timing of the mandatory

9   disclosures that you just testified about, do you quiz

10   them on that in every --

11      A   I wouldn't say on every.

12      Q   Generally?

13      A   Yes, generally.

14      Q   For callers who -- I'm sorry.

15          For applicants who submit a loan application

16   exclusively over the internet and don't speak to a

17   loan agent, there's no disclosures made to them other

18   than what they see in CashCall's written

19   documentation; correct?

20      A   You're asking me if they never speak to

21   anyone in CashCall if they -- do they somehow hear

22   verbal disclosures?

23      Q   Yeah, that's my question.

24      A   I guess no, that wouldn't be possible.

25      Q   There is no requirement that CashCall call

DEPOSITION OF BRENDAN MYLES McCARTHY - VOL. II - 3/16/2010

198

1    all applicants and make any kind of verbal

2    disclosures; correct?

3         A    That is correct.

4         Q    The list of documents -- I'm sorry.

5         The list of loan terms that we

6    discovered that -- I just used your word.

7         The list of loan terms that we discussed are

8    the only mandatory disclosures either through the

9    triggering term or through the mandatory point of

10   after the application is submitted and pre-qualified;

11   correct?

12        A    Can you read them to me one more time?

13        Q    The loan amount, the APR, the minimum monthly

14   payment, the term or length of the loan, the

15   origination fee, and the interest rate.

16        A    Yes, I believe that covers them.

17        Q    So it's correct that loan agents aren't

18   required to tell callers that they can prepay a

19   loan -- correct? -- that they can pay it off early.

20        A    I don't know if I'd characterize that as a

21   requirement.  It tends to come up naturally on its

22   own.

23        Q    There's no requirement then that CashCall --

24   well, there is no requirement that an agent tell an

25   applicant how much they will be paying back in total

DEPOSITION OF BRENDAN MYLES McCARTHY - VOL. II - 3/16/2010

236

1          Q    It's the only way you've seen a promissory
2    note submitted to CashCall?
3          A    Yes.
4          Q    Okay.  And that's true the whole time that
5    you've been at CashCall; correct?
6          A    Yes.
7          Q    As a loan agent and as production manager
8    training loan agents on how to assist applicants with
9    signing and reviewing the promissory note and
10   disclosures; correct?
11         A    Yes.
12         Q    So it's true that CashCall does not provide a
13   borrower with the means to change the application;
14   correct -- I'm sorry -- change the promissory note?
15         A    You're asking me if an agent or borrower can
16   change the promissory note?
17         Q    Yeah.
18         A    They cannot directly change the promissory
19   note, no.
20         Q    They can't -- a borrower can't write off a
21   term or cross off a term, anything like that;
22   correct?
23         A    No, they cannot.
24         Q    And that's true the whole time you've been at
25   CashCall; correct?

DEPOSITION OF BRENDAN MYLES McCARTHY - VOL. II - 3/16/2010

237

1       A    Yeah.

2       Q    Borrowers are required to receive their Truth

3  In Lending Act disclosures electronically; correct?

4       A    And when you say "The Truth in Lending

5  Disclosures" you're referring to what specifically?

6       Q    Referring to -- if you'd turn to Exhibit 6.

7       MR. SEILING:  Vague and ambiguous as to

8  "required."  Do they receive them electronically?

9  BY MS. HUSTON:

10      Q    Okay.  Turn to page -- Exhibit 6.  Keep that

11  out because we might still ask about that.  But

12  Exhibit 6, page 1354, is a promissory note and

13  disclosure statement.  At the top there is a box

14  labeled "Truth in Lending Disclosure."  It's included

15  by CashCall as part of the promissory note and

16  disclosure statement; correct?

17      A    Yes, this is part of the promissory note,

18  yes.

19      Q    Okay.  Have you ever seen CashCall the

20  whole time you've worked there make this Truth in

21  Lending Disclosure that is at the top of this

22  promissory note and disclosure statement in any

23  form other than what is here included in Exhibit 6,

24  meaning have you ever seen them -- I'm not asking you

25  about the content of the Truth in Lending Disclosure

# Exhibit 9
# Submitted Conditionally
# Under Seal

# Exhibit 10
# Submitted Conditionally
# Under Seal

# Exhibit 11
# Submitted Conditionally
# Under Seal

# Exhibit 12

Unsecured Loans at CashCall: Quick Money, Fast Cash Loans Online - Microsoft Internet Explorer provided by Ceira Tech...

File   Edit   View   Favorites   Tools   Help

Address http://dev2.cashcall.com/    Go

Server: COGSTG03 (10.21.1.41) - Culture: English (United States) (en-US)



QUESTIONS? Call Us at 866-590-CASH   En Español

Home | Login | Testimonials | FAQs | Rates | Careers | Contact Us | Help

# Get $1000's in Your Checking Account in a Day!*



**Our easy application process can help you get the
money straight into your checking account, the
moment you need it!**

Call us to apply or with any questions you have at

## 866-590-CASH (2274)

**Apply Now**

| **Can't Catch Up?** | **How Does CashCall Work?** | **Get Started Now!** |
|---|---|---|
| At CashCall, we understand that life can be unpredictable. That's why we offer a quick and convenient application process so you can get the money you need, when you need it, even if you don't have perfect credit. | Just complete our short online application, and receive an answer in minutes. It doesn't get any easier than this! | Click below to get started. Our quick and easy application will have you enjoying the advantages of CashCall in no time!<br>You may apply now<br>or have a loan agent contact you! |



*Subject to credit approval. Additional documentation required.

CashCall is the marketing agent of First Bank & Trust, Milbank, South Dakota.
California, Idaho, Nevada, New Mexico, and Utah loans will be underwritten and funded by CashCall. All other loans will be
underwritten and funded by First Bank & Trust, Milbank, South Dakota.

  

© 2007 CashCall, Inc. All Rights Reserved.
Disclosures, Fraud Prevention, Terms Of Use

Powered by Cogility Software
Server: COGSTG03 (10.21.1.41) - Culture: English (United States) (en-US)



Internet



CASHCALL 001148

Application - Microsoft Internet Explorer provided by Ceira Technologies

File   Edit   View   Favorites   Tools   Help

Address http://dev2.cashcall.com/LoanApp/Application.aspx

Server: COGSTG03 (10.21.1.41) - Culture: English (United States) (en-US)

QUESTIONS? **Call Us at 866-590-CASH**   En Español

**CashCall**
LOANS THAT FIT YOUR LIFESTYLE

Home | Login | Testimonials | FAQs | Rates | Careers | Contact Us | Help

Fill Data   Fill Current Step Data   ☑ Allow duplicate email address.

# ① Welcome to CashCall! Get Started Now!

Have you ever applied for a CashCall loan before?

If you already have an account with us, please login.

**Personal Information**

| | | | |
|---|---|---|---|
| First Name: | John | Middle Initial: | |
| Last Name: | B_EXP_NBK_700_201 | Suffix: | None |
| Gender: | ⊙ Male ○ Female | | |

**Contact Information**

| | | | |
|---|---|---|---|
| Home Phone: | 714-333-4444 (nnn-nnn-nnnn) | Mobile Phone: | (nnn-nnn-nnnn) |
| Work Phone: | 949-123-4567   Ext.: | Email Address: | epost@cashcall.com |

I want a loan agent to contact me.                    Next >

CashCall is the marketing agent of First Bank & Trust, Milbank, South Dakota.
California, Idaho, Nevada, New Mexico, and Utah loans will be underwritten and funded by CashCall. All other loans will be
underwritten and funded by First Bank & Trust, Milbank, South Dakota.

