# Exhibit 13
# Submitted Conditionally
# Under Seal

# Exhibit 14
# Submitted Conditionally
# Under Seal

# Exhibit 15
# Submitted Conditionally
# Under Seal

# Exhibit 16
# Submitted Conditionally
# Under Seal

# Exhibit 17

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| KRISTA O'DONOVAN, EDUARDO DE LA TORRE, and LORI SAYSOURIVONG, individually and on behalf of all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | CASE NO. |
| vs. | ) ) | CV-083174-MEJ |
| CASHCALL, INC., a California corporation, and DOE 1 through DOE 50, inclusive, | ) ) ) ) | |
| Defendants. | ) ) | |

**Expert Report**
**Margot Saunders**
**National Consumer Law Center**

## I.      Summary of Report

The Defendant lender in this case (referred to collectively in this report as "CashCall") made loans of $2,525 to 135,378 people at interest rates ranging from 96% to 135%.[1]  These loans were secured by the borrower's agreement to allow the lender to debit the payments directly from the borrower's bank account. My assessment of these loans is that they did provide credit to necessitous borrowers. But it was toxic credit – credit that harmed the borrowers. The costs for these loans was very high, both for those borrowers who managed to repay according to the loan terms, and for those who were unable to pay and suffered the consequences of delinquencies and defaults.

After analyzing numerous records supplied by CashCall[2] to the borrowers' attorneys, as well as several depositions, I have identified the following characteristics and lending practices in relation to these loans:

   **1.   These loans carry extremely high direct financial costs for the borrowers.**
   For example, the 96% interest rate loans for $2,525 required payments of
   $216.55 for 42 months, for a total amount repaid of $9,094.  After just one year
   of monthly payments on these terms, borrowers pay back all of the money

---

[1] *See* CashCall's response to Interrogatory No. 12.

[2] *See* Appendix to this Report for a full listing of the material received from Plaintiff's counsel.

originally borrowed, yet 30 more payments are required. The total costs of these loans were not affordable for most of CashCall's borrowers.

2. **These loans also incur very high indirect costs**. The indirect costs were manifested in the borrowers' struggles to make the payments for the full term of the loan or dealing with the consequences of not paying: the demands of dealing with CashCall's aggressive collection tactics and the long-term consequences of detrimental reporting on their credit reports.

3. **CashCall deliberately designed this lending program with the knowledge that there would be significant delinquencies (well over half of all borrowers) and significant defaults (over 42% of borrowers).**   The high interest rates charged were used to offset the planned failures, regardless of the known difficulties borrowers would experience trying to repay these loans.

4. **It is unlikely that CashCall's borrowers had the sophisticated financial literacy skills necessary to protect themselves from the high costs of CashCall's loans.**  Based on the financial literacy skills in the U.S. population, and likely characteristics of CashCall's borrowers, it is doubtful that they were able to assess fully the risks and costs involved in these loans.

Based on these findings, it is my conclusion that the benefits CashCall provided its borrowers – quick cash to borrowers who had lower credit scores – were outweighed by the damage suffered by these borrowers as a result of these loans.  The negative impacts are significant, and include not only financial effects, but also negative and potentially enduring impacts upon personal, emotional and family welfare, personal privacy and credit worthiness. These negative impacts must be multiplied by CashCall's large loan volume. While credit was provided to cash-strapped borrowers who may have perceived that they did not have alternatives, the costs of that credit were significant and outweighed the benefits.

## II.     Assignment

I have been asked to identify the impacts on borrowers of CashCall's $2,600 loans, to explain how CashCall's policies affected borrowers, and to provide a benchmark interest rate for lending to credit-challenged borrowers.

## III.     Qualifications

I am Of Counsel to the National Consumer Law Center ("NCLC") where I have worked since 1991. Until 2005, I served as Managing Attorney of NCLC's Washington, D.C. office.

One of my principal duties at NCLC is to serve as a resource to legal services attorneys, attorneys engaged in private practice, and federal and state regulators on complex

consumer law cases. My job also includes policy analysis in the areas of predatory lending, credit reporting, debt collection, electronic commerce and electronic benefits transfer, preservation of homeownership, and other consumer credit issues.  I have provided training to thousands of attorneys on these topics in a variety of locals and forums.

During the past twenty years, I have regularly provided testimony to the House Financial Services Committee and the Senate Committee on Banking, Housing and Urban Affairs (in addition to other Congressional committees) regarding credit-related issues facing low-income households in the United States.  My responsibilities also require frequent appearances before and meetings with federal agencies including the Federal Reserve Board, the FDIC, the Federal Trade Commission, the Treasury Department, and more recently the Consumer Financial Protection Bureau, as well as members of Congress and their staffs.

I have testified on numerous occasions before Congress on the meaning and the causes of, as well as recommended solutions for, predatory lending.  I have been a primary resource for members and Congressional staff in the discussions in recent years regarding proposed changes to the law regarding predatory lending, electronic transactions, banking issues, protection of benefits in bank accounts, debt collection problems, and other consumer credit issues.

During the course of my career, I have prepared and presented testimony on dozens of occasions to Congressional committees. For example, in just the past six years, I have testified before Congress seven times. In September 2012, I testified before the House Ways and Means Committee on the impact of the mandate for direct deposit on unbanked recipients of Social Security. In July, 2011, I testified before a subcommittee of the House Financial Services Committee on problems with proposed legislation purporting to regulate the rent-to-own industry. In April, 2009, I testified before the full House Financial Services Committee on behalf of over fifty state and national groups representing consumers, regarding pending legislation to address predatory mortgage lending.  In March, 2009, I presented testimony to a subcommittee of the House Financial Services Committee on recommended reforms to the nation's system of mortgage regulation. In September, 2008, I testified to the same House Committee on HUD's proposed changes to the Real Estate Settlement Procedures Act.  In 2007, I testified before both the House Ways and Means Committee and the Senate Finance Committee on the effect upon the elderly of garnishing Social Security and other exempt benefits.  I regularly provide substantial input to the testimony of other staff at NCLC, just as I, in my own policy work, am counseled and guided by the other consumer law experts at the Center.

During the past eight years, I have provided expert witness reports and testimony in dozens of consumer law cases in multiple states, including Alabama, Delaware, Georgia, Illinois, Kentucky, Maryland, Massachusetts, Missouri, New Jersey, New York, Pennsylvania, Ohio, South Carolina, Washington and West Virginia.  My clients have included legal services lawyers, private attorneys, state attorneys general, and the Federal Trade Commission.  The subjects of my testimony have included predatory mortgage lending, non-secured predatory lending, banking practices, credit math issues, credit card issues, and compliance with credit industry standards. I have also provided assistance as an expert consultant to numerous state attorneys general, the U.S. Department of Justice, and private attorneys on a wide range of consumer credit issues.

My work also includes writing analytical books and articles on issues relating to low-income consumers; providing training and expert testimony on issues affecting low-income consumers; and providing analysis and assistance on credit math questions. I have authored or co-authored numerous articles in law reviews and other publications on consumer law including, for example, *Past, Present, and Future Threats to Federal Safety Net Benefits in Bank Accounts,* 16 N.C. Banking Inst. 43 (2012) and *The Credit Card Market and Regulation: In Need of Repair,* 10 N.C. Banking Inst. 23 (2006), published in the North Carolina Banking Institute Journal of the University of North Carolina School of Law; and *Regulation of Consumer Credit: The Cause or the Cure for Predatory Lending?* (March 2004), published in the Harvard University Joint Center for Housing Studies Working Paper Series (Paper No. BABC 04-21).

I am a co-author of two of NCLC's practice treatises, including all editions of Consumer Banking and Payments Law (5th ed. 2013) and all supplements, and the original and second editions of Access to Utility Service (2d ed. 2000). I have been a contributing author of several other NCLC manuals and their supplements, including Mortgage Lending (1st ed. 2012), Consumer Credit Regulation: Credit Cards, Payday Loans, Auto Finance and Other Non-Mortgage Credit (1st ed. 2012), The Cost of Credit: Regulation, Preemption, and Industry Abuses (4th ed. 2009), and Foreclosures (5th ed. 2012 and Supplement 2013), as well as several editions and supplements of Truth in Lending (8th ed. 2012).

## IV.   Report

The purpose of this report is provide information on:

- the benefits of CashCall's loans of $2,525 to borrowers;[3]
- whether CashCall's loans of $2,525 to borrowers were harmful;
- whether the harms to borrowers were mitigated by the benefits of the loans;
- whether these borrowers could adequately assess the perils of these loans and thus protect themselves from these harms; and
- a benchmark interest rate for consumer lending to borrowers with lower credit scores, who are thus considered riskier.

In the Introduction, section IV-A, I explain the background of the California laws governing small loans, specifically CashCall's loans of $2,525 to provide some of the historical considerations in California regarding the evaluation of the harm of these high cost loans to CashCall's borrowers. In this subsection, I also set out the benefits of CashCall's loans to borrowers.

In section IV-B, I describe the harmful effects of CashCall's loans to borrowers, focusing on the raw dollar costs of the loans, and the costs to borrowers from the anticipated delinquencies and defaults. In this section, I illustrate how CashCall's planned

---

[3] The loans at issue in this case were for the principal amount of $2,600. However, $75 of this amount went immediately to CashCall as an up-front, origination fee. Therefore, the real amount borrowed was $2,525.

delinquencies and defaults are much greater than industry norms, yet are dealt with by CashCall with aggressive collection practices.  I also explain the costs to the borrowers in their quest for future credit resulting from the negative credit reporting from CashCall.

In section IV-C, I describe how CashCall's business practices strategically targeted borrowers who would repay sufficient amounts of the loans to provide CashCall with healthy revenue returns – and pass CashCall's "break-even point" – yet would be unlikely to be able to pay the loans in full without the negative consequences of delinquencies and defaults.

In section IV-D, I explain the financial literacy characteristics of borrowers in the United States and conclude that it is unlikely that CashCall's borrowers had the wherewithal to protect themselves from the financial and other consequences of these high cost loans.

Finally, in section IV-E, I set out the rationale for using 36% as the benchmark rate for loans made to credit-challenged borrowers.

## A.    Introduction

Policymakers and the courts have recognized for centuries that lenders and borrowers have grossly unequal bargaining powers. Protections are necessary because – as the California Supreme Court recognized – borrowers who are desperate to acquire credit are "forced by [their] economic circumstances to resort to excessively costly funds to meet . . . financial needs."[4]  It is well recognized that borrowers will often accept almost any terms in order to obtain the money they require.[5]

---

[4] Ghirardo v. Antonioli, 883 P.2d 960, 969 (Cal. 1994). *See also* Jersey Palm-Gross, Inc. v. Paper, 658 So. 2d 531, 534 (Fla. 1995) (purpose of usury laws is to "protect borrowers from paying unfair and excessive interest to overreaching creditors"; and "to bind the power of creditors over necessitous debtors and prevent them from extorting harsh and undue terms in the making of loans"); Scarr v. Boyer, 818 P.2d 381, 383 (Mont. 1991) ("Usury statutes protect borrowers who lack real bargaining power against overreaching by creditors"); North Shore Auto Financing, Inc. v. Block, 2003 WL 21714583 (Ohio Ct. App. July 14, 2003); Smith v. Mitchell, 616 A.2d 17 (Pa. Super. Ct. 1992) (purpose of usury law, "to protect the citizenry . . . from being exploited at the hands of unscrupulous individuals seeking to circumvent the law at the expense of unsuspecting borrowers who may have no other avenue to secure backing for a, for example, business venture"); Whitworth & Yancy v. Adams, 5 Rand 333, 335, 26 Va. 333 (1827) ("These statutes we made to protect needy and necessitous persons from the oppression of usurers and monied men, who are eager to take advantage of the distress of others; while they, on the other hand, from the pressure of their distress, are ready to come to any terms; and with their eyes open, not only break the law, but complete their ruin"); Demopolis v. Galvin, 786 P.2d 804, 807 (Wash. Ct. App. 1990) (purpose is to protect desperate borrowers "driven to borrow money at any cost"). *See also* Trapp v. Hancuh, 530 N.W.2d 879 (Minn. Ct. App. 1995)  (purpose of usury laws is "to protect the weak and necessitous from being taken advantage of by lenders who can unilaterally establish the terms of the loan transaction"); Paulman v. Filtercorp, 899 P.2d1259 (Wash. 1995) ("The evil at which the usury laws are aimed . . . is the oppression of the borrower 'who by adversity and necessity of economic life [is] driven to borrow money at any cost' protecting vulnerable borrowers from oppression is the objective). *Cf.* Sunburst Bank v. Keith, 648 So. 2d 1147 (Miss. 1995) (purpose of usury statutes and their remedy of forfeiture "is to discourage exorbitance"; business loans at issue). *See generally* Steven W. Bender, *Rate Regulation at the Crossroads of Usury and Unconscionability: The Case for Regulating Abusive and Commercial Interest Rates Under the Unconscionability Standard*, 31 Hous. L. Rev. 721 (1994).

[5] Schneider v. Phelps, 359 N.E.2d 1361, 1365 (N.Y. 1977) ("The purpose of usury laws, from time immemorial, has been to protect desperately poor people from the consequences of their own desperation. Law-making

The recognition that credit extended desperate borrowers was rife with risk to them led to the adoption of small loan laws throughout the United States in the early part of the twentieth century. Over the years, there had been multiple strategies attempting to deal with the problems of loan sharking. However, the most successful was developed by the Russell Sage Foundation, which promoted the Uniform Small Loan Law.[6] This proposal – which proved highly effective across the nation -- took a direct approach to attracting capital to the consumer market.

The Uniform Small Loan Law, the first draft of which was issued in 1916, created a licensed class of small loan lenders authorized to charge rates significantly in excess of the general usury ceilings.  In return for the ability to charge higher rates, these lenders accepted regulation, the risk involved in personal lending, and the higher administrative expense of small loans.  For example, the fourth draft of the Uniform Law[7] allowed the charging of 3.5% *monthly* on loans of $300 or less.  This rate was much higher than the general usury ceiling, but was nevertheless vastly lower than the rates charged by loan sharks.[8]

Carving out statutory exceptions to the general usury laws proved an effective means of increasing consumer credit to those who needed it while closely controlling the charges allowed for this credit.  Not surprisingly, this balance – between making sufficient credit available and appropriately limiting the charges to avoid the oppression of needy borrowers – has proved to be difficult to maintain.[9]

While the credit laws developed differently in each state, almost every state followed the path of providing statutory usury exceptions for small loan lenders modeled on the Uniform Small Loan Law.[10] California's journey through the credit thicket was not atypical in this regard.

California's current small loan regulations have their roots in two laws passed in 1939: the Personal Property Brokers Act (PPBA) and the California Small Loan Laws (SLL),

---

authorities in almost all civilizations have recognized that the crush of financial burdens causes people to agree to almost any conditions of the lender and to consent to even the most improvident loans. Lenders, with the money, have all the leverage; borrowers, in dire need of money have none.").

[6] *See generally* Barbara A. Curran, Trends in Consumer Credit Legislation (1965); F.B. Hubachek, *The Development of Regulatory Small Loan Laws*, 8 Law & Contemp. Prob. 108 (1941).

[7] *Reprinted in* F.B. Hubachek, Annotations on Small Loan Laws (1938).

[8] *Cf.* Christopher L. Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minn. L. Rev. 1110 (Apr. 2008) (arguing that the enactment of the small loan laws eroded the consensus for a uniform and relatively low usury cap).

[9] Lynn Drysdale & Kathleen Keest, *The Two-Tiered Consumer Financial Services Marketplace:  The Fringe Banking System and Its Challenge to Current Thinking About the Role of Usury Laws in Today's Society*, 51 S.C. L. Rev. 589 (2000) (full discussion of the historical antecedents of today's fringe lenders); Lauren K. Saunders, *Why 36%? The History, Use, and Purpose of the 36% Interest Rate Cap,* National Consumer Law Center *(*April 2013)*, available at* http://www.nclc.org/images/pdf/pr-reports/why36pct.pdf.

[10] *See* Barbara A. Curran, Trends in Consumer Credit Legislation 65 (1965) (discussing the varying scope of installment loan laws).

both modeled on Uniform Small Loan Law (USLL) advocated by the Russell Sage Foundation.[11]  While the initial legislation, as well as the multiple changes over the years, attempted to balance the interests of creditors and borrowers, by 1979, the tide had turned toward the interests of the lending industry – permitting lenders in California to charge more for some small loans than allowed in many states. The governing statutes became more generous to lenders. Both the allowed interest rates and the amounts on which they could be charged were incrementally raised to a structure nearly identical to the current form and amounts, minus the $2,500 interest cap ceiling:

- 2 ½% per month on the unpaid principal balance up to $225;
- 2% per month on the unpaid principal balance up to $900;
- 1 ½% per month on the unpaid principal balance up to $1,650;
- 1% per month on the unpaid principal balance up to $10,000.[12]

The 1994 California Finance Lenders Law consolidated consumer and commercial lending, both secured and unsecured, under a single license for a "finance lender."[13]  The fused law preserved the prior laws' capped interest rate structure, including the same scale for loans under $2,500 from 12% to 30% per year based on the unpaid balance.[14]  The law also maintained other previous features, including a ban on compound interest on loans under $5,000 and limits on delinquency fees.[15] New administrative fees on loans over $2,500 were permitted and the requirement for minimum monthly payments was dropped.[16]  It appears that it was this law that removed the cap on interest rates for loans over $2,500.[17] However, I have been unable to find any legislative history discussing the reasons for, or even the justification, for the removal.

Despite the removal of the interest cap on loans over $2,500, the loans are still regulated by the Finance Lenders Law. A 1964 analysis by the California Supreme Court of the value of the Small Loan Act for individual borrowers is therefore helpful in framing the issue of how to determine whether lending is harmful:

> The small loan lender usually operates for that segment of the population between the poverty line and the commercial bank window.  The people who patronize the small loan business are ordinarily of modest income, without resources to meet unaided the bills brought about by unemployment,

---

[11] Robert E. Stone, *Small Loans in California*, 29 Cal. L. Rev. 332 (1941), *available at* http://scholarship.law.berkeley.edu/cgi/viewcontent.cgi?article=3688&context=californialawreview.   *See also* Harry P. Glassman and Rex A. Collings, *1949 California Legislation*, 37 Cal. L. Rev. 644, 652 (1949), *available at* http://scholarship.law.berkeley.edu/californialawreview/vol37/iss4/6.

[12].Former Cal. Fin. Code § 22451.

[13] Cal. Fin. Code § 22009.

[14]  S.B. 912, Legislative History (May 8, 1995).

[15] *Id*.; Cal. Fin. Code §§ 22309 and 22320.5 (capping delinquency fees at a maximum of $10 on loans 10 days or more delinquent and $15 on loans 15 days or more delinquent).

[16] S.B. 912, Legislative History (May 8, 1995).

[17] *Id.*

sickness or other emergency, with little to pledge as security anything other than their prospects and character, and are likely to be helpless because of their ignorance.[18]

This brings us to today's regulation of loans for $2,500 and above in California, which are regulated under California's Finance Lenders Law. The law governs a variety of terms of these loans without specifying a numeric limit on the rate of interest that can be charged. For example, there are limits on late fees,[19] limits on origination (called administrative) charges,[20] and other restrictions on these loans. One particularly important mandate requires that lenders ensure that borrowers are able to afford to pay the loans back throughout the term of the loan.[21] The only limit on the interest rates charged for loans over $2,500 is that imposed by the statute prohibiting unconscionability.[22]

CashCall's $2,525 loans provide benefits to borrowers. These benefits include:

- Quick decisions on whether borrowers qualify for credit: when borrowers are approved, the decisions generally appear to have been made within 1 to 4 days from the date of application.[23] Many of CashCall's television ads, on the other hand, promised "instant decisions."[24]

- Very quick funding: generally less than 4 days, and sometimes as soon as 1 day after the decision was made.[25]

- Loans made to some borrowers with compromised credit: CashCall provided credit to borrowers with a fairly wide range of credit scores, known as FICO scores.[26] (A borrower's FICO score is derived from the information on the borrower's credit report. Supposedly, the FICO score reflects the risk of extending credit to the borrower. Higher FICO scores indicate that the borrower has reliably repaid credit in the past. Lower scores reflect difficulties the borrower has experienced repaying previous credit.) The majority of CashCall's borrowers had scores fairly close to

---

[18] People v. Fairfax Family Fund, Inc., 235 Cal. App. 2d 881, 884 (1964).

[19] Cal. Fin. Code § 22320.5.

[20] Cal. Fin. Code § 22305.

[21] Cal. Admin. Code tit. 10, § 1452.

[22] Cal. Civ. Code § 1670.5.

[23] *See* CashCall: Monthly Origination Results -- July, 2011. Chart: Average Days To Fund. CashCall # 009535.

[24] *See* CashCall's television advertisements. CashCall ## 006494-006525 and ## 23783-23784.

[25] *Id. See also* New Hire Module, revised August, 2007, # Def 0182 (indicating that in most instances the process from application to funding occurs in "24 to 48 hours").

[26] This information is derived from my analysis of information provided in CashCall: Monthly Origination Results – July, 2011. Chart: Average FICO by Funding Company and Product. CashCall # 009538. Additional information is available from PowerPoint Presentation, CashCall, at CashCall # 026074, which shows a range of average FICO scores for borrowers in origination months July 2003 through December 2005 ranging from a low of 600 to a high of 656.

600.[27] Indeed, according to one document provided by CashCall, in one tranche of loans, 38% were made to borrowers with FICO scores of less than 600.[28] FICO scores of 600, which are considered lower than average, make it more difficult for these borrowers to obtain credit.[29]

The issue for the Court to decide is whether these benefits justify the harms suffered by CashCall's borrowers.

**B.      Harmful Effects of CashCall's $2,525 Loans to Borrowers**

CashCall loans were harmful to the borrowers in three important ways:

1.   **High Financial Costs to Borrowers.** The raw dollar cost of the loans to the borrowers was extraordinarily high. Borrowers paid a considerable amount for these loans both in terms of the monthly expenses and the total amount repaid. Only 33% percent of CashCall's borrowers made all of their payments without ever being 30 days or more late.[30] These borrowers – the ones who paid back the loans without delinquencies -- paid either 3½ times the amount they borrowed (for the 96% loans) or 4½ times the amount they borrowed (for the 135% loans).

2.   **Consequences of Delinquencies to Borrowers.** Well over half of CashCall's borrowers – 55% of the borrowers -- went into delinquency status at some or several points during the loan term, triggering CashCall's aggressive collection tactics, the emotional stress of dealing with CashCall's debt collectors, and the additional financial costs of delinquency.[31]

3.   **Consequences of Defaults on Borrowers.** Over 40% of all borrowers suffered the consequences of defaults on the loans. Although some portion of their loans were written off by CashCall, most of the borrowers had already paid back much *more* than they borrowed,[32] and were still subjected to CashCall's forceful collection efforts.

---

[27] *Id.*

[28] Delinquency Report – Principal Balances – FICO. CashCall # 009605.

[29] About one in four people has a FICO below 600.  *See* Karen Darko, *The Absolute Worst Credit Score: It's really difficult to earn the worst possible FICO score, requiring a perfect storm of bad luck and bad decisions,* MSN Money, Oct 14, 2011, *available at* http://money.msn.com/saving-money-tips/post.aspx?post=ac6e119a-adb3-40f2-943c-4bb7fc2237c0.

[30] *See* Table 2 and surrounding discussion.

[31] *Id.*

[32] Mr. Meeks, CashCall's CFO, said that most defaults occur at 1.6 or 1.7 years, namely 19 to 20 months. Deposition of Delbert Orien Meeks, III, June 13, 2013, at 93. After 19 months, the borrower has repaid $4,330.92, or over 166% of the amount of the loan received by the borrower. *See* Table 7 and surrounding discussion.

1.      **The High Dollar Cost of CashCall's Loans**

     a.      **The Dollar Costs of Repayment Are Substantial.**

CashCall's loans cost borrowers a significant amount of money:

- Payments for the $2,525 loan (plus the $75 origination charge imposed by CashCall), at the *96%* rate were $216.55 a month for 42 months. These borrowers repaid more than three and a half times that amount – for a total of payments of over $9,094.

- Payments for the same loan of $2,525 at the *135%* rate were over $297 a month for 38 months.[33] Carrying the loan to full term, these borrowers repaid almost *four* and a half times the amount they received: $11,311.

These costs were geometrically greater than what would have been charged on loans of just $25 less. If the loan amounts had been $2,500, CashCall would have only been able to charge the interest rate set out in section 22303 of the California Finance Lenders Law, which would have a rate in the 28% range.[34] The total of payments for a loan at the same 42-month term, yet governed by section 22303, would have been only $3,975.38, with monthly payments of only $95.07.[35] By making loans of $25 more – or $2,525 – CashCall was able to circumvent the law limiting the interest rate charged.

Table 1 illustrates these costs and the broad distinctions between the financial burdens imposed on borrowers of CashCall loans in which the borrower has the benefit of $2,525 versus the more-regulated loans for $25 less, or $2,500.

A comparison between the CashCall loan in which the borrower receives $2,525 and a loan for $2,500 in which section 22303 would mandate an interest rate cap of 28% requires a slight adjustment. The CashCall loan of $2,525 assumes that CashCall receives its $75 fee – such that the borrower will receive $2,525, yet the loan amount will be $2,600. To ensure a conservative comparison, I assume that the lender for the lower rate loan also charges the administrative fee allowed by the Consumer Finance Lenders Law. For loans under $2,500, the maximum fee is $50 (or 5% of the loan, whichever is less).[36] If this were the case, the borrower would receive the benefit of $2,450, as $50 would be used to pay the administrative fee. The principal amount of the loan (the amount on which interest is computed and which is actually owed by the borrower) is actually $2,500.

---

[33] According to CashCall's sample Promissory Note and Disclosure Statement provided in discovery, the payment schedule was: (1) 1 payment of $292.50; (2) 35 monthly payments of $298.94; and (3) 1 payment of $298.67. CashCall # 008758.

[34] Cal. Fin. Code § 22303 permits interest to be charged as follows: 2.50% per month up to $225; the amount above $225 to $900 is allowed 2% per month; the amount above $900 up to $1,650 is permitted a charge of 1.50% per month; and the amount above $1650 to $2500 is charged 1% per month. My calculations reveal that a loan of $2,500 for 42 months produces a blended interest rate of 28.75% per month.

[35] The section 22303 loan illustrated here assumes the maximum allowable origination charge of $50, such that the borrower would have received the benefit of $2,450.

[36] Cal. Fin. Code § 22305.

**Table 1**
**Effect of Different Interest Rates**

| | CashCall 96% loan of $2,525 | CashCall 135% loan of $2,525 | § 22303 Loan of $2,450 |
|---|---|---|---|
| **42 monthly payments of --** | $216.55 | $297.68 | $95.07 |
| **Total interest paid over term of loan** | $6,494.92 | $8,711.85 | $1,475.38 |
| **Total of Payments** | $9,094.92 | $11,311.85 | $3,975.38 |

As is illustrated in this chart, the section 22303 loan would only require payments of $95.07 a month; substantially less than the monthly payments required by the CashCall loans: $216 or $297 for 96% and 135% loans, respectively. Moreover, the total of payments for the CashCall loans are significantly greater: $9,094 and $11,311 as compared to $3,975. CashCall is charging these substantially higher amounts simply because an additional $75 was lent to these borrowers.[37]

According to CashCall's information, most (82.9%) borrowers of these loans used the money for either an emergency or debt consolidation.[38] This means that these borrowers had either an emergency that made them feel as though they had few options, or little cash to spare. The dynamics involved in these credit decisions are discussed in section IV-D, below.

> **b.      CashCall's Loans Do Not Appear to be Affordable for a Significant Percentage of Borrowers.**

CashCall was required by applicable regulations to ensure that borrowers had the ability to afford not only each monthly payment, but also *all* of the payments required to be paid throughout the term of the loan:

> Cal. Admin. Code tit. 10, § 1452. Loan Size and Duration: Limitations
> When making or negotiating loans, a finance company shall take into consideration, in determining the size and duration thereof, the financial ability of the borrowers to repay the same**,** *to the end that the borrowers should be reasonably [able] to repay said loans in the time and manner provided in the loan contracts. (*Emphasis added.)

This regulation mandates two measures of affordability. The loans made by covered lenders (such as CashCall) have to be affordable each month (as measured against income and other obligations). The loans also have to be affordable in the long run – over the entire term of the loan – so that "borrowers should be reasonably [able][39] to repay said loans in the time and manner provided in the loan contracts."

---

[37] *See* the discussion in the next section regarding CashCall's practice of possibly pushing borrowers to take out larger loans than needed.

[38] CashCall # 026076 (adding the statistics for the debt consolidation group to those in the emergency group).

[39] The word "able" appears to be inadvertently omitted from the regulation.

CashCall's guidelines appear to have determined that most of the borrowers had sufficient resources to make some of the monthly payments (of $216 or $297). This conclusion is supported by the fact that the majority of borrowers did make multiple payments under the loans. However, it is also apparent that CashCall failed to ensure that most borrowers could afford *all* of the payments due under the loan. A delinquency rate of over 66% is an indication that the majority of the borrowers struggled to make the ongoing payments. A default rate of over 42% is an indication that a substantial proportion of these borrowers were simply unable to make all the payments.[40]

It is apparent that CashCall deliberately lends to borrowers who could not afford to make all the payments on the loans. This is apparent from the facts that 55% of the borrowers were delinquent at some point during the loan terms, and CashCall charged off as uncollectible 42% of the amount loaned -- over 40 cents on each dollar loaned.[41]

### c. Borrowers Were Likely Pushed to Borrow More Than Needed.

California borrowers who contacted CashCall and requested a loan for anything less than $2,525 were told that CashCall only made loans for $2,525. CashCall did not offer borrowers the opportunity to apply for the lower cost loans covered by California Finance Code section 22303. Instead, borrowers were provided a take-it-or-leave-it proposition: borrow the amount of $2,525 at the interest rates of 96% -- or later 135% -- or CashCall will not make the loan.

As a result, every borrower who wanted only $1,500, or even only $2,500, was provided a loan with the principal amount increased incrementally so that the limits of section 22303 would not apply. However, section 22251 of the California Financial Code appears to prohibit lenders from increasing the principal amount borrowed on a loan "for the purpose of evading this division."[42] This provision indicates that if the borrower is told to borrow more and then repay the extra amount borrowed early in the loan, then the loan should be treated as if it were for the lower amount.

---

[40] *See* the discussion surrounding Table 9, *infra,* regarding the balancing CashCall engaged in to make loans to a mix of borrowers that would include a sufficient number of borrowers who would repay the loans in full without defaulting, but who would not have the wherewithal to prepay the loans.

[41] *See* Table 2.

[42] Cal Fin. Code § 22251(a): "If a borrower applies for a loan in a bona fide principal amount of less than the specified amount and a loan to that borrower of a bona fide principal amount of the specified amount or more if made by a licensed finance lender, no adequate economic reason for the increase in the size of the loan exists, and by prearrangement or understanding between the borrower and the licensee a substantial payment is to be made upon the loan with the effect of reducing the bona fide principal amount of the loan to less than the specified amount within a short time after the making of the loan other than by reason of a requirement that the loan be paid in substantially equal periodical installments, then the loan shall not be deemed to be a loan of the bona fide principal amount of the specified amount or more and the regulatory ceiling provisions shall be deemed to be used for the purpose of evading this division unless the loan complies with the other provisions of the section that includes the regulatory ceiling provisions."

Mr. Meeks, CashCall's CFO, indicated that this was standard practice for larger loans. [43] Moreover, CashCall's loans of $2,600 showed substantial rates of repayment of principal (more than required by the amortization schedule) – called principal curtailments – in the first month of the loan. Partial repayments of principal in the first month of the loan are a good indication that the borrower received more from the loan proceeds than the borrower actually needed. Indeed, this is the measure mandated by the statute.

The first loans in the list provided by CashCall made in September 2004 showed principal curtailment rates of 7% in the first month. In other words, in October 2004, 7% of principal was repaid by borrowers, above and beyond what was required by the loan terms. These payments were *not* prepayments of the entire loan balance – those were measured elsewhere. They were simply prepayments of some of the principal borrowed on the loan.

By November 2009, the curtailment rate climbed to a high of 38% within the first month after the loan was made.  As of July 2011, it was back down a bit, to 23%.[44] The rate of so many borrowers paying back a substantial amount of the principal borrowed in the first month was found by the Department of Corporations to be an indication that borrowers were pushed into borrowing more than they really wanted or needed, just so that CashCall could avoid the interest rate limits in section 22303.[45] This activity might contravene the prohibitions in California Finance Code section22251.[46]

Borrowing more money – in this instance – meant much more than incrementally higher monthly payments. Borrowing more meant that the applicable interest rate roughly quadrupled: it went from the 28% range to either 96% or 135%. Borrowing more meant monthly payments that went from $99 to $216 or $298.

## 2.      The Costs to the Majority of CashCall's Borrowers from Delinquencies and Defaults

### a.      The Number of CashCall Borrowers Subject To Collection Efforts

According to CashCall, there are 135,378 people included in the class covered by this case who borrowed $2,525 during the relevant time period.[47] Well over half of these borrowers either were delinquent in their payments by more than 30 days at some point

---

[43] This is evident from Mr. Meeks' deposition in which he indicated that a person who only wanted a $2,500 loan but would qualify for a $5,000 loan would be provided the $5,000 loan. Deposition of Delbert Orien Meeks, III, June 13, 2013, at 131.

[44] These figures are derived from my analysis of the information provided in CashCall # 026503.

[45] CashCall was cited by the Department of Corporations for just this type of illegal behavior for "numerous borrowers" at least once. *See* letter from Department of Corporations to Ron Radziminsky, Vice President, CashCall, August 8, 2011. CashCall # 008997. CashCall subsequently disputed these findings in a letter to the Department of Corporations, dated September 2, 2011. CashCall # 09001.

[46] Cal. Fin. Code § 22251. According to the language in the statute, one of the ways that violation of this provision is determined is by evaluating early prepayments of principal.

[47] *See* CashCall's response to Interrogatory No.12.

during the loan period or defaulted altogether.[48]  CashCall wrote off loans it declared were in default.[49]

**Table 2**
**Loan Performance Statistics**

| | | |
|---|---|---|
| Number (#) of borrowers in class | 135,378 | 100% |
| # who became 30 - 59 days late | 74,633 | 55% |
| # who became 60 to 89 days late | 67,466 | 50% |
| # who became 90 - 119 days late | 64,547 | 48% |
| # who became 120 or more days late | 61,385 | 45% |
| # whose loans CashCall wrote off | 57,907 | 43% |
| # who paid in full without loan modification | 45,418 | 34% |
| *# who were never at least 30 days late* | *45,207* | *33%* |

These are CashCall's numbers. They illustrate that well over half of all CashCall borrowers of $2,525 loans experienced problems making the payments on these loans. This means that 74,633 of these borrowers went through some part or all of CashCall's collections process.

