1  James C. Sturdevant, SBN #94551
   Email: jsturdevant@sturdevantlaw.com
2  THE STURDEVANT LAW FIRM
   354 Pine Street, Fourth Floor
3  San Francisco, California 94104
   Telephone: (415) 477-2410
4  Facsimile: (415) 477-2420

5
   Arthur D. Levy, SBN #95659
6  Email: arthur@yesquire.com
   445 Bush Street, 6th Floor
7  San Francisco, California 94108
   Telephone: (415) 702-4550
8  Facsimile: (415) 814-4080
9  [Additional Counsel Appear on Signature Page]
   *Attorneys for Plaintiffs*
10

11               UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF CALIFORNIA
12

13  KRISTA O'DONOVAN, EDUARDO DE LA
    TORRE and LORI SAYSOURIVONG,          NO.   3:08-cv-03174-MEJ
14  individually and on behalf of all others
    similarly situated,                   **DECLARATION OF STACEY
15                                         WOOD IN OPPOSITION TO
                    Plaintiffs,            DEFENDANT'S MOTION FOR
16      v.                                 SUMMARY JUDGMENT ON
                                           UNCONSCIONABILITY CLAIM**
17  CASHCALL, INC., a California corporation,
    and DOES 1 through DOE 50, inclusive,  Complaint Filed:  July 1, 2008
18
                    Defendants.            Honorable Maria-Elena James
19
20                                         DATE:  November 21, 2013
                                           TIME:  10:00 A.M.
21                                         LOCATION:  Courtroom B, 15th Floor

22

23

24

25

26

27

I, Stacey Wood, Ph.D., declare as follows:

1.     I am a licensed clinical neuropsychologist in the state of California (PY 16805).

2.     My expert report in this case is attached as Exhibit "A" to this declaration.

3.     I have been licensed in California since 2000. I am also a tenured Associate Professor and Chair, of Psychology at Scripps College in Claremont, CA, where I teach courses in the areas of neuropsychology, neuroscience, and lifespan development. I supervise both undergraduate and graduate students in my lab.

4.     I received my undergraduate degree in Bio-Psychology from Middlebury College in Bio-Psychology1989, my Ph.D. in Clinical Neuropsychology from the University of Houston in neuropsychology in 1995, and completed a Postdoctoral Fellowship in neuropsychology at UCLA in 1997.  I served as an Assistant Research Professor in the Department of Neurology at UCLA from 1996 to-1998. From 1998 to 2001, I was a Research Associate at UCLA's Borun Center for Gerontological Research. From 1998 to 2001, I also served as an Assistant Professor in the Department of Psychology at Scripps College. From 2001 to 2004, I was employed as an Assistant Professor in the Department of Psychology at the University of Colorado in Colorado Springs. From 2004 to 2006, I was an Assistant Professor in the Department of Psychology at Scripps College, and in January 2007, I was promoted to Associate Professor. From 2008 to 2010 and from 2011 to July 2013, I have served as Chair of the Department of Psychology at Scripps College. I have also been in private practice as a neuropsychologist since 2004, specializing in the assessment of decisional abilities in forensic cases (criminal, civil, & probate).

5.     I am the Director of the Neuropsychology of Decision-Making Laboratory at Scripps College.  My research has resulted in approximately 50 publications, many of which are related to my work on the neuropsychology of decision-making across the adult lifespan, typically 18 – 90 years of age. More specifically, my work has examined how individuals make choices and assess risk at different stages of the lifespan, especially in the domain of financial decision-making. My research has been funded by grants from the National Institutes of Health

("NIH"), the National Science Foundation ("NSF"), the Robert Wood Johnson Foundation ("RWJ"), and the Borchard Foundation for Law and Aging. I have served as an NIH reviewer at NIH on study section panels related to my work since 2007, and as an ad-hoc grant reviewer for the NSF since 2011.  I currently have a grant from the Department of Justice for my work on risk and preventative factors of Elder Financial Exploitation.

6.    I have been asked to provide an opinion on the psychological factors impacting consumer decision-making regarding the CashCall loans.  In order to complete the requested tasks I reviewed the materials listed in my report.

7.    Any consideration of human decision-making must take account brain behavior and the neuropsychological components of decision-making.  One must consider many factors, including the decision context, what we know about the financial decision-making capacity of consumers as a group, and the cognitive biases and abilities human beings bring to decision-making.

8.    There are many indicia of impaired financial decision-making capacity for the Loan Unconsionability Class taken as a group. These indicia apply to the typical class member based on the data showing the general characteristic of the Class as consisting of consumers with low credit scores in need of ready cash.

9.    CashCall's advertising, application, and loan process, its promises of "apply today, cash tomorrow" and approval congratulations well before providing written Truth in Lending disclosures, are central to evaluating the decision-making context and decision-making capacities of a typical class member.

10.    Research has shown that consumers as a group suffer from low financial literacy and low numeracy.  This means that even educated individuals cannot reliably identify key information, do the math, and fairly evaluate the costs of financial products in their self-interest.

11.    These deficits are more pronounced for the typical CashCall borrower. Studies show low credit scores correlate with financial sophistication and financial literacy below that

of the general consumer population. The Loan Unconscionability Class as a group consists of subprime borrowers in need of quick cash. Lowered financial literacy has been found to be especially true of individuals who resort to alternative financial service products.

12. What we know about brain behavior is that stress both causes and exacerbates cognitive deficits. People in need of quick cash are generally under financial and personal stress. Individuals facing stress have reduced cognitive capacity overall and tend to make poor financial decisions. This is an additional neurocognitive and psychological factor indicating the reduced decision-making capacity of the Class taken as a whole.

13. CashCall designs its advertising is to appeal to the viewer's immediate need for money and the ease of quickly meeting that need, while minimizing information about the cost of the loans. CashCall's advertisements highlight high stress situations such as children's medical needs, a need to pay one's rent and divorce. CashCall's advertising "directs and deflects" by directing the viewer toward more understandable and appealing information, such as a low monthly payment, while deflecting him/her from critical information about the real cost of the loan.

14. Thus, many psychological factors contribute to the typical CashCall borrower's impaired cognitive capacity to understand and process loan disclosures, identify key information, and fairly evaluate the costs of financial products in their self-interest.

15. CashCall's practice of not providing written loan disclosures until late in the application process, after the borrower has already been approved, capitalizes on the psychological bias against losing "sunk costs." Having already invested in the application process and been "approved," now counting on getting his/her need filled, the borrower is psychologically biased against accepting contrary information and predisposed to either ignore the disclosures or unfairly discount their significance.

16.     I declare under penalty of perjury that the foregoing is true and correct under the laws of the United States and the State of California. Executed this 24th day of October 2013 at Claremont, California.

Stacey Wood, Ph.D

## CERTIFICATE OF SERVICE

I, Whitney B. Stark, hereby certify that on October 31, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

> Brad W. Seiling, SBN #143515
> Email: bseiling@manatt.com
> Lydia Michelle Mendoza, SBN #247916
> Email: lmendoza@manatt.com
> Noel Scott Cohen, SBN #219645
> Email: ncohen@manatt.com
> MANATT PHELPS & PHILLIPS LLP
> 11355 West Olympic Boulevard
> Los Angeles, California 90064-1614
> Telephone: (310) 312-4000
> Facsimile: (310) 312-4224

> *Attorneys for Defendants*

Dated: October 31, 2013.                TERRELL MARSHALL DAUDT & WILLIE PLLC

By:   /s/ Whitney B. Stark, SBN #234863
Whitney B. Stark, SBN #234863
E-mail: whitneystark@tmdwlaw.com
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
Telephone: (206) 816-6603
Facsimile: (206) 350-3528

*Attorneys for Plaintiffs*

# EXHIBIT A

*Krista O'Donovan et al. v. Cashcall, Inc.*

U.S. District Court Northern District of California No. 3:08-cv-03174-MEJ

# EXPERT REPORT

**Stacey Wood, Ph.D.**

**Associate Professor, Psychology**

**SCRIPPS COLLEGE**

**1030 Columbia Avenue, Box 4082**

**Claremont, California  91711-3905**

**ASSIGNMENT:** I was retained by the plaintiffs' counsel in O'Donovan versus CashCall Inc,. Case N0. C-08-03174 (ND Cal) to conduct an analysis regarding the psychological factors impacting consumer decision making.

**Qualifications:** I am a licensed clinical neuropsychologist in the state of California (PY 16805). I have been licensed in California since 2000. I am also a tenured Associate Professor and Chair, of Psychology at Scripps College in Claremont, CA, where I teach courses in the areas of neuropsychology, neuroscience, and lifespan development. I supervise both undergraduate and graduate students in my lab.

