United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EDUARDO DE LA TORRE, et al.,

           Plaintiffs,

   v.

CASHCALL, INC.,

           Defendant.

Case No.  08-cv-03174-MEJ

**ORDER RE: MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 159, 166, 175

## INTRODUCTION

Pending before the Court are the Motions for Summary Judgment filed by Defendant CashCall, Inc. regarding Plaintiffs Eduardo de la Torre and Lori Kempley's[1] ("Plaintiffs") Conditioning Claim ("Def. Condit. Mot.," Dkt. No. 159) and Unconscionability Claim ("Unc. Mot.," Dkt. No 166).  Also pending is Plaintiffs' Cross-Motion for Partial Summary Judgment on the Conditioning Claim and California Business and Professions Code section 17200 ("UCL") Unfair Competition Claim ("Pl. Condit. Mot.," Dkt. No. 175).  The Court held oral argument on these matters on April 3, 2014.  Having considered the parties' briefing and oral arguments, relevant legal authority, and the record in this case, the Court: (1) DENIES CashCall's Motion on the Conditioning Claim; (2) DENIES CashCall's Motion on the Unconscionability Claim; and (3) GRANTS Plaintiffs' Cross-Motion on the EFTA violation for the reasons set forth below.

---

[1] Formerly known as Lori Saysourivong.

**FACTUAL BACKGROUND**

**A.     Introduction**

CashCall makes high interest unsecured personal loans to qualifying consumers.  Holland Decl., ¶ 2, Dkt. No. 173.  On July 1, 2008, Plaintiffs initiated this class action lawsuit against CashCall, in which they contend that CashCall's loans violate consumer protection laws and are unconscionable.  Dkt. No. 1.  The Court granted class certification on November 15, 2011.  Class Cert. Order, Dkt. No. 100.  CashCall now moves for partial summary judgment as to the First Cause of Action for violation of the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693 et seq., and Federal Reserve Regulation E, 12 C.F.R. § 205 et seq. (the Conditioning Claim); the Fifth Cause of Action for Violation of the UCL based on unlawful violation of the EFTA; and the issue of actual damages.  Plaintiffs move for summary judgment as to the Conditioning Claim and the UCL Claim.  CashCall also moves for summary judgment as to the Fourth Cause of Action for violation of the UCL based on unconscionable loan terms pursuant to California Financial Code section 22302.

**B.     The Conditioning Claim**

Plaintiffs' Conditioning Claim is asserted on behalf of a "Conditioning Class" consisting of "all individuals who, while residing in California, borrowed money from CashCall, Inc. for personal, family or household use on or after March 13, 2006 through July 10, 2011 and were charged an NSF fee[2]."  Class. Certification Order at 38.  The class includes 96,583 borrowers, who were charged NSF fees that Plaintiffs now seek to recover as damages under the EFTA.  Pl. Opp'n to Condit. Mot. at 1, Dkt. No. 188.  Plaintiffs also seek to recover statutory damages under the EFTA, which are capped at the lesser of $500,000 or 1% of CashCall's net worth.  *Id*.

The promissory notes used by CashCall during the class period contained an Electronic Funds Authorization and Disclosure ("EFT Authorization") that stated in relevant part:

ELECTRONIC FUNDS AUTHORIZATION AND DISCLOSURE

**I hereby authorize CashCall to withdraw my scheduled loan payment from my checking account on or about the FIRST day**

---

[2] Insufficient funds fee.

United States District Court
Northern District of California

**of each month**. I further authorize CashCall to adjust this withdrawal to reflect any additional fees, charges or credits to my account. I understand that CashCall will notify me 10 days prior to any given transfer if the amount to be transferred varies by more than $50 from my regular payment amount. I understand that this authorization and the services undertaken by CashCall in no way alters or lessens my obligations under the loan agreement. **I understand that I can cancel this authorization at any time (including prior to my first payment due date) by sending written notification to CashCall.** Cancellations must be received at least seven days prior to the applicable due date.

Def.'s Sep. Stmt. in Supp. of Condit. Mot. ("Def. Condit. Stmt.") No. 1, Dkt. No. 160 (emphasis added); Stark Decl. in Support of Pls.' Mot. ("Stark Decl."), Ex. 3, P0352; Ex. 4, CC000445, Dkt. No. 177.

In order to obtain a loan, all Conditioning Class Members were required to check a box indicating that they authorized CashCall to withdraw their scheduled loan payments from their checking accounts on or about the first day of each month.  Pls.' Sep. Stmt. in Supp. of Cross-Mot. ("Pl. Condit. Stmt.") No. 5, Dkt. No. 175-1.  If a borrower did not check the box, the borrower could not obtain a loan from CashCall.  *Id.*, No. 6.  During the class period, CashCall would not and did not fund any loans to Class Members who did not check the check box on their CashCall promissory notes indicating that they authorized CashCall to withdraw their scheduled loan payments from their checking accounts on or about the first day of each month.  *Id.*, No. 7. However, once funded, Borrowers had the right to cancel the EFT Authorization at any time, including prior to the first payment, and to make any or all of their loan payments by other means. Def.'s Resp. to Pl. Condit. Sep. Stmt., No. 9, Dkt. No. 207.  Of the 96,583 members of the Conditioning Class, 15,506 (16%), canceled their EFT Authorization at some point after the loan funded.  *Id.*, No. 10.

The parties' cross-motions for summary judgment concern whether CashCall violated Section 1693k(1) of the EFTA, which prohibits "conditioning the extension of credit" on a borrower's "repayment by means of preauthorized electronic funds transfers ("EFT")."  Def. Condit. Mot. at 1 (citing 15 U.S.C. § 1693k(1) and Federal Reserve Regulation E, 12 C.F.R. § 205).  CashCall argues that the EFT Authorization contained in its promissory note did not violate the EFTA because the Act prohibits lenders from imposing EFTs as the exclusive method for

United States District Court
Northern District of California

1    consumers to repay a loan in its entirety, and CashCall's promissory notes authorized, but did not

2    require, payment by EFT.  *Id.* at 2.  CashCall also argues that the fact that it allowed other means

3    of payment from the inception of the loans establishes that it did not condition the extension of

4    credit on repayment by EFT.  *Id.* at 3.

5    **C.    Actual Damages**

6            In conjunction with its Motion for Summary Judgment on the Conditioning Claim,

7    CashCall also moves for partial summary judgment on the issue of actual damages, arguing that

8    Plaintiffs cannot establish that CashCall's initial EFT Authorization caused borrowers to incur

9    NSF fees in every instance.  *Id.* at 1-2.  Of the class members who incurred NSF fees, CashCall

10   directs the Court's attention to Class Representative Lori Kemply, who incurred fees because her

11   estranged husband made unauthorized withdrawals from her bank account. Def.'s Reply Stmt. No.

12   4, Dkt. No. 212.[3]  She also incurred NSF fees after cancelling her first EFT authorization, paying

13   by other means, and then providing a new EFT authorization.  *Id.*  Lori Hume and Tonya Gerald

14   incurred NSF fees after they instructed their banks to stop honoring CashCall's attempts to debit

15   their accounts without first cancelling their EFT authorizations.  *Id.*, No. 5.

16   **D.    The Unconscionability Claim[4]**

17           The Court also certified a class based on the allegation that CashCall's installment loans

18   charged an unconscionable rate of interest.  Class Cert. Order at 38.  The Loan Unconscionability

19   Class is comprised of "[a]ll individuals who while residing in California borrowed from $2,500 to

20   $2,600 at an interest rate of 90% or higher from CashCall for personal family or household use at

21   any time from June 30, 2004 through July 10, 2011."  *Id.*

22           CashCall's loans are offered to subprime borrowers, or those with FICO scores on average

23   less than 600.  Pls.' Sep. Stmt. Undisp. Mat. Facts in Supp. of Unc. Mot. ("Pl. Unc. Stmt.") No.

24   13, Dkt. No. 196.  From 2004 to the present, the default rate for the $2,600 loan product has been

25

26   _____

27   [3] Plaintiffs dispute the relevance of CashCall's facts regarding specific instances in which
     borrowers incurred NSF fees because they contend that class members incurred NSF fees as a
     result of the requirement that they make EFT payments to CashCall in order to receive a loan. Pl.
     Resp. to Def. Condit. Sep. Stmt., Nos. 4-5, Dkt. No. 189.
28   [4] Unless noted, the following facts are undisputed.

1    35% to 45%. *Id.*, No. 5. The total default rate for loans in the Class was 45%. *Id.*, No. 41.

2    CashCall rejected more than 72% of loan applications during this time. *Id.*, No. 15.

3         CashCall's signature product is an unsecured $2,600 loan with a 42 month term, using only

4    simple interest, and without prepayment penalty. *Id.*, No. 17-19.  This is the lowest amount

5    offered to members of the Class. *Id.*, No. 16.  CashCall has charged varying interest rates on its

6    $2,600 loan product during the Class Period.  Prior to the beginning of the Class period, the

7    interest rates on these loans were 79% and 87%. *Id.*, No. 20.  CashCall determined it could not

8    make a profit at these interest rates.[5] *Id.*, No. 21.  From August 18, 2005 to July 2009, CashCall

9    set the interest rate at 96%. *Id.*, No. 22.  In August 2005, CashCall also added a bold-print

10   warning to its promissory notes:

11            THIS LOAN CARRIES A VERY HIGH INTEREST RATE. YOU
         MAY BE ABLE TO OBTAIN CREDIT UNDER MORE
12       FAVORABLE TERMS ELSEWHERE. EVEN THOUGH THE
         TERM OF THE LOAN IS 37 MONTHS, WE STRONGLY
13       ENCOURAGE YOU TO PAY OFF THE LOAN AS SOON AS
         POSSIBLE. YOU HAVE THE RIGHT TO PAY OFF ALL OR
14       ANY PORTION OF THE LOAN AT ANY TIME WITHOUT
         INCURRING ANY PENALTY.
15

16   *Id.*, No. 23.  Beginning in July 2009, CashCall increased the interest rate to 135%. *Id.*, No. 24.

17   On September 27, 2010, CashCall also started charging more than 90% on its $5,075 loans. *Id.*,

18   No. 25.

19        During the class period, CashCall made a total of 135,288 loans with interest rates above

20   90%. *Id.*, No. 6.  Of those loans, 60,981, or 45.1%, defaulted. *Id.*, No.7.  Of this number, 5,401

21   defaulted without any repayment of principal. *Id.*, No.11.  Conversely, 58,857, or 43.7%, of the

22   signature loans were repaid in full prior to the end of the loan term. *Id.*, No. 8.  Of these loans,

23   5,651 were paid off within one month of origination. *Id.*, No. 9.  Another 23,723 loans were paid

24   off within six months of origination. *Id.*, No. 10.  Only 8,858 of the loans were repaid in full after

25   going to the full term of the loan. *Id.*, No. 12.  Of the Class, 29,039 borrowers, or 21.5%, have

26

27   _____

     [5] Plaintiffs do not dispute this fact, but contend that the reason for the lack of profitability at those
28   rates was due to CashCall's "business strategy for aggressive growth and large loan volumes."  Pl.
     Resp. to Def. Unc. Sep. Stmt., No. 21, Dkt. No. 206.

