BRAD W. SEILING (Bar No. CA 143515)
DONALD R. BROWN (Bar No. CA 156548)
MANATT, PHELPS & PHILLIPS, LLP
11355 West Olympic Boulevard
Los Angeles, CA  90064-1614
Telephone:     (310) 312-4000
Facsimile:     (310) 312-4224
E-mail: bseiling@manatt.com; dbrown@manatt.com

*Attorneys for Defendant*
CashCall, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTA O'DONOVAN, EDUARDO DE LA TORRE and LORI SAYSOURIVONG, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>CASHCALL, INC., a California corporation, and DOES 1 through DOE 50, inclusive,<br><br>Defendants. | Case No.  C 08-03174 MEJ<br><br>**DEFENDANT CASHCALL, INC.'S MOTION FOR RECONSIDERATION OF ORDER RE: MOTIONS FOR SUMMARY JUDGMENT PURSUANT TO N.D. CAL. CIVIL L.R. 7-9**<br><br>Date:        October 23, 2014<br>Time:        10:00 a.m.<br>Courtroom: B<br>Judge:       Hon. Maria-Elena James |

## NOTICE OF MOTION

TO THE PARTIES AND TO THEIR RESPECTIVE COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on October 23, 2014, at 10:00 a.m., or as soon thereafter as this matter can be heard, in Courtroom B, located at 400 Golden Gate Avenue, San Francisco, California, Defendant CashCall, Inc. will move for reconsideration of the Order Re Summary Judgment Motions (Dkt. No. 220, the "Order") pursuant to Local Rule 7-9.  Reconsideration of the Order is appropriate because the Court failed "to consider . . . dispositive legal arguments which were presented to the Court before [the] interlocutory order."  Civil L.R. 7-9(b)(3).

On August 20, 2014, the Court granted CashCall leave to file this motion.  (Dkt. No. 223.)

This motion will be based on this notice of motion, the attached memorandum of points and authorities, the pleadings and papers in the court file, and such further evidence and argument as the parties may present at the hearing.

Dated:  September 15, 2014          MANATT, PHELPS & PHILLIPS, LLP


                                    /s/ Brad W. Seiling
                                    Brad W. Seiling
                                    *Attorneys for Defendant*
                                    CashCall, Inc.

DEFENDANT'S MOTION FOR RECONSIDERATION

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.   ARGUMENT ...................................................................................................... 3

A.   Courts May Not Engage in Economic Regulation Under the Guise of
     Enforcing Consumer Protection Statutes ................................................. 3

B.   Plaintiffs' Legal Theory Requires the Court to Determine the
     "Appropriate" Interest Rate on CashCall's Loans – A Pure Economic
     Policymaking Exercise That Conflicts and Interferes With the Existing
     Scheme of Regulation .............................................................................. 7

     1.   Awarding Restitution Requires the Court to Retrospectively Set the
          Appropriate Interest Rate ................................................................ 7

     2.   Issuing an Injunction Requires the Court to Prospectively Set the
          Appropriate Interest Rate ................................................................ 9

     3.   A Court-Imposed Interest Rate Cap Would Conflict With the FLL
          and Regulation by the Department................................................. 10

     4.   The FLL's Incorporation of the Unconscionability Defense Does
          Not Mean the Court Can Use the UCL to Regulate Interest Rates .......... 12

C.   Plaintiffs' Expert Evidence Confirms That They Are Asking the Court to
     Engage in Economic Regulation............................................................. 14

     1.   Plaintiffs' Expert Opinions About CashCall's Business Model Ask
          the Court to Make Value Judgments About How CashCall
          Allocates Its Costs ......................................................................... 14

     1.   Plaintiffs' Expert Opinions Regarding Consumer Financial Literacy
          Demonstrate That Plaintiffs Want the Court to Engage in Economic
          Regulation ...................................................................................... 17

     2.   Plaintiffs' Opinions About the Harm to the Class Are Based on
          Speculation That Is Contrary to the Court's Certification Order .............. 19

III.  CONCLUSION ................................................................................................ 21

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

# TABLE OF AUTHORITIES

**Page**

## CASES

*A & M Produce Co. v. FMC Corp.*,
  135 Cal. App. 3d 473 (1982)...................................................................................12

*Animal Defense Fund v. Mendes*,
  160 Cal. App. 4th 135 (2008)....................................................................................9

*Archer v. United Rentals, Inc.*,
  195 Cal. App. 4th 807 (2011).....................................................................................6

*Califano v. Yamasaki*,
  442 U.S. 682 (1979)...................................................................................................9

*California Grocers Ass'n v. Bank of Am.*,
  22 Cal. App. 4th 205 (1994)..................................................................................5, 13

*Carboni v. Arrospide*,
  2 Cal. App. 4th 76 (1992)...............................................................................2, 13, 17

*Cazares v. Household Finance Corp.*,
  2005 WL 6418178 (C.D. Cal. Jul. 26, 2005) ...........................................................9, 13

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
  20 Cal. 4th 163 (1999) ................................................................................................5

*Cortez v. Purolator Air Filtration Prods.*,
  23 Cal. 4th 163 (2000) ................................................................................................8

*Crusader Ins. Co. v. Scottsdale Ins. Co.*,
  54 Cal. App. 4th 121 (1997)....................................................................................6, 9

*Day v. AT&T Corp.*,
  63 Cal. App. 4th 325 (1998).......................................................................................7

*Dean Witter Reynolds, Inc. v. Sup. Ct.*,
  211 Cal. App. 3d 758 (1989).....................................................................................13

*Del Webb Communities, Inc. v. Partington*,
  652 F.3d 1145 (9th Cir. 2011).....................................................................................9

*Ford Motor Co. v. Milhollin*,
  444 U.S. 555 (1980)....................................................................................................6

*Freeman v. San Diego Ass'n of Realtors*,
  77 Cal. App. 4th 171 (1999).......................................................................................6

*Freeman v. Wal-Mart Stores, Inc.*,
  111 Cal. App. 4th 660 (2003)......................................................................................6

*Harris v. Capital Growth Inv.*,
  52 Cal. 3d 1142 (1991), 52 Cal. 3d 1166 ......................................................... passim

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

*Hauk v. JP Morgan Chase Bank, N.A.,*
    552 F.3d 1114 (9th Cir. 2009)....................................................................18

4

*IO Grp., Inc. v. Jordon,*
    708 F. Supp. 2d 989 (N.D. Cal. 2010) .........................................................9

5

*Koehl v. Verio, Inc.,*
    142 Cal. App. 4th 1313 (2006)....................................................................13

6

7

*Korea Supply Co., v. Lockheed Martin Corp.,*
    29 Cal. 4th 1134 (2003) ................................................................................8

8

9

*Korens v. R. W. Zukin Corp.,*
    212 Cal. App. 3d 1054 (1989)......................................................................6

10

*Lazzareschi Inv. Co. v. San Francisco Fed. Sav. & Loan Ass'n,*
    22 Cal. App. 3d 303 (1971).......................................................................4, 5

11

*Lona v. Citibank, N.A.,*
    202 Cal. App. 4th 89 (2011)........................................................................13

12

*Marin Storage & Trucking v. Benco Contractor & Eng'g,*
    89 Cal. App. 4th 1042 (2001)......................................................................13

13

14

*Max Factor & Co. v. Kunsman,*
    5 Cal. 2d 446 (1936) .....................................................................................6

15

16

*McCormack v. Hiedeman,*
    694 F.3d 1004 (9th Cir. 2012)......................................................................9

17

*Meeks v. CashCall, Inc.,*
    Los Angeles County Superior Court Case No. BC 367894, May 6, 2008........12

