1  BRAD W. SEILING (Bar No. CA 143515)
   DONALD R. BROWN (Bar No. CA 156548)
2  MANATT, PHELPS & PHILLIPS, LLP
   11355 West Olympic Boulevard
3  Los Angeles, CA 90064-1614
   Telephone: (310) 312-4000
4  Facsimile: (310) 312-4224
   E-mail: bseiling@manatt.com; dbrown@manatt.com

5

*Attorneys for Defendant*
6  CashCall, Inc.

7

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10

11  KRISTA O'DONOVAN and EDUARDO
    DE LA TORRE, individually and on behalf
12  of all others similarly situated,

13             Plaintiff,

14       vs.

15  CASHCALL, INC., a California
    corporation, and DOES 1 through DOE 50,
16  inclusive,

17            Defendants.

Case No. C 08-03174 MEJ

**DEFENDANT'S TRIAL BRIEF ON CONDITIONING CLAIM**

Trial Date: June 22, 2015
Time: 9:30 a.m.
Courtroom: B—15th Floor
Judge: Hon. Maria-Elena James

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

203073326.1

DEFENDANT'S TRIAL BRIEF RE CONDITIONING CLAIM

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .................................................................................................... 1

II. THE CONDITIONING CLAIM .............................................................................. 3

III. KEMPLY CANNOT PROVE ACTUAL DAMAGES ........................................... 4

    A. Actual Damages Under the EFTA Require Proof of Causation ............................ 4

    B. The Initial EFT Authorization Was Freely Revocable At Any Time ................... 5

    C. The Testimony and Payment History of Borrower Witnesses Confirms That the Conditioning Did Not Cause Borrowers to Incur NSF Fees ................... 6

    D. Class-Wide Data Also Confirm That the Initial EFT Authorization Did Not Cause Borrowers to Incur NSF Fees ..................................................................... 8

    E. The Actual Damages Claim Falsely Assumes that Class Members Would Not Have Used EFTs If Not for the Conditioning .................................................. 9

    F. The Use of EFTs Did Not Harm Borrowers .......................................................... 10

IV. KEMPLY AND THE CLASS ARE NOT ENTITLED TO RESTITUTION OF NSF FEES UNDER THE UCL ............................................................................. 10

V. CLASS MEMBERS WHO DEFAULTED ON THEIR LOANS CANNOT RECOVER ACTUAL DAMAGES OR RESTITUTION ......................................... 12

VI. THERE IS NO BASIS FOR AWARDING STATUTORY DAMAGES ................. 13

VII. POTENTIAL EVIDENTIARY ISSUES ................................................................. 14

VIII. CONCLUSION ....................................................................................................... 15

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

# TABLE OF AUTHORITIES

**Page**

## CASES

*Adiel v. Chase Federal Savings & Loan Assn.,*
   630 F. Supp. 131 (S.D. Fla. 1986) ........................................................................4, 5

*Bank of the West v. Super. Ct.,*
   2 Cal. 4th 1254 (1992) ...........................................................................................11

*Brown v. Bank of Am.,*
   457 F. Supp. 2d 82 (D. Mass. 2006) ..................................................................4, 11

*Burns v. First Am. Bank,*
   2006 WL 3754820 (N.D. Ill. 2006)...................................................................11, 14

*Federal Trade Comm'n v. Payday Fin. LLC,*
   989 F. Supp. 2d 799 (D.S.D. Sept. 30, 2013)......................................................1, 14

*Friedman v. 24 Hour Fitness USA, Inc.,*
   580 F. Supp. 2d 985 (C.D. Cal. 2008)....................................................................10

*Granberry v. Islay Investments,*
   9 Cal. 4th 738 (1995) .............................................................................................12

*Korea Supply Co. v. Lockheed Martin Corp.,*
   29 Cal. 4th 1134 (2003) .........................................................................................10

*Martz v. PNC Bank, N.A.,*
   2006 U.S. Dist. LEXIS 94474 (W.D. Pa. 2006) ......................................................4

*McCoy v. Salem Mortg. Co.,*
   74 F.R.D. 8 (E.D. Mich. 1976)..................................................................................5

*People v. Duz-Mor Diagostic Lab., Inc.,*
   68 Cal. App. 4th 654 (1999)....................................................................................12

*Peters v. Jim Lupient Oldsmobile,*
   220 F.3d 915 (8th Cir. 2000)....................................................................................4

*Polo v. Goodings Supermarkets, Inc.,*
   232 F.R.D. 399 (M.D. Fla. 2004)........................................................................4, 11

*Rucker v. Sheehy Alexandria, Inc.,*
   228 F. Supp. 2d 711 (E.D. Va. 2002)........................................................................5

*Vallies v. Sky Bank,*
   583 F. Supp. 2d 687 (W.D. Pa. 2008) .......................................................................5

*Voeks v. Pilot Travel Ctrs.,*
   560 F. Supp. 2d 718 (E.D. Wis. 2008)......................................................................4

*Wiley v. Earl's Pawn & Jewelry, Inc.,*
   950 F. Supp. 1108 (S.D. Ala. 1997).........................................................................5

