1  BRAD W. SEILING (Bar No. CA 143515)
   DONALD R. BROWN (Bar No. CA 156548)
2  MANATT, PHELPS & PHILLIPS, LLP
   11355 West Olympic Boulevard
3  Los Angeles, CA 90064-1614
   Telephone:    (310) 312-4000
4  Facsimile:    (310) 312-4224
   E-mail: bseiling@manatt.com; dbrown@manatt.com
5
   *Attorneys for Defendant*
6  CashCall, Inc.

7

8                  UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10

11 KRISTA O'DONOVAN and EDUARDO          Case No. C 08-03174 MEJ
   DE LA TORRE, individually and on behalf
12 of all others similarly situated,       DEFENDANT'S [PROPOSED] FINDINGS OF
                                           FACT AND CONCLUSIONS OF LAW ON
13                Plaintiff,               TRIAL OF CONDITIONING CLAIM

14       vs.                              Trial:      June 22, 2015
                                          Time:       9:30 a.m.
15 CASHCALL, INC., a California           Courtroom: B—15th Floor
   corporation, and DOES 1 through DOE 50, Judge:     Hon. Maria-Elena James
16 inclusive,

17                Defendants.

18

19

20

21

22

23

24

25

26

27

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

1    Defendant CashCall, Inc. submits these [Proposed] Findings of Fact and Conclusions of

2  Law in connection with the trial that is scheduled to commence on June 22, 2015.  CashCall

3  reserves the right to modify, supplement, or augment any and all proposed findings of fact and

4  conclusion of law in any respect.

5    From June 22, 2015 through _____, 2015, this action came on for trial

6  before the Honorable Maria-Elena James of the United States District Court for the Northern

7  District of California.  The sole issue in the trial was whether the Court should award monetary

8  relief based on CashCall's pre-November 2011 practice of requiring borrowers to sign a

9  promissory note that included a freely revocable authorization to make payments by electronic

10  fund transfers ("EFT").  The Court has found that this revocable EFT authorization constituted

11  conditioning credit on repayment by EFT and thus violated Section 1693k of the Electronic Funds

12  Transfer Act ("EFTA").  [Dkt. No. 220]  This claim is referred to as the "Conditioning Claim."

13  The monetary relief that sought by plaintiff Lori Kemply (fka Lori Saysourivong) for herself and

14  the "Conditioning Class" consisted of actual and statutory damages under the EFTA, and

15  alternatively, restitution under California Business & Professions Code section 17200 *et seq.*

16    Oral and documentary evidence was introduced on behalf of the parties and the case was

17  argued and submitted for decision.  After considering all of the evidence and the arguments of

18  counsel, the Court issues the following Findings of Fact and Conclusions of Law with respect to

19  monetary relief relating to the following claims and defenses:

20    (a)    In the Fourth Amended Complaint, monetary relief for the First Claim for Relief

21  based on the violation of EFTA Section 1693k(1).

22    (b)    In the Fourth Amended Complaint, monetary relief for the Fifth Claim for Relief

23  under California Business & Professions Code section 17200 et seq., based on the violation of

24  EFTA Section 1693k(1); and

25    (c)    In CashCall's Answer, (i) the Eighteenth Affirmative Defense of Setoff and (ii) the

26  Fourth Affirmative Defense of Unclean Hands.

27

28

1

I.      **FINDINGS OF FACT**

      A.      **The Parties**

      1.      Plaintiff Lori Kemply is an individual who resides in California and who borrowed money from CashCall.

      2.      Defendant CashCall, Inc. is a California corporation that is licensed under the California Finance Lenders Law to issue consumer finance loans.

      B.      **The Class**

      3.      The Court previously certified the Conditioning Class in connection with the Conditioning Claim.  The Conditioning Class is defined as: "All individuals who, while residing in California, borrowed money from CashCall, Inc. for personal, family or household use on or after March 13, 2006 through July 10, 2011 and were charged an NSF [insufficient funds] fee."

