James C. Sturdevant, SBN #94551
THE STURDEVANT LAW FIRM
A Professional Corporation
354 Pine Street, Fourth Floor
San Francisco, California 94104
Telephone: (415) 477-2410
Facsimile: (415) 477-2420
Email: jsturdevant@sturdevantlaw.com

Arthur D. Levy, SB #95659
LAW OFFICE OF ARTHUR D. LEVY
445 Bush Street
Sixth Floor
San Francisco, CA 94108
Telephone: (415) 702-4550
Email: arthur@yesquire.com

*Additional Attorneys for Plaintiff listed on Signature Page*

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

EDUARDO DE LA TORRE, et al.,

Plaintiffs,

vs.

CASHCALL, INC.,

Defendants.

Case No. C 08-03174 MEJ

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Date: June 22, 2015
Time: 10:00 a.m.
Courtroom: B – 15th Floor
Judge: Hon. Maria-Elena James

## INTRODUCTION

The Court held a three-day bench trial in this case on June 22, 23, and 24, 2015. This trial was limited to the issue of class-wide monetary relief on the Class Conditioning Claims based on CashCall's violations of the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. §§ 1693 *et seq*. The "Conditioning Claims" consist of the certified First and Fifth Claims in the Fourth Amended Complaint (Dkt. 54) to the extent they are based on violation of 15 U.S.C. § 1693k(1).[1]

On July 18, 2012, the Court granted class certification as to the Conditioning Claims and defined the "Conditioning Class" as follows:

> All individuals who, while residing in California, borrowed money from CashCall, Inc. for personal, family, or household use on or after March 13, 2006 through July 10, 2011 and were charged a NSF Fee.

(Dkt. 128 at p. 2; Dkt. 130.)

On July 30, 2014 granted Plaintiffs' Motion for Partial Summary Judgment as to liability on the Conditioning Claims. (Dkt. 220 at pp. 17-18.) That Order determined that CashCall had violated section 1693k(1) for all purposes in this action.

Plaintiffs request the following class-wide monetary relief against CashCall on three different grounds:

(1) "Statutory damages," pursuant to 15 U.S.C. § 1693m(a)(2), in the maximum amount of $500,000; plus

(2) Actual damages, pursuant to 15 U.S.C. § 1693m(a)(1), in the amount of the non-sufficient fund (NSF) fees that CashCall charged and collected from Class Members based on automatic electronic fund transfers (EFTs) from loan inception until such time as the borrower may have cancelled electronic payment authorization; or

(3) Restitution, pursuant to Business & Professions Code § 17203, of the NSF fees CashCall charged and collected from Class Members based on automatic EFTs from loan inception until any cancellation of EFT authorization.

[1] "No person may … (1) condition the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers …."

Plaintiffs also request reversal of all NSF fees CashCall charged to Class Members but did not collect on automatic EFTs from loan inception until any EFT cancellation, and prejudgment interest on all monetary amounts awarded by the Court.

Having considered all of the evidence submitted both by Plaintiffs and Defendant that was admitted during the trial, having considered all inferences from that evidence, both consistent and conflicting, and having considered all arguments and submissions of counsel for the respective parties, the Court finds the following Findings of Fact and makes the following Conclusions of Law.  To the extent any Conclusion of Law may be considered a Finding of Fact, it shall be so considered.

## FINDINGS OF FACT

1. On May 24, 2006, Plaintiff Lori Saysourivong, who is now known as Lori Kemply, took out a CashCall loan for $2,525.00.  (Parties' Undisputed Fact, included in the Joint Pretrial Statement filed April 6, 2015 ("Undisputed Fact") No. 1.)

2. Plaintiffs' Exhibit 1 is a true and correct copy of Kemply's Promissory Note with CashCall.  (Undisputed Fact No. 2.)

3. All promissory notes for loans covered by the Conditioning Class contained an authorization for payment by preauthorized electronic fund transfer (EFT).  CashCall would not make a loan unless a borrower signed the EFT authorization.  (Undisputed Fact No. 3.)

4. All promissory notes for loans covered by the Conditioning Class contained a provision for CashCall to impose non-sufficient fund (NSF) fees for payments returned for insufficient funds.  (Undisputed Fact No. 4.)

