James C. Sturdevant, SBN #94551
THE STURDEVANT LAW FIRM
A Professional Corporation
354 Pine Street, Fourth Floor
San Francisco, California 94104
Telephone: (415) 477-2410
Facsimile: (415) 477-2420
Email: jsturdevant@sturdevantlaw.com

Arthur D. Levy, SB #95659
LAW OFFICE OF ARTHUR D. LEVY
445 Bush Street
Sixth Floor
San Francisco, CA 94108
Telephone: (415) 702-4550
Email: arthur@yesquire.com

*Additional Attorneys for Plaintiff listed on Signature Page*

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

EDUARDO DE LA TORRE, et al.,

Plaintiffs,

vs.

CASHCALL, INC.,

Defendants.

Case No. C 08-03174 MEJ

**PLAINTIFFS' TRIAL BRIEF**

Date: June 22, 2015
Time: 10:00 a.m.
Courtroom: B – 15th Floor
Judge: Hon. Maria-Elena James

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION 1

ARGUMENT 2

A. Congress Intended Statutory Damages to Deter Future Violations of the EFTA by Imposing Monetary Liability on Violators In Private Enforcement Litigation, Such As this Case. 2

B. The Court Should Award the Maximum Amount of $500,000 in Favor of the Class... 5

1. CashCall's Violations Were Frequent and Persistent 5

2. CashCall's Violations Adversely Affected a Large Number Of Persons. 6

3. The Nature of CashCall's Noncompliance; CashCall's Violations Were Intentional and Part and Parcel of Its Subprime Lending Business Model. 7

4. CashCall's Resources Justify the Maximum Award. 8

C. The Court Should Award NSF Fees as Actual Damages under the EFTA Because CashCall's Violation in Conditioning Loans on EFTs was a "Substantial Factor" in Causing Borrowers to Incur the NSF Fees. 9

D. The Court Should Alternatively Award Restitution Under the UCL 11

# TABLE OF AUTHORITIES

**Federal Cases** **Page(s)**

Abdelfattah v. Carrington Mortgage Services LLC, 2013 WL 495358 at *4 (N.D. Cal. Feb. 7, 2013) (Whyte, J.) .......... 10

Baker v. G.C. Servs. Corp., 677 F. 2d 775 (9th Cir. 1982) .......... 5

Barrepski v. Capital One Bank (USA) N.A., 2014 WL 935983 at *7 (D. Mass. Mar. 7, 2014) .......... 10

Camacho v. Bridgeport Fin., Inc., 523 F.3d 973 (9th Cir. 2008) .......... 4

Doe 1 v. AOL, LLC, 719 F.Supp.2d 1102 (N.D. Cal. 2010) .......... 10

Erlenbaugh v. U. S., 409 U.S. 239 (1972) .......... 4

Evon v. Law Offices of Sidney Mickell, 688 F.3d 1015 (9th Cir. 2012) .......... 4

Gonzales v. Arrow Financial Services, LLC, 660 F.3d 1055 (9th Cir. 2011) .......... 4, 5

Jenkins v. Miller, 983 F.Supp.2d 423 (D. Vt. 2013) .......... 10

McCollough v. Johnson, Rodenburg & Lauinger LLC, 637 F.3d 939 (9th Cir. 2011) .......... 9, 11

National Ass'n of Home Builders v. San Joaquin Valley Unified Air Pollution Control Dist., 627 F.3d 730 (9th Cir. 2010) .......... 4

Pourfard v. Equifax Information Services LLC, 2010 WL 55446 at *5 (D. Or. Jan. 2, 2010) .......... 10

Tourgeman v. Collins Financial Services, Inc., 755 F.3d 1109 (9th Cir. 2014) .......... 5

**State Cases**

Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., 20 Cal. 4th 163 (1999) .......... 12

Fletcher v. Security Pacific National Bank, 23 Cal.3d 442 (1979) .......... 12, 13

In Re Tobacco II Cases, 46 Cal.4th 298 (2009) .......... 13

## TABLE OF AUTHORITIES CONTINUED

**State Cases (cont'd)** **Page(s)**

Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134 (2003) ............ 13, 14

Nelson v. Pearson Ford Co., 186 Cal. App. 4th 983 (2010) ............ 14

People ex rel. Kennedy v. Beaumont Investment, Ltd., 111 Cal. App. 4th 102 (2003) ............ 12

People v. McCall, 25 Cal.3d 626, (1979) ............ 12

State ex rel. Wilson v. Superior Court, 227 Cal. App. 4th 579 (2014) ............ 10

