United States District Court
Northern District of California

1

2

3

4                    UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7   LORI KEMPLY, et al.,                Case No.  08-cv-03174-MEJ

            Plaintiffs,
8                                       FINDINGS OF FACT AND
       v.                               CONCLUSIONS OF LAW
9
10  CASHCALL, INC.,

            Defendant.
11

12

13                         INTRODUCTION

14       In this certified class action, the Court previously found that Defendant CashCall, Inc.

15  ("CashCall") violated the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693k(1),[1] when

16  it conditioned its extension of credit on borrowers' repayment by means of preauthorized

17  electronic funds transfers ("EFTs").  Order re: Mots. for Summ. J. ("MSJ Order") at 16-17, Dkt.

18  No. 220.  In doing so, the Court also found that CashCall violated California's Unfair Competition

19  Law ("UCL"), Business and Professions Code section 17200,[2] by engaging in an unlawful

20  business practice.  *Id.* at 17.  This Order decides what relief class members are entitled to as a

21  result of CashCall's violations.  For the reasons set forth in this Order, the Court finds CashCall

22  must pay a statutory penalty of $500,000 for its EFTA violation; however, Plaintiffs[3] otherwise

23

24  [1] Under the EFTA, "[n]o person may . . . condition the extension of credit to a consumer on such
    consumer's repayment by means of preauthorized electronic fund transfers."  15 U.S.C. §
25  1693k(1).

26  [2] Under the UCL, "unfair competition" includes "any unlawful, unfair or fraudulent business act or
    practice[.]"  Cal. Bus. & Prof. Code § 17200.  Accordingly, courts often refer to the "three prongs"
27  of the UCL.

28  [3] The Court interchangeably refers to Plaintiffs and the class.  There is only one class
    representative for the "Conditioning Class" (defined below): Plaintiff Lori Kemply.

failed to show they are entitled to actual damages under the EFTA.  Additionally, as Plaintiffs failed to prove that Class Representative Lori Kemply has standing to pursue a representative action under the UCL, the Court may not award restitution to the class under the UCL.

## PROCEDURAL HISTORY

Plaintiffs commenced this action in July 2008, alleging among other things, violations of the EFTA and the UCL based on CashCall's practice of conditioning the extension of credit on repayment by preauthorized EFTs.  Compl. ¶¶ 38-48, Dkt. No. 1-2.  Plaintiffs filed the operative Fourth Amendment Complaint in February 2010, continuing to allege that CashCall's conditioning practices violated the EFTA and UCL.  Fourth Am. Compl. ¶¶ 41-53, 95-98, Dkt. No. 54.

On November 15, 2011, the Court granted Plaintiffs class certification as to the "Conditioning Class" (Class Cert. Order, Dkt. No. 100), which was later limited to "[a]ll individuals who, while residing in California, borrowed money from CashCall, Inc. for personal, family, or household use on or after March 13, 2006 through July 10, 2011 and were charged an NSF fee."  Order Approving Class Notice Plan, Dkt. No. 130.[4]  The "Class Period" is thus between March 13, 2006 through July 10, 2011.  Notice was sent out to class members on August 31, 2012 via email and again on October 3, 2012 for those class members who only had mailing addresses or whose email notices came back as undeliverable.  Status Report re: Clarification of the Record at 3, Dkt. No. 308 (citing Declaration of Jeffrey Gyomber ¶¶ 9-10, Dkt. No. 308-1); *see also* March 3, 2013 Status Report at 1, Dkt. No. 136.  The Court additionally ordered supplemental notice to be sent to an additional 13,541 Conditioning Class members who were improperly excluded from the original class list.  Order re: Suppl. Notice, Dkt. No. 144. Supplemental notice was sent via email to those class members on August 9, 2013, and again on September 6, 2013 to those class members who only had mailing addresses or whose email notices came back as undeliverable.  Gyomber Decl. ¶¶ 13-19; Exs. A-D (respectively, copies of the Email Notice, Postcard Notice, Long-Form Notice, and Exclusion Request Form).  As indicated,

---

[4] The Court recently issued an order confirming this class definition under Federal Rule of Civil Procedure 23.  *See* Dkt. No. 311.

United States District Court
Northern District of California

the Court granted summary judgment in favor of Plaintiffs as to their EFTA and UCL claims on

July 14, 2014.  MSJ Order at 16-17, 36.

The Court held a bench trial on September 8-9, 2015 on the issue of whether Plaintiffs are

entitled to statutory and/or actual damages under the EFTA and/or restitution under the UCL.  *See*

Sept. 8, 2015 Trial Transcript ("Sept. 8 Tr."), Dkt. No. 296; Sept. 9, 2015 Trial Transcript ("Sept.

9 Tr."), Dkt. No. 298; Undisputed Facts ("UF") No. 7, Dkt. No. 281 (submitted as part of the Joint

Pretrial Statement).  During trial, Plaintiffs called two adverse witnesses: (1) CashCall Chief

Executive Officer Delbert Meeks and (2) CashCall Principal Architect Ethan Post.  Sept. 8 Tr.

44:4-5; 112:23-24.  CashCall also called two witnesses: (1) former CashCall employee Sean

Bennett and (2) Dr. Bruce Carlin, a consumer finance expert.  Sept. 9 Tr. 181:24-25; 182:9;

251:24-25.  Following trial, the Court granted the parties leave to file post-trial briefs and

proposed findings of fact and conclusions of law, which they did.  Def.'s Post-Trial Br., Dkt. No.

301; Def.'s Proposed Findings of Facts & Conclusions of Law ("Def.'s F&C"), Dkt. No. 302; Pls.'

Post-Trial Br., Dkt. No. 304; Pls.' Proposed Findings of Facts & Conclusions of Law ("Pls.'

F&C"), Dkt. No. 303.

Having carefully considered the testimony at trial, the trial exhibits, the parties' written

arguments, and the relevant legal authority, the Court renders the following Findings of Fact and

Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a)(1).[5]

## FINDINGS OF FACT

**A.    CashCall's Business**

1.      CashCall is a California corporation licensed under the California Finance Lenders

Law, Cal. Fin. Code §§ 2200 et seq.  UF No. 28.

2.      CashCall is engaged in the business of making unsecured personal loans to

consumers who typically do not qualify for traditional bank lending due to poor credit histories.

Sept. 8 Tr. 46:12-25.

---

[5] "In an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court."  Fed. R. Civ. P. 52(a)(1).

United States District Court
Northern District of California

3.      CashCall borrowers typically have low credit scores and have had other past credit difficulties—such as bankruptcies, foreclosures and defaults on consumer loans—which make these borrowers higher credit risks.  Plaintiffs' Trial Exhibit ("Pls.' Ex.") 11 at 6 (CashCall's Answer to Interrog. No. 14), Dkt. No. 300-1 (list of Plaintiffs' Admitted Trial Exhibits[6]).

4.      CashCall's unsecured personal loans leave it vulnerable to borrower default.  Pls.' Ex. 11 at 6.

5.      CashCall processes thousands of monthly loan installment payments for collection every month.  Sept. 8 Tr. 63:11-21.

6.      One percent of CashCall's net worth exceeds $500,000 for purposes of 15 U.S.C. § 1693m.  UF No. 27.

**B.      CashCall's Conditioning Violation**

7.      During the Class Period, CashCall required borrowers to sign a four-page promissory note as part of its loan application process.  Def.'s F&C ¶ 4; Pls.' F&C ¶ 5; *see* Pls.' Ex. 1 (CashCall Promissory Note and Disclosure Statement).

8.      The promissory note contained an Electronic Funds Authorization and Disclosure ("EFT Authorization") that allowed CashCall to automatically withdraw loan payments directly from borrowers' bank accounts through preauthorized automatic electronic fund transfers.  Pls.' Ex. 1; UF No. 3.  CashCall also refers to EFTs as "Automatic clearinghouse payment, ACH payment."  Pls.' Ex. 4 (CashCall Loan Servicing Department: Policies & Procedures).

9.      CashCall's online loan application required borrowers to check a box to indicate their consent to the EFT Authorization.  Sept. 8 Tr. 59:10-12.  A copy of this EFT authorization is included below (excerpted from Pls.' Ex. 1; *see also* Declaration of Ethan Post, Dkt. No. 162).

//

//

//

---

[6] The parties' original exhibits are on file with the Clerk of Court.

4

**ELECTRONIC FUNDS AUTHORIZATION AND DISCLOSURE**

I hereby authorize CashCall to withdraw my scheduled loan payment from my checking account on or about the FIRST day of each month. I further authorize CashCall to adjust this withdrawal to reflect any additional fees, charges or credits to my account. I understand that CashCall will notify me 10 days prior to any given transfer if the amount to be transferred varies by more than $50 from my regular payment amount. I understand that this authorization and the services undertaken by CashCall in no way alters or lessens my obligations under the loan agreement. I understand that I can cancel this authorization at any time (including prior to my first payment due date) by sending written notification to CashCall. Cancellations must be received at least seven days prior to the applicable due date.

> ☑  **I UNDERSTAND CASHCALL'S PAYMENT COLLECTION POLICY AND AUTHORIZE ELECTRONIC DEBITS FROM MY BANK ACCOUNT.**

10.     If the borrower failed to check the box consenting to the EFT Authorization, a warning message would instruct the borrower to check the box before continuing.  Sept. 8 Tr. 118:13-119:8.

11.     CashCall CEO Delbert Meeks testified that borrowers could not obtain a loan from CashCall without signing the EFT Authorization.  *Id.* 89:20-23; UF No. 3.

12.     The promissory note stated that borrowers would be charged (1) a nonsufficient funds ("NSF") fee if any payments failed due to insufficient funds in their bank account and (2) a fee for late payments.  UF No. 4; Pls.' Ex. 1; Def.'s F&C ¶ 5; Pls.' F&C ¶ 12.

13.     The EFT Authorization also stated "I understand that I can cancel this authorization at any time (including prior to my first payment due date) by sending written notification to CashCall."  Pls.' Ex. 1 (excerpt above); Defendant's Trial Exhibits ("Def.'s Ex.") AP, Dkt. No. 300-2 (list of Defendant's Admitted Trial Exhibits).

14.     Dr. Bruce Carlin, a consumer finance expert, testified that the EFT Authorization clearly disclosed that the borrower was authorizing CashCall to make electronic withdrawals and could cancel the authorization at any time, and that CashCall would charge the borrower a fee if a payment was returned for nonsufficient funds.  Sept. 9 Tr. 265:2-266:6.

15.     CashCall made a total of 155,147 consumer loans to 135,176 California borrowers during the Class Period.  Def.'s Ex. AN; UF No. 8; Pls.' F&C ¶ 47; Def.'s F&C ¶ 37.

**C.     Borrowers' Post-Funding Interactions with CashCall**

16.     CashCall made a "welcome call" to each borrower after their loans were approved and funded.  Pls.' Ex. 3 at DEF 0281 (CashCall New-Hire Training Manual); Sept. 9 Tr. 186:23-187:6; 192:9-21.

17.     During the welcome call, CashCall reviewed the amount of the first payment with the borrower and informed him or her that the payment would be drafted via EFT.  Pls.' Ex. 4 at 16-17; Sept. 9 Tr. 196:17-21.

18.     Borrowers could also change the scheduled date of the EFT payment during the welcome call.  Pls.' Ex. 4 at 16-17; Sept. 9 Tr. 192:22-24.

