1

2

3

4
UNITED STATES DISTRICT COURT

5
NORTHERN DISTRICT OF CALIFORNIA

6

7
EDUARDO DE LA TORRE, et al.,

Plaintiffs,

v.

CASHCALL, INC.,

Defendant.

Case No.  08-cv-03174-MEJ

**ORDER RE: MOTIONS FOR RELIEF AND/OR NEW TRIAL**

Re: Dkt. Nos. 326, 334

8

9

10

11

12

13
**INTRODUCTION**

14
Pending before the Court are the parties' cross-motions for a new trial and/or relief from

15
the Court's Findings of Fact and Conclusions of Law ("FFCL") following a bench trial in this

16
action.  CashCall Mot., Dkt. No. 326; Pls.' Mot., Dkt. No. 334.  The Court has not yet issued a

17
judgment related to the FFCL.[1]  Having considered the parties' positions, the record in this case,

18
and the relevant legal authorities, the Court now issues the following Order.

19
**BACKGROUND**

20
In this certified class action, the Court found at summary judgment that Defendant

21
CashCall, Inc. ("CashCall") violated the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. §

22
1693k(1),[2] when it conditioned its extension of credit on borrowers' repayment by means of

23
preauthorized electronic funds transfers ("EFTs").  Order re: Summ. J. Mots. at 16-17, Dkt. No.

24

25
[1] The Court entered a judgment pursuant to Federal Rule of Civil Procedure 54(b) in favor of
CashCall on Plaintiffs' "Loan Unconscionability Claim."  Dkt. No. 247.

26

27
[2] Under the EFTA, "[n]o person may . . . condition the extension of credit to a consumer on such
consumer's repayment by means of preauthorized electronic fund transfers."  15 U.S.C. §
1693k(1).

28

United States District Court
Northern District of California

220.  Accordingly, the Court also found CashCall violated California's Unfair Competition Law ("UCL"), Business and Professions Code section 17200, by engaging in an unlawful business practice.  *Id.* at 17.  The Court then held a bench trial to determine damages under the EFTA and UCL claims.  At the conclusion of the trial, the Court (1) ordered CashCall to pay a statutory penalty of $500,000 for its EFTA violation, but found Plaintiffs and the Class[3] otherwise failed to show they are entitled to actual damages under the EFTA; and (2) found restitution was unavailable to Plaintiffs as they failed to prove that Class Representative Lori Kempley[4] had standing to pursue a representative action under the UCL's "lost money or property" requirement.  *See* FFCL, Dkt. No. 312.  The Court ordered the parties to submit proposed judgments and a notice plan to inform class members about the results of the trial and to distribute the statutory award to the class no later than May 2, 2016.  *Id.*  The Court ordered the parties to file a supplemental status report by May 26, 2016.  May 12, 2016 Order, Dkt. No. 314.

In the parties' Joint Response to the May 12, 2016 Order, CashCall expressed its intention to file a motion to alter or amend the judgment or for a new trial pursuant to Rule 59.  Jt. Resp., Dkt. No. 315.  The basis for CashCall's intended motion was the recent United States Supreme Court decision in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) as revised (May 24, 2016).  CashCall asserted, and continues to assert, that *Spokeo* "compels the finding that plaintiff Lori Kempl[e]y lacks standing under the EFTA."  *Id.*  After holding a status conference on this matter (Dkt. No. 318), the Court issued an Order setting the framework for CashCall's proposed Rule 59

---

[3] The Court interchangeably refers to Plaintiffs and the class.  On November 15, 2011, the Court granted Plaintiffs class certification as to the "Conditioning Class" (Class Cert. Order, Dkt. No. 100), which was later limited to "[a]ll individuals who, while residing in California, borrowed money from CashCall, Inc. for personal, family, or household use on or after March 13, 2006 through July 10, 2011 and were charged an NSF fee."  Order Approving Class Notice Plan, Dkt. No. 130; *see also* Order Confirming Class Definition, Dkt. No. 311.

[4] Throughout the litigation, the parties spelled the class representative's last name as "Kemply."  *See, e.g.*, Jt. Pretrial Statement at 2, Dkt. No. 281; Pls.' Tr. Br. at 1, Dkt. No. 285; Jt. Status Report at 1, Dkt. No. 315.  But in their Motion, Plaintiffs changed the spelling of her name to "Lori Kempl*e*y."  *See* Pls.' Mot. (emphasis added).  CashCall adopted this new spelling in its Reply.  *See* CashCall Reply, Dkt. No. 335.  As Plaintiffs are in the best position to know the proper spelling of their class representative's name, the Court assumes "Kempley" is correct and addresses her as such in this Order.

1   motion, as well as any cross-motion by Plaintiffs (Dkt. No. 319).

2         CashCall now moves to amend the FFCL and enter judgment in its favor pursuant to Rule

3   59(a)(2), on the ground that the controlling law has changed since the Court issued the FFCL.  *See*

4   CashCall Mot.  It contends "[t]he decision of the U.S. Supreme Court in *Spokeo, Inc. v. Robins*,

5   136 S. Ct. 1540 (2016), makes clear that the Class representative in this action lacks standing to

6   pursue the claim for statutory damages under the Electronic Funds Transfer Act, on her own

7   behalf or on behalf of the Class, and CashCall is entitled to judgment in its favor."  CashCall Mot.

8   at 1.  CashCall argues "*Spokeo* establishes that Kempl[e]y and the Class lacked a concrete injury-

9   in-fact and therefore lacked Article III standing[,]" and accordingly the Court "lacked jurisdiction

10  to adjudicate Plaintiffs' statutory damages claim" under the EFTA.  *Id.* at 8.  It contends Kempley

11  lacked a concrete injury in fact because "Plaintiffs sought and were awarded statutory damages

12  based on a 'bare procedural violation' of the EFTA."  *Id.*

13        Plaintiffs oppose CashCall's Motion and affirmatively move under Rule 59 or,

14  alternatively, Rule 52, to submit additional evidence, amend the class definition, and amend the

15  Findings of Fact and Conclusions of Law.  *See* Pls.' Mot.  Plaintiffs contend that under *Spokeo*, a

16  Congressionally-defined intangible injury, such as Kempley's, is concrete and sufficient to

17  establish Article III standing.  They also argue the Court should grant Plaintiffs' affirmative Rule

18  59/52 motion to allow them also to prove their *tangible* injuries to confirm their standing for the

19  expected future appellate review of this case by the Ninth Circuit and to demonstrate their UCL

20  standing, which they did not have an opportunity to do at trial.  Finally, they point to another case

21  that was decided around the time the Court issued the FFCL: *Beaver v. Tarsadia Hotels*, 816 F.3d

22  1170, 1178 (9th Cir. 2016)—a case that clarifies the statute of limitations for violations of the

23  UCL. In light of *Beaver*, Plaintiffs urge the Court to revise the class definition and amend the

24  Court's Findings of Fact and Conclusions of Law as necessary.

25                       **LEGAL STANDARDS**

26  **A.**    **Procedural Standards**

27        Federal Rule of Civil Procedure 59 provides in part: "After a nonjury trial, the court may,

28  on motion for a new trial, open the judgment if one has been entered, take additional testimony,

United States District Court
Northern District of California

3

amend findings of fact and conclusions of law or make new ones, and direct the entry of a new

judgment." Fed. R. Civ. P. 59(a). "'Rule 59 does not specify the grounds on which a motion for a

new trial may be granted.'" *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting

*Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003), *cert. denied*, 541 U.S. 902

(2004)). "'Since specific grounds for a motion to amend or alter are not listed in the rule, the

district court enjoys considerable discretion in granting or denying the motion.'" *Allstate Ins. Co.*

*v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011) (quoting *McDowell v. Calderon*, 197 F.3d 1253,

1255 n.1 (9th Cir. 1999) (en banc) (per curiam)).  A Rule 59 motion may be appropriate when,

among other situations, there has been an intervening change in the controlling law.  *Allstate*, 634

F.3d at 1111.

Similarly, Rule 52(b) provides that "[o]n a party's motion …, the court may amend its

findings—or make additional findings—and may amend the judgment accordingly.  The motion

*may accompany a motion for a new trial under Rule 59*." Fed. R. Civ. P. 52(b) (emphasis added).

Motions under both Rules 59 and 52(b) are properly brought when they seek to correct errors of

law or fact or to address an intervening change in the law.  *See McDowell*, 197 F.3d at 1255

(grounds for a Rule 59(e) motion include when a trial court has committed clear error or if there is

an intervening change in controlling law, or is presented with newly-discovered evidence).