VeriSign Secured   HACKER SAFE TESTED 24-JAN

© 2007 CashCall, Inc. All Rights Reserved.
Disclosures. Fraud Prevention. Terms Of Use

Powered by Cogility Software
Server: COGSTG03 (10.21.1.41) - Culture: English (United States) (en-US)

Internet





Application - Microsoft Internet Explorer provided by Ceira Technologies

File Edit View Favorites Tools Help

Address http://dev2.cashcall.com/LoanApp/Application.aspx Go

Server: COGSTG03 (10.21.1.41) - Culture: English (United States) (en-US)

QUESTIONS? Call Us at 866-590-CASH En Español

CashCall
LOANS THAT FIT YOUR LIFESTYLE

Home | Login | Testimonials | FAQs | Rates | Careers | Contact Us | Help

Fill Data Fill Current Step Data ☑ Allow duplicate email address.

# Secure Loan Application

Date of Birth and Driver's License/ID

Date of Birth: Month: February Day: 2 Year: 1966

License Number: C9999999 State: California

Expiration Date: Month: February Day: 2 Year: 2016

Home Address

Street Number: 9999 Street Name: Michelson Street Abbrv.: Drive

Apartment: City: Westminster

State: California Zip Code: 92634

Previous Address

Have you moved in the past 6 months? ○ Yes ◉ No

I want a loan agent to contact me.

Next >

CashCall is the marketing agent of First Bank & Trust, Milbank, South Dakota.
California, Idaho, Nevada, New Mexico, and Utah loans will be underwritten and funded by CashCall. All other loans will be underwritten and funded by First Bank & Trust, Milbank, South Dakota.

VeriSign Secured VERIFY HACKER SAFE TESTED 24-JAN

© 2007 CashCall, Inc. All Rights Reserved.
Disclosures. Fraud Prevention. Terms Of Use

Powered by Coolility Software

Internet

Application - Microsoft Internet Explorer provided by Ceira Technologies

File Edit View Favorites Tools Help

Address http://dev2.cashcall.com/LoanApp/Application.aspx Go

Home | Login | Testimonials | FAQs | Rates | Careers | Contact Us | Help

Fill Data Fill Current Step Data ☑ Allow duplicate email address.

1 2 3 4

# Secure Loan Application

## Social Security Number

Social Security Number: 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 (nnn-nn-nnnn)

## Current Employment Information

Are you self-employed? ○ Yes ⦿ No

Company Name: Ceira

Employment Type: Finance Job Title: Accountant

Company Phone: 949-333-3333 Ext.:

Company Address

Street Number: 99999 Street Name: Von Karman Street Abbrv.: Avenue

Suite: City: Irvine

State: California Zip Code: 92612

Payday Information

Please fill in your payday information.

Type: Monthly Day 1: 1

Monthly Income and Expenses

Alimony, child support, or separate maintenance income need not be revealed if you do not wish to have it considered as a basis for repaying this obligation.

Monthly Gross Income: $10,000 Supplemental Income: $250

Rent Or Own: ○ Rent ⦿ Own Monthly Rent Amount:

Military Information

Are you currently serving in the military? ○ Yes ⦿ No

I want a loan agent to contact me. Next >

Done Internet

Application - Microsoft Internet Explorer provided by Ceira Technologies

File   Edit   View   Favorites   Tools   Help

Address http://dev2.cashcall.com/LoanApp/Application.aspx

Server: COGSTG03 (10.21.1.41) - Culture: English (United States) (en-US)

QUESTIONS? Call Us at 866-590-CASH   En Español

**CashCall**
LOANS THAT FIT YOUR LIFESTYLE

Home | Login | Testimonials | FAQs | Rates | Careers | Contact Us | Help

Fill Data   Fill Current Step Data   ☑ Allow duplicate email address.

# Secure Loan Application

## Loan Referrer

How did you hear about CashCall?   Radio

## References

Please provide two reference names and phone numbers.

Full Name 1:  John Doe              Phone Number 1:  909-289-8292   (nnn-nnn-nnnn)

Full Name 2:  Mary Doe              Phone Number 2:  714-892-9292   (nnn-nnn-nnnn)

Please provide the name and phone number of the closest family member in case of emergency.

Relative Full Name:  Uncle Sam      Relative Phone Number:  949-345-4532   (nnn-nnn-nnnn)

## Verbal Pledge

Please explain in one sentence what makes you a good credit risk for this loan.

Testing

## Username and Password

Username:  ecp03      Your **username** must contain at least 3 characters. Do not include special characters (e.g.: &, *, @, #, -).

Password:  ••••••••   Your **password** must contain at least 6 characters. Do not include special characters (e.g.: &, *, @, #, -).

Re-type Password:  ••••••••

**I want a loan agent to contact me.**

Next >

CashCall is the marketing agent of First Bank & Trust, Milbank, South Dakota.
California, Idaho, Nevada, New Mexico, and Utah loans will be underwritten and funded by CashCall. All other loans will be underwritten and funded by First Bank & Trust, Milbank, South Dakota.

Done                                                          Internet

CASHCALL 001152



Application - Microsoft Internet Explorer provided by Ceira Technologies

File Edit View Favorites Tools Help

Address http://dev2.cashcall.com/LoanApp/Application.aspx

# Secure Loan Application

**E-Sign Agreement**

To apply for and obtain a loan from CashCall, Inc., you must agree to receive all information and disclosures regarding your loan electronically prior to submitting your loan application.

The following information will be provided by electronic communication:

- Promissory Note and Truth In Lending Disclosure Statement and any applicable attachments;
- Electronic Funds Transfer Act Authorization and Disclosure;
- Notices of changes to any of the agreements listed above;
- Loan settlement statement;
- Adverse Action Notifications;

I Agree I Disagree Print Agreement

**Note to California Borrowers**

NOTE TO CALIFORNIA BORROWERS: A married or registered domestic partner applicant may apply for a separate account. As required by law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations. If Holder takes any adverse action as defined by Section 1785.3 of the California Civil Code and the adverse action is based, in whole or in part, on any information contained in a consumer credit report, you have the right to obtain within 60 days a free copy of your consumer credit report from the consumer reporting agency who furnished us your consumer credit report and from any other consumer credit reporting agency which compiles and maintains files on consumers on a nationwide basis. You have the right as described by Section 1785.16 of the California Civil Code to dispute the accuracy or completeness of any information in a consumer credit report furnished by the consumer credit reporting agency.

Print Agreement

**Consent to Obtain Credit Report**

You understand that by clicking on the I AGREE button immediately following this notice, you are providing 'written instructions', under the Fair Credit Reporting Act authorizing us, to obtain information from your personal credit profile or other information from Experian.

I Agree I Disagree Print Agreement

**Privacy Statement**

I have read and understand the Privacy Statement. Privacy Statement

I Agree I Disagree

**USA Patriot Act**

To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens a loan account.

What this means to you: When you open a loan account, we will ask for your name, address, date of birth and other information that will allow us to identify you. We may ask to see your driver's license or other identifying documents.