The higher the interest rate was, the higher the payments. The higher interest rates also meant that the high payments lasted longer (three and a half years).  Both of these factors significantly increased the likelihood of delinquencies and defaults. This point was somewhat acknowledged by CashCall's witness Delbert Meeks, Chief Financial Officer.[50]

The delinquency and default rates are *expected* by CashCall, as built-in factors of doing business.[51] CashCall's business model is based on the calculation and expectation that more than a third of its loans will result in defaults.[52] CashCall deliberately lends to borrowers with compromised credit; the low FICO scores reflect a well-considered business strategy to lend to risky borrowers. (See discussion in section IV-C for further discussion of this business model.)

---

[48] This information is from CashCall's responses to Interrogatories Nos. 29 through 35.

[49] Deposition of Delbert Orien Meeks, III, June 13, 2013, at 72.

[50] Deposition of Delbert Orien Meeks, III, June 13, 2013, at 77:
Q: So, all other things being equal, if you increase the interest rate, then you are going to increase the cumulative default rate.  Is that correct?
A: There is that potential, but not that assured.

[51] Deposition of Delbert Orien Meeks, III, June 13, 2013, at 75:
Q: . . . Is there a range of assumed acceptable cumulative default rates?
A : It is within the profitability model on the products.
Q: Yeah, but what is that range?
A: It depends on the products.
Q: Well, for the 2600-dollar-loan product.. . .
 A: Thirty-five to 40%.

[52] Deposition of Delbert Orien Meeks, III,  June 13, 2013, at 87:
Q: When you say cumulative default rate, you are saying that it is the total number of charge-offs at any given point during the loan?
A: It is the charge-off rate at the end of the life of the loan, meaning if you have a thousand loans and it's a 45% charge-off rate, that means 450 loans will have charged off.  That's in a dollar amount, not a unit amount. So out of a million dollars, $450,000 worth of principal will have charged off.

While CashCall has an aggressive stance towards borrowers who fall behind on payments, the lender continues to use underwriting criteria it fully expects will result in the same level of defaults. There is no effort by CashCall to change its loan origination guidelines to reduce these delinquency rates. In fact, the aim is just the reverse. The delinquencies and defaults are simply one element in their effort to reach their profitability goals; it is one of the "inputs" into the financial software that facilitates the determination of underwriting criteria for these loans.[53]

Because CashCall anticipates high delinquencies and defaults, it employs a lot of people to work in the collections department. The cost of this collections apparatus is 10% of each loan.[54] CashCall anticipates the difficulties that borrowers will experience in repaying the loans, but continues to use underwriting standards that it knows will lead to this level of defaults.

Within the group of 135,378 borrowers who obtained loans with the high interest rates at issue in this case, over two-thirds of these borrowers became delinquent. These 90,171 borrowers were all subject to CashCall's harsh collection techniques.

### b.    CashCall's Aggressive Collection Practices

CashCall anticipated huge numbers of delinquencies and designed an aggressive collections campaign to push these delinquent borrowers to pay every possible dollar. Yet CashCall's collections program wreaked havoc on the borrowers subjected to it. According to its Director of Collections, CashCall has employed hundreds of employees in its servicing section – otherwise known as collections.[55] At some point, as many as 1,200 employees were focusing on collections work in two offices, one in Las Vegas, Nevada and the other in Anaheim, California.[56]

CashCall's debt collectors are required to place hundreds of calls every day to delinquent borrowers. As one example, the collectors working in the group dealing with borrowers who are 30 days delinquent are required to make 190 calls to borrowers every day.[57]

The collectors are incentivized through bonus systems to obtain promises to pay by borrowers, and then to collect the dollars promised. [58] They also receive bonuses based on the number of payment plans entered into with borrowers.[59]

---

[53] *Id.*

[54] Deposition of Delbert Orien Meeks, III, June 13, 2013, at 90.

[55] These numbers have varied over the years. It appears that during the 2007-2008 period, the number of employees was at its highest. *See generally* Deposition of Stephen B. Klopstock, Mar. 17, 2010, at 20-24.

[56] Deposition of Stephen B. Klopstock, March 17, 2010, at 19. *See also* CashCall # 0626104 ( indicating there was room for 1,200 collections personnel).

[57] Deposition of Stephen B. Klopstock, March 17, 2010, at 94.

[58] Deposition of Stephen B. Klopstock, Mar. 17, 2010, at 113-17.

CashCall requires collectors to push customers with delinquent payments to make their payments using MoneyGram.[60] Every time a customer uses MoneyGram to make a payment, there is an additional $6.50 or $6.95 fee. This fee is in addition to the late fees imposed by CashCall. CashCall's insistence to borrowers that they use a payment method that imposes an additional fee may be in violation of the rules in the California Finance Lenders Law, which strictly limit the fees to those specifically named in the Act.[61]

The incentive systems for CashCall's collectors, as well as the threat of requiring an expensive payment mechanism for delinquent payments, have proven successful in pushing many borrowers out of delinquency so that they keep making payments to CashCall. This is apparent from the numbers in Table 2,  which illustrate that the number of borrowers who ultimately defaulted (otherwise referred to as those CashCall "wrote off") was a much smaller number than those who were only 30 days behind.  So while 74,633 borrowers were delinquent at some point in the loan for 30 days, the number decreased by 22% to 57,907 borrowers, who eventually defaulted altogether.

These 57,907 borrowers whose loans were written off by CashCall were the subject of a special team of collectors who focused efforts on squeezing more payments from them.[62] Their forceful methods, while successful for CashCall's bottom line, have generated considerable complaints and criticisms from the California borrowers subjected to them. Indeed, about 13% of these borrowers – 7,442 of the borrowers whose loans were written off – made further payments, even after their loans had been charged off by CashCall.[63]

The numerous borrower complaints have been made to CashCall's regulator, the Department of Corporations, as well as to the Attorney General's office and the Better Business Bureau. Many of the complaints protest CashCall's rough collection practices. Some examples of the concerns raised include:

- "Now that I can't make the payments they call my cell phone and work saying that they are going to call the cops on me and they are leaving message with my works voicemail about this issue where my co workers can hear."[64]
- "This company would harass me all day long, morning and night regardless of time. Didn't stop calling even after I requested. They would automatically take money from my bank account even when I told them not to. I had to change my bank account number and cell number in order for the calls to stop."[65]

---

[59] Deposition of Stephen B. Klopstock, Mar. 17, 2010, at 113-17.

[60] *See* CashCall's New Hire Module 2, Training Manual, Def # 0213.

[61] Cal. Fin. Code § 22306.

[62] Deposition of Delbert Orien Meeks, III, June 13, 2013, at 128.

[63] Amended Response to Interrogatory No. 33 states that 57,907 class members' loans were charged off, and 50,465 of these borrowers "made no further loan payments after charge-off."

[64] Complaint to California Department of Corporations, 6/16/2011. CashCall  # 023313.

[65] Complaint to California Better Business Bureau, unknown date. CashCall # 0233374.

"I receive over 10 calls a day starting on the 1st and not ending until I make my payment. Rude messages are left on my phone and constant emails. This company pries into your very personal business to get an answer from you. I was lied to about the terms of my loan and interest rate. I became ill for a short period of time and alerted them that a payment would be late and I was belittled and barraged with question after question for over 20 minutes until I just gave up and hung up the phone. . . . I would like the harassing phone calls to stop, and to have my interest rate lowered and payment amount reduced."[66]

After a trial, and an extensive analysis of numerous consumer witnesses, as well as statistical information presented by the West Virginia Attorney General's office, a Superior Court judge in West Virginia found that CashCall engaged in abusive and illegal collection practices routinely.  The court noted that there were a total of 292 CashCall borrowers in West Virginia – some who were never in default on their loans. Yet CashCall made 84,371 calls to these borrowers.[67]  Some excerpts from the Court's order on CashCall's collection practices include:

- All of the State's representative consumer witnesses testified that CashCall contacted them repeatedly and continuously at home, at work, on their cell phones, and at times or places that CashCall knew, or should have known, were inconvenient. The Court notes with particular concern that CashCall continued to contact the consumers at work after they unequivocally asked CashCall to stop.[68]
- The total number of calls to consumers at all places, including their homes and places of employment, is so voluminous as to defy description and would be difficult to believe if not confirmed by the records produced by CashCall to the State during discovery. . . . .[69]
- CashCall admitted that 10-20 calls per day, and 1,000 calls over several months, were not unusual or unreasonable.[70]

As is indicated by the many complaints about CashCall's collection activities, many people find it very trying to be the recipient of multiple collection calls every day.[71] These

---

[66] Complaint to California Attorney General's Office, October, 2011. CashCall  # 023523.

[67] State of West Virginia *ex rel.* Darrell V. McGraw, Jr., Attorney General v. CashCall, Inc. and J. Paul Reddam, in his capacity as president and CEO of CashCall, Inc. Final Order on Phase I of Trial: The State's Debt Collection Claims, Sept. 10, 2012, at ¶¶ 24 (number of calls) and  49 (number of consumers).

[68] State of West Virginia, *ex rel.* Darrell V. McGraw, Jr., Attorney General v. CashCall, Inc. and J. Paul Reddam, in his capacity as president and CEO of CashCall, Inc. Final Order on Phase I of Trial: The State's Debt Collection Claims, Sept. 10, 2012, at ¶ 43. A number of callers received over 1,000 calls from CashCall attempting to collect from them.

[69] State of West Virginia*, ex rel.* Darrell V. McGraw, Jr., Attorney General v. CashCall, Inc., and J. Paul Reddam, in his capacity as president and CEO of CashCall, Inc. Final Order on Phase I of Trial: The State's Debt Collection Claims, Sept. 10, 2012, at ¶ 44.

[70] State of West Virginia, ex rel. Darrell V. McGraw, Jr., Attorney General v. CashCall, Inc., and J. Paul Reddam, in his capacity as president and CEO of CashCall, Inc. Final Order on Phase I of Trial: The State's Debt Collection Claims, Sept. 10, 2012, at ¶ 50.

calls, and the conversations that occur with borrowers when the calls are answered, are intrusive.  The calls often cause anxiety; and they trigger difficulties in marriages. Multiple collection calls interfere with daily life. The calls themselves, the dread of future calls, and the fear of the dissemination of personal, embarrassing information to friends, neighbors, co-workers and employers constitute an invasion of personal privacy and permeate the lives of consumers. Collection efforts such as CashCall's have been known to cause significant emotional distress, often leading to physical manifestations. [72]

> c. **The Negative Consequences to Consumers From CashCall's Reporting Delinquencies and Defaults to Credit Reporting Agencies**

One's credit history, as compiled by a credit reporting agency ("CRA"), is a significant asset for many consumers. Information contained in a consumer's credit reporting file affects access to and costs of home mortgages, car loans, credit cards, utility services, residential tenancies, employment, and even insurance.

The consumer's credit history is used to develop a credit score. Credit scores are used as a factor, sometimes the sole factor, in determining whether to grant credit to a consumer, or in determining the price of the credit. The credit score may be the single most influential, critical piece of information associated with a consumer's file at a CRA.

Credit scores are also used by insurers to determine whether and at what price insurance will be provided to a consumer.  For example, a survey from 2002 showed that 92% of automobile insurers surveyed use credit scores. [73]  A consumer with a poor credit history may be charged 40 to 75% more in premiums for automobile insurance. [74] Additionally, credit reports are used by employers to determine whether to hire or even to

---

[71] Courts have found that even fewer calls than those admitted by CashCall can state a claim for harassment. See, e.g., Meadows v. Franklin Collection Serv., Inc., 414 Fed. Appx. 230 (11th Cir. 2011) (200-300 calls); Rucker v. Nationwide Credit, Inc., 2011 WL 25300 (E.D. Cal. Jan. 5, 2011) (approximately 80 phone calls in one year); Krapf v. Nationwide Credit, Inc., 2010 WL 2025323 (C.D. Cal. May 21, 2010) (four to eight calls daily for two months); Turman v. Central Billing Bureau, Inc., 568 P.2d 1382 (Or. 1977) (at least four calls over nine days).

[72] See, e.g., Margita v. Diamond Mortgage Corp., 406 N.W.2d 268 (Mich. Ct. App. 1987) (stress from telephone collection efforts including phone calls aggravated paroxysmal atrial tachycardia); Turman v. Central Billing Bureau, Inc., 568 P.2d 1382 (Or. 1977) (affirming tort verdict; blind consumer rehospitalized with anxiety and glaucoma complications after more than four collection calls in nine days); GreenPoint Credit Corp. v. Perez, 75 S.W.3d 40 (Tex. App. 2002) (affirming jury verdict of $5 million in compensatory damages against debt collector; elderly consumer suffered severe shingles-related sores, anxiety, nausea, and elevated blood pressure due to repeated telephone and in-person harassment over a debt she did not owe).

[73] Brian Grow and Pallavi Gogoi, *Insurance:  A New Way to Squeeze the Weak?*, Business Week, Jan. 28, 2002, at 92.

[74] Pamela Yip, *One Number, Many Uses*, Dallas Morning News, Apr. 8, 2002, at 1D.  *See also Use of Credit Information Beyond Lending: Issues and Reform Proposals:  Hearing Before the Subcomm. on Fin. Inst. and Consumer Credit Hearing of the H. Comm. on Fin. Serv.*, 111th Cong. (statement of Michael T. McRaith, Illinois Insurance Comm'r) (2010) (for homeowners insurance in one state, discounts for good credit score ranged from 7.6% to 51% and surcharges for bad score ranged from 1% to 86%; for auto insurance, discounts as high as 36% and surcharges from 12% to 99%).

retain employees.[75] As a result of these diverse uses, negative information in a credit report has expensive and potentially very harmful effects on consumers.

Credit scores are used to predict the probability that consumers with a certain score will engage in a particular behavior, e.g., delinquency, default, or bankruptcy. Because a borrower's credit score is generated based on information in a consumer's credit file, it will change as the consumer's creditors update the information in the consumer's credit file. Reports of delinquencies in loan payments lower a consumer's credit score.  Defaults lower a credit score even more.

Information provided by creditors, such as CashCall, to the CRAs thus has a significant effect on the financial future of its borrowers.  The payment history reported to a CRA is particularly key as it includes information about late payments, defaults, collections, repossessions, bankruptcies, and judgments.  A single 30-day late payment can lower a good credit score (e.g., 780) by 90 to 110 points.[76]  It can lower a mid-range credit score (e.g., 680) by 60 to 80 points, or well into the poor credit risk range.[77] Multiple late payments will cause a more dramatic decrease.[78] A charge-off of a credit line or loan will cause a "major score drop."[79]

All of the information that CashCall reports about its borrowers will affect their future credit, their future insurance costs, and potentially their future employment opportunities. Yet CashCall designs its high interest rate loan products with the expectation that a majority of the people who borrow money from them -- two-thirds of its borrowers – will suffer negative consequences to their credit reports and credit scores directly as a result of these transactions.

**C.     CashCall's Business Model Builds in Delinquencies, Aggressive Collections and Defaults.**

**1.     CashCall's Underwriting Guidelines**

CashCall has developed a sophisticated, ongoing, iterative analysis of loan products, its cash flow from these products, and its underwriting guidelines to maximize profits. This

---

[75] Consumer reports covered by the Fair Credit Reporting Act include reports for "establishing the consumer's eligibility for . . . employment purposes." 15 U.S.C. § 1681a(d)(1)(B).

[76] VantageScore, *Assume the Role of Managing Your Credit Prudently and Watch Your Credit Score Improve,* July 2012, at 4, Fig. 2, *available at* http://www.vantagescore.com/docs/VantageScore_Score_Impacts_Paper_July_2012_Final.pdf. *See also* Jeremy Simon, *FICO Reveals How Common Credit Mistakes Affect Scores,* July 13, 2010, *available at* www.creditcards.com/credit-card-news/fico-credit-score-points-mistakes-1270.php.

[77] VantageScore, *Assume the Role of Managing Your Credit Prudently and Watch Your Credit Score Improve,* July 2012, at 4, Fig. 2, *available at* http://www.vantagescore.com/docs/VantageScore_Score_Impacts_Paper_July_2012_Final.pdf;

[78] *Id.*

[79] *Id.*

process has multiple parts, including the production of historical data on a loan level basis, weekly analyses of that information, and the constant adjusting of underwriting requirements.[80]

The daily and weekly reports of loan performance (called "static pools") are performed at the highest level of the company – led by the Chief Financial Officer (Delbert Meeks), and participated in by the President and CEO of the company (Paul Reddam).[81] This inner circle of executives then uses a financial model based on the information in the static pools, as well as certain "inputs" (which are given, fixed attributes about the loans) to produce the interest rates and underwriting criteria for each of CashCall's loan products.[82]

CashCall uses what they call a "profitability model" that includes the anticipated default and prepayment rates, as well as the "scheduled payment curves."[83] The model was created by CashCall.[84] It contains what it calls "inputs" into this software, which include both the expected default and prepayment rates.[85] The result of the analysis – the "output," in Mr. Meeks' terms – is the return on investment: the profit these loans will generate.[86]

Mr. Meeks' own words, provided in response to the question of how a particular interest rate will affect the rate of return, best describe this process:

> Question:  On what -- how does the executive team determine that a particular interest rate is likely to result in a profit within this 15 to 20% target?
> Answer:   We base it on forecast models, and then as the models -- as the actual history or the actual performance comes in, it is measured against the model and where that performance was estimated to be or should be to get the return and where it actually is.
>       And if there are situations where there's a lower return, then underwriting might be reviewed to tighten up underwriting guidelines to improve the performance of the loan at that interest rate.[87]

CashCall builds into this profitability model a 35 to 40% cumulative default rate.[88] When asked what the basis is for considering a 35 to 40% default rate as acceptable, Mr. Meeks responded:

---

[80] Deposition of Delbert Orien Meeks, III, June 13, 2013, at 45: "We look at analysis of the cost of not only originating loans, servicing loans, defaults, cost of funds, and we look at performance of loans from the average mean the life of a loan exists, and we come up with what exactly the cost of that loan would be."

[81] *Id.* at 46.

[82] *Id.* at 50-51.

[83] *Id.* at 61.

[84] *Id.* at 62.

[85] *Id.* at 74,  84-85.

[86] *Id.* at 84-85.

[87] Deposition of Delbert Orien Meeks, III, June 13, 2013, at 67-68.

[88] *Id.* at 75.

Based on the models that we build and the profitability models of each individual product, **there's an assumed acceptable default rate which will then generate the target, or the ROI,** that we accept as to what our goal or expectations of this product to be.

The issues come involved -- and, like I mentioned**,** the prepayment curve and the default curve are the two biggest determining factors.  So normally if prepayment speed goes up, interest income goes down but defaults go down as well because there's more that prepays.  If default rates go up, normally prepayments rate goes down.  So you have these variable factors.

At the end, between the two, you look at the full, if you have a full, 47 months' worth of history, they are pretty consistent, but during the individual months is where the variations go.  So if you have a high first payment default and then low prepayments, you will see that you get hit in the very beginning with a huge loss, and then over the life of the product, if it extends out beyond 1.6 years because of lower prepayments, you will come close, but you won't hit your ROI target or your estimated ROI margin target.

It is those variable factors that you have to look at as as a whole.  This is what our expectation is for this product, and we measure it against those expectations on a product basis.[89] (Emphasis added.)

In other words, CashCall is balancing prepayment rates against default rates to determine which combinations will yield the greatest profit.[90] The more demanding the underwriting criteria, the higher the prepayments on these loans will be. Prepayments bring full repayment of principal, but a loss of the interest income. On the other hand, less demanding underwriting standards will yield borrowers less capacity to prepay, but more likelihood of defaulting. Tightening the guidelines will reduce the number of potential borrowers. Conversely, relaxing the guidelines will yield a larger number of borrowers who qualify for the loans, yet who present a greater risk.

CashCall constantly changes its underwriting guidelines to achieve a balance of borrowers. It seeks borrowers who will not have sufficient resources to prepay the loan and yet will still be able to sustain the payment of $216 or $297 monthly, until the total due under the loan has been repaid. According to CashCall, 51,817 borrowers (33% of the total class of borrowers to whom CashCall extended these loans) fell into this magic middle and repaid the loans in full, without modification.[91]

In the following paragraphs, I will explain how CashCall benefits from these planned-for defaults. I do not mean to imply that CashCall would not prefer that all borrowers repay their loans in full –full repayment of a loan for $2,525 at 96% or 135% interest rate is, of course, much better than partial payment. But to the extent that prepayments are the other end of a continuum in its underwriting guidelines from defaults,

---

[89] *Id.* at  74-75.

[90] *Id.* at 79-80, 82-83.

[91] *See* Table 2.

CashCall appears to be deliberately incurring a healthy dose of defaults as a balance against the prepayments. These defaults,  deemed a necessary balance by CashCall to avoid prepayments, cause considerable harm to the borrowers who incur them, as explained in section IV-B.2, above. Yet, in setting its underwriting standards, CashCall does not appear to have even considered the harm to borrowers from these anticipated delinquencies and defaults.

## 2. CashCall's Charge-Off Rates Are Significantly Higher than Others in the Credit Industry.

CashCall supplied the Plaintiffs in this case with an Excel spreadsheet (CashCall # 026503) that provides data on each group of loans originated each month, for $2,525, from September 2004 through July 2011. The performance of each of these vintage loan pools is set out for every month between September 2004 and July 2011. The spreadsheet provides specific information on each of these loan pools in sixteen categories, including interest and fee income, principal income, charge-offs, delinquencies, and prepayments.  Much of my analysis in this section is drawn from the information in this spreadsheet from CashCall, as derived through my examination of CashCall's data.

The number of loans made by CashCall varied considerably from year to year (note that neither 2004 nor 2011 are full years), as illustrated in Table 3.[92]

**Table 3**
**Number of Loans**
**Made Yearly**

|      | Total # of Loans Made Each Year |
|------|---------------------------------|
| 2004 | 4,312.00                        |
| 2005 | 48,202.00                       |
| 2006 | 58,199.00                       |
| 2007 | 22,289.00                       |
| 2008 | 6,166.00                        |
| 2009 | 3,391.00                        |
| 2010 | 18,977.00                       |
| 2011 | 9,811.00                        |

The defaults and charge-offs were fairly consistently in the 30 to 40% range, as Mr. Meeks described.[93] The 2011 and 2010 loan pools, and even some of the 2009 loans, were not completed when CashCall's file was produced – meaning that the numbers may change with the additional performance information on these more recent loan pools.

---

[92] This information is derived from CashCall # 026503.

[93] Information derived from CashCall # 026503.

Table 4 shows the yearly averages of CashCall's total default rates for each loan pool originated in the designated year. These are very high default rates.  Compare these rates to those experienced by the credit card industry[94] in the same years:

**Table 4**
**Loan Charge-Off Comparison**

|  | Bank Loan Charge-Off Rate: Consumer Credit Cards (4 quarter average) | CashCall Charge-off Averages of Monthly Performance |
|---|---|---|
| 2004 | 5.05% | 30.18% |
| 2005 | 4.84% | 36.41% |
| 2006 | 3.55% | 39.78% |
| 2007 | 4.01% | 42.54% |
| 2008 | 5.49% | 37.57% |
| 2009 | 9.42% | 24.26% |
| 2010 | 9.43% | 28.23% |
| 2011 | 5.68% | 31.02% |

CashCall's charge-offs are over *ten times* the charge-off rates in some years as compared to the credit card industry. Indeed, CashCall's charge-off rates are consistently higher even than other California finance lenders. All lenders regulated by the California Finance Lenders Law are required to provide annual descriptions of their loan experiences to the California Department of Corporations.[95] The bad debt ratio in these reports is expressed as a percentage of revenue rather than a percentage of loan amounts. Even here, CashCall's numbers far exceed others in the same industry[96] in the same state:

---

[94] Federal Reserve Board, Charge-offs and Delinquency Rates on Loans and Leases at Commercial Banks, *available at* http://www.federalreserve.gov/releases/chargeoff/chgallsa.htm. Note that the data shown in Table 7 is only for consumer loans.

[95] Cal. Fin. Code § 22159(a).

[96] This analysis is drawn from the gross revenue and bad debt figures included in the annual reports compiled by the California Department of Corporations. Cal. Dep't of Corps., Bus., Transp. & Hous. Agency, 2011 Ann. Rep.: Operation of Finance Companies Under the California Finance Lenders Law 8 (2012), *available at* http://www.dbo.ca.gov/Licensees/Finance_Lenders/pdf/CFL2011ARC.pdf; Cal. Dep't of Corps., Bus., Transp. & Hous. Agency, 2010 Ann. Rep.: Operation of Finance Companies Under the California Finance Lenders Law 7 (2011), *available at* http://www.dbo.ca.gov/Licensees/Finance_Lenders/pdf/CFL2010ARC.pdf; Cal. Dep't of Corps., Bus., Transp. & Hous. Agency, 2009 Ann. Rep.: Operation of Finance Companies Under the California Finance Lenders Law 7 (2010), *available at* http://www.dbo.ca.gov/Licensees/Finance_Lenders/pdf/CFL2009ARC.pdf; Cal. Dep't of Corps., Bus., Transp. & Hous. Agency, 2008 Ann. Rep.: Operation of Finance Companies Under the California Finance Lenders Law 7 (2009), *available at* http://www.corp.ca.gov/Archives/Laws/Finance_Lenders/pdf/CFL2008ARC.pdf; Cal. Dep't of Corps., Bus., Transp. & Hous. Agency, 2008 Ann. Rep.: Operation of Finance Companies Under the California Finance Lenders Law 6 (2008), *available at* http://www.corp.ca.gov/Archives/Laws/Finance_Lenders/pdf/CFL2007ARC.pdf; Cal. Dep't of Corps.,

**Table 5**
**Comparison of Charge-off to Revenue Ratios**

|  | California Finance Lenders Bad Debt-Income Ratio[97] | CashCall's Charge-off to Revenue Ratio[98] |
|---|---|---|
| 2004 | 2.99% | 18.96% |
| 2005 | 1.75% | 22.45% |
| 2006 | 2.11% | 25.01% |
| 2007 | 3.75% | 28.79% |
| 2008 | 8.47% | 23.08% |
| 2009 | 8.73% | 12.95% |
| 2010 | 2.03% | 14.82% |
| 2011 | 0.91% | 19.98% |

CashCall tolerates these high default rates by charging the high interest rates of 96 or 135%. It makes so much money from the borrowers who pay all – or even some – of the assessed charges that it can still make a healthy profit, even with these astronomical default and charge-off rates. CashCall has clearly made the calculated assessment that it will make more money by charging all of these borrowers the high interest rates, and bearing the expected defaults, than it will by charging customers less interest and thus incurring a lower default rate.

CashCall receives substantial revenue from borrowers even when they default. Consider the manner in which a loan for $2,525 amortizes over 42 months when a 96% interest rate is applied to it. Table 6 shows not only how much interest is applied each month from the payments, but also the total amount of payments the borrower has made as compared to the original amount borrowed. The table also shows the amount of loan principal considered to be owed each month during the loan period. The ratio between these

---

Bus., Transp. & Hous. Agency, 2007 Ann. Rep.: Operation of Finance Companies Under the California Finance Lenders Law 7 (2007), *available at* http://www.corp.ca.gov/Archives/Laws/Finance_Lenders/pdf/CFL2006ARC.pdf.; at 7 (2007); Cal. Dep't of Corps., Bus., Transp. & Hous. Agency, 2006 Ann. Rep.: Operation of Finance Companies Under the California Finance Lenders Law, 7 (2006), *available at* http://www.corp.ca.gov/Archives/Laws/Finance_Lenders/pdf/CFL2005ARC.pdf; Cal. Dep't of Corps., Bus., Transp. & Hous. Agency, 2005 Ann. Rep.: Operation of Finance Companies Under the California Finance Lenders Law  7 (2005), *available at* http://www.corp.ca.gov/Archives/Laws/Finance_Lenders/pdf/CFL2004ARC.pdf.

[97] The information reported to the California Department of Corporations in Exhibit C compares the companies' gross income from all sources to its "Provision for bad debt allowance," which is taken as an expense.

[98] These numbers are the result of my analysis of CashCall # 026503. I compared the gross revenues earned from the loans made in each month's vintage with the amount charged-off in that month's vintage. The monthly results were then averaged into yearly numbers.

two amounts – the total amount actually repaid by the borrower as compared to the principal amount still considered to be due at each point during the loan term – is astonishingly high. Note that the principal amount of this loan is $2,600 (which includes CashCall's $75 administrative fee), because that is the amount on which interest is calculated, even though the borrower receives only $2,525.[99]

**Table 6**
**Loan Amortization**

|  | $2,600.00 | Loan |  |  |
|---|---|---|---|---|
|  | 96% | Interest | Rate |  |
|  | 42 | Payments | $216.55 | each |
| - | $6,494.92 | Total Interest Paid |  |  |
|  | $9,094.92 | Total of Payments |  |  |

| Pymt # | Interest Due | Payment Amount | Amount to Principal | New Balance | Borrower's Total Paid to Date | Ratio of Payments to Amount Borrowed | Percentage of Principal Still Owed |
|---|---|---|---|---|---|---|---|
|  |  |  |  | $2,600.00 |  |  |  |
| 1 | $208.00 | $216.55 | $8.55 | $2,591.45 | $216.55 | 8.3% | 99.7% |
| 2 | $207.32 | $216.55 | $9.23 | $2,582.23 | $433.09 | 16.7% | 99.3% |
| 3 | $206.58 | $216.55 | $9.97 | $2,572.26 | $649.64 | 25.0% | 98.9% |
| 4 | $205.78 | $216.55 | $10.77 | $2,561.50 | $866.18 | 33.3% | 98.5% |
| 5 | $204.92 | $216.55 | $11.63 | $2,549.87 | $1,082.73 | 41.6% | 98.1% |
| 6 | $203.99 | $216.55 | $12.56 | $2,537.32 | $1,299.27 | 50.0% | 97.6% |
| 7 | $202.99 | $216.55 | $13.56 | $2,523.76 | $1,515.82 | 58.3% | 97.1% |
| 8 | $201.90 | $216.55 | $14.65 | $2,509.11 | $1,732.37 | 66.6% | 96.5% |
| 9 | $200.73 | $216.55 | $15.82 | $2,493.30 | $1,948.91 | 75.0% | 95.9% |
| 10 | $199.46 | $216.55 | $17.09 | $2,476.21 | $2,165.46 | 83.3% | 95.2% |
| 11 | $198.10 | $216.55 | $18.45 | $2,457.77 | $2,382.00 | 91.6% | 94.5% |
| 12 | $196.62 | $216.55 | $19.93 | $2,437.84 | $2,598.55 | 99.9% | 93.8% |
| 13 | $195.03 | $216.55 | $21.52 | $2,416.32 | $2,815.10 | 108.3% | 92.9% |
| 14 | $193.31 | $216.55 | $23.24 | $2,393.09 | $3,031.64 | 116.6% | 92.0% |
| 15 | $191.45 | $216.55 | $25.10 | $2,367.99 | $3,248.19 | 124.9% | 91.1% |
| 16 | $189.44 | $216.55 | $27.11 | $2,340.89 | $3,464.73 | 133.3% | 90.0% |
| 17 | $187.27 | $216.55 | $29.28 | $2,311.61 | $3,681.28 | 141.6% | 88.9% |
| 18 | $184.93 | $216.55 | $31.62 | $2,280.00 | $3,897.82 | 149.9% | 87.7% |
| 19 | $182.40 | $216.55 | $34.15 | $2,245.85 | $4,114.37 | 158.2% | 86.4% |
| 20 | $179.67 | $216.55 | $36.88 | $2,208.97 | $4,330.92 | 166.6% | 85.0% |
| 21 | $176.72 | $216.55 | $39.83 | $2,169.15 | $4,547.46 | 174.9% | 83.4% |
| 22 | $173.53 | $216.55 | $43.02 | $2,126.13 | $4,764.01 | 183.2% | 81.8% |
| 23 | $170.09 | $216.55 | $46.46 | $2,079.68 | $4,980.55 | 191.6% | 80.0% |
| 24 | $166.37 | $216.55 | $50.18 | $2,029.50 | $5,197.10 | 199.9% | 78.1% |
| 25 | $162.36 | $216.55 | $54.19 | $1,975.32 | $5,413.64 | 208.2% | 76.0% |
| 26 | $158.03 | $216.55 | $58.52 | $1,916.80 | $5,630.19 | 216.5% | 73.7% |
| 27 | $153.34 | $216.55 | $63.21 | $1,853.59 | $5,846.74 | 224.9% | 71.3% |
| 28 | $148.29 | $216.55 | $68.26 | $1,785.34 | $6,063.28 | 233.2% | 68.7% |

---

[99] The Truth in Lending Disclosure will list the "amount financed" as $2,525.

| 29 | $142.83 | $216.55 | $73.72 | $1,711.62 | $6,279.83 | 241.5% | 65.8% |
| 30 | $136.93 | $216.55 | $79.62 | $1,632.01 | $6,496.37 | 249.9% | 62.8% |
| 31 | $130.56 | $216.55 | $85.99 | $1,546.02 | $6,712.92 | 258.2% | 59.5% |
| 32 | $123.68 | $216.55 | $92.87 | $1,453.15 | $6,929.47 | 266.5% | 55.9% |
| 33 | $116.25 | $216.55 | $100.30 | $1,352.86 | $7,146.01 | 274.8% | 52.0% |
| 34 | $108.23 | $216.55 | $108.32 | $1,244.54 | $7,362.56 | 283.2% | 47.9% |
| 35 | $99.56 | $216.55 | $116.99 | $1,127.56 | $7,579.10 | 291.5% | 43.4% |
| 36 | $90.20 | $216.55 | $126.35 | $1,001.21 | $7,795.65 | 299.8% | 38.5% |
| 37 | $80.10 | $216.55 | $136.45 | $864.77 | $8,012.19 | 308.2% | 33.3% |
| 38 | $69.18 | $216.55 | $147.37 | $717.40 | $8,228.74 | 316.5% | 27.6% |
| 39 | $57.39 | $216.55 | $159.16 | $558.24 | $8,445.29 | 324.8% | 21.5% |
| 40 | $44.66 | $216.55 | $171.89 | $386.36 | $8,661.83 | 333.1% | 14.9% |
| 41 | $30.91 | $216.55 | $185.64 | $200.72 | $8,878.38 | 341.5% | 7.7% |
| 42 | $16.06 | $216.55 | $200.49 | $0.24 | $9,094.92 | 349.8% | 0.0% |

When a loan is amortized over a period of time with equal payments, the higher the interest rate is, the *greater* the ratio between the payment amount and the amount of that payment that is applied to principal. For example, in a 42 month loan for $2,525 with a 36% interest rate, the first time the amount of the payment that is applied to principal will be as much as 18% occurs within the first year. But in the CashCall loan, with its 96% interest rate, the percentage of the payment that is applied to principal does not reach 18% until ten months later – at month 22. This comparison is relevant because it means that the higher interest rate carries benefits to CashCall in addition to the amount of interest that is generated. The high interest rate also means that less of the principal is repaid in each payment, meaning that when there is a default, more of the unpaid principal can be taken as a tax write-off by CashCall.