I received my undergraduate degree in Bio-Psychology from Middlebury College in Bio-Psychology1989, my Ph.D. in Clinical Neuropsychology from the University of Houston in neuropsychology1995, and completed a Postdoctoral Fellowship in neuropsychology at UCLA in 1997. I served as an Assistant Research Professor in the Department of Neurology at UCLA from 1996 to-1998. From 1998 to 2001, I was a Research Associate at UCLA's Borun Center for Gerontological Research. From 1998 to 2001, I also served as an Assistant Professor in the Department of Psychology at Scripps College. From 2001 to 2004, I was employed as an Assistant Professor in the Department of Psychology at the University of Colorado in Colorado Springs. From 2004 to 2006, I was an Assistant Professor in the Department of Psychology at Scripps College, and in January 2007, I was promoted to Associate Professor. From 2008 to 2010 and from 2011 to the present, I have served as Chair of the Department of Psychology at Scripps College. I have also been in private practice as a neuropsychologist since 2004, specializing in the assessment of decisional abilities in forensic cases (criminal, civil, & probate).

I am the Director of the Neuropsychology of Decision-Making Laboratory at Scripps College. My research has resulted in approximately 50 publications, many of which are related to my work on the neuropsychology of decision-making across the adult lifespan, typically 18 – 90 years of age. More specifically, my work has examined how individuals make choices and assess risk at different stages of the lifespan, especially in the domain of financial decision-making. My research has been funded by grants from the National Institutes of Health, ("NIH"), the National Science Foundation ("NSF"), the Robert Wood Johnson Foundation ("RWJ"), and the Borchard Foundation for Law and Aging. I have served as an NIH reviewer at NIH on study section panels related to my work since 2007, and as an ad-hoc grant reviewer for the NSF since 2011. My project identifying risk and protective factors for financial elder abuse has been funded by the Department of Justice (DOJ ) I have also served over the years as a peer-reviewer for the top journals in my field, including *Psychology & Aging, Journal of Gerontology, Journal of the American Geriatrics Society (JAGS), Health Psychology, Journal of Behavioral Decision-Making, Journal of the International Neuropsychological Society, Alzheimer's disease and Associated Disorders,* and the *Journal of Experimental Social Psychology*. I currently serve as a consulting editor for the American Psychological Association ("APA") journal, *Emotion.* I have been a Member of the International Neuropsychological Society since 1991.

I have presented at over 70 conferences and have been invited to provide statewide trainings for both the California District Attorney's Association ("CDAA") and the California Public Defender's Association ("CPDA") related to the use of neuropsychological data in forensic matters, as well as to a number of local bar associations. I have been invited to speak at local (Los Angeles Association of Certified Fraud Examiners; Los Angeles Bar Association),

state (California District Attorney's Association ) and national meetings (American Society of Criminology as part of invited Department of Justice Panel) related to my work on financial decision-making and fraud. From 2007 to 2010, I served as a Consulting Forensic Neuropsychologist to both Bernatz Forensic Psychology, Los Angeles, and the Los Angeles County Elder Abuse Forensic Center a county agency that investigates crimes against older adults and dependent adults.  From 2006 to the present, I have been an Appointed Member of the Joint American Bar Association/APA Working Group on Capacity Issues.  I have worked as a consulting expert witness on over 200 cases, including federal, criminal, civil, probate, and arbitration matters, and have testified as an expert about 27 times.   I am currently on the Superior Court Approved Panel of Mental Health Experts for Riverside County, and Los Angeles County, California. For a full description of my qualifications, please see my CV attached in Appendix A.

**Synopsis:**

Consumers are increasingly using high cost financial products such as those supplied by CashCall. Research on these products suggests three main factors impact consumers' decisions regarding these products: the veneer of friendliness of the company and ease in comparison to traditional lenders, the construction of the application process and marketing materials that emphasize speed and low monthly payments (versus total costs and APR), and the financial literacy of the consumers themselves. The processes taken together play to the consumers' immediate need, cognitive weaknesses and biases, and their past experience with traditional lenders.

**Sources Reviewed:**

1.    CashCall advertising (CashCall 006494-6525, 23783-23784);

2.    Promissory Note,  CashCall, 000441-45 (De La Torre; February 16, 2006)

3.    Payment Reminder, CashCall 000350-53 (De La Torre; 2/28/2007)

4.    Underwriting Guidelines, Deposition Exhibit 37, 39, 40, & 41 to Deposition of Delbert Meeks; CashCall 6001, 6006, 6015, 6018

5.    CashCall 025812-025916 (April 2006, Deutsche Bank)

6.     Website Screens and Application, CashCall001147-80; CashCall 001398-1402; CC 001181-01231

7.    CashCall Loan Servicing Policies & Procedures, 000001-00100

8.      Testimony of Mr. John Fuller

9.      CashCall's Amended Responses to Interrogatories, Set No. 3; CashCall's Responses to Interrogatories, Set No. 2.

10.     Fourth Amended complaint.

**Financial Decision-Making:** In order to understand consumer's financial decision-making two elements must be considered- aspects of the consumer's decision-making abilities and constraints and the context of the decision. The interaction of these two elements is critical for understanding a particular financial decision. The review below will examine what can be known regarding the CashCall consumer and followed will be an analysis of the application process.

**CashCall's consumers are primarily distressed subprime borrowers in need of quick cash:**

CashCall customers are for the most part distressed subprime borrowers based on my review of internal CashCall documents (CASHCALL 025812-025916). These documents indicated at that time (2006) that approximately 46 % of loans were made to consumers with FICO scores below 600; approximately 79.94 were made to consumers with FICO below 640 indicating that the majority are subprime consumers (CASHCALL 025878). Average FICO score is reported as 611 in April 2006 (CASHCALL 025900). The vast majority of loans were made in California (86 %) and Nevada (8 %), two regions that were among the hardest hit during the recession[1](CASHCALL 025882).

---

[1] Bureau of Labor Statistics indicated unemployment rates rose the most in Nevada and California during the great recession (Sept. 20, 2011).

I also reviewed the testimony of Mr. John Fuller who described consumers as individuals who needed cash fast. These two anecdotal examples of typical customers included a woman who needed money to buy a plane ticket to a funeral and a man who needed to replace his transmission for work (Fuller Testimony pp114:11). Mr. Fuller also testified that in general the loans were for "the general need of needing money fast for-to get past a problem (p 115:14-18). He further noted that the loans were designed to be fast and "that anybody who has a need for cash, the cash need exists, and so the faster that you are able to satisfy that need the better off you are ( p123:1-4)".

I also reviewed a number of advertisements to learn more about CashCall Borrowers (please see Appendix A for the number, title and description of advertisements reviewed).  In some of the advertisements, a consumer (teacher / hard hat/ real estate agent) indicated an acute need for cash—e.g., rent, children's dental needs, divorce, and a car--and described the ease and speed of the CashCall service. In most of these advertisements, none of the real terms or costs are mentioned. They give a pitch for quick and easy money that helped them out in the short term. In another set of advertisements reviewed, Gary Coleman is a celebrity endorser who suggests that CashCall has helped him out in some tight financial situations. In a subset of these advertisements Mr. Coleman indicated that while the interest rate is high, the monthly payments are very affordable, usually under $200 / month.  When numbers are mentioned in the advertising, they included the amount that could be borrowed, and the affordable $200 / monthly payment.  Financial fees, APRs, the final cost to consumers, and total loan length are either not included or are in fine print at the very end of the advertisement spot.  The design of the advertisements highlights an acute need for cash and quick case while minimizing information regarding the total cost of the product.

Not much empirical research has been done to date specifically on installment borrowers, although other similar subprime borrowers have been extensively studied. From this work we know that payday borrowers for example are unsophisticated borrowers based in a NBER paper[2] that included data from 102,779 individuals. For example on the day that the individuals take out a payday loan of $300.00 most have $1000 of liquidity on available credit cards with much better APRs.

Research in financial literacy discussed below indicated that dollar amounts are easier to understand than APR equivalents. In the case of CashCall, advertisements either did not discuss loan terms or only provided loan amounts ($2600 – $10 K) and "affordable" monthly payments of around $200 in the main pitch. This strategy would play to consumers' ability to understand dollar amounts, but not allow them to appreciate total costs of the product. This decision-making context nudges consumers into focusing on the fees and ignores the real total cost of the product, a technique called "direction and deflection" where borrowers attention is directed to the monthly payment and away from the APR[3]. We know from the literature on financial literacy discussed below, that most consumers can understand the absolute dollar amounts of a fee, but stumble when asked to calculate interest.

The CashCall product model combines some element of the payday loan (high interest, willingness to take on more risk, quick cash, and short term needs) but because of the higher dollar amounts loaned, is designed to be paid back over years (3.5 years for $2600 / loan). The

---

[2] Payday Loans and Credit Cards: New Liquidity and Credit Scoring Puzzles? Agarwal, Skiba, Tobacman. National Bureau of Economic Research (NBER) January 2009. *American Economic Review Papers and Proceedings* 99*, 412–417.*

[3] Stark & Chopin (2010). A Cognitive and Social Psychological Analysis of Disclosure Laws and Call for Mortgage Counseling to Prevent Predatory Lending. *Psychology, Public Policy, and the Law,* 16 (1), 85-131.

extended terms (years long) seems contrary to the short –term financial intention of the CashCall product marketing (quick cash) and may exacerbate versus relieve the financial problems some consumers face. The high default rate ( >40 %) is consistent with this hypothesis.