United States District Court
Northern District of California

1    taken out more than one loan from CashCall.  *Id.*, No. 14.  CashCall does not allow borrowers to

2    take out a second loan to repay an outstanding CashCall loan.  Post Decl. in Supp. of Unc. Mot. at

3    ¶ 5, Dkt. No. 171.

4        1.  CashCall's Business Model

5            CashCall's loans have a 42-month amortization period.  CashCall recovers its principal

6    loan amount of $2,600 in 12 months.[6]  Seiling Decl. in Support of Unc. Mot., Ex. C ("McFarlane

7    Rpt."), ¶ 81, Dkt. No. 172.  CashCall also incurs costs in making its loans.  Loan origination costs,

8    servicing costs, and cost of funds comprise on average 58% of the loan amount.  *Id.*  In order to

9    recoup these costs, plus any out-of-pocket expenses, CashCall must thus collect payments totaling

10   158% of the loan amount.  *Id.*  For its 96% APR loans with monthly payments of $216.55,

11   CashCall recovers 158% of the loan amount at month 19.  *Id.*  For its 135% APR loans with

12   monthly payments of $294.46, CashCall recovers the $2,600 loan amount by month nine, and

13   recovers the loan amount plus out-of-pocket expenses by month 14.  *Id.*  The average life of the

14   $2,600 loans was 20 months.  Def. Unc. Stmt., No. 27, Dkt. No. 206.  Due to the 42-month loan

15   term, CashCall can still earn a profit even if the borrower defaults before the maturity date.

16   McFarlane Rpt. ¶ 100.

17           Since it was founded, CashCall has pursued a business strategy of aggressive growth.[7]

18   Def. Unc. Stmt., No. 28.  The centerpiece of this strategy has been to increase and maintain high

19   loan volumes, including on its $2,600 loans.  *Id.*, No. 29.  Although CashCall incurred losses in

20   the financial crisis, it recovered in 2010, and in 2011 had profits of $60 million.  *Id.*, Nos. 30-31.

21           CashCall is licensed by the California Department of Business Oversight (the

22   "Department"), formerly known as the Department of Corporations Department.[8]  Def. Unc. Stmt.

23

24   ──────────────
     [6] This is not the same as crediting the borrower with payment of the principal.  Based on the
25   amortization schedule, the borrower repays the bulk of the principal in the last 12 months of the 42
     month repayment period.
26   [7] CashCall disputes the significance of its profitability figures, but not the amount.  Def.'s Resp. to
     Pls.' Unc. Sep. Stmt., Nos. 28-31.
27   [8] Pursuant to the Governor's Reorganization Plan No. 2 on July 1, 2013, the Department of
     Corporations and Department of Financial Institutions became the Department of Business
28   Oversight.  *See* www.dbo.ca.gov.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    No. 1, Dkt. No. 167.  As part of its licensing obligations, CashCall must file annual reports with

2    the Department.  Baren Decl. ¶¶ 3-12, Ex. A-H (CashCall's Annual Reports for 2004-2011).  *Id.*,

3    No. 2.  The Department additionally conducted audits of CashCall in 2004, 2007, and 2010.  *Id.*,

4    No. 3; Baren Decl. ¶ 13-16, Ex. I-K[9].  None of the audits objected to CashCall's practice of

5    charging interest rates above 90% on loans over $2,600.  *Id.*, No. 4.  Under the Financial Lender's

6    Law, interest rates on loans with principal amounts above $2,500 are not regulated.  Cal. Fin.

7    Code § 22303.  The Financial Code nonetheless authorizes the Department to take action against

8    improper charges by licensees.  *Id.* §§ 22700-13.

9               2.    <u>CashCall's Market Share and Availability of Alternative Products</u>

10              Up until 2007, CashCall offered a unique product in the subprime credit market because it

11   offered an installment loan based on a simple interest calculation, with no prepayment penalty,

12   that occupied the niche between payday loans and regular bank loans.  Levy Decl. in Opp'n to

13   Unc. Mot., Ex. 7 ("Levitin Rpt.") (citing Meeks Dep. Transcript, Vol. II at 362:21-363:4), ¶ 55,

14   Dkt. No. 194-1.

15              There are other loan options available to subprime borrowers, although the parties' experts

16   disagree on whether, or to what degree, these alternative loan products are comparable to

17   CashCall's consumer loans.  Def.'s Reply Stmt. No. 34, Dkt. No. 206 (citing Pls.' Consumer

18   Expert Sunders Dep. at 79:1-81:2).  Such options are payday loans, auto title loans, pawnshop

19   loans, tax refund anticipation loans, and secured credit cards.  Levitin Rpt. ¶ 44.  Payday loans are

20   typically for small dollar amounts and short duration (less than 31 days), but carry higher APRs.

21   Def. Reply Stmt. No. 37, Dkt. No. 206.  Tax refund anticipation loans are 1-2 week loans with

22   high APRs, average maturity of 11 days, and cannot be rolled over.  *Id.*, No. 38.  Auto title loans

23   are secured, require a car free and clear of liens, and are for a shorter duration than CashCall loans,

24   also with high APRs.  *Id.*, No. 39.  Pawnshop loans, which require collateral, also have shorter

25

26

27
     _____

     [9] Plaintiffs object to the Declaration of Mr. Baren in its entirety based on lack of disclosure in
     violation of Fed. R. Civ. R. 26(a)(1)(A) and (e). Dkt. No. 197.  As discussed below, the Court
     DENIES the motion to strike the declaration, and OVERRULES Plaintiffs' objections to

28   Paragraph Nos. 3, 13-16.

1    maturities and high APRs.  *Id.*, No. 40.

2              3.        The Relationship Between Default Rate and Profitability

3         CashCall bases its interest rates on a number of costs, including the rate charged by its

4    financing investors.  *Id.*, No. 46.  For instance, CashCall's advertising expenditures are high.  *Id.*,

5    No.  47.  Historically, advertising expense has accounted for nearly 20% of CashCall's total

6    operating costs.  *Id.*  CashCall builds the cost of its advertising campaigns into the interest rates it

7    charges consumers.  *Id.*, No. 48.  Advertising accounts for more than half of the 25% origination

8    costs input into CashCall's profitability model.  *Id.*  Plaintiffs contend that CashCall intentionally

9    builds a 35-40% default rate into its loan products, knowing that nearly half of the people it lends

10   to will be unable to repay, and that CashCall intentionally maintains low underwriting standards

11   leading to its high loan defaults in order to achieve its target loan volumes.  *Id.*, Nos. 43-44.  In

12   Plaintiffs' view, CashCall's efforts to increase loan origination s through increased advertising and

13   marketing activities, and the use of broad underwriting standards to increase the pool of qualified

14   borrowers, increases CashCall's expenses, which CashCall must recover through higher APRs

15   charged to borrowers.  *Id.*, No. 45.  CashCall's high interest rates are also intended to recoup the

16   cost of maintaining a collection unit to collect loans from defaulting borrowers.  *Id.*, No.  49.

17             4.        Impact of CashCall's Loans on Borrowers

18        For CashCall's 96% $2,600 loan, the actual APR was over 99%, with total loan payments

19   of $9,150, or 3.6 times the amount borrowed.  *Id.*, No. 50.  For the 135% loan, the APR is over

20   138%, with total loan payments of $11,000, or 4.3 times the amount borrowed.  *Id.*  Substantially

21   all Class Members paid these interest rates.  *Id.*, No. 51.  Approximately half of the Class

22   Members paid their loans in full.  *Id.*  Of these, 1/3 of this group paid in full more than six months

23   after taking out the loans, and about 6.5% paid until loan maturity.  *Id.*

24             5.        Consumer's Vulnerability to CashCall's Advertising[10]

25        CashCall is a "direct response" TV advertiser.  Pl. Unc. Stmt. No.  58, Dkt. No. 196.  Its

26   advertising objective is to get viewers to impulsively call for a loan.  *Id.*  CashCall's advertising

27   —————————————

28   [10] CashCall disputes the relevance of these facts, and the reliability of the expert testimony on
     which they are based.  Def. Reply to Pl. Unc. Sep. Stmt., Nos. 58-64, Dkt. No. 206.

United States District Court
Northern District of California

strategy capitalizes on the viewer's need to get money quickly. *Id.*, No. 59. CashCall strategically emphasizes the monthly payment in its advertising because many Americans make financial decisions based upon what they can afford each month, as opposed to the APR. *Id.*, No. 60. Studies show low credit scores correlate with financial sophistication and literacy. *Id.*, No. 62. CashCall lends to consumers with low credit scores, who are under financial stress. *Id.*, No. 63. Plaintiffs' expert opined that individuals facing financial stress have reduced cognitive capacity and tend to make poor financial decisions. *Id.* Plaintiffs do not allege that CashCall's advertising is deceptive, but contend that it nevertheless deflects borrowers from critical information about the real cost of the loan. *Id.*, No. 64.

### 6.   Effectiveness of CashCall's Disclosure Practices

CashCall's promissory notes satisfied TILA loan disclosure requirements. *Id.*, No. 67-71. However, Plaintiffs contend that CashCall's practice of not providing written loan disclosures until late in the application process, after the borrower has already been approved, capitalizes on the psychological bias against losing "sunk costs." *Id.*, No. 65. Borrowers who have already invested in the application process, been "approved," and are counting on getting the need for cash filled, are psychologically biased against accepting contrary information and are predisposed to either ignore the disclosures or unfairly discount their significance. *Id.*

**PROCEDURAL BACKGROUND**

Plaintiffs initially filed this action on July 1, 2008. Dkt. No. 1. Plaintiffs subsequently filed the Fourth Amended Class Action Complaint ("FAC") on February 25, 2010. Dkt. No. 54. Among other claims, Plaintiffs alleged causes of action under the EFTA and the UCL based on CashCall's practice of conditioning its extension of credit to consumers on an agreement to repay their loans by means of preauthorized electronic fund transfers. FAC ¶¶ 8-9; 17. Plaintiffs also alleged that CashCall violated the UCL, California Financial Code section 22302, and California Civil Code section 1670.5, by making loans at rates of interest and on other terms that are unconscionable in light of the financial circumstances of the borrowers. FAC ¶ 75.

On November 14, 2011, the Court granted in part Plaintiffs' motion for class certification on the EFTA conditioning claim, the UCL claim premised on the EFTA violations, and the UCL

United States District Court
Northern District of California

9

1    claim based on violation of California Financial Code section 22303 and Civil Code section

2    1670.5.  Dkt. No. 100.