18

*Morris v. Redwood Empire Bancorp,*
    128 Cal. App. 4th 1305 (2005).....................................................................7

19

*Nava v. VirtualBank,*
    2008 U.S. Dist. LEXIS 72819 (E.D. Cal. July 16, 2008) .............................13

20

21

*Nelson v. Pearson Ford,*
    186 Cal. App. 4th 983 (2010).................................................................6, 7, 8

22

*O'Donovan v. CashCall, Inc.,*
    278 F.R.D. 479 (N.D. Cal. 2011)............................................................7, 11, 19

23

24

*People ex rel. Kennedy v. Beaumont Inv., Ltd.,*
    111 Cal. App. 4th 102 (2003)........................................................................7

25

*Perdue v. Crocker Bank,*
    38 Cal. 3d 913 (1985) ......................................................................14, 16, 17

26

27

*Reno Air Racing Ass'n, Inc. v. McCord,*
    452 F.3d 1126 (9th Cir. 2006).......................................................................9

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

iii

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Reudy v. Clear Channel Outdoor, Inc.*,
  2010 WL 4918792 (N.D.Cal. 2010), *aff'd*, 428 Fed. Appx. 774 (9th Cir. 2011) .....................6

*Schmidt v. Lessard*,
  414 U.S. 473 (1974) ...........................................................................................................9

*Tucker v. Pacific Bell Mobile Svcs.*,
  208 Cal. App. 4th 201 (2012)...........................................................................................7

*Wayne v. Staples, Inc.*,
  135 Cal. App. 4th 466 (2006)...........................................................................................7

*Wholesale Tobacco Dealers, etc. v. National Candy & Tobacco Co.*,
  11 Cal. 2d 634 (1938) .......................................................................................................6

*Willard v. AT&T Commc'ns of Cal., Inc.*,
  204 Cal. App. 4th 53 (2012)..........................................................................................5, 6

*Wolfe v. State Farm Fire & Cas. Co.*,
  46 Cal. App. 4th 554 (1996)..............................................................................................5

*Zhang v. Superior Ct.*,
  57 Cal. 4th 364 (2013) ......................................................................................................8

## STATUTES

15 U.S.C. § 1601 ...................................................................................................................18

15 U.S.C. § 1604 ...................................................................................................................18

15 U.S.C. § 1610 ...................................................................................................................18

Cal. Bus. & Prof. Code § 17200 et seq ..................................................................................1

Cal. Bus. & Prof. Code § 17203 ............................................................................................8

Cal. Fin. Code § 22000 *et seq.* ...........................................................................................1

Cal. Fin. Code § 22001(a)(1) ...............................................................................................12

Cal. Fin. Code § 22001(a)(3) ...............................................................................................12

Cal. Fin. Code § 22302 ...........................................................................................9, 12, 13

Cal. Fin. Code § 22302(a) ....................................................................................................12

Cal. Fin. Code § 22302(b) ....................................................................................................13

Cal. Fin. Code § 22303 .........................................................................................................10

Cal. Fin. Code § 22337(a) ....................................................................................................18

Cal. Fin. Code § 22713 ..........................................................................................................9

Cal. Fin. Code § 22751(a) ......................................................................................................8

Civil Code § 1670.5 .......................................................................................................12, 13

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

## TABLE OF AUTHORITIES
**(continued)**

**Page**

### OTHER AUTHORITIES

http://www.dbo.ca.gov/ENF/pdf/2014/CFL-CashCall_accusationrev_redacted.pdf .....................11

R. Mann, *Bankruptcy Reform and the "Sweat Box" Model of Credit Card Debt,*
   2007 Ill. L. Rev. 375, 392 ........................................................................................................16

### RULES

Civil L.R. 7-9(b)(3) ......................................................................................................................3

Fed. R. Civ. P. 23(c)(1)(B) ........................................................................................................19

Fed. R. Civ. P. 54(b) ....................................................................................................................3

Federal Rule of Evidence 201 ....................................................................................................11

Rule 65(d) .....................................................................................................................................9

## I.   **INTRODUCTION.**

Plaintiffs' theory of unconscionability requires the Court to determine the "not unconscionable" interest rate that CashCall should have charged on the more than 135,000 consumer loans in the class, and determine what interest rate it can charge on any future loans. Any such interest rate determination would require the Court to engage in economic regulation – something California courts consistently have held that courts cannot do under the guise of enforcing general consumer protection statutes, such as the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq (UCL).  Plaintiffs have tried to sidestep these fundamental issues throughout this litigation.  But the Court must now focus on this dispositive legal point, raised in CashCall's summary judgment papers, in order to avoid an error of law.

CashCall is a licensed finance lender that operates under the California Finance Lenders Law, Cal. Fin Code § 22000 *et seq.* (the "FLL").  The purpose of this detailed statutory and regulatory scheme is to ensure uniformity in lending standards and to allow consumers access to credit.  The loans at issue in this case – short-term consumer loans in amounts of at least $2,600 – *used to* be subject to maximum interest rate caps imposed by the California Legislature.  But in 1986, the Legislature made an economic policy decision to remove interest rate caps for loans of more than $2,500.  The Legislature also entrusted the Department of Business Oversight (the "Department") with licensing and regulatory authority over all finance lenders.[1]  The Department has performed its function, auditing CashCall three times during the class period, but it has never challenged CashCall's interest rates.

Plaintiffs now ask this Court to reinstate an interest-rate cap, and to decide the appropriate maximum "not unconscionable" rate that CashCall could charge.  Clearly, this cannot be accomplished without engaging in economic regulation that conflicts with and supplants the Legislature's policy judgments and the existing regulatory structure.

Plaintiffs have provided the Court with no guidance on how to resolve this matter.  Their only expert who opined on an appropriate interest rate pegged 36% as the proper "benchmark

---

[1] The Department formerly was known as the Department of Corporations.

Manatt, Phelps & Phillips, LLP
Attorneys At Law
Los Angeles

DEFENDANT'S MOTION FOR RECONSIDERATION

rate," which she argues is the maximum interest rate *any* lender can charge *any* borrower for *any* loan – an opinion based on "historical and political reasons."  That is an argument for economic regulation through the political process, but not a sufficient basis for this Court to set an interest rate.  Plaintiffs also suggest that the Court can simply order a forfeiture of *all* interest paid by class members.  But such a remedy is not available under the UCL, so doing that would be legal error.  Plaintiffs' fallback position is that the Court can simply use "equitable discretion" to pick a rate out of thin air.  In essence, Plaintiffs believe that the Court can act as an interest rate price-setting board – exactly what a long line of California cases holds courts cannot do.

This case also involves economic regulation because it potentially impacts the entire California lending market.  It is undisputed that other lenders charge interest rates similar to or even higher than CashCall's.  If the Court followed Plaintiffs' lead, the outcome of this case likely would spawn further litigation challenging interest rates statewide without any objective guidance on how lenders should set their rates.  Such ad hoc, after-the-fact judicial regulation of interest rates raises the specter of inconsistent adjudications, and the choice of venue ultimately could determine whether a lender's interest rates were found to be permissible or not.

This is a truly unprecedented case.  In six years of litigation, Plaintiffs have not identified a case even remotely similar to this one.  Only one California case has applied the doctrine of unconscionability to challenge an interest rate – and it did so as a defense to a foreclosure action as to one individual secured loan made by an individual real estate broker, not on an offensive basis in a class action against a licensed finance lender seeking to modify the interest rates on more than 135,000 loans.  *See Carboni v. Arrospide*, 2 Cal. App. 4th 76 (1992).  The *Carboni* court recognized that it was plowing entirely new ground:  "Surprisingly, the parties have not cited, and we have not discovered, any case which applies the doctrine of unconscionability to specifically annul or reform a loan which bears a shockingly high rate of interest."  *Id.* at 81.