# TABLE OF AUTHORITIES
**(continued)**

Page

*Yarnall v. Four Aces Emporium, Inc.*,
    322 B.R. 422 (9th Cir. BAP 2005)...................................................................................4

## STATUTES

15 U.S.C. § 1693e(a)..............................................................................................................14, 15

15 U.S.C. § 1693k.........................................................................................................1, 4, 11, 13

15 U.S.C. § 1693k(1) ...................................................................................................................3

15 U.S.C. § 1693m(a) ..................................................................................................................4

15 U.S.C. § 1693m(a)(2)(B) ........................................................................................................3

15 U.S.C. § 1693m(b)(2) ...........................................................................................................13

Bus. & Prof. Code § 17200 *et seq.* .............................................................................................2

Cal. Fin. Code § 22320 ..............................................................................................................11

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

1  **I.     INTRODUCTION**

2        The sole issue in this trial is whether the Court should award monetary relief based on

3  CashCall's pre-November 2011 practice of requiring borrowers to sign a promissory note that

4  included a freely revocable authorization to make payments by electronic fund transfers ("EFT").

5  The Court has found that this revocable EFT authorization constituted conditioning credit on

6  repayment by EFT and thus violated Section 1693k of the Electronic Funds Transfer Act

7  ("EFTA").   Kemply seeks actual and statutory damages under the EFTA, and alternatively,

8  restitution under the UCL.  But "conditioning credit on an EFT clause, albeit one revocable at any

9  time, is a violation somewhat technical in nature and use of this EFT clause is not likely to merit

10  much, if any, monetary penalty."  *Federal Trade Comm'n v. Payday Fin. LLC,* 989 F. Supp. 2d

11  799, 812-13 (D.S.D. Sept. 30, 2013).[1]   Kemply cannot meet her burden of proof as to any

12  monetary relief for herself or the Conditioning Class she purports to represent.

13        The alleged actual damages Kemply seeks to recover consist of the NSF fees that she and

14  some Class members paid CashCall when their banks refused to process an EFT loan payment

15  because there were insufficient funds in the Class member's account.  To recover these fees as

16  damages, Kemply must prove that the EFT authorization signed at the outset of the loan

17  proximately caused each Class member to incur every NSF fee.  She cannot establish causation

18  for several reasons.  First and foremost, every Class member could cancel their EFT authorization

19  at any time, even prior to making *any* payments.  This unfettered cancellation right—which many

20  borrowers, including Kemply, exercised—severs any causal link between the initial EFT

21  authorization and NSF fees that may have been incurred months, or even years, later.  In addition,

22  Class members had numerous other options to manage their loans to avoid incurring NSF fees,

23  including changing the scheduled date of the EFT payment, requesting to have a payment

24  skipped, deferring one or more payments, or modifying their loan terms.  Kemply and thousands

25  of Class members availed themselves of all of these options, often using several of them.

26

27  _____

28  [1] The existence of a violation was determined on summary judgment.  In referring to a violation, CashCall is not waiving its right to appeal that determination.

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

203073326.1

DEFENDANT'S TRIAL BRIEF RE CONDITIONING CLAIM

1    In the final analysis, Class members incurred NSF fees because they did not have

2    sufficient funds in their accounts to cover their scheduled EFT payment, not because of the initial

3    EFT authorization.  That fact is made clear, because more than 60,000 CashCall borrowers who

4    took out loans during the Class period never incurred a single NSF fee, even though they signed

5    the same EFT authorization that supposedly caused other borrowers to incur multiple NSF fees.

6    Furthermore, the premise of the actual damages claim—that borrowers would not have

7    selected EFTs as a payment method if not for conditioning—is demonstrably false.  In November

8    2011, CashCall modified its application process to allow borrowers to select whether to make

9    EFT payments or to make manual payments before they signed their promissory notes.  Since that

10   minor change, 96% of borrowers have chosen to make EFT payments.  Thus, changing from an

11   opt-out to an opt-in application process had essentially no effect on the payment methods used by

12   CashCall borrowers.

13   For these and other reasons, Kemply and the Class are not entitled to actual damages

14   under the EFTA.  Nor are they entitled to recover the exact same fees by calling them

15   "restitution" under the California Unfair Competition Law, Bus. & Prof. Code § 17200 *et seq.*

16   ("UCL").  Courts have consistently held that the type of fees Kemply seeks to recover constitute

17   damages, which are not recoverable under the UCL.  In addition, the California Finance Lender

18   Law, as well as the Class members' loan agreements, expressly permitted CashCall to charge

19   NSF fees.  Thus, CashCall did not acquire these fees by unlawful means.

20   As to statutory damages, the violation at issue here was highly technical and

21   unintentional.  The first court that adjudicated a legal challenge to CashCall's revocable EFT

22   authorization concluded that the practice was legal.  Borrowers actually benefitted from making

23   EFT payments because they incurred fewer total fees (late fees = NSF fees) overall when making

24   their loan payments by EFT than when paying by other methods.  Finally, CashCall voluntarily

25   changed its EFT enrollment process in November 2011, years before this Court's summary

26   judgment ruling.