      C.      **The EFT Authorizations at Issue Were Freely Revocable, and Information Relating to Payments and Charges Was Disclosed.**

      4.      As part of the process for applying for a loan from CashCall, consumers electronically sign a simple, 4-page Promissory Note and Disclosure Statement, which they typically discuss with a CashCall loan agent before signing.  The form of the promissory note that CashCall used during the Class period contained an Electronic Funds Authorization and Disclosure ("EFT Authorization") that stated in relevant part:

> You hereby authorize us to initiate electronic funds transfers ("EFTs") for withdrawal of your scheduled loan payment from your checking account on or about the FIRST day of each month . . . You understand that you can cancel this authorization at any time (including prior to your first payment due date) by sending written notification to us.

      5.      The promissory note also disclosed that borrowers would be charged a fee if any payments failed due to insufficient funds in their bank account.

      6.      During their "welcome call," which occurred after their loans were approved and funded, borrowers were again advised that payments would be automatically deducted from their

1  checking account. The welcome call provided borrowers with the opportunity to cancel or

2  change their EFT authorization, and borrowers frequently changed the date of their EFT

3  payments or cancelled the authorization entirely during this call.

4      7.    CashCall sent every borrower on EFT payments an email several days prior to the

5  scheduled EFT payment reminding the borrower of the date and amount of the EFT. Borrowers

6  could also access their account information online or contact CashCall's customer service

7  department to find out about upcoming payments or make alternative payment arrangements.

8      **D.    Individual Borrower Evidence Shows that Borrowers Controlled Their Loan
        Payments and that the EFT Authorization Was Not the Cause of NSF Fees.**

9

10     8.    CashCall borrowers have always had a variety of ways to make their loan

11  payments. In addition to EFTs, borrowers have made loan payments by personal check, certified

12  check, phone, MoneyGram, money order, and in-person payment at CashCall's corporate office.

13     9.    Kemply made EFT loan payments for six months (July through December 2006)

14  without incurring any NSF fees. She ran into financial difficulties in January 2006 when her

15  husband made unauthorized withdrawals from her bank account, which caused her to incur NSF

16  fees from CashCall and several other creditors. Kemply then closed that account, canceled her

17  CashCall EFT authorization, and subsequently made loan payments manually until September

18  2008, when she voluntarily reinstated her EFT authorization.

19     10.   During the period when Kemply was making manual payments, she incurred late

20  fees almost every month; the amount of late fees she incurred exceeded the amount of NSF fees

21  she paid.

22     11.   Kemply continued to have trouble making payments after she reinstated the EFT

23  authorization. She incurred three of the four NSF fees she claims as damages after canceling and

24  reinstating the EFT authorization.

25     12.   Over the course of her loan, Kemply had payments deferred, skipped payments,

26  and ultimately modified her loan to lower the interest rate and monthly payments. Even with

27  these accommodations, Kemply still defaulted on her loan. A series of unfortunate and

28  unforeseen circumstances, including state government employee furloughs, which reduced her

income, contributed to her having trouble making ends meet. The EFT authorization was not responsible for these financial setbacks.

13.     CashCall borrower Lori Hume made four payments by EFT before deciding to stop repaying her loan after repaying only $1100. She canceled her EFT authorization in writing, as required by the promissory note, well in advance of the date of her next scheduled payment and therefore was not charged an NSF fee. Thus, borrowers who canceled their EFT authorization in writing in advance of a scheduled payment could avoid incurring an NSF fee.

14.     CashCall borrower Tonya Gerald had no objection to EFT payments and made every scheduled EFT payment for two years without incurring an NSF fee. Like Hume, she simply decided to stop repaying her loan. But unlike Hume, she did not notify CashCall and instead simply told her bank not to honor any further EFTs from CashCall. She was therefore charged an NSF fee when CashCall attempted to collect the next scheduled payment.