5. This Court has previously found that "during the Class Period, CashCall issued consumer loans only to borrowers who initially entered into a loan agreement containing an EFT authorization clause. CashCall's loan application and loan agreement forms do not state that a consumer need not consent to EFT to obtain a loan from CashCall or explain how a consumer could obtain a loan from CashCall without consenting to EFT. To the contrary, checking the EFT Authorization box was a mandatory prerequisite to obtaining a loan. CashCall conditioned the extension of credit on consent to EFT by requiring Conditioning Class Members to check the EFT

authorization box in order to submit their loan agreements, receive credit, and have their loans funded. Section 1693k(1) is unambiguous, and its purpose is clear. By conditioning its extension of credit to members of the Conditioning Class on Class Members' agreement to repay their CashCall loans by means of preauthorized electronic fund transfers, CashCall violated the EFTA." (Dkt. 220 at 16:18-28.) The Court incorporates that ruling in these Findings.

6. Kemply did not have sufficient funds in her bank account at the time CashCall ran electronic fund transfer transactions for monthly loan installments on the following dates, resulting in the following NSF fees imposed and collected by CashCall:

    1/4/07: $15.00

    1/7/09: $15.00

    7/20/09: $15.00

    11/17/09: $15.00

    12/7/09: $15.00

    01/11/10: $15.00

    Total = $90.00

(Undisputed Fact No. 5.)

7. Ms. Kemply is a member of the Conditioning Class defined by the Court. (Undisputed Fact No. 6.)

8. This Court has ruled that a one-year statute of limitations applies to all of the Conditioning Claims and that the Conditioning Claims are time-barred for any loan obtained before March 13, 2006. (Dkt. 127 at pp. 4-6.) Under this ruling, Plaintiff De La Torre's Conditioning Claims are time-barred and he is not a member of the Conditioning Class. Plaintiffs contest this ruling as to their UCL claim and reserve the right to appeal it at an appropriate time.

## Statutory Damages

### The Frequency and Persistence of CashCall's Noncompliance

9. CashCall violations of section 1693k(1) were frequent and persistent. CashCall's violations affected 96,588 borrowers in the Conditioning Class on 93,183 loans during the class

period. (Undisputed Fact No. 9.)

10. On average over the five-year Class period, CashCall violated section 1693k(1) approximately 20,000 times per year for five years, or over 50 times a day.

11. The persistence of CashCall's violations is also shown by the fact that CashCall continued the practice until at least November 2011, more than two years after the Court denied CashCall's motion to dismiss the conditioning claim in June 2009. (Plaintiffs' Trial Ex. 17 at p. 4.) Further, CashCall opposed, tried, and lost a case brought by the State of West Virginia on conditioning claims under the EFTA in 2012. (Plaintiffs' Trial Ex. 18 at pp. 17-20.)

CashCall's Violations Adversely Affected a Large Number of Persons

12. Although CashCall's violations affected 96,588 borrowers in the Class, this number does not include borrowers who are not in the Conditioning Class whose loans CashCall also illegally conditioned on payment by automatic EFTs. The Court limited the Class to the five-year period from March 13, 2006 through July 10, 2011, when CashCall changed its Loan Agreement to include an arbitration clause. (Dkt. 128 at p. 2; Dkt. 130.) The 95,588 borrowers in the Class do not include borrowers whose loans were prior to March 13, 2006, which the Court has ruled are time-barred under the one-year EFTA statute of limitations. (Dkt. 127 at pp. 4-6.) Even during the Class period, some CashCall borrowers were not charged an NSF fee and are not members of the Class for that reason.

13. CashCall made a total of 155,147 consumer loans to 135,176 borrowers during the Class period. (Undisputed Fact No. 8.) CashCall required EFT payments on all of these loans. This volume reinforces the reasonableness and appropriateness of the maximum award.