Troyk v. Farmers Group, Inc., 171 Cal. App. 4th 1305 (2009) ............ 13

Uzyel v. Kadisha, 188 Cal. App. 4th 866 (2010) ............ 14

Viner v. Sweet, 30 Cal.4th 1232 (2003) ............ 10

**Federal Statutes**

15 U.S.C. § 1693m(2)(a) ............ 6

15 U.S.C. § 1681 ............ 10

15 U.S.C. § 1692 ............ 3, 4, 5, 9

15 U.S.C. § 1692k ............ 3

15 U.S.C. § 1692k(a)(1) ............ 9

15 U.S.C. § 1692m(a)(1) ............ 11

15 U.S.C. § 1693 ............ passim

15 U.S.C. § 1693(a)(3) ............ 15

15 U.S.C. § 1693k(1) ............ passim

15 U.S.C. § 1693m ............ 3

15 U.S.C. § 1693m(a) ............ 3, 5, 9

15 U.S.C. § 1693m(a)(1) ............ 1, 9, 14

15 U.S.C. § 1693m(a)(2) ............ 1, 9

15 U.S.C. § 1693m(b) ............ 5

**TABLE OF AUTHORITIES CONTINUED**

**State Statutes** **Page(s)**

Cal. Bus. & Prof. Code § 17200 ........ 12, 13

Cal. Bus. & Prof. Code, § 17203 ........ 2, 12, 13, 14

**Other Authorities**

2B N. Singer, STATUTES AND STATUTORY CONSTRUCTION, (6th Ed. 2000) § 51.02 ........ 4

RESTATEMENT SECOND OF TORTS § 432(2) ........ 11

Plaintiffs Lori Kemply (formerly known as Lori Saysourivong) and Eduardo De la Torre[1] respectfully submit this Trial Brief pursuant to the Court's Case Management Order of February 26, 2015:

**INTRODUCTION**

This trial is limited to the issue of Class-wide monetary relief on the Conditioning Class Claims based on CashCall's violations of the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. §§ 1693 et seq. The "Conditioning Claims" consist of the certified First and Fifth Claims in the Fourth Amended Complaint (Dkt. 54) to the extent they are based on violation of 15 U.S.C. § 1693k(1).[2]

The Court defined the "Conditioning Class" as follows:

> All individuals who, while residing in California, borrowed money from CashCall, Inc. for personal, family, or household use on or after March 13, 2006 through July 10, 2011 and were charged a NSF Fee.

(Dkt. 128 at p. 2; Dkt. 130.)

The Court has already found CashCall liable on the Conditioning Claims by granting Plaintiffs' Motion for Partial Summary Judgment on these claims. (Dkt. 220 at pp. 17-18.) Plaintiffs seek to have the Court award the Conditioning Class monetary relief against CashCall on three different grounds:

(1) "Statutory damages," pursuant to 15 U.S.C. § 1693m(a)(2), in the maximum amount of $500,000; plus

(2) Actual damages, pursuant to 15 U.S.C. § 1693m(a)(1), in the amount of the non-sufficient fund (NSF) fees that CashCall charged and collected from Class Members based on

---

[1] This Court has ruled that a one-year statute of limitations applies to all of the Conditioning Claims and that the Conditioning Claims are time-barred for any loan obtained before March 13, 2006. (Dkt. 127 at pp. 4-6.) Under this ruling, Plaintiff De La Torre's Conditioning Claims are time-barred and he is not a member of the Conditioning Class. Plaintiffs contest this ruling as to their UCL claim, which has its own statute of limitations for liability and remedy, and reserve the right to appeal it at an appropriate time.

[2] "No person may … (1) condition the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers …."

automatic electronic fund transfers (EFTs) from loan inception until such time as the borrower may have cancelled electronic payment authorization; or

(3) Restitution, pursuant to Business & Professions Code § 17203, of the NSF fees CashCall charged and collected from Class Members based on automatic EFTs from loan inception until any cancellation of EFT authorization.

Plaintiffs also request reversal of NSF fees CashCall charged to Class Members but did not collect on automatic EFTs from loan inception until any EFT cancellation, and prejudgment interest on all monetary amounts awarded by the Court. Plaintiffs' counsel will make their application for an award of attorney's fees and expenses post-Judgment in conjunction with taxation of costs.

## ARGUMENT

### A. Congress Intended Statutory Damages to Deter Future Violations of the EFTA by Imposing Monetary Liability on Violators In Private Enforcement Litigation, Such As this Case.