19.     Dr. Carlin listened to recordings of welcome calls and opined that CashCall clearly disclosed information regarding EFTs during these calls to borrowers.  Sept. 9 Tr. 266:21-25.

20.     Several days prior to a borrower's scheduled EFT payment, CashCall emailed that borrower to remind him or her of the date and the amount of the upcoming EFT.  Pls.' Ex. 4 at 42; Def.'s Exs. G, M, X (reminder notices); Sept. 9 Tr. 196:7-21.

**D.     Nonsufficient Fund Fees**

21.     CashCall imposed a $15 NSF fee each time a payment was returned for insufficient funds.  Sept. 8 Tr. 116:18-19; *see also* UF No. 5.

22.     Former CashCall employee Mark Bennett testified that CashCall did not impose an NSF fee if a borrower had enough money in his or her account to cover the amount of a payment. Sept. 9 Tr. 248:9-11.

23.     CashCall accepted other forms of payment other than EFT, including personal check, certified check, MoneyGram, money order, credit card, and in-person cash payments.  Pls.' Ex. 4 at 84-87; Sept. 9 Tr. 184:24-185:13.

24.     CashCall imposed an NSF fee for all forms of payment that were returned for insufficient funds.  Sept. 8 Tr. 116:4-17.

25.     CashCall sent borrowers whose payments were returned due to insufficient funds an automated "NSF Notice," informing them that they would be assessed a $15 NSF fee.  Pls.' Ex. 4 at 42.

26.     CashCall treated all forms of payment equally and did not impose a penalty on borrowers who used other forms of payment rather than EFT.  Sept. 8 Tr. 131:17-25; Sept. 9 Tr. 186:1-3.

27.     Meeks testified that CashCall's $15 NSF fee is approximately the same amount the

6

banks charge CashCall when CashCall attempts to withdraw a payment from a borrower with insufficient funds.  Sept. 8 Tr. 102:5-14.

28.     Meeks testified that CashCall did not profit from the $15 NSF fee.  *Id.* 102:2-3.

29.     The Conditioning Class, defined as "[a]ll individuals who, while residing in California, borrowed money from CashCall, Inc. for personal, family, or household use on or after March 13, 2006 through July 10, 2011 and were charged an NSF fee" (*see* Dkt. Nos. 130, 311), consists of 93,183 borrowers who took out 96,588 loans during the Class Period.  UF Nos. 9-10.

30.     As of December 31, 2014, a total of 56,817 class members paid $2,373,458.53 in NSF fees due to "unsuccessful automatic EFT payments," i.e., a payment that was refused by the borrower's bank because there were insufficient funds in the account to cover the payment or the account was closed.  UF Nos. 12, 14.

31.     As of December 31, 2014, class members paid $2,128,654.65 in NSF fees due to unsuccessful automatic EFTs before cancelling the original EFT Authorization.  UF No. 16.

32.     CashCall charged class members NSF fees about 142,000 times.  Sept. 8 Tr. 142:3-7.

33.     NSF fees remain outstanding and uncollected for 37,343 of the class loans charged with such a fee.  *Id.* 138:3-14.

34.     A total of 39,194 class member loans did not incur an NSF fee during the first six months.  *Id.* 173:13-17.

35.     A total of 19,277 loans in the class did not incur an NSF fee during the first year.  *Id.*; UF No. 26.

**E.     Borrowers' Relationship with EFT Payment Method**

36.     Dr. Carlin opined that borrowers benefited from EFT payments, which allowed borrowers to conveniently make payments, helped them remember to make payments, and helped them avoid late penalties.  Sept. 9 Tr. 256:11; 262:4-263:7; 281:6-10.

37.     He testified that in his opinion, 70% to 80% of class members would have elected to use EFT payments over other forms of payments, and then clarified that it was his best estimate that north of 80% of people would have chosen to participate in EFT.  *Id.* 267:22-277:9.

38.     Dr. Carlin testified that a study by the Federal Reserve Bank of Boston regarding the use of EFTs revealed that 81% of people were using some sort of electronic means of making payments.  *Id.* 262:4-9.

39.     When CashCall removed the mandatory EFT Authorization from its promissory notes in November 2011, almost 98% of "CashCall borrowers" elected to pay by EFT as opposed to another method of payment.  Sept. 8 Tr. 168:15-169:15.  But this evidence only appears to consider the borrowers to whom CashCall ultimately made loans, excluding people to whom CashCall chose not to loan money.  *See id.*

40.     Certain CashCall borrowers testified (by deposition) that they preferred EFT payment and found it easier to use than some other methods of payment.  *See* Def.'s Discovery Excerpts,[7] Deposition of Johnny Cook 16:11-17; *id.*, Deposition of Arthur Vardanyan  23:7-13.

41.     Another CashCall borrower testified she "normally" preferred to "pay her own bills" and "[h]aving something automatically withdrawn is normally not [her] method of operation."  Pls.' Discovery Excerpts, Deposition of Tonye Niweigha, 67:25-68:16.

42.     Meeks and Bennett testified that borrowers could cancel the EFT Authorization at any point after their loans were funded by contacting CashCall in writing or over the telephone or by informing their banks that the EFT was no longer authorized.  Sept. 8 Tr. 89:24- 90:10; Sept. 9 Tr. 200:6-8.

43.     Non-delinquent borrowers could make a written or verbal request to change the date of their scheduled EFT payments.  *Id.* 193:7-194:6.

44.     CashCall's Policies and Procedures for its Loan Servicing Department state that "Customer Service Representatives play a key role in maintaining and/or returning customers to active, timely ACH status."  Pls.' Ex. 4 at 19.

45.     It further states "Representatives shall make every attempt to convince customers to maintain active ACH payment status.  Representatives shall probe to identify the reason the customer wants to change or cancel ACH status, then provide logical reasons why it would be in

---

[7] The parties provided Discovery Excerpts to be considered as part of the trial record.  *See* Pretrial Statement, Ex. C ("Joint List of Discovery Responses"), Dkt. No. 281.  Def.'s Discovery Excerpts are listed in Exhibit C on pages 3-4; Pls.' Discovery Excerpts are listed on pages 1-2.

the customer's best interests to maintain ACH status."  *Id.*

46.     Dr. Carlin testified that "status quo" bias exists when consumers remain in a certain default option and remain in that option because it is considered to be the path of least resistance. Sept. 9 Tr. 303:13-17; 304:23-306:24.

47.     Dr. Carlin explained status quo bias occurs when "people choose . . . not to act because of inertia."  *Id.* 304:23-305:6.  He explained that, for instance, a person who enrolls in a three-month free trial for a magazine subscription but fails to cancel the subscription at the end of the trial period may be operating under status quo bias.  *Id.* 305:13-22.

48.     Dr. Carlin testified that status quo bias did not exist among class members.  *Id.* 307:1-308:17.

49.     43,699 class members changed the scheduled date of their EFT payments.  UF No. 18; Def.'s Ex. AM (chart reflecting number of loans during class period).

50.     Dr. Carlin opined that the fact that 47% of class members changed the scheduled date of their EFT payments indicates class members understood they were making electronic payments and were actively involved.  Sept. 9 Tr. 268:20-23.

51.     As of December 31, 2014, 15,719 class members cancelled their EFT Authorizations for 15,795 loans.  UF No. 17; Sept. 9 Tr. 302:11-14.

52.     Dr. Carlin opined that the fact that 16% of class members cancelled their EFT Authorizations indicates the class members knew they could opt out of EFT payments.  Sept. 9 Tr. 268:13-16.

**F.     Class Representative: Lori Kemply[8]**

53.     On May 24, 2006, Class Representative Lori Kemply (formerly Lori Saysourivong) took out a CashCall loan for $2,525.00.  UF No. 1.

54.     From July through December 2006, Kemply made EFT loan payments without incurring NSF fees.  Def.'s Exs. AL (Timeline of Kemply's Loan), AR (chart of Kemply's fees before and after cancelling EFT Authorization)

---

[8] Although formerly there was another class representative in this action, Plaintiff Eduardo De La Torre, he is unable to represent the Conditioning Class as he took out a CashCall loan on February 16, 2006, which is outside the Class Period as defined in the class definition.  *See* UF No. 7.

United States District Court
Northern District of California

United States District Court
Northern District of California

55.     Between 2007 and 2010, Kemply incurred six NSF fees totaling $90.00.  UF No. 5; Pls.' F&C ¶ 16; Def.'s F&C ¶ 28.

56.     Kemply cancelled her EFT Authorization in January 2007.  Def.'s Ex. C (Cancellation Request); Pls.' F&C ¶ 72; Def.'s F&C ¶ 29.

57.     Kemply did not incur NSF fees during the time she was off EFTs, but she did incur late fees.  Pls.' F&C 74; Def.'s F&C ¶ 30; Def.'s Exs. AL, AR.

58.     Kemply reinstated her EFT Authorization in June 2008.  Def.'s F&C ¶ 31; Def.'s Exs. E, AL.

59.     Kemply incurred NSF fees after reinstating her EFT Authorization.  Def.'s Ex. AL; UF No. 5.

60.     Kemply also changed the date of her EFT payment.  Def.'s Exs. F, AL.

**G.     Benefits to CashCall**

61.     CashCall incurs fewer collection costs with EFT payments, compared to manual payments such as personal checks.  Sept. 8 Tr. 63:3-65:14.

62.     CashCall prefers EFT payments, as it is a "paperless" online lender and sought to reduce its costs.  *Id.* 61:1-3, 62:24-63:10; Def.'s F&C ¶ 6; Pls.' F&C ¶¶ 39-40.

63.     CashCall advertised to investors about its initial borrower enrollment in EFTs and its retention of borrowers in EFTs.  Sept. 8 Tr. 71:3-7, 74:18-75:3; Pls.' Ex. 5 at 11 (CashCall Company Overview presentation); Pls.' Ex. 6 at 40 (Deutsche Bank "pitch book" for potential CashCall investors).

64.     CashCall believed such statistics would be an attractive feature for CashCall's investors.  Sept. 8 Tr. 71:8-10.

65.     In 2006 and 2007, CashCall sought to raise money from Deutsche Bank Securities to fund new loans.  *Id.* 71:21-25, 72:1-2.

66.     Deutsche Bank Securities prepared a "pitch book" for potential investors which emphasized that CashCall borrowers were started on EFT payments, that 77% of borrowers remained on EFT payments after 6 months, and that 68% remained on EFT payments after 12 months.  *Id.* 72:3-8, 74:18-24; Pls.' Ex. 6 (pitch book).

United States District Court
Northern District of California

1    67.    In 2006 and 2007, CashCall raised $800 million through Deutsche Bank.  Sept. 8

2  Tr. 71:24-25, 72:1-2.

3                        **REQUEST FOR JUDICIAL NOTICE**

4        The Court previously took judicial notice of the legislative history of Title 15, United

5  States Code section 1693 through 1693r, the Electronic Fund Transfer Act by the United States

6  House of Representatives Bill No. 14279 of 1978 [H.R. 14279], enacted by Congress as Public

7  Law 95-630, on October 27, 1978, 92 United States Statutes 3641.  MSJ Order at 12.  CashCall

8  seeks to make that legislative history part of the trial record.  Def.'s Req. for Judicial Notice

9  ("RJN"), Dkt. No. 289.  As "[l]egislative history is properly a subject of judicial notice[,]" the

10  Court will take judicial notice of the legislative history of the EFTA pursuant to Federal Rule of

11  Evidence 201(b).  *Anderson v. Holder*, 673 F.3d 1089, 1094 n.1 (9th Cir. 2012); *Territory of*

12  *Alaska v. Am. Can Co.*, 358 U.S. 224, 226-27 (1959) (taking judicial notice of legislative history).