## B.     Article III Standing

"[T]he irreducible constitutional minimum of standing contains three elements": (1) the

plaintiff must have suffered an "injury in fact" that is "concrete and particularized" and "actual or

imminent, not conjectural or hypothetical"; (2) there must exist "a causal connection between the

injury and the conduct complained of"; and (3) it must be "likely, as opposed to merely

speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*,

504 U.S. 555, 560-61 (1992) (internal quotation marks omitted).

> Since they are not mere pleading requirements, but rather an
> indispensable part of the plaintiff's case, each element [of standing]
> must be supported in the same way as any other matter on which the
> plaintiff bears the burden of proof, *i.e.*, with the manner and degree
> of evidence required at the successive stages of the litigation.  At the
> pleading stage, general factual allegations of injury resulting from
> the defendant's conduct may suffice, for on a motion to dismiss we

United States District Court
Northern District of California

presume that general allegations embrace those specific facts that are necessary to support the claim.  In response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true.  And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial.

*Id.* at 561 (citations and internal quotation marks omitted).

"In a class action, standing is satisfied if at least one named plaintiff meets the requirements."  *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (en banc); *see also Lewis v. Casey*, 518 U.S. 343, 395 (1996) ("[Unnamed plaintiffs] need not make any individual showing of standing [in order to obtain relief], because the standing issue focuses on whether the plaintiff is properly before the court, not whether represented parties or absent class members are properly before the court." (internal quotation marks and citation omitted)); *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) (if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class); *see also Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1021 (9th Cir. 2011) ("At least one *named* plaintiff must satisfy the actual injury component of standing in order to seek relief on behalf of himself or the class.  The inquiry is whether any named plaintiff has demonstrated that he has sustained or is imminently in danger of sustaining a direct injury as the result of the challenged conduct." (quoting *Casey v. Lewis*, 4 F.3d 1516 (9th Cir. 1993); emphasis in *Casey*).

### ARTICLE III INJURY ANALYSIS

**A.      Standing Pre-*Spokeo***

The United States Supreme Court decided *Spokeo* after the Court issued the FFCL.  Prior to the Supreme Court's *Spokeo* decision, the law in the Ninth Circuit regarding Article III standing in the context of statutory violations was set by *Edwards v. First American Corporation* ("*Edwards II*"), 610 F.3d 514, 517 (9th Cir. 2010); *see Robins v. Spokeo, Inc.*, 742 F.3d 409, 413 (9th Cir. 2014) (relying on *Edwards II*).[5]

_____

[5] The *Spokeo* Court itself acknowledged the Ninth Circuit relied on *Edwards II* as "Circuit precedent" when the Court of Appeals stated "'the violation of a statutory right is usually a

United States District Court
Northern District of California

In *Edwards II*, the plaintiff alleged her title insurance company violated the Real Estate Settlement Procedures Act of 1974 ("RESPA") after learning it had paid $2 million in exchange for exclusive referral agreements with her settlement agent.  RESPA forbids any person from accepting "any fee, kickback, or thing of value" connected to a referral agreement involving real estate settlement services and gives consumers the right to sue RESPA violators for "three times the amount of any charge paid for such settlement service."  12 U.S.C. §§ 2607(a), (d)(2).  First American challenged Edwards' standing to sue in federal court, contending she had not suffered any injury because Ohio regulates the cost of title insurance so that all insurance companies charge the same price; in other words, the "kick-back" between First American and Edwards' settlement agent did not cause her to pay any more than she would have paid otherwise, leaving her with only a statutory violation of RESPA.  The district court found Edwards had standing, finding she "need not have suffered an overcharge to invoke the protection of RESPA."  *Edwards v. First Am. Corp.* ("*Edwards I*"), 517 F. Supp. 2d 1199, 1204 (C.D. Cal. 2007), *aff'd in part, rev'd in part,* 610 F.3d 514 (9th Cir. 2010).  Instead, it found that through RESPA "Congress created a right to be free from referral-tainted settlement services as demonstrated by both the statute's text and legislative history.  If Edwards can prove her claim, there is a statutory injury fairly traceable to defendants' action and redressable by a favorable decision."  *Id.*

The Ninth Circuit affirmed.  The Court of Appeals reasoned that Congress has the power to create standing by defining legal rights and injuries and agreed with the District Court that, through RESPA, Congress created the right to be free from referral-tainted settlement services.  "The injury required by Article III can exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.'"  *Edwards II*, 610 F.3d at 517 (quotations omitted).  Thus, "[e]ssentially, the standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's

---

sufficient injury in fact to confer standing.'"  *Spokeo*, 136 S. Ct. at 1546 & n.5 (quoting *Robins*, 742 F.3d at 412).  Years earlier, the Supreme Court had granted certiorari in *Edwards II*, *see First American Financial Corp. v. Edwards*, 564 U.S. 1018 (2011), but after it heard oral argument on the matter, the Court dismissed the case as improvidently granted, *see* 567 U.S. __, 132 S. Ct. 2536 (2012) (per curiam).

position a right to judicial relief." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)) ("The actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing . . . .'" (citing *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973) ("Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute."); *Sierra Club v. Morton*, 405 U.S. 727, 738 (1972) (Congress may "broaden[] the categories of injury that may be alleged in support of standing"))).  If the statute did not limit liability to instances where the plaintiff suffered actual injury, then, as the Ninth Circuit outlined the issue: "we must look to the text of [the statute] to determine whether it prohibited Defendants' conduct; if it did, then Plaintiff has demonstrated an injury sufficient to satisfy Article III." *Id.* (ultimately concluding that "[b]ecause the statutory text does not limit liability to instances in which a plaintiff is overcharged, . . . Plaintiff has established an injury sufficient to satisfy Article III.").

Given the Supreme Court's decision not to hear *Edwards II*, the Ninth Circuit's decision remained binding precedent, as reflected in *Robins*, 742 F.3d at 412.  The *Robins* court relied on *Edwards II* for the proposition that "[t]he scope of the cause of action determines the scope of the implied statutory right." *Id.* at 413 (citing *Edwards II*, 610 F.3d at 517).  Thus "[w]hen, as here, the statutory cause of action does not require proof of actual damages, a plaintiff can suffer a violation of the statutory right without suffering actual damages." *Id.*  The Ninth Circuit concluded that Robins adequately alleged Article III standing based on his allegations that Spokeo, an online background check company, reported inaccurate information about him to its customers, which violated the Fair Credit Reporting Act ("FCRA").  *See id.*  Specifically, "he allege[d] that Spokeo violated *his* statutory rights, not just the statutory rights of other people, so he is 'among the injured.'  Second, the interests protected by the statutory rights at issue are sufficiently concrete and particularized that Congress can elevate them." *Id.* (emphasis in original) (citing *Lujan*, 504 U.S. at 578).  Thus, "alleged violations of Robins's statutory rights are sufficient to satisfy the injury-in-fact requirement of Article III." *Id.* at 413-14 (further concluding that as "the injury in fact is the violation of a statutory right that [the court] inferred from the existence of a private cause of action, causation and redressability [were] satisfied.").

1        At the time of class certification, summary judgment, and trial, the Court and CashCall

2    were under the impression that "a statutory violation was sufficient to establish Article III

3    standing[.]"  CashCall Mot. at 6.  CashCall indeed never challenged Plaintiffs' standing until May

4    26, 2016—ten days after the Supreme Court decided *Spokeo* and several weeks after the Court

5    issued its FFCL.  The Court thus had no reason to question its authority to issue the FFCL.

6    **B.    *Spokeo* and Standing Post-*Spokeo***

7        After the Court rendered its FFCL, the Supreme Court reversed the Ninth Circuit's

8    decision in *Robins*, focusing on the Ninth Circuit's analysis of Article III's "particularized" and

9    "concrete" injury requirements.  *Spokeo*, 136 S. Ct. at 1548.[6]  Essentially, the Court found the

10   Ninth Circuit had conflated these two requirements.  The Court held that while "[p]articularization

11   is necessary to establish injury in fact, [] it is not sufficient.  An injury in fact must also be

12   'concrete.'  Under the Ninth Circuit's analysis, however, that independent requirement was

13   elided[]" as all its "observations concern[ed] particularization, not concreteness."  *Id.*  The Court

14   remanded the case because as "the Ninth Circuit failed to fully appreciate the distinction between

15   concreteness and particularization, its standing analysis was incomplete."  *Id.* at 1550.

16       In doing so, the Court clarified that it "t[ook] no position as to whether the Ninth Circuit's

17   ultimate conclusion—that Robins adequately alleged an injury in fact—was correct."  *Id.*  But the

18   Supreme Court stated that "Congress' role in identifying and elevating intangible harms does not

19   mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute

20   grants a person a statutory right and purports to authorize that person to sue to vindicate that

21   right."  *Id.*  "Article III standing requires a concrete injury even in the context of a statutory

22   violation."  *Id.*  Therefore, the Court reasoned, a plaintiff cannot allege a bare procedural violation

23   absent a concrete injury and still satisfy the Article III injury-in-fact requirement.  *Id.* (citing

24

25   _____

26   [6] The question before the Supreme Court was "[w]hether Congress may confer Article III standing
     upon a plaintiff who suffers no concrete harm, and who therefore could not otherwise invoke the
27   jurisdiction of a federal court, by authorizing a private right of action based on a bare violation of
     a federal statute."  *Stone v. Sterling Infosystems, Inc.*, 2015 WL 4602968, at *1 (E.D. Cal. July 29,
28   2015) (citing *Spokeo, Inc. v. Robins*, 13-1339, "Question Presented," available at
     http://www.supremecourt.gov/qp/13–01339qp.pdf (last visited July 20, 2015)).

*Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation . . . is insufficient to create Article III standing")).  A "'concrete' injury must be 'de facto'; that is, it must actually exist."  *Id.* (citing Black's Law Dictionary 479 (9th ed. 2009)).

While tangible injuries are easier to recognize as "concrete," the Court noted that many of its previous cases have shown that *intangible* injuries can also be concrete.  *Id.* at 1549 (citing *e.g.*, *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) (free speech); *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993) (free exercise)).  In cases alleging statutory damages, when "determining whether an intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles."  *Id.* at 1549 (the Court analogized to the common law, which has permitted tort suits to proceed as long as there is a "risk of real harm," even if that harm is "difficult to prove or measure.").  Moreover, "Congress may 'elevat[e] to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate in law.'"  *Id.* (quoting *Lujan*, 504 U.S. at 578).  Indeed, "the violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact . . . [and] a plaintiff in such a case need not allege any additional harm beyond the one Congress has identified."  *Id.* at 1549-50 (citing *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 20-25 (1998) (confirming that a group of voters' "inability to obtain information" that Congress had decided to make public is a sufficient injury in fact to satisfy Article III); *Public Citizen v. Dep't of Justice*, 491 U.S. 440, 449 (1989) (holding that two advocacy organizations' failure to obtain information subject to disclosure under the Federal Advisory Committee Act "constitutes a sufficiently distinct injury to provide standing to sue")).  The "the risk of real harm" may "satisfy the requirement of concreteness."  *Spokeo*, 136 S. Ct. at 1549.  The Court thus indicated that when lower courts consider cases alleging statutory violations, they must take into account "whether the particular procedural violations alleged in [that] case entail a degree of risk sufficient to meet the concreteness requirement."  *Id.* at 1550.

*Spokeo* thus clarified the significance of the independent concreteness inquiry of the Article III injury in fact requirement.  Courts must now consider not simply whether the defendant has violated a statute, but also the nature of the statute and whether the particular violations of that

9

statute results in harm or entails a risk that Congress deemed worthy to prevent.  On remand from the *Spokeo* decision, the Ninth Circuit has presented the issue as follows: whether "the particular procedural violations alleged in this case entail a degree of risk sufficient to meet the concreteness requirement" for Article III standing.  *Robins v. Spokeo, Inc.*, Case No. 11-56843, Dkt. No. 72 (9th Cir. June 20, 2016).

### C.        Application to the Case at Bar

While *Spokeo* created a shift in this Circuit's law, the question is whether that shift affects the Court's analysis of Plaintiffs' standing.  Simply because the Court and CashCall were under the impression that a statutory violation alone was enough to create injury in fact does not mean Plaintiffs did not have other grounds on which to satisfy this requirement.  But CashCall raised an interesting issue, and one which neither the Court nor the parties previously considered or reviewed.  The Court therefore permitted the parties to brief this issue.  The Court also queried whether, given this Circuit's prior precedent, the Court may be obligated to give Plaintiffs the opportunity to present evidence of injury in fact, which was not at issue at the time the Court rendered its FFCL.  Having reviewed the parties' briefs, the record in this matter, and the relevant authorities, the Court now determines that Plaintiffs have already demonstrated class representative Lori Kempley has Article III standing under *Spokeo*.

The Court begins with a closer look at the guidance set forth in *Spokeo*.  Although *Spokeo* addressed standing in the context of a motion to dismiss rather than proof at trial, the ultimate holding is not dependent on the procedural status of the action: ultimately, a plaintiff need not show a statutory violation resulted in *actual* harm to meet the concreteness requirement; rather a plaintiff must show the procedural violations entail a sufficient risk of harm.  *See* 136 S. Ct. at 1550.  For example, the *Spokeo* Court stated that even if a consumer reporting agency technically violated FCRA by "fail[ing] to provide the required notice to a user of the agency's consumer information," no concrete harm would result if that information was in fact accurate.  *Id.* at 1550.  Similarly, the Court noted if there were inaccuracies, "[i]t is difficult to imagine how the dissemination of an incorrect zip code, without more, could work any concrete harm."  *Id.* (footnote omitted).  In other words, not all failures to give statutorily mandated notice or accurate

10

information "cause harm or present any material risk of harm." *Id.*[7]

The *Spokeo* Court, however, also provided examples of congressionally-defined injuries that suffice to establish Article III standing. The first case was *Akins*, 524 U.S. at 20-25, which "confirm[ed] that a group of voters' 'inability to obtain information' that Congress had decided to make public is a sufficient injury in fact to satisfy Article III." S*pokeo*, 136 S. Ct. at 1549. In *Akins*, the Federal Election Commission ("FEC") determined that the American Israel Public Affairs Committee ("AIPAC") was not a "political committee" as defined by the Federal Election Campaign Act of 1971 ("FECA" or "Act"), and therefore refused to require AIPAC to disclose its donors, contributions, and expenditures. *Akins*, 524 U.S. at 13. A group of voters sued to challenge the FEC's determination, but the FEC challenged on standing grounds. *Id.* The Supreme Court ultimately held that "a plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." *Id.* at 21. The *Spokeo* Court also cited *Public Citizen v. Department of Justice*, 491 U.S. 440, 449 (1989), which upheld Public Citizen's constitutional standing to sue based on the congressionally-defined informational injury: "Our decisions interpreting the Freedom of Information Act have never suggested that those requesting information under it *need show more than that they sought and were denied specific agency records*. There is no reason for a different rule here." *Public Citizen*, 491 U.S. at 449-50 (emphasis added).

In his concurring opinion, Judge Clarence Thomas provides another example, *Havens Realty Corporation v. Coleman*, 455 U.S. 363 (1982). *See Spokeo*, 136 S. Ct. at 1553 (Thomas, J.,

---

[7] That emphasis on the "degree of risk" has been echoed by lower courts. *See, e.g.*, *Ramirez v. Trans Union, LLC*, 2016 WL 6070490, at *4 (N.D. Cal. Oct. 17, 2016) ("These alleged violations created a risk that Plaintiff would be harmed in precisely the way Congress was attempting to prevent when it mandated what disclosures consumer credit reporting agencies must make to consumers: a risk that the consumer is not made aware of material inaccurate information in the consumer's file, nor aware of how to dispute the inclusion of the harmful information. Thus, these omissions entailed a degree of risk sufficient to satisfy Article III's concrete injury requirement. *See Spokeo*, 136 S. Ct. at 1550."); *Cabiness v. Educ. Fin. Sols., LLC*, 2016 WL 5791411, at *4 (N.D. Cal. Sept. 1, 2016) (noting Supreme Court "suggested that . . . the statutory violation at issue could present an inherent 'risk of real harm' such that the statutory violation will be sufficient on its own to constitute an injury in fact.").

United States District Court
Northern District of California

concurring).  In *Havens*, the Court held a "tester"—an African-American person who, by posing as an apartment hunter, aimed to ferret out violations of the Fair Housing Act ("FHA")—possessed standing to bring suit based on the defendants falsely telling her that no apartments in a particular housing complex were available, even though the tester had no intention of actually renting an apartment from the defendant and, indeed, may well have "fully expect[ed] that [s]he would receive false information."  455 U.S. at 373-74.  The *Havens* Court found that the "alleged injury to [the plaintiff's] statutorily created right to truthful housing information" was a cognizable injury in and of itself—regardless of whether the plaintiff actually hoped to reside in the defendant's housing complex—and therefore "the Art. III requirement of injury in fact [was] satisfied."  *Id.* (citing *Warth*, 422 U.S. at 500).  The tester-plaintiff possessed standing not because she had been "deprived . . . of the benefits that result from living in an integrated community," *id.* at 375, but because her "statutorily created right to truthful housing information" had been infringed, *id.* at 374-75.  The fact that the tester never intended to rent the apartment "does not negate the simple fact of injury within the meaning of [the FHA]."  *Id.* at 374. Thus, the Court held that the tester-plaintiff "alleged injury to her statutorily created right to truthful housing information" and satisfied Article III's injury-in-fact requirement.  *Id.*  The Court stated the FHA "establishes an enforceable right to truthful information concerning the availability of housing" and that "[a] tester who has been the object of a misrepresentation made unlawful under [the FHA] has suffered injury in precisely the form the statute was intended to guard against, and therefore has standing to maintain a claim for damages under the Act's provisions."  *Id.*

Plaintiffs also highlight two other sources interpreting *Spokeo*.  First, they point out "the two Court[s] of Appeals decisions that have been decided since *Spokeo* have upheld standing *based on injuries defined solely by Congress*."  Mot. at 5 (citing *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 274 (3d Cir. 2016) (disclosure of information about minor children's online use sufficed to establish standing where under various federal statutes "Congress has long provided plaintiffs with the right to seek redress for unauthorized disclosures of information that, in Congress's judgment, ought to remain private"); *Church v. Accretive Health, Inc.*, No. 15-15708, ___ F. App'x ___, 2016 WL 3611543, at *3 (11th Cir. July 6, 2016) (per curiam) (relying

on *Havens* and finding defendant's violation of statutory disclosure requirement under the Fair

Debt Collection Practices Act established "a concrete—i.e., 'real'—injury because she did not

receive the allegedly required disclosures"; "this injury is one that Congress has elevated to the

status of a legally cognizable injury through the FDCPA")).