Print Agreement

I want a loan agent to contact me. Submit

Internet

**The complete text of the "E-Sign Agreement" from the above screen shot:**

*To apply for and obtain a loan from CashCall, Inc., you must agree to receive all information and disclosures regarding your loan electronically prior to submitting your loan application.*

*The following information will be provided by electronic communication:*

- *Promissory Note and Truth In Lending Disclosure Statement and any applicable attachments;*
- *Electronic Funds Transfer Act Authorization and Disclosure;*
- *Notices of changes to any of the agreements listed above;*
- *Loan settlement statement;*
- *Adverse Action Notifications;*
- *All inquiries, notices and delinquency information to you about your account or your payments on the account; and*
- *All ongoing communications to you regarding your loan.*

*To apply for and receive a loan from CashCall, Inc. and to receive all of the documents and information referenced above by electronic communication, you must have a personal computer (PC) or Macintosh computer with the following specifications: A secure Web Browser with 128 bit encryption and Java Script enabled and Internet access through an Internet Service Provider (ISP). We support most current commercially accepted browser versions supplied by Microsoft Internet Explorer.*

*If you wish to withdraw your consent to receive information electronically or if you wish to change the e-mail address at which you will receive communications from CashCall, Inc. and all subsequent holders of the promissory note, please-mail us at info@cashcall.com or send written notification to:*

*CashCall, Inc.*
*17360 Brookhurst Street*
*Fountain Valley, CA 92708*

*You may withdraw your consent at any time; however, if you do so before the loan funds are provided to you, we will cancel the transaction and your loan will not be made. If you do so after the loan funds are provided to you, then all ongoing communications regarding your loan provided after your withdrawal of consent will be delivered in non-electronic form.*

*You may obtain a paper copy of any disclosure provided to you electronically at no cost by sending a request in writing to the address listed above. This consent shall remain in effect until canceled and shall apply to CashCall, Inc. and any and all subsequent holders of the promissory note.*

## The complete text of the "USA Patriot Act" statement from the above screen shot:

*To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens a loan account.*

*What this means to you: When you open a loan account, we will ask for your name, address, date of birth and other information that will allow us to identify you. We may ask to see your driver's license or other identifying documents.*

*The information being requested and observed is for compliance with the requirements of Section 326 of the USA Patriot Act implementing customer identification and verification requirements.*

*This information in no way will be used in making the credit decision on your completed application.*

## The complete text of the "Privacy Statement":

*Introduction*

CASHCALL 001154

*Respecting and protecting customer privacy is vital to our business. By explaining our Privacy Policy to you, we trust that you will better understand how we keep our customer information private and secure while using it to serve you better. Keeping customer information secure is a top priority, and we are disclosing our policies to help you understand how we handle the personal information about you that we collect and disclose. The provisions of this notice will apply to former customers as well as current customers unless we state otherwise.*

**Confidentiality and Security**

*We restrict access to nonpublic personal information about you to those employees who need to know that information to provide products or services to you. We maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard your nonpublic personal information.*

**Information We May Collect**

*CashCall gathers only the customer information that is needed to administer its business and provide superior service to our customers. The categories of nonpublic personal information that may be collected about you include:*

*Information we receive from you on applications or other forms (such as your name, address, phone number, or Social Security Number);*

*Information about your transactions with us (such as account activity, payment history, or account balance); and*

*Information we receive from a consumer reporting agency (such as your creditworthiness or credit history).*

*When you visit our web site, we may collect and store information about your visit on an anonymous, aggregate basis. This information may include the time and length of your visit, the pages you look at on our sites, and the site you visited just before coming to ours. This information will not include your name, mailing address or e-mail address. We may also record the name of your Internet service provider. We use this information only to measure site activity and to develop ideas for improving our sites.*

*There are also opportunities on our web sites for you to provide us with information about you, such as your name, mailing address and e-mail address. If you choose to share any personal information with us, we may store it or use it for marketing research.*

*Some of our web sites may make use of "cookie" technology to measure site activity and to customize information to your personal tastes. A cookie is a "memory" file that may be placed on your hard drive by the computer which supports the web site that you are visiting. When you revisit that web site, the computer can recognize you as a prior visitor and identify some areas which were previously visited. No personal information is stored in our cookies. When you come back to visit us again, we can tailor information to suit your individual preferences. The goal is to save you time and provide you with a more meaningful visit. CashCall reserves the right to alter our privacy principles as business needs require. Any alterations to these principles will be posted on our web sites in a timely manner.*

**With Whom Do We Share Your Information**

*We will not sell or share your information with any other companies or third parties. In limited circumstances, however, we may share information with third parties as permitted by law.*

**INTERNET SECURITY DISCLOSURE**

We have implemented one of the highest levels of security for sending personal information via the Internet. We employ the latest technology by utilizing the Secured Sockets Layer protocol (SSL 3.0) and Microsoft's Private Communication Technology protocol (PCT 1.0) with full support for 128-bit encryption methods. These secured encryption methods are among the highest in the industry for online commerce and transactions on the Internet. Also, the Internet Web Server is protected by a firewall which restricts the access to the machine from the Internet.

Our SSL Technology is certified by VeriSign - the Web's leading "Seal of Approval" for online authentication services. This provides an internet security system that conforms to the highest standards available.

**These Protocols are used in several areas during the Internet Loan Application process:**

- *At the loan application web page when the applicant is entering in all of their personal information.*
- *For all internal validation/verification.*
- *When you are executing and submitting your online promissory note.*
- *During ALL communications between our Internet server and our host processing system.*
- *Some web browsers do not support secure servers. If you have difficulty accessing this area of our site, please call us toll-free at 1-866-590-CASH (2274) to apply by phone.*

We have made what we believe to be a reasonable effort to guard the security of this Web site's server. However, the Internet is generally accessible by the public, and information which is available on the Internet (including the information supplied by you on this Web site or sent to an e-mail address provided by you) is potentially accessible by unintended third parties. Your use of this Web site and your disclosure of personal information at this Web site, on or through any server, are strictly at your own risk. We do not guarantee the security of any user provided data.





ThankYou - Microsoft Internet Explorer provided by Ceira Technologies

File Edit View Favorites Tools Help

Back Search Favorites

Address http://dev2.cashcall.com/LoanApp/ThankYou.aspx?loanToken=VOR45imxB8ZWBJWba5njIA6RPlescMo9Ky6%2bTc9mRxGUj%2b2RcTwTV%2bUaW Go

Server: COGSTG03 (10.21.1.41) - Culture: English (United States) (en-US)

QUESTIONS? Call Us at 866-590-CASH En Español

CashCall
LOANS THAT FIT YOUR LIFESTYLE

Home | Login | Testimonials | FAQs | Rates | Careers | Contact Us | Help

**Thank You!** Apply Now

Thank you for applying for a loan with CashCall, Inc..

We are processing your application now. In a moment we will redirect you to another page as part of the application process. Please wait...

CashCall is the marketing agent of First Bank & Trust, Milbank, South Dakota.
California, Idaho, Nevada, New Mexico, and Utah loans will be underwritten and funded by CashCall. All other loans will be underwritten and funded by First Bank & Trust, Milbank, South Dakota.

VeriSign Secured VERIFY HACKER SAFE TESTED 24-JAN

© 2007 CashCall, Inc. All Rights Reserved.
Disclosures, Fraud Prevention, Terms Of Use

Powered by Cogility Software

Server: COGSTG03 (10.21.1.41) - Culture: English (United States) (en-US)

Done Internet

Application submitted - Message (HTML)

File   Edit   View   Insert   Format   Tools   Actions   Help

From:    Dev2_Do.Not.Reply@cashcall.com .            Sent:   Wed 1/24/2007 1:42 PM
To:      epost@cashcall.com
Cc:
Subject:  Application submitted



"Loans that fit your lifestyle."