The amortization in Table 6 reflects CashCall's 96% loans.  By the end of the first year (the 12th payment), the borrower's payments will equal $2598.55 – 99.9% of the $2600 amount borrowed.  Yet because so little of each of these twelve payments goes to principal, over 93% of the principal amount of the loan is still considered due.

Mr. Meeks, CashCall's CFO, said that the typical life of the $2,600 loan is 1.6 to 1.7 years.[100] That would mean that most of these loans would last between 19 and 20 months. Note in Table 7 how much in dollars has been paid and how much in principal is still considered to be owed at month 20 of the $2,600 loan on which 96% interest is charged:

---

[100]Deposition of Delbert Orien Meeks, III, June 13, 2013, at 73:
  Q: The length -- the length of loan is determined by the loan terms; is that correct?
  A: Not necessarily.  It is determined on historical -- the duration of the loan is the actual historical rate that the loan is outstanding.  The 2600 loan, even though it is a 47-month loan, it is averaging about 1.6 to 1.7 years because of the prepayment speed and the default speed."

**Table 7**
**Loan Stats at Month 20**

| Payment # | Interest Due | Payment Amount | Amount to Principal | New Balance | Borrower's Total Paid to Date | Ratio of Payments to Amount Borrowed | Percentage of Principal Still Owed |
|---|---|---|---|---|---|---|---|
| 20 | $179.67 | $216.55 | $36.88 | $2,208.97 | $4,330.92 | 166.6% | 85.0% |

After 20 months of payments of $216.55 each, the borrower still owes $2,208.97 – or 85% of the original principal of the loan. This is the case even though this borrower has already repaid 166% of the amount received.[101] A key point here is that if this borrower defaults on the loan at this point, CashCall will charge off $2,208.97. This charge-off amount will be accounted for as a non-cash loss, or a reduction in the amount of profit CashCall would otherwise have on this loan.

CashCall would undoubtedly be best off if every borrower paid back a loan in full over the course of the term of the loan. In that scenario, CashCall has expended $2,525, but will receive from the borrower the total of payments due on the loan: $9,094.92 (see Table 6, above). Apparently, CashCall receives this full total of payments from at least 38% of its borrowers on these loans (see Table 2, above).

According to Mr. Meeks, CashCall experiences a significant number of prepayments for these loans (45 to 50%).[102] Mr. Meeks also indicates that CashCall wants to avoid prepayments.[103] If the borrower prepays at 20 months, the borrower will have already paid CashCall $4,330.92 in monthly payments. To pay off the loan, the borrower would have to pay off the balance of the principal still considered due: $2,208.97. The total of payments – of the 20 monthly payments plus the paid-off balance – from this borrower would be $6,539.89 (of which $3,939.89 would be considered taxable income, subject to further reduction once expenses are allocated to it).

If a borrower defaults at this same point in the course of the loan, CashCall will have reduced total revenue. But CashCall still benefits from the default because of the substantial reduction in taxable income produced by the write-off of unpaid principal. Because of the way these very high interest rate loans amortize over the course of the 42-month term,

---

[101] Actually, the ratio illustrating the amount paid as compared to the amount borrowed is understated. This is because borrowers on these loans actually received only $2,525, yet the ratio compares the total repaid to the original principal of the loan, which is $2,600.

[102] Deposition of Delbert Orien Meeks, III, June 13, 2013, at 75.

[103] *Id.* at 76-77.
A:  . . . .(D)efault rates go up, the prepayment rates go down; prepayment rates go up, default rates go down.  They sort of go hand in hand.
Q:   I see.  So are you saying that you start with an acceptable range for the cumulative default rate and that the estimated prepayment -- cumulative prepayment rate would follow from that?
A:   Would follow from that, correct.
Q:   So if the estimated acceptable cumulative default rate is 35 to 40%, what does that translate to in terms of an estimated cumulative prepayment rate?
A:   Forty-five to 50%.

CashCall receives a significant tax benefit from the default. This benefit is in the relatively high amount of write-off against taxable income – in the form of a non-cash loss – that CashCall can take from a default that occurs at 20 months. A default after 20 months would allow the amount of principal still considered due –$2,208.97 – to be considered a non-cash loss.[104] Ignoring other expenses for these loans – which apparently run in the 43% range and which apparently apply to all loans equally[105] -- one can see how CashCall has created a loan product for which even planned-for defaults of 42% can be used to maximize profit. In most cases, CashCall recovers the amount loaned (this is recovered if only 12 payments are made), even when the consumer defaults. Additionally, the tax write-offs from the defaults reduce taxes on the profits from those 38% of borrowers who pay in full.

Using the 96% interest rate loans, Table 8 illustrates how defaults provide benefits to a lender's bottom line. The total revenue to the lender from the borrower who defaults at 20 months is $4,330.92. These loans, which default after 20 months in the 42 month term, still provide $3,939.89 of interest income – subject to taxes, after expenses. But from this income of $3,939.89, the remaining principal is considered still due, so there is a write-off of $2,208.97, leaving only $1,730.92 in income to be taxed – after expenses are deducted.

**Table 8**
**Effect of Default on CashCall's Taxable Income**

| | |
|---|---|
| Gross Revenues at 20 months (20 payments) | $4,330.92 |
| Revenues allocable to interest | $3,939.89 |
| Principal considered still due – amount taken as a charge-off against income | $2,208.97 |
| Taxable income (before expenses) after write-off of unpaid principal | $1,730.92 |

Thus in this example, the borrower has repaid $4,330.92 – all of the payments due on the original loan of $2,525 for 20 months. Yet, the taxable income (subject to further reduction once expenses are allocated to it) is only $1,730.92.

As explained above, CashCall uses the anticipated defaults and prepayments as inputs – as acceptable standards – for its loans. It continually corrects its underwriting criteria with these two givens in mind. Indeed, as Table 9 illustrates, the two inputs – defaults and prepayments – seem to track each other very closely over the years.[106] This table is intended to show how the underwriting changes made by CashCall, constantly adjusting the default and prepayment expectations, alter the actual results. (Note that the year numbers

---

[104] I am *not* providing a tax, or even an accounting, analysis of CashCall's business practices.  I am simply pointing out some of the potential benefits to CashCall from the defaults.

[105] Deposition of Delbert Orien Meeks, III, June 13, 2013, at 76-77.

[106] This is my analysis based on the information in CashCall # 026503.

on the horizontal axis refer to the years in which the loans were originated, not the years in which the payments were made.)

**Table 9**
**Defaults and Prepayments Tracking**



So it seems as though CashCall's executives thoroughly understand the effect of their underwriting, as well as their loan terms, on loan performance. CashCall thus *uses* this information to its benefit, rather than attempting to minimize and reduce these defaults.

While some of the default activity can be traced to the financial climate of the times (such as the spike in defaults during the financial crisis in 2008 – which is not reflected in Table 9) the close parallel between the arcs of these two payment responses illustrates that CashCall has considerable control over the prepayments and defaults. CashCall appears to be carefully calibrating the numbers of prepayments and defaults in each loan pool. CashCall is deliberately making these loans to a mix of borrowers, some of whom it expects will pay in full, some who will prepay, and some who will default. The defaults provide benefits to CashCall – as they reduce taxable income by providing non-cash losses.

The idea that CashCall is deliberately making loans in some months to more borrowers who it has a higher expectation will default on the loans rather than pay in full or prepay is further supported by an examination of two other pieces of data from CashCall. From a Delinquency Report, comparing Principal Balances to FICO scores,[107] one can see the clear lesson that the lower the borrower's FICO score, the more likely the borrower will go into delinquency. Borrowers with FICO scores under 519 were 80% delinquent. Conversely, borrowers with FICO scores over 780 were only 6% delinquent. The higher the FICO score, the lower numbers of borrowers who were delinquent.

---

[107] CashCall # 009605.

Yet in a Portfolio Analysis showing the FICO scores of borrowers by month of origination,[108] the average FICO scores of each month's borrowers varied considerably. This supports the inference that CashCall's constant changes in underwriting criteria are intended to change the mix of borrowers to achieve the sought-after balance between borrowers who prepay and default.

Indeed, the structure of the loans themselves appears to be designed to facilitate default at some point. The 96% loans are for a term of 42 months, with payments of $216.55 a month. Extending the repayment period out 42 months enlarges the time during which borrowers will have to default. If the term were 6 months shorter, at 36 months, the payments would be only $5.35 more a month. Yet for those borrowers who repay over the full the term of the loan, there would be savings of $1,106.66 in finance charges. Moreover, at that magic 20th month – by which time two-thirds of all borrowers are expected to default or prepay – less principal is still owed. Instead, CashCall benefits from the extended term of 42 months: each payment during the first 20 months includes a higher percentage of interest, and less of principal. And a charge-off at month 20 provides more benefit to CashCall than it would if the loan were for only 36 months.

Mr. Meeks explained that increasing interest rates will increase defaults, but that CashCall found it profitable to do so anyway:

> Question – Okay.  How does that work?
> Answer – Well, if you have a higher interest rate on the product, you would more than likely have a monthly payment or a monthly coupon that is due. So instead of being a $200-a month payment, it might be a $300-a-month payment.  Again, people are probably looking at a $200-a-month payment saying that's easier to make than a $300-a-month payment.  **So by the nature of the increase in payment, your defaults are going to increase.**
> The way you offset that is you will tighten underwriting guidelines, meaning trying to tighten it up, which means you will loan out less product, but you will have better performing product.
> Again, it is those levers that you have to pull between those different factors.  It is not just one thing that determines profitability; it is a combination of all these factors.[109] (Emphasis added.)

The problem is, of course, for those consumers who default – as they suffer from the consequences of defaulting on CashCall's loans (see section IV-B, above).

Using CashCall's spreadsheet detailing the income from all loans for $2,525 between September 2004 and July 2011, I calculated the total of payments from each loan pool, and compared that revenue figure with the funded amounts. The analysis shows that during this time period, CashCall experienced revenue from these loans of substantially more than the amount of the loans.

---

[108] PowerPoint Presentation, CashCall. CashCall # 026074.

[109] Deposition of Delbert Orien Meeks, III, June 13, 2013, at 91-92.

**D.      Most Borrowers Do Not Have the Tools to Protect Themselves from CashCall**

CashCall spent a considerable amount of money on advertising. Indeed, approximately 25% of the costs of each loan were comprised of the origination costs, over half of which was attributable just to advertising.[110] These ads, appearing regularly on day-time and late night television, include Gary Coleman and others, enticing potential borrowers to borrow money from CashCall.

**Quotes from CashCall's TV Advertisements[111]**

*"I got hit by too many bills and needed cash right away. Call today. Cash tomorrow. Money wired right into your account."*

*"If you get into a tight spot and need cash, call CashCall."*

*"CashCall was there when I needed them. Money is wired right into your account the next day.*

*"Pay it back with one low monthly payment."*

*"Let CashCall make your road easy."*

*"They just want to lend you the money you need. Call today, cash tomorrow."*

*"We can approve you right over the phone and you can have cash in your account the next day."*

*"Want thousands of dollars in your account by tomorrow for just over $200 a month, just based on trusting you? With no security of any kind, just your signature. Call CashCall. Make the call now – 866 590 CASH."*

*"It only takes a few minutes to get the cash you need. Make that call now. Call CashCall, at 866 590 CASH."*

*"Need cash? If you have a job, I can wire thousands of dollars into your account today. But you do need to make the monthly payments. So call me at 866 590 CASH."*

CashCall is promising to rescue people, to help them out of a desperate situation: *"CashCall was there when I needed them."*

CashCall is promising to provide the needed cash right away: *"They just want to lend you the money you need. Call today, cash tomorrow."*

CashCall is promising it will get that cash to you quickly: *"It only takes a few minutes to get the cash you need. Make that call now. Call CashCall."*

---

[110] Deposition of Delbert Orien Meeks, III, June 13, 2013, at 135.

[111] *See* CashCall's television advertisements, CashCall ## 006494-006525 and ## 23783-23784.

CashCall's promises are:

- Ease and convenience;
- Quick decisions;
- Almost immediate cash; and
- Affordable payments
- To help customers out of "a tight spot."

CashCall spends millions of dollars every year on these ads.[112] These ads appeal to people who need money quickly, are experiencing a feeling of desperation, and are likely not in the best frame of mind to make solid financial decisions.

The issue I am addressing in this section is whether CashCall's borrowers could assess the value of CashCall's loans, and whether they were likely to have the ability to evaluate the risks and dangers of a loan from CashCall. It is my belief that they most likely did not have this capacity.

National studies on financial literacy have identified a number of characteristics about consumers in the United States:

- A majority of consumers – over 90% -- are not able to answer a simple series of five questions posed about basic financial issues.[113] Almost 30% are not able to answer a basic question about the relationship between interest charges and the term of the loan.[114]
- Individuals in households that rely on alternative financial services (such as CashCall) rather than mainstream banks for their credit needs are more likely to be black or Hispanic, less educated (25% lacking high school degree), unmarried, foreign born, and/or have Spanish as the only language spoken.[115] Note that CashCall ran ads in Spanish as well as English.
- The primary reasons provided for using alternative financial services are convenience and "to get money faster."[116]
- Many households use the expensive credit alternatives (such as CashCall) to pay for basic living expenses, indicating a rise in financial distress.[117]

---

[112] *See e.g.* CashCall's 2005 and 2006 Financial Statements. CashCall ## 001557 and  001574.

[113] FINRA Investor Education Foundation, *Financial Capability in the United States: National Survey – Executive Summary* 18 (Dec. 2009), *available at* http://www.usfinancialcapability.org/downloads/NFCS_2009_Natl_Exec_Sum.pdf.

[114] *Id.*

[115] 2011 FDIC National Survey of Unbanked and Underbanked Households 17 (Sept. 2012), available at http://www.fdic.gov/householdsurvey/2012_unbankedreport.pdf.

[116] *Id.* at 37-38; *see also* Financial Capability in the United States—2012 Report of National Findings 8 (2012), *available at* http://www.usfinancialcapability.org/downloads/NFCS_2012_Report_Natl_Findings.pdf.

[117] 2011 FDIC National Survey of Unbanked and Underbanked Households 41 (Sept. 2012), *available at* http://www.fdic.gov/householdsurvey/2012_unbankedreport.pdf.

- Most consumers do not compare information about the costs of credit among providers. Those with less education are more likely than those with more education not to shop for credit.[118]
- Many consumers were surprised by the terms of credit after they had obtained it.[119]
- A significant number of consumers using alternative financial services assumed that it was their only option.[120]

These statistics present a picture of a group of consumers who a) do not have the basic financial skills to evaluate the costs and risks of credit products, and b) often believe that the credit provided to them is their only option.

Given these dynamics – lack of understanding of how credit works, and a perceived lack of choice – these consumers shop for what they can evaluate: convenience and fast service. And this is exactly what CashCall advertises:

> *CashCall was there when I needed them. Money is wired right into your account the next day.*

Behavioral economics studies also indicate that consumers regularly make mistakes even when they are shopping for consumer credit products.[121] These findings – that consumers systematically err in choosing credit products – seem to be appreciated by credit providers, and used by these providers as tools to market and design their products.[122] In other words, credit providers understand the limits of consumer choice and consumer literacy and use that knowledge in the design of their credit products.

Not only are there grossly unequal knowledge levels between consumers and credit providers,[123] but there is also unequal bargaining power between borrowers and lenders that

---

[118] Financial Capability in the United States—2012 Report of National Findings 22 (2012), *available at* http://www.usfinancialcapability.org/downloads/NFCS_2012_Report_Natl_Findings.pdf.

[119] Final Report – The 2011 Consumer Financial Literacy Survey, prepared for the National Foundation for Credit Counseling 11 (Mar. 2011) *available at* http://www.nfcc.org/newsroom/FinancialLiteracy/files2011/NFCC_2011Financial%20LiteracySurvey_FINALREPORT_033011.pdf.

[120] *Id.* at 11.

[121] *See* Oren Bar-Gill, *The Behavioral Economics of Consumer Contracts*, 92 Minn. L. Rev. 749, 761-62. (2008).

[122] *Id.* at 774, 785.

[123] The unequal knowledge level between different groups of consumers – generally distinguished by race, education level, and wealth – has led to market segmentation (which is the splitting of the market into prime, subprime, and predatory markets). *See generally* Kathleen C. Engel & Patricia A. McCoy, *A Tale of Three Markets: The Law and Economics of Predatory Lending*, 80 Tex. L. Rev. 1255,  1271-83 (2002); Cassandra Jones Havard, *Democratizing Credit: Examining the Structural Inequities of Subprime Lending*, 56 Syracuse L. Rev. 233 (2006) (discussing market segmentation and information asymmetries); Ronald J. Mann, *"Contracting" for Credit*, 104 Mich. L. Rev. 899, 914-15 (2005-2006) (describing how complexity, segmentation, and unilateral modification of terms combine to prevent increased consumer sophistication from reducing profits or increasing market efficiency); Ronald H. Silverman, *Toward Curing Predatory Lending*, 122 Banking L.J. 483, 531-44 (2005) (discussing information asymmetries, rent seeking, lack of competition, and adverse selection in predatory home mortgage lending); Elvin K. Wyly, *et al.*, *American Home: Predatory Mortgage Capital and Neighborhood Spaces of*

has long been recognized.[124] Without interest rate caps on consumer credit, this leaves disclosures – generally only those required by the Truth in Lending Act – as consumers' only bulwark against the dangers of high cost credit.

In this case, borrowers were provided with CashCall's Truth in Lending disclosure. The Truth in Lending disclosure for the $2,525 loan at the 135% interest rate includes boxes with the following information:

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | AMOUNT FINANCED | TOTAL OF PAYMENTS |
|---|---|---|---|
| *The cost of your credit as a yearly rate* | *The dollar amount the credit will cost you* | *The amount of credit provided to you* | *The amount you will have paid after all payments are made as schedules* |
| **139.31%** | **$8,529.07** | **$2,525.00** | **$11,054.07** |

Some important information for consumers is included in these disclosures. However, for this information to be valuable and useful the consumer needs to understand what an Annual Percentage Rate is and how it relates – if at all – to the interest rate charged on the loan. The Finance Charge is also unlikely to be a familiar term to many people – is it interest? It is not a percentage, so what is it? Many consumers should recognize – in this instance, at least – that the Amount Financed is the same amount they received from the loan. But the Total of Payments is not used in common parlance, although the number beneath it is alarmingly high.

Beneath these four boxes is the payment schedule, showing 37 payments:

| PAYMENT SCHEDULE |
|---|
| One payment of **$292.50** on **October 01, 2009**. |
| **35** monthly payments of **$298.94** beginning on **November 01, 2009**. |
| One payment of **$298.67** on **October 01, 2012**. |

**Late Charge:** If a payment is more than 15 days late, you will be charged $15.00.

**Prepayment:** If you payoff this loan early, you will not have to pay any penalty.

---

*Race and Class Exploitation in the United States*, 88 Geografiska Annaler, Series B: Human Geography 105 (2006) (arguing that lenders have targeted vulnerable neighborhoods). *See also* Michelle A. Danis & Anthony Pennington-Cross, *The Delinquency of Subprime Mortgages,* Fed. Reserve Bank of St. Louis, Working Paper No. 2005-022A, at 7 (Mar. 2005) (discussing economic theories to explain market segmentation between prime and subprime markets), *available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=761804*; Paul Muolo, *Subprime Lending Starting to Attract Interest Again*, Am. Banker (July 14, 2010) (high cost lender reports that prime borrowers willing to pay 12% interest, 5% fees on five- year loan at 65% loan-to-value ratio because "borrowers don't even know there's a source of funding out there for them").

[124] *See, e.g.,* Am. Fin. Serv. Ass'n v. Fed. Trade Comm'n, 767 F.2d 957, 976 (D.C. Cir. 1985) (consumers' limited ability to shop for and bargain over terms cited as grounds for upholding Federal Trade Commission's credit practice rule). *See generally* Alan M. White & Cathy Lesser Mansfield, *Literacy and Contract*, 13 Stan. L. & Pol'y Rev. 233, 243-51 (2002) (collecting cases).

> Please see the remainder of this document for additional information about nonpayment, default and any required repayment in full before the scheduled date.

This information is useful and should apprise the reader of the amount and the number of payments. But the CashCall Promissory Note and Disclosure Statement, on which these disclosures are located, is one page of four of packed legalese containing all the contractual terms of the transaction.

Nowhere on these pages is there information that enables consumers to comprehend the amortization of these loans. For example, there is nothing about the fact that the consumer will have paid back in monthly payments more than the full amount received through the loan *in eight payments* and will still owe *more* than she received (after eight payments on this loan, the balance due is $2,530.89).

Nowhere on the Truth in Lending Disclosure does it inform this borrower that even after she pays back the loan amount in these eight payments, and continues making payments through month 20 – the month by which, according to Mr. Meeks, most defaults will occur –she will have paid by over $5,965.49. Nowhere does it say that after paying over $5,900 on a loan for $2,525, if she defaults then CashCall will pursue her for a loan balance of more than $2,200 (which may actually be more with late and other fees assessed).[125] However, even if this information were included, many consumers would still not understand it or use it to assist in their credit decisions.

Few, if any, of the proponents of a disclosure-based model of regulation have made any effort to ensure that disclosures are provided in a meaningful way. There is little market incentive to produce effective disclosures.[126] In fact, most of the existing disclosures of the cost of credit are considered by many to be functionally ineffective.[127]

Roughly forty percent of the United States population lacks the literacy to correctly fill out a job application or a bank deposit slip.[128] Compare those tasks to understanding this

---

[125] Unsophisticated consumers are not alone in this problem. As Deputy Treasury Secretary Neal S. Wolin said of his own mortgage closing: "The documents are literally impenetrable. . . . Here I was—former general counsel of the Treasury, former general counsel of a Fortune 100 financial services company—asking my lawyer to help me through 100 pages of incomprehensible, turgid gobbledygook." Sewell Chan, *Trench Warfare: Send in the Deputies*, N.Y. Times, Apr. 16, 2010.

[126] *See* Oren Bar-Gill, *The Behavioral Economics of Consumer Contracts*, 92 Minn. L. Rev. 749, 759-60 (2008).

[127] *See id.* at 796–801 (discussing needed improvements in TILA disclosures primarily in the credit card context, including the need for binding disclosures and disclosure of use patterns). *See also* Patricia A. McCoy, *Rethinking Disclosure in a World of Risk-Based Pricing*, 44 Harv. J. on Legis. 123, 128-38, 142-43 (2007) (discussing limitations of current disclosure regime in providing relevant, binding information in a timely and useful manner); Elizabeth Renuart & Diane E. Thompson, *The Truth, the Whole Truth, and Nothing but the Truth: Fulfilling the Promise of Truth in Lending*, 25 Yale J. on Reg. 181 (2008) (existing finance charge and APR disclosures do not permit consumers to shop for credit in a meaningful way).

[128] Nat'l Ctr. for Educ. Statistics, Adult Literacy in America (Sept. 1993); Alan M. White & Cathy Lesser Mansfield, *Literacy and Contract*, 13 Stan. L. & Pol'y Rev. 233, 235-42 (2002). *See also* Mary Jordan, *Literacy of 90 Million Is Deficient*, Wash. Post, Sept. 9, 1993, at A1; *cf.* Mark Kutner, *et al.*, *Literacy in Everyday Life: Results from the 2003 National Assessment of Adult Literacy* 13 (2007) (22% of the United States population has less than basic proficiency in quantitative literacy), *available at* http://nces.ed.gov/pubs2007/2007480.pdf.

CashCall disclosure, both the information that is included as well as what is *not* included. Moreover, the overwhelming majority of consumers in the U.S. do not understand how to calculate the amount of interest charged on a loan upon being given the amount borrowed on a loan and the number and amount of payments.  (This question was not asked on the more recent Financial Literacy Capability analysis.) The 1992 National Assessment of Adult Literacy used a typical advertisement for a home equity loan as one of its measures of "quantitative literacy," and only four percent of the adults sampled could calculate how much interest would be charged.[129] Deficiencies in quantitative literacy are particularly pronounced for non-whites and older consumers,[130] precisely those groups most often targeted by abusive lenders. Unsurprisingly, consumers with the worst quantitative literacy are the most likely to use the most expensive forms of credit, and then to default.[131]

Legal scholars and behavioral economists have applied well-established insights of psychology to demonstrate that many, if not most, consumers make systematic errors of judgment in evaluating credit.[132] Most consumers, even educated consumers, focus on the

---

[129] Nat'l Ctr. for Educ. Statistics, Adult Literacy in America 100 (Sept. 1993) (the advertisement included all the information necessary to make the calculation: number and amount of monthly payments, and loan principal); *cf.* Annamaria Lusardi & Olivia S. Mitchell, *Baby Boomer Retirement Security: The Roles of Planning, Financial Literacy, and Housing Wealth*, 54 J. Monetary Econ. 205, 207, 216 (2007) (fewer than 18% of surveyed adults between the ages of 51 and 56 could calculate compound interest at 10% on $200 over two years); Annamaria Lusardi & Olivia S. Mitchell, *Financial Literacy and Planning: Implications for Retirement Wellbeing*, Pension Research Council, Working Paper No. 1,  at 4, 7 (2006) (noting that only 67% of surveyed adults, many over fifty, could correctly determine whether, after five years of interest at 2% on $100, they would have less than, more than, or exactly $102), *available at* www.dartmouth.edu/~alusardi/Papers/Financial Literacy.pdf; Macro Int'l, Inc., Design and Testing of Effective Truth in Lending Disclosures 52 (2007), *available at* http://www.federalreserve.gov/newsevents/press/bcreg/bcreg20081218a8.pdf;  Danna Moore, Wash. State Univ., Soc. & Econ. Sci. Research Ctr., Tech. Rep. No. 03-39, Survey of Financial Literacy in Washington State: Knowledge, Behavior, Attitudes, and Experiences (2003) (finding approximately 30% of respondents do not understand that if interest compounds, it builds on itself), *available at https://www.sesrc.wsu.edu/sesrcsite/papers/files/dfi-techreport-FINAL2-16-04.pdf.*

[130] Mark Kutner, Elizabeth Greenberg, & Justin Baer, *A First Look at the Literacy of America's Adults in the 21st Century*, Nat'l Ctr. for Educ. Statistics, at 1, 10 (Dec. 2005), *available at* http://nces.ed.gov/pubsearch/pubsinfo.asp?pubid=2006470.

[131] This relationship has been studied extensively in the mortgage context. *See, e.g,.* Brian Bucks & Karen Pence, Fed. Reserve Board, *Do Homeowners Know Their House Values and Mortgage Terms?* 18–22 (2006) (borrowers, particularly low-income borrowers, underestimate caps on life time interest rates in adjustable rate mortgages), *available at http://www.federalreserve.gov/pubs/FEDS/2006/200603/200603pap.pdf*; Consumer Fed'n of Am., Lower-Income and Minority Consumers Most Likely to Prefer and Underestimate Risks of Adjustable Mortgages 3 (July 26, 2004) (consumers cannot calculate the increase in the payment in an adjustable rate mortgage, and they minimize the interest rate risk by understating the increase in the payment; problem is present for all categories, but particularly pronounced for younger, poorer, less educated, and non-white consumers), *available at http://www.consumerfed.org/elements/www.consumerfed.org/file/housing/072604_ARM_Survey_Release.pdf.*

[132] *E.g.,* Oren Bar-Gill, *The Behavioral Economics of Consumer Contracts*, 92 Minn. L. Rev. 749, 761-65 (2008); Oren Bar-Gill, *Bundling and Consumer Misperception*, 73 U. Chi. L. Rev. 33, 45 (2006); Oren Bar-Gill, *Seduction by Plastic*, 98 Nw. U. L. Rev. 1373 (2004); Susan Block-Lieb, *The Myth of the Rational Borrower: Rationality, Behavioralism, and the Misguided "Reform" of Bankruptcy Law*, 84 Tex. L. Rev. 1481 (2006); Matthew A. Edwards, *Empirical and Behavioral Critiques of Mandatory Disclosure: Socio- Economics and the Quest for Truth in Lending*, 14 Cornell J.L. & Pub. Pol'y 199, 221-23 (2005); Jason J. Kilborn, *Behavioral Economics, Overindebtedness & Comparative Consumer Bankruptcy: Searching for Causes and Evaluating Solutions*, 22 Emory Bankr. Dev. J. 13, 18-19 (2005); Patricia A. McCoy, *Elder Law: A Behavioral Analysis of Predatory Lending*, 38 Akron L. Rev. 725, 734 (2005) (detailing the

payment to estimate the cost of a loan.[133] Because credit defers payments into the future, most consumers heavily discount the actual cost of repaying that credit, and so purchase more on credit than they would with cash and borrow more heavily than is prudent.[134]

Finally, borrowers often are not aware of the credit choices available, and are simply responding to the best-advertised product.

*"CashCall trusts you. It only takes about a 5 minute call and the payment is affordable, only about $200 a month."*

### E. The Best Benchmark Rate for Credit to Risky Borrowers is 36%.

The National Consumer Law Center recently published a report entitled *Why 36%? The History, Use, and Purpose of the 36% Interest Rate Cap.*[135] This report identifies the historical and political justification for a 36% interest rate cap for loans made to risky borrowers. The question has arisen in recent years because policymakers on the state and federal levels have been reconsidering interest rate deregulation in light of the repeated findings regarding the devastation caused by high interest rate loans.

The Report points out that 36% is a number that has been widely used both recently and in the nation's history as the maximum amount of interest that should be charged on loans which are sustainable.

- The 36% rate has a long and well-recognized history in America dating back 100 years.
- The 36% rate has been reaffirmed repeatedly at the state and federal level in recent years. Congress and three federal agencies have endorsed the rate. More and more states and their voters are capping small loans at 36% or less – currently 15 states and the District of Columbia.

---

difficulties faced by shoppers for subprime mortgage loans); Elizabeth Renuart & Diane E. Thompson, *The Truth, the Whole Truth, and Nothing But the Truth: Fulfilling the Promise of Truth in Lending*, 25 Yale J. on Reg. 181 (2008); Jeff Sovern, *Toward a Theory of Warranties in Sales of New Homes: Housing the Implied Warranty Advocates, Law and Economics Mavens, and Consumer Psychologists Under One Roof*, 1993 Wis. L. Rev. 13 (1993); Lauren E. Willis, *Decisionmaking and the Limits of Disclosure: The Problem of Predatory Lending: Price*, 65 Md. L. Rev. 707 (2006); Ren S. Essene & William Apgar, Joint Ctr. for Hous. Studies, Harvard Univ., Understanding Mortgage Market Behavior: Creating Good Mortgage Options for All Americans (2007).

[133] *See, e.g.*, Lauren E. Willis, *Decisionmaking and the Limits of Disclosure: The Problem of Predatory Lending: Price*, 65 Md. L. Rev. 707 (2006); Ren S. Essene & William Apgar, Joint Ctr. for Hous. Studies, Harvard Univ., Understanding Mortgage Market Behavior: Creating Good Mortgage Options for All Americans (2007).

[134] See, e.g., Oren Bar-Gill, *Seduction by Plastic*, 98 Nw. U. L. Rev. 1373, 1375-76 (2004); Jason J. Kilborn, Behavioral Economics, *Overindebtedness & Comparative Consumer Bankruptcy: Searching for Causes and Evaluating Solutions*, 22 Emory Bankr. Dev. J. 13, 18-19 (2005).

[135] Lauren K. Saunders, *Why 36%? The History, Use, and Purpose of the 36% Interest Rate Cap*, National Consumer Law Center (April 2013), *available at* http://www.nclc.org/images/pdf/pr-reports/why36pct.pdf.

- The 36% rate for small loans results in payments that consumers have a decent chance of being able to pay.[136]

As explained in Section IV-A of this report, the 36% rate cap for small dollar lending emerged in the first half of the twentieth century – a time when there were remarkable parallels to today. The 36% cap is no less valid now. The Russell Sage Foundation came up with the idea of a highly regulated credit industry to replace the black market for illegal usurious small loans, run by loan sharks.

The majority of states adopted a version of the Uniform Small Loan Law or its equivalent, including California. The rates used in these state laws were the result of hypotheses, bolstered by some research studies and testing in real world arenas. The real world validated these efforts. The landscape for small dollar lending was transformed. Through the 1960s, the RSF-inspired small loan laws kept small dollar consumer loans available to consumers.[137]

California, like many other states, deregulated interest rates on some consumer loans.[138] However, there is a current resurgence for a 36% cap for consumer loans.[139] Many states still have or have reinstated interest rate caps on small loans.[140] Moreover, voters in several states have, overwhelmingly supported the 36% rate. For example, in 2010, 72% of voters in Montana voted to impose a 36% rate cap on small loans. In prior years, voters in Ohio and Arizona also had supported annual rate caps of 28% and 36%, respectively.[141]

The federal government, through several of its agencies, has endorsed a 36% rate cap, as well:

- In 2006, the Department of Defense (DOD) issued a report detailing the problems that payday loans and other high-cost credit products were posing for servicemembers and military readiness.[142]

---

[136] *Id.* at 1.

[137] Lynn Drysdale & Kathleen Keest, "The Two-Tiered Consumer Financial Services Marketplace: The Fringe Banking System and Its Challenge to Current Thinking About the Role of Usury Laws in Today's Society, 51 S.C. L. Rev. 589, 623 (2000).

[138] S.B. 912, Legislative History (May 8, 1995).

[139] Lauren K. Saunders, *Why 36%? The History, Use, and Purpose of the 36% Interest Rate Cap,* National Consumer Law Center *(*April 2013)*, available at* http://www.nclc.org/images/pdf/pr-reports/why36pct.pdf.

[140] *Id.* at 3-4.

[141] *Id.* at 4 (citing National Consumer Law Center, Consumer Federation of America, Consumers Union, Small Dollar Loan Products Scorecard—Updated (May 2010),*available at* http://www.nclc.org/issues/payday_loans/content/cu-small-dollar-scorecard-2010.pdf).

[142] Department of Defense, Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents 13(Aug. 9, 2006) ("DOD Report"), *available at* http://www.defense.gov/pubs/pdfs/Report_to_Congress_final.pdf; Center for Responsible Lending, Nine Signs of Predatory Payday Loan, *available at* http://www.responsiblelending.org/payday-lending/tools-resources/ninesigns.html.