Based on my review of a number of advertisements, internal documents, and Mr. John Fuller's testimony, the typical CashCall consumer is a subprime borrower with a quick need for cash. Subprime borrowers in general are unsophisticated borrowers with fewer options for obtaining loans. CashCall marketing materials are designed to emphasize information that is understandable and appealing to consumers, while deemphasizing other pieces of critical information such as total costs.

**CashCall Consumer's are under stress and need cash quickly:**

 CashCall's marketing strategy and advertisements include pitches that indicated an acute need for cash—e.g., rent, children's dental needs, divorce, and a car--and described the ease and speed of the CashCall service. In another set of advertisements reviewed, Gary Coleman is a celebrity endorser who suggests that CashCall has helped him out in some "**tight" financial situations**. This line of ads suggests that borrowers in similar jams may find relief through CashCall products. It is reasonable to assume that individuals in these situations may be under some type of financial stress with limited options for traditional loans given CashCall's published FICO average of 610.

How does stress impact financial decision-making? In general, stress results in an inverse U-shape relationship between arousal and performance. When arousal is either very low or very high performance tends to deteriorate. The effects of arousal have been studied on day-traders

performance[4]. Their results showed that traders who experienced greater positive or negative arousal towards monetary gains and losses exhibited significantly *worse* trading performance. Other research has demonstrated that participants who are stressed are more likely to take risks when encountering gambles that could result in losses[5].  In trying to explain their results, the researchers have argued that in stressful situations *we are less able to use our rational and deliberative abilities in the decision making process*. Interestingly, in a survey among American households, more than 75% of respondents indicated that financial concerns were a key contributor to their stress levels (American Psychological Association 2009). It is reasonable to assume, thus, that those who require fast loans are precisely the ones who are experiencing financial stress.  Recent research has found that when low income individuals are faced with a financial decision-making task, they demonstrate reduced cognitive capacity overall.[6]

In conclusion, the advertisement and marketing is using language that suggests they are trying to help individuals out of stressful situations with quick cash. However, we know that in general individuals who are under stress make poor financial decisions.

**What is financial literacy and how does it impact financial decision-making?**  About 25% of Americans are now turning to some high-cost method of borrowing (such as payday loans).[7] Do

---

[4] Lo, Repin, Steenbarger (2006).

[5] Porcelli & Delgado (2009). Acute Stress Modulates Risk taking in Financial Decision-Making. *Psychological Science,* 20 (3) 278- 283.

[6] Mani et al (2013). Poverty Impedes Cognitive Functioning. *Science, 341, 976.*

[7] Financial Literacy and High-Cost Borrowing in the United States. Annamaria Lusardi, Carlo de Bassa Scheresberg. NBER Working Paper No. 18969 Issued in April 2013

consumers have the necessary tools, abilities, and capacities to understand and calculate the (often complex) financial information provided to them? The research in this area suggests that a typical consumer often lacks the abilities to comprehend, evaluate and judge the full nature of these loans and their future implications, lack the ability to make even simple financial calculation, and is largely unfamiliar with key financial terms.

High levels of numeracy or literacy for numbers is a cognitive skill that has been linked to strong decision-making. High-numeracy adults are at greater ease in using numeric information and utilize the correct numerical principles. Low-numeracy individuals, on the other hand, "are left with information that is less complete and less understood, lacking in the complexity and richness available to the more numerate" (2006, p. 412[8]). What this means in everyday terms is that individuals who are low in numeracy are more susceptible to using cognitive short cuts such as heuristics in their decision-making and less "able to do the math" to make the optimal financial decision.

This difference in abilities plays out across a wide range of financial products, such as health insurance, stocks, housing, saving, and borrowing (e.g. Wood et al, 2011[9]). In contrast, we know that the majority of the population is having difficulties with numbers.

---

[8] Peters, Vastfjall, Slovic, Mertz, Mazzocco, & Dickert (2006). Numeracy and Decision-Making. Psychological Science, 17:407.

[9] Wood, S., Hanoch, Y., Barnes, A., Liu, P-J., Cummings, J., Bhattacharya, C., & Rice, T. (2011). Numeracy and Medicare Part D: the importance of choice & literacy for numbers in optimizing decision making for Medicare's prescription drug program. *Psychology and Aging, 26(2),* 295-307. doi: 10.1037/a0022028.

The pioneering work of Lusardi and colleagues (e.g., Lusardi and Mitchell, 2007; 2011)[10] [11]provides further support for the finding that as a group consumers struggle with the comprehension of questions that involve interest rates. The results of the U.S. Financial Capability Study (Lusardi and Mitchell, 2011), asked participants a number of financial questions, such as how much money a person will have after 5 years if they had $100 in a savings account and the interest rate was 2% per year and were provided with the following prompts: more than $102.00; exactly 102; less than $102; and refuse to answer. About 65 % of respondents are able to get this answer correct which is surprisingly small given its simplicity and the lack of a requirement to complete calculations. More concerning, about 13.5% of the participants indicated that they are not even able to answer this question.  As a result when faced with a loan with a high APR, arguably a more difficult calculation than the example above,  the majority of consumers (not only subprime) are simply unable to calculate the total costs on their own.

The (in)ability to correctly answer these simple questions is vital for any discussion of consumers' ability to understand financial data and make informed decisions, as calculations about compound interest is part and parcel of any decision about saving and borrowing. In one investigation, participants were asked the following question: "Suppose you owe $1,000 on your credit card and the interest rate you are charged is 20% per year compounded annually. If you didn't pay anything off, at this interest rate, how many years would it take for the amount you owe to double?(i) 2 years; (ii) Less than 5 years; (iii) 5 to 10 years; (iv) More than 10 years; (v)

---

[10] Lusardi & Mitchell (2007). Baby Boomer retirement security: The Roles of planning, financial literacy, and housing wealth. Journal of Monetary Economics, 54 205-224.
[11] Lusardi & Mitchell (2011).  Financial Literacy and Retirement Planning in the US. NBER working paper 17108.

Do not know;(vi) Prefer not to answer." Only roughly a third of the sample was able to correctly answer this question. Perhaps more importantly, 40% of the participants overestimated the time it would take for the debt to double (Lusardi and Tufano 2009[12]).

What might be the side-effect of low numeracy? Repeated studies have shown that higher numeracy is linked to greater investment in the stock market, better retirement planning, higher accumulation of wealth, lower rates of mortgage and loan defaults, and higher probability of paying credit card payment in full. Those with low numeracy, on the other hand, tend to pay fees and rely more heavily on high-cost methods of borrowing. One can argue that a large portion of the population simply does not have adequate numeracy and financial literacy levels; numeracy is one of the best predictors for retirement saving and investment, and that numeracy is correlated to an understanding of many financial services.

In conclusion, a large survey of American consumers indicates poor understanding of certain key financial terms such as interest. Therefore, even when the terms and conditions are disclosed many borrowers will be unable to do the math in order to understand the financial implications of these high cost loans.

**CashCall's Business Approach Appeals to Distressed Consumers who have few options with traditional lenders:**

CashCall's Company Business thesis appears to be consistent with marketing principles that include creating a friendly and welcoming environment for consumers and speedy processing of

---

[12] Lusardi & Tufano (March 2009). Debt literacy, Financial Experiences, and Overindebtedness. NBER

loans in contrast to traditional lenders. Alternative financial services appeal to consumers not only because of a lack of other options, but also because they are marketed and designed to promote a friendly lending environment in contrast to traditional lenders[13]. Lenders such as CashCall use marketing material that is welcoming, and emphasizes the ease of the process. The use of courtesy, availability, and speed contrast positively with traditional lenders who are slower, have more rigorous standards, and will more frequently reject sub-prime borrowers. Later this "friendly" approach can be used as part of the collection process to induce reciprocity and maintain a relationship with the borrower. CashCall's business thesis is described to offer a product that is (1) an alternative to credit cards, (2) offer superior convenience through a one day approval process thereby appealing to a broad range of consumers, and (3) a strong brand name and quick loan approval which allows the Company to capitalize on consumers who need cash quickly and will pay a premium for this service (CASHCALL 025825).

The description of the welcome call is consistent with providing a friendly venire of the company (CASHCALL000001; 9 – 10). Callers are instructed to greet the consumer and inform them their loan has been funded. Next information necessary for collections is verified.

Testimonials available on the website is consistent with the friendly approach of the company (CASHCALL001181). For example, "I just wanted to drop you a quick email to tell you how very helpful Raul was in getting a loan. He made it effortless and very simple. He was very helpful and responded quickly to my email questions. I am in the customer service business and I know how important it is to have informative, helpful, and courteous people dealing with customers." "Thank you for creating a way for little people like me to get a loan. The CashCall

---

[13] (2007) Consumer Experience with predatory Lending Practices. J. of Consumer Affairs, V 41, (1), 29-47

money has changed my life. I am grateful for the trust you have extended to me by the loan. I am sure I speak for many others who have nowhere else to turn."