3            CashCall now moves for summary judgment as to its liability under the EFTA, the UCL,

4    and on the issue of actual damages.  Dkt. No. 159.  CashCall contends that it did not violate the

5    EFTA by conditioning the extension of credit to consumers on repayment by EFT.  *Id.* at 6.

6    Plaintiffs have filed an Opposition (Dkt. No. 188), to which CashCall has filed a Reply (Dkt. No.

7    211).  Both parties have filed Requests for Judicial Notice ("RJN").  Dkt. Nos. 164, 191.

8            Plaintiffs filed a cross-motion for partial summary judgment as to CashCall's liability on

9    the conditioning claims under the EFTA and the UCL.  Dkt. No. 175.  Plaintiffs argue that they

10   are entitled to summary judgment on the conditioning claim because the undisputed evidence

11   establishes that CashCall conditioned its extension of credit on payment by EFT by requiring all

12   borrowers to execute an EFT Authorization prior to receiving funding.  *Id.* at 6.  Plaintiffs

13   maintain that the right to later cancel EFT payments does not allow a lender who conditions the

14   initial extension of credit on such payments to avoid liability.  *Id.* at 4 (citing Ord. on Mot. to

15   Dismiss at 4-5, Dkt. No. 34).  CashCall has filed an Opposition (Dkt. No. 181), to which Plaintiffs

16   have filed a Reply (Dkt. No. 208).  CashCall has additionally filed a Request for Judicial Notice.

17   Dkt. No. 185.

18           CashCall also moves for summary judgment on the unconscionability claim, arguing that

19   Plaintiffs have failed to establish that its interest rates are unconscionable as a matter of law.  Dkt.

20   No. 166.  Plaintiffs have filed an Opposition (Dkt. No. 193), to which CashCall has filed a Reply

21   (Dkt. No. 204).  CashCall has additionally filed a Request for Judicial Notice.  Dkt. No. 174.

22   Plaintiffs filed objections to CashCall's Evidence in support of this Motion.  Dkt. No. 197.

23   CashCall has filed an Opposition (Dkt. No. 205) as well as its own objections to Plaintiffs' expert

24   evidence (Dkt. No. 214).  Plaintiffs have filed an Opposition to CashCall's evidentiary objections.

25   Dkt. No. 214.

26                                        **LEGAL STANDARD**

27           Summary judgment is proper where the pleadings, discovery and affidavits demonstrate

28   that there is "no genuine dispute as to any material fact and [that] the movant is entitled to

United States District Court
Northern District of California

10

1   judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party moving for summary judgment

2   bears the initial burden of identifying those portions of the pleadings, discovery and affidavits that

3   demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S.

4   317, 323 (1986).  Material facts are those that may affect the outcome of the case.  *Anderson v.*

5   *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is

6   sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id.*

7          Where the moving party will have the burden of proof on an issue at trial, it must

8   affirmatively demonstrate that no reasonable trier of fact could find other than for the moving

9   party.  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  On an issue where

10  the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by

11  pointing out to the district court that there is an absence of evidence to support the nonmoving

12  party's case.  *Celotex*, 477 U.S. at 324-25.  When cross-motions for summary judgment are filed

13  on the same claim, the court must consider evidence submitted in support of and in opposition to

14  both motions before ruling on either motion.  *See Fair Housing Council of Riverside Cty., Inc. v.*

15  *Riverside Two*, 249 F. 3d 1132, 1136 (9th Cir. 2001).

16         If the moving party meets its initial burden, the opposing party must then set forth specific

17  facts showing that there is some genuine issue for trial in order to defeat the motion.  Fed. R. Civ.

18  P. 56(e); *Anderson*, 477 U.S. at 250.  It is not the task of the Court to scour the record in search of

19  a genuine issue of triable fact.  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  The Court

20  "rel[ies] on the nonmoving party to identify with reasonable particularity the evidence that

21  precludes summary judgment."  *Id.*; *see also Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1017

22  (9th Cir. 2010).  Thus, "[t]he district court need not examine the entire file for evidence

23  establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with

24  adequate references so that it could conveniently be found."  *Carmen v. San Francisco Unified*

25  *Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).  If the nonmoving party fails to make this

26  showing, "the moving party is entitled to a judgment as a matter of law."  *Celotex*, 477 U.S. at 323

27  (internal quotations omitted).

28

United States District Court
Northern District of California

**CROSS MOTIONS FOR SUMMARY JUDGMENT ON THE CONDITIONING CLAIM**

**A.      Requests for Judicial Notice**

In conjunction with the Cross-Motions for Summary Judgment on the Conditioning Claim, both parties request that the Court take judicial notice of the legislative history of Title 15, United States Code sections 1693 through 1693r, the Electronic Fund Transfer Act by the United States House of Representatives Bill No. 14279 of 1978 [H.R. 14279], enacted by Congress as Public Law 95-630, on October 27, 1978, 92 United States Statutes 3641.  Def.'s Req. Jud. Not. Condit. Mot., Dkt. No. 164; Def.'s Req. Jud. Not. in Opp'n to Pl. Condit. Mot., Dkt. No. 185; Pls.' Req. Jud. Not. Condit. Mot., Dkt. No. 191.  The Court will take notice judicial notice of the legislative history of the EFTA pursuant to Federal Rule of Evidence 201(d), as judicial notice of legislative history is proper where, as here, its authenticity is beyond dispute.  *Territory of Alaska v. Am. Can Co.*, 358 U.S. 224, 226-27 (1959) (taking judicial notice of legislative history of statute); *Zephyr v. Saxon Mortg. Services, Inc.*, 873 F. Supp. 2d 1223, 1225 (E.D. Cal. 2012) (statute's legislative history is proper subject of judicial notice).

CashCall additionally requests that the Court take notice of *Meeks, et al. v. Cash Call, Inc.*, Case No. BC 367894, Superior Court of California, County of Los Angeles, May 6, 2008, Ruling on Demurrer. (Ex. B).  Def.'s Opp'n to Condit. RJN, Dkt. No. 185.  A court may take judicial notice "'of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to the matters at issue.'"  *United States v. Black*, 482 F.3d 1035, 1041 (9th Cir. 2007) (quoting *United States ex. rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992).  Because the demurrer addresses the same conditioning claims made against CashCall, it has a "direct relation" to the conditioning issue. The Court will thus take judicial notice of the ruling on the demurrer.

**B.      Motion for Summary Judgment on the Conditioning Claim**

CashCall moves for summary judgment on Plaintiffs' Conditioning Claim, which asserts that CashCall violated Section 1693k(1) of the EFTA, which prohibits "conditioning the extension of credit" on a borrower's "repayment by means of preauthorized electronic funds transfers ("EFT")."  Condit. Mot. at 1.  To the extent they are based on the Conditioning Claim, CashCall

12

1    also moves for summary judgment on Plaintiffs' UCL claims in the Fifth and Sixth Causes of

2    Action.  *Id.*  Alternatively, CashCall argues it is entitled to partial summary judgment on the issue

3    of actual damages on the Conditioning Claim because Plaintiffs cannot prove that every NSF that

4    was charged to members of the Conditioning Class was a result of the alleged conditioning of the

5    extension of credit on the borrower's repayment by EFT.  *Id.*

6            Plaintiffs also move for summary judgment on the Conditioning Claim, arguing that

7    CashCall's promissory note violated the EFTA because it required the class members to consent to

8    preauthorized electronic fund transfers before it would fund a loan, which is conditioning the

9    extension of credit on the borrower's agreement to pay by EFT.  Pl. Condit. Mot. at 6.

10           Under Regulation E, the implementing regulation of the EFTA, "[n]o ... person[11] may

11   condition an extension of credit to a consumer on the consumer's repayment by preauthorized

12   electronic fund transfers...."  12 C.F.R. § 205.10(e)(1); 15 U.S.C. § 1693k(1).  The EFTA defines

13   "preauthorized electronic fund transfer" as "an electronic fund transfer authorized in advance to

14   recur at substantially regular intervals."  15 U.S.C. § 1693a(10).  The purpose of the EFTA is to

15   define "the rights and liabilities of consumers, financial institutions, and intermediaries in

16   electronic fund transfers," with the "primary objective" of "the provision of individual consumer

17   rights."  15 U.S.C. § 1693.  One such objective is protecting consumers from compulsory use of

18   EFT services.  Def. Condit. RJN, Ex. A, at p. 31 (House Congressional Record—August 11, 1978,

19   p. 25733: "In section 912 [referring to what became § 1693k(1)] we insure that consumers are not

20   forced to use the EFT.").  The EFTA provides a private right of action for consumers, specifying

21   that "any person" who fails to comply with any provision of the EFTA with respect to any

22   consumer "is liable to such consumer."  15 U.S.C. § 1693m(a).

23           CashCall contends that the plain meaning of Section 1693k(1) prohibits conditioning the

24   extension of credit upon a requirement to make *all* loan payments by EFT during the life of the

25   loan.  Def. Condit. Mot. at 8.  Since CashCall does not require a borrower to make any payment

26

27   [11] A "person" is defined as a "natural person or an organization, including a corporation. . . ." 12
     C.F.R. § 205.2(j).  Accordingly, CashCall is a "person" for purposes of the EFTA.

28

United States District Court
Northern District of California

13

1    by EFT, it maintains it did not condition its loans on repayment by EFT.  Def. Condit. Reply at 1.

2    CashCall's interpretation of § 1693k(1) is unsupported by either the plain language of the

3    provision (which nowhere mentions repayment "in full" or "in its entirety") or its legislative

4    history.

5            To discern the meaning of a statute, courts first look to the plain language of the statute

6    itself.  *United States v. Williams*, 659 F.3d 1223, 1225 (9th Cir. 2011). Courts determine the plain

7    meaning of a statutory provision by reference to the "structure of the statute as a whole, including

8    its object and policy."  *Children's Hosp. & Health Ctr. v. Belshe*, 188 F.3d 1090, 1096 (9th Cir.

9    1999).  The plain meaning of a statute controls, and a court "need not examine legislative history

10   as an aide to interpretation unless 'the legislative history clearly indicates that Congress meant

11   something other than what it said.'"  *Williams*, 659 F.3d at 1225 (quoting *Carson Harbor Vill.,*

12   *Ltd. v. Unocal Corp.*, 270 F.3d 863, 877 (9th Cir. 2001) (en banc)).

13           It is evident from the statutory language that the activity prohibited by section 1693k(1) is

14   precisely the activity that CashCall engaged in here—"condition[ing] the extension of credit to a

15   consumer on such consumer's repayment by means of preauthorized electronic fund transfers."  A

16   violation of section 1693k(1) thus occurs at the moment of conditioning—that is, the moment the

17   creditor requires a consumer to authorize EFT as a condition of extending credit to the consumer.