No court has followed *Carboni's* lead, even for an individual loan.  Nor has any court applied *Carboni* to evaluate the interest rates on tens of thousands of loans made by a licensed finance lender – because that would amount to economic regulation on a mass scale.  The absence

1   of any remotely similar case demonstrates why this claim exceeds the Court's scope and should

2   give the Court pause.

3       CashCall disagrees with the Court's summary judgment order in several respects.  But this

4   motion highlights a fundamental threshold legal issue that the Court previously did not address.

5   Plaintiffs cannot use the Court to engage in this sort of economic regulation.  Summary judgment

6   is the proper result to avoid a costly, unnecessary and complex trial.

7   **II.    ARGUMENT.**

8       Reconsideration of the  Order is appropriate because the Court failed "to consider . . .

9   dispositive legal arguments which were presented to the Court before [the] interlocutory order."

10  Civil L.R. 7-9(b)(3).  *See also* Fed. R. Civ. P. 54(b) ("any order or other decision . . . may be

11  revised at any time before the entry of a judgment adjudicating all the claims and all the parties'

12  rights and liabilities").  The Court granted CashCall's application for leave to file a motion for

13  reconsideration on August 20, 2014.  (Dkt. No. 223.)

**A.    Courts May Not Engage in Economic Regulation Under the Guise of
Enforcing Consumer Protection Statutes.**

16      Plaintiffs ask this Court to enforce consumer protection statutes by imposing the

    maximum "not unconscionable" interest rate CashCall may charge, despite the Legislature's

    decision to remove caps on interest rates for loans above $2,500.  A long line of California

19  decisions confirm that this kind of judicial economic regulation is improper.

20      In *Harris v. Capital Growth Inv.*, 52 Cal. 3d 1142 (1991) (overruled in part on other

    grounds), the California Supreme Court explained in detail why courts should not engage in

    economic regulation under the guise of enforcing consumer protection statutes.  The *Harris*

    plaintiffs brought a representative action against landlords and apartment managers, challenging

    their requirement of a minimum income for renters as arbitrary economic and sex discrimination

    under the Unruh Act.[2]   The Court held that the lawsuit would require it to engage in economic

    regulation, which was not the proper role for courts:  "In the absence of clear legislative direction,

27  . . . we are unwilling to engage in complex economic regulation under the guise of judicial

28  _____
[2] The plaintiffs also alleged that the practice violated the UCL, but did not argue issues related to
their UCL claim in the court of appeal or Supreme Court.

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

3

1  decisionmaking." *Harris*, 52 Cal. 3d at 1168.  In addition, the possibility of multiple cases

2  seeking to enforce the same legal requirements "would generate expense and uncertainty on a

3  massive scale with little or no demonstrable benefit to the antidiscrimination policy of the Unruh

4  Act." *Id.* at 1167.

5  The Court succinctly summarized the extraordinary problems of setting economic policy

6  through trial courts:

7  The trial would devolve into a battle of economic studies and experts, with each side

8  arguing from statistical and other evidence to support its favorite criteria.  And the outcome

9  would be of little value to the parties (because the various economic factors involved are subject

10  to constant change) or to anyone else (because the fact-specific decision would not allow other

11  landlords or tenants to predict what minimum income policy, if any, would pass muster).  Indeed,

12  the issue of what criteria could be used by landlords could be tried and retried across the state as

13  an issue of fact, with no prospect of certainty or stability in the respective rights and duties of the

14  parties.

15  *Id.* at 1166.

16  *Harris* was not articulating a novel concept.  Twenty years earlier, in *Lazzareschi Inv. Co.*

17  *v. San Francisco Fed. Sav. & Loan Ass'n*, 22 Cal. App. 3d 303, 311 (1971), the court of appeal

18  affirmed summary judgment in favor of a savings and loan accused of excessive prepayment

19  charges on mortgage loans.  The court of appeal highlighted the problem of trial courts making

20  retroactive judgments about lending policies:

21  [W]e remark that the control of charges, if it be desirable, is better accomplished by

22  statute or by regulation authorized by statute than by ad hoc decisions of the courts.  Legislative

23  committees and an administrative officer charged with regulating an industry have better sources

24  of gathering information and assessing its value than do courts in isolated cases.  Besides,

25  institutions which lend vast sums of money should be informed, not by judgments after the fact

26  on a case-to-case basis, but by laws or regulations which are in existence in advance of the

27  undertaking to execute loans, of the validity or invalidity of terms that are commonly used.

28  Id.

1    California courts have applied the principles articulated in *Harris* and *Lazzareschi* to UCL

2    claims.  Even though the UCL is a broad remedial statute, it still does not give courts carte

3    blanche to make economic policy.  *See Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel.*

4    *Co.*, 20 Cal. 4th 163, 182 (1999) ("Although the unfair competition law's scope is sweeping, it is

5    not unlimited.  Courts may not simply impose their own notions of the day as to what is fair or

6    unfair.").[3]

7    *California Grocers Ass'n v. Bank of Am.*, 22 Cal. App. 4th 205, 209 (1994), shows that

8    courts cannot use a claim of unconscionability brought under the UCL to regulate economic

9    policy.  There, the plaintiff filed a UCL claim challenging charges and fees imposed by a

10   regulated financial institution.  The court of appeal reversed a ruling in favor of bank customers

11   who claimed that a $3 fee charged for each "deposited item returned" was unconscionable,

12   because such economic policy decisions belonged to the Legislature:  "This case implicates a

13   question of economic policy. . . . It is primarily a legislative and not a judicial function to

14   determine economic policy. . . ."  *Id.* at 218 (citing *Lazzareschi*, 22 Cal. App. 3d at 311).[4]

15   Numerous other cases have held that a party cannot use the UCL to make economic

16   policy.  In *Wolfe v. State Farm Fire & Cas. Co.*, 46 Cal. App. 4th 554, 564-65 (1996), the

17   plaintiffs filed a claim against insurers on the ground that the refusal to sell them homeowners

18   insurance violated the UCL.  Plaintiffs' theory was that this practice violated Proposition 103's

19   policy statements regarding access to insurance.  The trial court sustained the insurers' demurrers

20   without leave to amend on the ground that the issues raised were best addressed by the

21   Legislature.  The court of appeal affirmed, holding "[j]udicial intervention in areas of complex

22   economic policy is inappropriate."  *Id.* at 562; *see also id.* at 565 n.14 ("judicial intervention is

23   unwarranted under the principles stated in *Harris*").

24   _____

25   [3]  These cases stand for the proposition that the Court *cannot* use the UCL to engage in economic regulation.  The related doctrine of equitable abstention provides that a court *should not* engage in

26   such conduct, even if it could.  *See, e.g., Willard v. AT&T Commc'ns of Cal., Inc.*, 204 Cal. App. 4th 53, 60 (2012) (court abstained and dismissed a claim challenging allegedly unconscionable

27   prices, holding that a review of one company's prices was an inappropriate way to oversee a regulated industry).

28   [4]  This holding provided a "separate and independent basis for reversal," in addition to the court's conclusion that the fee was not unconscionable.  *Id.* at 217.