27

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

203073326.1

2

DEFENDANT'S TRIAL BRIEF RE CONDITIONING CLAIM

1    **II.    THE CONDITIONING CLAIM**

2        The Conditioning Claim is based on EFTA Section 1693k(1): "No person may condition

3    the extension of credit to a consumer on such consumer's repayment by means of preauthorized

4    electronic fund transfers." 15 U.S.C. § 1693k(1).

5        The Court originally certified a class for this claim (the Conditioning Class), consisting of

6    "All individuals who, while residing in California, borrowed money from CashCall, Inc. for

7    personal, family or household use at any time from June 30, 2004 to the present." After further

8    briefing, the Court narrowed the class to those individuals who borrowed money between March

9    13, 2006 and July 10, 2011. As a result, Kemply is now the sole Class representative.[2]

10        Kemply's counsel subsequently narrowed the class again without Court approval, by

11    excluding from the Class definition all borrowers who were not charged an NSF fee—a unilateral

12    concession that eliminated almost 60,000 borrowers from the Class, even though they signed the

13    same EFT authorization, which Kemply claims violated the EFTA. The apparent aim of this

14    unilateral redefinition of the Class was to hide the inconvenient fact that many borrowers who

15    were subjected to the "conditioning" did not incur any NSF fees—a fact that in itself undercuts

16    any claim of causation. The Class is now defined as: "All individuals who, while residing in

17    California, borrowed money from CashCall, Inc. for personal, family or household use on or after

18    March 13, 2006 through July 10, 2011 and were charged an NSF [insufficient funds] fee."

19        As relief for the Conditioning Claim, Kemply seeks statutory damages under the EFTA,

20    which are capped at the lesser of $500,000 and 1% of the defendant's net worth. *See* 15 U.S.C. §

21    1693m(a)(2)(B). She also seeks actual damages under the EFTA, in the amount of NSF fees that

22    CashCall charged to members of the Class. In addition, Kemply asserts a derivative claim under

23    the UCL based on the EFTA violation and seeks the identical recovery of NSF fees (albeit on a

24    theory of restitution rather than damages).

25

26    [2] Named plaintiff Eduardo de la Torre cannot represent the Conditioning Class because his loan
      preceded the March 13, 2006 cutoff for membership in the Class. Name plaintiff Krista
27    O'Donovan, in turn, has dismissed her claims against CashCall, but even if she had remained in
      the case, she still does not fit within the Class definition, because she took out her loan in 2005.

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

203073326.1                                    3

DEFENDANT'S TRIAL BRIEF RE CONDITIONING CLAIM

1    In 2013, both parties moved for summary judgment on liability under Section 1693k, and

2    CashCall also moved for summary judgment as to actual damages.  The Court granted summary

3    judgment against CashCall on liability, and denied CashCall's motion as actual damages, holding

4    that there are issues of fact.  [Dkt. No. 220, p. 18]

5    **III.    KEMPLY CANNOT PROVE ACTUAL DAMAGES.**

6        **A.    Actual Damages Under the EFTA Require Proof of Causation.**

7    Actual damages under the EFTA require proof that the damages were incurred *"as a

8    result"* of the defendant's violation of the statute.  15 U.S.C. § 1693m(a).  "The few reported

9    cases that have discussed the actual damages provision of EFTA have found that to recover actual

10    damages, a plaintiff must establish causation of harm. . . ."  *Martz v. PNC Bank, N.A.*, 2006 U.S.

11    Dist. LEXIS 94474, *14-15 (W.D. Pa. 2006).  *See also Brown v. Bank of Am.*, 457 F. Supp. 2d

12    82, 90 (D. Mass. 2006) (finding that plaintiffs must "establish causation of harm in the form of

13    detrimental reliance" to recover actual damages under the EFTA, relying on case law interpreting

14    the identical actual damages provision in the Truth in Lending Act "TILA")); *Voeks v. Pilot

15    Travel Ctrs.*, 560 F. Supp. 2d 718, 723 (E.D. Wis. 2008) ("[Plaintiff's] actual damages have to be

16    proximately caused by the Defendant's failure as recognized under the [EFTA].");  *id.* at 724 ("a

17    plaintiff must plead and prove detrimental reliance to establish actual damages");  *Polo v.

18    Goodings Supermarkets, Inc.*, 232 F.R.D. 399, 408 (M.D. Fla. 2004) (EFTA actual damages

19    require proof of detrimental reliance).