15.     CashCall borrower Barbara Jennings made every loan payment by EFT, which she considered an easy and convenient payment method, and never incurred an NSF fee, because she felt it was important always to have sufficient funds in her bank account to make every scheduled payment. When she was concerned about her cash flow, she would ask CashCall to change the date of the EFT, thereby avoiding any NSF fee.

16.     CashCall borrowers Johnny Cook and Arthur Vardanyan both took out at least five loans from CashCall but never incurred an NSF fee.

17.     CashCall borrower Yosvin De Leon made EFT payments for almost two years before incurring his first NSF fee. His financial circumstances had changed such that he was having trouble making ends meet and was incurring NSF fees from numerous creditors.

E.     **Class-Wide Data Shows that Borrowers Controlled Their Loan Payments and that the EFT Authorization Was Not the Cause of NSF Fees.**

18.     CashCall made 155,147 loans during the Conditioning Class period.

19.     Only 96,588 of those loans incurred an NSF fee (and of those, only 59,245 actually paid the fee).

20.     Of those 96,588 loans, 15,795 loans canceled their EFT authorization at some point.

21.     355 loans canceled their EFT authorization before making any loan payment.

22.     656 loans canceled the EFT authorization after making only one payment.

23.     44,895 loans during the Class period changed the scheduled date of the EFTs.

24.     40,875 loans during the Class period modified the loan terms (which is more involved than merely changing the scheduled date of an EFT).

25.     19,277 loans in the Class didn't incur any NSF fee during the first year.

26.     18,149 loans in the Class incurred NSF fees after the EFT authorization was canceled.

**F.      Borrowers Would Have Used EFTs Regardless of the Conditioning.**

27.     Consumers generally prefer EFT payments to other forms of payment, because EFTs are convenient and they ensure that every payment is made on schedule, as several of the borrowers who were deposed in this action, as well as CashCall's expert witness, Bruce Carlin, testified.

28.     In November 2011, CashCall modified its loan application procedure.   In the revised process, every applicant is asked before their application is approved whether they would like to make payments by EFT if their application is approved—an opt-in process.   Since CashCall initiated that minor change, CashCall borrowers have selected EFTs as their payment method more than 96% of the time.

**G.      Borrowers Incurred Fewer Fees and Penalties When Using EFTs.**

29.     The CashCall promissory note authorizes CashCall to collect NSF fees when any form of payment is returned (typically a check or EFT) and late fees when a borrower fails to make a timely payment with respect to any form of payment.

30.     Borrowers who paid by EFT were five times less likely than other borrowers to incur late fees.

31.     Borrowers who paid by EFT incurred fewer total fees (NSF fees + late fees) on average than did other borrowers.

**H.**     **Kemply and a Majority of the Class Defaulted on Their Loan Payments.**

32.     CashCall's general practice is to charge off a loan when a borrower is more than 120-150 days delinquent. When CashCall charges off a loan, it records a loss of the unpaid loan balance.

33.     Of the 96,588 loans in the Class, 63,508 were charged off. 2,581 of those loans defaulted at the time of the very first payment, leaving CashCall with a total loss on those loans

34.     The total amount of NSF fees paid to CashCall on the loans that were charged off was $1,157,371.29.

35.     Kemply defaulted on her loan repayment and her loan was charged off.

**I.**     **CashCall Reasonably Believed Its Practice Was Legal, and Voluntarily Changed its Practice Before Any Court Had Determined Otherwise.**

36.     The first court to consider the legality of CashCall's practice of including fully revocable EFT authorizations in its promissory notes concluded that it was lawful. In 2008, in a lawsuit against CashCall asserting an identical "conditioning claim," the Los Angeles County Superior Court held that the court "is satisfied a lender who in an Internet transaction demands authorization of electronic payment but simultaneously extends the right to cancel the authorization in writing 'at any time' has not conditioned the extension of credit on the authorization. Therefore, the demurrer to this cause of action is sustained without leave to amend." *Meeks v. CashCall, Inc.*, Los Angeles Cty. Superior Court Case No. BC 367894 (May 6, 2008).