The Nature of CashCall's Noncompliance and the Extent to Which It Was Intentional

14. In assessing the nature of CashCall's violations of section 1693k(1), the Court finds that CashCall's violations were strategic and central to its business model of making subprime loans to high-risk borrowers. CashCall occupies a market "niche," providing "credit that other lenders may not have been willing to extend," "to borrowers with poor credit histories"

whose "prior credit problems, including bankruptcies and defaults, limited their credit options." (Plaintiffs' Trial Ex. 19 at 3:14-15; 4:24-5:1.) CashCall's default rate on its loans consistently stayed between 35% and 45% for the $2,600 loan product since inception in 2004. (Plaintiffs' Trial Ex. 20 at p. 2; *see also* Ex. 11 at pp. 6, 7, 10-12.)

15. The risks of CashCall's lending practices is also reflected in its collections of non-sufficient fund (NSF) fees. As of December 31, 2014, the total amount of NSF fees paid by Class Members through December 31, 2014 was $2,406,182.60. (Undisputed Fact No. 13.) This number includes all NSF fees collected by CashCall from Class Members for any reason.

16. Based on $15 per NSF fee, CashCall collected NSF fees over 160,000 times where Class Members did not have sufficient funds in their bank accounts to make their loan installment payments. This does not include the NSF instances where CashCall charged but did not collect an NSF fee.

17. Collection risk was a paramount concern for CashCall. Mandatory EFTs enabled CashCall to efficiently and inexpensively "sweep" borrower accounts to collect monthly loan installment payments.

18. CashCall instructed its loan service agents to strongly encourage customers to stay on auto debt (EFT):

> ACH [i.e., EFT] is the primary and preferred method for CashCall customer loan payments. It is the default payment option on all newly funded loans. Maintaining and/or returning customers to active, timely ACH status is an ongoing, measurable objective for all CashCall loan servicing personnel.

(Plaintiffs' Trial Ex. 4 at p. 7.)

19. CashCall also advertised its high percentage of borrowers who pay via EFT to its investors. (Plaintiffs' Trial Ex. 5 at p. 026068; Ex. 6 at 025860; Ex. 7 at 026141.)

20. The Court finds that CashCall's violations of section 1693k(1) were intentional, inherent in a company policy to violate the EFTA, and did not result from a bona fide error.

The Resources of the Defendant

21. CashCall has substantial financial resources. CashCall's net worth as of December 2011 exceeded $101 million. (Plaintiffs' Trial Ex. 2.) CashCall's net worth has increased substantially since 2011 as the economy has recovered and CashCall has aggressively moved forward in the lending market.

22. A $500,000 award of statutory damages would be less than one half of one percent of CashCall's net worth in 2011, and even a smaller percentage today.

23. One percent of CashCall's net worth for purposes of 15 U.S.C. § 1681m exceeds $500,000. (Undisputed Fact No. 27.)

Actual Damages

24. Throughout the Class Period, CashCall's practice was to charge borrowers' accounts and collect a $15 NSF fee on any recurring installment loan payment returned for non-sufficient funds, including unsuccessful automatic payments made by EFT that CashCall processed.

25. CashCall's conditioning violations were sufficient to cause the imposition of the NSF fees, even if other causal factors were also operating. CashCall's violations were therefore a substantial factor in causing Class Members to pay NSF fees. CashCall imposed the EFT authorization on Class Members that enabled CashCall to electronically sweep the borrowers' bank accounts directly for payment. Without an electronic sweep, NSF fees would not have been charged to Class Members' accounts on automatic EFT payments.

26. Had borrowers been making payments by any method other than automatic EFT, they would not have incurred the NSF fees CashCall charged to their accounts as a result of an unsuccessful automatic EFT payment. A borrower who paid by check, money order, online payment, or other non-EFT method would only incur an NSF fee if the borrower took an affirmative step to make a payment and the payment was unsuccessful. By contrast, a borrower on automatic EFT payments would incur an NSF fee without any such affirmative action, simply when CashCall automatically processed an unsuccessful EFT request against the borrower's bank account.

27. CashCall's violations were not the sole or exclusive cause of the NSF charges. Other contributing causes may have included lack of funds on the Member's bank account, continuation of payment by automatic EFT when the Class Member could have taken affirmative steps to cancel EFT authorization, and that some Class Members may not have cancelled due to a preference for paying by EFT.  However, CashCall's practice of requiring payment by automatic EFT at loan inception deprived Class Members of their statutory rights to decide for themselves whether to pay by EFT.  CashCall's practice of placing all Class Members on EFT payment was a substantial contributing factor to Class Members' incurring NSF fees on automatic EFTs.