The EFTA prohibits any person from "condition[ing] the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers." 15 U.S.C. §1693k(1). This Court found as a matter of law that CashCall violated this provision of the EFTA: "The undisputed evidence in this case demonstrates that, as a condition of extending credit to Conditioning Class Members, CashCall required them to consent to 'preauthorized electronic fund transfers' that were 'authorized in advance to recur at substantially regular intervals,' in violation of the EFTA." (Dkt. 220 at p. 16:6-9.)

CashCall must bear the consequences of violating the law. In the EFTA, Congress gave borrowers the freedom to choose whether to allow CashCall to take loan payments electronically out of their accounts. Congress prohibited CashCall from depriving borrowers of this right of free choice by enacting section 1693k(1). The wisdom of Congress's prohibition, or whether the law is more honored in the breach than the observance — e.g., CashCall's claim that borrowers are better off with the law violated — is beyond CashCall or this Court to second guess: Congress settled the issue when it enacted section 1693k(1), giving borrowers, not CashCall, the legal right to decide whether to pay by EFT.

Congress provided a civil award of "statutory damages" in private enforcement cases, such as this one, as a means of punishing EFTA violations and deterring future would-be violators from violating the law. The Court should impose the full amount of statutory penalties to ensure that the Congressional command is fulfilled. Anything less, and the lending industry may interpret the Court's ruling as a "green light" to engage in similar violations of the EFTA, undermining compliance with the statute.

The EFTA authorizes the Court to make an award of actual damages, statutory damages, and attorney's fees and costs against CashCall:

> Except as otherwise provided by this section and section 1693h of this title, any person who fails to comply with any provision of this title with respect to any consumer, except for an error resolved in accordance with section 1693f of this title, is liable to such consumer in an amount equal to <u>the sum of</u> —
>
> (1) <u>any actual damage</u> sustained by such consumer as a result of such failure;
>
> (2)(A) in the case of an individual action, an amount not less than $100 nor greater than $1,000; or
>
> (B) in the case of class action, such amount as the court may allow, except that (i) as to each member of the class no minimum recovery shall be applicable, and (ii) <u>the total recovery under this subparagraph in any class action or series of class actions arising out of the same failure to comply by the same person shall not be more than the lesser of $500,000 or 1 per centum of the net worth of the defendant</u>; and
>
> (3) in the case of any successful action to enforce the foregoing liability, the costs of the action, together with a reasonable attorney's fee as determined by the court.

15 U.S.C. § 1693m(a) (emphasis added).

Congress passed the EFTA a year after it enacted the Fair Debt Collection Practices Act (FDCPA) in 1977, using the identical statutory language in the "civil liability" provision of the EFTA that it had used in the FDCPA the year before. <u>Compare</u> 15 U.S.C. § 1693m (EFTA) <u>with</u> 15 U.S.C. § 1692k (FDCPA). Cases interpreting the language of the FDCPA civil liability provision are, therefore, authoritative in interpreting the identical language in the EFTA.

The rule of "in pari materia" – giving the same meaning to the same or similar language in different statutes – applies to the identical "civil liability" provisions of both EFTA and the FDCPA:

> It is assumed that whenever the legislature enacts a provision it has in mind previous statutes relating to the same subject matter. In the absence of any express repeal or amendment, the new provision is presumed in accord with the legislative policy embodied in those prior statutes. Thus, they should all be construed together.

2B N. Singer, STATUTES AND STATUTORY CONSTRUCTION (6th Ed. 2000) § 51.02 at pp. 175-76 ("SINGER").

The U.S. Supreme Court has adopted this canon of construction:

> The rule of in pari materia—like any canon of statutory construction—is a reflection of practical experience in the interpretation of statutes: a legislative body generally uses a particular word with a consistent meaning in a given context. Thus, for example, a 'later act can . . . be regarded as a legislative interpretation of (an) earlier act . . . in the sense that it aids in ascertaining the meaning of the words as used in their contemporary setting,' and 'is therefore entitled to great weight in resolving any ambiguities and doubts.'

Erlenbaugh v. U. S., 409 U.S. 239, 243-44 (1972), cited in National Ass'n of Home Builders v. San Joaquin Valley Unified Air Pollution Control Dist., 627 F.3d 730, 735 (9th Cir. 2010) ("recognizing in pari materia as a logical and well established canon of statutory construction)".)

Because Congress incorporated the FDCPA civil liability provision in the EFTA, judicial interpretation of the FDCPA provides compelling guidance for the Court in this case.