13                          **CONCLUSIONS OF LAW**

14        The following section addresses (1) Plaintiffs' claims for relief under the EFTA,

15  specifically whether CashCall must pay actual damages and/or a statutory penalty; and (2) whether

16  Plaintiffs may obtain restitution under the UCL.

17  **A.    Background of the EFTA**

18        In 1978 when Congress enacted the EFTA, "[e]lectronic banking [was] a new way by

19  means of computer technology to pay for goods and services instead of paying by cash, checks or

20  credit card."  124 Cong. Rec. 25,731 (1978), RJN, Dkt. No. 289-4 at 1.  Congress accordingly

21  recognized at the time that "[m]ost consumers are not aware of the risks they run in using EFT

22  services.  *Id.*  Congress thus enacted the EFTA "to provide a basic framework establishing the

23  rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer

24  systems" with the "primary objective of . . . the provision of individual consumer rights."  15

25  U.S.C. § 1963(b).  The Congressional Record indicates that, through the EFTA, Congress sought

26  to balance protecting consumers while at the same time "allow[ing] the orderly development of

27  EFT systems for the benefit of our banking system."  124 Cong. Rec. 25,735, RJN, Dkt. No. 289-4

28  at 5.  Members of Congress anticipated that "[o]nce the rules implementing EFT became a fixed

United States District Court
Northern District of California

1  matter, consumers would be less reluctant to use EFT because their rights would be protected" and

2  "[f]inancial institutions would have the benefit of knowing what the law is before investing in the

3  expensive technology of EFT."  124 Cong. Rec. 25,734, RJN, Dkt. No. 289-4 at 4.

4      One objective of the EFTA is to "insure that consumers are not forced to use EFT."  124

5  Cong. Rec. 25,733, RJN, Dkt. No. 289-4 at 3.  Under section 1693k, "no person may condition the

6  extension of credit to a consumer on such consumer's repayment by means of preauthorized

7  electronic fund transfers."  15 U.S.C. § 1693k(1).  With this provision, Congress sought to protect

8  consumers' ability to choose their payment method by prohibiting persons from conditioning the

9  extension of credit on EFT payments.  *See* 124 Cong. Rec. 25,735, RJN, Dkt. No. 289-4 at 5 ("As

10  with any technology, many consumers will choose not to change but to cling to their traditional

11  method of payment.  [Section 1693k(1) is] designed to insure that consumers have this right.").  In

12  other words, consumers should "use electronic fund services only out of voluntary choice, not by

13  force."  H.R. Rep. No. 95-1315, at 12 (1978), RJN, Dkt. No. 289-4 at 22.  The Committee on

14  Banking, Finance and Urban Affairs feared that, absent a prohibition against the compulsory use

15  of EFT, "institutions, creditors, or the Government might resort to a variety of ploys to coerce

16  consumers to use electronic fund transfer services" which "is not the way a free market should

17  develop a service."  *Id.*  Rather, "[i]f electronic fund transfers offer a cost efficient and convenient

18  service, consumers will seek it out."  *Id.*  This would "assure that EFT develops in an environment

19  of free choice for the consumer."  H.R. Rep. No. 95-1273, at 14 (1978); Dkt. No. 289-7 at 54.

20  Consequently, the EFTA ensures that consumers only automatically pay their bills if they opt in to

21  doing so.  *Okocha v. HSBC Bank USA, N.A.*, 2010 WL 5122614, at *2 (S.D.N.Y. Dec. 14, 2010)

22  (authored by Judge Marilyn Patel of the Northern District of California, sitting by designation)

23  (citing 15 U.S.C. §§ 1693e(a); 1693k(1)).

24      While some provisions of the EFTA have been heavily litigated[9] since its enactment,

25  _____

26  [9] For instance, there have been a number of lawsuits alleging violations of 15 U.S.C.
§ 1693b(d)(3), which concerns fee disclosures at automated teller machines ("ATMs").  *See, e.g.*,
*Clemmer v. Key Bank Nat'l Ass'n*, 539 F.3d 349, 353-55 (6th Cir. 2008) (interpreting notice

27  requirement of 15 U.S.C. § 1693b(d)); *Singer v. EIntelligence, Inc.*, 55 F. Supp. 3d 1043, 1049-53
(N.D. Ill. 2014) (determining who was an ATM operator for purposes of 15 U.S.C. § 1693b(d) and
considering bona fide error defense); *Cohen v. Capitol One, N.A.*, 921 F. Supp. 2d 107, 110-11

28  (S.D.N.Y. 2013) (finding, after bench trial, defendant established affirmative defense of bona fide

United States District Court
Northern District of California

1   courts have rarely dealt with cases involving the conditioning of loans on EFT payments.  Where

2   courts have addressed section 1693k, they have done so before or without analyzing damages.

3   *See, e.g.*, *Klopfenstein v. Fifth Third Bank*, 2015 WL 1468382, at *4-5 (S.D. Ohio March 30,

4   2015) (considering claim brought under 15 U.S.C. § 1693k(1) in motion to dismiss); *Pinkett v.*

5   *First Citizens Bank*, 2010 WL 1910520, at *6-7 (N.D. Ill. May 10, 2010) (same); *McCready v.*

6   *eBay, Inc.*, 2005 WL 6082528, at *5-7 (C.D. Ill. Feb. 4, 2005) (same); *Mitchem v. GFG Loan,*

7   *Inc.*, 2000 WL 294119, at *7-9 (N.D. Ill. Mar. 17, 2000) (same); *Mitchem v. Paycheck Advance*

8   *Express*, Inc., 2000 WL 419993, at *1 (N.D. Ill. Apr. 14, 2000) (same); *F.T.C. v. Payday Fin.*

9   *LLC*, 989 F. Supp. 2d 799, 811-13 (D.S.D. 2013) (considering claim brought under 15 U.S.C. §

10  1693k(1) in motion for summary judgment); *Small v. BOKF, N.A.*, 2014 WL 3906257, at *4-5 (D.

11  Col. Aug. 7, 2014) (same); *Okocha*, 2010 WL 5122614, at *1-3 (granting judgment as a matter of

12  law to the defendant for section 1693k claim).  Only one court seems to have addressed both

13  liability under section 1693k and assessed damages, but that court based its damages award on

14  state laws rather than the EFTA's damages provision, section 1693m.  *See CashCall, Inc. v.*

15  *Morrisey*, 2014 WL 2404300, at *4-5 (W. Va. May 30, 2014) (unpublished op.), *cert. denied sub*

16  *nom. CashCall, Inc. v. Morrissey*, 135 S. Ct. 2050 (2015).  Thus, to this Court's knowledge, it will

17  be the first court in the 37 years since the EFTA's enactment to apply the EFTA's civil damages

18  provision, section 1693m, for a violation of section 1693k.

19  **B.      Relief Available Under the EFTA**

20          Section 1693m of the EFTA provides for both actual damages and a statutory penalty.  15

21  U.S.C. § 1693m(a)(1)-(2).  The amount of the statutory penalty varies depending on whether the

22  case is an "individual action" or a "class action."  15 U.S.C. § 1693m(a)(2).  Accordingly, in the

23  class action context, the EFTA provides in relevant part:

24                  [A]ny person who fails to comply with any provision of this
                    subchapter with respect to any consumer . . . is liable to such
25                  consumer in an amount equal to the sum of--
                    (1) any actual damage sustained by such consumer as a result of
26                  such failure;
                    (2)(A) . . . .
27                  (B) in the case of a class action, such amount as the court may

28  ────────────────────────────────────────────────────
    error to claim asserted under 15 U.S.C. § 1693b(d)).

> allow, except that (i) as to each member of the class no minimum recovery shall be applicable, and (ii) the total recovery under this subparagraph in any class action or series of class actions arising out of the same failure to comply by the same person shall not be more than the lesser of $500,000 or 1 per centum of the net worth of the defendant[.]

15 U.S.C. § 1693m(a).  Plaintiffs seek both actual damages and the full statutory penalty.

       1.   <u>Actual Damages</u>

     The EFTA makes any person who fails to comply with the Act liable for "actual damage sustained by [a] consumer as a result of such failure." 15 U.S.C. § 1693m(a)(1).  Though the EFTA does not define "actual damages," they are generally "'[a]n amount awarded to a complainant to compensate for a proven injury or loss; damages that repay actual losses.'" *Vallies v. Sky Bank*, 591 F.3d 152, 157 (3d Cir. 2009) (quoting Black's Law Dictionary 445 (9th ed. 2009); alterations in original).  Plaintiffs seek actual damages in the form of the NSF fees "CashCall charged and collected from class members based on preauthorized EFTs from loan inception until such time as the borrower may have cancelled electronic payment authorization." Pls.' F&C at 1.  As of December 31, 2014, class members paid $2,128,654.65 in NSF fees due to unsuccessful automatic EFTs before cancelling their original EFT Authorizations.  UF No. 16.

     "When the law grants persons the right to compensation for injury from wrongful conduct, there must be some demonstrated connection, some link, between the injury sustained and the wrong alleged." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2522 (2013).  The EFTA does not explicitly define what it means by "as a result of" to assess causation for actual damages, and neither the Ninth Circuit nor any other Court of Appeals has weighed in on how to apply section 1693m for a violation of section 1693k.  Understandably, one of Plaintiffs' and CashCall's primary disputes concerns which causation standard applies to determine if Plaintiffs' NSF fees were caused "as a result of" CashCall's conditioning its loans on EFT payments.  Plaintiffs argue the conditioning is not required to be the sole and exclusive cause of class members' harm.  Pls.' Trial Br. at 11, Dkt. No. 285.  Instead, Plaintiffs contend the Court should apply the "substantial factor" standard, such that the conditioning need only be "a significant factor in, not the sole cause of, [class members'] loss." *Id.* at 9.  CashCall argues Plaintiffs must prove class members detrimentally relied on CashCall's loans and "could have obtained other loans that would not have

United States District Court
Northern District of California

resulted in any NSF fees." Def.'s Post-Trial Br. at 10.[10]

While, as noted, no court has considered how to apply section 1693m for a violation of section 1693k, in interpreting section 1693e(a) as it applies to section 1693m, the Ninth Circuit noted that "a plaintiff must show that the claimed actual damages were 'as a result of' the violation, that is, he must show a causal connection between the EFTA violation and the claimed actual damages." *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1026 (9th Cir. 2011), *abrogated on other grounds as recognized in Green v. Fed. Exp. Corp.*, 614 F. App'x 905, 906 (9th Cir. 2015). According to the Ninth Circuit, "[t]hat would at least require the establishment of 'a substantial nexus between the injury' and the statutory violation." *Id.* (quoting *Valladolid v. Pac. Operations Offshore, LLP*, 604 F.3d 1126, 1139 (9th Cir. 2010) ("We do not [] find that Congress intended to enact a simple 'but for' test in covering injuries that occur 'as the result of'" a violation of the Outer Continental Shelf Lands Act[;]" rather, "[t]o meet the [substantial nexus] standard, the claimant must show that the work performed directly furthers outer continental shelf operations and is in the regular course of such operations.") and citing *Brown v. Gardner*, 513 U.S. 115, 119 (1994) ("as a result of" language in 38 U.S.C. § 1151 imposes a "causal

_____
[10] CashCall urges the Court to utilize the detrimental reliance standard based on cases interpreting the EFTA's notice provisions. *See* Def.'s Trial Br. at 4, Dkt. No. 282. Courts considering the EFTA's notice provisions have often borrowed from case law interpreting the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601-1667f, to hold that, in order to recover actual damages in cases concerning the EFTA's disclosure and notice provisions, plaintiffs must establish detrimental reliance. *See, e.g., Voeks v. Pilot Travel Centers*, 560 F. Supp. 2d 718, 722 (E.D. Wis. 2008) (plaintiff sued ATM operator under section 1693b of the EFTA for imposing a fee on ATM consumers without providing an accurate notice on its ATM screen); *Brown v. Bank of Am., N.A.*, 457 F. Supp. 2d 82, 85-90 (D. Mass. 2006) (challenging adequacy of fee notices posted on ATMs under section 1693b of the EFTA); *Vallies*, 591 F.3d at 161 ("actual damages for violations of EFTA's 'notice' provisions, 15 U.S.C. § 1693b(d)(3)(B), which are analogous to violations of TILA disclosure provisions, require a showing of detrimental reliance.").