As with *Havens*, *Akins*, and *Public Citizen*, the Court finds Kempley's harm, albeit an

intangible one, is sufficiently concrete to satisfy Article III's standing requirement.  Through

§ 1693k(1) of the EFTA, Congress defined a specific right, which was based on the risk of real

harm, and thereby elevated a violation of that right to legally cognizable, concrete injury.[8]  In

enacting the EFTA, Congress recognized that "[m]ost consumers are not aware of the risks they

run in using EFT services."  124 Cong. Rec. 25,731 (1978), RJN[9], Dkt. No. 289-4 at 1.  Congress

thus enacted the EFTA "to provide a basic framework establishing the rights, liabilities, and

responsibilities of participants in electronic fund and remittance transfer systems" with the

"primary objective of . . . the provision of individual consumer rights."  15 U.S.C. § 1963(b).

This includes the requirement "insur[ing] that consumers are not forced to use EFT."  124 Cong.

Rec. 25,733, RJN, Dkt. No. 289-4 at 3.  Consumers should "use electronic fund services only out

of voluntary choice, not by force."  H.R. Rep. No. 95-1315, at 12 (1978), RJN, Dkt. No. 289-4 at

22.  The Committee on Banking, Finance and Urban Affairs feared that, absent a prohibition

against the compulsory use of EFT, "institutions, creditors, or the Government might resort to a

variety of ploys to coerce consumers to use electronic fund transfer services[.]"  *Id.*  Congress

specifically identified one such means of coercion: "condition[ing] the extension of credit to a

consumer on such consumer's repayment by means of preauthorized electronic fund transfers."  15

---

[8] Plaintiffs also argue that Congress' prohibition on conditioning credit on the use of EFT "is analogous to other common law injuries, including (a) liability for non-disclosure of information, and (b) trespass to personal property."  Pls.' Mot. at 11.  These arguments are also persuasive indications as to Kempley's Article III standing but are ultimately unnecessary as the Court has found another basis for standing.  *See Spokeo*, 136 S. Ct. at 1549 (indicating not all injuries that Congress elevates were previously adequate "in law").  Plaintiffs further note that neither *Akins* nor *Public Citizen* "identified any common law or other historical antecedents to support standing."  Pls.' Mot. at 3-4.

[9] CashCall's Req. for Judicial Notice ("RJN"), Dkt. No. 289.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    U.S.C. § 1693k(1) ("[N]o person may condition the extension of credit to a consumer on such

2    consumer's repayment by means of preauthorized electronic fund transfers."); *see* CashCall Reply

3    at 5 n.3, Dkt. No. 335 ("It is undisputed that Congress intended in the EFTA to prevent consumers

4    from being required to agree to EFT payment as a condition of the transaction . . . .").  Congress

5    thus defined a right, i.e., the right to choose their payment method in repaying loans, and defined

6    an injury where a person or company extends credit in violation of that right.  *See* 124 Cong. Rec.

7    25,735, RJN, Dkt. No. 289-4 at 5 ("As with any technology, many consumers will choose not to

8    change but to cling to their traditional method of payment.  [Section 1693k(1) is] designed to

9    insure that consumers have this right.").

10          The EFTA guaranteed Kempley the right to choose her method of repayment when she

11   sought credit from CashCall.  When CashCall would not allow her to obtain credit without first

12   agreeing to use EFT payments, it violated that right and caused her to confront the very harms

13   Congress sought to avoid: the lack of choice in using EFT payments and the risks associated with

14   those methods of payments.  *See Spokeo*, 136 S. Ct. at 1549. ("[T]he violation of a procedural

15   right granted by statute can be sufficient in some circumstances to constitute injury in fact.  In

16   other words, a plaintiff in such a case need not allege any *additional* harm beyond the one

17   Congress has identified.").  Moreover, it is not "difficult to imagine how" the risks associated with

18   EFT payments such as nonsufficient fund ("NSF") fees "could work [] concrete harm" to

19   consumers.  *Id.* at 1550.  As the Court found in its FFCL, "there is no dispute that borrowers

20   enrolled in EFT payment were more likely to incur NSF fees than if they used other methods of

21   payment."  FFCL at 21; *see also id.* at 34 ("CashCall took control over its borrowers' method of

22   payment, making it likely borrowers would use that method of payment, and in turn making it

23   likely that borrowers would incur and pay CashCall NSF fees.").  CashCall produced a chart

24   demonstrating customers enrolled in EFT incurred NSF fees significantly more than customers

25   who were not enrolled in EFT.  *See* FFLC at 22 (citing Def.'s Ex. AO).  CashCall's conditioning

26   violation thus deprived Kempley of her choice not to use EFT payments and increased her risk of

27   being charged an NSF fee; indeed, CashCall charged Kempley several NSF fees.  *See* Jt. Pretrial

28   Statement ¶ 5.  Under these circumstances, the Court cannot ignore the dictates of *Spokeo* that "the

United States District Court
Northern District of California

1   risk of real harm" caused by CashCall's violation—NSF fees, for example—satisfies the

2   concreteness requirement.  *See Nicklaw v. Citimortgage, Inc.*, No. 15-14216, __ F.3d __,  2016

3   WL 5845682, at *3 (11th Cir. Oct. 6, 2016) ("A plaintiff must suffer some harm or risk of harm

4   from the statutory violation to invoke the jurisdiction of a federal court."); *see also Ramirez*, 2016

5   WL 6070490, at *4 ("These [] violations created a risk that Plaintiff would be harmed in precisely

6   the way Congress was attempting to prevent[.]"); FFCL at 30 ("In light of the importance

7   Congress put on consumers' right to choose their method of payment, the Court finds CashCall's

8   conditioning violation more than technical or trivial in nature and one that confronts the very issue

9   Congress designed the EFTA to prevent.").

10   None of the arguments CashCall raises in its Reply undermine the foregoing.  First,

11   CashCall contends that "if lack of choice itself were an injury, Plaintiffs should not have excluded

12   from the Class 60,000 borrowers who encountered the same lack of choice but were never charged

13   an NSF fee."  Reply at 1.  Perhaps CashCall is correct, but limiting the class to those borrowers

14   who actually encountered and suffered a risk of using EFT—i.e., NSF fees—sharpens the

15   concreteness of their injuries.  The Court cannot fault Plaintiffs for tailoring their class definition

16   to include only the customers who were more likely to have suffered actual harm.

17   Second, CashCall contends that "[a]rguments about abstract rights to choice and risks of

18   potential harm do not trump the extensive *evidence,* which established that Kempley and Class

19   members preferred making payments by EFT."  Reply at 1 (emphasis in original).  The Court

20   reiterates that for standing purposes in the class action context, Plaintiffs needed only show that

21   the named class representative has standing, not the entire class.[10]  But in any event, Kempley's

22   preference for EFT payments, if any, does not undermine the concreteness of her injury.  *See*

23   FFCL at 30 ("CashCall denied borrowers the choice of using payment methods other than EFT . . .

24

25   _____

26   [10] "*Spokeo* did not alter the well-settled legal principle set forth in *Bates* that 'In a class action, standing is satisfied if at least one named plaintiff meets the [Article III] requirements.'"  *Ramirez*, 2016 WL 6070490, at *5 (quoting *Bates*, 511 F.3d at 985)); *Larson v. Trans Union, LLC*, __ F.

27   Supp. 3d __, 2016 WL 4367253, at *4 (N.D. Cal. Aug. 11, 2016) (also continuing to rely on *Bates*); *McLaughlin v. Wells Fargo Bank, NA*, 2016 WL 3418337, at *6 n.5 (N.D. Cal. June 22,

28   2016) (same).

. Even if borrowers were likely to select EFT payments regardless of CashCall's violation, CashCall still did not give potential borrowers the right to make that choice at the time it extended credit to them.").  In *Havens*, for example, the Supreme Court explicitly found the fact that the tester-plaintiff had no intent of actually renting or purchasing from the defendant did not immunize the defendant from suit.  *See* 455 U.S. at 374.  *Havens* is still binding law on this Court; *Spokeo* did not purport to overturn this decision.