## Application Submitted

### Dear JOHN B_EXP_NBK_700_201_101_10000 ,

Your application was submitted successfully. It is currently being reviewed. CashCall, Inc.
reserves the right to request additional documents from you in certain cases.

You will be contacted as soon as the information you provided has been verified.

Your loan ID is: 1140119

CashCall, Inc.
1-866-590-CASH
http://www.cashcall.com

Please do not reply directly to this system-generated email. This mailbox is not monitored and
you will not receive a response.

CASHCALL 001158



GetCreditReport - Microsoft Internet Explorer provided by Ceira Technologies

File Edit View Favorites Tools Help

Address http://dev2.cashcall.com/LoanApp/GetCreditReport.aspx?loanToken=VOR4SimxB8ZWBJWbaSnjIA6RPlescMo9Ky6%2bTc9mRxFWfX8ER9IgJANPAp  Go

Server: COGSTG03 (10.21.1.41) - Culture: English (United States) (en-US)

QUESTIONS? Call Us at 866-590-CASH  En Espanol

**CashCall** — LOANS THAT FIT YOUR LIFESTYLE

Home | Login | Testimonials | FAQs | Rates | Careers | Contact Us | Help

**Processing**  Apply Now

Please wait a moment, we are retrieving your credit report...

CashCall is the marketing agent of First Bank & Trust, Milbank, South Dakota.
California, Idaho, Nevada, New Mexico, and Utah loans will be underwritten and funded by CashCall. All other loans will be
underwritten and funded by First Bank & Trust, Milbank, South Dakota.

VeriSign Secured  VERIFY ›  HACKER SAFE TESTED 24-JAN

© 2007 CashCall, Inc. All Rights Reserved.
Disclosures. Fraud Prevention. Terms Of Use

Powered by Cogility Software
Server: COGSTG03 (10.21.1.41) - Culture: English (United States) (en-US)

Done  Internet

**Application Being Processed - Message (HTML)**

File   Edit   View   Insert   Format   Tools   Actions   Help

From:     Dev2_Do.Not.Reply@cashcall.com                    Sent:   Wed 1/24/2007 1:43 PM
To:       epost@cashcall.com
Cc:
Subject:  Application Being Processed



"Loans that fit your lifestyle."

## Application Being Processed

You have been conditionally approved pending verification of your identity and final underwriting review.

You may be qualified for one of our $20,000, $10,000, $5,075 or $2,600 products. If you haven't already selected a product, please return to www.cashcall.com, or contact an agent at 1-866-590-CASH if you have any questions about these options or the terms and conditions of these loans.

To complete the approval process, please fax a copy of your driver's license and a voided check. The bank information from your check will allow us to setup the funds-transfer into your account. CashCall, Inc. reserves the right to request additional documents from you in certain cases.

Please fax your driver's license and voided check to: (949) 225-4699

You will be contacted as soon as the information you provided has been verified.

Your loan ID is: 1140119

CashCall, Inc.
1-866-590-CASH
http://www.cashcall.com

Please do not reply directly to this system-generated email. This mailbox is not monitored and you will not receive a response.

CASHCALL 001160

SelectLoanAmount - Microsoft Internet Explorer provided by Ceira Technologies

File   Edit   View   Favorites   Tools   Help

Address http://dev2.cashcall.com/LoanApp/SelectLoanAmount.aspx?loanToken=VOR45imxB8ZW8JWba5njlA6RPiescMo9Ky6%2bTc9mRxGUj%2b2RcTwTV   Go

Server: COGSTG03 (10.21.1.41) - Culture: English (United States) (en-US)

**QUESTIONS? Call Us at 866-590-CASH**   En Español

**CashCall**
LOANS THAT FIT YOUR LIFESTYLE

Home | Login | Testimonials | FAQs | Rates | Careers | Contact Us | Help

## Select Loan Product

**Apply Now**

Please select a loan amount.

Based on your credit, you may be qualified for our $20,000, $10,000, $5,075 & $2,600 loan products, pending identity verification. Which amount would you prefer at this time?

➡️ **$20,000**

➡️ **$10,000**

➡️ **$5,075**

➡️ **$2,600**

Note: the actual amount wired into your bank account is less the origination fee, which is $75.

If you have any questions about these options or the terms and conditions of these loans, please feel free to contact CashCall at 1-866-590-CASH (2274).

CashCall is the marketing agent of First Bank & Trust, Milbank, South Dakota.
California, Idaho, Nevada, New Mexico, and Utah loans will be underwritten and funded by CashCall. All other loans will be underwritten and funded by First Bank & Trust, Milbank, South Dakota.

  

© 2007 CashCall, Inc. All Rights Reserved.
Disclosures, Fraud Prevention, Terms Of Use

Powered by Cogility Software
Server: COGSTG03 (10.21.1.41) - Culture: English (United States) (en-US)

Done   Internet

CASHCALL 001161

ApplicationSubmitted - Microsoft Internet Explorer provided by Ceira Technologies

File   Edit   View   Favorites   Tools   Help

Address  http://dev2.cashcall.com/LoanApp/ApplicationSubmitted.aspx?loanToken=VOR4SimxB8ZWBJWba5njIGYRVypc8sd%2b104KAAAtt%2bIXdWID08o  Go

Server: COGSTG03 (10.21.1.41) - Culture: English (United States) (en-US)

**QUESTIONS? Call Us at 866-590-CASH**   En Español

# CashCall
### LOANS THAT FIT YOUR LIFESTYLE

Home | Login | Testimonials | FAQs | Rates | Careers | Contact Us | Help

## Application Submitted                                    Apply Now

Your application has been submitted.

You have been approved pending verification of your income and final underwriting review.

You are currently applying for our $10,000 product.
To complete the approval process, please fax a copy of your driver's license and a voided check.

Please fax these documents to: 1-949-225-4699
You will be contacted as soon as the information you provided has been verified.

Your loan ID is:  1140119

CashCall is the marketing agent of First Bank & Trust, Milbank, South Dakota.
California, Idaho, Nevada, New Mexico, and Utah loans will be underwritten and funded by CashCall. All other loans will be
underwritten and funded by First Bank & Trust, Milbank, South Dakota.

VeriSign Secured   HACKER SAFE TESTED 24-JAN   © 2007 CashCall, Inc. All Rights Reserved.
Disclosures, Fraud Prevention, Terms Of Use

Powered by Cogility Software
Server: COGSTG03 (10.21.1.41) - Culture: English (United States) (en-US)

Done                                                              Internet

CASHCALL 001162



Sign Document - Message (HTML)

File   Edit   View   Insert   Format   Tools   Actions   Help

From:   Dev2_Do.Not.Reply@cashcall.com                    Sent:   Wed 1/24/2007 1:50 PM
To:     epost@cashcall.com
Cc:
Subject:   Sign Document


"Loans that fit your lifestyle."

## Sign Document

***Hi JOHN B_EXP_NBK_700_201_101_10000 ! Your CashCall application has been conditionally approved for $10,000.00.***

To complete the transaction, you are required to sign the loan documents electronically. Please return to http://www.cashcall.com to complete this process.

Your loan ID is: 1140119

Please be advised that CashCall, Inc. performs a quality control review on all loans prior to funding. CashCall, Inc. reserves the right to cancel funding in the event that any loan does not pass this review. CashCall, Inc. may also require you to provide additional documentation to verify underwriting issues before your loan is funded.