- The same year, Congress voted to impose a 36% rate cap, including fees, on loans offered to active duty members of the military and their dependents.[143]
- Congress reaffirmed its support for the 36% rate cap for servicemembers in 2012 when it strengthened the enforcement provisions and directed DOD to remain vigilant to protect servicemembers from continuing and evolving predatory lending practices.[144]
- In 2007, the Federal Deposit Insurance Corporation (FDIC) announced Small Dollar Loan Guidelines, encouraging lenders to offer loans at rates less than 36% with low or no fees.[145] In 2008, the FDIC followed up with a two-year pilot program to study sound small dollar loan products based on the 2007 guidelines. The FDIC deemed a 36% APR, as well as the other features set forth in its guidelines, to be helpful for institutions to "meet the goal of safe and sound small-dollar credit programs, which is to provide customers with credit that is both reasonably priced and profitable."[146]
- In 2010, the National Credit Union Administration (NCUA) enacted rules to allow federal credit unions to charge 28% APR plus a single $20 application fee on short-term, installment loans of $200 to $1,000. [147]

The concept of sustainability is a critical feature of the justification for the 36% rate. The idea is that sufficient interest should be charged to compensate lenders for making loans that are likely to be repaid, but too much interest will likely lead to loans that are not likely to be repaid and so should not be encouraged. With the 36% rate, lenders would make a profit – despite the higher costs of administering consumer loans – and consumers in turn would be given a reasonably priced product.

Respectfully submitted:
September 18, 2013

*Margot Saunders*

Margot Saunders
National Consumer Law Center

---

[143] John Warner National Defense Authorization Act of 2006, Pub. L. No. 109-364, § 670 (2006).

[144] Public Law No. 112-239, §§ 661 to 663 (Jan. 2, 2013) (adding 10 U.S.C. § 987(f)(5)); H.R. 4310, H. Rep. 112-705 Text of the Joint Statement of Managers, Subtitle G-Military Lending 110–111, *available at* http://www.rules.house.gov/Media/file/PDF_112_2/PDF/HR4310crJES.pdf.

[145] FDIC, PR 52-2007, Small Dollar Loan Guidelines, *available at* http://www.fdic.gov/news/news/press/2007/pr07052a.html.

[146] *Id.*

[147] 12 C.F.R. § 701.21(c)(7)(iii).

**Appendix**
**Materials Supplied by Plaintiffs' Counsel**

Pleadings:
- Fourth Amended Complaint
- Plaintiffs' Revised Memo. Motion for Approval for Class Notice Plan
- Order Re Class Notice Plan & Appointment of Class counsel
- Order Re: Class Certification

Discovery:
- CashCall Responses to Interrogatories, Set One
- CashCall Responses to Interrogatories, Set Two
- CashCall's Amended Response to Interrogatory No. 8, Set 2
- CashCall's 2nd Amended Response to Interrogatory No. 8, Set 2
- CashCall's Amended Response to Interrogatories. 11, 13, Set 2
- CashCall Responses to Interrogatories, Set 3 with Attachment A
- CashCall Responses to Request to Produce, Set 5

Depositions:
- Deposition Transcript(s) of Thomas Morgan
- Deposition Transcript of Steven Klopstock
- O'Donovan Deposition for limited purpose
- Deposition Transcript of Delbert Meeks

Documents:
- Ex. 18 to Thomas Morgan Deposition (underwriting guidelines)
- P 350- 53 & CC 441-45 – Plaintiffs' Promissory notes
- CC001338-1360 – website screen shots
- CC001147-1280 – website screen shots
- CC001525-1627 – 2003-2008 financial statements
- CC 5989 – 6050 -2003-2006 underwriting guidelines
- CC006051-6151:  06-09 underwriting guidelines
- CC006527-6589 – delinquency reports
- CC008758- 8782 – guidelines & generic promissory note & report
- CC008782 -8836 – 2009-2011 financial statements
- CC009017 – native excel spreadsheet
- CC009524-9594 – monthly loan origination results July 2011
- CC025812-916; 26058- 90; 26091-199 – prospectus documents
- CC026503 – native excel spreadsheet
- Customer complaints including – 2360-72, 23111-16, 23313-23, 23374, 23427-42, 23444-45, 23497-23540
- CashCall's TV Advertisings in Video Format (CC 006494-6525; CC2378323784)
- Federal Reserve's Loan Charge Off Data

# Exhibit 18

2              UNITED STATES DISTRICT COURT

3           NORTHERN DISTRICT OF CALIFORNIA

4

5   KRISTA O'DONOVAN, EDUARDO  )
     DE LA TORRE and LORI      )
6   SAVSOURIVONG,            )
     individually and on      )
7   behalf of all others     )
     similarly situated,     )  No.  C 08-03174 MEJ
8                      )
             Plaintiffs,  )
9                     )
          vs.          )
10                    )
    CASHCALL, INC.,        )
11   California corporation    )
    and DOES 1 through DOE   )
12   50, inclusive,        )
                     )
13             Defendant.  )
   _____ )
14

15          DEPOSITION OF JOHNNY COOK

16        11355 WEST OLYMPIC BOULEVARD

17         LOS ANGELES, CALIFORNIA

18       TAKEN ON SEPTEMBER 18, 2013

19

20

21

22

23   Reported By:

24   PATRICIA L. HUBBARD, CSR #3400

25   JOB NO. 65826

1      A.   I guess when I took out my first loan.

2  I'm not sure what year that was but --

3      Q.   Okay.

4      A.   -- about that time.

5      Q.   Okay.  Do you recall whether you

6  learned about CashCall through an advertisement as

7  opposed, for example, to hearing about it from a

8  friend or a relative something like that?

9      A.   Yeah.  I believe I saw it on TV.

10     Q.   Any recollection of what the ad said?

11     A.   Cash -- quick cash right now, one day

12  in the bank.

13     Q.   If you don't mind my asking, why at

14  that time did you need cash?

15     A.   Holidays were coming around, and I

16  needed some cash.

17     Q.   Okay.  Did you -- the first time you

18  applied for a loan from CashCall did you look for

19  obtaining credit from any other sources than

20  CashCall?

21     A.   No.

22     Q.   Okay.  Was there anything particular

23  about CashCall that appealed to you?

24     A.   No.  It just was something that I saw

25  and figured I'd try it out.

# Exhibit 19

De La Torre, Eduardo:  11/10/2009

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--


KRISTA O'DONOVAN, and EDUARDO DE

LA TORRE, individually and on

behalf of all others similarly

situated,

        Plaintiffs,

   vs.              No. C 08-03174 MEJ

CASHCALL, INC., a California

corporation and DOE 1 through

DOE 3, inclusive,

        Defendants.

-------------------------------//


DEPOSITION OF EDUARDO DE LA TORRE

Tuesday, November 10, 2009

Pages 1 through 236


REPORTED BY:

YVONNE FENNELLY, CCRR, CSR NO. 5495

fbd87149-2d2e-4f1a-a82a-671bf57f0f7a

De La Torre, Eduardo:  11/10/2009

Page 18

1   collect payments was harassful (sic).  I don't think

2   that that was in the contract.

3          I think that their --

4   Q.   Let's -- let's stop for a second.

5   A.   Sure.

6   Q.   So you felt that the method of collecting

7   payment was harassment, but you don't feel that that

8   was a violation of the contract; correct?

9   A.   I feel that, you know, when they -- when

10  they did things like contact like third-party

11  people, I don't feel that that was following --

12  following what they had put forward.

13         And yes, the --

14  Q.   How many times did CashCall contact a third

15  party related to your loan contract with CashCall?

16  A.   At the very least three times to three

17  different people.

18  Q.   And who were those people?

19  A.   One of them was Caliph, last name

20  A-S-S-A-G-A-I, Assagai.

21         Second person was Anthony Pineda.

22         And the third person was -- the third

23  person was Darnell Holloway.

24  Q.   Who is Mr. Assagai?

25  A.   He was a colleague of mine at college, and

De La Torre, Eduardo:  11/10/2009

Page 20

1      A.    I know of one time.

2      Q.    And what is it that -- I assume you came to

3   learn from Mr. Assagai that CashCall had contacted

4   him; correct?

5      A.    Yes.

6      Q.    Is that correct?

7      A.    Yes, it is correct.

8      Q.    Okay.

9            And what did he tell you about that contact

10   from CashCall?

11      A.    He told me that they had contacted him,

12   that they told him who it was; that they told him

13   that I owed them money on my loan, and that he

14   should tell me to call them back.

15            And so they also gave him a phone number to

16   reach them at.

17      Q.    Did he tell you that the CashCall

18   representative said anything else?

19      A.    That's what I recall.

20      Q.    And what was wrong with that?

21      A.    Because I -- I think that that made me --

22   it pretty much put me in a bad light.  It was

23   embarrassing to, like, have somebody that I knew

24   from campus to, like, know, like, my personal

25   financial difficulty.  I don't think it was

Page 21

1    appropriate.

2        Q.   What was your understanding when you put

3    Mr. Assagai's name down on your CashCall application

4    as a reference?   What was your understanding of why

5    you were doing that?

6        A.   Well, I actually took it as a, like, well,

7    we actually use them for when we're trying to get a

8    job, you know, like to -- to put names forward of

9    people that can pretty much, like, testify to your,

10   like, character.

11       Q.   So it was your understanding that CashCall

12   might contact Mr. Assagai; correct?

13       A.   Yes, correct.

14       Q.   And it was your understanding when you put

15   his name down as a reference, that they might

16   actually contact him and ask him questions about

17   your character; correct?

18       A.   Yes.

19       Q.   Did you have a discussion with anyone at

20   CashCall when you applied for the loan about what

21   CashCall would do with the references -- with the

22   information you were providing of references on the

23   application?

24       A.   Can you say that one more time, sir?

25       Q.   Did you have a discussion with anyone at

De La Torre, Eduardo:  11/10/2009

Page 22

1   CashCall when you applied for the loan about what

2   CashCall was going to do with the information you

3   were providing on references on the loan

4   application?

5       A.   I was not aware that they would contact

6   them for that reason.

7       Q.   My question is, did you have any discussion

8   with anyone at CashCall about what they were going

9   to do with the information you were giving them?

10      A.   No, no.

11      Q.   And so your belief -- and I assume, then,

12  that you had a belief that CashCall might contact

13  those people in connection with your loan

14  application; is that accurate?

15      A.   Right.

16      Q.   But then when the application was done and

17  you were approved, you had a belief that CashCall

18  wasn't ever going to contact these people again; is

19  that right?

20      A.   Correct.

21      Q.   And that's a belief that you had based on

22  what?

23      A.   Based on -- and I guess common practice or,

24  like, common sense.

25      Q.   Okay.

Page 23

1          Explain that to me.  How is it based on

2    common practice that you have the belief that

3    CashCall wouldn't contact your references after you

4    were approved for a loan?

5    A.   Well, this was actually my -- it was my

6    belief that there would be no use for these

7    contacts.

8          In the case that I was not going to be able

9    to make my payments, I don't see what the -- the

10   reason for that would be.  So that's why I thought

11   of it that way.

12   Q.   Did you share that belief with anyone from

13   CashCall at the time you applied for the loan and

14   put Mr. Assagai down as a reference?

15   A.   No.

16   Q.   Anything else you recall about CashCall's

17   contact, the one contact you can specifically recall

18   that you were aware of, CashCall's contact with

19   Mr. Assagai?

20   A.   Uh-huh.

21   Q.   Anything else you can recall?

22   A.   From that, no.

23   Q.   Okay.

24        Let's talk about Anthony Pineda.  Who is

25   he?

De La Torre, Eduardo:  11/10/2009

Page 24

1    A.    He was my former boss at a campus job back

2    in 2006.

3    Q.    And Mr. Pineda, was he also someone whose

4    name you put down on your --

5    A.    Yes.

6    Q.    -- CashCall application?

7    A.    Correct.

8    Q.    And how many times did you become aware

9    that CashCall contacted Mr. Pineda?

10   A.    I know of at least one.   Once.

11   Q.    And how did you come to learn that?

12   A.    It was pretty much the same thing.   He

13   called me, told me that they had called him.   Told

14   me that they had told him who they were; the reason

15   that they were calling, because I owed on my loan

16   payment; that I should call them back, and they gave

17   him a phone number where I could call them back.

18   Q.    Essentially the same thing that Mr. Assagai

19   told you that CashCall had told them; correct?

20   A.    Same thing.   Same thing.

21   Q.    Okay.

22         Can you give me an idea of when Mr. Assagai

23   told you that he had been contacted?

24   A.    I don't recall the exact timeframe on that,

25   for any of them.

De La Torre, Eduardo:  11/10/2009

Page 25

1    Q.    Okay.

2          Had you moved or changed your address at

3    about the time that Mr. Assagai called you and told

4    you that CashCall had contacted him?

5    A.    I don't recall.

6    Q.    How about Mr. Pineda, had you moved around

7    that time?

8    A.    I don't recall either.

9    Q.    Okay.

10         And give me an idea these calls -- well,

11   let's finish up with Mr. Pineda.

12   A.    Sure.

13   Q.    Is there anything else that you can recall

14   about Mr. Pineda's contact from CashCall?

15   A.    Nothing else.

16   Q.    Okay.

17         And I take it that you felt that was

18   improper for the same reasons that you felt it was

19   improper that CashCall contacted Mr. Assagai; is

20   that correct?

21   A.    Yes.

22   Q.    And that's because it was your assumption

23   when you put Mr. Pineda's name down on the CashCall

24   application that CashCall might contact him and ask

25   about your character in connection with the

De La Torre, Eduardo:  11/10/2009

Page 26

1   application, but they wouldn't contact him after you

2   were approved; is that right?

3          MR. LEVY:   I'm going to object to the

4   question as misstating the witness's testimony and

5   argumentative.

6          You can answer.

7          THE WITNESS:   Yes, that's what I thought.

8   That was my understanding.

9          MR. SEILING:   I guess that would overrule

10  the objection, then.

11  BY MR. SEILING:

12     Q.   Anything else you can recall about the

13  contact from CashCall to Mr. Pineda?

14     A.   No, just that, you know, it was a bit

15  more -- it was actually worse that they contacted

16  him because of the fact that he was my boss at the

17  time, so it was more humiliating because I would

18  have to see him pretty often.

19     Q.   So at the time CashCall contacted

20  Mr. Pineda, he was your current boss --

21     A.   Yes.

22     Q.   -- is that right?

23     A.   Correct.

24     Q.   And that for you, because they were

25  contacting your current boss, that was embarrassing

Page 27

1   and humiliating for you; is that correct?

2       A.    Very embarrassing.

3       Q.    Okay.

4             Now, how was CashCall supposed to know

5   that?

6             MR. LEVY:   Objection; vague.   I'm not sure

7   what you're asking.

8   BY MR. SEILING:

9       Q.    Did you ever tell anyone from CashCall,

10  please don't contact Mr. Anthony Pineda because he's

11  my boss and it would be embarrassing and humiliating

12  if you did that?

13            Did you ever tell that to anyone from

14  CashCall?

15      A.    I think that that's a loaded question, but,

16  I mean, no.   No.

17      Q.    So as far as you know, CashCall would have

18  no reason to know that you would be embarrassed and

19  humiliated by them trying to contact Mr. Pineda?

20            MR. LEVY:   Objection; vague.

21  BY MR. SEILING:

22      Q.    You can answer the question.

23      A.    I mean, it's -- I mean, it's the same

24  reason as why they shouldn't have contacted somebody

25  that I didn't work for.   You know.   I mean, it was

Page 28

1  more humiliating than the first person that got

2  called, but it doesn't mean that it was still good

3  for me.   So I would say that's for the same reason.

4     Q.   Was Mr. Pineda your boss when you put him

5  down on the CashCall application?

6     A.   Yes.

7     Q.   So you understood when you put him down on

8  the application that CashCall might contact him at

9  least in connection with the loan; right?

10    A.   For when I was first trying to get the

11 loan, yes.

12    Q.   And that wouldn't have been a problem for

13 you at that time; is that correct?

14    A.   At that time, no.

15    Q.   It was just after the fact when you were --

16 at the time that CashCall contacted Mr. Pineda, were

17 you behind on your payments?

18    A.   Yeah, yeah.   That was the reason that they

19 contacted him and that they told him what they told

20 him, because I was behind.

21    Q.   Okay.

22         And at the time CashCall contacted

23 Mr. Assagai, were you behind on your payments?

24    A.   Yes.

25    Q.   Let's talk about Mr. Holloway.

Page 29

1       Who is he?

2    A.   Holloway was also a colleague of mine.  He

3  was also the president at my college, so that pretty

4  much fit the same profile as the first person that

5  got contacted.

6    Q.   Okay.

7         And Mr. Holloway, was he one of the

8  references you put down on your CashCall

9  application?

10    A.   I do remember that I put him down, and I do

11  remember that he called me and he told me the same

12  thing as the first two people, so yes.

13    Q.   So Mr. Holloway was a reference on your

14  CashCall application; is that correct?

15    A.   I looked over, you know, some of the

16  papers, and I saw that Holloway was not on there, on

17  the references part.  But they did actually contact

18  him, so there must have been a way where I either

19  changed the people that I put down or I added him on

20  there.

21         But they actually did contact him and they

22  actually told him the same thing as the first two

23  people.

24    Q.   Okay.

25         So if I understand your testimony, you

Page 30

1   don't recall putting Mr. Holloway down as a

2   reference --

3       A.   No, I --

4       Q.   -- on your application; is that correct?

5       A.   -- no, I do recall that I put him down.

6   I'm just not sure during what time period that was.

7       Q.   I see.

8       A.   Yeah.

9       Q.   So you might have provided CashCall with

10  Mr. Holloway's contact information after you had

11  applied and been approved for the loan; is that

12  right?

13      A.   Correct.  Yeah.

14      Q.   And if it wasn't in connection with the

15  application, why did you understand that you were

16  giving CashCall Mr. Holloway's contact information?

17      A.   I don't recall the exact reason so I don't

18  have any answer to that, really.  I just don't

19  recall the reason for that.

20      Q.   And what did you understand that CashCall

21  would do with the information that you were

22  providing it about Mr. Holloway?

23      A.   I really didn't know.

24      Q.   Did you understand that CashCall might

25  contact him at some point?

Page 31

1    A.    No.

2    Q.    So did anyone from CashCall -- do you

3    recall a discussion you had with someone from

4    CashCall where you provided Mr. Holloway's contact

5    information?

6    A.    I don't recall how I provided his contact

7    information; whether it was through a phone call or

8    whether it was through writing.

9    Q.    Okay.

10   A.    Or online.   I seriously don't recall, like,

11   how.

12   Q.    But you do have a recollection of providing

13   Mr. Holloway's contact information to CashCall; is

14   that correct?

15   A.    Yes.

16   Q.    And so then I take it you don't recall --

17   because you don't recall exactly how you provided

18   it, you don't recall a discussion with anyone from

19   CashCall or any kind of communication with someone

20   from CashCall where there was an explanation of why

21   you were giving that information to them; is that

22   right?

23   A.    No.

24   Q.    Okay.

25         And you said for Mr. Holloway kind of the

Page 32

1   same:   The call that he related to you from CashCall

2   was essentially the same call that you Mr. Pineda

3   and Mr. Assagai had received; is that correct?

4       A.    Correct.

5       Q.    And that was essentially that CashCall -- a

6   CashCall representative had told Mr. Holloway that

7   you owed CashCall money and that you should contact

8   CashCall, and they provided Mr. Holloway with a

9   number that you should call; is that right?

10      A.    Correct.   Right.

11      Q.    Can you give me an idea of how close in

12  time these three contracts with these three parties

13  were?

14      A.    I can't give you an exact timeframe.   I

15  know that they were contacted -- that they were

16  contacted once I was behind on a payment.

17      Q.    What I'm trying to get at -- I understand

18  you can't kind of pin them down with a day or a

19  month or anything like that, but what I'm trying to

20  get at is, you know, were they all in the same

21  month?   Was it, you know, in consecutive months?

22          Can you help me with that?

23      A.    I would say that those three people were

24  contacted within no more than two months of one

25  another.

Page 33

1    Q.   So it's your best testimony, as you sit

2  here today, that those three contacts were, at some

3  point, within a two-month period that each of those

4  three were called; is that correct?

5    A.   Yes.

6    Q.   And that each of them was called one time

7  as far as you can recall?

8    A.   Right.

9    Q.   Okay.

10        Anything else other than contacting third

11 parties that you felt was harassment by CashCall in

12 trying to collect payments?

13   A.   Yes.  I would get numerous calls around --

14 at the rate of, like, ten times a day when there

15 would be numerous representatives from CashCall

16 calling me on my cellphone when I was at work, when

17 I was in class, and sometimes also, too, when I was

18 sleeping, because they would also call early,

19 sometimes.

20        I don't think that it was wrong for them to

21 contact me about the fact that I owed them money,

22 but I do think that once I told them that, like, I

23 wasn't going to be able to pay them until a certain

24 date, I felt that they should have stopped calling

25 me because nothing was going to change, at least

De La Torre, Eduardo:  11/10/2009

Page 34

1    from my end.

2           And also, too, the fact that, you know, I

3    would say what was going on to one person, and they

4    would make note of it, and then I would get another

5    call pretty much the same day, or, like, a few

6    calls, and it was a different person calling for the

7    same reason but somehow didn't know that, like, I

8    had already talked to somebody else earlier in the

9    day.

10          So I felt that that was ineffective -- I

11   thought it was a waste of their time.  I thought it

12   was a waste of my time.

13          I told them numerous times that I was going

14   to be busy or that I was busy so that I could take a

15   phone call or that I could call them back during a

16   certain time period, but I was never listened to

17   because they would keep on calling back numerous

18   times, even right after I had gotten off the phone

19   with them.

20          And I would also get e-mails in my inbox,

21   and it was also written by different people.

22          And then I would also get written letters

23   to my home address.

24          So I felt that that was too much.

25   Q.   When you say you felt that was too much,

Page 35

1    what do you mean by that?

2        A.   I felt that I was very open and clear as to

3    when I wasn't going to be able to make that monthly

4    payment.  So I felt that I was trying to make sure

5    that they wouldn't contact me further, whether

6    through phone or e-mail or letters.

7            I felt that it was harassment to have to

8    deal with so many people that seemed to not know,

9    you know, what I had just said, like, in the

10   previous hour or two hours.

11           So I felt that it was too much because I

12   couldn't go through my day without -- without having

13   to get a phone call in the middle of my class or

14   while I was at work, and, you know, wonder if I

15   should pick it up or not because I was going to say

16   the same thing that I had just said earlier --

17   earlier in the day.

18       Q.   So if -- I appreciate your answer and your

19   explanation of those things, and I just want to make

20   sure that I understand all the different elements of

21   that, because there's a lot of things that you said

22   in there.

23       A.   Sure.

24       Q.   So as I understand it, you earlier said you

25   felt that CashCall was harassing and they were

Page 36

1  trying to collect payments from you and you talked

2  about contacting third parties, we went over that,

3  and then in this answer, the things that I

4  understand that you identified was, first of all,

5  that CashCall would make numerous calls in a single

6  day; is that correct?

7      A.   Correct.

8      Q.   You said up to ten calls in a single day;

9  is that right?

10     A.   I said at least ten.

11     Q.   What's the most number of calls you recall

12 receiving in a single day?

13     A.   I can't really say, and I don't want to

14 guess, so I'll just keep it at that.

15     Q.   Okay.

16          So the best you can say is at least ten; is

17 that right?

18     A.   Correct.

19     Q.   And when you say you received ten calls in

20 a day, that doesn't mean you actually spoke to

21 someone ten times from CashCall; is that right?

22     A.   Not all the time.

23     Q.   So there were ten calls that you might have

24 received that were -- that you didn't pick up or you

25 weren't there to pick it up or they were a voicemail

De La Torre, Eduardo:  11/10/2009

Page 37

1    or something like that?

2        A.    Correct.

3        Q.    So ten calls means ten attempts by CashCall

4    to contact you in a single day; is that correct?

5        A.    Correct.

6        Q.    Okay.

7              And then you said you received calls while

8    you were sleeping.   What's the earliest time you

9    ever received a call from CashCall?

10       A.    I believe before 8:00 a.m.

11       Q.    When did they do that?

12       A.    That was -- well, I mean, I can't give you

13   an exact date, but it must have been when I was

14   unable to make a payment.

15       Q.    How many times do you recall receiving a

16   call from CashCall before 8:00 a.m.?

17       A.    A handful of times.   I can't give you an

18   exact figure, but a handful.

19       Q.    Did you receive a call from a live person,

20   or was that an automatic dialed call?   Could you

21   tell?

22       A.    I believe most of the times that I was

23   called before 8:00 a.m. it was an automated call.

24   And, you know, the reason I would know, too, is

25   because they would leave a message with a --

Page 39

1    Q.   So let me just ask:  It wasn't so much that
you thought it was harassing you, it's just that the
people at CashCall didn't know what they were doing?

4    A.   No, I would say that I did feel like I was
being harassed because it was multiple people and
they were not nice people.  Ninety percent of the
time they were not nice.

8         I remember that, you know, just their tone;
they would scream, you know, like, not want to let
me get off the phone, even if I told them that I
couldn't be on the phone for long.  Very -- very,
very coercive at the very least verbally.

13   Q.   Tell me what you mean when CashCall people
would scream at you.

15   A.   They would say, you know, that I had to not
only pay them but that I would have to pay them
right away.  That I'd have to listen to them.  That
I had a loan to pay, you know, like this is what I
signed up for.  And that I should just -- should
pretty much make sure to -- you know, when I wasn't
able to, you know, like, give them new facts, I
guess -- I mean, that's when they seemed to hit a
wall because they realized that I wasn't going to be
able to make a payment within the timeframe that
they wanted me to.

Page 40

1          So they very easily got mad and told me

2     that I had to pay them right away.

3       Q.    Okay.

4          But I was focusing on, you used the word

5     scream.

6       A.    Yeah, yeah.

7       Q.    To me -- I want to know what you mean by

8     that.

9       A.    They would -- sure, sure.

10          They would say things, like, Listen.

11    Listen to me.  No, no, you listen to me.  And, you

12    know, I mean, I never, like, yelled at them back,

13    but that was the sort of like screaming that I'm

14    talking about.

15      Q.    All right.

16          So do you mean that they were using a real

17    stern tone of voice with you?

18      A.    I wouldn't call it stern.  I would just say

19    that they were raising their voices and they were

20    obviously upset, and I didn't feel that that was

21    something that they should be doing because of the

22    fact that it was high and it was also very clear

23    that it was meant to inflict fear, or to try to

24    force me to make the payment right away.

25      Q.    You say it was meant to inflict fear.  Did

Page 41

1    it work?

2        A.   A few times.

3        Q.   Tell me about the times when you felt that

4    it worked where it inflicted fear on you.

5        A.   Well, it was the times when I sent in

6    payment via -- I would actually send in payments via

7    MoneyGram, sometimes that very same day because I

8    felt that -- that I had to do it.  I was given no

9    choice based on what we talked about, you know, the

10   person.

11            So I would say that it did.

12       Q.   You mentioned in describing how people were

13   not nice, you mentioned the tone, that people would

14   scream, they wouldn't let you get off the phone.

15   They were coercive and they easily got upset.

16            All those things that you've just been

17   describing in your last couple of answers, does that

18   summarize the ways that you felt that CashCall loan

19   representatives were not being nice to you when they

20   talked to you?

21       A.   Correct.

22       Q.   Anything else that you can recall?

23       A.   Sure.  Well, from the talks that I had with

24   them?  Or can you rephrase, I guess?

25       Q.   I'm just wondering, you know, I'm asking

Page 42

1    questions about your experiences.

2        A.    Right.

3        Q.    So you've given me a general description of

4    your feeling that the CashCall representatives

5    weren't nice to you when they dealt with you.

6    You've given me specific examples, and what I'm

7    wondering is if we've exhausted all of that.

8              Is there anything else you can tell me

9    about how you felt that the CashCall representatives

10   were not being nice to you?

11       A.    Well, just on the -- I guess, like, on a

12   personable level, I wouldn't, like, add much else to

13   that.

14       Q.    Swearing?  Did that happen?

15       A.    I don't remember that, no.  I don't recall.

16       Q.    Threats?  Did those happen?

17       A.    Yes.

18       Q.    What kind of threats?

19       A.    Threats that they would actually -- that

20   they would actually try to garnish my wages, that

21   they would contact my workplace, which they did.

22   They would call the office line.  And that the ACH

23   would still go through even if I wasn't able to make

24   the payment.

25       Q.    Any other things that you can recall that

De La Torre, Eduardo:  11/10/2009

Page 85

1  styles?

2    A.   Yes, it was curved a little bit, so --

3    Q.   How did you hear about CashCall?

4    A.   I first heard about CashCall when I saw a

5  TV ad at my university's memorial union.   So there

6  was a common eating area and I saw their ad.

7    Q.   So that was an ad on television; is that

8  right?

9    A.   Yes, correct.

10   Q.   Did you ever receive any kind of direct

11 marketing material to you from CashCall?

12   A.   No.

13   Q.   So you saw this add in the commons on TV.

14 What network was it?

15   A.   I don't know.

16   Q.   And tell me what you remember about the ad.

17   A.   I remember that they mentioned you could

18 get cash quickly, that you -- oh, Jesus.

19        I remember the image of them just saying

20 that it was, like, really easy to get a quick loan.

21 And past that, I don't recall what else was

22 mentioned in that ad.

23   Q.   Now, you saw this in a common area.   I

24 mean, could you hear what the announcer or what was

25 being said in the ad?   Could you hear everything or

# Exhibit 20

1            UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4   KRISTA O'DONOVAN,            )
    EDUARDO DE LA TORRE and      )
5   LORI SAYSOURIVONG,           )
    individually and on          )
6   behalf of all others         )
    similarly situated,          )
7                                )
            Plaintiffs,          )
8                                )
    vs.                          )   Case No. C 08-03174 MEJ
9                                )
    CASHCALL, INC., a            )
10  California corporation,      )
    and DOES 1 through DOE 50,   )
11  inclusive,                   )
                                 )
12          Defendants.          )
    _____)

13

14

15

16

17

18          DEPOSITION OF YOSVIN DE LEON

19            LOS ANGELES, CALIFORNIA

20           FRIDAY, AUGUST 16, 2013

21

22

23

    REPORTED BY:
24  Alejandria E. Kate
    CSR NO. 11897, RPR-CLR
25  JOB NO. 64873

DEPOSITION OF YOSVIN DE LEON (AUGUST 16, 2013)

Page 11

1    what the interest would be after I had signed a

2    consent -- excuse me, after I signed or initialed the

3    required paperwork that was needed for me to get funded

4    for this loan.

5        Q.    Okay.   Great.

6              So going back -- and you got this loan in 2010;

7    correct?

8        A.    Correct.

9        Q.    How did you hear about CashCall?

10       A.    TV commercial.

11       Q.    And what do you remember about the TV

12   commercial?

13       A.    Just, you know, something along, you know, you

14   can apply for a $2500 loan, call this number, easy

15   process.   Something like, you know, bad credit, no

16   credit, something like that.

17       Q.    Do you remember where you saw that TV ad?

18       A.    Yeah.   It was the night before I applied or I

19   called, at home, watching TV, and it, you know, aired.

20       Q.    And you remember what station it was on?

21       A.    I don't remember.

22       Q.    And what was your impression of CashCall from

23   that ad?

24       A.    Just wrote down the number, and told myself

25   that I said I'd give them a call the next day and see

Page 12

1    <u>what happens.</u>

2        Q.    You, prior to applying for your loan with

3    CashCall, had filed for bankruptcy; correct?

4        A.    Correct.

5        Q.    And when was that?

6        A.    I think that was 2004.

7            MR. SEILING:  Can we go off the record for a

8    second.

9            (Recess:  9:58 a.m. to 9:59 a.m.)

10   BY MR. SEILING:

11       Q.    So, Mr. De Leon, your bankruptcy in 2004 when

12   was that -- what kind of bankruptcy was that?

13   Chapter 11?  Chapter 7?  Chapter 13?  Do you remember?

14       A.    I don't remember.

15       Q.    And do you remember when that case was

16   resolved, when the bankruptcy was resolved?

17       A.    I believe I filed in 2004, and it was either

18   resolved the same year.  I recall going to Woodland

19   Hills, where they had the courts and -- bankruptcy

20   courts are in that area.  I remember going there and was

21   granted bankruptcy by the judge.

22       Q.    Okay.  And so after that bankruptcy, did the

23   fact that you had filed for bankruptcy, did that impact

24   your ability to get credit?

25       A.    Yeah.

DEPOSITION OF YOSVIN DE LEON (AUGUST 16, 2013)

Page 14

1   bankruptcy in 2004?

2       A.   No.

3       Q.   Just you?

4       A.   Just myself.  We were living together at the

5   time.  We didn't get married until 2006.

6       Q.   And so other than CashCall -- so you needed --

7   about how much money did you need?

8            MR. CONNOLLY:  Objection.  Vague.

9   BY MR. SEILING:

10      Q.   Well, did you have an idea?  You said you

11  having some financial issues and you needed some cash.

12  How much money did you think you needed?

13      A.   At the time?

14      Q.   Yes.

15      A.   2500 would have helped out a lot.

16      Q.   Okay.  Other than applying to CashCall, did you

17  apply anywhere else?

18      A.   I recall talking to a credit union to check out

19  their rates, what the process would be.  Before anything

20  was run, meaning my credit score or my social or any of

21  that, the gentleman, you know, roughly said, "You know,

22  based on what you're telling me" -- I mean, I did

23  disclose my bankruptcy with them.  He says, you know, it

24  would be hard for me to get a loan.  I would probably

25  need a cosigner.  So I pushed that venue away.

Page 17

1      Q.    And are these loans still outstanding?

2      A.    Yes.

3      Q.    And then going down, I see an entry here for

4    the California Credit Union.

5      A.    What page are you looking at?

6      Q.    I'm looking at page 2, and it's the third entry

7    from the top.  It's the California Credit Union.

8            And so did you have a credit card with the

9    California Credit Union?

10     A.    That was my debit card.

11     Q.    I see.

12     A.    It was linked to my checking account.

13     Q.    So with this California Credit Union account,

14   you were limited by what amount was in your checking

15   account; is that right?

16     A.    Correct.

17     Q.    So with the California Credit Union account,

18   you couldn't take an advance of, say, $2500 and pay it

19   back over time; is that right?

20     A.    That's correct.

21     Q.    And then going down, the next entry is

22   something for GMB/Living Spaces.

23           Was that a credit card?

24     A.    Yeah.  It was a department credit card for

25   Living Spaces.

1    that that was -- you had a $500 credit limit on that

2    card.

3            Does that sound about right?

4        A.    Yes.   These are -- if I remember correctly,

5    these were -- when I called them up, I mentioned that I

6    was trying to reestablish my credit, and I was told that

7    this would be a good start, you know, trying to get back

8    on reestablishing my credit.   Start with the credit

9    card, and then start with the department credit card,

10   like the Living Spaces.

11       Q.    And do you remember what the HSBC card -- did

12   you have to actually pay money to get the card?

13       A.    I believe they had an initiation fee to process

14   the paperwork.

15       Q.    And so could you have taken out a cash advance

16   on that HSBC credit card of $2500?