"My name is Amber-Lee G and I have had all kinds of trouble getting a financial institution to believe in me enough to give me a loan, I am a married working mother who really messed up her credit during her crazy teenage years. Then I got your flier in the mail, I call and talk to your wonderful representative Kyle and he has helped me take a million pounds off my shoulders".

In summary, alternative lenders such as CashCall appeal to consumers with few other options by contrasting themselves with traditional lenders. These alternative companies use friendliness and courtesy with costumers who have often been rejected by traditional lenders and emphasize the ease and speed of the process. These relationships also help later with collection process.

**The construction of the loan process influences consumer decision-making by leaving the terms and conditions until the end stage:**

The on-line loan application process is designed in a way that emphasizes ease and speed but does not provide information on total costs, APR, and length of the payments until very late in the application process- after about 20 screens. In fact, the consumer has already been congratulated on their approval prior to receiving the Truth in Lending disclosure with the terms. (A complete summary of the screen shots reviewed will be provided in Appendix B).

Therefore, while on the surface, a review of the CashCall on-line application process seems to indicate that consumers are eventually given accurate, full disclosure with the Truth in Lending Disclosure Statement these disclosures are placed 20 – 24 screens into the process. The

construction of the application process induces powerful contextual factors known as heuristics that are well known to impact consumer decision-making and in this case induce consumers to enter into loans before having all of the (possibly most important) information.[14] The information is constructed to begin with screen shots that emphasize the ease and speed of the application (friendliness, availability of funds, and speed). Full terms (length) and conditions (APR, total cost) of the loans are not given until AFTER the loan has been "conditionally approved" approximately 20 screens into the application process.

**Late Disclosure evokes powerful heuristics, or mental short cuts that can result in irrational decision-making.**

The late disclosure design evokes the endowment effect. In behavioral economics, the endowment effect is the finding that individuals value a good differently (greater) once their ownership has been established and treat it differently. For example, two homeowners who own essentially the same track home may value their own home more and express to a real estate agent that it should be listed for a greater price than their neighbor's. Owning the home has caused an emotional attachment that irrationally increases the value in the eyes of the owner. In the case of CashCall, the applicant has already been approved (can imagine having the money, and having their predicament being solved and stress relieved), when the full terms and conditions are discussed. In absolute terms, the borrower would experience a psychological loss of funding to "return" the money to CashCall.

---

[14] Stark & Choplin (2010). A Cognitive and Social Psychological Analysis of Discolsure Laws and Call for Mortgage Counseling to Prevent Predatory Lending. Psychology, Public Policy, and the Law, V 16 (1), 85 – 131.

In behavioral economics, it is also understood that a loss is valued differently than a gain even when the absolute value of the money is the same, a phenomenon known as loss aversion. Loss aversion refers to the finding that individuals evidence a stronger preference to avoid losses than to acquire gains, and that losses are weighed as much as twice as heavily as gains in decision-making.[15] By setting up the application to approve the money up front, prior to disclosing all of the terms and conditions, the borrowers will experience the end of the contract as a "loss" if they withdraw. In fact, this observation is consistent with internal CashCall documents that indicated that while they have a policy to return all fees and interest if a customer complains during the welcome call, **almost no customers** request this refund (0.67 % were refunded). Individuals are more likely to take risks to avoid losses. The endowment effect and loss aversion are well known to marketers. For example, individuals are offered "teaser rates" or "no money down" to entice then into purchases that induce these effects.

Another important heuristic that can induce bias into decision-making is sunk costs. When information is disclosed later in the decision-making process and people have invested time and effort into applying for a loan from a particular lender, they will often discount the likelihood of negative consequences.[16] Sunk costs are costs that cannot be recovered. Good decisions about future costs should not be impacted by sunk costs per decision theory. For example, individuals should make the financial decision regarding the loan completely based upon the terms and conditions, but its hard to ignore the sunk costs invested (time and effort) when making decisions.

---

[15] Kahneman, D. and Tversky, A. (1984). "Choices, Values, and Frames". *American Psychologist* **39** (4): 341–350.
[16] Stark & Chopin (2010).

The placement of the terms and conditions at the end of the application also make it very difficult to shop for loans. For example, when looking for a mortgage rate, one can open multiple windows on ones' computer screen and make apples to apples comparisons across products. In contrast, an individual would essentially have to apply for the loan, and be approved for the loan prior to receiving all the terms and conditions. At that point, they may be very hesitant to "apply" for a second loan, just to learn the terms in case that loan is "approved" as well.

These loans will work best for consumers if they can be paid off quickly. However individuals are not good estimators regarding future costs and earnings[17]. In general individuals tend to overestimate how much more earnings they will have in the future and "discount" future expenses and eventualities. This bias arises from the general assumption that earnings do tend to rise over time, so individuals may be overly optimistic regarding their ability to prepay the loans. CashCall's business thesis likens these loans to a mortgage payment and estimates the terms as 42 months to 10 years. The majority of the borrowers will not prepay the loan and for these consumers, information regarding the term of the loan (number of months) is a critical piece of information. In fact we know that around 40 % default at some point in the loan process. This information regarding the length of the payments is presented well into the application process, around screen 20.

In conclusion, the structure of CashCall's loan application process evokes several important psychological processes that result in cognitive biases which include the psychological loss of funding, the feeling of lost costs, and the optimism of future earnings that result in consumers willingness to obtain a loan even though it may not be in the consumers best interest.

---

[17] Stark & Chopin (2010).

### *Summary and Conclusions*

In summary, the CashCall approach capitalizes on the consumers' cognitive vulnerabilities and biases to make obtaining the loan appealing in particular to the stressed borrowers who are known to make risky decisions. However, key information regarding the prudence of such loans is withheld until late in the loan process, making it less likely that consumers will consider and weigh the information in an unbiased manner.

Executed on September 18, 2013 in Claremont, California.

Stacey Wood, PhD

Associate Professor of Psychology, Scripps College

# Curriculum Vitae

## Stacey Wood, Ph.D.

Scripps College
1030 Columbia Ave. OMB 1082
Claremont, CA 91711-3948
Phone (office) (909) 607-9505

Phone (cell) (909) 706-2764

Fax (909) 607 - 9599
Email: swood@scrippscollege.edu

## Education/Professional Experience

| | |
|---|---|
| January 2007 - Present | Associate Professor, Scripps College, Department of Psychology |
| January 2004- present | Private Practice, Claremont, CA. |
| July 2004 – December 2006 | Assistant Professor, Scripps College, Department of Psychology. |
| July 2001 - July 2004 | Assistant Professor, University of Colorado, Colorado Springs, Department of Psychology. |
| July 1998 - July 2001 | Assistant Professor, Scripps College, Department of Psychology. |
| July 1998 - July 2001 | Research Associate, UCLA Borun Center for Gerontological Research. |
| July 1996 - July 2001 | Assistant Research Professor, Department of Neurology, UCLA School of Medicine. |
| September 1995 - October 1997 | NIMH Post-Doctoral Fellow in Neuropsychology, Neuropsychiatric Institute, University of California at Los Angeles. |
| September 1995 | Ph.D. in Clinical Neuropsychology, University of Houston, Department of Psychology, Houston, Texas. |
| July 1995 | APA Approved Clinical Psychology Internship, University of Arizona, Health Sciences Center, Tucson, Arizona. |
| March 1993 | M.A. in Psychology, Specialty: Neuropsychology, University of Houston. |
| May 1989 | B.A. in Biology-Psychology, Middlebury College, Vermont. |

**Other Positions and Professional Memberships:**
6/08 - 7/10; 3/11 – 6/13: Chair, Department of Psychology, Scripps College.

1/11 – Present: Riverside County Panel Court Approved Panel of Experts.
1/11- Present: Pomona Valley Estate Planning Council.
7/09- Present: Consultant, Riverside Public Defenders Office.
7 /07 -6 /10: Consultant, Forensic Neuropsychologist LA County Elder Abuse Forensic Center.
7/ 07 -6 /10: Consultant Bernatz Forensic Neuropsychology, Los Angeles.
7/06 - 7/08: Clinical Supervisor, Center for Aging Resources (CFAR), Pasadena, CA.
12/06 – Present:  Member American Bar Association/ APA Working Group on Capacity Issues.
3 /08 – 6/ 10: Member National Institutes of Health Review Panel, NIA-S.
1991 – Present:  International Neuropsychological Society.

**PROFESSIONAL SERVICE:**

2006 – Present. Appointed Member, Joint APA-ABA Working Group on Capacity Issues.

2010 – Present.          Editorial Board, APA Journal *EMOTION*.

3 /08 – 6/ 10:          Member: National Institutes of Health Review Panel, NIA-S.

June 2009          Chair: National Institutes of Health Special Emphasis Panel.