18   As the statute's plain language is unambiguous, the Court need only look to the legislative history

19   to confirm that Congress did not mean something other than what it said.  *Williams*, 659 F.3d at

20   1225.  The EFTA's legislative history confirms that Congress intended § 1693k(1) to prohibit

21   creditors from conditioning the extension of credit on consumers' agreement to repay their loans

22   by EFT. Exh. A to Pl. RJN, p. 34 ("A creditor could not condition the extension of credit on a

23   consumer's agreement to repay by automatic EFT payments. . . .  [A] creditor could not offer only

24   loans repayable by EFT.").  Contrary to CashCall's suggestion, this interpretation of the statute is

25   fully consistent with the statutory purpose of insuring that "EFT develops in an atmosphere of free

26   choice for the consumer" and "consumers are not forced to use EFT."  *Id.*, p. 33 (Congressional

27   Record— House, p. 25733).  Thus, the legislative history of the EFTA confirms § 1693k(1)'s

28   plain meaning: a creditor may not condition the extension of credit to a consumer on the

United States District Court
Northern District of California

14

consumer's preauthorization of EFTs.

The only district court to consider this issue came to the same conclusion. *Federal Trade Commission v. Payday Financial LLC,* 2013 WL 5442387, at *8-9 (D. S.D. Sept. 30, 2013). In that case, the Federal Trade Commission ("FTC") brought an action against payday lenders for violation of Section 1963k(1) by conditioning loans on consent to an EFT clause that, like the clause at issue in this case, permitted EFT authorization to be revoked prior to the first payment. In finding that the lenders violated the EFTA, the *Payday* court relied on this Court's reasoning in its prior ruling on CashCall's Motion to Dismiss. *Payday,* at *8. CashCall argues that the Court should not consider this as persuasive authority because the *Payday* court merely adopted this Court's reasoning without further analysis. The Court disagrees.

The loan agreements at issue in *Payday* provided that EFT authorization was "revocable 'at any time (including prior to your first payment due date) by sending written notification to [defendants].'" *Id.* at *8. The defendants argued that no claim could lie under the EFTA because the requirement that borrowers consent to electronic fund transfers was "for 'the consumer's convenience' and 'revocable at any time.'" *Id.* The court rejected this argument and granted summary judgment to the FTC, holding that the EFTA and Regulation E permit no exception for "consumer convenience" and that the revocability of EFT authorization was irrelevant to the court's liability determination. *Id.* at *8-9. The court reasoned as follows:

> No provision of any of the Defendants' loan agreements . . . .expressly states that the consumer does not need to authorize EFT at all to receive a loan or provides a means by which a consumer can obtain a loan without initially agreeing to EFT. Defendants no doubt would argue that a consumer could infer from the language that, if the EFT can be revoked "prior to your first payment due date," then the loan is not conditioned on agreement to the EFT clause. This argument, albeit in the context of a ruling in a motion to dismiss, was rejected in *O'Donovan v. CashCall, Inc.*, No. C 08–03174 MEJ, 2009 WL 1833990 (N.D. Cal. June 24, 2009). . . . This Court agrees.

*Id.* Central to the court's analysis was the fact that "the [lender] ha[d] never issued a consumer loan without the consumer initially entering into a loan agreement containing an EFT clause." *Id.* at *9. The court observed that despite the cancellation clause, "there [was] no language expressly stating that the extension of credit is not conditioned on agreement initially to EFT" or explaining

15

how a consumer might otherwise obtain a consumer loan from the lender.  *Id*.  The court reasoned that the lender's arguments that "in practice" they did not condition the extension of credit on consent to EFTs ignored that in reality their loan agreements did just that.  *Id*.  Although the court described the violation as "somewhat technical in nature," and not likely to yield extensive damages, it found the lender's EFT clause nevertheless violated the EFTA and Regulation E.  *Id.*

The undisputed evidence in this case demonstrates that, as a condition of extending credit to Conditioning Class Members, CashCall required them to consent to "preauthorized electronic fund transfers" that were "authorized in advance to recur at substantially regular intervals," in violation of the EFTA.  Pl. Condit. Stmt., Nos. 5-6, Dkt. No. 175-1.  In order to have their loans funded, all Conditioning Class Members were required to check a box authorizing CashCall to withdraw their monthly loan payments by EFT.  *Id.,* No. 6.  If the borrower did not check the box, CashCall would not fund the loan.  *Id*., No. 7.  All members of the Conditioning Class signed the electronic funds authorization at the time they signed their promissory note.  *Id*., No. 5.  There is thus no dispute that CashCall conditioned the funding of loans to Conditioning Class Members on their consent to having their monthly loan payments withdrawn from their bank accounts.  By conditioning the extension of credit to Conditioning Class Members on their repayment by means of preauthorized electronic fund transfers, CashCall violated the EFTA.

The uncontroverted evidence thus demonstrates that during the Class Period, CashCall issued consumer loans only to borrowers who initially entered into a loan agreement containing an EFT authorization clause.  CashCall's loan application and loan agreement forms do not state that a consumer need not consent to EFT to obtain a loan from CashCall or explain how a consumer could obtain a loan from CashCall without consenting to EFT.  To the contrary, checking the EFT Authorization box was a mandatory prerequisite to obtaining a loan.  CashCall conditioned the extension of credit on consent to EFT by requiring Conditioning Class Members to check the EFT authorization box in order to submit their loan agreements, receive credit, and have their loans funded.  Section 1693k(1) is unambiguous, and its purpose is clear.  By conditioning its extension of credit to members of the Conditioning Class on Class Members' agreement to repay their CashCall loans by means of preauthorized electronic fund transfers, CashCall violated the EFTA.

United States District Court
Northern District of California

1    *See* 15 U.S.C. § 1693k(1). Accordingly, the Court DENIES CashCall's Motion and GRANTS

2    Plaintiffs' Motion for Partial Summary Judgment on the EFTA claim.

3    **C.**      **The Unfair Competition Claim**

4          By establishing that they are entitled to partial summary judgment on their EFTA claim,

5    Plaintiffs have also established that they are entitled to summary judgment on their UCL claim

6    premised on CashCall's violation of the EFTA. The UCL proscribes three types of unfair

7    competition: "practices which are unlawful, unfair or fraudulent." *In re Tobacco II Cases*, 46 Cal.

8    4th 298, 311 (2009) (internal quotation marks and citation omitted); *see also* Cal. Bus. & Prof.

9    Code § 17200 (defining unfair competition to include "any unlawful, unfair or fraudulent business

10    act or practice"). With respect to the UCL's unlawful prong, the California Supreme Court has

11    held: "By proscribing 'any unlawful' business practice, § 17200 borrows violations of other laws

12    and treats them as unlawful practices that the unfair competition law makes independently

13    actionable." *Cel–Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180

14    (1999) (internal quotations omitted). In other words, claims raised under the UCL's unlawful

15    prong rise or fall with the Court's determination of liability with respect to the underlying

16    violation. *See Krantz v. BT Visual Images*, 89 Cal. App. 4th 164, 178 (2001). In this action,

17    Plaintiffs' UCL claim is premised on CashCall's violation of the EFTA, which explicitly provides

18    that lenders may not "condition the extension of credit to a consumer on such consumer's

19    repayment by means of preauthorized electronic fund transfers." 15 U.S.C. § 1693k(1).

20    Plaintiffs' UCL claim borrows the EFTA violation and treats it as an independently actionable

21    unlawful business practice. As Plaintiffs have established that CashCall violated the EFTA,

22    Plaintiffs are entitled to partial summary judgment on their UCL claim.

23    **D.**      **Actual Damages on the Conditioning Claim**

24          CashCall also moves for partial summary judgment on the issue of actual damages on the

25    Conditioning Claim. Def. Condit. Mot. at 10. Particularly, CashCall contends that Plaintiffs have

26    not raised a triable issue of fact because they cannot establish that its violation of Section 1693k(1)

27    caused every instance in which CashCall charged NSF fees. *Id.* Plaintiffs argue that this issue

28    turns on a number of disputed facts and is not appropriate for resolution on summary judgment.

1    Pl. Condit. Opp'n at 14.

2         Actual damages under the EFTA require proof that the damages were incurred "as a result"

3    of the defendant's violation of the statute.  15 U.S.C. § 1693m(a).  CashCall cites a number of

4    cases for the general proposition that "to recover actual damages [for violation of the EFTA], a

5    plaintiff must establish causation of harm. . . ."  *See Martz v. PNC Bank, N.A.*, 2006 WL 3840354,

6    at *5 (W.D. Pa. Nov. 30, 2006); *Brown v. Bank of Ant*, 457 F. Supp. 2d 82, 90 (D. Mass. 2006)

7    (finding that plaintiffs must "establish causation of harm in the form of detrimental reliance" to

8    recover actual damages under the EFTA, relying on case law interpreting the identical actual

9    damages provision in the Truth in Lending Act); *Voeks v. Pilot Travel Ctrs.*, 560 F. Supp. 2d 718,

10   723 (E.D. Wis. 2008) ("[Plaintiff's] actual damages have to be proximately caused by the

11   Defendant's failure as recognized under the [EFTA].").  However, none of these cases conclude

12   that actual damages must be assessed as a group, rather than on individual proof.  Moreover, the

13   causal link between the EFTA violation and the NSF fees incurred by the Class Members is

14   disputed.  The evidence in this case raises a dispute of material fact as to whether CashCall would

15   have collected NSF fees from Class Members had CashCall had not conditioned the funding of

16   their loans on EFT authorization.  The exact amount of actual damages attributable to CashCall's

17   violation of the EFTA is thus a disputed factual question that may be decided after liability is

18   determined, together with Plaintiffs' claims for statutory damages and restitution.  Accordingly,

19   CashCall's motion for summary judgment as to actual damages is DENIED.

20   **E.    Conclusion**

21        For the foregoing reasons, the Court DENIES CashCall's Motion and GRANTS Plaintiffs'

22   Motion for Partial Summary Judgment as to the Conditioning Claim.  As Plaintiffs have

23   established that they are entitled to partial summary judgment on their EFTA claim, the Court also

24   GRANTS summary judgment as to the UCL claims in the Fifth Cause of Action because they are

25   premised on the EFTA violation.  The Court DENIES CashCall's Motion for Partial Summary

26   Judgment on the issue of actual damages as Plaintiffs have set forth specific facts showing that

27   there is some genuine issue for trial.

28

United States District Court
Northern District of California

1  **MOTION FOR SUMMARY JUDGMENT ON THE UNCONCSIONABILITY CLAIM**

2  **A.     Request for Judicial Notice**

3          Along with its Motion for Summary Judgment on the Unconscionability Claim, CashCall

4  requests that the Court take judicial notice of the following documents: (1) Annual Reports by the

5  California Department of Business Oversight (formerly the California Department of

6  Corporations, and hereinafter "the Department") for Operation of Finance Companies for the years

7  2004-2011 (Exs. A-H); (2) Annual Reports by the Department for Operation of Deferred Deposit

8  Originators for the years 2005-2011 (Exs. G-O); and (3) Excerpts from the legislative history of

9  California Financial Code section 22303 Senate Bill No 447 Introduced by Senator Vuich on

10  February 19, 1985.  Plaintiffs do not object.  Pursuant to Federal Rule of Evidence 201, the Court

11  takes judicial notice of Exhibits A-O attached to CashCall's request because they are matters of

12  public record.  *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001).  With respect to

13  Exhibit N, judicial notice is appropriate because that document reflects legislative history that's

14  authenticity is beyond dispute, pursuant to Rule 201(d).  *See Oneida Indian Nation of N.Y. v. State*

15  *of New York*, 691 F.2d 1070, 1086 (2d Cir 1982); *Matter of Reading Co.; Pet. of U.S.*, 413 F.