1          In *Korens v. R. W. Zukin Corp.*, 212 Cal. App. 3d 1054 (1989), the court of appeal

2   affirmed the trial court's grant of summary judgment in a certified UCL class action alleging that

3   landlords violated the UCL by not paying interest on security deposits.  The court of appeal held

4   that it would be improper to make such a policy through judicial fiat:  "Any requirement that

5   interest be paid [on security deposits] should be enacted explicitly by the Legislature, not

6   developed through doctrinal manipulation by the courts."  *Id.* at 1061.[5]

7          The consistent theme running through these cases, and others, is that the proper forum to

8   address concerns over economic policy and price regulation is the Legislature.[6]  Deference to the

9   legislative and administrative policymaking process applies with equal force to federal courts.

10  *See Reudy v. Clear Channel Outdoor, Inc.*, 2010 WL 4918792 (N.D.Cal. 2010) (abstaining from

11  UCL claim seeking to enforce city billboard laws in deference to city processes), *aff'd*, 428 Fed.

12  Appx. 774 (9th Cir. 2011).  Indeed, a federal court should be even more reticent to wade into state

13  economic regulation when the case at issue does not implicate any federal law, regulation or

14  constitutional principle.

15         Courts in unconscionability cases likewise emphasize the importance of judicial caution

16  when applying the doctrine:  "Basing an unconscionability determination on the reasonableness

17  of a contract provision would inject an inappropriate level of judicial subjectivity into the

18  ─────────────
    [5] These cases stand in contrast to cases in which the defendant is accused of deceptive conduct.

19  In such cases, courts routinely intervene using the UCL.  *See, e.g., Nelson v. Pearson Ford*, 186
    Cal. App. 4th 983, 1018 (2010) (UCL claim based on alleged misrepresentation of interest rates

20  in auto loans).  But this case does not involve alleged deception or failure to disclose the interest
    rates.  As the Court has noted, and as Plaintiffs concede, CashCall complied with TILA's
    disclosure requirements.  (Dkt. No. 220, 9:11, citing Plaintiffs' UFs 67-71.)

21  [6] *See also Crusader Ins. Co. v. Scottsdale Ins. Co.*, 54 Cal. App. 4th 121, 138 (1997) (refusing to
    create "court-created regulation" of insurance brokers, explaining that "[i]nstitutional systems . . .

22  are in place to deal with [the issue]"); *Freeman v. Wal-Mart Stores, Inc.*, 111 Cal. App. 4th 660,
    667 (2003) ("We thus leave it to the Legislature to prohibit this type of card if the Legislature

23  deems the service fee provision reprehensible."); *Wholesale Tobacco Dealers, etc. v. National
    Candy & Tobacco Co.*, 11 Cal. 2d 634, 647 (1938) ("It is primarily a legislative and not a judicial

24  function to determine economic policy.") (quoting *Max Factor & Co. v. Kunsman*, 5 Cal. 2d 446,
    455-56 (1936)); *Freeman v. San Diego Ass'n of Realtors*, 77 Cal. App. 4th 171, 203 n. 35 (1999)

25  (rejecting claim that defendant charged excessive prices and explaining that "[t]o hold otherwise
    would place this court in the role of a price control board"); *Willard*, 204 Cal. App. 4th at 59

26  (dismissing claims, including UCL, asserting unconscionability because courts should not engage
    in "complex economic policy"); *Archer v. United Rentals, Inc.*, 195 Cal. App. 4th 807, 822

27  (2011) ("judges are not accredited to supersede [the Legislature] or the appropriate agency by
    embellishing upon the regulatory scheme") (quoting *Ford Motor Co. v. Milhollin*, 444 U.S. 555,

28  565 (1980)).

analysis. 'With a concept as nebulous as unconscionability, it is important that courts not be thrust into the paternalistic role of intervening to change contractual terms that the parties have agreed to merely because the court believes the terms are unreasonable.'" *Wayne v. Staples, Inc.*, 135 Cal. App. 4th 466, 483 (2006) (quoting *Morris v. Redwood Empire Bancorp*, 128 Cal. App. 4th 1305, 1322-23 (2005)).

### B. Plaintiffs' Legal Theory Requires the Court to Determine the "Appropriate" Interest Rate on CashCall's Loans – A Pure Economic Policymaking Exercise That Conflicts and Interferes With the Existing Scheme of Regulation.

Plaintiffs' legal theory and their experts' opinions confirm that they want the Court to engage in judicial economic regulation contrary to the holdings in the long line of cases discussed above. It would be impossible for the Court to award *any* relief to the class without deciding the interest rate that CashCall should have charged borrowers in the past and may charge in the future. Determining an appropriate interest rate – particularly when the California Legislature has deregulated rates on loans above $2,500 – is, by definition, economic regulation.[7]

### 1. Awarding Restitution Requires the Court to Retrospectively Set the Appropriate Interest Rate.

There are clear principles that govern the equitable remedy of restitution, the only monetary relief available under the UCL. Restitution only returns the amount that is wrongfully taken. *Day v. AT&T Corp.*, 63 Cal. App. 4th 325, 338-39 (1998). Restitution is limited to "recovery of the excess paid." *People ex rel. Kennedy v. Beaumont Inv., Ltd.*, 111 Cal. App. 4th 102, 135 (2003). To be recoverable at all, restitution requires proof of a "measurable amount" based on substantial evidence. *Tucker v. Pacific Bell Mobile Svcs.*, 208 Cal. App. 4th 201, 228 (2012). A "measurable amount" here would require the Court to determine a lawful interest rate against which to measure the "excess paid." *Nelson*, 186 Cal. App. 4th at 995 (measure of restitution for alleged overcharge of interest is the interest charges above the stated amount).

---

[7] The Court has not, as Plaintiffs have argued, "already ruled [that] the [UCL] vests the Court with jurisdiction" to rule on their novel unconscionability claim. (Dkt. No. 193, 26.) The Court's certification order, which Plaintiffs cite for this proposition, does not purport to rule on the merits of this claim, and it could not have done so, since a ruling on class certification does not address the underlying merits of a claim. The Court merely describes the legal theories underlying Plaintiffs' UCL claims and analyzes whether individual issues predominate. *O'Donovan v. CashCall, Inc.*, 278 F.R.D. 479, 499-503 (N.D. Cal. 2011).

Manatt, Phelps & Phillips, LLP
Attorneys At Law
Los Angeles

7

1    Thus, under basic principles of restitution, any class restitutionary award requires the

2    Court to determine the difference between the interest rate CashCall charged borrowers and the

3    rate it "should have charged" them.  This case involves loans, and loans carry an interest rate.  For

4    a loan, the amount "wrongfully taken" would be the difference between the interest rate charged

5    and the interest rate that properly should have been charged.  *See Nelson*, 186 Cal. App. 4th at

6    995.  That the UCL allows courts flexibility in determining remedies does not mean that the Court

7    can ignore the principles of restitution, as Plaintiffs have argued.  *Id.*

8    The Court also cannot avoid determining the appropriate interest rate by ordering a

9    forfeiture of all interest, as Plaintiffs also have argued.  The remedies available under the UCL,

10    the vehicle through which Plaintiffs assert their unconscionability claim, are limited to restitution

11    and injunctive relief.  Cal. Bus. & Prof. Code § 17203; *Cortez v. Purolator Air Filtration Prods.*,

12    23 Cal. 4th 163, 180-181 (2000); *Zhang v. Superior Ct.*, 57 Cal. 4th 364, 371 (2013) (remedies

13    available under UCL "are narrow in scope").  The UCL does not authorize "disgorgement" of a

14    defendant's profits.  *Korea Supply Co., v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1148-49

15    (2003).  Rescission is also not an available remedy under the UCL.  *Nelson*, 186 Cal. App. 4th at

16    1018.  So the Court cannot simply order all loans rescinded and refund the interest (net of

17    principal) to class members, as Plaintiffs suggest in their "Restitution Model #1."  (Dkt. No. 172,