20    To establish actual damages in the amount of NSF fees that were charged to the Class,

21    Kemply must prove not only that the EFTA violation—i.e., the conditioning at the outset of the

22    loan—was the proximate cause of all of those NSF fees, but also that she and the Class could

23    have obtained other loans that would have resulted in fewer fees.  Under the analogous TILA

24    statute, for example, to recover actual damages borrowers must prove that they would have

25    obtained another loan on more favorable terms but for the violation.  *See, e.g., Adiel v. Chase

26    Federal Savings & Loan Assn.*, 630 F. Supp. 131, 133 (S.D. Fla. 1986); *Peters v. Jim Lupient

27    Oldsmobile*, 220 F.3d 915, 917 (8th Cir. 2000) (no actual damages under TILA without proof that

28    plaintiff would otherwise have obtained insurance at lower price); *Yarnall v. Four Aces*

*Emporium, Inc.*, 322 B.R. 422, 428 (9th Cir. BAP 2005) (no actual damages under TILA without proof that plaintiff would otherwise have pursued different or less expensive transaction); *Vallies v. Sky Bank*, 583 F. Supp. 2d 687, 691-92 (W.D. Pa. 2008) (same); *Rucker v. Sheehy Alexandria, Inc.*, 228 F. Supp. 2d 711, 719-20 (E.D. Va. 2002) (same).[3]

By defining the burden of proving actual damages in terms of reliance and proximate cause, courts have made it clear that the recovery of actual damages requires much more than a mere showing that a fee has been charged.  Kempley cannot meet her burden of proof.

### B. The Initial EFT Authorization Was Freely Revocable At Any Time.

As part of the process for applying for a loan from CashCall, consumers electronically sign a simple, 4-page Promissory Note, which they typically discuss with a CashCall loan agent before signing.  The promissory note that CashCall used during the Class period contained an Electronic Funds Authorization and Disclosure ("EFT Authorization") that stated in relevant part:

> You hereby authorize us to initiate electronic funds transfers ("EFTs") for withdrawal of your scheduled loan payment from your checking account on or about the FIRST day of each month . . . *You understand that you can cancel this authorization at any time (including prior to your first payment due date) by sending written notification to us.* (emphasis added).

The promissory note also clearly disclosed that borrowers would be charged a fee if any payments failed due to insufficient funds in their bank account.  (Ex. 1.)

During their "welcome call," which occurred after their loans were approved and funded, borrowers were again advised that payments would be automatically deducted from their checking account.  The welcome call provided borrowers with the opportunity to cancel or

---

[3] The difficulty of proving actual damages is why Congress also authorized statutory damages. *See Wiley v. Earl's Pawn & Jewelry, Inc.*, 950 F. Supp. 1108, 1114 (S.D. Ala. 1997) (quoting *McCoy v. Salem Mortg. Co.*, 74 F.R.D. 8, 12 (E.D. Mich. 1976)) ("'if actual damages could be computed by a simple formula, no statutory damages provision would have been necessary'"); *see also Adiel*, 630 F. Supp. at 134 & n.3 ("Actual damages for disclosure violations are likely to be nonexistent or extremely difficult to prove, particularly in the class action context.").

1  change their EFT authorization, and borrowers frequently changed the date of their EFT

2  payments or cancelled the authorization entirely during this call.

3       CashCall sent every borrower on EFT payments an email several days prior to the

4  scheduled EFT payment reminding the borrower of the date and amount of the EFT.  (Exs. B, M,

5  O.)  Borrowers could also access their account information online or contact CashCall's customer

6  service department to find out about upcoming payments or make alternative payment

7  arrangements.

8       **C.   The Testimony and Payment History of Borrower Witnesses Confirms
        That the Conditioning Did Not Cause Borrowers to Incur NSF Fees.**

9       CashCall borrowers have always had a variety of ways to make their loan payments.  In

10 addition to EFTs, borrowers have made loan payments by personal check, certified check, phone,

11 MoneyGram, money order, and in-person payment at CashCall's corporate office. This evidence

12 confirms that members of the Class understood their right to choose methods of repayment other

13 than EFTs, and that there was no link between the EFT authorization and subsequent NSF fees.

14      Class representative Kemply made EFT loan payments for six months (July through

15 December 2006) without incurring any NSF fees.  She ran into financial difficulties in January

16 2006 when her husband made unauthorized withdrawals from her bank account, which caused her

17 to incur NSF fees from CashCall and several other creditors.  Kemply then closed that account,

18 canceled her CashCall EFT authorization, and subsequently made loan payments manually until

19 September 2008, when she voluntarily reinstated her EFT authorization.  During the period when

20 she was making manual payments, she incurred late fees almost every month; the amount of late

21 fees she incurred exceeded the amount of NSF fees she paid.  Kemply continued to have trouble

22 making payments after she reinstated the EFT authorization.  She incurred three of the four NSF

23 fees she claims as damages *after* canceling and reinstating the EFT authorization.

24      Kemply is supposed to represent the Class; its claims rise and fall with hers.  Her facts

25 belie any claim that the EFT authorization caused of any of the NSF fees she paid.  It certainly

26 could not have caused her to incur fees after she canceled the authorization.[4]  The only NSF fee

27
28

[4] In her opposition to CashCall's motion for summary judgment, Kemply disclaimed that she was
seeking NSF fees incurred after an NSF authorization was canceled.  (*See* Response to UF 4:
"Immaterial in that Plaintiffs do not request damages based on NSF fees incurred after the initial

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

203073326.1                                        6

DEFENDANT'S TRIAL BRIEF RE CONDITIONING CLAIM

she paid while on the original EFT authorization happened after her husband took money from her account, causing her to incur fees from CashCall and other creditors.   Kemply also demonstrates the numerous ways that borrowers could take steps to avoid NSF fees.  Over the course of her loan, Kemply had payments deferred, skipped payments, and ultimately modified her loan to lower the interest rate and monthly payments.  Even with these accommodations, Kemply still defaulted on her loan.   A series of unfortunate and unforeseen circumstances, including state government employee furloughs, which reduced her income, contributed to her having trouble making ends meet.  The EFT authorization was not responsible for these financial setbacks.  Thus, Kemply's own facts demonstrate that the NSF fees were not "a result of" the conditioning but rather resulted from intervening causes.