37.     The Court's denial of CashCall's motion to dismiss at the outset of the case was not a finding that CashCall violated Section 1693k. A motion to dismiss tests the allegations in the complaint. Thus, the Court ruled: "Accepting the truth of the allegations and drawing all reasonable inferences in favor of the Plaintiffs, the Complaint states a claim for relief under § 1693k." [Dkt. No. 34, pp. 4-5.]

38.     In November 2011, before the Court's summary judgment ruling or the West Virginia trial court's ruling, CashCall voluntarily modified its loan application process to allow borrowers to elect whether to make payments by EFT before their application is approved. All

1    borrowers are asked the following question: "If your loan application is approved, do you agree

2    to make your monthly payments via electronic funds transfer ("EFT") form the bank account

3    identified on your Application?"  Thus, applicants are given the chance to opt in to making EFT

4    payments, and CashCall will fund a loan even if a borrower does not agree to make EFT

5    payments.

6    **II.      CONCLUSIONS OF LAW**

7         39.     If any of the above-stated Findings of Fact are deemed to be Conclusions of Law,

8    they shall be construed as such.

9         40.     The Court has jurisdiction over the parties.

10        41.     The Court has jurisdiction of the subject matter of the action.

11        **A.      Actual Damages Under the EFTA Require Proof of Causation.**

12        42.     Kemply seeks actual damages under the EFTA in the amount of NSF fees that

13   CashCall charged to Kemply and the other members of the Class.

14        43.     Actual damages under the EFTA require proof that the damages were incurred "as

15   a result" of the defendant's violation of the statute.  15 U.S.C. § 1693m(a).  "The few reported

16   cases that have discussed the actual damages provision of EFTA have found that to recover actual

17   damages, a plaintiff must establish causation of harm. . . ."  *Martz v. PNC Bank, N.A.*, 2006 U.S.

18   Dist. LEXIS 94474, *14-15 (W.D. Pa. 2006).  *See also Brown v. Bank of Am.*, 457 F. Supp. 2d

19   82, 90 (D. Mass. 2006) (finding that plaintiffs must "establish causation of harm in the form of

20   detrimental reliance" to recover actual damages under the EFTA, relying on case law interpreting

21   the identical actual damages provision in the Truth in Lending Act); *Voeks v. Pilot Travel Ctrs.*,

22   560 F. Supp. 2d 718, 723 (E.D. Wis. 2008) ("[Plaintiff's] actual damages have to be proximately

23   caused by the Defendant's failure as recognized under the [EFTA].");  *id.* at 724 ("a plaintiff must

24   plead and prove detrimental reliance to establish actual damages");  *Polo v. Goodings*

25   *Supermarkets, Inc.*, 232 F.R.D. 399, 408 (M.D. Fla. 2004) (EFTA actual damages require proof

26   of detrimental reliance).

27        44.     To establish actual damages in the amount of NSF fees that were charged to the

28   Class, Kemply must prove that the EFTA violation—i.e., the conditioning of the making of the

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

7

1    loan on the borrower's agreement to repay through the use of EFTs—was the cause of those NSF

2    fees.

3         45.     Cases decided under the EFTA shed little light on the precise nature of actual

4    damages, but cases under the Truth in Lending Act ("TILA"), which contains a closely analogous

5    actual damages provision, are instructive on this point.  TILA cases have held that to recover

6    actual damages borrowers must prove that they would have obtained another loan on more

7    favorable terms but for the violation.  *See, e.g., Adiel v. Chase Federal Savings & Loan Assn.*,

8    630 F. Supp. 131, 133 (S.D. Fla. 1986); *Peters v. Jim Lupient Oldsmobile*, 220 F.3d 915, 917 (8th

9    Cir. 2000) (no actual damages under TILA without proof that plaintiff would otherwise have

10   obtained insurance at lower price); *Yarnall v. Four Aces Emporium, Inc.*, 322 B.R. 422, 428 (9th

11   Cir. BAP 2005) (no actual damages under TILA without proof that plaintiff would otherwise have

12   pursued different or less expensive transaction); *Vallies v. Sky Bank*, 583 F. Supp. 2d 687, 691-92

13   (W.D. Pa. 2008) (same); *Rucker v. Sheehy Alexandria, Inc.*, 228 F. Supp. 2d 711, 719-20 (E.D.