28. As of December 31, 2014, the total amount of NSF fees paid by Class Members after an unsuccessful automatic EFT payment was $2,373,458.53.  (Undisputed Fact No. 14.)  An "automatic EFT payment" is an EFT payment initiated by CashCall, as opposed to an EFT transaction out of the ordinary course that was specifically requested by the borrower, such as for a prepayment.  (Id.)  An "unsuccessful automatic EFT payment" is one that was refused by the borrower's bank because there were insufficient funds in the account to cover the payment or the account was closed.  (Id.)

29. However, some Class Members cancelled their EFT authorizations and may later have incurred some NSF fees after renewing their EFT authorizations.  As of December 31, 2014, the total amount of NSF fees paid for unsuccessful automatic EFT payments on loans in the Class after the EFT authorization was canceled for NSF events that occurred after the EFT cancelation was $244,803.88.  (Undisputed Fact No. 15.)

30. As of December 31, 2014, the total amount of NSF fees paid for unsuccessful automatic EFT payments on loans in the Class attributable to an automatic EFT before the original EFT authorization was canceled was $2,128,654.65.  (Undisputed Fact No. 16.)

31. Kemply and each Member of the Conditioning Class sustained actual damages as a result of CashCall's violations of section 1693k(1) in the amount of NSF fees he or she actually paid on unsuccessful automatic EFT payments before an original EFT authorization may have been canceled, but not after.

Restitution Under Cal. Bus. & Prof. Code §17203

32. The NSF fees members of the Class actually paid on unsuccessful automatic EFT payments attributable to an automatic EFT before the original EFT authorization was canceled "may have been acquired" by means of CashCall's violations of section 1693k(1), regardless of whether such payments were caused by or as a result of CashCall's violations.

33. Based on the totality of the evidence admitted at trial and consideration of all equitable factors, the Court finds that CashCall should pay restitution to Kemply and each Member of the Class in the amount of the total NSF fees the Class Member actually paid on unsuccessful automatic EFT payments before an original EFT authorization may have been canceled.

34. To the extent not addressed elsewhere in these Findings of Fact and Conclusions of Law, the Court finds CashCall's affirmative defenses to the Conditioning Claims to be without merit. CashCall's violations of section 1693k(1) were intentional, legally erroneous, and do not qualify for the bona fide error defense under 15 U.S.C. § 1693(c). Under 15 U.S.C. § 1693(d), CashCall did not rely on any rule, regulation, or interpretation thereof by the Board of Governors of the Federal Reserve System or the Bureau of Consumer Financial Protection, or on any interpretation or approval by an official or employee of the Bureau of Consumer Financial Protection or the Federal Reserve System duly authorized by the Bureau or the Board to issue such interpretations or approvals under such procedures as the Bureau or the Board may prescribe therefor.

CONCLUSIONS OF LAW

The Court concludes as follows:

35. The EFTA authorizes the Court to make an award of statutory damages against CashCall. In the case of a class action, the amount of the class-wide award of statutory damages "shall not be more than the lesser of $500,000 or 1 per centum of the net worth of the defendant." 15 U.S.C. § 1693m(a)(2)(B). Here, the $500,000 limit applies because one per cent of CashCall's net worth exceeds $500,000. (Undisputed Fact No. 27.)

36. The EFTA provides that "In determining the amount of liability in any action under subsection (a), the court shall consider, among other relevant factors …. (2) in any class action under subsection (a)(2)(B), the frequency and persistence of noncompliance, the nature of such noncompliance, the resources of the defendant, the number of persons adversely affected, and the extent to which the noncompliance was intentional." 15 U.S.C. § 1693m(b)(2).

37. Congress passed the EFTA a year after it enacted the Fair Debt Collection Practices Act (FDCPA) in 1977, using the identical statutory language in the "civil liability" provision of the EFTA that it had used in the FDCPA the year before. *Compare* 15 U.S.C. § 1693m (EFTA) *with* 15 U.S.C. § 1692k (FDCPA). Therefore, cases interpreting the FDCPA civil remedies can be used to interpret the EFTA. *Erlenbaugh v. U. S.*, 409 U.S. 239, 243-44 (1972), cited in *National Ass'n of Home Builders v. San Joaquin Valley Unified Air Pollution Control Dist.*, 627 F.3d 730, 735 (9th Cir. 2010) ("recognizing *in pari materia* as a logical and well established canon of statutory construction)".)