Congress intended private enforcement of the EFTA, like the FDCPA, to be the primary enforcement mechanism in the law and encouraged aggrieved individuals to file suits as private attorneys general. "Though the Federal Trade Commission ("FTC") is empowered to enforce the FDCPA, 15 U.S.C. § 1692l, Congress encouraged private enforcement by permitting aggrieved individuals to bring suit as private attorneys general." Gonzales v. Arrow Financial Services, LLC, 660 F.3d 1055, 1061 (9th Cir. 2011), citing Camacho v. Bridgeport Fin., Inc., 523 F.3d 973, 978 (9th Cir. 2008).

"The FDCPA is a consumer protection statute and was intended to permit, even encourage, attorneys [like Plaintiffs' Class counsel] to act as private attorney generals to pursue FDCPA claims." Evon v. Law Offices of Sidney Mickell, 688 F.3d 1015, 1031 (9th Cir. 2012). "[B]y making available to prevailing consumers both statutory damages and attorneys' fees, Congress 'clearly intended that private enforcement actions would be the primary enforcement tool of the [FDCPA].'" Tourgeman v. Collins Financial Services, Inc., 755 F.3d 1109, 1118 (9th

Cir. 2014), quoting Baker v. G.C. Servs. Corp., 677 F. 2d 775, 780– 81 (9th Cir. 1982).

The touchstone of an award of statutory damages is deterrence. “Statutory damages under the FDCPA are intended to “deter violations by imposing a cost on the defendant even if his misconduct imposed no cost on the plaintiff.” Gonzales, at 1067. Accordingly, statutory damages do not require any showing of actual harm. Tourgeman, at 1117-1118. As such, statutory damages are not tied in any way to actual losses suffered. Gonzales, at 1068.

These principles apply here and should guide the Court in determining the amount of the statutory damages award.

### B. The Court Should Award the Maximum Amount of $500,000 in Favor of the Class.

The EFTA provides that, in a class action, the award of statutory damages cannot exceed “the lesser of $500,000 or 1 per centum of the net worth of the defendant.” 15 U.S.C. § 1693m(a). The parties have stipulated that one per cent of CashCall’s net worth exceeds $500,000. Therefore, this Court may award Class-wide statutory damages up to $500,000.

Title 15 U.S.C. § 1693m(b) states four factors the Court is to consider in awarding class-wide statutory damages:

> In determining the amount of liability in any action under subsection (a), the court shall consider, among other relevant factors …. (2) in any class action under subsection (a)(2)(B), the frequency and persistence of noncompliance, the nature of such noncompliance, the resources of the defendant, the number of persons adversely affected, and the extent to which the noncompliance was intentional.

Here, all four statutory factors militate in favor of an award of the maximum amount, $500,000, against CashCall.

#### 1. CashCall’s Violations Were Frequent and Persistent

CashCall’s violations were not occasional, accidental, or sporadic. CashCall’s violations were systematic, universal, and affected nearly 100,000 borrowers in the Conditioning Class alone, and thousands of other CashCall borrowers who are not in the Conditioning Class. CashCall’s violations affected 93,183 borrowers in the Conditioning Class and 96,588 different loans during the Class period (the number of borrowers is slightly larger because some borrowers took out more than one loan). Therefore, on average over the five-year Class period, CashCall

violated section 1693k(1) approximately 20,000 times per year for five years, or more than 50 times a day, just as to Members of the Class.

With the passage of the EFTA, Congress had forbidden even a single violation and has provided for minimum statutory damages in individual cases of $100. 15 U.S.C. § 1693m(2)(a) (requiring statutory damages in "an amount not less than $100 nor greater than $1,000" in an individual action). If applied on an individual basis to each loan covered by the Class, this provision would yield a $9.6 million penalty. Congress, however, saw fit to protect defendants against such large awards by capping them at $500,000.

The Court should award $500,000 in statutory damages against CashCall to let other lenders know that persistently and systematically requiring EFTs on widely available loans has the Congressionally intended consequences. In light of CashCall's 50 violations per day for five years, the Court should award the full statutory damage amount to deter violations and uphold the integrity of EFTA enforcement.

The persistence of CashCall's violations is also shown by the fact that CashCall continued the practice until at least November 2011, more than two years after the Court denied CashCall's motion to dismiss the Conditioning Claims in June 2009. (Plaintiffs' Trial Ex. 17 at p. 4.) Further, CashCall fought, tried, and lost a case brought by the State of West Virginia on EFTA conditioning liability in 2012. (Plaintiffs' Trial Ex. 18 at pp. 17-20.)