But to do so in this context would be "irrational." *See Lyon v. Chase Bank USA, N.A.*, 656 F.3d 877, 887 (9th Cir. 2011). As the Ninth Circuit noted in *Lyon*, a case concerning the Fair Credit Billing Act ("FCBA"), 15 U.S.C. §§ 1666-1666j (an addition to TILA), in some cases "there are simply no disclosure[s] or conduct . . . that [a plaintiff] could have relied upon." *Id.* (finding detrimental reliance standard inappropriate where the defendant-creditor violated the FCBA by failing to either "make appropriate corrections in the account of the obligor" or "send a written explanation or clarification to the obligor" after being timely notified of a billing dispute). Like *Lyon*, there are no facts in this case that support the "detrimental reliance" standard as being the appropriate causation standard. Simply put, there were no notices, disclosures, or conduct that class members could have relied on. Accordingly, the Court finds the detrimental reliance standard inappropriate in analyzing potential damages for violations of section 1693k.

15

connection")).

The Ninth Circuit did not elaborate much about how to apply the "substantial nexus" test for an EFTA violation.  In *Stearns*, the district court found that the defendant had violated the EFTA when it failed to follow the requirements of section 1693e(a), which requires that "[a] preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made."  *Stearns*, 655 F.3d at 1026 (citing 15 U.S.C. § 1693e(a)).  But under the substantial nexus test, the Ninth Circuit explained that "[f]or example, if a plaintiff fully intended to purchase merchandise or a service and to use a debit card, but the merchant or other seller obtained the transfer from the plaintiff's account without first obtaining a proper authorization, the plaintiff will, most likely, find it difficult or impossible to show actual damages measured by the amount removed from his account."  *Id.* at 1026-27.  "Logically, he would be hard pressed to show that the removal was caused by the authorization failure."  *Id.* at 1027.  *Stearns* thus indicates that under the "substantial nexus" test, where a plaintiff would likely have made the same decision that would have caused their same sought after "damages," that plaintiff will likely find it difficult to prove he or she is entitled to actual damages.

Albeit in a different context and interpreting a different statute, the Supreme Court affirmed the Ninth Circuit's "substantial nexus" test for assessing damages under the Outer Continental Shelf Lands Act, which extends the federal workers' compensation scheme established in the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq., to injuries "occurring as the result of operations conducted on the outer Continental Shelf" for the purpose of extracting natural resources from the shelf.  43 U.S.C. § 1333(b).  In affirming, the Supreme Court explained that "[w]e understand the Ninth Circuit's [substantial nexus] test to require the injured employee to establish a significant causal link between the injury that he suffered and his employer's on-[outer continental shelf] operations conducted for the purpose of extracting natural resources from the [outer continental shelf]."  *Pac. Operators Offshore, LLP v. Valladolid*, 132 S. Ct. 680, 691 (2012).  The Supreme Court thus indicated that a plaintiff attempting to prove a "substantial nexus" between the violation and their injury must show more

16

than "but-for" causation, because mere "but-for" causation would extend liability too far when taken to its logical conclusion; rather, courts should only focus on injuries that have a significant causal link with the defendant's conduct.  *Id.* at 690-91.

The cases applying the "substantial nexus" test suggest that, at a minimum, if a plaintiff cannot prove "but-for" causation, he or she will consequently be unable to prove causation under the "substantial nexus" test.  Applying the "but-for" causation standard to statutes using the language "as result of" is also consistent with much of the Supreme Court's recent analyses of other federal statutes considering language such as "results from," "as a result of," "because of," and "based on."  Indeed, "[w]here there is no textual or contextual indication to the contrary, courts regularly read phrases like 'results from' to require but-for causality."  *Burrage v. United States*, ___ U.S. ___, 134 S. Ct. 881, 888 (2014)); *Nassar*, 133 S. Ct. at 2528 (finding that under the ordinary meaning of the word "because," Title VII retaliation claims "require proof that the desire to retaliate was the but-for cause of the challenged employment action." (citation omitted)); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (relying on dictionary definitions of "because of" to hold that "[t]o establish a disparate-treatment claim under the plain language of the [Age Discrimination in Employment Act] . . . a plaintiff must prove that age was [a] 'but for' cause of the employer's adverse decision."); *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 653-54 (2008) (in an action under the Racketeer Influenced and Corrupt Organizations Act, recognizing that the phrase, "by reason of," requires at least a showing of "but for" causation); *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 63-64 n.14 (2007) (in an action under the Fair Credit Reporting Act, observing that "[i]n common talk, the phrase 'based on' indicates a but-for causal relationship and thus a necessary logical condition" and that the statutory phrase, "based on," has the same meaning as the phrase, "because of" (internal quotations omitted)).  Thus, before the Court can award damages, it must at least find that CashCall's conditioning violation was the "but-for" cause of the NSF fees Plaintiffs seek as damages.

The Supreme Court provided a useful example of "but for" causation:

> Consider a baseball game in which the visiting team's leadoff batter hits a home run in the top of the first inning.  If the visiting team goes on to win by a score of 1 to 0, every person competent in the

United States District Court
Northern District of California

17

1
2
3
4
5
6
7

English language and familiar with the American pastime would agree that the victory resulted from the home run. This is so because it is natural to say that one event is the outcome or consequence of another when the former would not have occurred but for the latter. It is beside the point that the victory also resulted from a host of *other* necessary causes, such as skillful pitching, the coach's decision to put the leadoff batter in the lineup, and the league's decision to schedule the game. By contrast, it makes little sense to say that an event resulted from or was the outcome of some earlier action if the action merely played a nonessential contributing role in producing the event. If the visiting team wound up winning 5 to 2 rather than 1 to 0, one would be surprised to read in the sports page that the victory resulted from the leadoff batter's early, non-dispositive home run.

8   *Burrage*, 134 S. Ct. at 888 (emphasis in original).  For the non-sports fan, the Court also provided

9   this example: "if poison is administered to a man debilitated by multiple diseases, it is a but-for

10  cause of his death even if those diseases played a part in his demise, so long as, without the

11  incremental effect of the poison, he would have lived."  *Id.*; *see also id.* at 890 (noting that even in

12  cases that apply "substantial factor" causation, "no case has been found where the defendant's act

13  could be called a substantial factor when the event would have occurred without it.").[11]  The

14  question to be resolved in this case is therefore whether without CashCall's conditioning violation,

15  class members would have not incurred NSF fees; in other words "whether CashCall would have

16  collected NSF fees from Class Members had CashCall had not conditioned the funding of their

17  loans on EFT authorization."  *de la Torre v. CashCall, Inc.*, 56 F. Supp. 3d 1073, 1092 (N.D.

18  Cal.), *on reconsideration on other ground*, 56 F. Supp. 3d 1105 (N.D. Cal. 2014).

19       As indicated from the examples above, "[b]ut-for causation is a hypothetical construct."

20  *Price Waterhouse v. Hopkins*, 490 U.S. 228, 240 (1989) (plurality opinion).  As one commentator

21  explained, "[i]n a rigorous philosophical sense we can never know the answer to the but-for

22  question, because it asks about a state of affairs that never existed: the defendant has engaged in

23
24
25
26
27
28

[11] As these examples reflect, CashCall confuses the nature of "but-for" causation when it argues "but-for" causation requires the damages to be inevitable.  Specifically, CashCall points out that out of the 155,000 loans that it conditioned on EFT preauthorization nearly 60,000 borrowers never incurred NSF fees, and therefore, it argues that conditioning did not cause the NSF fees for class members.  Def.'s Trial Br. at 9 ("This data confirms that NSF fees were not the *inevitable* result of signing the EFT authorization, since 40% of all loans during the Class period never incurred a single NSF fee." (emphasis added)).  While this fact may show that NSF fees are not the inevitable result of CashCall's conditioning, it does not mean CashCall's initial conditioning did not cause Plaintiffs' NSF fees.  For instance, in the baseball example, one homerun at the beginning of the game does not mean that victory is inevitable in every instance, but it may mean that in one particular game, such a homerun will be the dispositive "but-for" cause of victory.

United States District Court
Northern District of California

bad behavior, and the but-for test asks what would have happened had the defendant's behavior been different enough to be acceptable." David W. Robertson, *The Common Sense of Cause in Fact*, 75 Tex. L. Rev. 1765, 1768 (1997). But-for causation is thus "a factual inquiry, which requires a fact-finder to assess the likelihood of a counterfactual: Would X still have happened if Y had not." *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 324 (E.D.N.Y. 2015). Another commentator addressed the complexities in analyzing "but-for" causation is certain situations:

> At times th[e "but-for"] determination is made so automatically that the cause issue is little more than a bit of formalism in the trial. But at other times the same test demands the impossible. It challenges the imagination of the trier to probe into a purely fanciful and unknowable state of affairs. He is invited to make an estimate concerning facts that concededly never existed. The very uncertainty as to what *might* have happened opens the door wide for conjecture. But when conjecture is demanded it can be given a direction that is consistent with the policy considerations that underlie the controversy.

Wex S. Malone, *Ruminations on Cause-in-Fact*, 9 Stan. L. Rev. 60, 67 (1956) (emphasis in original). The difficult issue here is attempting to understand how class members would have behaved without CashCall's conditioning violation.

To deal with the cases where "but-for" causation presents certain added complexities, one commentator suggests framing the "but-for" analysis as follows:

> Properly framing the but-for issue in a lawsuit is a significantly complex mental operation involving four essential steps. First, one must identify the injury or injuries for which redress is sought. . . . Second, one must identify the defendant's wrongful conduct. The third step is the trickiest. It involves using the imagination to create a counterfactual hypothesis. One creates a mental picture of a situation identical to the actual facts of the case in all respects save one: the defendant's wrongful conduct is now "corrected" to the minimal extent necessary to make it conform to the law's requirements. . . . The fourth step asks the key question whether the injuries that the plaintiff suffered would probably still have occurred had the defendant behaved correctly in the sense indicated. . . . The fifth and final step is answering the question.

Robertson, *supra* at pp. 1770-71.