This situation is even less obvious than *Havens* when it comes to intent, i.e., how Kempley would have behaved if CashCall had not violated the EFTA.  In its FFCL, the Court discussed the difficulty of assessing a counterfactual, i.e., "Would X still have happened if Y had not."  FFCL at 19 (quotation omitted)).  Doing so "challenges the imagination of the trier to probe into a purely fanciful and unknowable state of affairs.  He is invited to make an estimate concerning facts that concededly never existed.  The very uncertainty as to what *might* have happened opens the door wide for conjecture."  *Id.* (quoting Wex S. Malone, *Ruminations on Cause-in-Fact*, 9 Stan. L. Rev. 60, 67 (1956) (emphasis in original)).  The Court specifically acknowledged "the fundamentally tenuous nature of trying to determine how class members would have behaved in this alternate reality[.]"  FFCL at 22.  Thus, the Court did not definitely find that class members would have selected EFT if CashCall had given them the choice, but rather acknowledged that Plaintiffs provided no evidence that they would not have—which was particularly problematic as CashCall put on persuasive evidence that consumers seemed to prefer EFT payments.  The Court did not reach a conclusive finding on this issue.

Similarly, the Court did not make a specific finding that Kempley did prefer EFT payments.  Rather, in regard to Kempley's standing under the UCL, the Court pointed out Plaintiffs' lack of evidence that Kempley would have selected a payment form other than EFT.  This absence of evidence was in contrast to CashCall's evidence that borrowers generally prefer EFT payments, which the Court acknowledged was "*persuasive* evidence that Kempl[e]y *likely* would have selected EFT[.]"  FFCL at 37 (emphasis added).  Ultimately though, "[w]ithout evidence to show otherwise" (*id.*), the Court found Plaintiffs had not shown Kempley would not have selected EFT, and had not proved she "lost money or property as a result of" CashCall's

United States District Court
Northern District of California

16

1   conditioning violation, as required under the UCL (*id.* at 34-37; Cal. Bus. & Prof. Code § 17204).

2   The Court did not find Kempley actually preferred EFT payments and would have selected EFT if

3   given the choice—it found Plaintiffs failed to prove that she would not have.  To the extent this

4   finding was unclear, the Court clarifies it now: neither party presented strong enough evidence

5   about Kempley's payment preferences for the Court to make a determinative finding on that issue

6   one way or another.

7          In a footnote, CashCall also argues that "Kempley, like all Class members, did get a

8   choice" of whether to use EFT payments, noting "[b]orrowers had the right to cancel their EFT

9   authorization at any time."  CashCall Reply at 6 n.4 (citing FFCL at 5, No. 13).  It further

10  contends "the Court found that borrowers who remained on EFTs did so by choice and not as a

11  result of 'status quo bias.'"  *Id.* (citing FFCL at 23, 25-26 n.15).  The Court never held that

12  borrowers' decision to stay on EFTs was not a result of status quo bias; the Court's ruling was that

13  Plaintiffs did not show that was in fact the *only* or *primary* reason why they stayed on EFT

14  payments.  *See* FFCL at 9, Nos. 46-48 (noting CashCall's expert "testified" status quo bias did not

15  exist); 25 n.15 ("The problem is Plaintiffs provided no evidence showing that class members

16  suffered from status quo bias or that this bias was responsible for keeping them enrolled in EFT

17  payments.").  Regardless of whether it was status quo bias or not, the Court acknowledged that

18  "[t]he fact that consumers could later change their method of payment does not change the result

19  that CashCall's initial conditioning made it more likely that consumers would use EFT payment.

20  If it did not, why would CashCall have required EFT payment to begin with?"  FFCL at 21.  But

21  more importantly for the purposes of this Order, that Kempley could have mitigated her risk of

22  harm does not deprive her of standing; CashCall provides no support for this argument, and

23  *Spokeo* does not establish this contention.  *See Ramirez*, 2016 WL 6070490, at *4 ("[A]ccording

24  to Defendant, if the consumer is able to avert the risk created by the nondisclosure once made

25  aware of the consumer reporting agency's error such that the consumer does not suffer a tangible

26  injury, the consumer reporting agency is insulated from suit.  *Spokeo* suggests no such thing.").

27         Ultimately, that Plaintiffs did not prove Kempley suffered actual damages does not mean

28  she lacks standing such that she is unable to represent the class through trial and in collecting its

statutory damages.  The fact that Kempley was unable to ultimately prove actual harm does not

mean she has been unable to show CashCall violated a statutory right that in turn caused her to

confront the risk of real harm Congress intended to prevent.  *See Spokeo*, 136 S. Ct. at 1549 ("the

law has long permitted recovery by certain tort victims even if their harms may be difficult to

prove or measure."); *see also Church*, 2016 WL 3611543, at *1 (interpreting *Spokeo* and

determining plaintiff demonstrated injury-in-fact where defendant failed to include certain

disclosures required by FDCPA, even though plaintiff did not allege actual damages from this

failure to disclose); *Stearns*, 655 F.3d at 1026 ("Statutory damages are meant to compensate

victims when actual loss is hard to prove." (quotation omitted)); *Bateman v. Am. Multi-Cinema,

Inc.*, 623 F.3d 708, 719 (9th Cir. 2010) ("Congress expressly created a statutory damages scheme

that intended to compensate individuals for actual or potential damages resulting from . . .

violations, without requiring individuals to prove actual harm."); Def.'s Trial Br. at 5 n.3, Dkt. No.

282 (acknowledging "[t]he difficulty of proving actual damages is why Congress also authorized

statutory damages." (citations omitted)).  On the contrary, the Court finds Plaintiffs have shown

these conditions by a preponderance of the evidence.  *See* FFCL at 4-5, 6-7, 9-10, Nos. 7-13, 21,

24, 30-32, 53, 55.  Consequently, Plaintiffs have established Kempley suffered a concrete injury.

Finally, although CashCall has not challenged the other elements of Article III standing,

the Court finds Plaintiff meets them.  Once a plaintiff establishes such a[ concrete] interest . . . its

burden to establish the other two standing elements—causation and redressability—is lessened."

*Multistar Indus., Inc. v. U.S. Dep't of Transp.*, 707 F.3d 1045, 1054 (9th Cir. 2013).  CashCall's

conditioning its extension of credit on EFT payments was the sole cause of the violation of

Kempley's statutory rights under the EFTA, which can be redressed by an award of statutory

damages.  *See Stearns*, 655 F.3d at 1026; *Bateman*, 623 F.3d at 719.  In sum, the Court finds no

additional trial is needed to confirm Kempley's injury in fact and Article III standing and likewise

denies CashCall's Motion to Amend the FFCL as to the EFTA findings.[11]

---

[11] Under other circumstances, given that the injury-in-fact requirement was different at the time of trial, the Court would find it in the interests of justice to permit Plaintiffs and Kempley "the opportunity to submit additional evidence to meet a standard that CashCall itself argues did not

18

**UCL STANDING ANALYSIS**

Although an additional trial is not necessary to evaluate Kempley's Article III standing, the Court does find Kempley should be allowed to present testimony as to her standing under the UCL. As the Court noted in the FFCL, the UCL requires a plaintiff pursuing a representative action to demonstrate she "lost money or property as a result of" the unlawful act.  FFCL at 36; *see Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1104 (9th Cir. 2013), *as amended on denial of reh'g and reh'g en banc* (July 8, 2013) ("The 'lost money or property' requirement therefore requires a plaintiff to demonstrate some form of economic injury as a result of his transactions with the defendant, . . . although the quantum of lost money or property necessary to show standing is only so much as would suffice to establish Article III injury in fact[.]" (internal quotation marks, citation, and brackets omitted)).  California courts have interpreted the "as a result of" language to require proof of a "causal connection between the harm suffered and the unlawful business activity" but "[t]hat causal connection is broken when a complaining party would suffer the same harm whether or not a defendant complied with the law." *Id.* (quoting *Daro v. Superior Court*, 151 Cal. App. 4th 1079, 1099 (2007), *as modified on denial of reh'g* (July 3, 2007)).

In its FFCL, the Court noted that "for a lawsuit properly to be allowed to continue, standing must exist at all times until judgment is entered and not just on the date the complaint is filed."  FFCL at 34 (quoting *Californians For Disability Rights v. Mervyn's, LLC*, 39 Cal. 4th 223, 232-33 (2006)).  This means that "contentions based on a lack of standing involve jurisdictional challenges and may be raised at any time in the proceeding."  *Id.* (quoting *Mervyn's*, 39 Cal. 4th at 233; brackets omitted); *see Troyk v. Farmers Grp., Inc.*, 171 Cal. App. 4th 1305, 1345 (2009) ("Because elements for standing 'are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." (quoting *Lujan*, 504 U.S. at 561)); Pls.' Tr. Br. at 13 (citing *Troyk*, 171 Cal. App. 4th at 1338); *see also Medrazo v. Honda of N. Hollywood*, 205 Cal.

previously exist."  Pls.' Reply at 1.  The Court, however, has found that Plaintiffs have shown Kempley suffered a concrete injury without such testimony.