CashCall, Inc.
1-866-590-CASH
http://www.cashcall.com

Please do not reply directly to this system-generated email. This mailbox is not monitored and you will not receive a response.

CASHCALL 001163



Login - Microsoft Internet Explorer provided by Ceira Technologies

File Edit View Favorites Tools Help

Back Search Favorites

Address http://dev2.cashcall.com/Login.aspx Go

Server: COGSTG03 (10.21.1.41) - Culture: English (United States) (en-US)

QUESTIONS? Call Us at 866-590-CASH En Español

CashCall

LOANS THAT FIT YOUR LIFESTYLE

Home | Login | Testimonials | FAQs | Rates | Careers | Contact Us | Help

## Login

Apply Now

**Existing Customers:**

Sign in to access your personal account to:

1) View the progress of your submitted loan application.
2) View the status and details of your funded loans.

Username: ecp03

Password: •••••••••

Login

Forget your password?

---

**New Customers:**

Create a new account and start a new application. Apply Now

CashCall is the marketing agent of First Bank & Trust, Milbank, South Dakota.
California, Idaho, Nevada, New Mexico, and Utah loans will be underwritten and funded by CashCall. All other loans will be underwritten and funded by First Bank & Trust, Milbank, South Dakota.

VeriSign Secured VERIFY HACKER SAFE TESTED 24-JAN

© 2007 CashCall, Inc. All Rights Reserved.
Disclosures, Fraud Prevention, Terms Of Use

Powered by Cogility Software

Server: COGSTG03 (10.21.1.41) - Culture: English (United States) (en-US)

Internet

RequestAuth3Call1 - Microsoft Internet Explorer provided by Ceira Technologies

File   Edit   View   Favorites   Tools   Help

Back •      •          Search    Favorites

Address  http://dev2.cashcall.com/Auth/RequestAuth3Call1.aspx?loanToken=VOR45imxB8ZWBJWba5njIJ5jtgodGxx0QqiR8zXgrbqPQ3rF8gkPwODnKhGe4Q ▾    Go

Server: COGSTG03 (10.21.1.41) - Culture: English (United States) (en-US)

QUESTIONS? Call Us at 866-590-CASH

**CashCall**
LOANS THAT FIT YOUR LIFESTYLE

Home | Logout | Loan Status | Testimonials | FAQs | Rates | Careers | Contact Us | Help

**Identity Authentication Questionnaire**                    **Apply Now**

We will ask you several questions to verify your identity. Please answer the questions within 5 minutes.

**Continue**

CashCall is the marketing agent of First Bank & Trust, Milbank, South Dakota.
California, Idaho, Nevada, New Mexico, and Utah loans will be underwritten and funded by CashCall. All other loans will be
underwritten and funded by First Bank & Trust, Milbank, South Dakota.

VeriSign
Secured
VERIFY ▸

HACKER
SAFE
TESTED 24-JAN

© 2007 CashCall, Inc. All Rights Reserved.
Disclosures, Fraud Prevention, Terms Of Use

Powered by Cogility Software
Server: COGSTG03 (10.21.1.41) - Culture: English (United States) (en-US)

Internet

CASHCALL 001165

RequestAuth3Question - Microsoft Internet Explorer provided by Ceira Technologies

File   Edit   View   Favorites   Tools   Help

Back ▾   ⦿   ▸   ▸   ⟳   ▸ Search   ⭐ Favorites   ⦿   ▸   ▸   ▸   ▸   ▸

Address  http://dev2.cashcall.com/Auth/RequestAuth3Pause1.aspx?loanToken=VOR45imxB8ZWBJWba5njINlgCG2IFNBI5wchQ07OuVgXSzM2JpXQn%2FAke   ▸ Go

Server: COGSTG03 (10.21.1.41) - Culture: English (United States) (en-US)

**QUESTIONS? Call Us at 866-590-CASH**

**CashCall**
LOANS THAT FIT YOUR LIFESTYLE

Home | Logout | Loan Status | Testimonials | FAQs | Rates | Careers | Contact Us | Help

## Identity Authentication Questionnaire

**Apply Now**

Please select your answer for each of the questions below.

According to your credit profile, you may have opened a mortgage loan in or around April 2003. Please select the lender to whom you currently make your mortgage payments. If you do not have a mortgage, select 'NONE OF THE ABOVE/DOES NOT APPLY'.

INDEPENDENT MTG  ▾

Please select the range that includes the monthly mortgage payment shown on your lender's statement (this MAY include taxes and insurance, but should not include additional principal payments). If you do not have a mortgage, select 'NONE OF THE ABOVE/DOES NOT APPLY'.

$100 - $299  ▾

Please select the city that you have previously resided in.

ATTALLA  ▾

Please select the state that issued your Social Security Number.

IA  ▾

**Submit**

Note: Please do not refresh the page after you have submitted the answers. This may cause your application being denied.

CashCall is the marketing agent of First Bank & Trust, Milbank, South Dakota.
California, Idaho, Nevada, New Mexico, and Utah loans will be underwritten and funded by CashCall. All other loans will be underwritten and funded by First Bank & Trust, Milbank, South Dakota.

Verisign Secured   VERIFY▸   HACKER SAFE TESTED 24-JAN   © 2007 CashCall, Inc. All Rights Reserved. Disclosures, Fraud Prevention, Terms Of Use

Powered by Coility Software
Server: COGSTG03 (10.21.1.41) - Culture: English (United States) (en-US)

Done                                                                    Internet

Application Conditionally Approved - Message (HTML)

File  Edit  View  Insert  Format  Tools  Actions  Help

| From: | Dev2_Do.Not.Reply@cashcall.com | Sent: | Wed 1/24/2007 1:53 PM |
|---|---|---|---|
| To: | epost@cashcall.com | | |
| Cc: | | | |
| Subject: | Application Conditionally Approved | | |

**CashCall**
*"Loans that fit your lifestyle."*

## Application Conditionally Approved

**Congratulations JOHN B_EXP_NBK_700_201_101_10000 ! Your CashCall application has been conditionally approved for $10,000.00.**

Your loan ID is: 1140119

Please be advised that CashCall, Inc. performs a quality control review on all loans prior to funding. CashCall, Inc. reserves the right to cancel funding in the event that any loan does not pass this review. CashCall, Inc. may also require you to provide additional documentation to verify underwriting issues before your loan is funded.

CashCall, Inc.
1-866-590-CASH
http://www.cashcall.com

Please do not reply directly to this system-generated email. This mailbox is not monitored and you will not receive a response.

CASHCALL 001167



LoanStatus - Microsoft Internet Explorer provided by Ceira Technologies

File Edit View Favorites Tools Help

Back Search Favorites

Address http://dev2.cashcall.com/LoanStatus/LoanApproved.aspx Go

Server: COGSTG03 (10.21.1.41) - Culture: English (United States) (en-US)

QUESTIONS? Call Us at 866-590-CASH

CashCall
LOANS THAT FIT YOUR LIFESTYLE

Home | Logout | Loan Status | Testimonials | FAQs | Rates | Careers | Contact Us | Help

**Approved** Apply Now

**Congratulations! Your application has been approved.**

To complete the transaction, you are required to sign the loan document electronically. You will be issued a digital certificate for this purpose. The certificate will be installed in your browser. You will then use the certificate to sign the loan document.