17       A.    How could I when my limit was 500?

18       Q.    I'm just asking.   I don't know.   So I ask these

19   questions because I don't know.

20       A.    Well, okay.   Then the answer to your question

21   is, no, I could not.   When my credit limit was $500, I

22   couldn't.

23       Q.    And then going back -- going back down, the

24   next entry is for First Premier Bank.   Was that also a

25   credit card that you had?

DEPOSITION OF YOSVIN DE LEON (AUGUST 16, 2013)

Page 22

1    account in December of 2009, very end of the year.

2              Does that refresh your recollection whether you

3    were trying to reestablish your credit in March of 2010,

4    when you applied for CashCall?

5              MR. CONNOLLY:  Objection.  Lacks foundation.

6              THE WITNESS:  Could you ask me that ...

7    BY MR. SEILING:

8         Q.   If you look at the -- what I'm trying to get

9    at, Mr. De Leon, and I'm looking at the credit report

10   and these cards that we've gone over, it says that you

11   opened them in either December or January -- December of

12   2009 or January of 2010.

13        A.   Right.

14        Q.   Just a couple months before you applied for the

15   CashCall loan; is that a fair statement?

16        A.   Yeah.  That's fair.

17        Q.   And so my question is at the time you applied

18   for the CashCall loan, were you trying to reestablish

19   your credit after the bankruptcy?

20        A.   No.

21        Q.   So you felt your credit had already been

22   reestablished?

23        A.   I could say that I was starting to establish my

24   credit the year before, when I applied for these credit

25   cards.

DEPOSITION OF YOSVIN DE LEON (AUGUST 16, 2013)

Page 90

1    A.    Yes.   On several occasions.

2    Q.    When?

3    A.    This year.   Last year.

4    Q.    What's the APR you pay on a payday loan?

5    A.    Outrageous.

6    Q.    More than CashCall; right?

7    A.    Probably.

8    Q.    So if you needed money, and you had a choice

9    between a 400 APR payday loan and a CashCall loan, which

10   would you take, Mr. De Leon?

11   A.    I was in need.   Does that give the right to

12   CashCall to take advantage of me?

13   Q.    Do you think -- based on your experience -- how

14   many payday loans have you taken out, Mr. De Leon?

15   A.    Quite a few.

16   Q.    More than ten?

17   A.    Probably.

18   Q.    More than 20?

19   A.    Probably.

20   Q.    Prior to taking out the loan with CashCall, had

21   you taken out payday loans?

22   A.    Yes.

23   Q.    And how many before you took out the loan with

24   CashCall?

25   A.    I don't remember exactly the number, but --

DEPOSITION OF YOSVIN DE LEON (AUGUST 16, 2013)

Page 91

1    you're trying to get me to give you a specific number.

2    I don't know.

3        Q.    I'll take an estimate.

4        A.    All I know is that I've been responsible to pay

5    those loans back.

6        Q.    And it's important to pay those payday loans

7    back as soon as you can because the APR is sometimes

8    three times as much as the CashCall APR; right?

9        A.    Right.

10       Q.    And would you agree with me, based on your

11   experience in taking out more than 20 payday loans, that

12   that 135 percent CashCall loan is a better deal than a

13   400 percent payday loan?

14            MR. CONNOLLY:   Objection.  Vague.

15            THE WITNESS:   If you say so.

16   BY MR. SEILING:

17       Q.    I -- I'm asking you, sir.  I want to know your

18   experience.  You've taken out a CashCall loan.  You've

19   taken out a bunch of payday loans.  And you understand

20   that the payday loans carry a higher APR than the

21   CashCall loan; right?

22       A.    Correct.

23       Q.    So in comparing those two loans, based on your

24   personal experience, which is a better deal?

25            MR. CONNOLLY:   Objection.  Vague.  A better

1    deal?

2              MR. SEILING:   Yeah.

3              MR. CONNOLLY:   What does that mean?

4              THE WITNESS:   They're both screwing me with the

5    high interest.  Am I going to -- if I'm walking on a

6    tight rope, if I fall this way, I'm going to be falling

7    in a pit of crocodiles.  If I fall on this side, I'm

8    going to be fall in shark-infested waters.  Does it

9    matter which side I fall in?  I'm going to get my ass

10   chewed out regardless.

11   BY MR. SEILING:

12      Q.   They're both high interest rate loans; right?

13      A.   Right.  But my point, sir --

14           (Speaking simultaneously.)

15           MR. SEILING:  But --

16           THE WITNESS:  Can I speak now?

17   BY MR. SEILING:

18      Q.   No, you can't actually.  You answer my

19   questions, and that's what you do.

20      A.   Okay.

21      Q.   If your counsel wants to ask you questions, you

22   can talk.  You want to go to trial, you can talk all you

23   want.  If the judge wants to put up with it, that's

24   fine.  But we're here for me to ask questions to find

25   out about you; right?

DEPOSITION OF YOSVIN DE LEON (AUGUST 16, 2013)

Page 93

1          So based on your experience, have you ever had

2     a payday loan where the interest rate was less than the

3     interest rate on the CashCall loan?

4          A.   I'm not sure.

5          Q.   And you understand that those payday loans are

6     a bad deal for you; right?

7               MR. CONNOLLY:  Objection.  Vague.

8               THE WITNESS:  Not sure.

9     BY MR. SEILING:

10         Q.   You think you're being screwed by the payday

11    lenders; right?

12         A.   I'm in need.  I have need for the cash.  I'm

13    going to -- as long as I -- I'm responsible.  I'm a

14    responsible person that's trying to get back on his

15    feet, making payments.

16              Does that give the right to give CashCall or

17    any other type of loan to take advantage of a consumer

18    like myself?

19         Q.   But what I don't understand, sir, is how is it

20    that you think that CashCall is taking advantage of you?

21              MR. CONNOLLY:  Asked and answered.

22              You can answer again if you'd like.

23              THE WITNESS:  Again, aren't there any laws to

24    protect consumers like myself in the state of California

25    that can tell companies like CashCall, you know, wow,

127 NOTE_3857764.htm

## CASHCALL, INC. PROMISSORY NOTE AND DISCLOSURE STATEMENT

| Loan No.: | 3857764 | Date of Note: | March 15, 2010 |
|---|---|---|---|
| | | Expected Funding Date: | March 16, 2010 |
| Lender: | CashCall, Inc. | Borrower: | YOSVIN O DELEON |
| Address: | 1600 S Douglass Rd Anaheim, CA 92806 | Address: | 25781 N PERLMAN PL STEVENSONS RANCH, CA 91381 |

In this Promissory Note and Disclosure Statement ("Note"), the words "you" and "your" mean the person signing as a borrower. "We," "us," "our," and "Lender" mean CashCall, Inc. and any subsequent holder of this Note.

### TRUTH IN LENDING ACT DISCLOSURE STATEMENT

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | AMOUNT FINANCED | TOTAL OF PAYMENTS |
|---|---|---|---|
| The cost of your credit as a yearly rate | The dollar amount the credit will cost you | The amount of credit provided to you | The amount you will have paid after all payments are made as scheduled |
| 138.43 % | $8,392.57 | $2,525.00 | $10,917.57 |

| PAYMENT SCHEDULE |
|---|
| One payment of $454.94 on May 01, 2010. |
| 34 monthly payments of $298.94 beginning on June 01, 2010. |
| One payment of $298.67 on April 01, 2013. |

**Late Charge:**   If a payment is more than 15 days late, you will be charged $15.00.

**Prepayment:**    If you pay off this loan early, you will not have to pay any penalty.

Please see the remainder of this document for additional information about nonpayment, default and any required repayment in full before the scheduled date.

| ITEMIZATION OF AMOUNT FINANCED | |
|---|---|
| Amount Financed: | $2,525.00 |

Exhibt: 14
Witness: DE LEON
Date: 8/16/13
Reporter: A. Kate, CSR 11897

CONFIDENTIAL
CASHCALL 028421

127 NOTE_3857764

| Amount Paid to Borrower Directly: | $2,525.00 |
|---|---|
| Prepaid Finance Charge/Origination Fee: | $75.00 |

FOR VALUE RECEIVED, you promise to pay to the order of CashCall, Inc., or any subsequent holder of this Note (the "Holder"), the sum of **$2,600.00**, together with interest calculated at **135.00 %** and any outstanding charges or late fees, until the full amount of this Note is paid.

Your payments will be applied first to any outstanding charges or late fees, then to earned interest and finally to principal. The payment schedule described above is only an estimate and may change in the event you do not make all payments as scheduled.

Interest is calculated on a 360/360 simple interest basis. This means that interest is calculated by dividing the annual Interest Rate by 360, multiplying that number by the outstanding principal balance, and multiplying that number by the number of days the principal balance is outstanding.

You may prepay all or any part of the principal without penalty.

You will be subject to a fee not to exceed the legally permitted amount if any payment you make is returned for non-sufficient funds.

If you fail to make any payment due hereunder, the Holder of this Note shall have the right, after a 30-day grace period, to declare this Note to be immediately due and payable. If you file for an assignment for the benefit of creditors, bankruptcy, or for relief under any provisions of the United States Bankruptcy Code, the Holder of this Note shall have the right to declare this Note to be immediately due and payable.

In the event that Holder is required to employ an attorney at law to collect any amounts due under this Note, you will be required to pay the reasonable fees of such attorney to protect the interest of Holder or to take any other action required to collect the amounts due hereunder.

You agree that all payments not made within fifteen (15) days of the due date shall be subject to a late fee of $15.00. Any late fee assessed shall be collected by the Holder on behalf of the Holder and shall inure to the exclusive benefit of the Holder.

The origination fee included in the prepaid finance charge/origination fee disclosed above is fully earned upon loan origination, is not subject to rebate upon prepayment or acceleration of this Note and is not considered interest.

The Holder of this Note may delay or forgo enforcing any of its rights or remedies under this Note without losing them. You hereby, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for payment, or protest and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability.

The rights of Holder hereof shall be cumulative and not necessarily successive. This Note shall take effect as a sealed instrument and shall be construed, governed and enforced in accordance with the laws of the State of California.

This Note is in original format an electronic document fully compliant with the Electronic Signatures in Global and National Commerce Act (E-SIGN) and other applicable laws and regulations, and that the one, true original Note is retained electronically by Holder on behalf of Holder. All other versions hereof, whether electronic or in tangible format, constitute facsimiles or reproductions only.

CONFIDENTIAL
CASHCALL 028422

127 NOTE_3857764

You understand that you have previously consented to receive all communications from the Holder, including but not limited to, all required disclosures via electronic mail.

You understand and agree that CashCall, Inc. may obtain credit reports on you an ongoing basis as long as this loan remains in effect. You also authorize CashCall, Inc. to report information concerning your account to credit bureaus and anyone else it believes in good faith has a legitimate need for such information.

You understand that, from time to time, we may monitor or record telephone calls between you and us for quality assurance purposes. You expressly consent to have your calls monitored or recorded.

You agree that in the event we need to contact you to discuss your account or the repayment of your loan, we may telephone you at any number, including any cell phone number provided, and that we may leave an autodialed or prerecorded message or use other technology to make that contact or to communicate to you the status of your account.

A married or registered domestic partner applicant may apply for a separate account. As required by law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations. If Holder takes any adverse action as defined by Section 1785.3 of the California Civil Code and the adverse action is based, in whole or in part, on any information contained in a consumer credit report, you have the right to obtain within 60 days a free copy of your consumer credit report from the consumer reporting agency who furnished us your consumer credit report and from any other consumer credit reporting agency which compiles and maintains files on consumers on a nationwide basis. You have the right as described by Section 1785.16 of the California Civil Code to dispute the accuracy or completeness of any information in a consumer credit report furnished by the consumer credit reporting agency.

This Agreement encompasses the entire agreement of the parties, and supersedes all previous understandings and agreements between the Parties, whether oral or written. Any modifications to this Agreement must be made in writing and signed by both parties.

**THIS LOAN CARRIES A VERY HIGH INTEREST RATE. YOU MAY BE ABLE TO OBTAIN CREDIT UNDER MORE FAVORABLE TERMS ELSEWHERE. EVEN THOUGH THE TERM OF THE LOAN IS 36 MONTHS, WE STRONGLY ENCOURAGE YOU TO PAY OFF THE LOAN AS SOON AS POSSIBLE. YOU HAVE THE RIGHT TO PAY OFF ALL OR ANY PORTION OF THE LOAN AT ANY TIME WITHOUT INCURRING ANY PENALTY. YOU WILL, HOWEVER, BE REQUIRED TO PAY ANY AND ALL INTEREST THAT HAS ACCRUED FROM THE FUNDING DATE UNTIL THE PAYOFF DATE.**

| | |
|---|---|
| ☑ | YOU CERTIFY THAT NO PERSON HAS PERFORMED ANY ACT AS A BROKER IN CONNECTION WITH THE MAKING OF THIS LOAN. |
| ☑ | YOU CERTIFY THAT YOU HAVE READ AND UNDERSTAND THE AMORTIZATION SCHEDULE ON THIS LOAN. Click here to view. |
| ☑ | **YOU HAVE READ ALL OF THE TERMS AND CONDITIONS OF THIS PROMISSORY NOTE AND DISCLOSURE STATEMENT AND AGREE TO BE BOUND BY ITS TERMS. YOU UNDERSTAND AND AGREE THAT YOUR EXECUTION OF THIS NOTE SHALL HAVE THE SAME LEGAL FORCE AND EFFECT AS A PAPER CONTRACT.** |

CONFIDENTIAL
CASHCALL 028423

127 NOTE_3857764

This Loan Is Made Pursuant To The California Finance Lender Law, Division 9 (commencing with Section 22000) of the Financial Code. **FOR INFORMATION, CONTACT THE DEPARTMENT OF CORPORATIONS, STATE OF CALIFORNIA, LICENSE NO. 603-8780.**

### ELECTRONIC FUNDS AUTHORIZATION AND DISCLOSURE

You hereby authorize us to initiate electronic funds transfers ("EFTs") for withdrawal of your scheduled loan payment from your checking account on or about the FIRST day of each month. You further authorize us to adjust this withdrawal to reflect any additional fees, charges or credits to your account. You understand that we will notify you 10 days prior to any given transfer if the amount to be transferred varies by more than $50 from your regular payment amount. You also authorize us to withdraw funds from your account on additional days throughout the month in the event you are delinquent on your loan payments. You understand that this authorization and the services undertaken by us in no way alters or lessens your obligations under the loan agreement. You understand that you can cancel this authorization at any time (including prior to your first payment due date) by sending written notification to us. Cancellations must be received at least three business days prior to the applicable due date. This EFT debit authorization will remain in full force and effect until the earlier of the following occurs: (i) you satisfy all of your payment obligations under this Loan Agreement or (ii) you cancel this authorization.

In addition, you hereby authorize us and our agents to initiate a wire transfer credit to your bank account to disburse the proceeds of this Loan. You acknowledge that the origination of the wire transfer to your bank account must comply with applicable provisions of U.S. law.



| ☑ | YOU UNDERSTAND CASHCALL'S PAYMENT COLLECTION POLICY AND AUTHORIZE ELECTRONIC DEBITS FROM YOUR BANK ACCOUNT. |

Click here to print out a copy of this document for your records.

CONFIDENTIAL
CASHCALL 028424

# Exhibit 21

Page 1

1                UNITED STATES DISTRICT COURT
2              NORTHERN DISTRICT OF CALIFORNIA
3
4     KRISTA O'DONOVAN,            )
      EDUARDO DE LA TORRE and      )
5     LORI SAYSOURIVONG,           )
      individually and on          )
6     behalf of all others         )
      similarly situated,          )
7                                  )
             Plaintiffs,           )
8                                  )
      vs.                          )  Case No. C 08-03174 MEJ
9                                  )
      CASHCALL, INC., a            )
10    California corporation,      )
      and DOES 1 through DOE 50,   )
11    inclusive,                   )
                                   )
12           Defendants.           )
      _____)
13
14
15
16
17
18              DEPOSITION OF TONYA GERALD
19               LOS ANGELES, CALIFORNIA
20              FRIDAY, AUGUST 16, 2013
21
22
23
      REPORTED BY:
24    Alejandria E. Kate
      CSR NO. 11897, RPR-CLR
25    JOB NO. 64873

Page 7

1      A.   Yes.

2      Q.   Okay.  Any reason you can't proceed with our

3  deposition today?

4      A.   No.

5      Q.   Okay.  You took out a loan from CashCall in

6  2005; correct?

7      A.   Yes, I did.

8      Q.   Okay.  And so tell me how you heard about

9  CashCall before you applied for the loan.

10     A.   On the television, with Gary Coleman.  The

11  actor, Gary Coleman.

12     Q.   And what do you -- what do you remember about

13  that television ad?

14     A.   It said that you can take out CashCall loans,

15  personal loans, for 25- -- no, $2600, and there's no

16  credit check.

17     Q.   And how many times did you see that ad before

18  you applied for the loan?

19     A.   I can't remember how many times.

20     Q.   Do you know what your credit score was at the

21  time you --

22     A.   It wasn't very good.  It was not very good at

23  the time.

24          (Speaking simultaneously.)

25  ///

Page 9

1    in court; right?

2        A.    Yes.

3        Q.    When did that bankruptcy court proceeding end?

4        A.    2000.

5        Q.    So it was all done within the year 2000; is

6    that right?

7        A.    Well, December of 1999 is when I applied, and

8    then January of 2000 is when it was resolved.

9        Q.    And so at some point you decided to apply for

10   this loan with CashCall in 2005; right?

11       A.    I thought my loan was 2004.

12       Q.    We can get to some documents that might show

13   that.

14            At some point you tried to -- you decided you

15   were going to apply for a CashCall loan; right?   That's

16   why you're here?

17       A.    Yes.

18       Q.    Okay.   What did you need the money for?

19       A.    To pay off some bills.

20       Q.    What bills did you want to pay off?

21       A.    I can't remember what bills they were, but I

22   was in a financial dire at the time.

23       Q.    And what do you mean, you were in a financial

24   dire?

25       A.    Well, desperation, stress.

Page 10

1    Q.    And how much money were you looking to borrow?

2    A.    Just a few thousand dollars.

3    Q.    Before you applied for the loan for CashCall,

4  did you apply for a loan from any other bank or credit

5  union, financial institution?

6    A.    Yes, I did.  I applied for credit cards,

7  personal loans with the banks, and I was not eligible

8  due to my credit.

9    Q.    How many credit cards did you apply for?

10   A.    I can't remember how many, but I know I

11  applied.

12   Q.    Was it more than five?

13   A.    I have -- I can't remember.  I know I applied.

14   Q.    More than one?

15   A.    Yes.

16   Q.    And was that from the period January 2000, when

17  your bankruptcy was discharged, to the time you applied

18  for your CashCall loan that you had applied for credit

19  cards?

20   A.    Why do we have to go back to 2000?

21   Q.    Because that's when you filed for bankruptcy,

22  ma'am.

23   A.    We need to stick to the CashCall for the year.

24  That's what I would like to do.

25   Q.    What I would like for you to do, ma'am, is to

DEPOSITION OF TONYA GERALD (AUGUST 16, 2013)

Page 15

1       A.    Not that I can recall.

2       Q.    In 2005, when you applied for the CashCall

3   loan, did you have a credit card, any credit card?

4       A.    No.

5       Q.    Did you own your home at the time?

6       A.    I don't own a home.

7       Q.    Did you have a personal line of credit that you

8   could draw on?

9       A.    No.

10      Q.    And so had you ever taken out a payday loan

11  before you applied for the CashCall loan?

12      A.    Not that I can recall.

13      Q.    Had you ever discussed with anyone taking out a

14  payday loan?

15      A.    Not that I can recall.

16      Q.    In 2005, were you aware of what payday loans

17  were?

18      A.    Yes, I was -- known about payday loans.

19      Q.    And what did you know about them?

20      A.    I know that payday loans are for where you can

21  get loans.  You can go to a little branch and take it

22  out for -- you know, pay it back when you're -- you have

23  to get -- when you get paid from your job.

24      Q.    And did you consider taking out a payday loan

25  instead of the CashCall loan?

DEPOSITION OF TONYA GERALD (AUGUST 16, 2013)

Page 16

1    A.   Payday loans -- those payday loans or branches

2  do not offer what CashCall offers, which is, like,

3  $2600.  They don't offer large amounts back then.

4    Q.   And so you were aware back then that a payday

5  loan wasn't going to meet your needs because you

6  couldn't get as much money as you were looking for; is

7  that right?

8    A.   Correct.

9    Q.   And how did you go about applying for the

10 CashCall loan?

11   A.   I did it through the telephone.  I called the

12 800 number that CashCall advertises on television.

13   Q.   And tell me what you remember about that call

14 when you called to apply.

15   A.   Well, the salesman, the gentleman was pretty

16 nice about it, and he asked me -- I was at work, so he

17 asked me to fax over specific information.  And I sent

18 it by fax, which was, like, my driver's license,

19 financial statement, bank statement.

20      And we -- he told me how much that I would get,

21 the 2600.  They would take it out of my -- he wanted to

22 know the dates that I was going to be paid.  I told him

23 two specific dates that I get paid on.

24      And he also had me fax over a voided check

25 because they were going to automatically take the money

1    A.    It wasn't 99 percent.

2    Q.    What was it?

3    A.    Usually everybody applies for loans, it can be

4    like 10 percent.

5    Q.    When you were applying for the Bank of America

6    loan, did you ask them what the interest rate was going

7    to be?

8    A.    No, because it was on the paper.  It was on the

9    paper, what they were going -- I applied for this not in

10   person.  I applied for the Bank of America loan online.

11   Q.    Okay.  And so in the call you had with

12   CashCall, where you said they were going to loan you

13   $2600 --

14   A.    Right.

15   Q.    -- you didn't ask what the interest rate was

16   going to be?

17   A.    No.

18   Q.    Why not?

19   A.    Because I was stressed at the time.

20   Q.    Why not?

21   A.    You didn't hear what I just said.  I was

22   stressed.  People who are very stressed out about money

23   at the time, you need to pay off your bills and you're

24   behind, you're very stressed, you're very nervous.

25   You're trying to get the money.  It's desperation.

# Exhibit 22

```
 1
 2                 UNITED STATES DISTRICT COURT
 3               NORTHERN DISTRICT OF CALIFORNIA
 4
 5    KRISTA O'DONOVAN, EDUARDO   )
      DE LA TORRE and LORI        )
 6    SAVSOURIVONG,               )
      individually and on         )
 7    behalf of all others        )
      similarly situated,         )  No.  C 08-03174 MEJ
 8                                )
                     Plaintiffs,  )
 9                                )
               vs.                )
10                                )
      CASHCALL, INC.,             )
11    California corporation      )
      and DOES 1 through DOE      )
12    50, inclusive,              )
                                  )
13                     Defendant. )
      _____)
14
15              DEPOSITION OF LORI HUME
16               695 TOWN CENTER DRIVE
17              COSTA MESA, CALIFORNIA
18             TAKEN ON AUGUST 27, 2013
19
20
21
22
23    Reported By:
24    PATRICIA L. HUBBARD, CSR #3400
25    JOB NO. 65048
```

1    correct?

2           A.   That and page four.

3           Q.   And so you had a call then after your

4    loan funded with someone from CashCall, correct?

5           A.   I had a call from them?

6           Q.   Yes.

7           A.   I don't recall.

8           Q.   You don't recall a call where they went

9    over the terms of the loan again after the loan had

10   funded?

11          A.   No.  No one called me to go over the

12   terms of the loan.

13          Q.   And you don't recall them telling you

14   that the interest rate was 135 percent; is that

15   correct?

16          A.   That's correct.

17          Q.   And if they had told you that at the

18   time, you would have been surprised, correct?

19          A.   Very surprised, yes.

20          Q.   How did you hear about CashCall?

21          A.   TV.

22          Q.   And tell me what you heard.

23          A.   A gentleman with blondish curly hair

24   was on TV saying you could get quick money in

25   24 hours and all you had to do was make a phone

1    call for any purpose.

2         Q.   In the TV ad that you saw was there any

3    statement about the interest rates?

4         A.   Not that I could see.  There was some

5    very tiny, tiny print at the bottom of the

6    commercial, but it wasn't legible.

7         Q.   Had anyone ever told you that they had

8    taken a loan from CashCall?  Do you know anyone who

9    did?

10        A.   No.

11        Q.   And this was in May of 2010 you needed

12   money to pay rent.

13             Had you tried to get a loan from

14   someone else?

15        A.   No.

16        Q.   Did you have a bank?

17        A.   Yes.

18        Q.   What was your bank at the time?

19        A.   What was my bank?

20        Q.   Yeah.

21        A.   They changed names.  It's South County

22   Bank now.  I'm not positive if it was South County

23   Bank then, because they've changed names a couple

24   times.

25        Q.   And at the time you got the loan from

1   correct?

2       A.   That's correct.

3       Q.   And is the reason that you went to the

4   auto title lender because you couldn't get a loan

5   elsewhere?

6       A.   Yes.

7       Q.   Did you try to get loans elsewhere?

8       A.   No.

9       Q.   And why didn't you try?

10           I mean what's the basis -- you just

11  said the reason you went there is that you couldn't

12  get loans from somewhere else.

13           So, why is that?  Why did you know

14  that?

15      A.   Because I had filed bankruptcy, and I

16  know upon filing bankruptcy that you -- you are

17  not -- you can't get loans when you file

18  bankruptcy.  You're considered a high risk.

19      Q.   And so I take it, then, at the time you

20  got the CashCall loan in May of 2010, you still had

21  that belief, that you were going to have difficulty

22  getting loans elsewhere?

23      A.   Yes.  Quick loan.

24      Q.   And so you didn't even try to get a

25  loan from anywhere else?

1          A.    No.

2          Q.    We have time to take a break --

3                Well, did you understand that the

4    interest rate -- you don't remember the specific

5    interest rate.

6                Do you remember if -- let me give you

7    some numbers and throw them out for you.

8                On your auto title loan does it -- does

9    it refresh your recollection that that interest

10   rate was above 100 percent?

11         A.    No.

12         Q.    No?  It wasn't above 135 percent?

13         A.    I don't know.

14         Q.    And you don't remember the term of that

15   loan?

16         A.    No, other than I could -- there was no

17   prepayment penalty.

18         Q.    And so because there was no prepayment

19   penalty, you determined for the auto title loan

20   that it was in your best interest to pay that loan

21   off as soon as possible; is that correct?

22         A.    That's correct.

23         Q.    And is that because you knew that the

24   interest rate was very high; and that if you took

25   the loan to term, that you'd be paying back a lot

# Exhibit 23

Page 1

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4

5     KRISTA O'DONOVAN, EDUARDO   )
      DE LA TORRE and LORI        )
6     SAVSOURIVONG,               )
      individually and on         )
7     behalf of all others        )
      similarly situated,         )   No.  C 08-03174 MEJ
8                                  )
                    Plaintiffs,   )
9                                  )
                vs.               )
10                                 )
      CASHCALL, INC.,             )
11    California corporation      )
      and DOES 1 through DOE      )
12    50, inclusive,              )
                                   )
13                  Defendant.    )
      _____ )
14

15            DEPOSITION OF BARBARA JENNINGS

16                695 TOWN CENTER DRIVE

17               COSTA MESA, CALIFORNIA

18              TAKEN ON AUGUST 27, 2013

19

20

21

22

23    Reported By:

24    PATRICIA L. HUBBARD, CSR #3400

25    JOB NO. 65048

Page 15

1          A.   No.

2          Q.   Had you applied for credit cards?

3          A.   I had a credit card at the time.

4          Q.   What was your credit card?

5          A.   It was a chase credit card?

6          Q.   And what was the credit limit on that

7    credit card?

8          A.   $750.

9          Q.   And what was the interest rate on that?

10         A.   I'm not even sure.

11         Q.   Was it -- was it normal, in your

12   recollection?

13         A.   Yeah.

14         Q.   20 percent?

15         A.   It was under 20.

16         Q.   And so when you applied for the

17   CashCall loan, why didn't you apply for a loan with

18   Chase?

19         A.   Just saw the commercial on TV and gave

20   it a call, and they approved us.  So we didn't have

21   to look further.

22         Q.   So you didn't look for any other source

23   other than CashCall --

24         A.   No.

25         Q.   -- for the loan?

# Exhibit 24

1                UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF CALIFORNIA

3

4

5     KRISTA O'DONOVAN; EDUARDO
      DE LA TORRE and LORI
6     SAYSOURIVONG, individually
      and on behalf of all others
7     similarly situated,

8                   Plaintiffs,

9     vs.                       CASE NO. C 08-03174 MEJ

10    CASHCALL, INC., a
      California corporation, and
11    DOE 1 through DOE 50,
      inclusive,

12

                  Defendants.
13    _____/

14

15

16      VIDEOTAPED DEPOSITION OF TONYE W. NIWEIGHA

17             SAN FRANCISCO, CALIFORNIA

18           THURSDAY, SEPTEMBER 5, 2013

19

20

21    BY:  ANDREA M. IGNACIO HOWARD, CSR, RPR, CCRR, CLR

22         CSR LICENSE NO. 9830

23         JOB NO. 65176

24

25

Page 38

1    that time, if you recall?

2         A    Not that I recall.

3         Q    When did you first hear about CashCall?

4         A    I wouldn't know the date or year, but it

5    probably will be around the time when I got the loan,

6    so I'm thinking 2005.

7         Q    How did you learn of CashCall?

8         A    There were lots of advertisements on the

9    television.

10        Q    Do you recall generally what the ads said?

11        A    Either get cash fast, or get cash now.  It

12   can be deposited either the same day, or the next day,

13   or something like that.

14        Q    Okay.  Do you recall the ad said anything

15   about whether you need to provide any collateral for

16   the loan?

17        A    I don't remember that.

18        Q    Okay.  Do you recall whether the ad said

19   anything about the interest rate?

20        A    No.

21        Q    About how many times do you think you saw

22   that TV ad, one or more of the TV ads, before you

23   applied in September 2005?

24        A    A million times.  They would be in between,

25   you know, the shows and different channels.

1    Q    And why did that -- what was appealing to you

2  about CashCall as -- you know, let me rephrase that.

3         Did you decide to apply for a loan from

4  CashCall on the basis of those advertisements?

5    A    The advertisement is that you get cash fast

6  and the payments were low, or something like that.

7    Q    Okay.  So what was the first thing you did in

8  order to start applying for a loan?

9    A    I don't really remember if I called or if it

10 was the Internet.  I don't know.

11   Q    Have you ever applied for a loan of any

12 kind -- leaving CashCall aside for a moment -- have

13 you ever applied for a loan of any kind through the

14 Internet?

15   A    Through the Internet, yes.

16   Q    Okay.  How many times?

17   A    I guess two, excuse me, that I can remember.

18   Q    When was that?

19   A    Specific loan, I got my car.  I don't know if

20 that's necessarily the loan through the Internet.  I

21 shopped for my car on the Internet, picked it out with

22 a dealer, but actually I didn't shop for the loan

23 through them.  They did the shopping, I guess.

24   Q    Can you think of any time when you personally

25 applied for a loan through a website as opposed to

# Exhibit 25

1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

KRISTA O'DONOVAN, EDUARDO )
DE LA TORRE and LORI        )
SAYSOURIVONG, individually  )
and on behalf of all others )
similarly situated,         )
        Plaintiffs,          )
                             )
     vs.                     )  Case No. C 08-03174 MEJ
                             )
CASHCALL, INC., a California )
corporation, and DOES 1     )
through DOE 50, inclusive,  )
_____Defendants._____)
CASHCALL, INC., a California )
corporation,                )
        Counterclaimant,     )
                             )
     vs.                     )
                             )
EDUARDO DE LA TORRE and LORI )
SAYSOURIVONG,               )
        Counterdefendants.   )

VIDEOTAPED DEPOSITION OF

LORI SAYSOURIVONG

_____

Friday, May 28, 2010

REPORTED BY:

MARYANN H. VALENOTI, RPR

CSR #11266

1    account to cover an ACH payment; correct?

2        A.    Sometimes.

3        Q.    Do you feel that there was something

4    inappropriate about Cashcall calling you and asking

5    about status of your account when payments were, in

6    fact, late?

7        A.    I think that the one call, especially when I

8    actually talked to somebody and explained the

9    situation, but the amount of calls that I received and

10   the nature of the calls and the way I was treated

11   during those calls, the excessive amount of the calls,

12   that I don't agree with.

13       Q.    Did there ever come a time when Cashcall

14   called you more than once in a day where they spoke to

15   you more than once in a day?

16       A.    Yes.

17       Q.    How many times did that happen?

18       A.    I can't be sure on the numbers, several.

19       Q.    And when was the first time you remember being

20   called more than once in a day from Cashcall?

21       A.    I couldn't tell you.  I don't have the -- I

22   have no clue.

23       Q.    Do you have any specific recollection of any

24   time you were called more than once in a day?

25       A.    Within the past, the end of last year, of

97

1    2009, there was multiple times that I was called, you

2    know, sometimes, maybe it was five times a day one day,

3    and then maybe it was twice a day the next day, and

4    then, you know, maybe a day would go by and I wouldn't

5    receive any, and then the next day I would receive

6    several.

7        Q.   When you say you received five calls in a day,

8    does that mean Cashcall tried to call you five times or

9    they called and spoke to you five times in the same

10   day?

11       A.   They called that many times in a day.  I

12   didn't necessarily speak to them that many times, but

13   they called that many times.

14       Q.   And how do you know they were calling, how do

15   you know it was Cashcall?

16       A.   There was times when I'd answer the phone and

17   I would get, "Please wait for a representative," and it

18   was always -- that's always how their calls worked.

19       Q.   So in the times when you answered the phone

20   and it said, "Please wait for a representative," what

21   would you do, hang up?

22       A.   Sometimes.

23       Q.   And would you say anything?

24       A.   Sometimes I would speak to somebody, sometimes

25   I would just hang up because there was nobody on the

LORI SAYSOURIVONG

98

1    line.

2        Q.    And if you hung up when they called you, and

3    it was -- was it your understanding that was some sort

4    of auto dialing machine that was calling you

5    automatically?

6        A.    I didn't know, I don't know how their system

7    worked.

8        Q.    But in the times when you would get a phone

9    call and you would hear that, was it an automated

10   message?

11       A.    Yes.

12       Q.    So you would hear that automated message and

13   you would hang up, did you think there was anything

14   wrong with Cashcall trying to call you again that same

15   day?

16       A.    Yes.

17       Q.    Did you ever express that to anyone at

18   Cashcall?

19       A.    Yes.

20       Q.    When did you do that?

21       A.    There's multiple times when I spoke to

22   somebody on the phone, and I would state that I was not

23   happy with how many times they called.  That I had just

24   spoken -- whether it be a few hours before or a day

25   before, that I just called and spoke to somebody and

124

1      Q.   Well, during that particular period of time

2   when -- during that month between when the payment was

3   due and when it was made, is there anything that you

4   can recall specifically that you felt that Cashcall did

5   inappropriately in handling the collection on your

6   account?