11/2/11          Member: NIH Specialty Review Panel

4/29/12          Member: NIH Affective Decision Making Study Section

 REVIEWER

Journals (ad hoc)          *Psychology & Aging, Journal of Gerontology, Journal of the American Geriatrics Society (JAGS), Health Psychology, Journal of Behavioral Decision-Making, Journal of the International Neuropsychological Society, Alzheimer's disease and Associated Disorders, Journal of Experimental Social Psychology; Brain Imaging and Behavior*

Grants (ad hoc)          National Science Foundation (Decision-Making Division)

## Grant Support

Wood, Stacey. (Principal Investigator). Identification of Risk and Preventative factors for Financial Elder Exploitation. Department of Justice. 136,290. 9/13 – 12/15.

Wood, Stacey. (Principal Investigator), Development of a laboratory model for financial elder exploitation. Borchard Foundation, 20,000. 1/13- 12/13.

Wood, Stacey  Co- Principal Investigator, NSF BCS-1039791, Major Research Instrumentation Program: Instrument Acquisition or Development "MRI: Acquisition of a High-Density Electrophysiology Laboratory for Intercollegiate Research and Training in Cognitive Neuroscience" (Alan Hartley, P.I.)  Direct costs: $411,008. Year 7/10-7/12.

Wood, S. ( PI on subcontract to Scripps). Manacled Competition: Limiting Health Insurance Choices for the Elderly. (PIs Yaniv Hanoch & Tom Rice, UCLA) Robert Wood Johnson Foundation. Support Years 5/ 06 – 5/ 10. Total subcontract $100,000.

Wood, Stacey (Co - Principal Investigator with Scripps student Lauren Moneta). Behavioral and neurophysiological correlates of risk behavior.  (Mellon Foundation). Support Years 3 / 05 – 3/ 06. Total Award $5, 000.

Wood, Stacey (Co - Principal Investigator with Scripps Student Lauren Moneta). Affective Forecasting across the lifespan. (Mellon Foundation). Support Years 3 / 05 – 3/ 06. Total Award $5, 000.

Wood, Stacey (Principal Investigator). Cognitive and Social Aspects of Decision-making. (NIH/NIA R15 AG021442-01). Support Years 10/03-10/05. Total Award $136,750. This award is only given to those whose primary mission is training undergraduates.

Wood, Stacey (Co-Investigator). Limited Guardianship to maximize independence of elders: A review of Law and Practice. (PI – Jennifer Moye, Ph.D. Harvard University) Farnsworth Foundation. Support years July 2004- July 2006. Total Award $80,000.

Wood, Stacey (Principal Investigator). The role of emotion on decision-making in older adults. University of Colorado, Colorado Springs Committee on Research and Creative Works. Support Years 7/03-6/04. Total Award $4,660.

Wood, Stacey (Principal Investigator). Assessing the Risk for abuse and neglect in assisted living facilities. John Randolph Haynes and Dora Haynes Foundation. Support Years 3/00-3/01. Total Award $10,000.

Wood, Stacey (Principal Investigator). Detection of Depression in Nursing Home Residents. California Department of Health Services: Support Years 7/98-6/01. Total Award $125,000; part of Alzheimer's Disease Research Centers of California (PI Cummings).

Wood, Stacey (Principal Investigator). Neuroscience on the WEB. Mellon Foundation, Support Years 1/99-12/00. Total Award $15,000.

Wood, Stacey (Principal Investigator). Information-processing anomalies and functional implications in HIV-1 infection. (NIH-NRSA 1F32AI097969-01). Support Years 10/96-10/97. Total Award $25,000. Award declined.

Wood, Stacey (Principal Investigator). Neurobehavioral Disturbances in Nursing Home Residents: Economics, Occupational Disruption, and Clinical Correlates. Pfizer Pharmaceuticals, Support Years 1/97-12/97. Total Award $80,000.

Wood, Stacey (Co-Investigator, PI Jeffrey L. Cummings, MD) The Effect of Aricept on cognition and Behavior in nursing home residents with Alzheimer's Disease. Pfizer Pharmaceuticals, Support Years 8/96-3/98. Total Award $100,000.

Wood, Stacey (Co-Investigator, PI Jeffrey L. Cummings, MD) The effect of Exelon on behavioral disturbances in moderately to severely impaired Alzheimer's patient's at a nursing home setting. Novartis Pharmaceuticals, Support Years 11/96-6/99. Total Award $70,000.

Wood, Stacey (Co-Investigator, PI Jeffrey L. Cummings, MD) Olanzapine treatment for psychopathology and agitation in Alzheimer's Disease in a residential care facility. Eli Lilly Pharmaceuticals, Support Years 1/97-1/98. Total Award $50,000.

**Consultation to Industry:** Jannsen Pharmaceuticals, Astra-Zeneca Pharmaceuticals, Eli Lilly Pharmaceuticals, Pfizer Pharmaceuticals, Novartis, Merck, Forrest Research Industries.

**Media Consultation / Activities:** Reuters, UPI, Reader's Digest, MSNBC.COM, Dow Jones MarketWatch, MSN Money, Live Science.com; Readers Digest, Health Magazine; Prevention Magazine, AARP Bulletin, LA Times.

## Invited Lectures

Behavior disturbances in Alzheimer's Disease: Characterization and measurement. Grand Rounds, Simon Fraser / Riverview Hospital, Vancouver, B.C. November, 1997.

Detection of depression in late-life. Conference sponsored by California State Northridge on fitness is late-life, April 1999.

Early detection of Alzheimer's disease. Conference sponsored by California State Northridge on fitness is late-life, April 1999.

The Use of Videotaped vignettes to improve mental health care in long-term care. Conference sponsored by UCLA department of Geriatrics. Laguna Beach, May 2001.

Assessing decision-making for issues related to abuse and neglect in assisted living residents. Geriatric Health Conference, University of Colorado at Colorado Springs, April 2002.

Working with Vulnerable Populations: Older adults. El Paso Bar Association Lecture Series on Ethics, Colorado Springs, December 2002.

Early Onset Alzheimer's Disease. Rocky Mountain Alzheimer's Association, Colorado Springs, April 2003.

Optimizing decision-making. PILLAR Lecture series "Mental Longevity", Colorado Springs March 2004.

The Negativity Bias is eliminated in older adults:Implications for Decision-making Presentation to Claremont Graduate University Cognitive Brown Bag lunch, September 25, 2004.

Neuropsychological Assessment of Capacity: Presented at National Academy of Elder Law Attorneys (**NAELA**) ,November 12, 2004, Colorado Springs, CO as part of workshop with co-presenters Edie Greene and Sara Qualls.

Changes in Decision-Making across the lifespan: UCLA Psychology Department January 13, 2005.

The negativity bias is eliminated in older adults: Implications for management: Presented to the UC-Riverside School of Management, January 14, 2005.

Scripps College Alumni Weekend: "Cognitive impairment and other elder care issues. " April 25, 2006.

Geropsychology National Conference on Decision-Making Capacity, Colorado Springs, CO; How does dementia impact decision-making abilities, June 16, 2006.

Geropsychology National Conference on Decision-Making Capacity, Colorado Springs, CO; Neuropsychological assessment as part of a capacity evaluation process June 17, 2006.

Research Colloquium: Fuller School of Psychology, Pasadena, CA. Emotion and how it impacts decision-making as we age. October 15, 2006.

San Gabriel Valley Elder Law Task Force, Pasadena, CA. The role of neuropsychology in capacity evaluations. November 28, 2006.

Scripps College Family Weekend: "Emotion and how it effects our thinking across the lifespan" February 22, 2007.

Scripps College Alumni Weekend: "Cognitive impairment and decision making in the elderly" April 28, 2007.

Certificate in Older Adult Mental Health Services Lecture: Dementia, Delirium, Depression. **(**February 2008). For WISE- Healthy Aging Antioch University, Culver City.

LACBA  / LA County Superior Court PVP Training (May 2008 with Susan Bernatz), "Assessment of Decision-Making Capacity". Loyola Marymount College of law.

LACBA / PVP Training (October 2008), "Assessment and Undue Influence in Capacity Cases". Loyola Marymount College of Law.

UC Riverside, Extension. (December 2008). Genetics and Human Behavior: Genetics & Dementia.

Mental Capacity and Undue Influence. (February 2009 with Susan Bernatz). Part of Probate and Mental Health Institute, Judicial education state of California. San Diego, CA.

UC Riverside Psychology Cog Lunch. Medicare Part D: (May 2009). The effects of age, choice size & numeracy.

Aviva K. Bobb Advanced PVP Attorney Training Program (September 2009). Interviewing Impaired Clients. LACBA, Los Angeles

Northern California Neuropsychological Forum (May 2010). Assessment of Decisional Capacity. San Francisco, CA.

American Psychological Association. (August 2010). Chair:  CE Workshop: Assessment of Decisional Capacity in Older Adults. San Diego, CA.

Central California Federal Public Defender's Office. (July 12, 2011). CE Workshop: Neuropsychology 101. Los Angeles, CA.

Riverside Public Defender's Office. (October 6, 2011). CE Workshop: Integrating neuropsychology into your defense. Riverside, CA.

California District Attorney's Association (CDDA). (December 6, 2011). Part of the statewide Elder Abuse Symposium. Competency and Capacity Issues, Monterey, CA.