16  Supp. 54, 57 (E.D. Pa. 1976).

17  **B.     Plaintiffs' Evidentiary Objections**

18          1.     <u>Motion to Strike the Baren Declaration</u>

19          Pursuant to Federal Rule of Civil Procedure ("Rule") 37(c), Plaintiffs seek to preclude

20  CashCall from introducing the Declaration of Daniel Baren in support of its Motion for Summary

21  Judgment, arguing that CashCall never disclosed Baren in the initial or supplemental disclosures

22  required by Rule 26(a)(1)(A) and (e).  Mot. to Strike ("MTS") at 1, Dkt. No. 197.  CashCall offers

23  Baren's declaration to: (1) authenticate CashCall's 2004-2011 Annual Reports and the

24  Department's 2007-2010 Audit Reports of CashCall's lending activities; and (2) explain

25  CashCall's reporting requirements.  Decl. of Daniel H. Baren In Support of CashCall's Motion for

26  Summary Judgment ("Baren Decl."), Ex. A-K, Dkt. No. 168.

27          Rule 26(e) requires a party who has responded to an interrogatory or who has made a

28  disclosure under Rule 26(a) to supplement its response in a timely manner if: "the party learns that

United States District Court
Northern District of California

19

in some material respect the disclosure or response is incomplete or incorrect, *and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process* or in writing" (emphasis added).  Rule 37 provides that "[i]if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  The "party facing sanctions bears the burden of proving that its failure to disclose the required information was substantially justified or is harmless."  *R&R Sails, Inc. v. Ins. Co. of Penn.*, 673 F.3d 1240, 1246 (9th Cir. 2012); *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001).  The determination of whether a failure to disclose is justified or harmless is entrusted to the broad discretion of the district court.  *Kim v. Pacific Bell*, 1999 WL 760634, *2 (N.D. Cal. Sep. 20, 1999) (citing *Mid–America Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1363 (7th Cir. 1996)).

Plaintiffs argue that CashCall failed to list Baren on its updated disclosures, resulting in unfair surprise and prejudice, as Plaintiffs no longer have the opportunity to depose him.  MTS at 2.  CashCall contends that Plaintiffs' argument is frivolous because Plaintiffs were aware of the scope and nature of Baren's potential testimony because they listed him as "an individual that is likely to have discoverable information Plaintiffs may use to support their claims or defenses" in their own initial disclosures months before the discovery-cut off.  Decl. of Noel S. Cohen in Supp. of Opp'n to MTS, Ex. A, ("Cohen Decl."), at 1, Dkt. No. 205.

Courts routinely permit Rule 37 sanctions where the party facing sanctions does not justify the failure to disclose or where the failure to disclose prejudices the other party.  *See Medina v. Multaler*, 547 F. Supp. 2d 1099, 1106, fn8 (C.D. Cal. 2007) (striking declarations first disclosed in opposition to summary judgment motion because the "failure to disclose [the declarant] as a likely witness" on the central issue in the case "before defendants' summary judgment motion was filed prejudiced defendants by depriving them of an opportunity to depose him").  Conversely, Rule 37 sanctions are unwarranted where, as here, the undisclosed declarant was a likely witness, and his testimony was foreseeable.  *See Ashman v. Solectron, Inc.*, 2010 WL 3069314, at *4 (N.D. Cal.

1    Aug. 4, 2010).[12]  CashCall's CFO, Delbert Meeks, testified at his July 8, 2013 deposition that

2    Baren had the most knowledge about CashCall's dealings with the Department of Corporations.

3    Ex. B to Cohen Decl. ("Meeks Dep.") at 405:2-16.  CashCall has previously produced the

4    documents contained in the Baren Declaration in response to discovery requests, and Plaintiffs

5    requested many of the same documents via a Public Records Request to the Department of

6    Corporations.  Opp'n to MTS at 1; *see also Nehara v. California*, 2013 WL 1281618, at *4 (E.D.

7    Cal. Mar. 26, 2013) (court declined to exclude undisclosed witnesses that were fully known to the

8    defendants through their role in the events, which had been established by documents produced by

9    defendants in discovery)).

10            The Court also finds that Plaintiffs cannot establish prejudice.  Baren's declaration

11    functions largely to authenticate documents Plaintiffs already have, rather than to provide any

12    opinion on the underlying issues.  To the extent Baren provides limited opinion as to his

13    understanding of Department reporting requirements, it is collateral to any material issue of fact.

14    Accordingly, the motion to strike the declaration is DENIED.

15            2.       Evidentiary Objections to the Baren Declaration

16            In addition to objecting to Mr. Baren's declaration generally, Plaintiffs also object to

17    paragraphs 3 and 13-16 on the grounds that the statements lack foundation, lack personal

18    knowledge and are speculative.  Evid. Obj. No. 1, MTS at 3.  Each of these objections is

19    OVERRULED.

20            **Objection No. 1:** In Paragraph 3, Baren, as CashCall's General Counsel, states what

21

22    ---

      [12] Plaintiffs' authority in support of the motion to strike is inapposite because it involves situations
23    where the witness, or the proffered testimony, was a complete surprise.  *See Kim v. Pacific Bell*,
      1999 WL 760634, at *2 (striking declarations introducing new witnesses on previously
24    undisclosed theory of liability at summary judgment stage); *Howard v. Hibshman*, 2012 WL
      2524373, at *6 (S.D. Cal. June 29, 2012) (striking declarations filed in opposition to motion for
25    summary judgment where plaintiffs disclosed witnesses for the first time prior to discovery
      cutoff); *Blaj v. Stewart Enters.*, 2010 WL 4909621, at *9 (S.D. Cal. Nov. 23, 2010) (disregarding
26    surprise declaration which cut to the heart of the issues, distinguishing it from situation where
      witness was likely and testimony was foreseeable); *Johnson v. Kriplani*, 2008 WL 2620378, at *2
27    (E.D. Cal. July 2, 2008) (striking declarations first disclosed in opposition to summary judgment
      motion because plaintiff conceded, by failing to oppose the motion to strike, that the information
28    in the proffered declarations was not harmless or substantially justified).

United States District Court
Northern District of California

1  CashCall is required to do as a condition of its licensing with the Department of Corporations.

2  Mr. Baren states in paragraph 4 that, as General Counsel, he personally supervises these activities

3  and signs the documents that are submitted.  He clearly has personal knowledge of these matters.

4  Cohen Decl, Ex. B at 407:1-408:4.

5  **Objection No. 2:** In Paragraph 13, Baren demonstrates he has personal knowledge of his

6  interactions with the Department of Corporations when they come to CashCall to conduct on-site

7  audits.

8  **Objection No. 3:** In Paragraphs 14-16, Baren attaches copies of Department of

9  Corporation audits of CashCall that he received in the ordinary course of business and states his

10  knowledge about these audits.  As General Counsel, Baren is directly responsible for dealing with

11  the Department of Corporations.  Opp'n to MTS at 2.  Accordingly, he is qualified to make the

12  statements in these four paragraphs and to authenticate the exhibits therein.

13      3.  Evidentiary Objections to the Holland Declaration

14      Plaintiffs next object to portions of the Declaration of Hillary Holland, on the grounds that

15  the statements lack foundation, lack personal knowledge and are speculative.  Evid. Obj., MTS at

16  3-4.  Holland is the Vice President of Production and in charge of all aspects of loan origination,

17  including oversight of the loan agents prospective borrowers speak to during the loan application

18  process.  Opp'n to MTS at 3.  Each of these objections is OVERRULED.

19  **Objection No. 1:** Plaintiffs object to Paragraph Nos. 2-7, p.1:7-28 on the basis that

20  Holland had no involvement with CashCall's advertising program beyond sometimes being asked

21  about her opinion of a commercial, or being told when ads would run so she could staff call lines.

22  Evid. Obj. No. 2, p. 3 (citing Stark Decl., Ex. 1, Holland Dep., 20:5-15, 28:22-34:1).  The Court

23  finds that Holland has sufficient personal knowledge to testify as to: (1) the media CashCall

24  advertised through since she joined the Company; and (2) the general content and disclosures in

25  the ads.  Accordingly, this Objection is OVERRULED.

26  **Objection Nos. 2-3:** Plaintiffs also object to Paragraph Nos. 8-16, pp. 2:1-4:4, and

27  Paragraph Nos. 18-24, pp. 4:8-5:24 on the basis that (1) Holland does not "know about CashCall

28  loan agent practices" and (2) she was not CashCall's PMK on this subject four years ago.  *Id.*

22

1    (citing Stark Decl., Ex. 2, McCarthy Dep., 11:8-12:17, 188:2-9).  Holland has been the executive

2    in charge of loan agents since 2003, and thus has sufficient knowledge to testify as to CashCall's

3    loan agent practices.  Opp'n to MTS at 3.  The fact that CashCall has designated another party as

4    PMK on this topic does not mean that Holland has no personal knowledge of these practices.

5    Plaintiffs' objections are OVERRULED.

6    **C.     CashCall's Objections to Plaintiffs' Evidence**

7           CashCall also filed evidentiary objections to Plaintiffs' expert testimony regarding class

8    characteristics and the availability of comparable loans.  Def. Obj. to Pl. Unc. Opp'n Evid. ("Def.

9    Evid Obj."), Dkt. No. 209.

10          1.     Objections to Expert Testimony re: Class Characteristics

11          CashCall objects to the evidence of Plaintiffs' experts regarding the Class Members'

12   characteristics, such as lack of financial literacy, cognitive impairment, and duress.  CashCall

13   argues these declarations are unreliable and speculative because the experts did not rely on data

14   specific to the class, including class members' testimony, in analyzing class characteristics.  Def.

15   Evid. Obj. at 2.  On this basis, CashCall contends that the experts' opinions should be excluded

16   because they do not meet the minimum standards for admissibility under Federal Rule of Evidence

17   702 because the experts did not review any of the ten Class Member depositions or consider the

18   individual factual circumstances of any CashCall borrower in formulating their opinions as to the

19   class characteristics.  Plaintiffs respond that CashCall misstates the basis for the expert opinions,

20   ignores that the class characteristics were based on numerous empirical studies of general

21   characteristics of similar consumers, and ignores that review of the ten class depositions would not

22   render a scientifically significant sample.  Pl. Opp'n to Evid. Obj. at 3, Dkt. No. 214.