18    pp. 140-44.)[8]

19    Similarly, Plaintiffs' argument that the Court can order a forfeiture of interest payments

20    under the FLL's penalty provisions – Cal. Fin. Code § 22751(a) – is simply wrong.  The FLL's

21    penalties are not available in this case, because Plaintiffs' only claim arises under the UCL, not

22    under the FLL.  *Cortez*, 25 Cal. 4th at 179 (claims for violation of the UCL based on failure to

23    pay wages under the Labor Code are governed by the UCL and not the Labor Code:  "A UCL

24    [8] Restitution Model #1 does not actually amount to a forfeiture of *all* interest, even if such a

25    remedy were available under the UCL, which it is not.  Under this model, 33,315 loans
(approximately 25% of all loans in the class) are "negative restitution" loans – which simply

26    means that these borrowers made total payments of principal and interest of less than $2600 and
thus still owe CashCall money.  (Dkt. No. 172, 143-44.)  Restitution Model #1 gives these class

27    members nothing.  As to the borrowers who paid CashCall more than $2600, Plaintiffs would ask
the Court to return the interest paid "net of principal."  In essence, Model #1 seeks to return the

28    parties to the status quo ante, so this Restitution Model seeks a rescission of the loans.  But
rescission, like forfeiture, is not an available remedy under the UCL.

action is independent of a statutory claim for back wages.").  Plaintiffs do not pursue a claim under the FLL, nor could they.[9]

### 2. Issuing an Injunction Requires the Court to Prospectively Set the Appropriate Interest Rate.

Plaintiffs' request for an injunction prohibiting CashCall from engaging in future acts of unfair competition poses the same economic regulation problem.  "Rule 65(d) requires an injunction to 'state its terms specifically' and 'describe in reasonable detail . . .  the act or acts restrained.'  The benchmark for clarity and fair notice is not lawyers and judges, who are schooled in the nuances of [the] law, but instead the lay person, who is the target of the injunction." *Del Webb Communities, Inc. v. Partington*, 652 F.3d 1145, 1149-50 (9th Cir. 2011) (citing *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1134 (9th Cir. 2006)) (internal quotation marks omitted); *see also Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) ( "[T]he specificity provisions of Rule 65(d) are no mere technical requirements. The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood.").

Because injunctions are punishable by contempt, an injunction must be sufficiently clear, so the defendant can obey it.  An injunction that merely says "do not make loans at unconscionable interest rates" would be impermissibly vague. *IO Grp., Inc. v. Jordon*, 708 F. Supp. 2d 989, 1001 (N.D. Cal. 2010) ("Generally, an injunction must be narrowly tailored to remedy only the specific harms shown by the plaintiffs, rather than to enjoin all possible breaches of the law.").  "A district court abuses its discretion by issuing an overbroad injunction." *McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

---

[9]  The forfeiture penalty appears in Chapter 4 of the FLL, the "Revocation and Penalties" section of the law.  All of these provisions refer to actions that can be taken against a licensee by the commissioner of the Department.  The FLL limits enforcement actions to those filed by the commissioner.  Cal. Fin Code § 22713.  No case has held that these penalties provisions apply in a private action.  In the absence of legislative intent to create a private right of action under a statute, a trial court should not do so. *See Animal Defense Fund v. Mendes*, 160 Cal. App. 4th 135, 144-45 (2008); *Crusader*, 54 Cal. App. 4th at 153.  Indeed, at least one district court has held that there is no private right of action under Financial Code section 22302. *Cazares v. Household Finance Corp.*, 2005 WL 6418178 *12 (C.D. Cal. Jul. 26, 2005).

Any injunction would have to tell CashCall what it can and cannot do in the future.  That means the proposed injunction must set an interest rate that is "not unconscionable."  Otherwise, the Court would be setting up the next case challenging CashCall's interest rates – as the *Harris* court warned, "the outcome [of this case] would be of little value to the parties."  *Harris*, 52 Cal. 3d at 1166.

3. **A Court-Imposed Interest Rate Cap Would Conflict With the FLL and Regulation by the Department.**

Plaintiffs have given the Court no guidance on how to set an interest rate.  Only one of Plaintiffs' four experts has opined on an appropriate "benchmark" interest rate.  Margot Saunders argues that 36% is the most *any* lender should be able to charge *any* borrower for *any* loan.  The basis for her opinion is "historical and political" – a clear indication that Plaintiffs want the Court to engage in economic regulation for political reasons.  (Dkt. No. 172-1, 55-66.)  When all is said and done, Plaintiffs suggest that the Court can simply "exercis[e] equitable discretion," with no guidance or standards for how the Court should do that.  (Dkt. No. 193, 27-28.)

Plaintiffs' failure to suggest any guidance or standards for how the Court could determine an appropriate, "not unconscionable" interest rate is especially significant in light of the business and regulatory context in which CashCall operates.   In 1986, when it enacted Financial Code section 22303, the Legislature made a clear policy decision to remove the interest rate caps on loans above $2,500.  Adopting Plaintiffs' theory would effectively overrule the Legislature's policy determination and reinstate interest rate caps.

CashCall and other lenders made business decisions based on the existing regulatory structure.  CashCall set its interest rates based on its costs and desired profitability.  When it began in business, CashCall offered loans with rates of 79% and 87%, but ultimately raised the rate on its $2,600 loans to 96% because it could not make a profit at the lower rates.  When "the Great Recession intervened" causing CashCall to suffer a "catastrophic loss" and "shrink dramatically,"[10] it raised rates to 135%.

---

[10] This description comes from *Plaintiffs'* opposition brief.  (Dkt. No. 193, p. 9.)  These facts show CashCall setting rates according to business realities – an "equilibrium-seeking process," as described by Plaintiffs' lending expert McFarland.  (Dkt. No. 172-1, p. 22.)  This is exactly the sort of process that *any* business would need to engage in to determine how to price its products.

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

1    All that time, CashCall has been making loans under the supervision of the Department,

2    which was aware of what CashCall was doing and took no action, even though it has the authority

3    to regulate lenders charging excessive fees and audited CashCall three times during the class

4    period.  The Department understands the conditions in the California lending market based on its

5    audits of CashCall and other lenders and the detailed annual reports that all licensed lenders must

6    file and which the Department compiles into annual reports on lending in California.  Thus, the

7    Department is appropriately vested with the power to regulate excessive charges.  But that does

8    not mean a private litigant can use the courts to do so.

9    That the Department has not challenged CashCall's interest rates does not merely

10    represent "inaction," as Plaintiffs have argued.  (Dkt. No. 193, 27.)  The scope of the

11    Department's three comprehensive audits and the actions taken by the Department indicate that it

12    was closely monitoring whether CashCall was making loans above $2,500, the statutory cut-off

13    for exemption from the FLL's interest rate caps.  The 2010 audit resulted in the Department filing

14    an administrative action seeking to suspend CashCall's finance license for up to one year based

15    on alleged violations of the FLL and other allegations.[11]  Significantly, the Department has not

16    included an allegation that CashCall charges unconscionable interest rates.  To the contrary, the

17    Department states that "a CFLL licensed lender can charge whatever interest rate it chooses on

18    loans of bona fide principal amounts of $2500 or more."  *See* Accusation, p. 2.  In all these

19    regulatory actions, the Department would not have overlooked the fact that CashCall was

20    charging interest rates above 90% on most of its loans, and, if the Department considered those

21    rates to be problematic, it surely would have taken action.

22    After-the-fact adjudication of the validity of CashCall's interest rates would interfere with

23    the uniform regulation by the Department and raise the prospect of inconsistent adjudications.