The testimony of other CashCall borrowers who were exposed to the same EFTA violation only underscores the serious and fatal flaws in Kemply's causation theory:

*Lori Hume* made four payments by EFT before deciding to stop making payments after repaying only $1100.   She canceled her EFT authorization in writing, as required by the promissory note, well in advance of the date of her next scheduled payment and therefore was not charged an NSF fee.  Thus, borrowers who canceled their EFT authorization in writing in advance of a scheduled payment could avoid incurring an NSF fee.

*Tonya Gerald* had no objection to EFT payments and made every scheduled EFT payment for two years without incurring an NSF fee.  Like Hume, she simply decided to stop repaying her loan.  But unlike Hume, she did not notify CashCall and instead simply told her bank not to honor any further EFTs from CashCall.   She was therefore charged an NSF fee when CashCall attempted to collect the next scheduled payment.

*Barbara Jennings* made every loan payment by EFT, which she considered an easy and convenient payment method, and never incurred an NSF fee, because she felt it was important always to have sufficient funds in her bank account to make every scheduled payment.  When she

EFT authorization was cancelled.")  [Dkt. No. 189, p. 5.]  It is not clear whether she has withdrawn that concession, since she proposed including all NSF fees she paid as a stipulated fact in the Joint Pre-Trial Statement.  This latest re-definition of the Class would exclude borrowers who did not incur NSF fees prior to the time their original EFT authorization was canceled.

1   was concerned about her cash flow, she would ask CashCall to change the date of the EFT,

2   thereby avoiding any NSF fee.

3          *Johnny Cook and Arthur Vardanyan* both took out at least five loans from CashCall but

4   never incurred an NSF fee.

5          *Yosvin De Leon* made EFT payments for almost two years before incurring his first NSF

6   fee.  His financial circumstances had changed such that he was having trouble making ends meet

7   and was incurring NSF fees from numerous creditors.

8          This evidence demonstrates that borrowers could control their loan payments, freely

9   cancel their EFT authorizations, and avoid NSF fees simply by keeping sufficient funds in their

10  accounts.  Even with all of these mechanisms to avoid incurring NSF fees, unforeseen events still

11  might intervene to cause a borrower to incur an NSF fee.  But it simply cannot be said that the

12  original EFT authorization proximately caused that or any other NSF fee.

13

14          **D.     Class-Wide Data Also Confirm That the Initial EFT Authorization Did
                      Not Cause Borrowers to Incur NSF Fees.**

15          Undisputed Class-wide data confirms the absence of any causal link between the initial

16  EFT authorization and subsequent NSF fees:

17  • CashCall made 155,147 loans during the Conditioning Class period.

18  • Only 96,588 of those loans incurred an NSF fee (and of those, only 59,245 actually paid

19     the fee).

20  • Of those 96,588 loans, 15,795 loans canceled their EFT authorization at some point.

21  • 355 loans canceled their EFT authorization before making any loan payment.

22  • 656 loans canceled the EFT authorization after making only one payment.

23  • 44,895 loans during the Class period changed the scheduled date of the EFTs.

24  • 40,875 loans during the Class period modified the loan terms (which is more involved

25     than merely changing the scheduled date of an EFT).

26  • 19,277 loans in the Class didn't incur any NSF fee during the first year.

27  • 18,149 loans in the Class incurred NSF fees after the EFT authorization was canceled.

28

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

203073326.1                                    8

DEFENDANT'S TRIAL BRIEF RE CONDITIONING CLAIM

1   This data confirms that NSF fees were not the inevitable result of signing the EFT
2   authorization, since 40% of all loans during the Class period never incurred a single NSF fee. If
3   the EFT authorization violates the EFTA, then every borrower who signed that authorization
4   should be in the Class. But those who never paid an NSF fee would not be entitled to recover
5   such fees as damages, and their presence in the Class would create an inconvenient fact that
6   Kemply would have to explain. Kemply's tactical decision to exclude them from the Class does
7   not eliminate the causation problem that they expose.

8   The data also confirms that borrowers could cancel the EFT authorization (as 16% of the
9   loans in the Class did); change the date of their EFT payment (as more than 25% did); or modify
10  the loan terms (as more than 25% did). In sum, borrowers were in control of their payment terms.

11  In addition, that almost 20% of the loans in the Class incurred no NSF fees for at least a
12  year shows that circumstances far removed from the initial conditioning caused the borrower to
13  incur an NSF fee. Likewise, the fact that almost 20% of the loans incurred NSF fees after the
14  EFT authorization was canceled shows that neither the initial authorization nor EFTs themselves
15  were inherently to blame for NSF fees.