14   Va. 2002) (same).

15        46.     Thus, to recover actual damages, Kemply was also required to prove that she and

16   the Class could have obtained other loans that would have resulted in fewer fees.

17        **B.      Actual Damages Are Denied Because the NSF Fees Were Due to Intervening
             Causes and Not to the Conditioning.**

18

19        47.     CashCall's borrowers understood their right to choose methods of repayment other

20   than EFTs.  CashCall borrowers had a variety of ways to make their loan payments and in fact

21   used those other methods.  In addition to EFTs, borrowers have made loan payments by personal

22   check, certified check, phone, MoneyGram, money order, and in-person payment at CashCall's

23   corporate office.

24        48.     The fact that Kemply made six months of payments via EFT without incurring an

25   NSF fee, that she incurred an NSF fee only after her husband made unauthorized withdrawals

26   from her bank account, and that she later provided a new, unquestionably voluntary EFT

27   authorization and thereafter incurred multiple NSF fees, shows that NSF fees were not "a result

28   of" the conditioning but rather were a result of intervening causes.

49.     Evidence regarding other CashCall borrowers who have testified in this case also demonstrates that NSF fees were not an inevitable result of the conditioning, and that borrowers had the ability to manage their payments and their payment methods notwithstanding the conditioning.

50.     The evidence demonstrates that borrowers could control their loan payments, freely cancel their EFT authorizations, and avoid NSF fees simply by keeping sufficient funds in their accounts.  If borrowers were concerned about running low on cash, they could avoid NSF fees by changing the payment date, asking CashCall to skip a payment, asking CashCall to defer a payment, or modifying the loan to change the amount of the monthly payments.

51.     Even with all of these mechanisms to avoid incurring NSF fees, unforeseen events still might intervene to cause a borrower to incur an NSF fee.  But it simply cannot be said that the original EFT authorization caused that or any other NSF fee.

52.     The lack of any causal link between the conditioning and the charging of NSF fees is further illustrated by Class-wide data.

53.     Forty percent of all loans during the Class period—which by definition all involved the conditioning—never incurred NSF fees at all.  If the EFT authorization violates the EFTA, then every borrower who signed that authorization should be in the Class.

54.     The data also confirms that borrowers could cancel the EFT authorization, if they chose (as 16% of the loans in the Class did, some of them having done so immediately); change the scheduled date of their scheduled EFT payment (as more than a quarter of the loans did); or modify the terms of the loan (as more than a quarter of the loans did).  In sum, borrowers were in control of their payment terms.

55.     That almost 20% of the loans in the Class incurred no NSF fees for at least a year shows that circumstances far removed from the initial conditioning were a more likely cause of such fees.  Likewise, the fact that almost 20% of the loans incurred NSF fees after the EFT authorization was canceled shows that neither the initial authorization nor EFTs themselves were inherently to blame for NSF fees.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

56.     The evidence confirms that the initial EFT authorization signed at the outset of the loan did not cause Class members to incur every (or even any) subsequent NSF fee.  Numerous intervening events and individual borrower decisions led to particular borrowers not having sufficient funds in their bank accounts when an EFT payment was scheduled.

C.     **Actual Damages Are Denied Also Because Borrowers Would Have Used EFTs Even Without the Conditioning and the Use of EFTs Did Not Harm the Class.**

57.     The premise of the claim for actual damages is that CashCall borrowers would not have selected EFTs as their payment method if not for the conditioning.  Yet, the evidence shows that CashCall borrowers prefer EFTs.  Thus, in making EFT payments the default method of payment prior to November 2011, CashCall was not foisting on borrowers a payment option that they did not want.