38. Statutory damages under the federal consumer protection statutes are intended to "deter violations by imposing a cost on the defendant even if his misconduct imposed no cost on the plaintiff." *Gonzales v. Arrow Financial Services, LLC*, 660 F.3d 1055, 1067 (9th Cir. 2011). Statutory damages do not require any showing of actual harm. *Tourgeman v. Collins Financial Services, Inc.*, 755 F.3d 1109, 1117-18 (9th Cir. 2014). As such, statutory damages are not tied in any way to actual losses suffered. *Gonzales*, at 1068.

39. Based on the totality of the evidence admitted at trial, and after consideration of all relevant factors, the Court awards the sum of $500,000 as class-wide statutory damages against CashCall pursuant to 15 U.S.C. § 1693m(a)(2)(B).

40. The EFTA authorizes the Court to make an award of any actual damage sustained by the Class as a result of CashCall's violations of section 1693k(1). 15 U.S.C. § 1693m(a)(1). Under the EFTA, statutory damages and actual damages are cumulative, not alternative, remedies. Section 1693m(a) provides that CashCall is liable to the Class "in an amount equal to the sum of" actual damage under subdivision (a)(1) and statutory damages under subdivision (a)(2).

41. In determining whether the NSF fees were "sustained … as a result of" CashCall's violations of section 1693k(1), the Court applies the substantial factor test. To show that damages are "sustained … as a result of such failure" under the FDCPA, a plaintiff need only show that the statutory violation was a substantial factor in, not the sole cause of, the damage. *McCollough v. Johnson, Rodenburg & Lauinger LLC*, 637 F.3d 939, 957-58 (9th Cir. 2011); *see also Pourfard v. Equifax Information Services LLC*, 2010 WL 55446 at *5 (D. Or. Jan. 2, 2010) (applying substantial factor test to Fair Credit Reporting Act provision that "any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000"); *Abdelfattah v. Carrington Mortgage Services LLC*, 2013 WL 495358 at *4 (N.D. Cal. Feb. 7, 2013) (Whyte, J.) (same); *Barrepski v. Capital One Bank (USA) N.A.*, 2014 WL 935983 at *7 (D. Mass. Mar. 7, 2014) (applying substantial factor test to RICO provision that "any person injured in his business or property" as a result of a RICO violation may bring a civil RICO suit); *Jenkins v. Miller*, 983 F.Supp.2d 423, (D. Vt. 2013) (same); *see also Doe 1 v. AOL, LLC*, 719 F.Supp.2d 1102, 1113 (N.D. Cal. 2010) (substantial factor test applies to California's Consumer Legal Remedies Act (CLRA); "a claim may be brought by a consumer who has suffered injury 'as a result of the use or employment of a proscribed method, act, or practice'") (Armstrong, J.)).

42. Under the Restatement Second of Torts, section 432, the "but-for" test of causation generally applies, requiring that the loss would not have occurred "but for" the defendant's conduct. However, the "but-for" test does not apply if "two forces are actively operating ... and each of itself is sufficient to bring about harm to another"; in such circumstances, the actor's conduct "may be found to be a substantial factor" in bringing about the result, without proof that the result would not have occurred but for the actor's conduct. RESTATEMENT SECOND OF TORTS § 432(2). "[W]hen multiple forces operate independently, each of which is sufficient by itself to bring about the harm, a force that is a substantial factor in bringing about the harm may be found to have caused the harm." *State ex rel. Wilson v. Superior Court,* 227 Cal. App. 4th 579, 605-06 (2014).

43. The Court therefore applies the "substantial factor" test of causation and finds Class-wide actual damage for all NSF fees incurred on automatic EFT payments to the point

when a borrower opted out of payment by NSF.