**2. CashCall's Violations Adversely Affected a Large Number Of Persons.**

Although the factor of the number of the persons adversely affected is also included in the frequency and persistency factor, it has independent significance: sheer volume. In this case, there is not only frequency (50 violations per day) and persistence (more than five years), there is also the sheer scale of the violations: 96,588 borrowers in the Class were affected.

This figure does not include borrowers who are not in the Class whose loans CashCall also illegally conditioned on payment by automatic EFTs. The Court limited the Class to the five-year period from March 13, 2006 through July 10, 2011, when CashCall changed its Loan Agreement to include an arbitration clause. (Dkt. 128 at p. 2; Dkt. 130.) The 95,588 borrowers

in the Class do not include borrowers whose loans were prior to March 13, 2006, which the Court has ruled are time-barred under the one-year EFTA statute of limitations. (Dkt. 127 at pp. 4-6.) Even during the Class period, some CashCall borrowers were not charged an NSF fee and are not members of the Class for that reason.

CashCall made a total of 155,147 consumer loans to 135,176 borrowers during the Class period. CashCall required EFT payments on all of these loans. This volume reinforces the reasonableness and appropriateness of the maximum award.

**3. The Nature of CashCall's Noncompliance; CashCall's Violations Were Intentional and Part and Parcel of Its Subprime Lending Business Model.**

CashCall's conditioning requirement was strategic and central to its business model of making subprime loans to high-risk borrowers. Plaintiffs filed this case in June 2008, challenging the conditioning practice as an EFTA violation. For six years, CashCall aggressively fought the Conditioning Claims on motions to dismiss, class certification, and summary judgment. If the conditioning violation is as trivial, "technical," or unworthy of any significant penalty as CashCall insists, why has CashCall been so persistent and intransigent in defending its conditioning practices and intractable to change them?

The Court will find the answer in CashCall's own summary judgment papers on the Loan Unconscionability Claim. (Plaintiffs' Trial Ex. 19 at pp. 3-5.) CashCall is in the business of making high-risk loans to subprime borrowers. According to CashCall, CashCall occupies a market "niche," providing "credit that other lenders may not have been willing to extend," "to borrowers with poor credit histories" whose "prior credit problems, including bankruptcies and defaults, limited their credit options." (Id. at 3:14-15; 4:24-5:1.) CashCall's default rate on its loans consistently stayed between 35% and 45% for the $2,600 loan product since inception in 2004. (Plaintiffs' Trial Ex. 20 at p. 2; see also Ex. 11 at pp. 6, 7, 10-12.)

As of December 31, 2014, the total amount of NSF fees paid by Class Members through December 31, 2014 was $2,406,182.60. Based on $15 per NSF fee, this means that CashCall collected NSF fees over 160,000 times where Class Members did not have sufficient funds in their bank accounts to make their loan installment payments. This does not even include the NSF

instances where CashCall charged but did not collect an NSF fee.

Collection risk is a paramount concern for CashCall. Mandatory EFTs enable CashCall to efficiently and inexpensively "sweep" customer accounts to collect monthly payments. Thus, CashCall has instructed loan service agents to strongly encourage customers to stay on auto debit (EFT):

> ACH [i.e., EFT] is the primary and preferred method for CashCall customer loan payments. It is the default payment option on all newly funded loans. Maintaining and/or returning customers to active, timely ACH status is an ongoing, measurable objective for all CashCall loan servicing personnel.

(Plaintiffs' Trial Ex. 4 at p. 7.) CashCall has also advertised its high percentage of borrowers who pay via EFT to investors. (Plaintiffs' Trial Ex. 5 at p. 026068; Ex. 6 at 025860; Ex. 7 at 026141.)

CashCall's conditioning violations are part and parcel of CashCall's model of high risk lending to borrowers who can scarcely afford these loans, if they can afford them at all. Thus, the nature of CashCall's violations militates strongly in favor of the maximum statutory penalty.

**4. CashCall's Resources Justify the Maximum Award.**

CashCall is not a minor player. The penalty should be calculated to effectively deter further violations, not to be easily brushed off as a vindication of its practices. This Court has consistently validated the Conditioning Claims by denying CashCall's Motion to Dismiss, certifying the Conditioning Class, denying CashCall's Summary Judgment Motions on the Conditioning Claim, and granting plaintiffs partial summary judgment on conditioning liability. The statutory damages award should be commensurate with the importance of the claims and this substantial litigation history.