While this is a useful framework for determining whether but-for causation is present, it does not suggest who bears or should bear the burden of proof in such situations. Indeed, in some cases, "once the plaintiff has established that the tortious aspect of a certain defendant's conduct

1    contributed to the injury, many courts shift the burden to the defendant to establish that []the

2    injury would have occurred anyway as a result of independent nontortious conditions[.]"  Richard

3    W. Wright, *Causation in Tort Law*, 73 Cal. L. Rev. 1735, 1798-99 (1985); *see, e.g.*, *Haft v. Lone*

4    *Palm Hotel*, 3 Cal. 3d 756, 769 (1970) ("Upon defendants' failure to provide lifeguard services,

5    the burden shifted to them to prove that their violation was not a proximate cause of the deaths; in

6    the absence of such proof, defendants' causation of such death is established as a matter of law.").

7    A Supreme Court plurality opinion adopted such a test in *Price Waterhouse v. Hopkins*, holding

8    that the former "because of" provision of 42 U.S.C. § 2000e-2(a) allowed a showing that

9    discrimination was a "motivating" or "substantial" factor to shift the burden of persuasion to the

10   employer.  490 U.S. at 228; *see* 42 U.S.C. § 2000e-2(m) (removing "because of" standing and

11   replacing it with "motivating factor").

12              But regardless of which party properly holds the burden in this case, having considered the

13   four steps articulated above for determining "but-for" causation, the Court finds it lacks the

14   necessary evidence to find that class members would not have incurred NSF fees without

15   CashCall's conditioning violation—and consequently, the causal connection between CashCall's

16   violation and class members' NSF fees is too frayed to establish damages.

17              As to the first step in determining "but-for" causation, the injuries for which Plaintiffs seek

18   redress are the NSF fees class members incurred when CashCall made EFT debits from class

19   members' accounts.  *See* Pls.' F&C at 1.  As to the second step, CashCall's wrongful conduct is

20   conditioning its extension of credit on borrowers' repayment by means of preauthorized electronic

21   funds transfers.  MSJ Order at 16-17.  The third step, then, requires the Court to consider an

22   alternative reality where CashCall never conditioned the extension of credit based on class

23   members preauthorizing payment by EFT.  In the Court's opinion, at minimum, this alternative

24   reality would have given borrowers the opportunity to elect to use EFT payments or not, and

25   CashCall's decision to extend credit to those borrowers would not be based on whether those

26   borrowers chose the EFT payment method.  Finally, the fourth step in the "but-for" analysis

27   requires the Court to answer the key question of whether the NSF fees class members suffered

28   would probably still have occurred had CashCall behaved correctly as just explained.

United States District Court
Northern District of California

20

1    Before answering this question, the Court first acknowledges that Plaintiffs put forward

2    evidence that certainly shows some causal connection between CashCall's requirement that

3    borrowers agree to EFT payments and NSF fees.  The only way CashCall is able to charge NSF

4    fees is if, *on payment*, borrowers do not have sufficient funds in their account to cover the

5    payment.  Thus there are two necessary steps before CashCall can charge an NSF fee: (1) a

6    payment must be made from an outside account, i.e., a check sent to CashCall or CashCall's EFT

7    withdrawal from a customer's account; and (2) there must be sufficient funds in that outside

8    account to cover the payment.  Through its conditioning violation, CashCall took away borrowers'

9    choice about how and if to make their payments because it forced borrowers to agree to automatic

10   EFT payments before it would fund their loans.  In doing so, CashCall took control over the first

11   step in incurring an NSF fee, i.e., if, how, and when the payment would be issued.  The fact that

12   consumers could later change their method of payment does not change the result that CashCall's

13   initial conditioning made it more likely that consumers would use EFT payment.  If it did not, why

14   would CashCall have required EFT payment to begin with?  Logically, CashCall knew that

15   requiring borrowers to sign up for EFT would make it more likely they would remain using EFT

16   payments.[12]  As to the second step, there is no dispute that borrowers enrolled in EFT payment

17   were more likely to incur NSF fees than if they used other methods of payment.  Indeed, CashCall

18   itself provided this chart reflecting that fact:

19   //

20   //

21   _____

[12] And CashCall had significant incentive to do so.  Even though CashCall's CEO testified
22   CashCall did not profit as a result of NSF fees, Plaintiffs presented several reasons why CashCall
     had incentive to keep borrowers on EFT payments.  First, and most innocuously, CashCall prefers
23   EFT payments as it seeks to be "paperless" online lender.  Sept. 8 Tr. 61:1-3, 62:24-63:10.
     Second, CashCall incurs fewer collection costs with EFT payments, compared to manual
24   payments such as personal checks.  *Id.* 63:3-65:14.  Third, CashCall sought to raise money from
     Deutsche Bank Securities to fund new loans and it advertised to investors about its initial borrower
25   enrollment in EFTs and its retention of borrowers in EFTs.  *Id.* 71:3-7; 71:21-25; 72:1-2; 74:18-
     75:3; Pls.' Ex. 5 at 11 (CashCall Company Overview presentation); Pls.' Ex. 6 at 40 (Deutsche
26   Bank pitch book for potential CashCall investors).  CashCall believed such statistics would be an
     attractive feature for CashCall's investors.  Sept. 8 Tr. 71:8-10.  And by all accounts it was:
27   Deutsche Bank's "pitch book" for potential investors emphasized that CashCall borrowers were
     started on EFT payments, that 77% of borrowers remained on EFT payments after 6 months, and
28   that 68% remained on EFT payments after 12 months.  *Id.* 72:3-8, 74:18-24; Pls.' Ex. 6.

United States District Court
Northern District of California



United States District Court
Northern District of California

Def.'s Ex. AO.  As such, the fact that through its conditioning CashCall took control over its

borrower's method of payment, which made it more likely that borrowers would use that method

of payment, made it in turn more likely that borrowers would incur and pay CashCall NSF fees.

Yet under the "but-for" causation standard, it appears Plaintiffs must prove more.  Turning

back to the fourth step in the "but-for" analysis, the Court must address whether class members

would probably still have suffered the NSF fees had CashCall behaved lawfully.  *See also*

*Burrage*, 134 S. Ct. at 887-88 (asking would the harm "not have occurred in the absence of—that

is, but for—the defendant's conduct." (quoting *Nassar*, 133 S. Ct. at 2525 (some internal marks

omitted))).  While acknowledging the fundamentally tenuous nature of trying to determine how

class members would have behaved in this alternate reality, the Court must nonetheless answer the

question of whether class members would probably still have suffered the NSF fees in the

affirmative.[13]  As discussed below, CashCall put forward substantial evidence to demonstrate that

---

[13] Justice Stephen Breyer explained some of the difficulty in applying the "but-for" causation analysis to questions involving how people make decisions.  He noted that "[i]t is one thing to require a typical tort plaintiff to show 'but-for' causation" because "[i]n that context, reasonably objective scientific or commonsense theories of physical causation make the concept of 'but-for' causation comparatively easy to understand and relatively easy to apply."  *Gross*, 557 U.S. at 190 (Breyer, J., dissenting).  "But it is an entirely different matter to determine a 'but-for' relation when we consider, not physical forces, but the mind-related characterizations that constitute motive."  *Id.*  Although Justice Breyer was referring to the motives of a defendant in an employment discrimination case, his general recognition of the difficulty of assessing "mind-

borrowers would have likely selected EFT payment and incurred NSF fees regardless of

CashCall's violation.  Plaintiffs failed to undermine that evidence, and without more, the Court

cannot find CashCall's conditioning violation was the "but-for" cause of their NSF fees.

First, CashCall presented evidence that consumers prefer the EFT payment method, and if

given the choice, likely would have selected EFT payment on their own.  Dr. Carlin testified about

his experience and research into consumer behavior and confirmed that consumers generally

prefer EFT payments.  Sept. 9 Tr. 256:11; 262:4-263:7.  He explained that EFT payment is

convenient for consumers and helps them to avoid forgetting to pay their bills and to also avoid

having to pay late fees.  *Id.* 262:4-263:7; 281:6-10.  He testified that in his opinion 70% to 80% of

class members would have elected to use EFT payments over other forms of payments, and then

clarified that it was his best estimate that north of 80% of people would have chosen to participate

in EFT.  *Id.* 267:22-277:9.  He noted that a study by the Federal Reserve Bank of Boston regarding

the use of EFTs confirmed that 81% of people were using some sort of electronic means of

making payments.  *Id.* 262:4-9.  CashCall further supported this fact by demonstrating that after it

removed the mandatory EFT Authorization from its promissory notes in November 2011, almost

98% of "CashCall borrowers" elected to pay by EFT as opposed to another method of payment.

Def.'s F&C ¶¶ 65-68.  While the Court does not rely on this evidence too heavily as it appears to

only consider the borrowers to whom CashCall ultimately made loans—in other words, it excludes

people to whom CashCall did not want to loan money, *see* Sept. 8 Tr. 168:15-169:15; Sept. 9 Tr.

343:20-22; 344:6-8—it nonetheless is supported by the other evidence above indicating that

borrowers mostly preferred to make payments through EFTs.

Second, CashCall provided testimony from borrowers stating that they preferred EFT

payment and found it easier to use than some other methods of payment.  *See* Cook Dep. 16:11-

17; Vardanyan Dep. 23:7-13.  Class Representative Kemply's own experience shows that after she

cancelled her EFT payment method she incurred several late fees and then elected to go back on

EFT payments.  Def.'s Exs. AL (Timeline of Kemply's Loan), AR (chart of Kemply's fees before

and after cancelling EFT Authorization).  The testimony and experiences of these borrowers

related" choices in the context of "but-for" causation is apropos in this case as well.

reflect that there are good reasons why such borrowers might elect EFT payment and prefer it.

Third, CashCall put forth evidence that consumers stayed with EFT payments despite having the opportunity to cancel those payments and even after incurring NSF fees.  CashCall provided evidence that borrowers could change their method of payment from EFT to another of CashCall's other accepted payment method at any time, including prior to their first loan payment.  *See* Pls.' Ex. 1 (promissory note with EFT Authorization, stating "I understand that I can cancel this authorization at any time (including prior to my first payment due date) by sending written notification to CashCall.").  In other words, if borrowers wanted to pay by another method of payment, they could have changed their method of payment off EFT payment.  Dr. Carlin's testimony suggests that borrowers more likely than not understood that they could change their method of payment, testifying that the loan terms in the EFT Authorization were clear.  Sept. 9 Tr. 264:2-265:21 (stating in part that in Dr. Carlin's experience, the promissory note "clearly says that . . . you are authorizing CashCall to withdraw money electronically.  When it's going to happen.  And it clearly says that you have the -- the right to cancel this at any time, even prior to the first payment you ever make.").  Even after incurring NSF fees, class members still elected to stay on EFT.  Dr. Carlin created the following chart to show that 83.9% of all class members[14] elected to continue using EFT payments and never opted-out of the EFT payments:

//

//

//

//

//

//

//

---

[14] This statistic conflicts with the one presented in the Deutsche Bank Securities' "pitch book" for potential investors which emphasized that CashCall borrowers were started on EFT payments, that 77% of borrowers remained on EFT payments after 6 months, and that 68% remained on EFT payments after 12 months.  Sept. 8 Tr. 72:3-8, 74:18-24; Pls.' Ex. 6 (pitch book).  Nonetheless, it is consistent with the finding that a high number of class members continued to use EFT payments.