United States District Court
Northern District of California

App. 4th 1, 11 (2012), *as modified on denial of reh'g* (Apr. 16, 2012) (plaintiff must establish standing throughout trial to bring a representative action under the UCL).  Thus, when Plaintiffs failed to demonstrate at trial that Kempley had standing under the UCL to represent a class in the potential recovery of restitution, the Court found that it did "not have jurisdiction to be able to award relief to the Conditioning Class under the UCL."  FFCL at 37.

Plaintiffs now contend the Court should give them an additional opportunity to present evidence of Kempley's UCL standing.  Of the arguments raised, the Court finds most persuasive the issue that CashCall did not question Kempley's UCL standing in its pretrial submissions or at trial and relatedly, the Joint Pretrial Conference Statement only identified class-wide issues for trial.  Pls.' Mot. at 17; Jt. Pretrial Statement at 5-6 (defining issues to be resolved at trial as "1. The amount of statutory damages, if any, to be awarded to the Class pursuant to 15 U.S.C. § 1693m(a)(2)"; "2. Whether class members sustained NSF fees collected by CashCall as actual damages as a result of CashCall's conditioning violations under 15 U.S.C. § 1693m(a)(1), and the amount of their damages";  and "3. The amount of restitution to be awarded the class under the UCL based on CashCall's conditioning violations, including amounts collected and cancellation of amounts charged but uncollected by CashCall.").  Plaintiffs explain "they were not put on notice at any time before CashCall's post-trial briefs on October 15, 2015 that her UCL standing was in dispute" and only put on class-wide evidence as a result.  Pls.' Mot. at 19; *id.* at 16.

CashCall argues "Plaintiffs want a do-over because they claim they did not anticipate the factual basis for the Court's ruling, despite the central relevance of evidence regarding Plaintiffs' preference for EFT payment."  CashCall Reply at 20.  It challenges Plaintiffs' decision not to submit Kempley's testimony, calling this a "conscious, strategic decision about how best to present their case" and asserts "Rule 59 does not allow Plaintiffs to ask for a do-over to correct their strategic error."  *Id.*  CashCall does not address its failure to raise standing under the UCL prior to its post-trial brief.

Both parties also highlight the Court's reasoning for finding Kempley lacked standing.  Plaintiffs contend that "[e]ven when it questioned [Kempley's] UCL standing for the first time *after* trial, CashCall did not advance the basis adopted by the Court—namely, that she would have

20

chosen to make payments by electronic fund transfer even if she had been given the option not to do so." Pls.' Mot. at 14 (emphasis in original). In considering CashCall's challenges that (1) class members were more likely to prefer EFT payments regardless of its conditioning, and (2) Kempley could not show she had lost money or property as a result of its EFTA violation, the Court found that Plaintiffs had not proved CashCall's conditioning violation caused Kempley to lose money or property, for instance by "providing evidence that [she] would have elected to use another form of payment other than EFT if CashCall had given her the choice." *Id.* at 37. Plaintiffs, however, assert that "because the basis for the Court's ruling as to Kempley's UCL standing was not raised until the Findings were issued, Plaintiffs should be afforded an opportunity to provide the evidence from Kempley the Court found to be lacking." *Id.* For its part, CashCall notes that "the standing problem in this case is not solely about Kempley or her individual evidence" and asserts "the Court already found—based on the 'class-wide' evidence Plaintiffs supposedly thought was all that mattered—that *the Class* preferred the use of EFT payments[.]" CashCall Reply at 14 (emphasis in original). It appears to argue that should Kempley have an opportunity to put on evidence showing she lost money or property as result of CashCall's conditioning violation, and should the Court believe her, then she is not typical of the class. *Id.* It points out that "[t]he Court can always de-certify the class." *Id.*

In light of the foregoing, the Court finds it appropriate to grant Plaintiffs a limited opportunity to put on evidence of Kempley's UCL standing. While standing is an elemental aspect of a UCL claim, the Court cannot disagree with Plaintiffs that this issue was never raised before the post-trial briefs, and the parties' Pretrial Statement limited the issues for trial in accordance with the Court's Pretrial Order. *See* Case Management Order at 2, Dkt. No. 280 (ordering the parties to file a Joint Pretrial Conference Statement by April 6, 2015, including "[a] plain and concise statement of all disputed factual issues that remain to be decided."). Specifically, as Plaintiffs argue, CashCall agreed in the Joint Pretrial Conference Statement to limit the issues for trial to class-wide monetary relief—it did not identify Kempley's standing or the merits of her individual claim as issues to be tried. *See* Pretrial Statement at 17. In retrospect, the Court agrees with Plaintiffs that the UCL standing issue should have been raised before trial;

21

1   alternatively, once CashCall raised Kempley's standing in its post-trial brief, the Court should

2   have given Plaintiffs the opportunity to address this issue.[12]

3          Plaintiffs point to a number of persuasive cases protecting *defendants* from last minute

4   claims raised by plaintiffs, and the concerns underlying those decisions are persuasive here.  *See*

5   *Dream Games of Ariz., Inc. v. PC Onsite*, 561 F.3d 983, 995-96 (9th Cir. 2009) (secondary patent

6   infringement claim barred where pretrial order contained no mention of secondary infringement

7   liability: "it would be unduly prejudicial to require [defendant] to defend its JMOL motion or this

8   appeal on a theory of secondary liability"); *United States v. First Nat'l Bank*, 652 F.2d 882, 886

9   (9th Cir. 1981) (the "objectives" of the pretrial proceedings is to "simplify issues and avoid

10  unnecessary proof"; "accordingly, a party need offer no proof at trial as to matters agreed to in the

11  [pretrial] order, nor may a party offer evidence or advance theories at the trial which are not

12  included in the order or which contradict its terms.  Disregard of these principles would bring back

13  the days of trial by ambush and discourage timely preparation by the parties for trial.").  "Courts

14  generally hold stipulations, agreements, or statements of counsel made at the pretrial conference

15  binding for purposes of the trial.  This practice furthers the Rule 16 policy of limiting the trial to

16  those issues that are actually in dispute without impairing the basic rights of the litigants."  6A

17  Charles A. Wright et al., Federal Practice and Procedure § 1527 (3d ed. 2016) (footnotes omitted).

18  "This means that testimony . . . on issues not raised in the order or that were not listed before trial,

19  if that was required by the order, may be excluded at the trial."  *Id.* (footnote omitted).  Under

20  other circumstances, CashCall's failure to raise an issue could be considered waiver; however, the

21  issue of standing is not subject to waiver.  *See Troyk*, 171 Cal. App. 4th at 1345 ("[B]ecause

22  standing goes to the existence of a cause of action, lack of standing may be raised . . . at any time

23  in the proceeding, including at trial").  The only way to resolve this issue now is to give Plaintiffs

24  _____

25  [12] Plaintiffs did not object to CashCall's inclusion of this issue into its Post-Trial brief at any point
    prior the Court's issuance of the FFCL or when the parties submitted their proposed judgments to

26  this Court.  However, Plaintiffs explain that "CashCall's *post-trial* filings raised *UCL* standing,
    but not . . . the ground adopted by the Court.  Nothing in CashCall's pretrial or post-trial filings, or

27  during the trial, signaled that Kempley's person preferences regarding EFTs were in issue."  Pls.'
    Mot. at 19 (emphasis in original).

28

United States District Court
Northern District of California

1   the opportunity to offer evidence they did not earlier have the opportunity to present.[13]

2       CashCall's arguments to the contrary are not persuasive.  While it calls Plaintiffs' decision

3   not to call Kempley "a conscious, strategic decision" and argues that Plaintiffs would have "every

4   reason" to present testimony from her (CashCall Reply at 12-13), Plaintiffs rebut that

5   characterization.  Plaintiffs explain that "Kempley's testimony about her individualized experience

6   could not have proven *class-wide* damages.  Her testimony could only detail how and why *she* was

7   personally harmed by the conditioning violation.  Her testimony could not competently prove that

8   the entire Class was harmed by the conditioning requirement of CashCall's loans, which was the

9   issue for trial."  Pls.' Reply at 4, Dkt. No. 337 (citing *Marlo v. UPS, Inc.*, 639 F.3d 942, 945 (9th

10  Cir. 2010) (to support class-wide judgment, "Plaintiff had to provide common evidence to support

11  extrapolation from individual experiences to a class-wide judgment that is not merely speculative.

12  Plaintiff has not come forward with common proof sufficient to allow a fact-finder to make a

13  class-wide judgment as to the FTS.")).  Although Kempley's testimony was always relevant, the

14  Court cannot find that Plaintiffs were adequately on notice about the importance of her testimony

15  for standing purposes; if they had been, they indicate they would have made a different decision.