IMPORTANT

All of the following requirements must be met so that you can sign the loan documents from your computer:

- You must use Microsoft Internet Explorer, version 5.5 or higher. Netscape does not support the digital signature technology we are using.
- You must be running Windows 95 or higher. The Macintosh version of Internet Explorer does not work with the digital signature technology we are using.
- Your browser security settings must allow scripting and ActiveX controls. If you aren't sure if your security settings are correct, from your Internet Explorer menu, select "Tools", "Internet Options...", the "Security" tab, click the "Default Level" button (if this button is not enabled, your settings are already correct), and then click the "OK" button. Click here for ActiveX Troubleshooter.
- Digital signing components and a digital certificate will be installed in you browser. Please answer "Yes" or "OK" to all prompts for installation and signing questions.

Continue

CashCall is the marketing agent of First Bank & Trust, Milbank, South Dakota.
California, Idaho, Nevada, New Mexico, and Utah loans will be underwritten and funded by CashCall. All other loans will be underwritten and funded by First Bank & Trust, Milbank, South Dakota.

© 2007 CashCall, Inc. All Rights Reserved.
Disclosures. Fraud Prevention. Terms Of Use

Powered by Cogility Software
Server: COGSTG03 (10.21.1.41) - Culture: English (United States) (en-US)

Internet

**Internet Explorer browser popup informing the user that it is about to request a digital certificate:**

**Potential Scripting Violation**

This Web site is requesting a new certificate on your behalf. You should allow only trusted Web sites to request a certificate for you. Do you want to request a certificate now?

Yes No





**Internet Explorer browser popup informing the user that the requested digital certificate is about to be installed into the browser:**



**The next 4 screen shots are all part of the same signing/note page:**

CertSign - Microsoft Internet Explorer provided by Ceira Technologies

File   Edit   View   Favorites   Tools   Help

Back •   Search   Favorites

Address http://dev2.cashcall.com/LoanStatus/LoanSigning.aspx   Go

Server: COGSTG03 (10.21.1.41) - Culture: English (United States) (en-US)

**QUESTIONS? Call Us at 866-590-CASH**

# CashCall
LOANS THAT FIT YOUR LIFESTYLE

Home | Logout | Loan Status | Testimonials | FAQs | Rates | Careers | Contact Us | Help

**Loan Document**                                                    **Apply Now**

## CASHCALL PROMISSORY NOTE AND DISCLOSURE STATEMENT

| | |
|---|---|
| Account No.: 1140119 | Date of Note: January 24, 2007 |
| Lender: CashCall, Inc. | Expected Funding Date: January 25, 2007 |
| Address: 17360 Brookhurst Street | Borrower: JOHN B_EXP_NBK_700_201_101_10000 |
| Fountain Valley, CA 92708 | Address: 9999 MICHELSON DR |
| | WESTMINSTER, CA 92634 |

### TRUTH IN LENDING ACT DISCLOSURE STATEMENT

| ANNUAL PERCENTAGE RATE  The cost of my credit as a yearly rate | FINANCE CHARGE  The dollar amount the credit will cost me | AMOUNT FINANCED  The amount of credit provided to me | TOTAL OF PAYMENTS  The amount I will have paid after all payments are made as scheduled |
|---|---|---|---|
| 21.22 % | $14,107.43 | $9,925.00 | $24,032.43 |

| PAYMENT SCHEDULE |
|---|
| One payment of $240.76 on March 01, 2007. |
| 119 monthly payments of $199.93 beginning on April 01, 2007. |

**Late Charge:** If a payment is more than 15 days late, I will be charged $15.00.

**Prepayment:** If I pay off this loan early, I will not have to pay any penalty.

Please see the remainder of this document for additional information about nonpayment, default and any required repayment in full before the scheduled date.

Internet

CASHCALL 001170

CertSign - Microsoft Internet Explorer provided by Ceira Technologies

File   Edit   View   Favorites   Tools   Help

Back • ⚙ • 🖹 🗐 ⚙ | 🔍 Search ☆ Favorites ⚙ | 🖨 • 🖨 🖩 • 🗔 🎇 🌐

Address 🔗 http://dev2.cashcall.com/LoanStatus/LoanSigning.aspx                                                    ▾ ➡ Go

Prepayment:  If I pay off this loan early, I will not have to pay any penalty.

Please see the remainder of this document for additional information about nonpayment, default and any required repayment in full before the scheduled date.

| ITEMIZATION OF AMOUNT FINANCED | |
|---|---|
| Amount Financed: | $9,925.00 |
| Amount Paid to Borrower Directly: | $9,925.00 |
| Prepaid Finance Charge/Origination Fee: | $75.00 |

In this Promissory Note & Disclosure Statement ("Note"), the words "I" and "me" mean the person signing as a borrower. The boxed-in disclosures above are part of the terms and conditions of your agreement with us.

FOR VALUE RECEIVED, I promise to pay to the order of CashCall, Inc., or any subsequent holder of this Note (the "Holder"), the sum of **$10,000.00**, together with interest calculated at **21.00 %** and any outstanding charges or late fees, until the full amount of this Note is paid.

I understand that my payments will be applied first to any outstanding charges or late fees, then to earned interest and finally to principal. The payment schedule described above is only an estimate and may change in the event I do not make all payments as scheduled.

I understand that I may prepay all or any part of the principal without penalty.

I understand that I will be subject to a fee not to exceed the legally permitted amount if any payment I make is returned for non-sufficient funds.

I understand that if I fail to make any payment due hereunder, the Holder of this Note shall have the right, after a 30-day grace period, to declare this Note to be immediately due and payable. I further understand that if I file for an assignment for the benefit of creditors, bankruptcy, or for relief under any provisions of the United States Bankruptcy Code, the Holder of this Note shall have the right to declare this Note to be immediately due and payable.

I understand that in the event that Holder is required to employ an attorney at law to collect any amounts due under this Note, I will be required to pay the reasonable fees of such attorney to protect the interest of Holder or to take any other action required to collect the amounts due hereunder.

I agree that all payments not made within fifteen (15) days of the due date shall be subject to a late fee of $15. Any late fee assessed shall be collected by the Holder on behalf of the Holder and shall inure to the exclusive benefit of the Holder.

The origination fee included in the prepaid finance charge/origination fee disclosed above is fully earned upon loan origination, is not subject to rebate upon prepayment or acceleration of this Note and is not considered interest.

The Holder of this Note may delay or forgo enforcing any of its rights or remedies under this Note without losing them. I hereby, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for payment, or protest and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability.

🔗                                                                                                    🌐 Internet

CASHCALL 001171



The Holder of this Note may delay or forgo enforcing any of its rights or remedies under this Note without losing them. I hereby, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for payment, or protest and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability.

The rights of Holder hereof shall be cumulative and not necessarily successive. This Note shall take effect as a sealed instrument and shall be construed, governed and enforced in accordance with the laws of the State of California.

This Note is in original format an electronic document fully compliant with the Electronic Signatures in Global and National Commerce Act (E-SIGN) and other applicable laws and regulations, and that the one, true original Note is retained electronically by Holder on behalf of Holder. All other versions hereof, whether electronic or in tangible format, constitute facsimiles or reproductions only.

I understand that I have previously consented to receive all communications from the Holder, including but not limited to, all required disclosures via electronic mail.

I understand and agree that CashCall, Inc. may obtain credit reports on me an ongoing basis as long as this loan remains in effect. I also authorize CashCall, Inc. to report information concerning my account to credit bureaus and anyone else it believes in good faith has a legitimate need for such information.