7      A.   Probably just numerous calls, more than, you

8   know, having talked to one person and then continuously

9   talking to several people that would call over and

10  over.   It was always a different person.

11     Q.   Is it your testimony that you think there's

12  something inappropriate about different people calling

13  you?

14     A.   Well, I think that it's inappropriate when you

15  talk to one person and then later on somebody else

16  calls you and you have to re-explain your story, you

17  know, you have to re-explain what's going on over and

18  over and over again.

19     Q.   What's wrong with that?

20     A.   It's frustrating and it's hard.   I don't

21  know -- I mean, you would think that notes would be

22  made or something on your case file so that you don't

23  have to re-explain yourself over and over and over

24  again, sometimes multiple times a day.

25     Q.   Do you recall that during that period in May

129

1    recall having with Cashcall -- and these would have

2    been collection agents; right?

3        A.   I assume so.

4        Q.   And these were folks calling and saying you

5    haven't paid and you owe and when are you going to pay,

6    essentially; is that correct?

7        A.   Yeah, and in more detail they would say --

8    numerous times they said, well, why can't you borrow

9    the money from your parents or from somebody at church

10   or from a friend or something like that.  I told them

11   that's not an option.  They had made threats to come

12   after my -- that they would take -- go after my

13   paycheck for the payments.

14       Q.   When did that happen?

15       A.   It's been off and on, I know probably during

16   that time of 2008 into 2009, there was threats made

17   against my -- not my checking account, my paycheck,

18   that they could go after it.

19            They just said, you know, don't you understand

20   that you owe us this money, and I would say, yes, but I

21   can't give you what I don't have.  And most of the time

22   they were just like, well, you know, you need to make

23   this payment, it's going to go badly on your credit.

24   It was just all the same thing over and over and over

25   and over again.

LORI SAYSOURIVONG

133

1      A.   Yes.

2      Q.   What was wrong with that?

3      A.   The way that they -- I could understand one

4  person calling and asking you that, typical collection

5  call, like I understand that.  But the numerous amount

6  of calls that I received, the number of times a day

7  that I received calls, the nature of the way they

8  talked to you, I see something wrong with that.

9      Q.   Did you have an instance between January 30 --

10 January 31, 2008, and May 30, 2008, where you were

11 called multiple times in a single day asking you why

12 you couldn't make the payment?

13     A.   I believe so, yes.

14     Q.   How many times did that happen during that

15 period of time?

16     A.   I can't recall.  It was so long ago.  I would

17 say several times.  I don't know how many times.

18     Q.   So you believed that you received multiple

19 calls in a day where you basically went through the

20 same information and the same drill with a different

21 person?

22     A.   I could remember there was times, I don't know

23 the exact period of time, where I would talk to more

24 than one person a day, but maybe not consecutive days,

25 but there was times when I talked to more than one

LORI SAYSOURIVONG

134

1    person in a single day.

2       Q.   And where you went through exactly the same

3    thing as though -- where they would ask, why you can't

4    make the payment, why you can't get it from someone

5    else, when are you going to get it current?

6       A.   Not the exact verbiage, there wasn't always

7    the same verbiage, sometimes there was more, well, when

8    can you make a payment, that kind of thing.  There was

9    times where somebody would call, I would say I already

10   talked to somebody else today.  I can't make the

11   payment right now, I'll get it to you when I can.

12      Q.   Is that a specific conversation you are

13   recalling?

14      A.   No, I can't recall a specific conversation,

15   but that was -- like that was pretty much what

16   happened.  I can't be specific on that conversation

17   from that long ago.

18      Q.   So in the conversation you are generally

19   talking about where you said, "I already talked to

20   someone, I told them I can't pay," what was the

21   response?

22      A.   Sometimes it was like, okay.  Sometimes it

23   was, well, then it would go into, "Well, can you borrow

24   the money," and I would say, "No.

25           "Well, when can you make the payment?

1          "Well, when do you get paid?"   Then they would

2     ask, "Don't you still have a job," that kind of thing.

3          Q.   So is it fair to say that different people

4     that you spoke to had different approaches?

5          A.   Yes, definitely.

6          Q.   And I take it that some of them treated you

7     rudely?

8          A.   Most definitely.

9          Q.   Could you give me an idea, I know that you --

10    could you give me an estimate of was it half the time

11    you felt that you were being treated rudely or all the

12    time?

13         A.   I would say probably 90 percent of the time.

14         Q.   So 90 percent of the time you felt you were

15    treated rudely, and tell me how so?

16         A.   Just in their tone of voice, the way that they

17    just tried to -- the way that they would go after you

18    as far as, you know, making you feel bad for not being

19    able to pay the money.  You know, saying, "Well, don't

20    you have people at church?  Don't you have your

21    family," well, that kind of thing, they would go

22    after -- you know, it's almost like a personal attack

23    in a way just to go after you.

24         Q.   What about their tone of voice, did you feel

25    it was inappropriate?

136

1    A.   It was aggressive.  I know they don't have to

2    be compassionate.  There was no understanding, it was

3    just like harsh.

4    Q.   And what did you think they were supposed to

5    do when they were calling you?

6    A.   I don't know, maybe try and help me in some

7    way, try and have some understanding and try and work

8    with me instead of just demanding, being so demanding.

9    Q.   Did you ever express that you felt that people

10   were using an inappropriate tone of voice with you?

11   A.   Yes.

12   Q.   How many times did you do that?

13   A.   I don't know, not very often.

14   Q.   What was the response?

15   A.   Something to the effect of, I don't know what

16   words they could have used.  I mean, there was times I

17   would get transferred to a supervisor.  There's times

18   where you have to understand that we, you know, we're

19   trying to get this money from you, you owe this money,

20   that kind of thing.

21   Q.   When were the instances you can recall where

22   you were transferred to a supervisor?

23   A.   There was different instances.  I mean, it

24   could have been during that 2008 period.  I know there

25   was times during the 2009 period.

# Exhibit 26

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--


KRISTA O'DONOVAN, and EDUARDO DE

LA TORRE, individually and on

behalf of all others similarly

situated,

              Plaintiffs,

   vs.                    No. C 08-03174 MEJ

CASHCALL, INC., a California

corporation and DOE 1 through

DOE 3, inclusive,

              Defendants.

------------------------------//




VIDEOTAPED DEPOSITION OF KRISTA O'DONOVAN

Monday, November 9, 2009

Pages 1 through 245




REPORTED BY:

YVONNE FENNELLY, CCRR, CSR NO. 5495

35e8ab74-2b5e-4b13-abfd-6773139af648

O'Donovan, Krista:  11/9/2009

Page 112

1    Q.    Okay.

2          Let's focus on August.

3    A.    Okay.

4    Q.    You were -- admittedly you were a month

5    behind on your loan; correct?

6    A.    I had missed one payment.

7    Q.    What did you expect CashCall to do?

8    A.    It's in their right to call me and ask for

9    the payment.  I believe that.

10         However, when I've already talked to one

11   representative and told them I couldn't pay it, and

12   you talk to another one the same day, and the next

13   day you talk to another one and the next day you

14   talk to another one, you're getting a call every

15   single hour, I would -- I understand that they want

16   their payments but in excess of calling me so much,

17   I don't understand what else they expected me to do.

18   Q.    How many times -- what's the most number of

19   calls that you received in a day from CashCall?

20   A.    Thirteen.

21   Q.    And when was that?

22   A.    I can't tell you.  Honestly, multiple

23   times.  There were multiple days where it was 8:00

24   a.m. to 9:00 p.m., every hour on the hour.

25   Q.    Did you ever get a call before 8:00 a.m.?

O'Donovan, Krista:   11/9/2009

Page 114

1    A.    There were multiple days of 13 calls.

2    Q.    The day you talked to three

3    representatives, is that a day you received 13

4    calls?

5    A.    Yes.

6    Q.    Let's focus on the day you received 13

7    calls.

8          Well, how many days do you recall receiving

9    13 calls?

10   A.    Honestly, I couldn't tell you.

11   Q.    Now, I take it from reading your complaint,

12   and I'll use layman's terms, but I take that it's

13   your belief that CashCall stepped over the line in

14   trying to collect its debt from you; is that

15   correct?

16   A.    Correct.

17   Q.    How so?

18   A.    Multiple phone calls, obviously.  Multiple

19   e-mails, letters.

20         There were quite a few representatives that

21   I did talk to that were quite threatening; making

22   statements that were not only personal but uncalled

23   for.

24   Q.    Okay.

25         So receiving multiple phone calls, multiple

O'Donovan, Krista:  11/9/2009

Page 115

1    e-mails, and you indicated that some of the

2    representatives were threatening to you.

3        A.    Correct.

4        Q.    And some made personal remarks that you

5    felt were inappropriate; is that right?

6        A.    Correct.

7        Q.    Tell me about the threats.

8        A.    I have one representative that always

9    stands out.  And this, again, was in August of 2006.

10            Called me while I was at my mother's house,

11    and when I told her I just didn't have any money to

12    pay, she actually told me -- actually I told her I

13    didn't have any money and I was having to decide

14    between feeding my kids and paying them, and she

15    specifically said, We don't care if your kids eat;

16    we want our money either way.

17        Q.    What else did she say?

18        A.    That was at the point I hung up on her.

19        Q.    And you understand -- did you understand

20    that to be a threat?

21        A.    Very much, yes.

22        Q.    What was the threat?

23        A.    That CashCall was going to be taking money

24    away from my kids.

25        Q.    And did you have an understanding in that

O'Donovan, Krista:   11/9/2009

Page 116

1    conversation as to how CashCall was going to do

2    that?

3        A.   I didn't take it that far.  Like I said, at

4    that point I hung up and did not want to speak with

5    her anymore.

6        Q.   Do you recall anything else that this

7    CashCall representative said to you during that

8    conversation?

9        A.   I believe I started off the conversation by

10   telling -- again, explaining my situation; that I

11   was an unemployed mother of three.

12            I also, at that time, was trying to get

13   financial assistance through the county.  And I told

14   her that I had applied for that, and she didn't want

15   to hear anything I had to say.  She just kept asking

16   when could I make a payment.

17       Q.   Anything else you recall?

18       A.   No.

19       Q.   Can you give me another instance when you

20   felt that a CashCall representative was being

21   threatening to you?

22       A.   I had several representatives that had

23   threatened that they could -- they didn't want to

24   have to start the garnishment process.

25            I had one representative ask me, when I

1   told them I had nothing to give them, they said,

2   well, don't you own your home or a car?

3           That was generally what I heard the most.

4    Q.   You indicated that several representatives

5   threatened you with the garnishment process.

6           How many times?

7    A.   That was probably closer to five times.

8    Q.   Over what period of time?

9    A.   Between 2006 and 2007.

10   Q.   And do you recall specifically what they

11  said?

12   A.   It was more of a kind of a casual, well, if

13  you can't pay us, you know, we'd hate to have to

14  start the garnishment process.

15          Simple -- it was just a simple way of -- I

16  took it as a threat.

17   Q.   Did you take it as a threat that they were

18  going to initiate some legal process against you to

19  collect the loan?

20   A.   Correct.

21   Q.   And so, what in your mind, was wrong with

22  that?

23   A.   Just that I felt that it was -- they

24  weren't saying that they were starting the process,

25  they weren't saying that they weren't letting me --

1   or giving me notice that the process has started.

2   They were using it as a way to make me feel that it

3   was more important for me to make a payment at that

4   point.

5       Q.    And did you respond in any -- do you recall

6   responding in any of these conversations where they

7   discussed the garnishment process?

8       A.    Responding how?

9       Q.    I don't know.

10          That's what I'm asking.

11      A.    If I felt I needed to make a payment, at

12  that point I would discuss setting up the payment.

13      Q.    In any of these instances when a CashCall

14  representative talked about possibly starting the

15  garnishment process, did you ask to speak to a

16  supervisor?

17      A.    On a few occasions, I had asked to speak to

18  a supervisor, yes.

19      Q.    I'm asking about specifically, though,

20  about the instances when a CashCall representative

21  talked about initiating the garnishment process, did

22  you say, I want to speak to a supervisor?

23      A.    No.   I believe my response was that there

24  was nothing I could do.

25      Q.    Did you tell them at the time that they

O'Donovan, Krista:  11/9/2009

Page 119

1    said that that you felt it was inappropriate?

2      A.   No.  At that point, I was used to the

3    conversations with them.

4      Q.   Anything else you can recall about any of

5    these conversations when CashCall representatives

6    talked about initiating a garnishment process?

7      A.   Just like I said before:  It didn't seem

8    like it was noticed that the process had been

9    started.  It seemed more of an argumentative

10   persuasion on their point for me to make a payment.

11     Q.   So you felt that what they were trying to

12   do is encourage you to make a payment, and you felt

13   that was wrong; is that right?

14     A.   I felt it was threatening.

15     Q.   Did you ever -- did you ever cry during any

16   of the conversations that you had with the CashCall

17   representatives?

18     A.   Several times.

19     Q.   How many times?

20     A.   Again, probably five times.

21     Q.   I take it the time between December of 2005

22   when your -- when your then-fiance was sentenced to

23   prison and September of 2006 when you got another

24   job, that that was a very difficult time for you

25   emotionally; correct?

Page 153

1    Q.   Is sending two of the same e-mails, is that

2  over the line, in your view?

3         MR. LEVY:   Objection; it's vague.   Depends

4  on what the e-mail says.

5         You can answer.

6         THE WITNESS:   I believe sending the same

7  e-mail multiple times is over the line, yes.

8  BY MR. SEILING:

9    Q.   And in your mind, how many times is too

10 many?

11   A.   I believe sending -- I mean, if you're

12 going to send me a notice that my payment is late, I

13 believe one e-mail is sufficient in a matter of one

14 payment cycle.

15   Q.   Did you ever tell CashCall that just send

16 me one e-mail when my payment is late, that's all I

17 need?

18   A.   I'm sure I did at some point.

19   Q.   Do you have a specific recollection of a

20 conversation you can help me out with?

21   A.   No.

22   Q.   Did you ever -- I take it when you got some

23 of these calls that you regarded as threatening or

24 inappropriately personal, that they upset you?

25   A.   Yes.

O'Donovan, Krista:  11/9/2009

Page 154

1    Q.    How so?

2    A.    When I actually spoke to somebody, and like

3  I said, when they would make comments that were

4  personal that I thought were inappropriate, I felt

5  it was unprofessional.

6         I mean, there were times when I was at

7  family or friends' house when they would call.

8  There were times when I would be out with my friends

9  and, you know, I would get multiple calls and you

10  get to the point where you have to step away and

11  finally answer it.

12         I just felt like my privacy was being

13  interrupted.  I felt like no matter where I turned,

14  someone was going to, you know, give me a call and

15  pry into my personal business that was beyond what

16  they were trying to accomplish.

17    Q.    Explain to me how you felt that CashCall

18  was prying into your -- I assume when you say beyond

19  what they were trying to accomplish is trying to

20  accomplish getting payment for the debt; correct?

21    A.    Correct.

22    Q.    So how was it that CashCall was prying

23  beyond what they were trying to accomplish?

24    A.    Their excessive phone calls to me.  It just

25  seemed like they didn't care where I was, what I had

O'Donovan, Krista:  11/9/2009

Page 155

1   to do, whether I was at work or with my family or

2   anywhere.  They just assumed that at any given time

3   of the day, I would have the liberty of answering

4   their phone calls.

5       Q.   And on what do you base that, that they

6   just assumed that you'd have the liberty of

7   answering their phone calls any time?

8       A.   The loop, hour after hour of phone calls.

9       Q.   Do you have an understanding of whether

10  these calls were hand-dialed or whether they were

11  dialed by an automatic dialing machine?

12      A.   I was told by a couple of representatives

13  that I was on their automatic dial system.

14      Q.   When you say you felt your privacy was

15  being invaded, did that cause you any sort of

16  distress?

17      A.   It did.  I mean, it's really embarrassing

18  to be out at dinner with friends and them to hear

19  your phone ringing and you not answering and then

20  questions start, well, why aren't you answering your

21  phone?  Or even at home or when I was just, you

22  know, anywhere.

23          It was just incessant, constantly phone

24  ringing, phone ringing, phone ringing.  You get to

25  the point where you don't even want to look at your

O'Donovan, Krista:  11/9/2009

Page 156

1   phone.

2      Q.   Now, are you -- in the lawsuit, you

3   understand that one of your claims against CashCall

4   is related to CashCall's collection activities.

5           Do you understand that?

6      A.   I do.

7      Q.   And you're seeking some damages against

8   CashCall as a result of what you feel are

9   inappropriate collection activities.

10          Are you not?

11     A.   Correct.

12     Q.   And is one of the types of damages that

13  you're seeking compensation for the distress that

14  you suffered as a result of feeling your privacy was

15  being invaded?

16     A.   I believe my lawyers, I think, can

17  determine what that is.

18     Q.   Well, I want you to describe it for me.

19          I mean, you can tell me.  Your lawyers can

20  say things, but you're bringing this lawsuit.

21          So I want to know, are you seeking

22  compensation for that stress that you feel was

23  caused to you?

24     A.   I believe it's appropriate, yes.

25     Q.   Okay.

# Exhibit 27

# IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

STATE OF WEST VIRGINIA ex rel.
DARRELL V. McGRAW, JR.,
ATTORNEY GENERAL,
                    Plaintiff,

v.                                                       Civil Action No.: 08-C-1964
                                                         Judge Louis H. Bloom

CASHCALL, INC., and
J. PAUL REDDAM, in his capacity as
president and CEO of CashCall, Inc.
                    Defendants.

## FINAL ORDER ON PHASE I OF TRIAL: THE STATE'S
## DEBT COLLECTION CLAIMS

On October 31 and November 1, 2011, came the Plaintiff, the State of West Virginia ex

rel. Darrell V. McGraw, Jr., Attorney General ("State" or "Attorney General"), by Norman

Googel and Douglas Davis, Assistant Attorney Generals, and the Defendants, CashCall, Inc.

("CashCall") and J. Paul Reddam ("Mr. Reddam" or collectively "Defendants"),  by counsel,

Charles L. Woody, Bruce M. Jacobs, and Eric N. Whitney, *pro hoc vice*, for a bench trial

pursuant to W. Va. Code § 46A-7-112, upon the "Amended Complaint for Injunction, Consumer

Restitution, Civil Penalties, and Other Appropriate Relief" ("Amended Complaint") in the

above-styled action.  Upon the parties' agreement, the Court bifurcated for trial the counts of the

Plaintiff's Amended Complaint.  On October 31 and November 1, 2011, the Court heard all of

the evidence on the State's debt collection claims, as set forth in the fifth through fifteen causes

of action in the Amended Complaint.  On January 3, 2012, the Court heard all of the evidence on

the State's usury and lending claims, as set forth in the second through fourth causes of action in

the Amended Complaint. Upon review of the evidence, including the testimony offered at trial,

the pleadings of record, the parties' proposed findings of fact and conclusions of law, and the

1

applicable law, the Court makes the following findings of fact and conclusions of law, as to the State's debt collection claims.

## FINDINGS OF FACT

### *Background and Procedural History*

1.   In 2007, the State opened a formal investigation of CashCall and Mr. Reddam, its sole owner and shareholder, after receiving many complaints from West Virginia consumers about CashCall's usurious interest rates and its debt collection practices.

2.   On August 30, 2007, the Attorney General issued an investigative subpoena, as authorized by W. Va. Code § 46A-7-104, directing CashCall to produce all of its lending and debt collection activities in West Virginia.

3.   By letter dated October 22, 2007, CashCall responded but did not comply with the subpoena.  In the letter, CashCall asserted that it was not the lender, but was merely a "marketing agent" for the state-chartered bank, First Bank & Trust, Milbank, South Dakota ("Bank").[1]  Ex. C, Amended Complaint, Subpoena Response Letter, p. 3.

4.   Based upon its investigation of the consumer complaints, CashCall's responses and its independent review of the applicable law, the State concluded that the lending program established by CashCall with the Bank was essentially a sham intended to make improper use of federal preemption in order to unlawfully evade West Virginia's lender licensing and usury laws. The State also concluded that CashCall's debt collection practices violated numerous provisions of the West Virginia Consumer Credit and Protection Act ("WVCCPA").  *See* Amended Complaint.  Based on its conclusions, the State demanded that CashCall cease the continued

---

[1] The State originally included a claim for failure to comply with the subpoena against CashCall ("First Cause of Action"), but agreed to dismiss this claim as moot. *See* Pre-Trial Order.

collection of its loans and make appropriate restitution to aggrieved consumers. CashCall declined to do so.[2]

5.   On October 8, 2008, the State commenced the above-styled civil action by filing a "Complaint for Injunction, Consumer Restitution, Civil Penalties and Other Appropriate Relief" ("Complaint") against the Defendants.

6.   On November 17, 2008, the Defendants removed the case to federal court, asserting that the Bank is the real party in interest and as such the State's usury law claims against CashCall are completely preempted by §27 of the Federal Deposit Insurance Act ("FDIA"), 12 U.S.C. §1831d.  Defendant's Notice of Removal.

7.   By order entered March 11, 2009, U.S. District Court Judge Joseph R. Goodwin found that because the State only asserts state law claims against CashCall, a non-bank entity, "the claims do not implicate the FDIA, the FDIA does not completely preempt the state-law claims, and there are no federal questions on the face of the Complaint." *West Virginia v. CashCall, Inc.*, 605 F.Supp.2d 781 (S.D.W. Va. 2009). The case was remanded back to this Court. *See id.*

8.   The State filed a motion for leave to amend its Complaint, which was granted by this Court by order entered June 4, 2010.  It is the Amended Complaint that is before the Court in this trial.

9.   On October 27, 2011, the Court entered a Pre-Trial Order by which it granted, in part, and denied, in part, the Motion to Dismiss filed by the Defendant, J. Paul Reddam.  Specifically, the Court found that because there is no allegation in the Amended Complaint, except ¶ 13, referencing the Defendant J. Paul Reddam as a party and that the State does not seek any relief

---

[2] CashCall made and/or collected the loans in West Virginia from August 2006 to March 2007.  Ex. C, Amended Complaint, Subpoena Response Letter, p. 2; Transcript of January 3, 2012 Trial ("Tr. Vol. III"), p. 105.

against Defendant Reddam, the Court would not impose any liability on Defendant Reddam. However, Defendant Reddam was ordered to remain a party to the action. Pre-Trial Order, ¶ 2.

10. The Court ordered the trial be bifurcated into two phases: (1) Phase I on the State's debt collection claims; and (2) Phase II on the alleged violations of West Virginia usury and lending laws by CashCall. This Final Order only addresses Phase I of the trial.

## DISCUSSION[3]

### *Overview of State's Staff Witnesses*

1. After conclusion of the testimony of the 10 consumers, the State presented the testimony of Raquel Gray and Angela B. White, both long-time paralegals with the Attorney General's Consumer Protection Division. Ms. Gray was tasked with reviewing documents that came from consumer files provided by CashCall during discovery. She went through each file on the computer, page by page, to search for specific letters that had been identified. October 31, 2011, Trial Transcript ("Tr. Vol. I"), p. 245. She characterized these letters as employment verification letter, breach letter, 48-hour notice letter, broken promise letter, arbitration letter, field visit letter, and final demand letter. Tr. Vol. I, p. 245. She explained her methodology in locating the letters and compiling total numbers of each type of letter found in each consumer's file. *See generally* Tr. Vol. I, pp. 245-253.

2. A total of 292 loans were made to West Virginia consumers and collected by CashCall, beginning in August 2006 up to and including March 2007. Joint Ex. 1. Three types of

---

[3] A detailed summary of the testimony of all of the witnesses presented by the State and CashCall, including transcript cites was attached as an Appendix to the "State's Proposed Memorandum Opinion and Order." The Court hereby incorporates by reference and adopts the Appendix, a copy of which is attached to the Order.

loans were made in West Virginia: (1) loans in the amount of $1,000 at 89% interest; (2) loans in

the amount of $2,525 at 96 % interest; and (3) loans in the amount of $5,000 at 59% interest. Tr.

Vol. III, p. 23; Joint Ex. 1. There were a total of 292 loans made to West Virginia consumers,

consisting of 15 loans of $1,000; 214 loans of $2,525; and 63 loans of $5,000. *See* Joint Ex. 1.

3.   The evidence shows that to date, West Virginia consumers made total payments of

$1,201,366.12 to CashCall throughout the duration of the lending program. *See* Joint Ex. 1. The

total amount of interest "agreed to be paid" by West Virginia consumers (as distinguished from

the amount actually paid) is $2,511,421.99. *See* Joint Ex. 1.

4.   The State next presented the testimony of Angela B. White, who was tasked with

reviewing and compiling certain data from the service logs for West Virginia accounts produced

by CashCall during discovery. Tr. Vol. I, p. 293. She said she was tasked with identifying the

total number of all outbound calls made to West Virginia consumers by CashCall. The service

logs for every consumer file produced by CashCall were reviewed. Tr. Vol. I, p. 295.

5.   She did not personally review all service logs, but oversaw a process that involved eight

or ten people, who reviewed the records by highlighting each instance in which outbound calls

were made by CashCall. After this process was completed, the data was entered by four

professional data entry people employed by the Attorney General's Office. Tr. Vol. I, p. 295.

Although the persons working on this project were instructed to count every call regardless of

whether contact was made with the consumer, if it could not be absolutely determined whether it

was a phone call or not, it was not counted. Tr. Vol. I, p. 298. The data entry persons also made

a second review before a questionable call was counted and entered into data. Tr. Vol. I, pp.

289-299. She said that they erred on the side of being conservative when counting the calls and,

5

if anything, the total counted "might be a little under" the actual number.  Tr. Vol. I, pp. 298-299.  She was also tasked with reviewing the service logs in an effort to determine any time there was mention of a notice of arbitration that was sent to consumers, any time consumers' references were contacted, and any time calls were made to consumers' place of employment. Tr. Vol. I, p. 304.

6.  After the data was entered, she prepared a document called State's Summary Exhibit B ("Summary Ex. B") that contains such information as total number of calls made to each consumer, total number of days each consumer was called, the total number of calls made to each consumer per day, and the date of the first and last calls made to each consumer.  In compiling total numbers of calls made per day, she explained that this was broken down into categories consisting of days when consumers received 20 or more calls, 15-19 calls, 10-14 calls, 5-9 calls, and 1-4 calls.  Tr. Vol. I, p. 300.

7.  Using the file of Brenda Baylous as an example, she explained that CashCall made 20 or more calls to her on two days; 15-19 calls to her on five days; 10-14 calls to her on 12 days; 5-9 calls to her on 71 days; and 1-4 calls to her on 143 days.  Altogether CashCall made a total of 1,071 calls to Ms. Baylous over a period of 233 days beginning September 22, 2006, through June 2, 2009.  She explained that the same type of data was compiled for all of the West Virginia consumers from the documents that CashCall produced.  Tr. Vol. I, p. 301-302.

8.  She also found information in the service logs indicating that notices of arbitration were sent 262 times, consumers references were called 540 times, and calls were made to consumers' places of employment.  At the conclusion of Ms. White's testimony, Summary Ex. B was admitted into evidence.  Tr. Vol. I, p. 310.

*Overview of CashCall's Witnesses*[4]

9.   Elissa Chavez is the director of fraud prevention and dispute resolution for CashCall.
Ms. Chavez handles disputes, fraud claims, identity theft, customer resolution and complaints.
She has worked for CashCall for almost six years. November 1, 2011, Trial Transcript ("Tr. Vol.
II"), p. 5-6. She admitted that CashCall required consumers to agree to make payments by
electronic funds transfers as a condition of obtaining the loan.  She also said that CashCall sends
a "welcome letter" and makes a welcome call to consumers to remind them about the date of
their first electronic debit.  She acknowledged that these "welcome" communications do not
advise consumers that they can cancel the debit or how to do it or that their account may be
debited subsequent times if the initial debit bounces.  She also explained that the reason CashCall
might make a large volume of calls to consumers, even 11 to 20 times per day, is to make contact
with the consumer.  She also asserted that an oral request from consumers to stop calls at work
would be sufficient and that references would only be called if they are trying to make contact
with the consumer.  She was not able to point to any specific references to these practices in
CashCall's policy manual as she did not have it with her.

9.   Sean Bennett is employed as a "business analyst" for CashCall.  He has worked at
CashCall since December 2003 and his primary responsibilities have included supervision and
management of collection employees, loss mitigation employees, skip tracing employees, and
payment processing employees.  Tr. Vol. II, p. 76. Mr. Bennett confirmed that if the initial
account debit bounces, CashCall will make at least two subsequent attempts to debit the
consumer's account during that month.  He acknowledged that the subsequent debits are not
disclosed in CashCall's loan contract or any other written or oral communications furnished to

---

[4] *See* footnote 3, *supra.*

7

consumers. CashCall's collection employees, including collection supervisors, are paid on an hourly basis but also receive an incentive based upon amounts collected.

10. CashCall honors verbal requests to stop further calls at work, but if the consumer asks not to be called on their cell phone during working hours, a written request is required. He also said CashCall's purpose in calling third parties is to establish contact with consumers. It is CashCall's policy to call references and other third parties even if it has accurate location information for consumers if it is necessary to make a direct contact with a consumer.

11. Although Mr. Bennett stated that CashCall has an elaborate formal training program for its employees, he admitted that he previously testified at a March 31, 2010, deposition taken by the State that CashCall had no formal training for every employee at that time. Although Mr. Bennett testified that CashCall made a training manual available to all employees, he admitted that he previously testified at the same deposition that he was unaware whether the training manual was made available to every employee at that time. Mr. Bennett also asserted that it was his understanding that CashCall failed to follow through with the eleven arbitration claims it had initiated because of the Attorney General's investigation.

12. Immediately following the conclusion of Mr. Bennett's testimony, CashCall indicated that it had planned to call CashCall's general counsel, Dan Baron, as a witness. However, Mr. Whitney proffered that the only purpose of his testimony in this phase of the proceedings would be to confirm that it was also his understanding, as was the case with Mr. Bennett, that CashCall "ultimately abandoned" the eleven arbitration proceedings "based on the pendency of the investigation by the Attorney General." Tr. Vol. II, p. 229.

8

*Applicable Legal Standard in Determining Whether Debt*
*Collection Practices Are Unlawful*

13. Under W. Va. Code § 46A-2-122(d), a "'debt collector' means any person or organization engaging directly or indirectly in debt collection." Debt collection is "any action, conduct or practice of soliciting claims for collection or in the collection of claims owed or due or alleged to be owed or due by a consumer." W. Va. Code § 46A-2-122(c). There is no dispute in this case that CashCall, as an entity collecting its own debts, meets the definition of a "debt collector" as defined by W. Va. Code § 46A-2-122(d) and W. Va. Code § 46A-6-104. Therefore, CashCall is subject to the debt collection provisions outlined in the WVCCPA, which is enforced by the Attorney General.

14. Before discussing the specifics of the State's causes of action, the Court finds it necessary to address the applicable legal standards in evaluating whether debt collection practices are unlawful. A substantial body of case law concerning abusive debt collection practices has been developed by federal courts in cases arising under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, et seq. The prohibited debt collection practices enumerated in the WVCCPA largely mirror and in many instances are identical to the provisions in the FDCPA. One important difference between the laws is that the FDCPA only covers outside collection agencies, including debt buyers, whereas the WVCCPA covers all debt collectors, including original creditors collecting their own debts. *See id.* § 1692a(6); W. Va. Code § 46A-2-122(d).

15. It is also important to note the West Virginia Legislature's intentions when enacting the WVCCPA, wherein it declared,

9

> It is the intent of the legislature that, in construing this article, the courts be guided by the interpretation given by the federal courts to the various federal statutes dealing with the same or similar matters. To this end, the article shall be liberally construed so that its beneficial purposes may be served.

*See*, W. Va. Code § 46A-6-101(1). It is with this proviso in mind that this Court reviewed the body of case law developed by federal courts in cases arising under the FDCPA in search of guidance in determining whether CashCall's practices were unlawful and, if so, in fashioning appropriate remedies, including restitution and civil penalties if warranted.

16. The FDCPA creates liability for "conduct the natural consequence of which is to harass, oppress or abuse any persons in connection with the collection of a debt. *Kerwin v. Remittance Assistance Corp.*, 559 F.Supp.2d 1117, 1123-1124 (D.Nev. 2008) (quoting 15 U.S.C. § 1692(d)). Continuing, the court held "An act's 'natural consequences' are evaluated according to their likely effect on the <u>least sophisticated consumer</u>." *Id.* (citing *Baker v. G.C. Services Corp*, 677 F.2d 775, 778 (9th Cir. 1982)) (emphasis added).

17. The least sophisticated consumer standard was best explained in *Jeter v. Credit Bureau, Inc.*, 760 F.2d 1168, 1172-1173 (11th Cir. 1985). In that case, the court was seeking to determine whether an allegedly misleading written collection communication violated the FDCPA. The court noted that the FTC Act "was enacted to protect unsophisticated consumers, not only 'reasonable consumers' who could otherwise protect themselves in the marketplace." *Jeter*, 760 F.2d at 1172. Continuing, the court explained

> That law [FDCPA] was not 'made for the protection of experts, but for the public—that vast multitude which includes the ignorant, the unthinking, and the credulous.' And the 'fact that a false statement may be obviously false to those who are trained and experienced

10

> does not change its character, nor take away its power to deceive
> others less experienced.'

*Jeter*, 760 F.2d at 1172-1173 (citations omitted).  In *Joseph v. J.J. MacIntyre Companies, LLC*,

238 F.Supp.2d 1158, 1168 (N.D.Cal. 2002), a case evaluating whether repeated telephone calls

violated the FDCPA, the court noted "claims under the FDCPA are evaluated under a least

sophisticated consumer standard," (citing *Jeter*, 760 F.2d at 1179 ("[W]e hold that claims §

1692d [including telephone harassment] should be viewed from the perspective of a consumer

whose circumstances makes him relatively more susceptible to harassment, oppression, or

abuse.")).

18. The Fourth Circuit Court of Appeals has adopted the least sophisticated consumer

standard when evaluating whether conduct violates the FDCPA.  In *United States v. National*

*Financial Services, Inc.*, 98 F.3d 131, 136 (4th Cir., 1996), the court held that "evaluating debt

collection practices with an eye to the 'least sophisticated consumer' comports with basic

consumer protection principles."  Continuing, the court explained,

> The basic purpose of the least sophisticated consumer standard is
> to ensure that the FDCPA protects all consumers, the gullible as
> well as the shrewd.  This standard is consistent with the norms that
> courts have traditionally applied in consumer protection law.

*Id.*  The Fourth Circuit noted that this principle was rooted in a 1937 United States Supreme

Court case which held,

> [T]he fact that a false statement may be obviously false to those
> who are trained and experienced does not change its character, nor
> take away its power to deceive others less experienced.  There is
> no duty resting upon a citizen to suspect the honesty of those with
> whom he transacts business.  Laws are made to protect the trusting
> as well as the suspicious.