Inland Bar Association (January 20, 2012). Covina, CA.  Neuropsychology 101.

Pomona Valley Estate Planning Council (March 27, 2012).  Dementia, Decision-making, and Capacity.

San Gabriel Valley Elder Law Task Force, Pasadena, CA. Optimizing your clients decision-making abilities: Older adults, dementia & capacity. May 22, 2012.

California Public Defenders Association (CPDA). (August 25, 2012). Integrating Neuropsychology into your defense. Berkeley, CA.

Aviva K. Bobb Advanced PVP Attorney Training Program (October, 2012). Undue Influence & Interviewing  Clients. Los Angeles County Bar Association, Los Angeles, CA.

California District Attorney's Association (CDDA). (December 4, 2012). Part of the National Elder Abuse Symposium. Competency and Capacity Issues, San Francisco, CA.


## Publications

### Books and Book Chapters:

Wood, S. & Kubick, J.* (2005). Presenting the complex capacity client in court: Practical Issues related to the Assessment of Capacity. *Rehabilitation Psychology, V 50 (3)* 201 – 206.

Wood, S. Assessment of decisional capacity from a neuropsychological perspective. In ED. (Smyers, M. & Qualls, S.) (2007) *Aging and Decision-Making Capacity: Clinical Family, and Legal Issues. Wiley Clinical Gerontology Series.* New York.

Wood, S.  The impact of dementia on decisional capacity. (2007) In ED. (Smyers, M. & Qualls, S.) *Aging and Decision-Making Capacity: Clinical Family, and Legal Issues. Wiley Clinical Gerontology Series.* New York.

***Assessment of Older Adults with Diminished Capacity: A Handbook for Psychologists.* (2008). (Eds: S. Wood & J. Moye). American Bar Association / American Psychological Association (ABA / APA), Washington DC.**

Wood, S. & Hanoch, Y. (2011). The impact of financial literacy on Medicare part D insurance choice in Older Adults. In D. Lamdin (Ed.), *Financial Decisions Across the Lifespan: Problems, Programs, and Prospects*.

Moye, J., Marson, D., Edelstein, B., Wood, S. , Saldivar, A. (2010).  Decision making capacity. In W.

Schaie & S. L. Willis (Eds.),  *Handbook of the Psychology of Aging, 7th Edition.  Academic Press.*


Wood, S. & O'Brien, M. (2011). Assessment of decisional capacity. In G. Demakis (Ed.) Civil capacities in clinical

neuropsychology: Research findings and practical applications. Oxford University Press.


Wood, S. & Krauss, D.  (2012) Determination of Capacity: Legal and Ethical Considerations. In C. Noggle & R. Dean (Eds.), *The Neuropsychology of Cortical Dementias*. Springer.



**Wood, S. (2013).** *Elder Abuse and Neglect: Forensic Evaluation and Testimony.* **Part of the Forensic Practice in Psychology Series. American Psychological Association, Washington, DC.** *In progress.*

Wood, S. & Steele, A. (2012). Integrating Neuropsychology into your defense 101. Capital Defender. March 2012.

**Peer-reviewed Articles:**

Mortel, K.F., Wood, S., Pavol, M. A., Meyer, J. S., & Rexer, J. (1993). Analysis of familial and individual risk factors among patients with ischemic vascular dementia and Alzheimer's Disease. *Angiology, 43, (3),* 599-605.

Mortel, K. F., Pavol, M. A., Wood, S., Meyer, J. S., Teryama, Y., & Rexer, J. L., Herod, B. (1994). Prospective studies of cerebral perfusion and cognitive testing among elderly normal volunteers and patients with ischemic vascular dementia and Alzheimer's Disease. *Angiology, 44, (8),* 171-180.

Wood, S., Mortel, K. F., Hiscock, M., Breitmeyer, B., & Caroselli, J. S. (1997). The perception and utilization of color in Alzheimer's Disease. *Archives of Clinical Neuropsychology, 12, (5),* 483-489.

Wood, S., Hiscock, M., Pearson, D., Breitmeyer, B., & Foorman, B. (1996). Localization versus detection: Evidence for separate auditory pathways from a dichotic listening experiment. *Brain and Cognition, (32),* 302-304.

Castellion, S., Hinkin, C., Wood, S., & Yarema, K. *(1998). Apathy, depression, and cognitive performance in HIV-1 infection. *Journal of Neuropsychiatry and Clinical Neurosciences, 10, (3),* 320-329.

Hinkin, C. H., van Gorp, Wilfred, Satz, P., Marcotte, T., Durvasula, R. S., Wood, S., Campbell, L., & Baluda, M. R. (1996). Actual versus self-reported cognitive dysfunction in HIV-1 infection: Memory-metamemory dissociations. *Journal of Clinical and Experimental Neuropsychology, 18, (3),* 431-443.

Wood, S., Hinkin, C., Castellion, S., & Yarema, K.* (1998). Working memory deficits in HIV-1 infection. *Brain and Cognition, 37, (1),* 163-166.

Wood, S., & Cummings, J. L. (1999). Optimizing outcomes in Alzheimer's Research: Current Evidence for the effectiveness of Interventions and Future Prospects. *Disease Management and Health Outcomes, January, 5, (1),* 1-12.

Wood, S., Cummings, J. L., Barclay, T.* Hsu. M. A., Allahyar, M.*, & Schnelle, J. F. (1999). Assessing the impact of Neuropsychiatric symptoms on distress in professional caregivers. *Aging and Mental Health; 3, (3),* 241-245.

Wood, S., Cummings, J. L., Hsu, M. A., Barclay, T.*, Wheatley, M. V.*, Yarema, K.*, & Schnelle, J. F. (2000). Neuropsychiatric disturbances in nursing home residents: Characterization and measurement. *American Journal of Geriatric Psychiatry, 8, (1),* 75-83.

Wood, S., & Hiscock, M. (2000). Selective listening fails to alter the dichotic listening lag effect: Evidence that the lag effect is preattentional. *Brain and Language, 71,* 373-390.

Schnelle, J. F., Wood, S., Schnelle, B.*, & Simmons, S. (2001) Measurement Sensitivity and the MDS Depression Quality Indicator. *Gerontologist, 41, (3),* 401-405.

Wood, S., Cummings, J. F., Schnelle, B,* & Stephens, M.* (2002). The use of Videotaped Vignettes to improve the detection of depression in nursing facilities. *Gerontologist, 42, (1),* 1-8.

Wood, S., Cummings, J., & Stephens, M.* (2002). The use of videotaped training to improve the detection of Neuropsychiatric symptoms in individuals with Alzheimer's disease. *Alzheimer's Disease Quarterly, 3, (3)*, 1-6.

Wood, S, & Stephens, M. (2003).* Vulnerability to elder abuse and neglect in assisted living facilities. *Gerontologist*, *43, (5):* 753-7.

Wood, S., Busemeyer, J., Koling, A.*, Cox, K*., & Davis, H. (2005). Older adults as adaptive decision-makers: Evidence from the Gambling Task. *Psychology and Aging, V.* 20 (2) 220 -225.

Wood, S. (2006). Involving undergraduates in research: implementation of an AREA award for the study of aging and decision-making. Invited paper for special issue of *Educational Gerontology*,V 32 (7) 565 - 574.

Hiscock, M., Caroselli, J. S., & Wood, S. (2006). Concurrent Counting and Keyboarding: Lateralized interference depends on a difference between the hands in motor skills. *Cortex* V 1, 38 – 47.

Wood. S. & Kisley, M. (2006) The negativity bias is eliminated in older adults: Age-related reduction in event related brain potentials associated with evaluative categorization. *Psychology and Aging, 21( 4)*  815-821. .

Moye, J., Milnac, M., Wood, E., Wood, S., & Edelstein, B. (2006) Challenges in Guardianship of Older Adults:  Results of a Tri-state Study. *Journal of the National College of Probate Judges. 3*, 1-3.

Kisley, M. Wood, S. & Burrows, C. *(2007) Looking at the sunny side of life: The negativity bias is eliminated in older adults. *Psychological Science, 18* (9) 838-843.

Moye, J., Wood, S., Edelstein, B., & Wood. E.(2007).  Clinical Evidence is inadequate in guardianship trials: Results of a Tri-state Study. *Gerontologist, 47, 604-612.*

Moye, J., Wood, E., Edelstein, B., Wood, S., Bower, E., Harrison, E., & Armesto, J. (2007). Statuatory reform is associated with improved court practice: results from a tri-state comparison. *Behavioral Science and the Law, 25 (3)* 425-436.

Hanoch, Y., Wood, S., & Rice, T. (2007). Bounded rationality, emotions and elderly decision making: Not so fast and yet so frugal. *Human Development,* 50(6), 333-358.

Tanius, B., Wood, S., Hanoch, Y., & Rice, T. (2009). Aging and Choice: Applications to Medicare Part D. *Journal of Judgment and Decision Making, 4 (1), 92-101.*

Hanoch, Y., Rice, T., Cummings, J. Wood, S. (2009). How much Choice is too much? The case of the Medicare Prescription Drug Benefit. *Health Services Research, 44* (4), 1157-1168.