23          To be admissible under Federal Rule of Evidence 702, an expert opinion must be "not only

24   relevant but reliable."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993); *Kumho Tire*

25   *Co. v. Carmichael*, 526 U.S. 137 (1999).  Expert testimony is reliable only if (1) it is based upon

26   sufficient facts or data, (2) it is the product of reliable principles and methods, and (3) the witness

27   has applied the principles and methods reliability to the facts of the case.  *Kumho Tire*, 526 U.S. at

28   147; *Daubert*, 509 U.S. at 590.

United States District Court
Northern District of California

1    An expert opinion may not be based on assumptions of fact without evidentiary support.

2    *Guidroz-Brault v. Mo. Pac. R. Co.*, 254 F.3d 825, 830-31 (9th Cir. 2001) (excluding expert

3    testimony "not sufficiently founded on the facts" of the case).  "When expert opinions are not

4    supported by sufficient facts, or when the indisputable record contradicts or otherwise renders the

5    opinions unreasonable, they cannot be relied upon."  *W. Parcel Express v. United Parcel Serv. of*

6    *Am., Inc.*, 65 F. Supp. 2d 1052, 1060 (N.D. Cal. 1998); see also *Estate of Gonzales v. Hickman*,

7    2007 WL 3237727, at *3, n 34 (C.D. Cal. May 30; 2007) (expert "cited no specific facts in the

8    record . . . which support the opinion, and the only available evidence contradicts it. Consequently

9    the court concludes the opinion is not admissible"); *United States v. Rushing*, 388 F.3d at 1156

10   ("Expert testimony should not be admitted when it is speculative, it is not supported by sufficient

11   facts, or the facts of the case contradict or otherwise render the opinion unreasonable"); *Greenwell*

12   *v. Boatwright*, 184 F.3d 492, 497 (6th Cir. 1999) ("Expert testimony . . . is inadmissible when the

13   facts upon which the expert bases his testimony contradict the evidence").  Conversely, an expert's

14   conclusions are admissible where they were based "on the knowledge and experience in his [or

15   her] discipline rather than on subjective believe or unsupported speculation."  *San Francisco*

16   *Baykeeper v. West Bay Sanitary Dist.*, 791 F. Supp. 2d 719, 740 (N.D. Cal. 2011) (citations

17   omitted).  As discussed below, the Court finds that the expert opinions of Dr. Wood, Margot

18   Saunders, and Professor Levitin as to relevant class characteristics should not be excluded under

19   Rule 702.  These opinions were based on empirical studies of consumers and consumer behavior,

20   and the experts' knowledge and experience in each of their disciplines.

21       2.    Objections to Dr. Wood's Class Characteristics Opinions

22   Objection Nos. 1 through 8 seeks to exclude the testimony of Plaintiffs' neuropsychiatric

23   expert, Dr. Wood.  Evid. Obj. at 2.  CashCall objects to Dr. Wood's conclusions that among other

24   things, consumers generally have little financial literacy and that class members' ability to

25   understand and process loan disclosures (i.e., their financial literacy) is even lower than that of

26   consumers generally.  Declaration of Stacey Wood ("Wood Decl."), ¶¶ 10-11, Dkt. No. 195.

27   CashCall further objects to Dr. Woods' findings that: (1) class members "cannot readily identify

28   key information, do the math, and fairly evaluate the costs of financial products in their self-

United States District Court
Northern District of California

24

United States District Court
Northern District of California

interest" (¶¶ 10-11); and (2) the marginal cognitive ability of these class members was further impaired by their "financial and personal stress" (¶ 12).  CashCall argues that this testimony is speculative, unreliable, lacks foundation, and is irrelevant because it is not based on any class member testimony or the consideration of class members' personal circumstances.  Evid. Obj. at 2.  Further, CashCall argues that Dr. Wood ignored actual testimony from class members demonstrating the cognitive ability to understand the loan.  *Id.*  (citing Seiling Decl., Ex. F ("De Leon Dep."), at 27:5-28:15.)  Plaintiffs counter that Dr. Wood's opinions, which refer to the typical class member, are based on class-wide data and carefully tailored to the evidence that supports them.  Pl. Opp'n Evid. Obj. at 5-6.  The Court finds that to the extent Dr. Wood's opinion is based on general characteristics of consumers with low credit scores, it is based on reliable principles and methods that are validated by empirical studies in the peer-reviewed literature.  Although the relevance of Dr. Wood's opinion is marginal, the Court OVERRULES Objection Nos. 1-8.

### 3.   Objections to Margot Saunders' Class Characteristics Opinions

CashCall also moves to exclude the opinions of Margot Saunders regarding class members' lack of cognitive ability and financial literacy to understand CashCall's loan terms on the grounds that it directly contradicts class member testimony.  Def. Evid. Obj. at 3.  CashCall specifically moves to exclude opinion testimony regarding cognitive ability, financial literacy, mental and emotional state, and any individual harm on the grounds that it conflicts with the fact that numerous class members took out more than one loan, which evidences sophisticated use of the product.[13]  *Id.*

The Court disagrees with CashCall and finds that Saunders' testimony regarding consumer understanding is not speculative.  Plaintiffs have sufficiently established that Saunders' opinions are based on her significant knowledge, skill, experience, training, and education in consumer law matters related to low-income consumers, as described in her report.  *See* Saunders Rpt., p. 2-4.

---

[13] CashCall's objection misstates Saunders' testimony, in which she found that borrowers who repaid the loan immediately behaved in a "fairly sophisticated manner" by avoiding any interest charges.  *See* Saunders Dep. at 91:7-92:2

1    Saunders' opinion is based on comprehensive studies of relevant consumers in general, and thus

2    does not require individual class member experience to describe general class characteristics.

3    Saunders Dep. at 99:18-100:6.  Saunders' testimony also considered CashCall's documents

4    regarding its product and advertising, depositions, discovery responses and pleadings.  *Id.*,

5    Appendix, p. 40.  On this record, the Court declines to find Saunders' testimony regarding

6    consumer understanding to be speculative.  Plaintiffs have established that Saunders' sources and

7    bases of her understanding are grounded in significant research as well as extensive relevant

8    experience.  Accordingly, the Court OVERRULES Objection Nos. 13-14.

9            4.       Objections to Professor Levitin's Class Characteristics Opinions

10           CashCall objects to any testimony regarding characteristics of class members including,

11   but not limited to, their mental or emotional state, reasons for securing a CashCall loan, and ability

12   to comprehend CashCall's loan terms.  CashCall argues that Professor Levitin strays from the

13   scope of his expertise by imputing particular characteristics to individual class members, while

14   admitting that he has not read class member depositions.  CashCall argues that Levitin's

15   conclusions that class members are desperate and do not shop for market alternatives are

16   speculative because he reached these conclusions without reading the deposition transcripts of a

17   single class member.  Def. Evid. Obj. at 5 (citing Levitin Rpt., p. 11; Seiling Decl., Ex. C

18   ("Levitin Dep."), at 6:21-7:15.  Plaintiffs argue that CashCall fundamentally misconstrues the

19   nature and purpose of Professor Levitin's opinion because its focus is the nature of the product

20   being offered by CashCall and how it is being sold to consumers rather than the characteristics of

21   the class itself.  Pl. Evid. Opp'n at 14 (citing Levitin Rpt. at ¶¶ 20-27).

22           The Court agrees that Levitin's opinions are based on market analysis of the market in

23   which CashCall operates, and that his conclusions pertain to the characteristics of CashCall's

24   signature loan product relative to that market.  Accordingly, Levitin's conclusions about the type

25   of consumer likely to be attracted to CashCall's product are based on objective factors that are not

26   dependent on specific class members' circumstances.  It is the market factors themselves that

27   indicate the type and characteristics of the typical consumer who takes out a CashCall loan.

28   Levitin Rpt. ¶¶ 13-32-56; 63-84; 75.  The Court thus OVERRULES Objection No. 9.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

United States District Court
Northern District of California

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

    5.    Objections to Professor Levitin's Market Alternatives Testimony

        CashCall moves to strike portions of the opinion of Plaintiffs' financial expert Adam

Levitin on the grounds that it conflicts with Plaintiffs' consumer behavior expert, Margot

Saunders' opinion that there were market alternatives to CashCall's loans, thus creating a sham

issue of fact. Evid. Obj. at 7. CashCall maintains that Plaintiffs cannot create a triable issue of

fact by securing conflicting expert testimony on the same issue. *Id.* The Court does not agree that

there is a basis to strike Professor Levitin's testimony regarding market alternatives. The cases

cited by CashCall are inapposite, as they pertain to the "sham affidavit rule," which generally

prohibits a party from defeating summary judgment simply by submitting an affidavit that

contradicts the party's previous sworn testimony. *Van Asdale v. Int'l Game Technology,* 577 F.3d

989, 998 (9th Cir. 2009); *Secrest v. Merck, Sharp & Dohme Corp.*, 707 F.3d 189 (2nd Cir. 2013).

To invoke the sham affidavit rule, the court must make a factual determination that the

contradiction was actually a "sham." *Van Asdale,* 577 F.3d at 998-99. CashCall has not made

such a showing. Plaintiffs' experts have given well-researched and well-documented opinions that

are consistent within their reports and depositions. The only conflict is the context in which

Levitin and Saunders consider the loan products to be comparable. Regardless of the market

comparable issue, both experts conclude that CashCall's loan product was unconscionable. *See

Prichard v. Kurucz*, 22 Fed. Appx. 122, 127 (W.Va. 2001) (conflicting opinions of plaintiffs'

medical experts was insufficient to strike testimony where the experts' overall opinions agreed

that the defendant was in some way negligent). Additionally, all of the expert testimony was

given prior to the motion for summary judgment. *See Secrest*, 707 F.3d at 195 (finding likelihood

that affidavit provided solely to gain a litigation advantage very likely where contradictions arose

only after a summary judgment). Accordingly, Objection Nos. 10, 11, and 12 are OVERRULED.

**D.    Unconscionability Claim**

        CashCall moves for summary judgment on Plaintiffs' unconscionability claim on the

grounds that Plaintiffs cannot establish that CashCall's interest rates on its unsecured subprime

loans were unconscionable as a matter of law. Unc. Mot. at 15-16. Plaintiffs argue that the

unconscionability claim is not appropriate for resolution on summary judgment because there exist

27

1    numerous genuine issues of fact that can only be resolved at trial.  Pl. Opp'n Unc. Mot. at 1.

2        1.    Legal Standard

3        "Under California law, a contract provision is unenforceable due to unconscionability only

4    if it is both procedurally and substantively unconscionable."  *Shroyer v. New Cingular Wireless*

5    *Services, Inc.*, 498 F.3d 976, 981 (9th Cir. 2007) (citing *Nagrampa v. MailCoups, Inc.*, 469 F.3d

6    1257, 1280 (9th Cir. 2006)).