24    Other lenders currently are charging comparable or even higher rates than CashCall.  A

25    determination in this case of the maximum "not unconscionable" rate that *CashCall* may charge

26

27    _____
[11]  A copy of the Department's Accusation can be found at the following self-authenticating link: http://www.dbo.ca.gov/ENF/pdf/2014/CFL-CashCall_accusationrev_redacted.pdf.  CashCall

28    requests that the Court take judicial notice of the Accusation pursuant to Federal Rule of Evidence 201, since it is a matter of public record.

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

11

1    potentially would impact the entire California credit market and almost certainly would subject all

2    licensed lenders to similar challenges.  The possibility of conflicting court rulings would mean

3    some lenders are subject to court-imposed restrictions, while others are not.

4         The problem of conflicting court rulings is not an abstract concern.  The court in *Meeks v.*

5    *CashCall, Inc.* rejected the exact same theory of relief that Plaintiffs are pursuing here.[12]  So

6    regulation of finance lenders would move from the uniform regime overseen by the Department

7    to an ad hoc case-by-case adjudication where the propriety of a lender's interest rates depends on

8    the venue selected and the persuasiveness of the expert witnesses employed "with no prospect of

9    certainty or stability in the respective rights and duties of the parties."  *Harris*, 52 Cal. 3d at 1167.

10        Moreover, if the Court were to create and impose new interest rate caps, it is highly

11   unlikely that lenders would make loans to subprime borrowers.  CashCall certainly wouldn't,

12   since it was unable to make a profit when it previously set its rates at 79% or 87%.  Faced with

13   this option, CashCall would have no choice but to exit the subprime credit market entirely.  Such

14   a result is inconsistent with the policy goals of the FLL – to foster competition and ensure

15   available credit to consumers.  Cal. Fin. Code §§ 22001(a) (1) and (3) ("This division shall be

16   liberally construed and applied to promote its underlying purposes and policies, which are:  (1)

17   To ensure an adequate supply of credit to borrowers in this state. . . . (3) To foster competition

18   among finance lenders.").

19          4.   **The FLL's Incorporation of the Unconscionability Defense Does Not
                Mean the Court Can Use the UCL to Regulate Interest Rates.**

20

21        Plaintiffs have argued that Financial Code section 22302 gives the Court the ability to use

22   the unconscionability doctrine to set interest rates notwithstanding the removal of rate caps on

23   loans above $2,500.  But that is not what section 22302 says.  It merely provides that "[s]ection

24   1670.5 of the Civil Code applies to the provisions of a loan contract that is subject to this

25   division."  Fin. Code § 22302(a).  That really says nothing, because *all* contracts in California are

26   subject to Civil Code section 1670.5.  *See A & M Produce Co. v. FMC Corp.,* 135 Cal. App. 3d

27   473, 484-85 (1982).  Any FLL loan found to be unconscionable is a violation of the FLL and is

---

[12]  Los Angeles County Superior Court Case No. BC 367894, May 6, 2008, Ruling on Demurrer
(Dkt. No. 185, Ex. B.)

1   "*subject to the remedies specified in this division*."  Fin. Code § 22302(b) (emphasis added).

2   Nothing in this section indicates that the Legislature intended Section 22302 to provide a means

3   for courts to re-impose rate caps.  As discussed above, there is no indication that "the remedies

4   specified in this division" of the FLL apply in a private action, particularly one seeking to use the

5   doctrine of unconscionability offensively to set interest rates on a mass scale.

6           Unconscionability is traditionally a defense to enforcement of a contract, not an

7   affirmative/offensive claim.[13]  That a borrower may raise the defense in an individual action to

8   prevent the enforcement of unconscionable loan terms – as individual borrowers did in *Carboni*

9   and *Lona v. Citibank, N.A.*, 202 Cal. App. 4th 89 (2011) – does not mean it can be used

10  affirmatively to set interest rates for tens of thousands of borrowers doing business with a

11  lender.[14]  And, as discussed above, at least one federal district court has held that there is no

12  private right of action under section 22302.  *See Cazares*, 2005 WL 6418178 *12.

13      **C.**     **Plaintiffs' Expert Evidence Confirms That They Are Asking the Court to Engage in Economic Regulation.**

14

15          Plaintiffs have turned this case into a battle of expert opinions – exactly the result the

16  California Supreme Court warned against in *Harris*.  Plaintiffs' experts do not actually dispute the

---

17  [13]  *See Koehl v. Verio, Inc.*, 142 Cal. App. 4th 1313, 1338 (2006) ("while [Civil Code § 1670.5] does not in itself create an affirmative cause of action, it codifies the defense of unconscionability") (internal citations and quotation marks omitted); *Marin Storage & Trucking v. Benco Contractor & Eng'g*, 89 Cal. App. 4th 1042, 1049 (2001) ("The doctrine of unconscionability is a defense to the enforcement of a contract or a term thereof."); *California Grocers*, 22 Cal. App. 4th at 209 (1994) ("We conclude the fee is not unconscionable, and even if it were, that fact could not support affirmative injunctive relief."); *Nava v. VirtualBank*, 2008 U.S. Dist. LEXIS 72819 at *30-*31 (E.D. Cal. July 16, 2008) ("The doctrine of unconscionability has historically provided only a defense to enforcement of a contract. California Civil Code § 1670.5, which codifies the doctrine of unconscionability, does not in itself create an affirmative cause of action but merely codifies the defense of unconscionability.  As such, plaintiff's allegation that defendants breached the Note because the Note was unconscionable does not create a recognized claim under California law.") (internal citations and quotation marks omitted); *Dean Witter Reynolds, Inc. v. Sup. Ct.*, 211 Cal. App. 3d 758, 764 (1989) (Civil Code § 1670.5 merely codifies a contract defense).

[14]  *Lona* and *Carboni* demonstrate the unique factual circumstances that have compelled courts to apply the doctrine of unconscionability in individual loan cases.  In *Lona*, the court of appeal reversed summary judgment because the bank failed to address evidence that the borrower couldn't understand loan terms because of limited English skills and evidence that the monthly payments were four times the borrower's income.  In *Carboni*, a private lender made a $4,000 loan, secured by a deed of trust on an elderly man's home, which ultimately ballooned to a debt of $100,000 at 200% interest without justification.  *Carboni* also did not involve a UCL claim, as Plaintiffs have argued. (Dkt. 193, 27.)  The borrower there raised unconscionability as an affirmative defense to a foreclosure action.

1    facts, such as the fact that CashCall's high costs require it to charge higher interest rates to remain

2    viable and maintain profitability.  They merely opine on the undisputed factual record, relying on

3    policy arguments and general studies of consumer behavior.  Plaintiffs' expert opinions confirm

4    that they are asking the Court to engage in economic regulation.

5              **1.  Plaintiffs' Expert Opinions About CashCall's Business Model Ask the Court to Make Value Judgments About How CashCall Allocates Its Costs.**

6

7              Plaintiffs' experts agree that CashCall's costs require it to charge higher interest rates to

8    recoup its costs and achieve its targeted profitability.[15]  Plaintiffs simply make value judgments

9    about how CashCall chooses to spend its money, arguing that CashCall should run its business

10   differently.  And this Court would need to adopt those value judgments – even though they may

11   be at odds with the views of the Legislature and the Department – in order to award Plaintiffs the

12   relief they seek.  For instance, the Court would have to determine whether, notwithstanding

13   Plaintiffs' experts' concession that CashCall's high costs required it to charge higher interest

14   rates, a "business strategy for aggressive growth and large loan volumes"[16] or a "sweatbox

15   lending model" render the loans unconscionable and require CashCall to loan money at interest

16   rates that already have proven to be unprofitable, given the inherent risks in making unsecured

17   loans to subprime borrowers.