16  All of this undisputed evidence confirms that the initial EFT authorization signed at the
17  outset of the loan did not cause Class members to incur every (or even any) subsequent NSF fee.
18  Numerous intervening events and individual borrower decisions led to particular borrowers not
19  having sufficient funds in their bank accounts when an EFT payment was scheduled. All of these
20  facts belie Kemply's claim that the initial EFT authorization proximately caused every NSF fee.

21
22  **E.      The Actual Damages Claim Falsely Assumes that Class Members Would
          Not Have Used EFTs If Not for the Conditioning.**

23  Kemply's damages model also falsely assumes that Class members would not have
24  chosen to pay by EFT if they had not been required to provide the EFT authorization in the
25  promissory note. To the contrary, consumers generally prefer EFT payments to other forms of
26  payment, because EFTs are convenient and they ensure that every payment is made on schedule,
27  as several of the borrowers who were deposed in this action have testified.

28

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

203073326.1                                    9

DEFENDANT'S TRIAL BRIEF RE CONDITIONING CLAIM

1    In fact, CashCall's borrower data conclusively establishes that CashCall borrowers

2    overwhelmingly prefer to repay their loans via EFT.  In November 2011, CashCall modified its

3    loan application process so that every applicant is asked *before their application is approved*

4    whether they would like to make payments by EFT if their application is approved—an opt-in

5    process.  Since CashCall initiated that minor change, CashCall borrowers have selected EFTs as

6    their payment method more than 96% of the time.  Thus, in making EFT payments the default

7    method of payment prior to November 2011, CashCall was clearly not foisting on borrowers a

8    payment option that they did not want.

9            **F.      The Use of EFTs Did Not Harm Borrowers.**

10    Class members actually benefited from making payments by EFT.  The promissory note

11    authorizes CashCall to collect NSF fees when any form of payment is returned (typically a check

12    or EFT) and late fees when a borrower fails to make a timely payment with respect to any form of

13    payment.  Borrowers who paid by EFT were five times less likely than other borrowers to incur

14    late fees.  More importantly, borrowers who paid by EFT incurred fewer total fees (NSF fees +

15    late fees) on average than did other borrowers.  Thus, CashCall's efforts to facilitate payment by

16    EFT actually helped borrowers avoid fees and saved them money.

17    That CashCall borrowers clearly prefer EFTs and actually saved money by using EFTs

18    precludes any showing that the Class could have obtained alternative loans involving fewer fees.

19    So even if Kemply could prove that conditioning was the cause of the NSF fees—which she

20    cannot—she still cannot prove that those fees should be recovered as EFTA actual damages.

21  **IV.    KEMPLY AND THE CLASS ARE NOT ENTITLED TO RESTITUTION OF NSF**
22  **FEES UNDER THE UCL.**

23    Kemply seeks to recover the exact same NSF fees as restitution under the UCL.

24    Kemply's claim for restitution fails for several reasons.

25    First, NSF fees cannot be recovered under the UCL because those fees, if recoverable at

26    all, are only recoverable as damages.  The UCL only allows recovery of restitution and not

27    damages.  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th  1134, 1144 (2003).  The

28    EFTA, conversely, only allows recovery of damages but not restitution.  *Friedman v. 24 Hour*

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

203073326.1                                            10

DEFENDANT'S TRIAL BRIEF RE CONDITIONING CLAIM

1    *Fitness USA, Inc.*, 580 F. Supp. 2d 985, 998-99 (C.D. Cal. 2008) (there is "no EFTA provision or

2    other authority supporting a restitution remedy"). The NSF fees cannot be both damages and

3    restitution.

4           Federal courts consistently have held that fees charged by banks or financial institutions

5    related to alleged EFTA violations are damages, not restitution.  *See Brown*, 457 F. Supp. 2d at 90

6    (plaintiff seeking to recover ATM fees as damages based on alleged violation of EFTA provision

7    requiring prominent disclosure of ATM fees); *Burns v. First Am. Bank*, 2006 WL 3754820 (N.D.

8    Ill. 2006) (ATM fees claimed as damages for EFTA violation); *Polo*, 232 F.R.D. 399 (same).

9    The California Supreme Court outlined the differences between damages and restitution.

10   Damages are intended to compensate someone for injuries suffered; while restitution merely

11   restores something taken directly from the allegedly injured party.  *Bank of the West v. Super. Ct.*,

12   2 Cal. 4th 1254, 1269 (1992).

13          Restitution as a remedy for a violation of Section 1693k would only be permissible if

14   CashCall had charged a fee to make electronic payments at the outset of its relationship or to

15   cancel the EFT authorization—i.e., if CashCall had collected a fee that was directly related to the

16   EFT authorization itself.  Only then might CashCall be obligated to restore money as UCL

17   restitution based on the conditioning violation.  But the fees at issue here were incurred months or

18   years after the original loan transaction, and are related to conduct far removed from the original

19   transaction.  Such fees would be recoverable, if at all, only as damages, not as restitution.