58.     Class members were not harmed by the conditioning and appear to have benefited from it.  Borrowers who paid by EFT incurred fewer total fees (NSF fees + late fees) on average than did other borrowers.

59.     That CashCall borrowers prefer EFTs and actually saved money by using EFTs precludes any showing that the Class could have obtained alternative loans involving fewer fees.  Thus, even if Kemply had established that conditioning was the cause of the NSF fees—which she did not—she still could not prove that those fees should be recovered as EFTA actual damages.

D.     **Kemply and the Class Are Not Entitled to Restitution.**

60.     As an alternative to her claim for actual damages under the EFTA in the amount of NSF fees that were charged to the Class, Kemply seeks restitution of the same NSF fees under California Business & Professions Code Section 17200 *et seq.* (the UCL).  This claim is asserted under the UCL's "unlawful" prong and thus is based on the underlying violation of the EFTA.

61.     NSF fees cannot be recovered under the UCL because those fees, if recoverable at all, are only recoverable as damages.  The UCL only allows recovery of restitution and not damages.  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th  1134, 1144 (2003).  The EFTA, conversely, only allows recovery of damages but not restitution. *Friedman v. 24 Hour*

*Fitness USA, Inc.*, 580 F. Supp. 2d 985, 998-99 (C.D. Cal. 2008) (there is "no EFTA provision or other authority supporting a restitution remedy"). The NSF fees cannot be both damages and restitution.

62.    Federal courts consistently have held that fees charged by banks or financial institutions related to alleged EFTA violations are damages, not restitution. *See Brown*, 457 F. Supp. 2d at 90 (plaintiff seeking to recover ATM fees as damages based on alleged violation of EFTA provision requiring prominent disclosure of ATM fees); *Burns v. First Am. Bank*, 2006 WL 3754820 (N.D. Ill. 2006) (ATM fees claimed as damages for EFTA violation); *Polo*, 232 F.R.D. 399 (same).

63.    The California Supreme Court outlined the differences between damages and restitution.  Damages are intended to compensate someone for injuries suffered; while restitution merely restores something taken directly from the allegedly injured party. *Bank of the West v. Super. Ct.*, 2 Cal. 4th 1254, 1269  (1992).

64.    Restitution as a remedy for a violation of Section 1693k would only be permissible if CashCall had charged a fee to make electronic payments at the outset of its relationship or to cancel the EFT authorization—i.e., if CashCall had collected a fee that was directly related to the EFT authorization itself.  Only then might CashCall be obligated to restore money as UCL restitution based on the conditioning violation.  But the fees at issue here were incurred months or years after the original loan transaction, and are related to conduct far removed from the original transaction.  Such fees would be recoverable, if at all, only as consequential damages, not as restitution.

65.    Furthermore, the California Finance Lenders Law (FLL), under which CashCall is licensed, permits lenders to charge a $15 fee for payments returned for insufficient funds.  Cal. Fin. Code § 22320.  At the outset of the case, Plaintiffs challenged CashCall's right to charge *any* NSF fees under Section 22320.  The Court rejected that claim, dismissing it with prejudice.  [Dkt. No. 34, pp. 14-15]  CashCall's promissory note, in turn, disclosed that CashCall would charge an NSF fee if any loan payments were returned due to insufficient funds.

66.   As a result, Kemply cannot establish that CashCall's collection of NSF fees was unlawful, which in turn precludes her from any recovery of those fees as restitution under the UCL's "unlawful" prong.

67.   In addition, where, as here, a UCL claim is asserted under the "unlawful" prong, the claim is subject to any defenses that apply to the underlying statute.  Accordingly, a defense to the EFTA claim is equally a defense to the UCL claim.  *See People v. Duz-Mor Diagostic Lab., Inc.*, 68 Cal. App. 4th 654, 673 (1999) (in UCL claim, "a defense to the underlying offense is a defense under the [UCL]").  As discussed above, Kemply has not proven that the EFTA violation was the cause of the NSF fees.  Perforce she cannot establish any right to restitution of those fees under the UCL.