44. Based on the totality of the evidence admitted at trial and consideration of all relevant factors, pursuant to 15 U.S.C. § 1693m(a)(1), the Court awards Kemply and each Member of the Class actual damages as a result of CashCall's violations of section 1693k(1) in the amount of NSF fees he or she actually paid on unsuccessful automatic EFT payments before an original EFT authorization may have been canceled.

45. The Court awards prejudgment interest on such damages at the rate of seven per cent per annum from the date of payment of the NSF fee until the date of Judgment. *Uzyel v. Kadisha*, 188 Cal. App. 4th 866, 921 (2010) ("The legal rate of interest on an obligation before the entry of judgment is 7 percent, unless otherwise specified by statute") (citing authority).

46. Plaintiffs have predicated their "unlawful prong" claim under the UCL on CashCall's violation of 15 U.S.C. § 1693k(1). The "unlawful prong" of the UCL "'borrows' violations of other laws by making them independently actionable as unfair competitive practices." *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 180 (1999). Violations of other laws, when committed pursuant to business activity, become independently actionable under the UCL and subject to its remedies. *People ex rel. Kennedy v. Beaumont Investment, Ltd.*, 111 Cal. App. 4th 102, 120 (2003). Virtually any law can serve as a predicate for a § 17200 action; the law may be "civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made." *People v. McCall*, 25 Cal.3d 626, 632 (1979).

47. CashCall engaged in an unlawful business practice by violating section 1693k(1). That practice constituted "unfair competition" in violation of California Business & Professions Code section 17200.

48. Section 17203 of the UCL provides, "The court may make such orders or judgments … as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition."

49. The Class Members' payments of NSF fees to CashCall qualify for restitution under section 17203. The California Supreme Court has defined restitution for purposes of section 17203 as the "return [of] money obtained through an unfair business practice to those

persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144-45 (2003). "The object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest." *Id.* at 1149.

50. Pursuant to section 17203, the Court orders that CashCall pay restitution to Kemply and each Member of the Class in the amount of the total NSF fees the Class Member actually paid on unsuccessful automatic EFT payments before an original EFT authorization may have been canceled, plus prejudgment interest at the rate of seven per cent per annum from the date of payment of the NSF fee until the date restitution is paid.

ORDER

The Court orders as follows:

51. Within 30 days of the date of these Findings of Fact and Conclusions of Law, CashCall shall provide Plaintiffs' counsel with a list through the date of these Findings, showing for each member of the Class the amount of the total NSF fees the Class Member actually paid on unsuccessful automatic EFT payments attributable to an automatic EFT before the original EFT authorization was canceled, and the amount of prejudgment interest that has accrued at the rate of seven per cent per annum from the date of payment of the NSF fee until the date of these Findings.

52. CashCall shall correct all Class Members' loan accounts by reversing all NSF fees CashCall charged to Class Members but did not collect on automatic EFTs from loan inception until any EFT cancellation.

53. Counsel for the parties shall meet and confer and file a Joint Status Report including proposed forms of final Judgment consistent with these Findings of Fact and Conclusions of Law no later than 60 days after the date of these Findings of Fact and Conclusions of Law.

54. The Court sets a Status Conference for ____________________ 2015 to resolve any issues as to the form of Judgment. The procedure for addressing Plaintiffs' counsel's claims pursuant to 15 U.S.C. § 1693(a)(3) and under California law for award of the costs of the action, together with a reasonable attorney's fee as determined by the court, and all other remaining issues in the action shall be addressed at that time.

DATED: April 6, 2015

/s/ Arthur D. Levy
Arthur D. Levy, SB #95659

James C. Sturdevant, SB# 94551
THE STURDEVANT LAW FIRM
354 Pine Street, Fourth Floor
San Francisco, CA 94104
Telephone: (415) 477-2410

Arthur D. Levy, SB# 95659
LAW OFFICE OF ARTHUR D. LEVY
445 Bush Street, Sixth Floor
San Francisco, CA 94108
Telephone: (415) 702-4550

Steven M. Tindall, SB# 187862
Jessica Riggin, SB# 281712
RUKIN HYLAND DORIA & TINDALL LLP
100 Pine Street, Suite 2150
San Francisco, CA 94111
Telephone: (415) 421-1800

Attorneys for Plaintiffs
EDUARDO DE LA TORRE et al.