CashCall's net worth as of December 2011 exceeded $101 million according to the last financial statement CashCall produced in discovery. (Plaintiffs' Trial Ex. 2.) Plaintiffs will show at trial that CashCall's net worth has increased substantially since 2011 as the economy has recovered and CashCall has aggressively moved forward in the lending market.

A $500,000 award amounts to one half of one percent of CashCall's net worth in 2011. Even the maximum statutory damages award would therefore serve as a less than adequate

penalty for a company of CashCall's financial resources. Given the statutory limitation, the Court should award the maximum to achieve the Congressionally intended deterrent value.

**C. The Court Should Award NSF Fees as Actual Damages under the EFTA Because CashCall's Violation in Conditioning Loans on EFTs was a "Substantial Factor" in Causing Borrowers to Incur the NSF Fees.**

The EFTA authorizes the recovery of "any actual damage sustained by such consumer as a result of such failure." 15 U.S.C. § 1693m(a)(1) (emphasis added).

Under the EFTA, statutory damages and actual damages are cumulative, not alternative, remedies. Section 1693m(a) provides that CashCall is liable to the Class "in an amount equal to the sum of" actual damages under subdivision (a)(1) and statutory damages under subdivision (a)(2).

CashCall moved for summary judgment on the ground that plaintiffs could not establish that CashCall's violation of Section 1693k(1) caused every instance in which CashCall charged NSF fees. The Court denied that motion, finding a triable issue of fact. (Dkt. 220 at pp. 17-18.)

The EFTA "civil liability" provision is substantially identical to the FDCPA's, which likewise allows plaintiffs to recover "any actual damage sustained by such person as a result of such failure." 15 U.S.C. § 1692k(a)(1). The FDCPA is again compelling authority for the interpretation of section 1693m(a)(1).

To show that damages are "sustained … as a result of such failure" under the FDCPA, a plaintiff need only show that the statutory violation was a significant factor in, not the sole cause of, the loss. In McCollough v. Johnson, Rodenburg & Lauinger LLC, 637 F.3d 939, 957-58 (9th Cir. 2011), plaintiff suffered from pre-existing head injury, personality disorders, and PTSD. The Ninth Circuit affirmed an award of actual damages under the FDCPA, holding that the debt collector's violation "was a significant stress factor in McCollough's life," warranting the jury's emotional distress award under the FDCPA. The debt collector's violation was not the sole cause of plaintiff's emotional distress — he had a long prior history of mental problems. The proof that the FDCPA violation was a "significant stress factor," however, was sufficient to support the jury damage award for emotional distress.

The courts have applied the "substantial factor" causation test to actual damages under federal and state consumer protection laws, rejecting any requirement that the violation be the sole or exclusive cause of actual damages:

- Fair Credit Reporting Act (substantial factor test applies to "any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000"): Pourfard v. Equifax Information Services LLC, 2010 WL 55446 at *5 (D. Or. Jan. 2, 2010); Abdelfattah v. Carrington Mortgage Services LLC, 2013 WL 495358 at *4 (N.D. Cal. Feb. 7, 2013) (Whyte, J.); Barrepski v. Capital One Bank (USA) N.A., 2014 WL 935983 at *7 (D. Mass. Mar. 7, 2014).
- RICO (substantial factor test applies; "any person injured in his business or property" as a result of a RICO violation may bring a civil RICO suit): Jenkins v. Miller, 983 F.Supp.2d 423, 453 (D. Vt. 2013) .
- See also Doe 1 v. AOL, LLC, 719 F.Supp.2d 1102, 1113 (N.D. Cal. 2010) (substantial factor test applies to California's Consumer Legal Remedies Act (CLRA); "a claim may be brought by a consumer who has suffered injury 'as a result of the use or employment of a proscribed method, act, or practice'") (Armstrong, J.); State ex rel. Wilson v. Superior Court, 227 Cal. App. 4th 579, 605-06 (2014)("California has definitively adopted the substantial factor test of the Restatement Second of Torts for cause-in-fact determinations", quoting Viner v. Sweet, 30 Cal.4th 1232, 1239 (2003).