1

2

3

4

## Exhibit 9
## EFT Opt-Out Status[1]
## Conditioning Class

5

6

| EFT Opt-Out Status | Loans | Percent |
|---|---|---|
| At Origination | 0 | 0.0% |
| Post-Origination | 15,506 | 16.1% |
| Never | 81,077 | 83.9% |
| Total | 96,583 | 100.0% |

7

8

9

Source:  CashCall Loan Data; Conditioning Class Notification List

10

Note:
[1] EFT Opt-Out status identifies which loans had borrowers that proactively elected to opt-out of EFT.  'At Origination' loans are loans which opted out of EFT at the point of loan origination, as identified by a 'N' in the FUNDED_WITH_AUTO_EFT variable of the loan database. 'Post Origination' loans are those loans that opted out some time after origination as identified by the codes 'STOP–CUST NOT INTERESTED', 'STOP–LTR', or 'STOP–FAX PENDING' in values variables of the EFT changes database.  'Never' loans are loans that have not proactively elected to opt-out of EFT.

11

12

13

14

15

16   Dr. Carlin's Expert Report, Ex. 9 (attached to Joint Pretrial Statement).  The fact that so many

17   class members remained on EFT payment for so long without deciding to quit this mode of

18   payment, despite the ability to do so and even after incurring NSF fees, indicates class members

19   likely preferred to be on EFT payment rather than another method of payment.[15]  In other words,

20

---

21   [15] Plaintiffs attempted to rebut this evidence by arguing that "status quo bias" kept consumers from changing their payment system.  Pls.' F&C ¶¶ 62, 136, 140.  Dr. Carlin explained status quo bias occurs when "people choose . . . not to act because of inertia."  Sept. 9 Tr. 304:23-305:6.  He explained that, for instance, a person who enrolls in a three-month free trial for a magazine subscription but fails to cancel the subscription at the end of the trial period may be operating under status quo bias.  *Id.* 305:13-22.  Plaintiffs' theory is that class members operating under status quo bias would not take the steps to cancel their EFT Authorizations even if they had the option to do so and would instead continue to allow the preauthorized automatic EFT payments.

22

23

24

25   The problem is Plaintiffs provided no evidence showing that class members suffered from status quo bias or that this bias was responsible for keeping them enrolled in EFT payments.  Dr. Carlin was the only expert in this case, and he opined status quo bias did not exist.  *Id.* 307:1-308:17. Plaintiffs did not call their own expert to challenge Dr. Carlin's opinion about whether and how status quo bias operated on these class members.  *See id.* 305:23-306:5 (testifying that class members "didn't exhibit inertia").  Nor did they call on class members to testify in support of such a theory.  While Plaintiffs' argument certainly raises some specter of doubt as to whether class members suffered from status quo bias, the problem is that is all it is—an argument. (Cont.)

26

27

28

25

1    they probably would have still chosen EFT payments regardless of CashCall's initial conditioning.

2         Plaintiffs did not counter CashCall's evidence with any showing that class members would

3    not have chosen EFT payment had CashCall given them the choice, with one single exception:

4    they provided an excerpt of the deposition of Tonye Niweigha, who testified she "normally"

5    preferred to "pay her own bills" and "[h]aving something automatically withdrawn is normally not

6    [her] method of operation."  Niweigha Dep. 67:25-68:16.  But even Ms. Niweigha does not say

7    she would not have selected EFT in this instance if given a choice.  Plaintiffs provided no other

8    evidence showing class members would not have selected EFT payments on their own.

9    Ultimately, CashCall has presented persuasive evidence that consumers would have chosen

10   payment by EFT regardless of its violation.  As there is no indication that any other facts in this

11   case would have changed had CashCall not conditioned borrowers loans on EFT payment, the

12   result then is that class members would likely still have incurred NSF fees.  Plaintiffs' failure to

13   meet the "but-for" causation standard likewise means that the "substantial nexus" standard is not

14   met.  *See Stearns*, 655 F.3d at 1026.  Accordingly, the Court is unable to award actual damages

15   under 15 U.S.C. § 1693m(a)(1).

16        2.   <u>Statutory Damages</u>

17        The Court may award statutory damages even if it does not award actual damages.

18   "Congress expressly created a statutory damages scheme that intended to compensate individuals

19   for actual or potential damages resulting from . . . violations, without requiring individuals to

20   prove actual harm."  *Stearns*, 655 F.3d at 1026 (quotation omitted)); *see also Clemmer*, 539 F.3d

21   at 353 ("The EFTA . . . is a remedial statute accorded 'a broad, liberal construction in favor of the

22   consumer.'" (quoting *Begala v. PNC Bank, Ohio, Nat'l Ass'n*, 163 F.3d 948, 950 (6th Cir. 1998)).

---

24   The Court does not have evidence before it to suggest that Dr. Carlin's opinion and testimony is
     incorrect.  CashCall provided uncontroverted evidence that 43,699 class members—approximately
25   45 percent of the Class—changed the date of their scheduled EFT payments and that 15,719 class
     members—approximately 16 percent of the Class—cancelled their EFT authorizations.  *See* UF
26   Nos. 17, 18.  Class Representative Kemply herself changed the date of her EFT payment and
     cancelled her EFT Authorization.  Def.'s Ex. AL.  If status quo bias were an influence, it would
27   seem that class members would be more likely to remain with the default settings and not change
     them, but the Court does not have the evidence to say that is the case here.  Even if the Court
28   disregarded Dr. Carlin's opinion about status quo basis entirely, it simply does not have the
     evidence before it to find that status quo bias existed among these class members.

1    "Statutory damages are meant to compensate victims when actual loss is hard to prove."  *Stearns*,

2    655 F.3d at 1026 (quotation omitted); *see also* Def.'s Trial Br. at 5 n.3 ("The difficulty of proving

3    actual damages is why Congress also authorized statutory damages." (citations omitted)).

4          In a class action lawsuit, the EFTA authorizes the recovery of damages in the amount of

5    either the "lesser of $500,000 or 1 per centum of the net worth of the defendant."  15 U.S.C. §

6    1693m(a)(2)(B).  To determine the amount of the award, courts consider, "among other relevant

7    factors," the following: "the frequency and persistence of noncompliance, the nature of such

8    noncompliance, the resources of the defendant, the number of persons adversely affected, and the

9    extent to which the noncompliance was intentional."  15 U.S.C. § 1693m(b)(2).

10         The parties agree that 1% of CashCall's net worth exceeds $500,000 for purposes of 15

11   U.S.C. § 1693m.  UF No. 27.  Plaintiffs thus seek the maximum amount of $500,000 in statutory

12   damages as permitted by the EFTA.  Pls.' F&C at 1.  CashCall argues Plaintiffs failed to show its

13   actions warrant an award any statutory damages whatsoever.  Def.'s Post-Trial Br. at 8-10.

14         As previously noted, courts have not examined the EFTA's civil damages provision as it

15   relates to section 1693k, but a handful of courts have applied section 1693m to other EFTA

16   provisions.   Where they have done so, however, these courts have generally assessed a statutory

17   penalty without a detailed analysis of the factors in section 1693m(b).  *See, e.g.*, *Archbold v.*

18   *Tristate ATM, Inc.*, 2012 WL 3887167, at *5-6 (E.D.N.Y. Sept. 7, 2012) (noting section

19   1693m(b)(1) factors but recommending minimum statutory damages on grounds that "plaintiffs

20   sought out and used defendants' ATMs because they wanted to file EFTA lawsuits and collect

21   statutory damages."); *Kinder v. Dearborn Fed. Sav. Bank*, 2013 WL 879301, at *2 (E.D. Mich.

22   Mar. 8, 2013) (never explicitly discussing the nature of the noncompliance).

23         Thus, in the absence of guiding authority interpreting the application of the section

24   1693m(b) factors, the Court looks to how other courts interpret these factors to determine whether

25   Plaintiffs' evidence supports a statutory penalty.  *See Gross*, 557 U.S. at 175-76 (in conducting

26   statutory interpretation, courts may look to other statutes for assistance but "must be careful not to

27   apply rules applicable under one statute to a different statute without careful and critical

28   examination." (quotation omitted)).  The civil damages provision of the Fair Debt Collection

United States District Court
Northern District of California

27

1   Practices Act ("FDCPA") requires courts to consider factors that are virtually identical to those in

2   the EFTA.[16]  15 U.S.C. § 1692k.  Accordingly, the Court looks for guidance from cases

3   interpreting the FDCPA.

4               a.       Frequency and Persistence of Noncompliance

5           In considering whether a defendant's noncompliance is frequent and persistent, courts

6   generally look to whether there is a repeated pattern of conduct in violation of the statute.  *See,*

7   *e.g.*, *Riveria v. MAB Collections, Inc.*, 682 F. Supp. 174, 179 (W.D.N.Y. 1988) (awarding full

8   amount of statutory damages where the violative clause in question appeared on every debt

9   collection letter sent out by the defendant as these were computer generated forms); *Patton v.*

10  *Prober & Raphael*, 2012 WL 294537, at *6 (N.D. Cal. 2012) ("In light of the lack of factual

11  allegations suggestive of repeated egregious conduct, the Court finds that Plaintiff is entitled to

12  $500 in statutory damages for Defendant's violations of the FDCPA . . . ."); *Zimmerman v.*

13  *Portfolio Assocs., LLC*, 2013 WL 1245552 (S.D.N.Y. 2013) ("Although 'a single violation of the

14  FDCPA is sufficient to impose liability' . . . courts . . . have found that a smaller award is

15  appropriate where there is no repeated pattern of intentional abuse or where the violation was

16  technical" (quotations and some internal marks omitted)); *Johnson v. CFS II, Inc.*, 2013 WL

17  1809081, at *10 (N.D. Cal. Apr. 28, 2013) (lowering the statutory penalty amount where plaintiff

18  "present[ed] no evidence . . . indicating that [the defendant] persistently sends out deficient debt

19  collection notices.").

20          The Court finds CashCall's noncompliance with the statute was frequent and persistent, as

21  CashCall violated section 1693k numerous times over the Class Period.  CashCall conditioned all

22  93,183 class members' loans on EFT, for a total of 96,588 loans.  UF Nos. 9-10.  And the Class

23  only represents those borrowers who incurred an NSF fee: CashCall made a total of 155,147

24  consumer loans to 135,176 borrowers during the Class Period spanning over five years, and

25  CashCall conditioned each of those loans on borrowers' agreement to pay their loans by EFT.  UF

26

27  ─────────────────────
    [16] In awarding statutory damages in a class action under the FDCPA, courts consider, "the
    frequency and persistence of noncompliance by the debt collector, the nature of such
28  noncompliance, the resources of the debt collector, the number of persons adversely affected, and
    the extent to which the debt collector's noncompliance was intentional."  15 U.S.C. § 1692k.

United States District Court
Northern District of California

1   No. 8.  These numbers demonstrate CashCall frequently and persistently violated the EFTA.

2   CashCall also changed its promissory note four times between 2004 and 2008, each time retaining

3   the requirement that borrowers sign the EFT Authorization as a condition of obtaining the loan.

4   Pls.' F&C ¶¶ 50-51.  That CashCall continued to condition its loans on preauthorized automatic

5   EFT payments even after revising its promissory note is indicative of its persistence.  Accordingly,

6   the Court finds this factor weighs in favor of awarding statutory damages.