16      Finally, as to the class certification issue over Kempley's typicality if she ultimately is able

17  to demonstrate that she would have selected a payment method other than EFT, the Court is

18  unconcerned.  As addressed above, in the FFCL, the Court expressly addressed the difficulty of

19  assessing a counterfactual—in this case, what class members would have done had CashCall not

20  violated the EFTA.  The FFCL does not include conclusive findings about what class members

21  would have done if CashCall had not conditioned their loans on EFT payments.  But in any event,

22  this inquiry related only to assessing whether Plaintiffs were entitled to actual damages under the

23  EFTA.  S*ee* 15 U.S.C. § 1693m(a) (violators are liable "in an amount equal to the sum of . . .  (1)

24  any actual damage sustained by such consumer *as a result of* such failure" (emphasis added))).  It

25  does not have any bearing on the UCL's standard of causation, as the UCL "requires only that the

26  plaintiff must once have had an ownership interest in the money or property acquired by the

27

28  ――――――――――――――――――
    [13] Unless the parties stipulate to another finding.

United States District Court
Northern District of California

1   defendant *through* unlawful means."  FFCL at 33 (citing *Shersher v. Superior Court*, 154 Cal.

2   App. 4th 1491, 1500 (2007) (emphasis added); also citing *Sevidal v. Target Corp.*, 189 Cal. App.

3   4th 905, 924 (2010) (the "which may have been acquired standard" is "substantially less stringent

4   than a reliance or 'but for' causation test.")); *see also* Def.'s Post-Trial Br. at 14, Dkt. No. 301

5   ("Under the UCL[], CashCall would be required to restore money that 'may have been acquired'

6   from Class members by reason of the violation.").  Additionally, California courts have

7   "repeatedly and consistently [held] that relief under the UCL is available without individualized

8   proof of deception, reliance and injury[.]"  *In re Tobacco II Cases*, 46 Cal. 4th 298, 320 (2009).

9   Consequently, if Kempley can demonstrate she lost money or property as a result of CashCall's

10  EFTA conditioning violation, the Court finds no reason why it should revisit class certification or

11  delay the issuance of judgment.

12          Thus, Kempley will have one limited opportunity to put on evidence about her UCL

13  standing as discussed below.

### UCL STATUTE OF LIMITATIONS ANALYSIS

15          In its June 3, 2016 Order, the Court asked the parties to address whether, prior to issuing

16  judgment, the Court must consider relevant changes or clarifications in the law that may affect

17  Plaintiffs' conditioning claims.  Dkt. No. 319 at 1-2 (citing *Beaver*, 816 F.3d at 1178).  As the

18  parties are both aware, the *Beaver* Court cited with disapproval this Court's July 2, 2012 ruling

19  that Plaintiffs' UCL claim was subject to the federal statute of limitations of the EFTA.  *See* 816

20  F.3d at 1180 n.5.  The parties acknowledge that *Beaver* clarifies that the statute of limitations on

21  Plaintiffs' UCL claim is based on the UCL's own statute of limitations of four years—not the one-

22  year EFTA statute of limitations.[14]

23          CashCall argues that "whether to reconsider the class definition is entirely within the

24  Court's discretion; it is not mandatory, and a revised class definition would not impact any of the

25  Court's rulings on the merits."  CashCall Mot. at 16.  It argues the Court has "no obligation" to

---

[14] CashCall states it "reserves the right to argue that the *Beaver* decision does not require the Court to change its prior ruling on the statute of limitations, but does not assert that argument for the purposes of this motion."  CashCall Mot. at 15 n.5.

United States District Court
Northern District of California

1    consider this change, and "[c]ourts are afforded significant discretion in decisions to grant or deny

2    new trial motions," which "will not be reversed absent a clear abuse of discretion." *Id.* (citing

3    *Kode v. Carlson*, 596 F.3d 608, 611 (9th Cir. 2010) ("A Rule 59 motion for a new trial is confided

4    to the discretion of the district court, whose decision will be overturned on appeal only for abuse

5    of discretion.") and *Zhang*, 339 F.3d at 1040 (court "will not overturn a district court's denial of a

6    motion for a new trial absent a clear abuse of discretion" (internal quotation marks and citation

7    omitted))).

8         CashCall urges the Court to exercise its discretion not to grant a new trial, and instead

9    allow the Ninth Circuit to address the issue of the statute of limitations applicable to Plaintiffs'

10   UCL claim.  CashCall argues that while a change or clarification in the law or an error of law can

11   be a ground for granting a new trial, *Brown v. Wright*, 588 F.2d 708, 710 (9th Cir. 1978), parties

12   are not required to raise a claim of legal error by a new trial motion.  CashCall Mot. at 16 ("While

13   a change or clarification in the law or an error of law can be a ground for granting a new trial, . . .

14   parties are not required to raise a claim of legal error by a new trial motion.").  And new trial

15   motion is not a prerequisite for an appeal raising an issue that was previously presented to the

16   district court.  *Id.* at 16-17; *see Floyd v. Laws*, 929 F.2d 1390, 1400-01 (9th Cir. 1991) ("As a

17   general rule of federal practice, any question which has been presented to a federal district court

18   for a ruling and which has not thereafter been waived or withdrawn is preserved for review . . . . A

19   question raised and ruled upon need not be raised again on a motion for a new trial to preserve it

20   for review.").  It thus contends the issue "should be raised before the Ninth Circuit in conjunction

21   with the parties' other arguments on appeal" and argues "[i]t would not be an abuse of discretion

22   to deny a new trial motion on the class definition issue."  CashCall Mot. at 3, 16.  Finally,

23   CashCall warns that "expanding the Class at this point would require the Court to undo its prior

24   rulings and start the class notice process all over again." *Id.* at 3.  It suggests that "[t]o undo the

25   prior merits rulings at this point and to undertake new class notice and a new opt-out opportunity

26   would be extremely burdensome, and likely unnecessary because the Ninth Circuit need not ever

27   reach this issue in order to affirm the UCL decision on the merits." *Id.* at 3-4.

28         The Ninth Circuit's decision shows that both CashCall and this Court were wrong in

*United States District Court*
*Northern District of California*

25

1    believing the UCL's four-year statute of limitations must be abandoned when the UCL violation is

2    based on the violation of a federal law.  This binding decision recognizes that "as a general matter,

3    the UCL statute of limitations will apply to a UCL claim, even when that claim is based on an

4    underlying law with its own separate statute of limitations."  *Beaver*, 816 F.3d at 1177; *see also id.*

5    at 1180 (rejecting argument that the applicable federal law's three-year limitations period

6    preempted the UCL four-year statute of limitations because the federal law has a "saving clause,"

7    that "[n]othing in this chapter may be construed to prevent or limit the authority of any State or

8    local government to enact and enforce with regard to the sale of land any law, ordinance, or code

9    not in conflict with this chapter."); Pls.' Reply at 20 (arguing the "EFTA saving clause is even

10   stronger . . . because the EFTA makes clear that 'greater protection' by a state is not 'inconsistent'

11   with the EFTA." (citing 15 U.S.C. § 1693q ("A State law is not inconsistent with this subchapter if

12   the protection such law affords any consumer is greater than the protection afforded by this

13   subchapter.")).  The Court sees no reason why it should upwardly delegate the issue to the Ninth

14   Circuit instead of resolving it now.

15        As Plaintiffs argue "[t]he application of the four-year UCL statute of limitations could

16   significantly impact the Court's decision on the merits because it would allow Plaintiff [Eduardo]

17   De la Torre to pursue this claim on behalf of the Class."[15]  Pls.' Mot. at 20.  Specifically, they

18   contend that "[c]orrect application of the four-year UCL statute of limitations would render De la

19   Torre's claim timely because any loan taken out on or after June 1, 2004 would be included within

20   the Conditioning Class."  *Id.* at 20-21.  The Court agrees that to wait for the Ninth Circuit to rule

21   on the statute of limitations issue, particularly when neither party here truly suggests the Ninth

22   Circuit is likely to come to a different result than *Beaver*, would be a waste of Court resources and

23   time, and not in the interests of justice for the parties.

24        In the interests of judicial efficiency, the Court finds the following procedure to be best

25

26   [15] The Court excluded De la Torre from the Class when it applied the EFTA's one-year statute of
     limitations to the UCL claim.  Order at 1-6, Dkt. No. 127.  Further, as with Kempley, Plaintiffs
27   have interchangeably spelled his name as "De la Torre" and "De La Torre."  *See* Jt. Pretrial
     Statement; Pls.' Mot.  The Court again relies on the most recent variation, that is, "De la Torre."

28

United States District Court
Northern District of California

suited to resolve this situation.  The Court shall hold an evidentiary hearing to determine whether De la Torre and, as discussed above, Kempley, have standing to represent a class of borrowers for the four-year UCL statute of limitations period.  If neither has standing—i.e., cannot demonstrate lost money or property as a result of the conditioning violation, then that will be the end of the matter—the Court will not entertain any request by Plaintiffs to put forward another class representative to represent a UCL-based class.