NOTE TO CALIFORNIA BORROWERS: A married or registered domestic partner applicant may apply for a separate account. As required by law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations. If Holder takes any adverse action as defined by Section 1785.3 of the California Civil Code and the adverse action is based, in whole or in part, on any information contained in a consumer credit report, you have the right to obtain within 60 days a free copy of your consumer credit report from the consumer reporting agency who furnished us your consumer credit report and from any other consumer credit reporting agency which compiles and maintains files on consumers on a nationwide basis. You have the right as described by Section 1785.16 of the California Civil Code to dispute the accuracy or completeness of any information in a consumer credit report furnished by the consumer credit reporting agency.

| ☑ | I CERTIFY THAT NO PERSON HAS PERFORMED ANY ACT AS A BROKER IN CONNECTION WITH THE MAKING OF THIS LOAN. |
| --- | --- |
| ☑ | I ATTEST THAT THE CHECK SUBMITTED FOR APPROVAL OF MY LOAN IS FROM A LEGAL, OPEN AND ACTIVE ACCCUNT. THE CHECK IS NOT ALTERED, FORGED, STOLEN OR OBTAINED THROUGH FRAUDULENT OR ILLEGAL MEANS. |
| ☑ | I ATTEST THAT (1) THE PAY STUB THAT I SUBMITTED FOR APPROVAL OF MY LOAN IS A VALID STUB FROM A JOB THAT I CURRENTLY HOLD AND THE STUB HAS NOT BEEN ALTERED OR FORGED IN ANY WAY; OR (2) I WAS NOT REQUIRED TO SUBMIT A PAY STUB TO OBTAIN MY LOAN. |
| ☑ | I HAVE READ ALL OF THE TERMS AND CONDITIONS OF THIS PROMISSORY NOTE AND DISCLOSURE STATEMENT AND AGREE TO BE BOUND THERETO. I UNDERSTAND AND AGREE THAT MY EXECUTION OF THIS NOTE SHALL HAVE THE SAME LEGAL FORCE AND EFFECT AS A PAPER CONTRACT. |

CASHCALL 001172



ACCOUNT. THE CHECK IS NOT ALTERED, FORGED, STOLEN OR OBTAINED THROUGH FRAUDULENT OR ILLEGAL MEANS.

☑ I ATTEST THAT (1) THE PAY STUB THAT I SUBMITTED FOR APPROVAL OF MY LOAN IS A VALID STUB FROM A JOB THAT I CURRENTLY HOLD AND THE STUB HAS NOT BEEN ALTERED OR FORGED IN ANY WAY; OR (2) I WAS NOT REQUIRED TO SUBMIT A PAY STUB TO OBTAIN MY LOAN.

☑ I HAVE READ ALL OF THE TERMS AND CONDITIONS OF THIS PROMISSORY NOTE AND DISCLOSURE STATEMENT AND AGREE TO BE BOUND THERETO. I UNDERSTAND AND AGREE THAT MY EXECUTION OF THIS NOTE SHALL HAVE THE SAME LEGAL FORCE AND EFFECT AS A PAPER CONTRACT.

This Loan Is Made Pursuant To The California Finance Lender Law, Division 9 (commencing with Section 22000) of the Financial Code. FOR INFORMATION, CONTACT THE DEPARTMENT OF CORPORATIONS, STATE OF CALIFORNIA, LICENSE NO. 603-8780.

### ELECTRONIC FUNDS AUTHORIZATION AND DISCLOSURE

I hereby authorize CashCall to withdraw my scheduled loan payment from my checking account on or about the FIRST day of each month. I further authorize CashCall to adjust this withdrawal to reflect any additional fees, charges or credits to my account. I understand that CashCall will notify me 10 days prior to any given transfer if the amount to be transferred varies by more than $50 from my regular payment amount. I understand that this authorization and the services undertaken by CashCall in no way alters or lessens my obligations under the loan agreement. I understand that I can cancel this authorization at any time (including prior to my first payment due date) by sending written notification to CashCall. Cancellations must be received at least seven days prior to the applicable due date.

☑ I UNDERSTAND CASHCALL'S PAYMENT COLLECTION POLICY AND AUTHORIZE ELECTRONIC DEBITS FROM MY BANK ACCOUNT.

Click here to print out a copy of this document for your records.

**Sign Document**

CashCall is the marketing agent of First Bank & Trust, Milbank, South Dakota.
California, Idaho, Nevada, New Mexico, and Utah loans will be underwritten and funded by CashCall. All other loans will be underwritten and funded by First Bank & Trust, Milbank, South Dakota.

© 2007 CashCall, Inc. All Rights Reserved.
Disclosures, Fraud Prevention, Terms Of Use

Powered by Cogility Software
Server: COGSTG03 (10.21.1.41) - Culture: English (United States) (en-US)

Internet Explorer browser popup informing the user that it is about to access the digital certificate (installed in the earlier step):

CASHCALL 001173

**Security Alert**

This Web site needs access to digital certificates on this computer.

WARNING: By allowing access to your certificates, this Web site will also gain access to any personal information that are stored in your certificates.

Do you want this Web site to gain access to the certificates on this computer now?

Yes   No

**Internet Explorer browser popup informing the user that it is about to use the digital certificate to create a digital signature:**



**Security Alert**

This Web site needs to create a digital signature using your private key.

WARNING: Allowing an untrusted Web site to use your private key is a security risk. The Web site could use your private key to compromise protected data or assume your identity.

Do you want this Web site to create the signature now?

☐ Do not show this dialog box again.

If you select this check box, any Web pages within this site will be able to create digital signatures without prompting you again. However, you will be prompted again when you visit another Web site.

Yes   No

LoanFunded - Microsoft Internet Explorer provided by Ceira Technologies

File  Edit  View  Favorites  Tools  Help

Back •  Search  Favorites

Address  http://dev2.cashcall.com/LoanStatus/LoanFunding.aspx  Go

Server: COGSTG03 (10.21.1.41) - Culture: English (United States) (en-US)

QUESTIONS? Call Us at 866-590-CASH

**CashCall**
LOANS THAT FIT YOUR LIFESTYLE

Home | Logout | Loan Status | Testimonials | FAQs | Rates | Careers | Contact Us | Help

## Loan Funding

**Apply Now**

**Congratulations! Your loan has been approved for funding.**

The loan funds will be transferred into your bank account on January 25, 2007 (If this is not a business day for your bank, funds will be transferred on the next business day of your bank.).

CashCall is the marketing agent of First Bank & Trust, Milbank, South Dakota.
California, Idaho, Nevada, New Mexico, and Utah loans will be underwritten and funded by CashCall. All other loans will be underwritten and funded by First Bank & Trust, Milbank, South Dakota.

VeriSign Secured  VERIFY

HACKER SAFE  TESTED 24-JAN

© 2007 CashCall, Inc. All Rights Reserved.
Disclosures, Fraud Prevention, Terms Of Use

Powered by Cogility Software
Server: COGSTG03 (10.21.1.41) - Culture: English (United States) (en-US)

Internet

CASHCALL 001175



Funding in Progress - Message (HTML)

File Edit View Insert Format Tools Actions Help

From: Dev2_Do.Not.Reply@cashcall.com
Sent: Wed 1/24/2007 1:58 PM
To: epost@cashcall.com
Cc:
Subject: Funding in Progress

CashCall "Loans that fit your lifestyle."

## Funding in Progress

***Congratulations JOHN B_EXP_NBK_700_201_101_10000 ! Your CashCall loan is in the process of being funded.***

You will receive your settlement statement by e-mail after we confirm the transfer of funds to your account.