11

*Id.* (citing *Clomon v. Jackson*, 988 F.2d. 1314, 1318 (2nd Cir., 1993)); *see also Federal Trade Commission v. Standard Education Society*, 302 U.S. 112, 116 (1937).

19. As explained herein above, the Legislature stated its intent that the courts be guided by the interpretation given by the federal courts to the various federal statutes dealing with the same or similar matters when construing the WVCCPA. Accordingly, this Court finds that the question of whether CashCall's debt collection practices violate the WVCCPA will be evaluated according to their capacity to deceive or their likely effect on the least sophisticated consumer.

### Discussion of Pertinent Evidence

20. The Court finds a remarkable consistency in the testimony provided by the State's ten witnesses concerning their experiences with CashCall. All of the witnesses who obtained loans from CashCall testified that they were required to agree to automatic debits from their accounts as a condition of receiving the loan.[5] All of the consumers who obtained loans from CashCall reported that they were harmed by the requirement of making payments by automatic debits. Each of them was charged overdraft fees by their banks when CashCall's debits failed to clear. Many of them contacted CashCall to ask that the debits be stopped, but did not succeed in doing so. Many of them reported that CashCall debited their account on dates other than the date agreed upon, usually an earlier date, which caused the debit to bounce. Many of them also reported that CashCall would try again to debit their account multiple times after the initial debit bounced, sometimes on the same day or within the first two to three days. The end result for each person was the involuntary closure of their account by their bank, closure of the account by

---

[5] JoAnn McKinney testified about CashCall's contacts with her concerning the loan obtained by her son, James Stollings. She did not obtain a loan from CashCall.

12

the consumer, or a permanent stop payment order from their bank prohibiting further debits by CashCall.

21. The consumers' accounts of alleged telephone harassment by CashCall were also remarkably similar. All of the consumers reported having received a high volume of telephone calls from CashCall, including large numbers of calls per day, high volumes of calls over a period of weeks and months, and multiple telephone calls at their places of employment which continued even after they asked CashCall to stop. Most of the consumers testified that CashCall had contacted other parties to leave messages for them to call CashCall, even though each one of them had the same mailing address and telephone numbers throughout their dealings with CashCall. Several consumers also testified that CashCall disclosed their alleged account delinquency when calling third-parties.

22. The consumers also testified that CashCall's repeated and continued calls to their places of employment interfered with their work, created friction with their employers, and caused them to suffer embarrassment and humiliation in front of their supervisors and co-employees. One consumer testified that she believed CashCall's calls caused her to be laid off before other employees, although she had a good employment record for many years. *See* Terrie McCann-Bushroe, Tr. Vol. I, pp. 64-65. Collectively, the consumers testified about having received many types of threats from CashCall over the telephone, including threats of arbitration proceedings, legal action, garnishment of wages, loss of home and other property, threats to contact their employer in person or over the phone, and threats to visit consumers at their places of employment or at their homes.

13

23. One consumer testified that CashCall faxed a letter to her place of employment at Cabell-Huntington Hospital threatening to visit her there and to charge her $55 to $150 for that visit and each subsequent visit. *See* Brenda Baylous, Tr. Vol. I, pp. 191-193. CashCall characterized the letter as a "fugitive letter" and denied sending it. While it is likely that the letter was not authorized by CashCall, it is obvious that the letter, whether authorized or not, was sent by a CashCall employee as it contained the correct name, address, and account number for the consumer. If the letter was not authorized, it stands as evidence of CashCall's lack of control over its collection employees.

24. The testimony of the State's witnesses concerning the volume of calls is consistent with the data produced by CashCall and compiled by the State in Summary Ex. A. Overall, the Court finds all of the State's consumer witnesses to be credible. In reviewing Summary Ex. A, the Court notes the following totals of significance: CashCall made more than 20 calls per day to a West Virginia consumer on 16 occasions; CashCall made 15-19 calls to a West Virginia consumer on 130 occasions; CashCall made 10-14 calls in a day to a West Virginia consumer on 910 occasions; CashCall made 5-8 calls in a day to a West Virginia consumer on 5,036 occasions; and CashCall made 1-4 calls in a day to a West Virginia consumer on 18,929 occasions. CashCall also made a total of 84,371 telephone calls to West Virginia consumers. The total number of calls figure is actually skewed downward because the figure includes persons who did not default on their loans and therefore received very few if any collection calls. For example, 102 persons received 50 or less calls; 52 of them received 10 or less calls.

25. In contrast, 16 persons received more than 1,000 calls, including Jay Heiss (2,445), Ricky Fox, Sr. (1,653), Brenda Baylous (1,071), Dwayne Thornton (1,445), and James Stollings (1,020). In addition, 40 persons received between 500 and 1,000 calls, including Bryant Creighton (999), Brenda Hall (955), Terrie McCann-Bushroe (704), Robert Cadle (580), and Denise Soccorsi (532). Also, 86 persons received between 200 and 500 calls, including Nancy Pickens (447). Summary Ex. B also indicates that CashCall sent 262 notices of arbitration, contacted consumers' references 542 times, and contacted consumers at work 172 times.[6]

26. The State's evidence of the volume and pattern of CashCall's calls is largely undisputed by CashCall and, in fact, is wholly supported by the documents CashCall produced during discovery. Although Ms. Chavez indicated that some of the outbound calls counted by the State may have been "welcome calls" or other non-collection calls, it is equally likely that the State failed to count other collection calls due to the occasional difficulty in deciphering CashCall's service logs. The Court finds that the number of calls as reported by the State in Summary Ex. B is substantially accurate to enable the Court to pass judgment on CashCall's collection practices.

27. Both of CashCall's witnesses testified that an oral request was sufficient to stop calls at work, but that position is contradicted by the credible evidence of the State's representative witnesses. If that was CashCall's formal policy, the Court finds that the policy was not followed by its collection employees or enforced by CashCall's management.

---

[6] The latter figure is likely far less than the actual times CashCall contacted consumers at work based upon the testimony of the nine consumers in Court.

28. The testimony also supports the contention that CashCall had a pattern of calling references and other third parties in an effort to "make contact" with consumers or to leave messages for them. CashCall's loan applications collected the names and contact information for numerous references from each consumer who applied for a loan. But the consumers did not authorize CashCall to contact the references in the event of a default. While consumers were led to believe that CashCall might contact their references in connection with their loan application, there is no evidence that CashCall ever contacted references for that purpose. Instead, it is clear that CashCall's intent was to contact references when consumers' accounts became delinquent or when they defaulted.

29. CashCall's pattern of calling references and other third parties to establish "contact" with a consumer is of concern to the Court. The FDCPA, which CashCall claims to train its employees on, prohibits a debt collector from calling third parties except to acquire "location information." *See* 15 U.S.C. § 1692b. But Mr. Bennett confirmed that CashCall called third parties regularly to establish "contact" even when it had location information.[7] *See generally* Sean Bennett, Tr. Vol. II, pp. 184-191. As an explanation, Mr. Bennett stated that if it could not force the consumer into a "direct" contact, CashCall made these calls to third parties to establish "contact." Tr. Vol. II, p. 189. This practice is a fundamental violation of the general prohibition against calling third parties in the FDCPA and the WVCCPA. *See* 15 U.S.C. § 1692c(b) ("Except as provided in § 1692b of this title . . . a debt collector may not communicate, in connection with the collection of any debt, with any person other than the consumer . . . .");

16

W. Va. Code § 46A-2-126.   CashCall's admitted practice serves to explain the relentless volume

of calls that CashCall unleashed upon West Virginia consumers.   It is clear that CashCall either

misunderstood, misapplied, or deliberately violated the prohibition against calling third parties.

*Fifth Cause of Action*
*(Conditioning Extension of Credit Upon Consumers' Agreement*
*to Electronic Account Debits)*

30. The State alleged in its fifth cause of action that CashCall required consumers to agree to

make payments by electronic debits as a condition of obtaining the loan, in contravention of the

policy established by the federal Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693, et

seq. In doing so, the State alleged that CashCall engaged in unfair or deceptive practices in

violation of the WVCCPA, W. Va. Code § 46A-6-104.   Specifically, the EFTA contains the

following express prohibition against compulsory use of electronic fund transfers, ·

> No person may—
> (1) condition the extension of credit to a consumer on such
> consumer's repayment by means of preauthorized electronic fund
> transfers; or
> (2) require a consumer to establish an account for receipt of
> electronic fund transfers with a particular financial institution as a
> condition of employment or receipt of a government benefit.

*See* EFTA § 1693k (emphasis added).   The EFTA states in its Congressional findings and

declaration of purpose that "the primary objective of this subchapter . . . is the provision of

individual consumer rights" *See* 15 U.S.C. § 1693(b) (emphasis added).   Further, the EFTA

provides that "a violation of any requirement this chapter [EFTA] imposed" under the EFTA is

---

[7] All of the State's representative witnesses testified that their home and employment "location information" (i.e., their home and work telephone numbers, cell phone numbers, and addresses) remained the same during the entire time they were dealing with CashCall.

an unfair or deceptive act or practice as defined by the Federal Trade Commission Act, 15 U.S.C. § 41 et seq. *See* 15 U.S.C. § 93o(c) (emphasis added).

31. In this case, the record is replete with evidence of harm caused by CashCall's policy of requiring consumers to agree to electronic debits of their accounts as a condition of getting the loan. Virtually every representative consumer witness encountered bounced debits from CashCall that resulted in hundreds of dollars in overdraft fees from their banks. In most cases, the consumers were forced to close their accounts if their banks had not already involuntarily done so. *See* Nancy Pickens, Tr. Vol. I, p. 16 (testifying that her account was so far overdrawn she could not deposit money to pay her bills); Lori Anello, Tr. Vol. I, pp. 80-82 (testifying that CashCall's debits bounced at least ten times causing her a $27.50 fee each time, CashCall would try again to debit her account within two to three days, and the bounced debits caused "charges and charges, and I just couldn't get out from under that,"); Brenda Hall, Tr. Vol. I, p. 103 (testifying that CashCall "would run the check back through several times" causing her additional fees before she had a chance to cover it; she called CashCall to tell them to stop, but it continued to run the checks through); Denise Soccorsi, Tr. Vol. I, pp. 120-123 (testifying that it "got out of control," her bank charged her $31 each time, CashCall's bounced debits caused so many overdraft fees that her bank would take her entire paycheck, and to this day she owes $1,200 in overdraft fees caused by CashCall); Bryant Creighton, Tr. Vol. I, pp. 141-143 (testifying that CashCall would debit his account two days before the agreed upon date, each bounced debit resulted in a $36 fee from his bank and a $15 fee from CashCall, and his bank closed his account); Dwayne Thornton, Tr. Vol. I, pp. 174-175 (testifying that CashCall refused to honor his request to stop the debits, which forced him to close his account); and Robert Cadle,

18

Tr. Vol. I, p. 213 (testifying that CashCall would try to debit his account two days before his paycheck went in and would hit his account multiple times, twice in one day on one occasion; he incurred about $200 in overdraft fees).

32. All of the State's representative witnesses testified that CashCall required them to agree to electronic debits to get the loan. CashCall's loan application required consumers to disclose the name of their bank, bank account number, and check routing number. CashCall's "welcome letter" advised "You will be making this payment by electronic funds transfer unless you elect to terminate the electronic funds transfer on your account." Elissa Chavez, Tr. Vol. II, p. 9. CashCall's standard loan contract required each consumer to authorize electronic debits from their account. Elissa Chavez, Tr. Vol. II, p. 41. Most importantly, CashCall admitted that consumers must agree to electronic fund transfers to get the loan. Elissa Chavez, Tr. Vol. II, p. 60.

33. A federal court in California recently upheld a claim in a class action suit against CashCall in which the plaintiffs alleged, as the State has done here, that CashCall wrongfully required consumers to agree to make payments by automatic debits as a condition of obtaining a loan. The court in *O'Donovan v. CashCall*, No. C 08-03174 MEJ, 2009 WL 1833990 (N.D.Cal. June 24, 2009), scrutinized the same provisions that were used by CashCall in its contracts with West Virginia consumers here. There, as here, CashCall asserted as its defense that plaintiffs failed to state a claim under the EFTA because its contract permitted a consumer "to cancel an EFT authorization at any time, including prior to the first scheduled payment." *Id.* at *3. Thus, CashCall argued that the extension of credit is <u>not</u> conditioned on the use of EFTs for payment. *Id.* Significantly, the court in *O'Donovan* held "the right to later cancel EFT payments does not

19

allow a lender who conditions the initial extension of credit on such payments to avoid liability." *Id.* Thus, the court found that the plaintiff's complaint stated a claim for relief under 15 U.S.C. § 1693(k).[8] *Id.*

34. Based upon all of the foregoing, this Court finds that CashCall did require consumers to agree to make payments by automatic debits as a condition of obtaining the loans. The Court also finds that the fact that consumers could cancel the debits at a later date does not relieve CashCall from liability for conditioning the initial extension of credit on making payments by electronic fund transfer. In fact, the testimony here indicated that CashCall refused or resisted efforts made by consumers to cancel the automatic debits. This Court also finds that CashCall, by requiring consumers to agree to electronic fund transfers as a condition of obtaining the loan, has engaged in unfair or deceptive acts or practices in violation of W. Va. Code § 46A-6-104 as alleged by the State in its fifth cause of action.

*Sixth Cause of Action*
*(Threatening Garnishment of Wages*
*Without Informing the Consumer that*
*There Must be in Effect a*
*Judicial Order Permitting Such Garnishment)*

35. In its sixth cause of action, the State alleges that CashCall made unlawful threats of garnishment of wages to coerce payment of debts. W. Va. Code § 46A-2-124 contains a broad prohibition against the use of any threat, coercion, or attempts to coerce in the collection of debts

---

[8]The court later entered an order granting class certification on the claim that CashCall unlawfully required consumers to agree to electronic funds transfers as a condition of obtaining the loan. The class is limited to loans originated in California. *See O'Donovan v. CashCall*, No. C 08-03174 MEJ, 2009 WL 1833990 (N.D.Cal. June 24, 2009).

and outlines certain conduct that is expressly prohibited but the statute is not limited to the

delineated conduct.[9]  The State specifically cites W. Va. Code § 46A-2-124(e)(2) which prohibits

> [t]he threat that nonpayment of an alleged claim will result in the:
> (2) Garnishment of any wages of any person or the taking of other
> action <u>requiring judicial sanction</u>, without informing the consumer
> that there must be in effect a judicial order permitting such
> garnishment <u>or such other action</u> before it can be taken.

(emphasis added.)  The Court construes this claim to not only encompass unlawful threats of

garnishment but also unlawful threats to seize or attach other property, both personal and real,

that would require judicial action.  The Court also construes this statute as intending to prohibit a

debt collector from leading a consumer to believe, falsely, that wages can be garnished or that

personal or real property can be seized or attached, without the necessity of the underlying

creditor proving its claim in court.

   36. The testimony of certain witnesses presented by the State, undisputed by CashCall,

indicates that CashCall made the types of unlawful threats as alleged.  *See Nancy Pickens*, Tr.

Vol. I, p. 11 (testifying that when she called CashCall to ask what the arbitration letters meant,

CashCall told her it meant that they could take her house and her car); Denise Soccorsi, Tr. Vol.

I, p. 127 (testifying that she asked CashCall why it would send one of its representatives to her

place of work in Morgantown, as it threatened to do; CashCall said, "Because we are going to

garnish your wages . . . we were going to talk to your employer"); Bryant Keith Creighton, Tr.

Vol. I, p. 147 (testifying that CashCall told him "they could take my home, they could take my

car . . . take my bank account . . . they could take—anything that I own as a possession, they had

---

[9] Although the WVCCPA enumerates specific conduct that is prohibited, this and other provisions contain the
phrase "[w]ithout limiting the general application of the foregoing." W. Va. Code § 46A-2-124. Thus, the conduct

21

a right to take it away from me"); and JoAnn McKinney, Tr. Vol. I, p. 239 (testifying that when attempting to reach her son, James Stollings, CashCall threatened about four or five times that it would come to her house "and take stuff out of [her] house because James had a loan").

37. Upon the basis of the undisputed testimony of these consumers, the Court finds that CashCall engaged in a pattern of making unlawful threats to garnish wages and seize personal or real property, in violation of W. Va. Code § 46A-2-124(e)(2) and W. Va. Code § 46A-6-104, as alleged by the State in its sixth cause of action.

*Seventh Cause of Action*
*(Threatening to Take Action Prohibited by the*
*WVCCPA and Other Laws Regulating*
*the Debt Collector's Conduct)*

38. In its seventh cause of action, the State alleges that CashCall engaged in other threats or coercion in violation of W. Va. Code § 46A-2-124 and W. Va. Code § 46A-6-104. The State specifically alleges that CashCall violated W. Va. Code § 46A-2-124(f), which prohibits "[t]he threat to take any action prohibited by this chapter or other law regulating the debt collector's conduct." This statute paints a broad brush and may encompass many of the threats that the State's witnesses testified to at trial. Evidence of CashCall's violations of this statute may also be found in some of the form letters used by CashCall and admitted into evidence without objection.

---

enumerated is not intended to be all inclusive.

39. Garnishment of wages and seizure of personal or real property cannot occur without judicial sanction and due process for the consumer. Thus, a threat to do these things that cannot lawfully be done without first going through the court also violates W. Va. Code § 46A-2-124(f) and W. Va. Code § 46A-6-104.

40. The WVCCPA, particularly W. Va. Code § 46A-2-126, prohibits a debt collector from unreasonably publicizing information relating to any alleged indebtedness of a consumer.[10] It specifically prohibits disclosure, publication, or communication of a consumer's alleged indebtedness to an employer or his agent, or to relatives or family members not residing with the consumer, except through proper legal action, process or proceeding. *See* W. Va. Code § 46A-2-126(a) and (b). The Court heard much testimony that CashCall violated these provisions by contacting and leaving messages with third parties without any legal justification. *See* Nancy Pickens, Tr. Vol. I, p. 17 (testifying that CashCall left a message with her secretary at work saying that they were trying to collect a debt); Terrie McCann-Bushroe, Tr. Vol. I, pp. 62-63 (testifying that CashCall called her at work and left messages for her to "call CashCall"); Brenda Hall, Tr. Vol. I, p. 98 (testifying that CashCall continued to call her at work after she told them not to; she was forced to take the calls in a room where five or six people were present who could overhear her telling CashCall such things as "I can't pay it now" or "I will send it . . . get the money in the bank as soon as possible"); Denise Soccorsi, Tr. Vol. I, p. 127 (testifying that CashCall told her it was just about to send one of its representatives to her place of work in Morgantown to "talk to your employer"); Bryant Creighton, Tr. Vol. I, p. 146 (testifying that

---

[10] The unlawful publication of all alleged indebtedness to third parties is discussed more specifically below in the Court's consideration of the State's ninth cause of action.

23

CashCall called him repeatedly at work after he asked it not to, leaving written messages with other employees for him to call CashCall; he said CashCall's calls were causing his personal information to be "spread amongst employees, that I was behind . . . this loan payment, because everybody can walk by my desk and look at the note that another employee had written"); Dwayne Thornton, Tr. Vol. I, pp. 170-171, 172-174 (testifying that CashCall called him multiple times at work every day after he asked it not to leaving messages disclosing his indebtedness; he said people at work "knew everything.  They knew more than I did [about CashCall] . . . he would come to work and there would be about three different little notes . . . everybody thought it was a joke;" CashCall also disclosed Mr. Thornton's indebtedness to his girlfriend and his uncle); Brenda Baylous, Tr. Vol. I, pp. 191-193 (testifying a letter was faxed to her place of work seemingly from a CashCall employee that disclosed her indebtedness to two persons who work under her supervision; the letter also threatened that someone was being sent to her place of employment and that she would be charged from $55 to $150 for the trip); Robert Cadle, Tr. Vol. I, p. 216, 220-221 (testifying that CashCall contacted his supervisor at work; CashCall also disclosed his alleged indebtedness to his first ex-wife and called a friend to relay a message that CashCall had called).

41. Based upon the testimony of these consumers, undisputed by CashCall, the Court finds that CashCall threatened to take and did take action prohibited by the WVCCPA and other laws regulating a debt collector's conduct in violation of W. Va. Code § 46A-2-124(f) and W. Va. Code § 46A-6-104 as alleged by the State in its seventh cause of action.

*Eighth and Eleventh Causes of Action (Harassing Consumers Repeatedly or Continually by Telephone)*

42. In its eighth and eleventh causes of action, the State alleges that CashCall engaged in unlawful oppression and abuse of consumers through repeated phone calls. W. Va. Code § 46A-2-125 generally prohibits a debt collector from unreasonably oppressing or abusing any person in connection with the collection of or attempt to collect an alleged debt. The State specifically alleges that CashCall violated W. Va. Code § 46A-2-125(d) that prohibits a debt collector from: "causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously, or at unusual times or at times known to be inconvenient, with intent to annoy, abuse, oppress or threaten any person at the called number."

43. All of the State's representative consumer witnesses testified that CashCall contacted them repeatedly and continuously at home, at work, on their cell phones, and at times or places that CashCall knew, or should have known, were inconvenient. The Court notes with particular concern that CashCall continued to contact the consumers at work after they unequivocally asked CashCall to stop. *See* Nancy Pickens, Tr. Vol. I, p. 17 (testifying that CashCall only called her once at work after she asked it not to, but the one call was so upsetting that she sat and cried for 30 minutes while at work); Terrie McCann-Bushroe, Tr. Vol. I, pp. 63-64 (testifying that CashCall called her multiple times at work after she asked it to stop, the calls interfered with her work as she was a classroom instructor and was forced to leave the classroom to take the calls; she believed the calls caused her to lose her job); Brenda Hall, Tr. Vol. I, p. 98 (testifying that CashCall repeatedly called her at work after she asked it to stop because she worked in an open office where she was forced to take the calls in the presence of other persons which resulted in

25

disclosure of her indebtedness); Bryant Creighton, Tr. Vol. I, p. 146 (testifying CashCall

contacted him repeatedly at work after he asked it not to because American Electric Power did

not like its phone lines being tied up with personal business and because the calls caused

disclosure of his indebtedness to his co-employees); Dwayne Thornton, Tr. Vol. I, p. 168, 171-

172 (testifying CashCall called him repeatedly at work after he asked it not to and when it knew

that any calls there would not be convenient because it was a facility that served individuals with

mental disabilities or who were facing various crises; the calls were so voluminous that his

indebtedness was universally disclosed throughout his office); Robert Cadle, Tr. Vol. I, p. 216

(testifying CashCall contacted him repeatedly at work, and contacted his supervisor after he

asked it not to).

44. The total number of calls to consumers at all places, including their homes and places of

employment, is so voluminous as to defy description and would be difficult to believe if not

confirmed by the records produced by CashCall to the State during discovery.  The Court first

examines the total number of calls and the time period during which they were made to the ten

representative consumers who testified in Court in the order of their appearance:

> Nancy Pickens, 447 calls from January 29, 2008 - June 3, 2009;
> Terrie McCann-Bushroe, 704 calls from December 11, 2006 - June 26, 2008;
> Lori Anello, 106 calls from February 1, 2007 - May 1, 2009;
> Brenda Hall, 955 calls from November 30, 2006 - June 2, 2009;
> Denise Soccorsi, 532 calls from November 13, 2006 - June 3, 2009;
> Bryant Creighton, 999 calls from January 17, 2007 - April 4, 2009;
> Dwayne Thornton, 1,445 calls from September 28, 2006 - June 1, 2009;
> Brenda Baylous, 1,071 calls from September 22, 2006 - June 2, 2009;
> Robert Cadle, 580 calls from January 15, 2007 - September 30, 2008; and
> JoAnn McKinney, 1,020 calls made to reach her son, James Stollings,
>       from December 21, 2006 - December 2, 2008.

*See* State's Summary Ex. B.

45. The volume of calls made by CashCall to other consumers whose accounts became delinquent or who allegedly defaulted is equally alarming.   As noted above, 16 consumers received more than 1,000 calls from CashCall, ranging from a low of 1,020 (James Stollings) to a high of 2,445 (Jay Heiss).  In addition, 40 persons received between 500 and 1,000 calls, and 86 persons received between 200 and 500 calls.  The State's Summary Ex. A also discloses that CashCall made at least 20 calls per day to a West Virginia consumer on 16 occasions, 15 to 19 calls on 130 occasions, 10-14 calls on 910 occasions, 5 to 8 calls on 5,036 occasions, and 1 to 4 calls in a day on 18,929 occasions.

46. During cross examination of the State's paralegal, Angela B. White, and through the direct testimony of its witness, Sean Bennett, CashCall tried to show that the State may have over counted the number of outbound telephone calls by including so-called "welcome calls," other non-collection calls, or by including other calls that were not connected due to technical difficulties.  On the other hand, Ms. White indicated that the Attorney General erred on the side of not counting a call when it was questionable.  The Court finds and concludes that the total number of calls made by CashCall to consumers as reported in Summary Ex. B are substantially accurate and that the number of non-collection calls that may have been counted by mistake are so *de minimis* that they would not affect the Court's conclusion about CashCall's telephone collection practices based upon the volume of calls.

47. The FDCPA provision governing telephone abuse and harassment, 15 U.S.C. § 1692d(5) is identical to the comparable provision in the WVCCPA, W. Va. Code § 46A-2-125(d). Significantly, both provisions require a finding that the telephone calls were made "with intent to annoy, abuse, oppress or threaten any person at the called number." *Id.* at § 125(b).  The

27

decisions of federal courts evaluating whether telephone communications constitute violations of

the FDCPA are particularly helpful to this Court in how they deal with the issue of intent.

48. Most recently, U.S. District Judge Irene C. Berger was asked to determine whether J. P.

Morgan Chase Bank "acted with the requisite <u>intent</u> to annoy, abuse, oppress or threaten the

person at the called number based upon having made more than 100 collection calls to the

plaintiff during a particular period" *Elisabeth Duncan v. J.P. Morgan Chase Bank, N.A.*, No.

5:10-cv-01049, slip op. at 8 (S.D.W. Va., Nov. 4, 2011) (emphasis in original). In so doing, the

court found,

> The plain language of the statute aptly sets forth that <u>a statutory</u>
> <u>violation can be bourne from the mere volume of calls placed to a</u>
> <u>debtor</u>. This is so, based on the statute's reference to calls which
> are repeated or continuous. Placed in the proper context, <u>the</u>
> <u>volume of calls made to a debtor can be demonstrative of an intent</u>
> <u>to annoy, abuse or oppress</u>, where, as in this case, those calls were
> repeated after Plaintiffs advised Defendant that they wished only to
> be contacted in writing, desired to have the autodialer to stop
> placing calls to their phones, or that future communications were
> to be with their attorney.

*Id.* (emphasis added). Continuing, the court noted that it is not always necessary to glean

"intent" from the "continuous nature of the calls by highlighting a distinctive pattern, such as the

number of calls placed in one day, or the time in which those calls were placed, these factors are

not required in every case." *Id.* Thus, she concluded that the Plaintiff had made a requisite

showing on the issue of the Defendant's intent for purposes of a motion for summary judgment

given the number of calls alone "which were repeatedly placed to his telephone." *Id.* at 9.

28

49. Other courts have taken similar approaches over the years when evaluating whether the repeated telephone calls violate the FDCPA. *See, e.g.*, *Krapf v. Nationwide Credit, Inc.*, No. SACV 09-00711 JVS (MLGx), 2010 WL 2025323, at *2-3 (C.D.Cal. May 21, 2010) (finding four to eight calls per day for two months stated a claim; it did not matter that the Plaintiff could not recall the precise dates of calls when the frequency and volume of the telephone calls can show the intent to annoy, abuse, and harass); *Gilroy v. Ameriquest Mortgage Company*, 632 F.Supp.2d 132, 135, 137 (D.N.H. 2009) (finding three calls per night for one year, a total of approximately 468 calls, stated a claim; when defendant made 200 calls after the consumer said he could not pay and asked that the calls stop, each of the 200 calls after that violated the FDCPA; intent may be inferred by the volume or content of calls); *Kerwin v. Remittance Assistance Corp.*, 559 F.Supp.2d 1117, 1124 (D.Nev. 2008) ("intent to annoy, abuse, or harass may be inferred from the frequency of phone calls, the substance of the phone calls, or the place to which phone calls are made."); *Sanchez v. Client Services, Inc.*, 520 F.Supp.2d 1149, 1160-1161 (N.D.Cal. 2007) (finding a total of fifty-four calls, including seventeen in one month and six calls in one day, stated a claim; the content or substance of the calls made are irrelevant to the issue of harassment); *Prewitt v. Wolpoff & Abramson, LLP*, No. 05-CV-725S (F), 2007 WL 841778, at *3 (W.D.N.Y. Mar. 19, 2007) (finding four calls per day during a three-month period, and one to two calls per day during a 200 day period state a claim); *Akalwadi v. Risk Management Alternatives, Inc.*, 336 F.Supp.2d 492, 505-506 (N.D. Md. 2004) (finding whether twenty-five calls in a two-month period state a claim is a question of fact for a jury; "whether there is actionable harassment or annoyance turns not only on the volume of calls made, but also on the pattern of calls."); *Joseph v. J.J. MacIntyre Companies, LLC*, 238 F.Supp.2d 1158, 1168-

1169 (N.D.Cal. 2002) (finding 200 calls during a 19-month period, including some days when there were multiple calls states a claim).

50. CashCall admitted that 10-20 calls per day, and 1,000 calls over several months, were not unusual or unreasonable. Based upon all of the foregoing, the Court finds that CashCall engaged in a pattern and practice of making repeated and continuous telephone calls or at times known to be inconvenient to consumers with the intent to annoy, abuse, oppress or threaten consumers, in violation of W. Va. Code § 46A-2-125(d), as alleged by the State in its eighth and eleventh causes of action.

*Ninth and Twelfth Causes of Action*
*(Unreasonable Publication of Information Relating*
*to Alleged Indebtedness of Consumers)*

51. In its ninth and twelfth causes of action, the State alleges that CashCall unreasonably publicized information relating to alleged indebtedness of consumers or unjustifiably contacted third parties in violation of W. Va. Code § 46A-2-126. The latter provision makes it unlawful for a debt collector to disclose the alleged indebtedness of a consumer to any person except: (i) upon the express and unsolicited request of a relative or family member who resides with the consumer or (ii) through proper legal action, process or proceeding. The record herein is replete with undisputed testimony that CashCall unlawfully disclosed consumers' alleged indebtedness by repeatedly contacting consumers at work after they asked not to be contacted there, by repeatedly leaving messages for consumers to "call CashCall" at their places of employment, and by repeatedly calling references and other third parties without any legal justification and leaving messages for consumers to "call CashCall" ( in some cases directly disclosing that the call was

30

about a debt).  Much of this conduct has already been enumerated in the discussions above

concerning the State's seventh and eighth causes of action.

52. To briefly recap, the following witnesses testified about conduct by CashCall that would

violate W. Va. Code § 46A-2-126:  Nancy Pickens testified that CashCall left a message with her

secretary at work that they were calling to collect a debt from her, Tr. Vol. I, p. 17, and she also

discovered that CashCall had contacted one of her neighbors and her mother about her account,

Tr. Vol. I, p. 69; Lori Anello testified that CashCall's repeated calls to her at work forced her to

discuss the account in an office that was not private and in the presence of others, Tr. Vol. I, pp.

85-85; Brenda Hall testified that CashCall's repeated calls to her at work after she asked not to

be called there forced her to discuss her account in an office area where her conversation was

overheard by others, Tr.  Vol. I, p. 98; Bryant Creighton testified that CashCall called him

repeatedly at work after he asked not to be called there and left messages to call CashCall,

disclosing the debt to others who worked there, Tr. Vol. I, p. 146; Dwayne Thornton testified

that CashCall's repeated calls to him at work after he asked not to be called there disclosed his

indebtedness to virtually everyone who worked at his office, Tr. Vol. I, pp. 170-172; Brenda

Baylous testified that a letter was faxed to her at her place of employment at a hospital expressly

disclosing her indebtedness and threatening that someone would be sent to her place of

employment to discuss the account was seen by two persons who work under her supervision,

Tr. Vol. I, pp. 191-192; Robert Cadle testified that CashCall disclosed his indebtedness by

calling his supervisor at work, his first ex-wife, and his friend, Tr. Vol. I, pp. 216, 220-221;

JoAnn McKinney testified that CashCall disclosed the account of her son, James Stollings, by

repeatedly calling and threatening her about his account; although he resided with her she had no knowledge of the loan until CashCall called, Tr. Vol. I, pp. 236-238.

53. On the basis of the foregoing undisputed testimony, the Court finds that CashCall unreasonably and unlawfully publicized information relating to consumers' alleged indebtedness in violation of W. Va. Code § 46A-2-126, as alleged by the State in its ninth and eleventh causes of action.

*Tenth Cause of Action*
*(Collecting, Attempting to Collect, or Representing that it May*
*Collect a Debt Collector's Fee or Charge for Services Rendered)*

54. In its tenth cause of action, the State alleges that CashCall collected, attempted to collect, or represented that it may collect a debt collector's fee or charge for services rendered. Whether a debt collector can charge a debt collector's fee to a consumer is a matter strictly governed by state law. While some states permit a collection fee to be added (usually requiring written authorization in the underlying contract), West Virginia does not. Specifically, it is unlawful in West Virginia for a debt collector to collect, attempt to collect, or even to represent that it can collect, a debt collector's fee or charge for services rendered. *See* W. Va. Code § 46A-2-127(g), W. Va. Code § 46A-2-128(c), and W. Va. Code § 46A-2-128(d).

55. There are two exceptions to the near total ban on fees. W. Va. Code § 46A-2-128(c) permits a debt collector to charge collection fees and attorney's fees when necessary "for the collection of any amount due upon delinquent educational loans made by any institution of higher education within this state," but only when such charges are authorized by the terms of the obligation. In addition, W. Va. Code § 46A-2-128(d) permits a debt collector to collect such fees or charges if it is "expressly authorized by the agreement creating the obligation and by

32

statute." (emphasis added). Thus, a fee for a dishonored check may be collected because it is authorized by a separate statute, W. Va. Code § 61-3-39e. A fee that is not authorized by statute cannot be collected even if it is included in the terms of the obligation.

56. When collecting debts in West Virginia, CashCall used a particular letter called "Field Call Notice Letter - 323" which was admitted into evidence at trial as an attachment to State's Summary Ex. A. The letter notifies the consumer (apparently falsely) that CashCall has sent a field representative to meet with the consumer at his or her home or place of employment due to alleged failure to return calls or respond to other communications. The letter also states: "The cost of this field visit may range from $55 to $150 depending on your location, and you may be charged for this and any other subsequent field visits." *See* Field Call Notice Letter -323. Although the State failed to produce any evidence that CashCall <u>actually</u> charged the fee threatened in the Field Call Notice Letter, the fee in question is an unlawful debt collection fee that could not be charged under any circumstances. Thus, CashCall violated W. Va. Code § 46A-2-127(g) by <u>representing</u> that such a fee could be charged, even if it had no intention of ever attempting to collect such a fee.