Falk, E., Landsverk, E., Mosqueda, L., Olsen, B.J., Schneider, D.C., Bernatz, S., & Wood, S. (2010).  Geriatricians and psychologists: Essential ingredients in the evaluation of elder abuse and neglect. *Journal of Elder Abuse & Neglect,* 22: 281-290.

Groscup, J. & Wood, S. (2010). Judicial Notebook: Neuropsychology in Capital Mitigation. *APA Monitor*, December, 2010.

Wood, S., Hanoch, Y., Barnes, A., Liu, P-J., Cummings, J., Bhattacharya, C., & Rice, T. (2011). Numeracy and Medicare Part D: the importance of choice & literacy for numbers in optimizing decision making for Medicare's prescription drug program. *Psychology and Aging, 26(2),* 295-307. doi: 10.1037/a0022028.

Hanoch, Y., Wood, S., Barnes, A., Liu, P., Rice, Y. (2012). Age, choice, and strategy selection: Searching for the right Medicare prescription drug plan. *Health Psychology.* .

Rolison, J. Hanoch, Y., & Wood, S. (2012). Risky Decision-Making in younger and older adults: the role of learning. Psychology and Aging, Vol 27(1), Mar 2012, 129-140.

Rice, T., Cummings, J., Hanoch, Y., & Wood, S. (2012). The Impact of Choice and Insurance Policy Standardization on Consumer Comprehension: A randomized trial. *Under Review.*

Barnes, A., Hanoch, Y. Wood, S., Liu, M., & Rice, T. (2012). One Fish, Two Fish, Red Fish, Blue Fish: Effects of Price Frames, Brand Names, and Choice Set Size in Medicare Part D Insurance Plan Decisions, *Medical Care Research & Review, Vol 69 (4) 460-473.*

Liu, M.*, Wood., S. & Hanoch, Y. Do Older Adults Prefer Fewer Options? (2012) Factors Impacting Preferred numbers of Choice. *Under review.*

Wood, S. et al. (2013). Neuropsychological predictors of elder fraud. *(Revision requested, Journal of Elder Abuse and Neglect).*

Wood, S. & Liu, M., (Summer, 2012). Undue Influence and Financial capacity. A Clinical Perspective. *Generations, Vol. 36 (2).*

Rolison, J.J., Wood, S., Hanoch, Y., & Liu, P.J. (2013). The subjective numeracy scale as a tool for assessing statistical numeracy in older adult populations. *Gerontology*, 59, 283-288.

Hsin, Y*., Wood, S., Hanoch, Y., & Berger, D. (2013) Risky Choice in Younger Versus Older Adults: Context Matters*; Journal of Behavioral Decision-Making (8) 2 MAR pp.*

Rolison, J.J., Hanoch, Y., Wood, S. & Liu, P. (2013). Risk taking differences across the lifespan: A question of age and domain. *Journal of Gerontology: Psychological Sciences.*

Barnes, A., Hanoch, Y., Federman, A., Wood, S., & Rice, T. (2013). Physician trainees' decision making and information processing: Choice size and Medicare Part D. PLOS-One.

# Presentations (over 70).

Wood, S., & Osborne, B. (1989). The effects of apomorphine on activity and exploration of rats with fornix transections. Paper presented at the Society for Neurosciences, Phoenix.

Osborne, B., Swanson, K., Wood, S., & Bjorn, K. (1989). The effects of D1 and D2 dopamine antagonists, SCH 23390 and Sulpiride, on the locomotor behavior of rats with fornix transections. Paper presented at Eastern Psychological Association, Boston.

Mortel, K. F., Wood, S., Pavol, M., & Meyer, J. S. (1992). Personal and familial risk factors among Alzheimer's and Vascular Dementia patients. Paper presented at American Neurological Association, Seattle.

Mortel, K. F., Pavol, M., Wood, S., Meyer, J. S., & Funk, J. L. (1992). Cerebral Perfusion and cognitive outcomes compared longitudinally among Alzheimer's and Multi-infarct dementia patients. Paper presented at American Neurological Association, Seattle.

Wood, S., Hiscock, M., Mortel, K. F., Breitmeyer, B., & Caroselli, J. S. (1994). Perception and utilization of color by patients with mild to moderate Alzheimer's Disease. Paper presented at International Neuropsychological Society, Cincinnati.

Wood, S., Hiscock, M., Pearson, D., Breitmeyer, B., & Foorman, B.(1996). An examination of the lag effect, attention, and localization in dichotic listening. Paper presented at the International Neuropsychological Society, Chicago.

Wood, S., Hiscock, M., Pearson, D., Breitmeyer, B., & Foorman, B. (1996). Localization versus detection: Evidence for separate auditory pathways from a dichotic listening experiment. Abstract presented at TENNET VII (Theoretical and Experimental Neuropsychology) Conference, August 1996, Montreal, Quebec.

Castellion, S., Hinkin, C., & Wood, S. (1997). Apathy and HIV-1 Infection: Who Cares? Paper to be presented at the International Neuropsychological Society, February 1997, Orlando.

Hinkin, C., Castellion S., & Wood, S. (1997). The Stroop effect in HIV-1 infection, Results from Stroop RT data. Paper presented at the International Neuropsychological Society, February 1997, Orlando.

Hinkin, C., Castellion S., & Wood, S. (1997). Information-processing speed in HIV-1 infection, Results from a dual-task experiment. Paper presented at the International Neuropsychological Society, February 1997, Orlando.

Wood, S., Green, M. F., Hiscock, M., Breitmeyer, B., & Satz, P. (1997). A comparison of visual and auditory masking at similar stimulus onset asynchronies (SOAs): Evidence for a common mechanism? Paper presented to the International Neuropsychological Society, June 1997, Bergen, Norway.

Wood, S., Hinkin, C., Castellion S., & Yarema, K.* (1997). Working memory deficits in HIV-1 infection. Paper presented to the TENNET VIII (Theoretical and Experimental Neuropsychology) Conference, June 1997, Montreal, Quebec.

Wood, S. Cummings, J. L., Schnelle, J. F., & Yarema, K.* (1998). Detection and Treatment of Depression in a demented nursing home setting. Paper presented at the 9th annual meeting of the American Neuropsychiatric Association in Honolulu, February 1998, Honolulu.

## Clinical Practice

**Licensed Clinical Psychologist in State of Colorado (#2557 inactive), California (#16805)**

| | |
|---|---|
| Aug 2004 - present | Clinical Neuropsychologist in Private Practice, Claremont, CA. Specializing in assessment of decisional abilities in forensic cases (criminal, civil, & probate). |
| December 2006- present | Member APA / ABA working group on capacity and guardianship issues. |
| June 2007 – March 2010. | Associate LA County Elder Abuse Forensic Center; Consultant Bernatz Forensic Neuropsychology |
| August 2006- August 2007 | Clinical Neuropsychologist / Clinical Supervisor: Center for Aging Resources (CFAR), Pasadena, CA. |
| | Provide training and supervision for neuropsychological assessment to Psychology Interns at community based, mental health center for older adults. |
| August 2001 - 2005 | Clinical Neuropsychologist / Clinical Supervisor: CU Aging Center. |
| | Provide supervision for neuropsychological assessment to graduate students. Established memory disorders clinic for older adults. Private practice specializing in neuropsychological assessment of older adults, assessment of capacity, and memory disturbances. |
| October 1995 - June 1997 | NIMH Chief Post-doctoral Fellow at the Neuropsychiatric Institute, University of California, Los Angeles. |
| | Director: Paul Satz, Ph.D. 2000 Hours. Licensed Clinical Psychologist in State of California (#16805). |
| July 1994 - June 1995 | Internship at the University of Arizona Health Sciences Center, Tucson, Arizona. |
| | Training Director: Anne M. Herring, Ph.D. 2000 Hours. Additional Supervisor: Alfred Kaszniak, Ph.D. |
| September 1992 - August 1993 | Transitional Learning Community, Galveston Texas. |
| | Supervisors: Karen Reed, Ph.D., and Lee Wang, Ph.D. 1000 Hours. Setting was a community re-entry post-acute rehabilitation facility with a functional approach. |
| September 1991 - August 1992 | Neurobehavioral Institute of Houston. |
| | Supervisors: Sigrid Rogers, Ph.D. and Walter High Jr., Ph.D. 1000 Hours. Setting was in-patient facility for acute and post-acute head-injury patients with significant behavioral disturbances. |

# Teaching Experience

<u>Undergraduate</u>

Introduction to Psychology

Foundations of Neuroscience

Cognitive Neuroscience and lab

Neuroscience of Decision-Making

Clinical Neuropsychology & Lab

Research Methods & Lab

Psychology of Aging

Adult Development & Aging

Survey of Clinical Psychology / Internship

Scripps Humanities CORE I: Culture Knowledge and Representation

Scripps Humanities CORE III: The Life Story.