7        Procedural unconscionability focuses on the elements of oppression and surprise.  *Wayne*

8    *v. Staples, Inc.*, 135 Cal. App. 4th 466, 555 (2006) (citing *Discover Bank v. Sup. Ct.*, 36 Cal.4th

9    148, 160 (2005)).  To establish oppression, there must be a showing that an inequality of

10   bargaining power existed that resulted in "no real negotiation and an absence of meaningful

11   choice."  *Nagrampa*, 469 F.3d at 1280 (citing *Flores v. Transamerica HomeFirst, Inc.*, 93 Cal.

12   App. 4th 846, 853 (2001)).  "[S]urprise involves the extent to which the supposedly agreed-upon

13   terms are hidden in a prolix printed form drafted by the party seeking to enforce them."  *Id.*

14       Substantive unconscionability, on the other hand, "refers to an overly harsh allocation of

15   risks or costs which is not justified by the circumstances under which the contract was made."

16   *Carboni v. Arrospide*, 2 Cal. App. 4th 76, 83 (1991) (citing *A & M Produce Co. v. FMC Corp.*,

17   135 Cal. App. 3d 473, 487 (1982)).  Substantive unconscionability "focuses on the terms of the

18   agreement and whether those terms are so one-sided as to shock the conscience."  *Davis v.*

19   *O'Melveny & Myers*, 485 F.3d 1066, 1075 (9th Cir. 2007) (citing *Soltani v. W. & S. Life Ins. Co.*,

20   258 F.3d 1038, 1042 (9th Cir. 2001)) (internal quotations omitted).

21       Both procedural and substantive unconscionability must be present before a contract or

22   clause will be held unenforceable, but they need not be present to the same degree and are

23   evaluated on a sliding scale.  *Armendariz v. Fdn. Health Psychcare Svcs., Inc.*, 24 Cal. 4th 83,114

24   (2000) ("the more substantively oppressive the contract term, the less evidence of procedural

25   unconscionability is required to come to the conclusion that the term is unenforceable, and vice

26   versa").  When it appears a contract provision may be unconscionable, "the parties shall be

27   afforded a reasonable opportunity to present evidence as to its commercial setting, purpose, and

28   effect to aid the court in making the determination."  Cal. Civ. Code § 1670.5, subd. (b); *Gutierrez*

United States District Court
Northern District of California

1    *v. Autowest*, *Inc.*, 114 Cal. App. 4th 77, 89 (2003).

2           2.     Whether Plaintiffs Have Established Procedural Unconscionability

3           The threshold inquiry in California's unconscionability analysis is whether the agreement

4    is adhesive. *Nagrampa*, 469 F.3d at 1281 (quoting *Armendariz*, 24 Cal. 4th at 113). A contract of

5    adhesion is "a standardized contract, which, imposed and drafted by the party of superior

6    bargaining strength, relegates to the subscribing party only the opportunity to adhere to the

7    contract or reject it." *Armendariz,* 24 Cal. 4th at 113. Absent unusual circumstances, evidence

8    that one party has overwhelming bargaining power, drafts the contract, and presents it on a take-it-

9    or-leave-it basis is sufficient to demonstrate procedural unconscionability and require the court to

10   reach the question of substantive unconscionability, even if the other party has market alternatives.

11   *Lona v. Citibank, N.A.*, 202 Cal. App. 4th 89, 109 (2011) (citing *Gatton v. T–Mobile USA*, 152

12   Cal. App. 4th 571, 586 (2007)). Thus, while not all contracts of adhesion are unconscionable,

13   courts have found that adhesion contracts satisfy the requirement of procedural unconscionability.

14   *Gentry v. Superior Court*, 42 Cal. 4th 443, 469 (2007) (contracts of adhesion are "indispensable

15   facts of modern life that are generally enforced …; [however, they] contain a degree of procedural

16   unconscionability even without any notable surprises.") (internal citations omitted)). Here,

17   CashCall's promissory note is a contract of adhesion, due to the unequal bargaining power

18   between CashCall and the Class Members, the standard form of the Promissory Note drafted by

19   CashCall, and the fact that Class Members were required to accept the interest rate and loan terms

20   in order to secure a loan. *See Nagrampa*, 469 F.3d at 1281.

21          CashCall argues that California law requires more than a finding of adhesion to establish

22   procedural unconscionability. Unc. Mot. at 17 (citing *Crippen v. Central Valley RV Outlet, Inc*.,

23   124 Cal. App. 4th 1159, 1165 (2005) and *Morris v. Redwood Empire Bancorp*, 128 Cal. App. 4th

24   1320, 1323 (2005)). "Although adhesion contracts often are procedurally oppressive, this is not

25   always the case." *Morris*, 128 Cal. App. 4th at 1320 (citing *Cal. Grocers Ass'n v. Bank of

26   America*, 22 Cal. App. 4th 205, 214 (1994) (recognizing adhesiveness "is not per se oppressive.").

27   While courts "recognize significant overlap" between the concepts of adhesion and oppression,

28   they are not identical. *Dean Witter Reynolds, Inc. v. Sup. Ct.*, 211 Cal.App.3d 758, 769 (1989).

United States District Court
Northern District of California

29

1    "Oppression refers not only to an absence of power to negotiate the terms of a contract, but also to

2    the absence of reasonable market alternatives."  *Id*.  CashCall argues that Plaintiffs cannot prove

3    that Class members had no meaningful choice but to accept the CashCall loans, and thus cannot

4    establish that the contracts were oppressive.  Unc. Mot. at 18 (citing *Kinney v. U.S. Healthcare*

5    *Svcs., Inc.*, 70 Cal. App. 4th 1322, 1329 (1999) (to meet oppression element, claimant must prove

6    the absence of a meaningful choice); *Gentry*, 42 Cal. 4th at 470 ("freedom to choose whether or

7    not to enter into a contract of adhesion is a factor weighing against a finding of procedural

8    unconscionability").

9         CashCall argues that the availability of alternative sources of subprime credit precludes a

10   finding of procedural unconscionability.   Unc. Mot. at 18 (citing *Dean Witter*, 211 Cal. App. 3d at

11   768-72).  However, there is conflicting evidence as to whether borrowers did have a meaningful

12   choice in deciding whether to take out a CashCall loan due to the lack of other unsecured

13   subprime credit options.  The availability of market alternatives is relevant to the existence, and

14   degree, of oppression, but is not dispositive.  *Lhotka v. Geographic Expeditions, Inc.,* 181 Cal.

15   App. 4th 816, 823-24 (2010) (citing *Szetela v. Discover Bank*, 97 Cal. App. 4th 1094, 1100

16   (2002); *Laster v. T–Mobile USA, Inc*., 407 F. Supp. 2d 1181, 1188 & fn. 1 (S.D. Cal. 2005)).

17   Thus, while Plaintiffs can establish some degree of procedural unconscionability, there is a factual

18   dispute precluding the Court from determining whether there is a higher degree of procedural

19   unconscionability based on the availability of meaningful choice.

20        3.    Whether Plaintiffs Have Established Substantive Unconscionability

21        Substantive unconscionability refers to an overly harsh allocation of risks or costs which is

22   not justified by the circumstances under which the contract was made. *Carboni*, 2 Cal. App. 4th at

23   83 (citing *A & M Produce*, 135 Cal. App. 3d at 487.)  "Where a party with superior bargaining

24   power has imposed contractual terms on another, courts must carefully assess claims that one or

25   more of these provisions are one-sided and unreasonable." *Gutierrez*, 114 Cal. App. 4th at 88

26   (citations omitted).  The focus is on whether the terms of the agreement are such an extreme

27   departure from common business practice, and so one-sided as to "shock the conscience." *Belton*

28   *v. Comcast Cable Holdings, LLC,* 151 Cal. App. 4th 1224, 1247 (2007) (citing *Morris*, 128 Cal.

United States District Court
Northern District of California

App. 4th at 1323; *American Software, Inc. v. Ali*, 46 Cal. App. 4th 1386, 1391–93 (1996)).  When a party alleges that the price for a good or service is unconscionable, California courts look to a number of factors, including: (1) comparison to the price other similarly situated consumers actually pay in similar transactions, (2) whether the seller's costs justify the price, (3) the true value of the good or service, and (4) whether the defendant's profits are excessive.  *See Perdue v. Crocker Nat'l Bank*, 38 Cal. 3d 913, 927-28 (1985); *Wayne*, 135 Cal. App. 4th at 481; *Morris*, 128 Cal. App. 4th at 1323.

CashCall argues that Plaintiffs cannot establish that the loans were substantively unconscionable because they have established that their interest rates and loan terms are justified by the risks of subprime lending.  Unc. Mot. at 3.  Plaintiffs contend that there exist a number of material issues with respect to whether the price of credit is substantively unconscionable.  Particularly, Plaintiffs contend that the loan terms are oppressive on their face because they combine a high rate of interest with a lengthy repayment period, in which borrowers must repay interest prior to principal.  Unc. Opp'n 9-21.  Applying the price comparison factors set forth in *Perdue*, the Court finds that there are a number of factual disputes precluding a finding of substantive unconscionability on summary judgment.  38 Cal. 3d at 927-28.

<em>a.</em> <em>There Are Triable Issues of Fact Regarding Price Comparability</em>

"Allegations that the price exceeds cost or fair value, standing alone, do not state a cause of action."  *Morris*, 128 Cal. App. 4th at 1323 (citing *Perdue*, 38 Cal. 3d at 926–27) (citations omitted).  Instead, courts look to "the basis and justification for the price, including 'the price actually being paid by . . . other similarly situated consumers in a similar transaction.'"  *Id*.  "While it is unlikely that a court would find a price set by freely competitive market to be unconscionable, the market price set by an oligopoly[14] should not be immune from scrutiny."  *Id*.  CashCall contends that Plaintiffs cannot show that its interest rates are unconscionable because they cannot show that CashCall's interest rates compare unfavorably to "the price actually being

---

[14] "An oligopoly is 'a market structure in which a few sellers dominate the sales of a product and where entry of new sellers is difficult or impossible.... [¶] Oligopolistic markets are characterized by high market concentration."  *Morris*, 128 Cal. App. 4th at 1323, fn 8 (citations and quotations omitted).

United States District Court
Northern District of California

United States District Court
Northern District of California

1   paid by other similarly situated consumers in a similar transaction." *See Wayne*, 135 Cal. App. 4th

2   at 481.  CashCall defines this comparison as between rates paid by borrowers for all subprime

3   consumer loans, regardless of their terms or length.  Unc. Mot. at 22.  CashCall contends that their

4   rates compared favorably to other subprime products, such as auto title loans, payday loans, tax

5   refund loans, and pawnshop loans, which carry higher APRs, shorter maturity dates, and require

6   some form of security.  Plaintiffs, on the other hand, argue that this is not a relevant comparison

7   because there are significant differences between CashCall's loans and other subprime loans.