18              As an example, much of Bruce McFarland's critique of CashCall's business model merely

19   highlights why CashCall's costs are high.  McFarland explains that a lender (*any* lender) seeking

20   to increase profits could do so by increasing the number of loans it makes, and can increase the

21   number of loans by increasing its advertising to generate more potential borrowers.  (Dkt. No.

22   172-1, 14-16.)  That is exactly what CashCall did.  According to McFarland, a lender (*any* lender)

23   can also increase the number of loan originations by adopting broad underwriting standards to

24   "expand the pool of qualified borrowers," another approach that CashCall employed.  (*Id.*, 18-

25   19.)  McFarland also notes that CashCall engaged in an "equilibrium-seeking process" to

26   _____

[15]  That concession should end the case under *Perdue v. Crocker Bank*, 38 Cal. 3d 913, 926-27 (1985), which focuses solely on the defendant's costs, not on the defendant's business model or rationale for the costs.
[16]  Dkt. No. 196, Plaintiffs' Separate Statement of Undisputed Material Facts in Support of Unconscionability Motion ("P's UF"), UF, 21, 26, 28-31, 41-49.

Manatt, Phelps & Phillips, LLP
Attorneys At Law
Los Angeles

14

1   determine the point at which its interest income was sufficient to cover its expenses and provide

2   its investors with a rate of return commensurate with the risk of their investment.  (*Id.*, 22.)

3   Again, any lender (indeed, any business) must engage in this equilibrium-seeking process to

4   determine how to price a new product.

5        Characterizing these legitimate business decisions as an "aggressive growth" business

6   model does not make them unconscionable.  It is also irrelevant to say that CashCall's costs are

7   "self-imposed."  Plaintiffs' experts concede that the primary driver of default rates is the

8   borrower's FICO score, and that CashCall would prefer that borrowers not default.  (Dkt., 172-1,

9   79-80.)  The question is not whether CashCall could have had a lower default rate if it chose to

10  lend to less risky borrowers with higher FICO scores – those people are not in this class.  The

11  only question is what costs CashCall actually incurred and what risks it actually assumed by

12  lending to these admittedly risky subprime borrowers.  So the business model is not "designed to

13  create defaults," as Plaintiffs argue.  (Dkt., 193, 16, 19.)  The business model takes into account

14  the default risk that these borrowers present.  That is the essence of loan underwriting.

15       The Legislature certainly could, if it wanted to, prohibit lending to borrowers with FICO

16  scores below 600, limit the percentage of a lender's loan portfolio that can default, or restrict

17  advertising expenses, collection costs, or any other aspect of a lender's operations.  But the Court

18  cannot and should not be making such a legislative policy decision based on an expert's

19  characterization that the defendant employed an "aggressive growth" strategy.

20       Professor Adam Levitin's argument that CashCall engages in "sweatbox lending" also

21  reflects Plaintiffs' attempt to have the Court engage in economic regulation.  Plaintiffs cite no

22  authority indicating that such a model is illegal.  Instead, as support for the existence of the

23  "sweatbox lending" model, Levitin cites a law review article discussing the impact of recent

24  bankruptcy reform legislation on credit card issuers and an article by Elizabeth Warren (before

25  she was elected to the Senate) advocating for the creation of the Consumer Financial Protection

26  Bureau – pure economic policy analysis.[17]  As these authorities demonstrate, there has been much

27  _____
    [17] It is not clear why Levitin would choose to import a concept applied to credit card issuers to
28  CashCall, because Levitin opined that credit cards were not a comparable substitute for
    CashCall's loans.  The sweatbox problem for credit card borrowers described in the law review

discussion in recent years about subprime lending and the wisdom of additional regulation in the subprime market.  Here again, if the Legislature wants to take action to regulate "sweatbox lending," it is free to do so, but it is not for the Court to make that sort of policy decision.

Plaintiffs also have argued that it is irrelevant that CashCall could lose money at lower interest rates.  (Dkt. No. 193, 28.)  That argument misconstrues California unconscionability law and confirms that Plaintiffs want to regulate economic policy.  California courts recognize that businesses are entitled to make a profit, even a healthy profit of more than 100%.  *See Perdue*, 38 Cal. 3d at 927 (600% profit margin "may not be automatically unconscionable").  And, as the Court has found, Plaintiffs produce no evidence that CashCall generated excessive profits (because it didn't).  (Dkt. No. 220, 35.)[18]  So if CashCall's high costs require it to charge higher interest rates and it is not making excessive profits, Plaintiffs' theory must be that these interest rates are *per se* unconscionable – that they are just too high – an economic regulation argument plain and simple.

And Plaintiffs' experts cannot even agree on important policy points, such as whether there were comparable loans available to class members.  (Dkt. No. 220, Order, p. 27.)  Indeed, in describing the availability of market alternatives, Plaintiffs' unconscionability expert Levitin conceded that "[t]he degree of substitutability can sometimes be quite subjective."  (Dkt. No. 194-1, p. 56.)  He also argued that certain alternative loans products – such as payday loans, auto

---

article was that, as a result of the changes to the bankruptcy laws, credit card borrowers were filing for bankruptcy later.  So borrowers would carry a balance on their card near the credit limit and "limp along" for years making the minimum payment but not making any additional charges.  R. Mann, *Bankruptcy Reform and the "Sweat Box" Model of Credit Card Debt*, 2007 Ill. L. Rev. 375, 392.  For credit card issuers, this allowed them to continue to collect minimum monthly payments and fees, which was highly profitable.  *Id.*  That is a problem with open-ended credit card debt, which has no end term.  Borrowers are obligated to make minimum payments but even if they do so, it can take years (if ever) before they repay the balance.  In the meantime, these borrowers are highly profitable for lenders.  Unlike credit card debt, CashCall loans have a maximum certain term and can be prepaid at any time.  Thus, there is no sweatbox for these loans.

[18]  Levitin's theory – that the sweatbox lending model allows CashCall to operate an "extremely profitable business" (Dkt. No. 194-1, 67) – directly conflicts with this finding.  In addition, Levitin ignores the fact that 43.7% of loans to the class were repaid in full prior to the end of the loan term, and that the majority of class members who defaulted (almost 25% of all class members) did so without even paying back $2,600 to CashCall.  Here again, expert theory collides head-on with facts.

finance loans, and tax refund loans – are "partial or incomplete substitutes" for CashCall's unsecured term loans.[19]  So this Court will be placed in the position of having to make admittedly subjective determinations of the degree of substitutability of various loans products.

As the *Harris* Court warned, "the outcome would be of little value to the parties . . . or to anyone else."  52 Cal. 3d 1166.  Could CashCall continue to make unsecured loans at 135% if it pursued a less aggressive growth model?  Could one of CashCall's competitors survive a challenge to 135% interest rates by showing that it employed a "less aggressive" growth model?  How can a court properly evaluate a business model, other than to determine whether a company's costs require it to charge a particular price?  Setting interest rates through court proceedings on a mass scale raises far more questions than answers.