20          Second, the California Finance Lenders Law (FLL), under which CashCall is licensed,

21   permits lenders to charge a $15 fee for payments returned for insufficient funds.  Cal. Fin. Code §

22   22320.  At the outset of the case, Plaintiffs challenged CashCall's right to charge *any* NSF fees

23   under Section 22320.  The Court rejected that claim, dismissing it with prejudice.  [Dkt. No. 34,

24   pp. 14-15]  CashCall's promissory note, in turn, disclosed that CashCall would charge an NSF fee

25   if any loan payments were returned due to insufficient funds.  As a result, Kemply cannot

26   establish that CashCall's collection of NSF fees was unlawful, which in turn precludes her from

27   any recovery of those fees as restitution under the UCL's "unlawful" prong.

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

203073326.1

11

DEFENDANT'S TRIAL BRIEF RE CONDITIONING CLAIM

Third, where, as here, a UCL claim is asserted under the "unlawful" prong, the claim is subject to any defenses that apply to the underlying statute.  Accordingly, a defense to the EFTA claim is equally a defense to the UCL claim.  *See People v. Duz-Mor Diagnostic Lab., Inc.*, 68 Cal. App. 4th 654, 673 (1999) (in UCL claim, "a defense to the underlying offense is a defense under the [UCL]").  As discussed above, Kemply cannot prove that the EFTA violation was the cause of the NSF fees.  Perforce she cannot establish any right to restitution of those fees under the UCL.[5]

## V.   CLASS MEMBERS WHO DEFAULTED ON THEIR LOANS CANNOT RECOVER ACTUAL DAMAGES OR RESTITUTION.

CashCall's general practice is to charge off a loan when a borrower is more than 120-150 days delinquent.  When CashCall charges off a loan, it records a loss of the unpaid loan balance.

If the Court were to find that Kemply and the Class are entitled to actual damages or restitution, CashCall would be entitled to an offset of any fees paid by borrowers who defaulted on their loans.  CashCall asserted the right to offset as its Eighteenth Affirmative Defense.[6]  The right of setoff is available against *every* Class member whose loan was charged off, resulting in a loss to CashCall.  *See Granberry v. Islay Investments*, 9 Cal. 4th 738, 743, 749 (1995) (in a class action, the right of setoff applies to members of the class as well as the class representative).

Of the 96,588 loans in the Class, 63,508 were charged off.  The total amount of NSF fees paid to CashCall on the loans that were charged off was $1,147,584.67.[7]  Members of the Class whose loans have been charged off cannot recover those fees as damages.  In fact, Kemply's own loan was charged off, so she is also barred from recovering actual damages or restitution.[8]

---

[5] The UCL itself also requires Kemply to prove that she was harmed by the violation.  Kemply is expected to argue that the Class, by contrast, can recover restitution under the UCL merely if the NSF fee "may have been acquired" as a result of the violation.  That would be incorrect.  Where, as here, a UCL claim is based on the violation of another statute that contains its own standard of proof for recovery, a plaintiff cannot use the UCL to circumvent that statutory requirement. Kemply and the Class must prove that the NSF fees were charged "as a result of" the violation.

[6] A setoff as to Class members who defaulted on their loans would also be appropriate under CashCall's Fourth Affirmative Defense of unclean hands.

[7] In fact, 2,581 loans defaulted at the time of the very first payment, leaving CashCall with a total loss on those loans.

[8] Given CashCall's modest NSF fee ($15 per occurrence), CashCall's loss on each charged-off loan almost certainly exceeds the amount of NSF fees that any particular Class member paid during the course of their loan.

## VI.     THERE IS NO BASIS FOR AWARDING STATUTORY DAMAGES.

Statutory damages are discretionary.  The factors to consider when evaluating a request for statutory damages include "the frequency and persistence of noncompliance, the nature of such noncompliance, the resources of the defendant, the number of persons adversely affected, and the extent to which the noncompliance was intentional." 15 U.S.C. § 1693m(b)(2).

These factors militate strongly against an award of statutory damages here. CashCall's "noncompliance" was certainly not intentional.  To the contrary, the first court to consider the legality of CashCall's practice of including fully revocable EFT authorizations in its promissory notes concluded that it was perfectly lawful.  In 2008, now-Court of Appeal Justice Victoria Chaney rejected the identical claim that is proceeding to trial here, finding:  "a lender who in an Internet transaction demands authorization of electronic payment *but simultaneously extends the right to cancel the authorization in writing 'at any time' has not conditioned the extension of credit on the authorization*.  Therefore, the demurrer to this cause of action is sustained without leave to amend." *Meeks v. CashCall, Inc.*, Los Angeles Cty. Superior Court Case No. BC 367894 (May 6, 2008) (emphasis added).