**E.   Recovery, If It Had Been Proven, Would Have Been Offset by the Losses to CashCall From the Defaults of Kemply and Many of the Class Members.**

68.   The right of setoff was pleaded as CashCall's Eighteenth Affirmative Defense.[1] The right of setoff is available, not only against Kemply individually, but also against every Class member whose loan was charged off, resulting in a loss to CashCall.  *See Granberry v. Islay Investments*, 9 Cal. 4th 738, 743, 749 (1995) (in a class action, the right of setoff applies to members of the class as well as the class representative).

69.   Members of the Class whose loans have been charged off—including Kemply herself—cannot recover NSF fees as actual damages or restitution.

**F.   Statutory Damages Are Not Warranted Here.**

70.   Statutory damages are discretionary.  The factors to consider when evaluating a request for statutory damages include "the frequency and persistence of noncompliance, the nature of such noncompliance, the resources of the defendant, the number of persons adversely affected, and the extent to which the noncompliance was intentional."  15 U.S.C. § 1693m(b)(2).

71.   These factors militate strongly against an award of statutory damages here. CashCall's "noncompliance" was not intentional or persistent, considering that its practice had

---

[1]     A setoff as to Class members who defaulted on their loans would also be appropriate under CashCall's Fourth Affirmative Defense of unclean hands.

been found legal by a state court and only later was found by this Court to constitute a violation, by which time CashCall had voluntarily changed its practice.

72.     Furthermore, the violation in question was a highly technical one.   CashCall merely required borrowers to sign an EFT authorization that could be canceled at any time. Because borrowers did not have to make any loan payment—let alone every loan payment—by EFT, CashCall's violation was not the type that resulted in harm to its borrowers.

73.     The court in *Federal Trade Comm'n v. Payday Fin. LLC,* 989 F. Supp. 2d 799 (D.S.D. 2013), found a similar provision by another lender to violate Section 1693k, but held that it is a "violation [that is] somewhat technical in nature and use of this EFT clause is not likely to merit much, if any, monetary penalty."  *Id.* at 812-13.

74.     Similarly, the court in *State of W. Virginia ex rel. McGraw v. CashCall*, No. 08-C-1964 (Kanawha Cty. Ct., W. Va.), considering the same provision, did not award any damages, even though there was evidence that consumers incurred NSF fees, but instead only awarded a civil penalty.  [Dkt. 190 (Stark Decl, Ex. 17 at 49-50).]

75.     Furthermore, borrowers benefited from the unintentional violation insofar as they incurred substantially fewer fees overall when making loan payments by EFT than when using other payment methods.

76.     Statutory damages are essentially punitive in nature.   *See Burns*, 2006 WL 3754820 at *11.  Accordingly, no statutory damages should be awarded.

## III.     <u>CONCLUSION</u>

77.     Although the Court has previously determined on summary judgment that CashCall had violated Section 1693k(1) by conditioning the extension of credit on the borrowers' repayment of the loans through the use of EFTs, the Court now rules that Kemply and the Conditioning Class are not entitled to actual damages or statutory damages on their First Claim for Relief for violation of Section 1693k(1), and further, that Kemply and the Conditioning Class are not entitled to restitution on their Fifth Claim for Relief under California Business & Professions Code section 17200 based on the violation of Section 1693k(1).  In addition, even if Kemply had proven actual damages or the right to restitution, any such recovery would be offset

1  by CashCall's losses from Kemply's default on her loan payments, and setoff would also apply to

2  any members of the Class whose loan had been charged off.

3

4  Dated: _____, 2015                    _____
                                                    JUDGE OF THE DISTRICT COURT

5

6  SUBMITTED BY:                    MANATT, PHELPS & PHILLIPS, LLP

7

8  Dated: April 6, 2015              /s/ Brad W. Seiling_____
                                     Brad W. Seiling
9                                    *Attorneys for Defendant* CashCall, Inc.

10

11

12

13

14

15

16  203073289.2

17

18

19

20

21

22

23

24

25

26

27

28