"[W]hen multiple forces operate independently, each of which is sufficient by itself to bring about the harm, a force that is a substantial factor in bringing about the harm may be found to have caused the harm." Wilson, 30 Cal. 4th at 605-06. Under the Restatement Second of Torts, section 432, the "but-for" test of causation generally applies, requiring that the loss would not have occurred "but for" the defendant's conduct. However, the "but-for" test does not apply if "two forces are actively operating ... and each of itself is sufficient to bring about harm to another"; in such circumstances, the actor's conduct "may be found to be a substantial factor" in bringing about the result, without proof that the result would not have occurred but for the actor's

conduct. RESTATEMENT SECOND OF TORTS § 432(2).

Because the "substantial factor" causation standard applies — and not the standard that the conditioning violation be the sole and exclusive cause of the loss — the Court should award Class-wide actual damages for all NSF fees incurred up to the point when a borrower opted out of payment by NSF.

Had borrowers been making payments by any method other than automatic EFT, they would not have incurred the NSF fees CashCall charged to their accounts as a result of an unsuccessful automatic EFT payment. A borrower who paid by check, money order, online payment, or other non-EFT method would only incur an NSF fee if the borrower took an affirmative step to make a payment and the payment was unsuccessful. By contrast, a borrower on automatic EFT payments would incur an NSF fee without any such affirmative action, simply when CashCall automatically processed an unsuccessful EFT request against the borrower's bank account.

CashCall's conditioning violations were sufficient to cause the imposition of the NSF fees, even if other causal factors were also operating. The violations were therefore a substantial factor in causing Class Members to pay NSF fees. CashCall imposed the EFT authorization that enabled CashCall to electronically sweep the borrowers' bank accounts directly for payment. Without the electronic sweep, there would have been no charge to their accounts and no NSF fees.

Class Members had many reasons for not having enough money in their accounts when CashCall attempted to collect on its electronic sweeps of borrower accounts. That there was an insufficient balance in their accounts was assuredly a contributing factor — just as plaintiff's pre-existing head injury, personality disorders, and PTSD were in McCullough. But the Class Members would not have been charged an NSF fee if CashCall had not conditioned their loans on EFT payments. Conditioning was a substantial contributing factor in the loss, therefore, and warrants an award of statutory damages under § 1692m(a)(1).

**D. The Court Should Alternatively Award Restitution Under the UCL**

Plaintiffs seek restitution of the NSF fees under the California Unfair Competition Law,

Cal. Bus. & Prof. Code §§ 17200 et seq. ("UCL") as an alternative to actual damages.

Plaintiffs have predicated their "unlawful prong" claim under the UCL on CashCall's violation of 15 U.S.C. § 1693k(1). The "unlawful prong" of the UCL "'borrows' violations of other laws by making them independently actionable as unfair competitive practices." Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., 20 Cal. 4th 163, 180 (1999). Violations of other laws, when committed pursuant to business activity, become independently actionable under the UCL and subject to its remedies. People ex rel. Kennedy v. Beaumont Investment, Ltd., 111 Cal. App. 4th 102, 120 (2003). Virtually any law can serve as a predicate for a § 17200 action; the law may be "civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made." People v. McCall, 25 Cal.3d 626, 632 (1979).

Section 17203 of the UCL provides, "The court may make such orders or judgments … as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." (Emphasis added.) The California Supreme Court has long interpreted this statute, which is the statutory authority for awarding restitution, as not requiring any proof of causation:

> Contrary to defendant's assertion, section 17535 [the parallel section to section 17203 containing substantially the same language under the False Advertising Law] authorizes restitution not only of any money which has been acquired by means of an illegal practice, but further, permits an order of restitution of any money which a trial court finds "*may have been* acquired by means of any . . . [illegal] practice." (Italics added.) This language, we believe, is unquestionably broad enough to authorize a trial court to order restitution without requiring the often impossible showing of the individual's lack of knowledge of the fraudulent practice in each transaction. Hence defendant's argument clearly fails to defeat the class action.

(Fletcher v. Security Pacific National Bank, 23 Cal.3d 442, 451 (1979), italics in original, underscoring added.) Plaintiff need only prove that the defendant violated the statute and received money from consumers in the transaction. In the oft-quoted formulation, the Court in Fletcher stated:

> The general equitable principles underlying section 17535 as well as its express language arm the trial court with the cleansing power to order restitution to effect complete justice. Accordingly the statute clearly authorizes a trial court to order restitution in the absence of proof of lack of knowledge in order to deter future violations of the unfair trade practice statute and to foreclose retention by the

violator of its ill-gotten gains.

(Id. at 449, emphasis added.) Fletcher's holding that no showing of loss or injury is needed to support an award of class-wide restitution "has led courts repeatedly and consistently to hold that relief under the UCL is available without individualized proof of deception, reliance and injury." In Re Tobacco II Cases, 46 Cal.4th 298, 315-24 (2009).