7                                  b.      Nature of Noncompliance

8          In considering the nature of noncompliance with the FDCPA, courts in the Ninth Circuit

9   have generally looked to (1) the effect of the defendant's violation on the plaintiff and (2) whether

10  the violation was trivial or technical in nature.  *See Neves v. Kraft*, 2014 WL 2154107, at *3 (N.D.

11  Cal. May 22, 2014) (considering nature of noncompliance and finding that sending one document

12  was "less severe than other FDCPA cases" and "much less likely to intimidate or frighten a debtor

13  than receiving a phone call at one's house or place of employment."); *Meszaros v. United*

14  *Collection Corp.*, 1996 WL 346872, at *1 (N.D. Cal. June 14, 1996) (declining to award

15  maximum statutory penalty where "[p]laintiff d[id] not . . . allege that the nature of this

16  noncompliance was threatening or harassing."); *accord Obenauf v. Frontier Fin. Grp., Inc.*, 785 F.

17  Supp. 2d 1188, 1202 (D.N.M. 2011) ("[T]he [c]ourt finds little for support awarding more than

18  nominal damages, because it does not believe that the natural consequence of [the defendant's

19  telephone calls [was] to harass, oppress, or abuse [the plaintiff.]" (quotations omitted)); *see also*

20  *Hernandez v. Guglielmo*, 977 F. Supp. 2d 1054, 1057 (D. Nev. 2013) (rejecting defendant's

21  argument that "the nature of the noncompliance was 'highly technical'"); *Jerman v. Carlisle,*

22  *McNellie, Rini, Kramer & Ulrich*, 2011 WL 1434679, at *6 (N.D. Ohio Apr. 14, 2011)

23  (considering whether "the nature of noncompliance was trivial, technical, and harmless").

24         CashCall's loan application required borrowers to check a box to indicate their consent to

25  repay their loan via EFT.  Pls.' F&C ¶ 9.  The EFT Authorization stated, "I hereby authorize

26  CashCall to withdraw my scheduled loan payment from my checking account."  Def.'s Ex. AP.  If

27  a borrower did not check the box, a "warning message would pop up instructing the borrower to

28  check the box[]."  Pls.' F&C ¶ 9.  If potential borrowers did not agree to EFT payments, CashCall

United States District Court
Northern District of California

29

1  did not fund their loans.  Sept. 8 Tr. 89:20-23; UF No. 3.  In doing so, CashCall denied borrowers

2  the choice of using payment methods other than EFT.

3  At trial, CashCall argued "[t]he violation in question was a highly technical one[,]" noting

4  that consumers could change their method of payment off of EFT *after* obtaining their loans.

5  Def.'s F&C ¶ 97.  But as discussed above, the purpose of section 1693k of the EFTA is to ensure

6  that consumers have the choice of whether or not to use EFT in order to obtain a loan.  While it

7  may be true that borrowers could have cancelled their EFT authorizations after CashCall funded

8  their loans, the post hoc justification does not mitigate Congress' concern about the initial

9  conditioning of credit on pre-authorized EFT payments.  *See* 15 U.S.C. § 1693k(1) ("no person

10  may condition the extension of credit to a consumer on such consumer's repayment by means of

11  preauthorized electronic fund transfers.").  Even if borrowers were likely to select EFT payments

12  regardless of CashCall's violation, CashCall still did not give potential borrowers the right to

13  make that choice at the time it extended credit to them.  In light of the importance Congress put on

14  consumers' right to choose their method of payment, the Court finds CashCall's conditioning

15  violation more than technical or trivial in nature and one that confronts the very issue Congress

16  designed the EFTA to prevent.  Accordingly, this factor weighs in favor a statutory penalty award.

17           *c.*    *CashCall's Resources*

18  The third factor calls on the Court to consider CashCall's resources.  At the end of 2014,

19  CashCall's net worth was approximately $71 million.  Sept. 8 Tr. 82:23-24; Def.'s Post-Trial Br.

20  8.  The $500,000 maximum statutory penalty represents 0.7% of CashCall's net worth.  As such,

21  CashCall has the resources to satisfy even the maximum statutory penalty.

22           *d.*    *Number of Persons Adversely Affected*

23  Within the context of the FDCPA, courts have noted "[i]f the term 'the number of persons

24  adversely affected' is to have meaning, it must be something in addition to the 'frequency and

25  persistence of noncompliance.'  Otherwise, the term would be superfluous and contradict the

26  familiar statutory canon that the interpretation should give meaning to all components of a

27  statute."  *Hernandez*, 977 F. Supp. 2d at 1056 (quotation omitted).  The Court thus considers the

28  numbers of persons adversely affected.

United States District Court
Northern District of California

30

United States District Court
Northern District of California

1    As noted above, section 1693k protects consumers' freedom to choose their methods of

2    payment.  During the Class Period, CashCall conditioned 155,147 loans on preauthorized

3    automatic EFT payments, which affected at least 135,176 borrowers.  UF No. 8.  Unknown

4    individuals may have been affected as well; for instance, those who were unable to obtain a loan

5    because they did not have a bank account from which to withdraw EFTs.  Though CashCall did

6    not charge an NSF fee to all borrowers who were subject to the conditioning, and while not every

7    borrower charged an NSF fee paid it, the conditioning adversely affected those borrowers by

8    depriving them of the choice of whether or not to pay their loan by EFT at the time they sought

9    their loans.  Accordingly, the Court finds this factor weighs in favor of a statutory penalty.

10                    e.      Extent to which Noncompliance was Intentional

11    The fifth and final factor considers whether the defendant's noncompliance was

12    intentional.  Although this factor is somewhat self-explanatory, importantly courts have found

13    intent where a defendant "circumvents the purpose" of a law.  *See, e.g.*, *Riveria*, 682 F. Supp. at

14    179 ("While the facts demonstrate that MAB was aware of the law . . . , it is obvious to the court

15    that MAB was intentionally circumventing the purpose of the Act by 'hiding' the notice on the

16    reverse of its form."); *cf. Johnson*, 2013 WL 1809081, at *10 (reducing statutory damages award

17    where there was no evidence indicating the defendant sent out deficient debt collection notices in

18    an attempt to intentionally circumvent the purpose of the FDCPA).

19    Plaintiffs argue CashCall intentionally conditioned loans on preauthorized EFT payments

20    to use the number of borrowers enrolled in EFT payments as a selling point to its investors.  Pls.'

21    F&C ¶ 43.  Plaintiffs point to the fact that "CashCall advertised its high percentage of borrower

22    participation in its preauthorized EFT program to investors as a leading 'bulletpoint' feature of

23    CashCall's loan servicing capability[.]"  *Id.*; *see* Sept. 8 Tr. 71:3-7, 74:18-75:3; Pls.' Ex. 5 at 11;

24    Pls.'s Ex. 6 at 40.  CashCall meanwhile maintains that its violation of the EFTA was

25    unintentional.  At trial, Meeks testified that CashCall's counsel and other banks including

26    Deutsche Bank and National Bank reviewed CashCall's loan process and did not have any

27    concerns about CashCall's process of requiring borrowers to enroll in EFT payments.  Sept. 8 Tr.

28    97:3-16, 100:11-101:8.  CashCall further relies on a California state court's ruling in May 2008

31

1    that CashCall's practice of conditioning loans on EFT payments while allowing borrowers to

2    cancel that authorization was not a violation of the EFTA.  Def.'s Post-Trial Br. at 8; *see Meeks v.*

3    *Cashcall, Inc.*, Case No. BC 367894, Superior Court of California, County of Los Angeles, May 6,

4    2008, Ruling on Demurrer.[17]

5            The Court is unconvinced by CashCall's arguments.  Meeks testified that during the Class

6    period, CashCall emphasized to potential investors that CashCall started borrowers on EFT

7    payments.  Sept. 8 Tr. 74:15-20.  CashCall also highlighted to investors not only its high borrower

8    participation in EFT payments, but also the fact that 77% of borrowers remained on EFT

9    payments after six months and 68% remained after twelve months.  Sept. 8 Tr. 74:21-75:3.  These

10   statistics were part of CashCall's efforts to secure money from investors, including an $800

11   million investment from Deutsche Bank.  Sept. 8 Tr. 71:24-72:2.  The fact that CashCall used its

12   EFT enrollment as a selling point to investors suggests CashCall intentionally conditioned its

13   loans on EFT payments to increase its marketability.  Additionally, the fact that outside counsel

14   and other financial institutions, in their review of CashCall's loan practices, were not concerned

15   about the conditioning violation is not demonstrative of CashCall's lack of intent so as to relieve it

16   of liability.  *See Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 581

17   (2010) ("We have long recognized the common maxim, familiar to all minds, that ignorance of the

18   law will not excuse any person, either civilly or criminally." (quotation omitted)).  Additionally,

19   CashCall did not submit[18] any documentation or the actual testimony of the other attorneys who

20   considered its promissory note, and therefore, the Court cannot assess the potential nuances of

21   those attorneys' determinations and beliefs and how they may have impacted CashCall.  In any

22   case, given the importance CashCall placed on borrower enrollment in EFT payments, the

23   evidence weighs in favor of finding CashCall intentionally violated the EFTA by conditioning

24   loans on EFT payments.  Accordingly, this factor supports an award of statutory damages.

25           *f.      Summary*

26           Having weighed the five required factors, the Court finds Plaintiffs are entitled to an award

---

[17] The Court previously took judicial notice of this ruling.  MSJ Order at 12.

[18] It appears Plaintiffs did not request this information either.

United States District Court
Northern District of California

1   of statutory damages under 15 U.S.C. § 1693m(a)(2)(B) in the maximum amount of $500,000.

2   **C.      Restitution Under the UCL**

3          Plaintiffs also seek restitution under California's UCL, Business & Professions Code

4   section 17203, in the form of the NSF fees CashCall collected and the cancellation of NSF fees

5   charged but not collected.  Joint Pretrial Statement at 2.

6          The UCL limits the remedies available for UCL violations to restitution and injunctive

7   relief.  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1152 (2003).  Section

8   17203 of the UCL provides in pertinent part:

9                  Any person who engages, has engaged, or proposes to engage in
                unfair competition may be enjoined in any court of competent
10               jurisdiction. The court may make such orders or judgments, . . . as
                may be necessary to prevent the use or employment by any person
11               of any practice which constitutes unfair competition, as defined in
                this chapter, or as may be necessary to restore to any person in
12               interest any money or property, real or personal, which may have
                been acquired by means of such unfair competition. . . . .
13

14  Cal. Bus. & Prof. Code § 17203.  "Restitution under . . . section 17203 is confined to restoration of

15  any interest in 'money or property, real or personal, which may have been *acquired* by means of

16  such unfair competition.'"  *In re Tobacco Cases II*, 240 Cal. App. 4th 779, 795 (2015) (quotations

17  omitted; emphasis in original).

18         The "which may have been acquired standard" is "substantially less stringent than a

19  reliance or 'but for' causation test."  *Sevidal v. Target Corp.*, 189 Cal. App. 4th 905, 924 (2010).