Should the Court find either of these class representatives has standing to represent an expanded class, CashCall argues the "one-way intervention" doctrine prevents the Court from altering the class at this point.  CashCall Mot. at 19.  The one-way intervention doctrine refers to a situation where a plaintiff in a class action intervenes "after an adjudication favoring the class had taken place.  Such intervention is termed 'one way' because the plaintiff would not otherwise be bound by an adjudication in favor of the defendant." *Schwarzschild v. Tse*, 69 F.3d 293, 295 (9th Cir. 1995) (citation omitted).  CashCall argues that "[i]n order to avoid one-way intervention arising from the UCL order unfavorable to the Class and/or the summary judgment order favorable to the Class, the trial and the summary judgment rulings as to the UCL claim must be vacated."  CashCall Mot. at 19.[16]

Rule 23(c)(1) requires the district court to rule on class certification "at an early practicable time" after the filing of the lawsuit. Fed. R. Civ. P. 23(c)(1).  "[T]he history of the development of Rule 23(c)(2) makes clear that the rule was adopted to prevent 'one-way intervention'—that is, the intervention of a plaintiff in a class action after an adjudication favoring the class had taken place[,]" and declining to intervene or opt-in if the ruling was not favorable to the plaintiff. *Schwarzschild*, 69 F.3d at 295.  "[I]t is unsettled in the Ninth Circuit whether—and if so, in what

---

[16] Plaintiffs also raise an argument that "CashCall induced the Court to make an erroneous statute of limitations ruling."  Pls.' Mot. at 26.  They explain that "[b]ecause CashCall invited the very error the effects of which it now argues against, it cannot shield itself from that error to avoid either the proper re-definition of the Class or seek the erasure of the summary judgment order or the trial judgment." *Id.* (citing *Mary M. v. City of L.A.*, 54 Cal. 3d 202, 212 (1991) ("when a party by its own conduct induces the commission of error, it may not claim on appeal that the judgment should be reversed because of that error.")).

United States District Court
Northern District of California

circumstances—equity can support post judgment certification and notice after determination" of a summary judgment motion. *Gomez v. Rossi Concrete Inc.*, 2011 WL 666888, *2 n.1 (S.D. Cal. 2011); *Weir v. Joly*, 2011 WL 6043024, at *1 (D. Or. Dec. 2, 2011) (noting that "while *Schwarzschild* prevents a defendant from compelling notice of a pending class action after a decision on its own motion for summary judgment, the Ninth Circuit has yet to rule whether that rule applies to plaintiffs as well").  Other Courts of Appeals have affirmed denial of class certification based on the principle that certification after judgment has been entered would allow putative class members to wait and see whether the judgment was favorable to plaintiff before joining, and being bound by, the action.  *See Kerkhof v. MCI WorldCom, Inc.*, 282 F.3d 44, 55 (1st Cir. 2002) (citing *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 545-49 (1974)); *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 558 (8th Cir. 1982) ("It is rarely appropriate for a court to delay the certification decision until after a trial on the merits."); *Horn v. Associated Wholesale Grocers, Inc.*, 555 F.2d 270, 273 (10th Cir. 1977) ("The district court's delay in making a decision on certification of the class until after the trial on the merits appears to be a procedure which is not in harmony with the literal terms of Rule 23(c)(1) or with many of the cases."); *Gooch v. Life Inv'rs Ins. Co. of Am.*, 672 F.3d 402, 432 (6th Cir. 2012) ("The rule against one way intervention prevents potential plaintiffs from awaiting merits rulings in a class action before deciding whether to intervene in that class action.").

However, as the Ninth Circuit as expressly recognized, "[n]either Fed. R. Civ. P. 23 nor due process necessarily requires that the district court rule on class certification before granting or denying a motion for summary judgment."  *Wright v. Schock*, 742 F.2d 541, 545-46 (9th Cir. 1984); *see* Fed. R. Civ. P. 23(c)(1) (class certification should be made at an early "practicable" time).  Under certain limited circumstances it is appropriate for the Court to resolve class certification issues even after the entry of judgment.  *See, e.g.*, *Postow v. OBA Fed. Sav. & Loan Ass'n*, 627 F.2d 1370, 1382 (D.C. Cir. 1980).  The *Postow* court noted that previous federal cases demonstrate a tolerance "for allowing, in appropriate circumstances, potential class members the option of joining an action after the trial court has passed on the merits of the basic claim."  *Id.* at 1382.  In doing so, the *Postow* Court rejected the defendants' argument that it had erred in not

vacating class certification as improper because the final designation of the class and the sending of class notice occurred only *after* the court had granted summary judgment for the plaintiffs. *Postow* stated that the case law indicates that "there may be equitable reasons for allowing post-judgment certification in some cases.  We believe this is such a case." *Id.* at 1383.

Postow also pointed out that the Supreme Court has decided that denial of class certification under Federal Rule of Civil Procedure 23(b)(3) can be appealed after a decision on the merits.  *Id.* at 1382.  "A necessary corollary to those cases is that if the denial of the class certification is reversed and remanded, the class may be certified after the entry of judgment.  Those cases therefore demonstrate the Court's tolerance for allowing, in appropriate circumstances, potential class members the option of joining an action after the trial court has passed on the merits of the basic claim."  *Id.*  Various treatises have agreed, adopting *Postow*'s reasoning that "[s]ince the Supreme Court has decided that denial of class certification under Fed. R. Civ. P. 23(b)(3) can be appealed after a decision on the merits, a necessary corollary of this ruling is that if the denial of the class certification is reversed and remanded, the class may be certified after the entry of judgment."  6A Stacy L. Davis et al., Federal Procedure, Lawyers Edition § 12:287 (2016); 32 Am. Jur. 2d, Federal Courts § 1784 (2016) (same) (both with footnotes omitted).

The circumstances of this case contemplate the same issue raised by *Postow* and these treatises.  If the Court follows CashCall's recommendation, and the Ninth Circuit reverses the Court's finding on the one-year UCL statute of limitations, thus expanding the UCL class to four years, then the parties would be in the same position they are in now with regard to the UCL claim.  Accordingly, under these complex and unique circumstances, this is the rare case where it may be appropriate for class members to join an action after the Court has determined the merits of the claim.  *See Postow*, 627 F.2d at 1383-84 ("[T]aking the complicated sequence of events in this case into consideration, we do not find that the trial court abused its discretion in managing the case as it did with regard to the timing of class certification.").

In sum, the one-way intervention doctrine is not dispositive of Plaintiffs' Motion or the Court's plan to hold an evidentiary hearing on the issue of the class representatives' standing to

1   bring their UCL claims on behalf of the class. The Court is not making a determinative finding at

2   this point that it will alter the class definition or certify a four-year UCL class.[17] The first issue

3   that must be resolved is whether Plaintiffs' class representatives have standing under the UCL to

4   even represent an expanded class. *See City of Inglewood v. City of L.A.*, 451 F.2d 948, 951 (9th

5   Cir. 1971) (proper for district court to assume the suit was a class action in order to determine if it

6   had jurisdiction, without first making the finding required by Rule 23(c)(1)). After that point, the

7   Court can determine whether CashCall's arguments about re-opening discovery and potential

8   revisions to prior orders are warranted under the circumstances.[18]

9                                         **CONCLUSION**

10              In light of the foregoing, the Court hereby **DENIES** CashCall's Motion and **GRANTS IN**

11   **PART** and **DENIES IN PART** Plaintiffs' Motion. The Court consequently **ORDERS** as follows:

12              (1) the portion of the FFCL entitled "Restitution Under the UCL" is stricken (*see Kemply*

13                   *v. Cashcall, Inc.*, 2016 WL 1055251, at *18-20 (N.D. Cal. Mar. 16, 2016)); and

14              (2) by December 8, 2016, the parties shall meet and confer and propose a plan to submit

15                   additional evidence regarding Kempley's and De la Torre's standing under the UCL,

16                   whether through an evidentiary hearing, deposition testimony, or otherwise.

17              (3) If the parties elect an evidentiary hearing, they shall include in their proposed plan

18                   three dates on which they are available this hearing, no later than April 30, 2017. They

19                   also shall submit a joint proposal for how the hearing should be conducted (e.g.,

20                   proposed preliminary findings of fact filed with the Court by [date]; live testimony by

21                   class representatives over [x] days; proposed final findings of fact filed with the Court

22                   by [date]; etc.).

23   ─────────────────

24   [17] Nor is it altering the EFTA claims or class. As Plaintiffs point out, "by CashCall's own
     admission, the newly added Class Members would have only UCL claims and not separate claims
25   under the EFTA." Pls.' Reply at 12.

26   [18] CashCall contends "[t]he Court [] would have to re-open discovery, since there is zero evidence
27   about the proposed new Class members, such as how many there are and how much they were
     charged in NSF fees. The expanded class may even impact evidence already presented, such as
28   Class members' preference for EFTs." CashCall Reply at 22.

(4) Within 90 days of the date of this Order, the parties shall attend another settlement conference with Magistrate Judge Laurel Beeler.

**IT IS SO ORDERED.**

Dated: November 23, 2016

_____
MARIA-ELENA JAMES
United States Magistrate Judge