Your loan ID is: 1140119

CashCall, Inc.
1-866-590-CASH
http://www.cashcall.com

Please do not reply directly to this system-generated email. This mailbox is not monitored and you will not receive a response.

**The next 3 screen shots are all part of the same email. The 1st is the main body of the email, the 2nd is the settlement attachment, and the 3rd is the note attachment (1st page of note only, see the signing screen shot above for the entire note):**



Settlement - Message (HTML)

File   Edit   View   Insert   Format   Tools   Actions   Help

From:    Dev2_Do.Not.Reply@cashcall.com                          Sent:   Wed 1/24/2007 2:00 PM
To:      epost@cashcall.com
Cc:
Subject:  Settlement

Attachments: CashCall Settlement.html (2 KB); CashCall Loan Agreement.html (20 KB)



"Loans that fit your lifestyle."

## Settlement

### Dear JOHN B_EXP_NBK_700_201_101_10000 ,

Attached are copies of your loan agreement and settlement statement.

Please remember that the first payment of $246.60 will be withdrawn from your checking account on March 01, 2007.

Your loan ID is: 1140119

If you have any questions, please call 1-866-590-CASH.

Thank you.

CashCall, Inc.
1-866-590-CASH
http://www.cashcall.com

Please do not reply directly to this system-generated email. This mailbox is not monitored and you will not receive a response.

CASHCALL 001177

C:\Documents and Settings\epost\Local Settings\Temporary Internet Files\OLKA1\CashCall Settleme - Microsoft Internet E...

File   Edit   View   Favorites   Tools   Help

Address   C:\Documents and Settings\epost\Local Settings\Temporary Internet Files\OLKA1\CashCall Settlement.html          Go

# STATEMENT TO BORROWER AND BROKER INFORMATION

**BORROWER(S) NAME AND ADDRESS:**
JOHN B_EXP_NBK_700_201_101_10000
9999 MICHELSON DR
WESTMINSTER, CA 92634

**LOAN ID: 1140119**

**FINANCE LENDERS NAME AND ADDRESS:**
CashCall, Inc.
17360 Brookhurst Street
Fountain Valley, CA 92708
(949) 752-4600

**TERMS OF THE LOAN CONTRACT:**

| | | | |
|---|---|---|---|
| Date: | January 24, 2007 | **Amount Financed:** | $9,925.00 |
| Term: | 120 months | **Annual Percentage Rate (APR):** | 21.22% |

YOUR FIRST PAYMENT OF $246.60 is due on March 01, 2007 and will be collected via electronic funds transfer.

No person has performed any act in connection with the making of this loan. The borrower has the right to prepay this loan in any amount at any time without penalty. This loan is made pursuant to the California Finance Lenders Law, Division 9 (commencing with Section 22000) of the Financial Code. FOR INFORMATION ON THIS LICENSE, CONTACT THE DEPARTMENT OF CORPORATIONS, STATE OF CALIFORNIA. FOR INFORMATION ON YOUR LOAN, PLEASE CALL CASHCALL'S TOLL-FREE CUSTOMER SERVICE LINE - (877) 525-2274.

CashCall is licensed by the California Department of Corporations under the California Finance Lenders Law -- License No. 6038780.

Done                                                                                          Internet

CASHCALL 001178



C:\Documents and Settings\epost\Local Settings\Temporary Internet Files\OLKA1\CashCall Loan Agr - Microsoft Internet E...

File Edit View Favorites Tools Help

Address C:\Documents and Settings\epost\Local Settings\Temporary Internet Files\OLKA1\CashCall Loan Agreement (5).html Go

## CASHCALL PROMISSORY NOTE AND DISCLOSURE STATEMENT

Account No.: 1140119
Lender: CashCall, Inc.
Address: 17360 Brookhurst Street
Fountain Valley, CA 92708

Date of Note: January 24, 2007
Expected Funding Date: January 24, 2007
Borrower: JOHN B_EXP_NBK_700_201_101_10000
Address: 9999 MICHELSON DR
WESTMINSTER, CA 92634

### TRUTH IN LENDING ACT DISCLOSURE STATEMENT

| **ANNUAL PERCENTAGE RATE** *The cost of my credit as a yearly rate* | **FINANCE CHARGE** *The dollar amount the credit will cost me* | **AMOUNT FINANCED** *The amount of credit provided to me* | **TOTAL OF PAYMENTS** *The amount I will have paid after all payments are made as scheduled* |
|---|---|---|---|
| **21.22 %** | **$14,113.27** | **$9,925.00** | **$24,038.27** |

| PAYMENT SCHEDULE |
|---|
| One payment of $246.60 on March 01, 2007. |
| 119 monthly payments of $199.93 beginning on April 01, 2007. |

**Late Charge:** If a payment is more than 15 days late, I will be charged $15.00.

**Prepayment:** If I pay off this loan early, I will not have to pay any penalty.

Please see the remainder of this document for additional information about nonpayment, default and any required repayment in full before the scheduled date.

### ITEMIZATION OF AMOUNT FINANCED

Done Internet

**Sample Adverse Action email (adverse action letters sent via U.S. mail contain the same content):**



Application Declined - Message (HTML)

File   Edit   View   Insert   Format   Tools   Actions   Help

From:   Dev2_Do.Not.Reply@cashcall.com                    Sent:   Wed 1/24/2007 2:05 PM
To:     epost@cashcall.com
Cc:
Subject:   Application Declined

**CashCall**
*"Loans that fit your lifestyle."*

## Application Declined

### Dear JOHN B_EXP_NBK_700_201_101_10000 ,

After careful review of your loan application, we are sorry to advise you that we cannot grant you
a loan at this time. If you would like a statement of specific reasons why your application was
denied, please contact the address shown below within 60 days of receiving this letter. We will
provide you with a statement of reasons within 30 days after receiving your request.

> Credit Inquiry Dept.
> CashCall, Inc.
> 17360 Brookhurst Street
> Fountain Valley, CA 92708
> (877) 525-2274

As part of the loan application approval process, CashCall uses information obtained from
Experian credit reporting agency. Experian's address and toll-free telephone number are
shown below. Experian played no part in our decision and is unable to provide specific reasons
why we have denied credit to you. You have a right under the Fair Credit Reporting Act to know
the information contained in your credit file at the consumer reporting agency. You have a right
to a free copy of your credit report from the reporting agency if you request it no later than 60
days after you receive this notice. In addition, if you find that any information contained in the
report you received is inaccurate or incomplete, you have the right to dispute the matter with the
reporting agency. You can find out about the information contained in your file (if one was used)
by contacting:

> Experian Credit Information
> 701 Experian Parkway
> P.O. Box 2002
> Allen, TX 75013
> 1-888-397-3742
> www.experian.com/reportaccess

*Notice:* The federal Equal Credit Opportunity Act prohibits creditors from discriminating
against credit applicants on the basis of race, color, religion, national origin, sex, marital
status, age (provided the applicant has the capacity to enter into a binding contract);
because all or part of the applicant's income derives from any public assistance program;
or because the applicant has in good faith exercised any right under the Consumer Credit
Protection Act. The federal agency that administers compliance with this law concerning this
creditor is the Federal Trade Commission, Equal Credit Opportunity, Washington, D.C.,
20580.

Please do not reply directly to this system-generated email. This mailbox is not monitored and
you will not receive a response.

CASHCALL 001180