57. The State's evidence indicates that the Field Call Notice Letter was sent to at least four persons in September and November 2007, namely, Brian Blankenship, Ricky Fox, Sr., Jay Heiss, and Douglas Steele. Brenda Baylous also testified that a similar letter was faxed to her at her place of employment in about January 2008. Although the letter received by Brenda Baylous is not identical to the Field Call Notice Letter produced by CashCall, and CashCall disclaims the letter, the Court finds that the letter must have been sent by a CashCall employee as it contained the correct name, address, and account number for Ms. Baylous. The first paragraph of the

"Notice of Field Visit" received by Ms. Baylous is almost identical to CashCall's official Field

Call Notice Letter - 323 and contains the same threat to charge her $55 to $150 for this and any

other subsequent field visits.  On this basis, the Court concludes that CashCall sent a debt

collection communication threatening to charge unlawful collection fees to West Virginia

consumers on at least five occasions.

58. Based upon the foregoing, the Court finds that CashCall represented that it could collect

unlawful fees and charges, specifically charges for a threatened visit at their home or place of

employment, in violation of W. Va. Code § 46A-2-127(g) and W. Va. Code § 46A-6-104.

*Thirteenth Cause of Action*
*(False Threats of Legal Action)*

59. In its thirteenth cause of action, the State alleges that CashCall made false threats of legal

action in violation of W. Va. Code § 46A-2-124 and § 46A-6-104.  The WVCCPA provides that

a debt collector shall not employ the means "of any threat, coercion, or attempt to coerce" in the

collection of alleged debts.  The State specifically alleges that CashCall made certain threats of

legal action that violate § 46A-2-124(f), which prohibits the threat to take any action prohibited

by this chapter [WVCCPA] or other law regulating the debt collector's conduct.  The State also

alleges that CashCall's threats constituted unfair or deceptive acts or practices, as defined by §

46A-6-104.  In light of the testimony and evidence presented at trial, the Court construes this

cause of action so as to encompass threats that may constitute fraudulent, deceptive or

misleading representations in violation of § 46A-2-127.

34

60. The Court heard testimony from several of the State's representative witnesses that CashCall threatened them with legal action, arbitration proceedings, non-judicial seizure of property, and other actions that it did not intend to take or that are prohibited by the WVCCPA. *See* Nancy Pickens, Tr. Vol. I, pp. 13-19 (testifying that CashCall sent two letters threatening arbitration); Lori Anello, Tr. Vol. I, p. 83 (testifying CashCall threatened to "take legal action" against her); Brenda Hall, Tr. Vol. I, p. 106 (testigying CashCall threatened "you will be receiving a letter from a lawyer"); Bryant Creighton, Tr. Vol. I, pp. 149-150 (testifying CashCall threatened it could take his home, his car, his bank accounts, anything he owned, and threatened him with arbitration); Dwayne Thornton, Tr. Vol. I, p. 177 (testifying CashCall threatened unless he paid they would take "legal action"); Brenda Baylous, Tr. Vol. I, p. 195 (testifying a letter she believed originated from CashCall was faxed to her at work threatening that someone was being sent to her place of employment and that she would be charged $55 to $150 for the trip); JoAnn McKinney, Tr. Vol. I, pp. 239-240 (testifying CashCall threatened to come to her house to take her belongings unless her son, James Stollings, paid his loan).

61. The State has argued that all of the threats of "legal action" were unlawful because CashCall did not intend legal action and, in fact, CashCall waived its right to take consumers to court because of a binding mandatory arbitration provision included in the contract. Although the loan contract afforded consumers an opportunity to "opt out" of the mandatory arbitration clause, CashCall admitted during discovery that not a single West Virginia consumer opted out of mandatory arbitration. CashCall has argued and its witnesses have asserted that when it threatened "legal action" orally or through its collection letters (see discussion below) it really meant "arbitration proceedings." But arbitration and court proceedings cannot possibly mean the

35

same thing. By including the mandatory arbitration provision in its contracts, CashCall has given up its right to litigate its claims against consumers in court. If the terms meant the same thing, then CashCall's arbitration clause would be meaningless.

62. The State also argues that CashCall repeatedly threatened to initiate arbitration proceedings when it had no intention of doing so. Angela B. White's analysis of the service logs produced by CashCall during discovery indicate that CashCall sent at least 262 written communications threatening arbitration or advising consumers that arbitration has already commenced. *See* Summary Ex. B. As it turns out, CashCall did initiate eleven arbitration proceedings against West Virginia consumers. The first three were initiated on May 30, 2007. The other arbitration proceedings were initiated in June, July, October, and the last one initiated on December 17, 2007. *See* Summary Ex. A. But CashCall abandoned all of the arbitration proceedings; thus, none of the proceedings ever resulted in awarding CashCall a claim against a consumer. However, Mr. Bennett did testify it was his "understanding" that CashCall failed to pursue the arbitration proceedings because of the Attorney General's investigation. Tr. Vol. II, p. 163.

63. The Court is not convinced of the reason given by CashCall for failing to follow through on its arbitration claims. The Attorney General's investigative subpoena was issued on August 30, 2007. Tr. Vol. I., p. 225. But CashCall commenced four arbitration proceedings after receiving the Attorney General's Subpoena (three in October and one in December 2007). *See* Summary Ex. A. Moreover, there is no evidence that CashCall notified the consumers that the arbitration proceedings would be dismissed.

64. CashCall responded to the Subpoena by letter dated October 22, 2007, and advised the Attorney General that "federal law preempts these provisions [the WVCCPA] and thus it is impossible for CashCall to violate them. Therefore, we respectfully submit that the Attorney General lacks probable cause to conduct this investigation and to exercise jurisdiction over CashCall." *See* Complaint, Ex. C, Letter from Eric N. Whitney at 11. Moreover, CashCall had every reason to believe that the Attorney General did not intend to pursue this matter further after receiving the letter from Whitney since it did not file the Complaint until more than one year later, on October 8, 2008. As stated above, CashCall's service logs indicate that CashCall sent at least 262 letters threatening to commence arbitration proceedings against consumers. *See* Summary Ex. B.

65. In addition to the testimony of the State's representative witnesses, CashCall made threats of legal action in various form letters that it sent to consumers. The form collection letters that CashCall produced during discovery indicate that CashCall used at least two letters that threatened legal action. *See* F.S. Final Attempt Letter - 316 ("[S]ince you have not given us any cooperation In our efforts to resolve your loan, it has now become necessary for us to review this account for litigation proceedings."); and Final Demand 48 Hour Letter - 562 ("[W]e have given you every opportunity to arrange for payment without the possibility of legal action. . . . If arrangements have not been made to pay all sums due within Forty-Eight (48) hours of this letter, we will review this account for litigation proceedings."). CashCall's records indicate that it sent the Final Demand 48 Hour letter out 60 times to 57 consumers and sent the Final Attempt Letter out 53 times to 12 consumers. *See* Attachments, State's Summary Ex. A.

37

66. Regardless of the real reason CashCall failed to complete the arbitration proceedings, it appears to the Court that CashCall used the threats of arbitration as a collection tactic to induce payments. Since CashCall had waived its right to take consumers to court, filed very few arbitration claims, and failed to complete any of them, the Court finds that CashCall made false threats of arbitration.

67. Federal courts have considered whether unintended threats to take legal action or other deceptive threats violate the FDCPA. Therein consumers typically alleged that the deceptive threats violate 15 U.S.C. § 1692e(5) (threat to take any action that cannot legally be taken or that is not intended to be taken) and/or 15 U.S.C. § 1692e(10) (the use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer). These provisions closely mirror the conduct prohibited by the WVCCPA, W. Va. Code § 46A-2-124 (prohibition of threats, coercion, or attempts to coerce) and W. Va. Code § 46A-2-127 (prohibition against use of any fraudulent, deceptive or misleading representation or means to collect a debt or to obtain information concerning consumers). The decisions in these cases help to guide this Court in deciding whether CashCall has violated the WVCCPA.

68. In *Pipiles v. Credit Bureau of Lockport, Inc.*, 886 F.2d 22 (2d Cir. 1989), the debt collector sent a letter to the consumer implying that legal action already had or would be taken when the evidence indicated that none was intended. *Id.* at 24. Although the language in the collection letter was vague, the court concluded,

> The clear import of the language, taken as a whole, is that <u>some</u> type of legal action has already been or is about to be initiated and can be averted from running its course only by payment. The only 'action' underway was the dispatching of the Notice itself, and the

only prospective future 'action' for this indebtedness was an
attempt at telephone contact (which in fact occurred).

*Id.* at 25-26. In *Creighton v. Emporia Credit Service, Inc.*, 981 F.Supp. 411 (E.D.Va. 1997), the

court considered whether a letter making an unintended threat to report an account to the credit

bureau violated the FDCPA. In concluding that it did, the court noted, "The test is the capacity

for the statement to mislead; evidence of actual deception is unnecessary." *Id.* at 416 (citing *U.S.*

*v. National Financial Services, Inc.*, 98 F.3d 131, 139 (4th Cir. 1996)). In *National Financial*

*Services*, the court found that a letter from a collection lawyer stating that he had "the authority

to see that suit is filed against you in this matter" when such was not the case was a false

representation or deceptive means to collect a debt in violation of § 1692e(10) of the FDCPA.

The court also noted "Courts have consistently found that falsely representing that unpaid debts

would be referred to an attorney for immediate legal action is a deceptive practice." *Id.* (citing

*Jeter v. Credit Bureau, Inc.*, 760 F.2d 1168, 1175 (11th Cir. 1985)). Significantly, the court in

*National Financial Services* also noted,

> Turning to injury to the pubic, the government need not prove
> actual harm to consumers in order to assess penalty. Threats of
> legal action are likely to be intimidating to consumers, and cause
> distress and anxiety. Stress resulting from false threats of suit have
> been recognized as a compensable injury in private suits under the
> FDCPA. Consumers might elect to pay a debt that they do not owe
> in order to avoid the threatened lawsuit. The court concluded that
> the millions of notices sent out bearing the violative language
> caused significant injury to the public.

*National Financial Services*, 98 F.3d at 140 (citations omitted).

39

69. Many other courts have found that false threats of legal action violate the FDCPA. *See Baker v. G.C. Services Corp.*, 677 F.2d 775, 777-778 (9th Cir. 1982) (finding a debt collector's letter stating that it first attempts to settle matters "out of court before making any decision whether to refer them to an attorney for collection" when only further phone calls and letters were intended created the impression that legal action was a real possibility and the consumer could legitimately believe that further collection procedures meant court action); *Bentley v. Great Lakes Collection Bureau*, 6 F.3d 60, 62 (2nd Cir. 1993) (finding a letter advising consumer that a creditor has "instructed us to proceed with whatever legal means is necessary to enforce collections misled consumer that legal action was imminent when such was not the case violated the FDCPA); *Brown v. Card Service Center*, 464 F.3d 450, 453 (3rd Cir. 2006) (finding a collection letter advising consumer that failure to cooperate "could result in our forwarding this account to our attorney with directions to continue collection efforts" misled the consumer into thinking that legal action was imminent when legal action was rarely taken); and *Antkowiak v. Taxmasters*, 779 F.Supp.2d 434, 449 (E.D.Pa. 2011) (finding a letter threatening legal action from lawyer not licensed to practice law in Pennsylvania on behalf of creditor who rarely filed suit created false impression of litigation in violation of FDCPA). The courts in these cases based their determination that the written communications violated the FDCPA by evaluating whether the letters had the capacity to mislead or deceive the "least sophisticated consumer." *See, e.g., Brown v. Card Service Center*, 464 F.3d at 454; *United States v. National Financial Services*, 98 F.3d at *136*; and *Jeter*, 760 F.2d at 1172-1173.

40

70. Based upon all of the foregoing, the Court finds that CashCall made false threats of legal action and other actions that were not intended or were prohibited by law in violation of W. Va. Code § 46A-2-124, W. Va. Code § 46A-2-127, and W. Va. Code § 46A-6-104 as alleged by the State in its thirteenth cause of action.

*Fourteenth Cause of Action*
*(Wrongfully Requiring Consumers to*
*Use Payment Methods Requiring a Fee)*

71. In its fourteenth cause of action, the State alleges that CashCall wrongfully required consumers to use payment methods requiring a fee in violation of W. Va. Code § 46A-2-128 and W. Va. Code § 46A-6-104.   Several of the State's representative witnesses testified that CashCall required that they make payments by MoneyGram as the only permissible method after they stopped the electronic debits from their account.   *See* Terrie McCann-Bushroe, Tr. Vol. I, p. 77 (testifying CashCall required her to make payments by MoneyGram for which she was charged a fee of $13 or $14 each time); Brenda Hall, Tr. Vol. I, pp. 105-112-113 (testifying CashCall required her to make payments by MoneyGram, which cost a fee of $6 to $8 each time—"that's the way they stated they wanted it done"); Robert Cadle, Tr. Vol. I, pp. 214-215 (testifying CashCall refused to accept his checks after he closed his account; "either they were going to debit my account or they were going to take a MoneyGram").   In addition to the testimony of the State's representative witnesses, CashCall employed at least three form collection letters that required consumers whose accounts were in default to make payments only by methods requiring a fee.   CashCall's Breach Letter-560 and Broken Promise Notification-355 both require consumers to make payments by MoneyGram, money order, or certified check. CashCall's Final Demand 48 Hour Letter-562 required that consumers may only make payments

41

by a cashier's check payable to CashCall or a money transfer via MoneyGram. *See* Attachments, State's Summary Ex. A.

72. Because CashCall required consumers who had defaulted to make payments by methods that required a fee, particularly MoneyGram, those consumers who were likely already having financial difficulties were forced to incur additional expenses by having to travel to the nearest Wal-Mart and then by paying an additional fee for the MoneyGram payments. However, Sean Bennett testified that although MoneyGram was the preferred payment method it was not required by CashCall. Tr. Vol. II, p. 114. He also insisted that CashCall will accept a regular check. "It [MoneyGram] might be our preferred method of payment, but "CashCall posts any payment that comes in and will not reject any sort of payment received by the consumer." Tr. Vol. II, p. 112. If Mr. Bennett's testimony is truthful, then CashCall's payment acceptance policies are unlawful in two respects. First, there is strong evidence that CashCall required consumers that defaulted to make payments by MoneyGram. Such a requirement would be an unfair or deceptive act or practice under W. Va. Code § 46A-6-104. If it is true that CashCall would accept payments by any method, then CashCall misled consumers by leading them to believe only payments by MoneyGram would be accepted when such was not the case, in violation of W. Va. Code § 46A-2-127.

73. Upon the basis of the foregoing, the Court finds that CashCall engaged in an unfair or deceptive act or practice by requiring consumers who had defaulted on their account by representing that payments could only be made by methods requiring a fee, particularly MoneyGram, in violation of W. Va. Code § 46A-2-127 and W. Va. Code § 46A-6-104. Although CashCall's policy required consumers to make payments by methods that incurred a

42

fee, the fee was not a "debt collector's fee" as defined by W. Va. Code § 46A-2-128(c) because the fee was paid to a third party and not to CashCall. Hence, while CashCall's payment method policy violated other provisions of the WVCCPA, as noted by the Court, the MoneyGram fees incurred by consumers were not debt collection fees, unlike the NSF fee discussed herein below.

*Fifteenth Cause of Action*
*(Charging Unlawful NSF Fees)*

74. In its fifteenth cause of action, the State asserts that the $15 NSF fee CashCall charged for electronic debits that failed to clear due to insufficient funds was an unlawful debt collection fee and excess charge. The standard loan contract that all West Virginia consumers were required to sign contained the following provision, "I understand that I will be subject to a fee of $15 if any payment I make is returned for non-sufficient funds." Despite the inclusion of this provision in the contract, the Court questioned whether CashCall actually charged the fee when consumers' debits bounced. Mr. Bennett said it did. "They are charged a non-sufficient funds fee of $15" which is disclosed in the contract. Tr. Vol. II, p. 129. At least one consumer also confirmed this practice. *See* Bryant Creighton, Tr. Vol. I, p. 141 (testifying CashCall charged him a $15 fee each time his debit bounced). Mr. Bennett also explained that when a consumer's debit bounces, CashCall makes at least two more attempts to debit the account within the month, but "CashCall only charges an insufficient funds fee after the first returned transaction." Tr. Vol. II, p. 129.

75. As explained above in the discussion on the State's tenth cause of action, the WVCCPA prohibits all debt collection fees, except in the collection of delinquent educational loans made by institutions of higher education within the state "if included in the terms of the loan contract"

43

or fees that are allowed by other statutes.  W. Va. Code § 61-3-39e provides that "the payee or holder of a <u>check</u>, <u>draft</u> or <u>order</u> which has been dishonored for insufficient funds" may impose or collect a fee of $25 on the consumer. (emphasis added).  Thus, if a consumer made payment by mailing a paper check to CashCall and the check was dishonored for insufficient funds, CashCall would be authorized to charge the consumer a $25 dishonored check fee.  That fee is allowed because it is expressly authorized by statute.

76.  The question before the Court is whether CashCall can charge consumers a $15 fee each time an <u>electronic funds transfer</u> fails to clear for insufficient funds.  Although the loan contract provides for such a fee, the fee is not lawful unless it is also authorized by statute.  The State argues that the terms "check," "draft," "order," and "drawer" that appear in West Virginia's worthless check statute are "terms of art" that are defined in the Uniform Commercial Code. *See, e.g.,* "Drawer," W. Va. Code § 46-3-103(a)(2);  "Order," W. Va. Code § 46-3-103(a)(6); "Check," W. Va. Code § 46-3-104(a)(f); and "Demand Draft," W. Va. Code § 46-3-104(k).  The State argues that each of these terms of art refer only to a "negotiable instrument" which is a physical thing that one can possess, like a paper check, draft, or order.  *See* W. Va. Code § 46-3-103 and § 46-3-104.  In contrast, an electronic funds transfer is an entirely different form of payment and is <u>not</u> a check, draft, or order.  *See* EFTA, 15 U.S.C. § 1693a(7) ("the term 'electronic funds transfer' means any transfer of funds, <u>other than a transaction originated by check, draft, or similar paper instrument</u>" (emphasis added)).

77.  It is undisputed here that CashCall represented that it could charge a $15 insufficient funds fee each time the consumer's electronic funds transfer failed to clear.  It is also admitted by CashCall that it did in fact charge this fee, though not necessarily every time to every consumer.

44

The Court agrees with the State that an electronic funds transfer is not a check, draft, or order as defined by the Uniform Commercial Code.  Thus, the Court finds that the $25 fee provided by W. Va. Code § 61-3-39e may only be charged when a paper check, draft, or order is dishonored for insufficient funds.  The Court further finds that this statute does not authorize a fee to be charged when an electronic funds transfer fails to clear for insufficient funds.  CashCall has not cited any other statutes that would authorize such a fee to be charged.  Since CashCall's $15 fee for electronic funds transfer that fail to clear is not authorized by statute, the Court concludes that it is an unlawful debt collection fee as defined by W. Va. Code § 46A-2-128(c) and an unlawful "excess charge" as defined by W. Va. Code § 46A-7-111(1).

78. Based upon the foregoing, the Court finds that CashCall has charged, attempted to charge, and represented that it can charge a $15 fee to consumers when an electronic funds transfer fails to clear their account in violation of  W. Va. Code § 46A-2-127(g), W. Va. Code § 46A-2-128(c),  W. Va. Code § 46A-2-128(d),  W. Va. Code § 46A-7-111(1), and W. Va. Code § 46A-6-104.

*Bona Fide Error Defense*

79. Having found that CashCall has violated the WVCCPA as alleged by the State in its fifth through fifteenth causes of action, one question that remains is whether CashCall may assert a "bona fide error" defense to the violations.  Specifically, the WVCCPA provides a defense as follows,

> If the creditor establishes by a preponderance of evidence that a violation is unintentional or the result of a bona fide error of fact notwithstanding the maintenance of procedures reasonably adapted to avoid any such violation or error, no liability is imposed under

45

> subsections (1), (2) and (4) of this section and the validity of the
> transaction is not affected.

*See* W. Va. Code § 46A-5-101(1).  The FDCPA also affords a bona fide error defense to debt

collectors if they can show "by a preponderance of evidence that the violation was not

intentional and resulted from a bona fide error notwithstanding the maintenance of procedures

reasonably adapted to avoid any such error." *See* 15 U.S.C. § 1692k(c).

80.  Although the majority of federal circuit courts have held that the bona fide error defense

to violations of the FDCPA is limited to unintentional clerical and factual errors only, some

courts had previously extended the defense to mistakes of law.  But the scope of the bona fide

error defense to violations of the FDCPA has now been definitively settled by the United States

Supreme Court.  In *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 130 S.Ct. 1605

(2010), the Court held that the bona fide error defense in the FDCPA is limited to unintentional

clerical and factual errors only and "does not apply to a violation of the FDCPA resulting from a

debt collector's incorrect interpretation of the requirements of that statute."  In keeping with the

Legislature's intention that West Virginia courts be guided by the interpretation given by federal

courts to the various federal statutes dealing with the same or similar matters, W. Va. Code §

46A-6-101(1), this Court holds that the bona fide error defense under the WVCCPA is similarly

limited to unintentional clerical errors or mistakes of fact and does not extend to mistakes of law.

81.  In the case at bar, it is clear that CashCall's violations of the WVCCPA are the result of

intentional actions and are not the result of clerical errors or mistakes of law.  In addition to

finding that CashCall's acts were willful, this Court further finds that CashCall "has engaged in a

course of repeated and willful violations" of the WVCCPA, as set forth in W. Va. Code § 46A-7-

46

111(2).  Accordingly, this Court is authorized to assess a civil penalty against CashCall of up to

$5,000 <u>for each violation</u> of the WVCCPA and does so as discussed further herein below.

*Appropriate Relief for Consumers and the State*

82.  Having found that CashCall has violated the WVCCPA in all of the respects as alleged

by the State in its Amended Complaint, the Court now considers what relief is appropriate to be

granted to the State in order to effectuate the purpose of the WVCCPA to protect the public from

an unfair, deceptive, and fraudulent acts or practices arising from consumer transactions.  The

WVCCPA provides that "the Attorney General may bring a civil action to restrain a person from

violating this chapter and for <u>other appropriate relief</u>" *See* W. Va. Code § 46A-7-108 (emphasis

added).  The West Virginia Supreme Court of Appeals in the *State of West Virginia ex rel.*

*McGraw v. Imperial Marketing*, 506 S.E.2d 799 (W. Va. 1998), examined the Attorney

General's authority to seek consumer restitution and other equitable remedies in its enforcement

actions.  Therein, the court held that the use of the phrase "other appropriate relief" in W. Va.

Code § 46A-7-108 "indicates that the Legislature meant the <u>full array of equitable relief</u> to be

available in suits brought by the Attorney General."  506 S.E.2d at 812-813 (emphasis added).

Thus, the Legislature has authorized the Attorney General to seek and authorized this Court to

grant the full array of equitable relief stemming from CashCall's violations of the WVCCPA,

including but not limited to, consumer restitution, disgorgement, and debt relief.

83.  The State also seeks its attorney's fees and costs for the prosecution of this enforcement

action against CashCall.  As to relief available under the WVCCPA, the Supreme Court of

Appeals of West Virginia held that the use of the phrase "other appropriate relief" in W. Va.

Code § 46A-7-108 "indicates that the Legislature means the full array of equitable relief to be

47

available in suits brought by the Attorney General." *State By and Through McGraw v. Imperial Marketing*, 203 W. Va. 203, 215-216, 506 S.E.2d 799, 811-812 (1998). In his concurring opinion in *Imperial Marketing*, Justice Starcher concluded that the Attorney General would "be entitled to collect the attorneys' fees and costs incurred for the work necessary in the filing and prosecution of [consumer protection] lawsuits." *Id.* at 219, 815, n. 6 (Starcher, J. concurring). Furthermore, the Supreme Court of Appeals of West Virginia has held that "there is authority *in equity* to award to the prevailing litigant his or her reasonable attorneys' fees as 'costs' without express statutory authorization, when the losing party has acted in bad faith, vexatiously, wantonly or for oppressive reasons." Syl. Pt. 3, *Sally-Mike Properties v. Yokum*, 179 W. Va. 48, 365 S.E.2d 246 (1986) (emphasis added). Based on the forgoing, the Court finds and concludes that the Attorney General should be awarded his costs, including reasonable attorney's fees for Phase II of the trial.

## DECISION

Based upon all of the foregoing, the Court does hereby **ORDER** as follows:

(1) The State is awarded an injunction against CashCall as authorized by W. Va. Code § 46A-7-108 permanently prohibiting CashCall from violating the WVCCPA and specifically prohibiting CashCall from engaging in the debt collection conduct as alleged by the State in its fifth through fifteenth causes of action.

(2) The State is awarded a judgment against CashCall in the amount of $292,000 for engaging in unfair or deceptive acts or practices stemming from the policy of requiring consumers to consent to automatic debits as a condition of obtaining the loan, failing to disclose that accounts would be debited at least two more times shortly thereafter when

48

the regularly-scheduled debit fails to clear, failing to timely honor consumer's requests to stop a particular debit or to permanently stop debits, and for subjecting consumers to multiple overdraft fees from their banks frequently resulting in the involuntary closure of their accounts, as alleged by the State in its fifth cause of action. Such amount consists of a civil penalty of $1,000 for each of the 292 West Virginia consumers affected, as authorized by W. Va. Code § 46A-5-101.

(3) The State is awarded a judgment against CashCall in the amount of $1,000,000 for engaging in threatening, coercive, oppressive, abusive, harassing, fraudulent, deceptive, misleading, unfair, or unconscionable debt collection practices, as alleged collectively in the State's sixth through fifteenth causes of action.

(4) The State is awarded a judgment against CashCall in the amount of $1,000,000 as civil penalty for engaging in a course of repeated and willful violations of the WVCCPA in its debt collection practices, as authorized by W. Va. Code § 46A-7-111(2). Such money awarded as a civil penalty shall be placed in the State Treasury to be appropriated by the West Virginia Legislature.

(5) It is further **ORDERED** as authorized by W. Va. Code § 46A-5-105 and by the equitable powers of this Court that any debts still allegedly owed by any West Virginia consumers to CashCall are hereby **CANCELLED** and CashCall shall notify credit bureaus to delete all references to West Virginia accounts from the credit records of West Virginia consumers; provided, however, CashCall is not required to delete the accounts in those instances where it has only reported positive payment history. Further, inasmuch as the subject debts are disputed and the amounts allegedly owed are offset by CashCall's debt

49

collection violations, CashCall shall not file 1099(c) cancellation of debt forms with the Internal Revenue Service.

(6) It is further **ORDERED** that it is that the amounts awarded to the State in Items 2 and 3 above shall be used to make appropriate restitution to West Virginia consumers who, in the judgment of the Attorney General, have been subjected to unlawful debt collection or other unfair or deceptive acts or practices by CashCall. Any such amount of restitution monies owed to a consumer, but unable to be paid to such consumer, shall be held in a trust account, pending a later determination by this Court as to the proper distribution of such money. In order to enable the Attorney General to carry out this provision, the Court **ORDERS** that CashCall shall, within 30 days after entry of this Order, provide the following additional documents and information to the Attorney General:

    a) A report that identifies each instance in which the account of a West Virginia consumer was subjected to an electronic funds transfer by CashCall, including debits that cleared as well as debits that failed to clear for insufficient funds or other reasons.

    b) A report that identifies each instance in which a West Virginia consumer was charged a $15 non-sufficient funds fee for a debit that failed to clear, regardless of whether the fee was actually collected by CashCall.

    c) A report that identifies each instance in which a West Virginia consumer made a payment to CashCall by MoneyGram or other methods that require a fee. The report shall include, if known by CashCall, the amount of the fee incurred by the consumer from making the payment.

d) Such reports shall identify all consumers and include, at a minimum, the date and amount of each debit or attempted debit, all NSF fees charged, and all MoneyGram or other such payments received by CashCall.

e) CashCall shall also provide the Attorney General with such other documents and information as shall reasonably be requested to assist in determining appropriate restitution to be paid to consumers who were aggrieved by the debt collection and other unfair or deceptive acts or practices.

(7) It is further **ORDERED** that the State is awarded a judgment against CashCall for its costs, including its reasonable attorney's fees, for the prosecution of Phase I of its enforcement action against CashCall. This amount shall be determined by the Court at a later date after entry of the final order concluding all phases of this trial.

The objections of any party aggrieved by this Order are noted and preserved. The Clerk is **DIRECTED** to send a certified copy of this Order to all counsel of record.

**ENTERED** this _10_ day of September, 2012

_____
**Louis H. Bloom, Judge**

STATE OF WEST VIRGINIA
COUNTY OF KANAWHA, SS
I, CATHY S. GATSON, CLERK OF CIRCUIT COURT OF SAID COUNTY
AND IN SAID STATE, DO HEREBY CERTIFY THAT THE FOREGOING
IS A TRUE COPY FROM THE RECORDS OF SAID COURT
GIVEN UNDER MY HAND AND SEAL OF SAID COURT
_____
CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

51

# Exhibit 28
# Submitted Conditionally
# Under Seal

# Exhibit 29
# Submitted Conditionally
# Under Seal

# Exhibit 30
# Submitted Conditionally
# Under Seal

# Exhibit 31

**Exhibit 31**

**CashCall's Advertising Expense Summary**

<u>Source</u>:  Exhibit 4 to Christopher James's Report (Dkt. 172 at p. 56), except for Advertising Expense for 2007, which is taken from CashCall's 2007

Annual Report to the Department of Corporations (Dkt. 168 at p. 82)

| Year | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|
| **Advertising Expenses** | $4,691,100 | $17,365,000 | $28,103,000 | $21,175,400 | $5,697,000 | $4,925,000 | $17,496,000 | $27,537,000 | $126,989,500 |
| **Total Operating Expenses** | $15,408,000 | $49,620,000 | $136,452,000 | $145,607,000 | $65,841,000 | $46,967,000 | $81,247,000 | $138,933,000 | $680,075,000 |
| **Advertising as a % of Operating Expenses** | **30.4%** | **35.0%** | **20.6%** | **14.5%** | **8.7%** | **10.5%** | **21.5%** | **19.8%** | **18.7%** |
| | | | | | | | | | |
| **Monthly Advertising Expense** | $390,925 | $1,447,083 | $2,341,917 | $1,764,617 | $474,750 | $410,417 | $1,458,000 | $2,294,750 | $10,582,458 |

# Exhibit 32
# Submitted Conditionally
# Under Seal

# Exhibit 33

Exhibit 33

TV Spot No. : ZKAJ-1029

Date:  January 8, 2004

Producer:  Kovel/Fuller

Title:  "GovCash"

Gary Coleman:  "Running for governor of California takes time and money.  So when I needed ten thousand dollars to balance my deficit, guess where I went?"

Background rap music: "CashCall!  Give us a ring!  Call 866 – CHA – CHING!"

Gary Coleman:  "I got approved in minutes, and they wired the money right into my account!"

Background rap music: "CashCall! Get ten k!  Make a call now!  It's the easy way!"

Gary Coleman:  "Now that I have extra cash, maybe I'll run for president!"

Background rap music: "CashCall!  Give us a ring! Call 866 – CHA- CHING!  866 – CHA – CHING!"

# Exhibit 33

# Video of CashCall's 2004 Television Commercial, Number ZKAJ-1029

# CD To Be Lodge Separately

# Exhibit 34

Exhibit 34

TV Spot No. : ZKAJ-1162

Date:  February 4, 2005

Producer:  Kovel/Fuller

Title:  "Divorce :60 R1"

Man:  "Getting the divorce was tough.  Starting over in a new apartment, I found myself in a cash crunch, until I found CashCall."

Narrator:  "Apartment renters, as long as you have a decent job, CashCall could usually help you with a loan of twenty six hundred to ten thousand dollars.  They don't even ask for any security"

Woman:  "I was out of work for a while.  Now I have a good job but I still needed some cash to get out of the whole I was in.  So I called 866-590-CASH."

Narrator:  "We can approve you right over the phone and wire the cash into your checking account the next day."

Woman:  "The interest rate can be high,  but the monthly payments are very affordable.  Mine are under two hundred dollars a month."

Narrator:  "You can pay it back in a few months or over a few years.  Whatever you want."

Woman:  "I paid my loan back in three months."

Narrator:  "Call 866-590-CASH or log onto CashCall.com.  Twenty four hours a day, seven days a week.  That's 866-590-CASH.  Call today!  Cash tomorrow!"

# Exhibit 34

# Video of CashCall's 2005 Television Commercial, Number ZKAJ-1162

# CD To Be Lodge Separately

# Exhibit 35

Exhibit 35

TV Spot No. : ZKAJ-1294

Date:  August 22, 2005

Producer:  Kovel/Fuller

Title:  "Doesn't Matter :30 R1"

Gary Coleman:  "Even if you make a good living, you could still get into money trouble.  I know.  I've been there.  That's why CashCall is so great.  Call 866-590-CASH and get five or ten thousand dollars in a day.  You don't need to own a home.  You don't need collateral.  CashCall will wire the money right into your checking account.  And you paid it back with one low monthly payment.  CashCall helped me.  They can help you, too.  Call 866-590-CASH.  That's 866-590-CASH."

# Exhibit 35

# Video of CashCall's 2005 Television Commercial, Number ZKAJ-1294

# CD To Be Lodge Separately

# Exhibit 36

Exhibit 36

TV Spot No. : ZKAJ-1377

Date:  November 18, 2005

Producer:  Kovel/Fuller

Title:  "No Nonsense"

Narrator: "Here's a no nonsense fact about getting cash and getting it fast.  CashCall can put ten thousand dollars in your checking account by tomorrow just based on trusting you. No security of any kind.  Just your signature.  You do not have to own a house and you do not need collateral.  It only takes a five minutes CashCall to get the thousands you need.  And paid back is affordable, only about two hundred bucks a month.  Just make a CashCall at 866-590-CASH.  That's 866-590-CASH, anytime!"

# Exhibit 36

# Video of CashCall's 2005 Television Commercial, Number ZKAJ-1377

# CD To Be Lodge Separately

# Exhibit 37

Exhibit 37

TV Spot No. : ZKAJ-1905

Date:  March 30, 2007

Producer:  Kovel/Fuller

Title:  "No Nonsense Daniel Local Q2"

Narrator:  "CashCall could put thousands of dollars in your checking account by tomorrow based on trusting you with no security of any kind.  Just your signature.  Monthly payments for just over two hundred dollars with no nonsense.  Make the CashCall at 866-590-CASH."

# Exhibit 37

# Video of CashCall's 2007 Television Commercial, Number ZKAJ-1905

# CD To Be Lodge Separately