<u>Graduate</u>

Seminar in Abnormal Psychology "Dementia"

Objective Testing: Personality and Cognitive Assessment

Human Neuropsychology

Neuropsychological Assessment

Practicum, Neuropsychological Assessment

Seminar Adult Development and Aging

**Appendix B: A review of advertisements provided by A. Levy.**

| File Name | Themes | | | |
|---|---|---|---|---|
| ZKAJ- 0983: using the money | You want to get your kids braces they need?Get 10K with 1 phone call | Don't need collateral or a home- cash call | Now I'm covered until my commission check comes in | Call today cash tomorrow |
| ZKAJ-O984 | Need cash fast. Don't need to leave home. | How about 10K | I got approved in minutes | |
| ZKAJ-0986: Apartmt Rev #1 | Apartment | | | Just need a good job and decent credit |
| 87 | Braces | | | |
| 90 | Rent? Apartment | | | |
| 91 | Braces | | | |
| 1000 | rent | | | |
| 1028: Future | Celebrity | Get 10 k wired directly to your account | Past doesn't matter-give us a ring ca ching | |
| 1051 Hard Hat | Teacher needs money for car | Gat 5 or 10 k | Call today cash tomorrow | Teacher and hard hat need cash for something |

| | Hard Hat: needs money fast | | | quickly |
|---|---|---|---|---|
| 1053 | Millions: Gary Coleman- I needed cash fast | 10k in my account thenext day | If you get in a tough spot and need cash cashcall was there | |
| 1159 | Gary Coleman: Globe | Money makes world go run: But when you run into trouble and need cash its tough | 2600 – 10K | Just need decent job interest rates are high but payments are VERYaffordable under 200 / month in most cases- pay it back in a few weeks or a few years. |
| 1160-62 | Gary Coleman: Globe | Money makes world go round | | |
| 1163 | Divorce: starting over needed cash | Renters | 2600-10K | Interest rate is high but payment is low |
| 1166 | Divorce / I was | | Need a good job | |

| | out of work for awhile | | not home ownership | |
|---|---|---|---|---|
| 1202 | Millions: Gary Coleman | | | Cash |
| 1363 | Want 10 K / month with only 200 monthly payments? | Just a signature? | 5 minutes | |
| 1087: Doesn't matter | Gary Coleman | Can get into money trouble | | 1 low monthly payment |
| 1375, 1377: No Nonsense | | | | 200 / month |
| 1321: Cash Machine | Gary Coleman: turn phone into a cash machine! | | | Cash call can put thousands into your checking account in a day! |
| | | | | |
| | | | | |
| | | | | |

**Appendix C: The following is a descriptions of the original website provided to me (document number).**

Screen 1:  Get $1,000's in your checking account in a day. Our easy application process can help you get the money straight into your checking account. The moment you need it!

"Can't catch up?". At CashCall, we understand that life can be unpredictable.  That's why we offer a quick and convenient application process so you can get the money you need, when you need it, even if you don't have perfect credit.

How Does CashCall work? Just complete our short online application, and receive an answer in minutes. It doesn't get any easier than this!

Get Started Now! Click below to get started our quick and easy application will have you enjoying the advantages of CashCall in minutes!

The site also has images of a smiling young woman operator and $100 bills.

Analysis: Screen is designed to draw consumers to an easy and fast procedure for almost instant money into their bank accounts. No cost is mentioned.

This screen has tabs in the top right that include "home", "login", "testimonials", "FAQs", "Rates", "careers" , "Contact Us", and "Help".

Screen 2: Application Process begins. Applicant provides name, age, and gender plus contact information. This screen has tabs in the top right that include "home", "login", "testimonials",

"FAQs", "Rates", "careers" , "Contact Us", and "Help".  There is no information on the screens that indicated total costs.

Screen 3: Application continues with driver's license and address. No terms or products are described. This screen has tabs in the top right that include "home", "login", "testimonials", "FAQs", "Rates", "careers" , "Contact Us", and "Help".

Screen 4: Application process continues. Employer information and SSN is sought. No term or loan information is provided. This screen has tabs in the top right that include "home", "login", "testimonials", "FAQs", "Rates", "careers" , "Contact Us", and "Help".

Screen 5: References are sought. This screen has tabs in the top right that include "home", "login", "testimonials", "FAQs", "Rates", "careers" , "Contact Us", and "Help".  However, no loan product information / terms is provided on the screen itself.

Screen 6: Some disclosures (Patriot act, Privacy statements, Note to California Borrowers) are provided directly. However, other key disclosures including the Promissory note and Truth in Lending Disclosure Statement "will be provided by electronic communication". Page 9 of doc.

Screen 7 & Screen 8: Internet Security Disclosure Information

Screen 9:  Indicates that the client has applied for a loan and it is processing. This screen has tabs in the top right that include "home", "login", "testimonials", "FAQs", "Rates", "careers" , "Contact Us", and "Help".

Screen 10:  Application submitted. Screen indicated the application was submitted successfully and is being reviewed.  The client is told they will be contacted as soon as the information has

been verified. No information regarding loan terms (APR, monthly payments, length of loan, total costs to consumers) is provided at this point.

Screen 11: Indicated that the credit report is being reviewed. This screen has tabs in the top right that include "home", "login", "testimonials", "FAQs", "Rates", "careers" , "Contact Us", and "Help".

Screen 12: This screen is entitled "Application being processed". It states "You have conditionally been approved pending verification of your identity and final underwriting review.

Next it states" You may be qualified for one of our $20,000, $10,000, $5,075, or $2600 products. If you haven't already selected a product, please return to www.cashcall.com or contact an agent. If you have any questions about these products or the terms and conditions of these loans.

The screen then asks for the client to fax a copy of the driver's license.

Screen 13: Select a loan product. This screen has the loan product amounts in large font bulleted by product (20,000; 10,000; 5,075, & 2600). Information is provided regarding the $75.00 fee. This screen has tabs in the top right that include "home", "login", "testimonials", "FAQs", "Rates", "careers" , "Contact Us", and "Help".  However no other information regarding the conditions and terms of the loan including total cost to them is provided.

Screen 14: Your application has been submitted. The loan product chosen is indicated here. This screen has tabs in the top right that include "home", "login", "testimonials", "FAQs", "Rates", "careers" , "Contact Us", and "Help".

No information regarding the terms and conditions regarding the specific product is provided to consumers on this screen.

Screen 15. Sign electronic document (with link). Your Cashcall application has been approved for xx amount. No terms of conditions are noted on this screen.

Screen 16: Log in screen for application. This screen has tabs in the top right that include "home", "login", "testimonials", "FAQs", "Rates", "careers" , "Contact Us", and "Help".

Screen 17 & Screen 18: Identity authorization. This screen has tabs in the top right that include "home", "login", "testimonials", "FAQs", "Rates", "careers" , "Contact Us", and "Help".

Screen 19: CONGRATULATIONS! Your loan has been approved. This screen has tabs in the top right that include "home", "login", "testimonials", "FAQs", "Rates", "careers" , "Contact Us", and "Help".

Screen 20 – 24: These screen shots are all part of the same signing / note page:

The Truth in Lending Disclosure is presented which includes in large font the annual percentage rate, Finance Charge, Amount Financed, and Total of payments. Late charges and Prepayment are also explained here.  Once checked (electrically signed), the loan is approved for funding,

Next a screen shot of emails received was reviewed. In these emails information regarding the loan payment (amount and date) is provided. The terms of the loan contract are provided. Consumers are provided with the term (in months), the amount financed and the annual percentage rate, but not total cost. The next screen is entitled CashCall Promissory Note and Disclosure Statement which included the Truth in Lending Disclosure which included the annual

percentage rate, the finance charge, the amount financed, and the total amount of payments (total cost of loan).

An updated series of screen shots was also provided to me (CASHCALL001398.pdf). An analysis of the updated version indicated similar themes of ease, speed, an emphasis on low monthly payments versus APR's and total costs accrued by consumers.

Screen 1:  The top of the screen indicated "Get up to $10,000 cash in one day!" Bullet points below say:

- "Save Time and Money" (prepay your CashCall loan at any time).
- Affordable monthly payments (Convenient monthly payments to help manage your life)
- How secure is my information? One of our highest commitment is to ensure your privacy. We do this by using some of the most advanced online security measures in the industry.
- How fast will I get my money?  Once you are approved and sign the online loan form agreement, in almost all cases you will receive the money in your bank account on the next business day.

Screen 2:  The top half now lists loan products: Choose from our loan products: 2,600, 5,075, and 10,000 and a statement Welcome to CashCall from first contact to your bank account in one business day.  The bottom half of the screen reiterates the information from above.

Screen 3: Reiterates previous screen information.

Screen 4: Frequently asked questions: There are 27 questions listed. Most pertain to application process and eligibility. One question asks "what is the APR and how is it calculated" There are no FAQ that ask about total costs.

Screen 5: Job opportunities.

Screen 6: Collections Job Descriptions

Screen 7: Secure Loan Application (solicits contact and other information about borrower.