8   Plaintiffs' economic and financial experts maintain that CashCall's loans differed markedly from

9   other subprime loans in terms and function.  MacFarlane Rpt. at ¶ 81-89.  Since CashCall's

10  product was unique and faced little or no competition, Plaintiffs argue that the interest rates do not

11  represent the price set by a freely competitive market.  *Id.*  The Court agrees that this creates a

12  factual dispute as to whether CashCall's products were comparable to other subprime products.[15]

13            *b.      Whether Costs Justify the Price*

14            CashCall maintains that its interest rates are justified by the risk inherent in extending

15  credit to subprime borrowers.  Unc. Mot. at 2-3.  CashCall's high origination and servicing costs,

16  high costs of funds, and high default rate also require CashCall to charge high interest rates to

17  achieve its target profitability.  *Id.*  Plaintiffs maintain that the risk is largely self-imposed by

18  CashCall because it combines its high interest rate with a 42-month repayment period that makes

19  the loans unaffordable to most borrowers.  Unc. Opp'n at 9-11.

20            "[A] contract is largely an allocation of risks between the parties, and therefore that a

21  contractual term is substantively suspect if it reallocates the risks of the bargain in an objectively

22  unreasonable or unexpected manner." *A & M Produce Co.*, 135 Cal. App. 3d at 487 (citations

23  omitted).  The type of risk allocation generally found to be unconscionable is that where the

24  stronger party shifts the risk of its own negligence or the defectiveness of its product onto the

25  _____

26  [15] CashCall argues that the fact that Plaintiffs' financial and economic experts (Levitin and
    Pinsonneault) disagree with Plaintiffs' consumer protection and neuropsychology experts
27  (Saunders and Wood) as to the existence of comparable loans is fatal to their motion.  Unc. Mot. at
    22.  The Court finds this argument unpersuasive as to Wood, given that her area of expertise is
28  neuropsychology .  As previously discussed, the Court also finds this argument unpersuasive as to
    Saunders.

weaker party.  *Id.* at 493.  "If there is a type of risk allocation that should be subjected to special scrutiny, it is probably the shifting to one party of a risk that only the other party can avoid."  *Id.* (citation omitted).

Plaintiffs contend that CashCall unfairly allocates its costs and risks to borrowers by aggressively marketing its product and lending to a large number of borrowers who cannot afford to pay the loan back.  Unc. Opp'n at 15 (citing Seiling Decl. in Supp. of Unc. Mot. ("MacFarlane Rpt.") at 14-23, Dkt. No. 172-1).  Plaintiffs' lead expert on CashCall's business model, Bruce McFarlane, found that by pursuing a high-volume, unsecured lending model targeted at higher risk subprime borrowers, CashCall incurs higher expenses in the form of advertising costs, cost of funds and default costs.  MacFarlane Rpt. ¶ 99; *see also* Pl. Unc. Stmt. No. 25, Dkt. No. 196.  This ultimately increases the APR CashCall must charge borrowers in order to achieve its targeted profitability.  *Id.*   Plaintiffs claim that it is the high interest rate, coupled with the lengthy repayment term, that unfairly increases the risk that borrowers will not be able to repay.  Levitin Rpt. ¶ 99 (CashCall's "sweatbox model" of lending is unfairly one-sided because lender still makes profit on defaults so long as they occur after the 15 or 16 month mark).

CashCall argues that its high default rates are an inherent risk of lending to subprime borrowers.  Unc. Reply at 8.  Given the undisputed 45% default rate, CashCall argues that it does not unreasonably shift the risk of default to borrowers.  *See Shadoan v. World Savings & Loan Assn.*, 219 Cal. App. 3d 97, 106 (1990) (finding it to be "less disturbing and less unexpected that a lender would shift the risk of market fluctuation to the party using the lender's money.").  At 96% interest, it takes CashCall nine months to recover its principal loan amount of $2,600 and 14 months to recover its costs, which comprise on average 58% of the loan amount.  McFarlane Rpt., ¶ 81.  At 135% interest, it takes CashCall 12 months to recover its principal loan amount of $2,600 and 20 months to recover its costs.  *Id.*  The average life of the loans is 20 months.  Pl. Unc. Stmt. No. 27, Dkt. No. 196.  Meanwhile, 45% of borrowers default on their loans.  *Id.*  Only a small number of borrowers take the loans to maturity.  *Id.*  Plaintiffs also do not factor in other impacts on CashCall's profitability loss, such as a high prepayment rate of 45-50%.  CashCall argues that there is thus no showing that they created a risk of default other than that inherent in making

United States District Court
Northern District of California

33

1   unsecured loans to subprime borrowers.[16]

2          CashCall also argues that cases of price unconscionability generally involve high price to

3   value disparities.  Unc. Opp'n at 16 (citing *California Grocers Ass'n*, 22 Cal. App. 4th at 216.)

4   By contrast, the cost of a signature loan is approximately 3.5 to 4.5 times the amount borrowed,

5   which is not an unusually high price to value disparity.  *Id.*  (citing *Perdue*, 38 Cal. 3d at 928

6   (profit estimates of 600 and 2,000 percent for NSF fee "indicate the need for further inquiry"));

7   *Carboni*, 2 Cal. App. 4th at 83-84 (interest rate approximately 10 times the prevailing rate); *Jones*

8   *v. Star Credit Corp.*, 298 N.Y.S. 2d 264, 267 (sale of freezer on credit at triple its retail value plus

9   credit charges exceeding value by more than $100)).

10                 *c.*      *The Value of the Loans to Consumers*

11          In determining whether a price term is unconscionable, courts also consider the value being

12   conferred upon the plaintiff.  *Morris*, 128 Cal. App. 4th at 1324 (citing *Carboni,* 2 Cal. App. 4th at

13   84.)  Plaintiffs contend that CashCall's loans are harmful to consumers due to the inordinately

14   high loan costs during the life of the loan.[17]  Unc. Opp'n at 15 (citing Ex. 17 (Saunders Decl.) at p.

15   9).  CashCall counters that the loans provided a legitimate benefit to borrowers because they did

16   not require security, charged simple interest with no hidden fees or prepayment penalty, and

17   allowed ample time for repayment where necessary.  Unc. Mot. at 22.  The Court finds there is a

18   triable issue of fact with respect to whether CashCall's loans provided value to the Class

19   Members.  Although there was evidence that the loans provided some value to borrowers by

20   providing access to unsecured credit despite low credit scores, there was also evidence of harm

21   due to the high cost of the loans.  Levy Decl. in Supp. of Unc. Opp'n, Ex. 17 (Saunders Rpt.), p.

22   _____

23   [16] Plaintiffs' expert, Professor Levitin, provides comparative default rates for other subprime
     loans.  Levitin Rpt. ¶ 82.  While these default rates are much lower (ranging from 7% (for payday
24   loans) to 29.63% (for adjustable rate subprime mortgage loans), Levitin does not provide a basis
     for comparing these secured types of secured loans with CashCall's unsecured loan products.  *Id.*
25   [17] Plaintiffs also contend that the loans harmed the Class because CashCall's collection practices
     are stressful and may cause harm to borrowers' credit ratings.  Unc. Opp'n at 15.  CashCall
26   responds that these factors raise individual issues, which are inappropriate for class treatment.
     Unc. Reply at 11 (citing *O'Donnovan v. CashCall, Inc.,* 278 F.R.D. 479, 496-99 (N.D. Cal. 2011)
27   (claims based on CashCall's alleged "aggressive collection practices" not suitable for class
     treatment due to predominance of individual issues)).  The Court agrees that these issues, unlike
28   analysis of the Class data regarding repayment, would require an individual inquiry and do not
     raise a material issue of fact with regard to harm based on the loan terms themselves.

1    10.  Borrowers paid a considerable amount for these loans both in terms of the monthly expenses

2    and the total amount repaid.  *Id*.  It is undisputed that 45% of borrowers were unable to afford the

3    cost of the loans after taking them out.  Pl. Unc. Stmt., No. 41, Dkt. No. 196.  Only a small

4    percentage of borrowers in the Class paid the loans within one month of origination, thus avoiding

5    paying interest.  *Id.,* No. 9.   Accordingly, there is a triable issue as to whether the value of the

6    loans outweighed the harm.

7                    d.       Whether CashCall's Profits Are Excessive

8            Plaintiffs argue that CashCall made an excessive profit on its loans.  Unc. Opp'n at 12.

9    CashCall's targeted profitability was 15-20%, although it is possible CashCall made as much as

10   40%, or possibly 53% on some loans.  *Id.* at 9.  There is no evidence that these amounts were

11   exorbitant such that they would support a finding of unconscionability.  A 100% markup may be

12   "generous," but "is wholly within the range of commonly accepted notions of fair profitability,"

13   and substantially higher profit levels are necessary before even considering whether substantive

14   unconscionability may exist.  *Cal. Grocers Ass'n*, 22 Cal. App. 4th at 216; *Wayne*, 135 Cal. App.

15   4th at 473 (100% markup on declared value coverage did not violate UCL).  Given that the highest

16   estimated profit on these loans was 53%, Plaintiffs have failed to establish that CashCall's profits

17   were excessive.

18   **E.      Conclusion**

19           Unconscionability is question of law to be decided by the Court.  *American Software, Inc.

20   v. Ali*, 46 Cal. App. 4th at 1391.  However, "numerous factual inquiries bear upon that question."

21   *Marin Storage & Trucking, Inc. v. Benco Contracting and Eng'g, Inc.*, 89 Cal. App. 4th 1042,

22   1055 (2001).  Only where "the extrinsic evidence [is] undisputed" will the court be able to

23   determine unconscionability absent predicate findings of fact.  *Id.*  In addition, because there is a

24   "sliding scale" relationship between procedural and substantive unconscionability, disputed

25   questions of fact with respect to either the procedural or substantive aspects of the contract will

26   preclude a legal determination of unconscionability.  *McCollum v. XCare.net, Inc*., 212 F. Supp.

27   2d 1142, 1150 (N.D. Cal. 2002) (citing *Ellis v. McKinnon Broad. Co.,* 18 Cal. App. 4th 1796,

28   1803 (1993)).  In this case, there are disputed questions of fact with regard to both the procedural

United States District Court
Northern District of California

35

and substantive unconscionability inquiries.  Accordingly, the Court DENIES CashCall's Motion for Summary Judgment.[18]

## CONCLUSION

Based on the analysis above, the Court ORDERS as follows:

1)    CashCall's Motion for Partial Summary Judgment on the Conditioning Claim and Actual Damages (Dkt. No. 159) is DENIED.

2)    CashCall's Motion on the Unconscionability Claim and accompanying UCL Claim (Dkt. No. 166) is DENIED.

3)    Plaintiffs' Cross-Motion on the Conditioning Claim and UCL Claim (Dkt. No. 175) is GRANTED.

**IT IS SO ORDERED.**

Dated: July 30, 2014

_____

MARIA-ELENA JAMES
United States Magistrate Judge

_____

[18] The Court thus declines to address CashCall's abstention argument.