1.   **Plaintiffs' Expert Opinions Regarding Consumer Financial Literacy Demonstrate That Plaintiffs Want the Court to Engage in Economic Regulation.**

As the Court has noted, and as Plaintiffs have conceded, CashCall complied with TILA's disclosure requirements.  (Dkt. No. 220, 9:11, citing P's UFs 67-71.)  According to Plaintiffs, borrowers with low credit scores simply cannot understand the disclosures.  (Dkt. No. 196, P's UF 60-63.)  Plaintiffs' experts conducted no analysis or study of these class members.  Their support for this concern is "numerous empirical studies of general characteristics of similar consumers" and "consumer behavior" (Dkt. No. 220, 23:20-21, 24:19) – opinions that would apply to *any* subprime lender.  Plaintiffs also complain about the timing of the disclosures, with their experts arguing that the borrower receives the disclosures so late in the process that they can't stop, because of "sunk costs."[20]  Plaintiffs obviously feel these are important points, because they hired three different experts to offer such opinions and devoted several pages of their summary judgment opposition brief to these arguments.  (Dkt. No. 193, 21-26.)

---

[19]  Here again, Plaintiffs and their experts misconstrue California unconscionability law.  The case law does not require that an alternative to an allegedly unconscionable contract term be a *perfect* substitute.  The relevant comparison is the "price actually being paid by other similarly situated consumers in a *similar transaction.*"  *Perdue*, 38 Cal. 3d at 926 (emphasis added).  The *Carboni* court likewise compared the interest rate charged to "the rate then prevailing in the credit market for *similar* loans."  2 Cal. App. 4th at 84 (emphasis added).
[20]  This opinion ignores testimony and evidence that callers received disclosures during the application process.

Plaintiffs' arguments on disclosure and financial literacy directly conflict with TILA and the FLL. "Congress enacted TILA 'to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices.'" *Hauk v. JP Morgan Chase Bank, N.A.,* 552 F.3d 1114, 1118 (9th Cir. 2009) (quoting 15 U.S.C. § 1601, which also provides "The informed use of credit results from an awareness of the cost thereof by consumers"). The Consumer Financial Protection Bureau has the authority to prescribe regulations to carry out the purpose of TILA, including the precise forms of disclosure. 15 U.S.C. § 1604. States also may adopt additional disclosure regulations, as long as they do not conflict with TILA. 15 U.S.C. § 1610. But California has not chosen to do so; the FLL simply incorporates Regulation Z's disclosure requirements and specifies that disclosures must be given "when the loan is made." Cal. Fin. Code § 22337(a).

Plaintiffs rely on general economic studies regarding consumer financial literacy, rather than analysis of the financial literacy of this class. The upshot of Plaintiffs' arguments is that CashCall needs to provide more extensive disclosures than the law requires, and it must provide them earlier than the law requires. Of course, based on Plaintiffs' experts' opinions, it is not clear if CashCall (or *any* lender) could ever sufficiently disclose loan terms to any borrower, since consumers allegedly lack the financial literacy to understand the financial impact of loans and simply jump at the most attractively advertised product. In any event, whether CashCall or any lender should provide additional or different disclosures to its borrowers is a legislative policy decision that the Court cannot impose on CashCall through this UCL litigation.

2. **Plaintiffs' Opinions About the Harm to the Class Are Based on Speculation That Is Contrary to the Court's Certification Order.**

Plaintiffs' arguments that the loans harmed all class members further demonstrates Plaintiffs' desire to engage in economic regulation. They ask the Court to ignore the admitted benefit to *all* borrowers in the class – obtaining access to credit – and conclude that the variable

harms that some, but not all, borrowers may suffer outweigh the uniform benefits and render the loans *per se* unconscionable.

Plaintiffs' arguments about harm to borrowers also are contrary to the Court's certification order.  In arguing for class certification, Plaintiffs promised that they would "proffer evidence on a class-wide basis that CashCall's high interest rate was one-sided and 'well outside of industry norms.'"  *O'Donovan*, 278 F.R.D. at 501.  The Court accepted that argument:  "Evidence regarding the 90% and above interest rates CashCall charged on its loans could be compared to those of similar loans in the credit market and any finding would be uniformly applicable . . . ."  *Id.*  The certification order defines the issues to be litigated. Fed. R. Civ. P. 23(c)(1)(B) ("[A]n order that certifies a class action must define the class claims, issues or defenses . . . .").  Plaintiffs also told this Court that CashCall's interest rates "will be the focus of the inquiry," and the Court could make this determination "without regard to the particular circumstances of each class member."  *O'Donovan*, 278 F.R.D. at 501.  The Court certified the unconscionability claim based solely on the claim that interest rates above 90% were unconscionable.  *Id.* at 501-02.

But the Court refused to certify the UCL unfairness claim, which Plaintiffs based on "CashCall's business practices in offering loans with grossly one-sided terms (including the charging of excessively high interest rates, requiring repayment of 4-6 times the original loan amounts, the extended maturities, charging of unfair and excessive fees designed to extend the length of repayment)."  *Id.* at 502-503 (citing Plaintiffs' Class Certification Motion at 22).  Plaintiffs also focused this claim on the "length of repayment of the loan, the structure of payments (*e.g.*, interest only for nearly two years) . . . ."  *Id.* at 503.  The Court found that this claim was not suitable for class treatment because "the circumstances surrounding each loan agreement, including each borrower's financial circumstances, would come into play, requiring individualized examinations."  *Id.*

The Court also refused to certify a UCL unlawfulness claim based on the theory that CashCall made loans without regard to the borrowers' ability to repay.  The Court concluded that this claim required a "more particularized examination of CashCall's underwriting process vis-à-vis individual borrowers . . . ."  *O'Donovan*, 278 F.R.D. at 502.

Plaintiffs' evidence of alleged harms necessarily raises individual issues, as the Court found in denying certification as to these other UCL claims. And the record here is replete with examples of how the loans impact borrowers differently. Only a small percentage of class members actually took the loans to their full term and repaid 3.5 or 4.5 times the amount borrowed. Even more people repaid the loans within six months, incurring only a fraction of the finance charges. A significant portion of the class (almost 25%) defaulted without even repaying $2,600 to CashCall. More that 29,000 class members took out more than one CashCall loan – an undisputed fact that simply cannot be reconciled with the notion that these loans were uniformly harmful to class members. Plaintiffs also argue (without evidence) that class members suffer "adverse credit reporting." (Dkt. No. 193, 21.) Those consequences would occur (if at all) only as to those borrowers who defaulted. Plaintiffs ignore the substantial benefits that accrue to borrowers who are able to establish credit or rebuild damaged credit – class members like Arthur Vardanyan, who took out five CashCall loans, but no longer needs to resort to subprime loans because of his improved credit.

So there is simply no basis to conclude that the loans uniformly harmed borrowers. Weighing these harms and benefits necessarily requires individual inquiries. Raising individual issues does not defeat summary judgment in a class case; it shows that the class should not have been certified in the first place.

Whether any particular borrower is impacted by Levitin's "sweatbox lending model" also necessarily depends on that borrower's unique circumstances, since so many loans are either prepaid or default before CashCall recoups the loan principal and its costs. So, unlike the credit card sweatbox problem, the evidence here shows that many borrowers could leave the "sweatbox" by prepaying their loans or by defaulting prior to CashCall's break-even point. If CashCall really wanted to keep borrowers in the "sweatbox," it would have imposed a substantial prepayment penalty to ensure it broke even on every loan, but it never did – a fact that, as Levitin concedes, benefitted borrowers.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

III.     **CONCLUSION.**

Plaintiffs ask this Court to set the interest rate on the 135,288 loans in this class and regulate the interest rates CashCall can charge future borrowers.  There is simply no way for the Court to do so and avoid an exercise in economic regulation on a mass scale.  The Court should grant summary judgment in CashCall's favor on the unconscionability claim.

Dated:  September 15, 2014              MANATT, PHELPS & PHILLIPS, LLP


                                        */s/ Brad W. Seiling*
                                        Brad W. Seiling
                                        *Attorneys for Defendant*
                                        CashCall, Inc.

202818865.4