The Court's denial of CashCall's motion to dismiss at the outset of the case was not a finding that CashCall violated Section 1693k, as Kemply almost certainly will argue.  A motion to dismiss tests the allegations in the complaint, which is what the Court's ruling shows:  "Accepting the truth of the allegations and drawing all reasonable inferences in favor of the Plaintiffs, the Complaint states a claim for relief under § 1693k."  [Dkt. No. 34, pp. 4-5.][9]

In November 2011, before the Court's summary judgment ruling or the West Virginia trial court's ruling (which Kemply will argue shows CashCall's bad faith and persistence of the violation), CashCall voluntarily modified its loan application process to allow borrowers to elect whether to make payments by EFT before their application is approved.  All borrowers are asked the following question:  "If your loan application is approved, do you agree to make your

---

[9] The motion to dismiss involved numerous claims, and at the time, the Section 1693k claim was not the focus of the parties' energies.  Thus, CashCall's motion did not include arguments that CashCall later raised on summary judgment.  The Court's discussion of the Section 1693k claim, in turn, was confined to a single paragraph, whereas its summary judgment order on the claim covered many pages.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

203073326.1                                                      13

DEFENDANT'S TRIAL BRIEF RE CONDITIONING CLAIM

1   monthly payments via electronic funds transfer ("EFT") form the bank account identified on your

2   Application?"  Thus, applicants are given the chance to opt in to making EFT payments, and

3   CashCall will fund a loan even if a borrower does not agree to make EFT payments.  Under those

4   circumstances, CashCall's non-compliance cannot be characterized as persistent or intentional.

5        Furthermore, the violation in question was highly technical and likely would not result in

6   harm to borrowers—as the South Dakota District Court found in *Payday Financial*:

7   "conditioning credit on an EFT clause, albeit one revocable at any time, is a violation somewhat

8   technical in nature and use of this EFT clause is not likely to merit much, if any, monetary

9   penalty."  989 F. Supp. 2d at 812-13.[10]  Similarly, the court in *State of W. Virginia ex rel.*

10  *McGraw v. CashCall*, No. 08-C-1964 (Kanawha Cty. Ct., W. Va.), considering the same

11  provision, did not award any damages, even though there was evidence that consumers incurred

12  NSF fees, but instead only awarded a civil penalty.  [Dkt. 190 (Stark Decl, Ex. 17 at 49-50).]

13       Not only were borrowers not harmed by the unintentional technical violation, they

14  actually benefited from making payments by EFT.  As discussed above, borrowers who made

15  loan payments by EFT incurred substantially fewer fees overall (NSF fees + late fees) than

16  borrowers who made loan payments by other methods.  Thus, statutory damages, which are

17  essentially punitive in nature, *see Burns*, 2006 WL 3754820 at *11, should not be awarded.

18  **VII.    POTENTIAL EVIDENTIARY ISSUES**

19       CashCall anticipates that Kemply will seek to re-inject evidence and argument into the

20  trial based on claims and legal theories that the Court already has rejected.  For example, the

21  operative complaint included a claim that challenged CashCall's policy regarding cancelation of

22  EFT authorizations.  CashCall's cancellation policy at the time Kemply entered into her loan

23  required borrowers to provide seven days' written notice to cancel the EFT authorization.  (Ex. 1,

24  p. 4.)  Plaintiffs alleged that this policy violated a separate provision of the EFTA, 15 U.S.C. §

25  1693e(a), and the original named Plaintiffs (O'Donovan, Kemply and de la Torre) testified

26  extensively regarding attempts to cancel their EFT payments.  The Court certified the cancellation

27

28
_____

[10] The court in *Payday* relied entirely on this Court's opinion and analysis on CashCall's motion
to dismiss, and this Court in turn relied on *Payday* in granting summary judgment on liability.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

203073326.1                                14

DEFENDANT'S TRIAL BRIEF RE CONDITIONING CLAIM

1   claim.  But, after the certification order, Plaintiffs stipulated the section 1693e(a) did not apply to

2   CashCall's cancellation policy, and they stipulated to dismiss the certified cancellation claim with

3   prejudice, even though they previously had opposed CashCall's motion to dismiss and had moved

4   to certify the claim.  The Court entered the dismissal.  [Dkt. 109.]  Thus, any testimony regarding

5   CashCall's EFT authorization cancellation policy is irrelevant to the narrow issues in this trial.  In

6   addition, to the extent Kemply would present evidence or argue that the cancellation policy

7   caused Class members to incur NSF fees, that would merely show yet another intervening event

8   that would break any possible causal connection between the initial EFT authorization and any

9   subsequently incurred NSF fees.

10      Plaintiffs also asserted a "double dipping" claim based on the fact that CashCall would,

11   under certain circumstances, initiate a second EFT withdrawal in a month, if the regularly

12   scheduled withdrawal was returned for insufficient funds.  Plaintiffs also alleged that this practice

13   violated section 1693e(a).  The Court denied Plaintiffs' motion to certify this claim, finding that

14   individual issues predominated.  Thus, any attempt to introduce testimony or argument regarding

15   the practice of making multiple attempts to make an EFT payment would only show that

16   individual issues predominate.

17   **VIII.   <u>CONCLUSION</u>**

18      As the sole Conditioning Class representative, Kemply is supposed to be typical of the

19   Class; thus, the Class claim rises and falls with hers.  Kemply cannot prove that she is entitled to

20   damages or restitution.  Therefore, the Court should enter judgment in CashCall's favor.

21   Dated:  April 6, 2015                    Manatt, Phelps & Phillips, LLP

22

23                                           By:  /s/ Brad W. Seiling
                                                  _____
24                                                Brad W. Seiling
                                                  *Attorneys for Defendant*
25                                                CashCall, Inc.

26

27

28