The California Supreme Court has held that Proposition 64 did not overrule Fletcher. Tobacco II, 46 Cal. 4th at 320. Proposition 64's standing requirement that private UCL actions may only be brought "by a person who has suffered injury in fact and has lost money or property as a result of the unfair competition" applies only to class representatives, and does not apply to class as a whole. Id. at 324 ("We therefore conclude that Proposition 64 was not intended to, and does not, impose § 17204's standing requirements on absent class members in a UCL class action where class requirements have otherwise been found to exist.")

Therefore, under Fletcher and § 17203, this Court has power to award restitution whenever money "may have been acquired by means of any . . . [illegal] practice," even in the absence of proof of class-wide traditional tort-style proximate causation. Here, it is enough that there is sufficient nexus between CashCall's conditioning violation and the imposition of the NSF fees to support this Court in finding that the NSF fees "may have been acquired by means of" the conditioning violation and to award class-wide restitution.

The Class Members' payments of NSF fees to CashCall qualify for restitution under section 17203. The California Supreme Court has defined restitution for purposes of section 17203 as the "return [of] money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person." Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1144-45 (2003). "The object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest." Id. at 1149.

Thus, Class Members were entitled to recover the undisclosed service charges they paid an insurance exchange in violation of statutory insurance disclosure requirements as restitution under section 17203. Troyk v. Farmers Group, Inc., 171 Cal. App. 4th 1305, 1338 (2009); see

also Nelson v. Pearson Ford Co., 186 Cal. App. 4th 983, 1016 (2010) (class members were entitled to restitution of interest they paid to a car dealer who backdated their purchase contracts to recover "pre-consummation interest").

Here, Class Members paid NSF fees to CashCall. They likewise meet the standard for restitution under Korea Supply.

CONCLUSION

CashCall's practice of requiring Class Members to agree to EFT payments violated the law and deprived them of the choice Congress entitled them to make. CashCall made it for them. Plaintiffs respectfully request that the Court, having previously found that CashCall violated section 1693k(1), vindicate the EFTA by awarding the Class full monetary relief.

Based on the guiding factors listed in the EFTA, an award of the $500,000 maximum in statutory damages is appropriate to deter future violations of the EFTA and uphold the integrity of EFTA enforcement.

Pursuant to 15 U.S.C. § 1693m(a)(1), the Court should award Kemply and each Member of the Class actual damages as a result of CashCall's violations of section 1693k(1) in the amount of NSF fees he or she actually paid on unsuccessful automatic EFT payments before an original EFT authorization may have been canceled.

Pursuant to Business & Profession Code section 17203, the Court should order that CashCall pay restitution to Kemply and each Member of the Class in the amount of the total NSF fees the Class Member actually paid on unsuccessful automatic EFT payments before an original EFT authorization may have been canceled.

The Court should award prejudgment interest on all monetary amounts at the rate of seven per cent per annum from the date of payment of the NSF fee until the date of Judgment. Uzyel v. Kadisha, 188 Cal. App. 4th 866, 921 (2010) ("The legal rate of interest on an obligation before the entry of judgment is 7 percent, unless otherwise specified by statute") (citing authority).

The Court should order CashCall to reverse all NSF charges that CashCall charged but has not collected on unsuccessful automatic EFT payments before an original EFT authorization may have been canceled.

The Court should set a post-trial Status Conference to resolve any issues as to the form of Judgment. The procedure for addressing plaintiffs' counsel's claims for award of attorney's fees and costs under 15 U.S.C. § 1693(a)(3) and under California law, and all other remaining issues in the action should be addressed at that time.

Respectfully submitted,

DATED: April 6, 2015

/s/ Arthur D. Levy
Arthur D. Levy #95659

LAW OFFICE OF ARTHUR D. LEVY
445 Bush Street, Sixth Floor
San Francisco, CA 94108
Telephone:   (415) 702-4550

James C. Sturdevant, SB# 94551
THE STURDEVANT LAW FIRM
354 Pine Street, Fourth Floor
San Francisco, CA 94104
Telephone:   (415) 477-2410

Steven M. Tindall, SB# 187862
Jessica Riggin, SB# 281712
RUKIN HYLAND DORIA & TINDALL LLP
100 Pine Street, Suite 2150
San Francisco, CA 94111
Telephone:   (415) 421-1800

Attorneys for Plaintiffs
EDUARDO DE LA TORRE et al.