20  The UCL "requires only that the plaintiff must once have had an ownership interest in the money

21  or property acquired by the defendant *through* unlawful means."  *Shersher v. Superior Court*, 154

22  Cal. App. 4th 1491, 1500 (2007) (emphasis added).  California Courts have "repeatedly and

23  consistently [held] that relief under the UCL is available without individualized proof of

24  deception, reliance and injury[.]"  *In re Tobacco II Cases*, 46 Cal. 4th 298, 320 (2009); *see also*

25  Def.'s Post-Trial Br. at 14 ("Under the UCL[], CashCall would be required to restore money that

26  'may have been acquired' from Class members by reason of the violation.").

27         It was not out of range for Plaintiffs to prove that they were entitled to restitution under the

28  UCL given the permissive causation standard and the findings above that CashCall's conditioning

United States District Court
Northern District of California

33

made it likely borrowers would incur NSF fees.  *See* Def.'s Ex. AO (CashCall's chart

demonstrating borrowers enrolled on EFT were more likely to incur NSF fees than those who

were not).  CashCall took control over its borrowers' method of payment, making it likely

borrowers would use that method of payment, and in turn making it likely that borrowers would

incur and pay CashCall NSF fees.  The problem is CashCall challenges Class Representative

Kemply's standing to assert a UCL violation, noting that "a UCL claim may only be pursued 'by a

person who has suffered injury in fact and has lost money or property as a result of the unfair

competition[.]'"  Def.'s Post-Trial Br. at 13-14 (citing Cal. Bus. & Prof. Code § 17204 and *In re*

*Tobacco II Cases*, 46 Cal. 4th at 326-28).  CashCall asserts "Kemply lacks standing because there

is no causal link between her NSF fees and CashCall's opt-out EFT authorization."  *Id.* at 14.

        "For a lawsuit properly to be allowed to continue, standing must exist at all times until

judgment is entered and not just on the date the complaint is filed."  *Californians For Disability*

*Rights v. Mervyn's, LLC*, 39 Cal. 4th 223, 232-33 (2006) ("[C]ontentions based on a lack of

standing involve jurisdictional challenges and may be raised at any time in the proceeding.").

Since the passage of Proposition 64 in 2004, a private individual has standing to bring a UCL

action only if she "has suffered injury in fact and has lost money or property as a result of the

unfair competition." Cal. Bus. & Prof. Code § 17204.  Proposition 64 was directed to stop the

abuse of the UCL "by unscrupulous lawyers who exploited the generous standing requirement of

the UCL to file 'shakedown' suits to extort money from small businesses."  *In re Tobacco II*

*Cases*, 46 Cal. 4th at 316 (explaining that "the voters determined [the UCL] had been 'misused by

some private attorneys who' '[f]ile frivolous lawsuits as a means of generating attorney's fees

without creating a corresponding public benefit,' '[f]ile lawsuits where no client has been injured

in fact,' '[f]ile lawsuits for clients who have not used the defendant's product or service, viewed

the defendant's advertising, or had any other business dealing with the defendant,' and '[f]ile

lawsuits on behalf of the general public without any accountability to the public and without

adequate court supervision.'" (quoting Prop. 64, § 1, subd. (b)(1)-(4))).  Consequently, to now

have standing under the UCL a plaintiff must show she has (1) suffered injury in fact; (2) lost

money or property; and (3) show that she lost that money "as a result of" the UCL violation.  The

United States District Court
Northern District of California

United States District Court
Northern District of California

1    standing requirement for the class representative—"any person who has suffered injury in fact and

2    has lost money or property *as a result of* the unfair competition"—is thus more stringent than the

3    requirement with respect to those entitled to restitution—"to restore to any person in interest any

4    money or property, real or personal, which *may have been acquired*" by means of the unfair

5    practice.  *See In re Tobacco II Cases*, 46 Cal. 4th at 320 (emphasis in original).

6         "[E]ach element [of standing] must be supported in the same way as any other matter on

7    which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required

8    at the successive stages of the litigation."  *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 327

9    (2011) (alterations in original; citation omitted).   "At trial, [the plaintiff] will, of course, have the

10   burden to prove by a preponderance of the evidence that he has standing under Business and

11   Professions Code section 17204 to prosecute the UCL cause of action on behalf of the class

12   members in this case."  *Troyk v. Farmers Grp., Inc.*, 171 Cal. App. 4th 1305, 1351 (2009)

13   (citations omitted).

14        Although section 17204 does not expressly define "injury in fact" for purposes of standing,

15   Proposition 64 states: "The people of the State of California find and declare that . . . [i]t is the

16   intent of the California voters in enacting this act to prohibit private attorneys from filing lawsuits

17   for unfair competition where they have no client who has been *injured in fact under the standing*

18   *requirements of the United States Constitution.*"  *Id.* at 1346 (quotation omitted; emphasis in

19   original).   "In so doing, the voters presumably intended to incorporate into Business and

20   Professions Code section 17204 the definition of 'injury in fact' as required for standing to bring

21   actions in federal courts under article III of the United States Constitution."  *Id.*  Federal standing

22   requires proof of three elements: (1) an injury in fact; (2) causation; and (3) likelihood that the

23   injury will be redressed by a favorable decision.   However, Proposition 64 expressly incorporates

24   into Business and Professions Code section 17204 only the first element (i.e., an "injury in fact")

25   for federal court standing.  The United States Supreme Court has described an "injury in fact" for

26   federal court standing purposes as "an invasion of a legally protected interest which is (a) concrete

27   and particularized . . . and (b) 'actual or imminent, not 'conjectural' or 'hypothetical[.]'"  *Lujan v.*

28   *Defs. of Wildlife*, 504 U.S. 555, 560  (1992) (citations omitted).  *Lujan* explained that "[b]y

35

United States District Court
Northern District of California

1    particularized, we mean that the injury must affect the plaintiff in a personal and individual way."

2    *Id.* at 560 n.1.  Alternatively stated, "the 'injury in fact' test requires more than an injury to a

3    cognizable interest. It requires that the party seeking review be himself among the injured.'" *Id.* at

4    563 (quotation omitted).

5         As to section 17204's "lost money or property" requirement, "[t]he plain import of this is

6    that a plaintiff now must demonstrate some form of economic injury."  *Kwikset Corp.*, 51 Cal. 4th

7    at 323.  At the same time, "[a]n injury to a tangible property interest, such as money, generally

8    satisfies the 'injury in fact' element for standing."  *Troyk*, 171 Cal. App. 4th at 1346.

9         Finally, Proposition 64 requires that a plaintiff's economic injury come "as a result of" the

10   unfair competition or a violation of the false advertising law.  Cal. Bus. & Prof. Code § 17204.

11   "The phrase 'as a result of' in its plain and ordinary sense means 'caused by' and requires a

12   showing of a causal connection or reliance on the alleged misrepresentation."  *Kwikset Corp.*, 51

13   Cal. 4th at 310 (citation omitted).  In the context of UCL claims brought under the statute's

14   "unlawful" prong, California courts have interpreted the UCL's standing requirement as follows:

15            When a UCL action is based on an unlawful business practice, as
              here, a party may not premise its standing to sue upon injury caused
16            by a defendant's lawful activity simply because the lawful activity
              has some connection to an unlawful practice that does not otherwise
17            affect the party.  In short, there must be a causal connection between
              the harm suffered and the unlawful business activity.  *That causal*
18            *connection is broken when a complaining party would suffer the*
              *same harm whether or not a defendant complied with the law.*  Here,
19            the lack of causation is illustrated by the fact the tenants would
              suffer the same injury regardless of whether the owners complied
20            with or violated the Subdivided Lands Act.

21   *Daro v. Superior Court*, 151 Cal. App. 4th 1079, 1099 (2007) (emphasis added), *as modified on*

22   *denial of reh'g* (July 3, 2007).  This example thus considers the counterfactual situation from the

23   one presented, i.e., whether a plaintiff would have suffered the same harm if the defendant had

24   acted lawfully.

25        As the Court explained above in analyzing causation under the EFTA, CashCall has

26   provided substantial evidence that class members such as Class Representative Kemply more

27   likely than not would have selected EFT payment regardless of CashCall's conditioning violation.

28   Plaintiffs did not challenge this evidence either as to the class or specifically for Kemply.  They

36

could have done this by providing evidence that Kemply would have elected to use another form of payment other than EFT if CashCall had given her the choice.  *See, e.g.*, Samuel Issacharoff, *Class Actions and State Authority*, 44 Loy. U. Chi. L.J. 369, 381 (2012) ("The best evidence of [] detrimental reliance is the testimony of the purchaser herself (even if it is prone to be self-serving after the fact), especially in omission cases where the individual claim of reliance constitutes a counterfactual about what would have happened under untested circumstances."); *Kwikset Corp.*, 51 Cal. 4th at 341 (Chin, J., dissenting) (criticizing the majority's holding, because under it, "a consumer may satisfy the UCL's new standing requirements merely by alleging that "he or she would not have bought the product but for the misrepresentation."); *Troyk*, 171 Cal. App. 4th at 1349 ("Troyk could have adequately alleged causation for UCL standing purposes by alleging in his complaint that he would not have paid, or not agreed to pay, the monthly service charges even had those charges been properly disclosed as premium in the insurance policy").

But regardless of what Plaintiffs could have done, CashCall ultimately provided substantial evidence that borrowers prefer to use EFT, which is persuasive evidence that Kemply likely would have selected EFT and that in turn, she likely would have incurred NSF fees regardless of CashCall's EFTA violation.  *See* discussion *supra* pp. 23-26.  Without evidence from Plaintiffs to show otherwise, under these circumstances the Court cannot find that Class Representative Kemply may pursue this claim on behalf of the class.[19]  Without a class representative who has standing to maintain this claim, the Court does not have jurisdiction to be able to award relief to the Conditioning Class under the UCL.  *See Medrazo v. Honda of N. Hollywood*, 205 Cal. App. 4th 1, 11 (2012), *as modified on denial of reh'g* (Apr. 16, 2012) (plaintiff must establish standing throughout trial to bring a representative action under the UCL).

//

//

//

---

[19] As previously noted, Plaintiff Eduardo De La Torre is not a class representative to the Conditioning Class as his claims fall outside the Class Period as defined in the class definition. *See* UF No. 7.  In any event, Plaintiffs provided very little evidence about De La Torre's experience with CashCall and no evidence to establish that he "lost money or property as a result of" CashCall's conditioning violation.

**United States District Court
Northern District of California**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CONCLUSION**

Based on the above findings, the Court makes the following conclusions:

1.  Plaintiffs are not entitled to actual damages pursuant to 15 U.S.C. §
    1693m(a)(1);

2.  Plaintiffs are entitled to statutory damages pursuant to 15 U.S.C. §
    1693m(a)(2)(B) in the amount of $500,000; and

3.  Plaintiffs are not entitled to restitution under California's Unfair Competition
    Law, Cal. Bus. & Prof. Code §§ 17200 et seq.

The parties shall meet and confer, and **by May 2, 2016**, they shall file with the Court a notice plan to inform class members about the results of the trial and to distribute the statutory penalty award.  The notice plan should include copies of the proposed notice form(s), the proposed schedule for distributing notice and amounts from the statutory penalty, and the parties' proposals about what to do with any unclaimed funds.  The Court will not consider any claims process for distributing the funds, i.e., no process by which class members would submit claims and then be paid.  The notice plan must include a method of direct disbursement to class members.

Any matters concerning attorney's fees or other costs will not be addressed until after the notice plan is determined.

**IT IS SO ORDERED.**

Dated: March 16, 2016

_____
MARIA-ELENA JAMES
United States Magistrate Judge