UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EDUARDO DE LA TORRE, ET AL.,

Plaintiffs,

v.

CASHCALL, INC.,

Defendant.

Case No. 08-cv-03174-MEJ

**ORDER GRANTING MOTION FOR FINAL APPROVAL AND MOTION FOR ATTORNEYS' FEES, COSTS, AND SERVICE AWARDS**

Re: Dkt. Nos. 367, 370

## INTRODUCTION

After litigating this certified class action for nearly nine years, Plaintiffs Eduardo De La Torre and Lori Kempley (together, "Plaintiffs") submitted to the Court a proposed Settlement which resolved one of their claims. *See* Settlement, Dkt. No. 362. On June 21, 2017, the Court preliminarily approved the proposed settlement and directed notice be sent to Class Members. Order re: Preliminary Approval ("Prelim. Approval Order"), Dkt. No. 364. Plaintiffs now move the Court to (1) finally approve the Settlement; (2) grant Plaintiffs' Motion for Attorneys' Fees, Costs, and Service Awards; and (3) enter judgment. Fees Mot., Dkt. No. 367; Final Approval Mot., Dkt. No. 370. The Court held a hearing on these matters on November 16, 2017. Having considered the parties' arguments, the relevant legal authority, and with the benefit of oral argument, the Court **GRANTS** the Motion for Final Approval and the Motion for Attorneys' Fees, Costs, and Service Awards.

## BACKGROUND

**A.  Factual Allegations[1]**

In February 2006, Mr. De La Torre borrowed $2,600 from Defendant CashCall, Inc. ("CashCall") based on an annual percentage rate of interest ("APR") of approximately 98%. Fourth Am. Compl. ("FAC") ¶ 24, Dkt. No. 54.  In May 2006, Ms. Kempley borrowed $2,525 from CashCall based on an APR of 99.07%.  *Id.* ¶ 28.

Plaintiffs allege CashCall made loans to Mr. De La Torre and Ms. Kempley that were beyond their financial abilities to repay in the time and manner set forth in the CashCall Promissory Note and Disclosure Statement.  *Id.* ¶¶ 25, 29.  They contend CashCall did not assess Mr. De La Torre's or Ms. Kempley's earning capacities, monthly expenses, or outstanding debts when it approved them for their loans.  *Id.* ¶¶ 27, 31.  Plaintiffs further allege CashCall conditioned the extension of credit on consumers' repayment by means of preauthorized electronic fund transfers ("EFTs").  *Id.* ¶ 48.

**B.  Procedural Background**

On July 1, 2008, Plaintiffs initiated this action on behalf of themselves and similarly situated individuals.  *See* Compl., Dkt. No. 1.  On February 25, 2010, they filed the operative FAC.  *See* FAC.  The FAC asserts a total of six claims.  It asserts claims for violations of (1) the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693; (2) the California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750; and (3) the Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788.  *Id.* ¶¶ 41-72.  In addition, the FAC asserts three claims under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, predicated on the aforementioned violations.  *Id.* ¶¶ 73-106.  As is relevant here, Plaintiffs' EFTA claim is based on CashCall's alleged practice of conditioning the extension of credit on the consumer's repayment by means of preauthorized EFTs in violation of 15 U.S.C. § 1693k(1).[2]  *Id.* ¶ 48.  This

---

[1] Former Plaintiff Krista O'Donovan dismissed her individual claims against CashCall on August 20, 2012.  Dkt. No. 132.

[2] "No person may . . . condition the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers[.]"  15 U.S.C. § 1693k(1).

violation is also the basis for one of Plaintiffs' UCL claims. *Id.* ¶ 96.

  1. <u>Class Certification, Summary Judgment, and Appeal</u>

  On November 15, 2011, the Court certified two classes. Class Cert. Order, Dkt. No. 100. It certified a Conditioning Class, which was later limited to "[a]ll individuals who, while residing in California, borrowed money from CashCall, Inc. for personal, family, or household use on or after March 13, 2006 through July 10, 2011 and were charged [a nonsufficient fund ('NSF')] fee." Order Approving Class Notice Plan, Dkt. No. 130.[3] The Court also certified a Loan Unconscionability Class of "[a]ll individuals who while residing in California borrowed from $2,500 to $2,600 at an interest rate of 90% or higher from CashCall for personal family or household use at any time from June 30, 2004 through July 10, 2011." Class Cert. Order at 38. The Court later appointed James Sturdevant, Arthur Levy, and Whitney Stark as class counsel. Dkt. No. 127 at 6-7; Dkt. No. 130.

  Thereafter, the parties filed Cross-Motions for Summary Judgment. Dkt. Nos. 159, 166, 175. On July 30, 2014, the Court denied CashCall's Motion for Summary Judgment on Plaintiffs' conditioning and unconscionability claims and granted Plaintiffs' Motion Summary Judgment on the EFTA violation. Order re: Mots. for Summ. J. ("MSJ Order"), Dkt. No. 220. CashCall moved the Court to reconsider its denial of summary judgment on the unconscionability claim. Dkt. No. 234. The Court granted the Motion for Reconsideration and granted CashCall's Motion for Summary Judgment as to the unconscionability claim. Dkt. No. 239. The Court entered judgment on this claim pursuant to Federal Rule of Civil Procedure 54(b) (Dkt. No. 247), and Plaintiffs appealed (Dkt. No. 248).[4]

---

[3] The Court confirmed this definition on March 16, 2016. Dkt. No. 311.

[4] On April 24, 2017, the Ninth Circuit certified the following question to the California Supreme Court: "Can the interest rate on consumer loans of $2500 or more governed by California Finance Code § 22303, render the loans unconscionable under California Finance Code § 22302?" Dkt. No. 357. The California Supreme Court has agreed to decide this question (*see* Dkt. No. 365), and briefing is in progress (*see* Dkt. Nos. 368-69). As of the date of this Order, the California Supreme Court has not decided the issue.

2. <u>Bench Trial</u>

The Court held a bench trial on September 8 and 9, 2015 on the issue of whether Plaintiffs are entitled to statutory and/or actual damages under the EFTA and/or restitution under the UCL. *See* Sept. 8, 2015 Trial Tr., Dkt. No. 296; Sept. 9, 2015 Trial Tr., Dkt. No. 298. On March 16, 2016, the Court issued its Findings of Fact and Conclusions of Law. Findings of Fact & Conclusions of Law ("FFCL"), Dkt. No. 312. The Court (1) ordered CashCall to pay a statutory penalty of $500,000 for its EFTA violation, but found Plaintiffs and the Class otherwise failed to show they were entitled to actual damages under the EFTA; and (2) found Plaintiffs had not established they were entitled to restitution, as they failed to prove they had standing to pursue a representative action under the UCL's "lost money or property" requirement. *See id.* The Court further ordered the parties to submit proposed judgments and a notice plan to inform the Class about the trial's outcome and to distribute the statutory award to the Class no later than May 2, 2016. *Id.* The Court also ordered the parties to file a supplemental status report to address some of its concerns about the proposed notice plan. May 12, 2016 Order, Dkt. No. 314.

In the parties' Joint Response to the May 12, 2016 Order, CashCall stated it intended to move to amend the judgment or for a new trial based on the United States Supreme Court's recent decision in *Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540 (2016) *as revised* (May 24, 2016), which CashCall asserted "compels the finding that . . . Kempl[e]y [also] lacks standing under the EFTA." Jt. Resp. at 1, Dkt. No. 315. The Court stayed any pending deadlines to allow the parties to file cross-Rule 59 motions. Dkt. Nos. 319, 325.

3. <u>Post-Trial Motions</u>

CashCall moved to amend the FFCL and enter judgment in its favor pursuant to Rule 59(a)(2), on the ground that *Spokeo* made it clear that Ms. Kempley lacked standing to pursue damages under the EFTA on both her own behalf and on behalf of the Class. CashCall Rule 59 Mot. at 1, Dkt. No. 326. Plaintiffs filed an opposition and affirmatively moved under Rule 59, or alternatively Rule 52, to submit additional evidence, amend the class definition, and amend the FFCL. Pls.' Rule 59 Mot., Dkt. No. 334. The Court denied CashCall's Motion and granted in part Plaintiffs' Motion. *See* Relief Order. The Court found "Kempley's harm, albeit an intangible one,

4

is sufficiently concrete to satisfy Article III's standing requirement. Through § 1693k(1) of the EFTA, Congress defined a specific right, which was based on the risk of real harm, and thereby elevated a violation of that right to legally cognizable, concrete injury." *Id.* at 13. Specifically,

> [t]he EFTA guaranteed Kempley the right to choose her method of repayment when she sought credit from CashCall. When CashCall would not allow her to obtain credit without first agreeing to use EFT payments, it violated that right and caused her to confront the very harms Congress sought to avoid: the lack of choice in using EFT payments and the risks associated with those methods of payments.

*Id.* at 14 (citing *Spokeo*, 136 S. Ct. at 1549 ("[T]he violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact. In other words, a plaintiff in such a case need not allege any additional harm beyond the one Congress has identified.")).

The Court also noted that "[w]hile standing is an elemental aspect of a UCL claim, . . . this issue was never raised before the post-trial briefs, and the parties' Pretrial Statement limited the issues for trial in accordance with the Court's Pretrial Order." *Id.* (citing Case Management Order at 2, Dkt. No. 280); *see* Jt. Pretrial Conference Statement, Dkt. No. 281. The Court thus granted Plaintiffs a limited opportunity to put on evidence of such standing. Relief Order at 21-24.

The Court also concluded it had erred in applying EFTA's one-year statute of limitations instead of the UCL's four-year statute of limitations to the Conditioning Claims. *Id.* at 25-26 (citing *Beaver v. Tarsadia Hotels*, 816 F.3d 1170, 1178 (9th Cir. 2016), *cert. denied*, 137 S. Ct. 113 (2016)); *see also* Order re Class Definitions, Dkt. No. 127. The Court allowed the parties to request an evidentiary hearing to determine whether Mr. De La Torre and Ms. Kempley had standing to represent a class of borrowers for the four-year UCL statute of limitations period. Relief Order at 27. The parties requested an evidentiary hearing, which the Court scheduled for April 5, 2017. Dkt. No. 345.

### 4. Settlement and Preliminary Approval

In the meantime, the parties returned to settlement negotiations. Dkt. Nos. 347, 350. On March 10, 2017, they reached a settlement as to the Conditioning Claims. Dkt. No. 350. The Court accordingly vacated the evidentiary hearing and set a briefing schedule for Plaintiffs to file

5

the instant motion.  Dkt. No. 356.

Plaintiffs moved for preliminary approval of the Settlement on May 17, 2017.  *See* Dkt. No. 361.  In considering the Settlement, the Court found it deficient only in one regard: although the Settlement provided that undistributed Settlement Funds would be given to a cy pres recipient, it did not identify who that recipient would be.  Prelim. Approval Order at 16-17; *see* Settlement ¶ 4.13.  The Court found this did not preclude preliminary approval and granted Plaintiffs' Motion. On July 12, 2017, the parties submitted a joint report, in which Plaintiffs propose that four cy pres recipients will receive equal shares of undistributed Settlement Funds: California Reinvestment Coalition, Consumer Federation of California, National Association of Consumer Advocates, and Consume Federation of America.  Cy Pres Report, Dkt. No. 366.  CashCall does not oppose this proposal. *Id.*

<strong>SETTLEMENT TERMS</strong>

The key provisions of the Settlement are as follows.

**A.      The Settlement Class**

The Settlement provides relief for the Conditioning Class, defined as "all individuals who, while residing in California, borrowed money from CashCall for personal, family, or household use from March 13, 2006 through July 10, 2011 and were charged an NSF fee."  Settlement ¶ 1.5.

**B.      Remedies**

CashCall shall pay a maximum of $1.5 million (the "Settlement Fund").  The Settlement allocates $830,000 of the Settlement Fund to Class Members who paid NSF fees prior to the cancellation, if any, of their respective authorizations to collect loan payments via EFT.  *Id.* ¶ 3.1. Class Members will receive a pro rata share of the $830,000 fund equal to the ratio of the total NSF fees he or she actually paid prior to the EFT cancellation, if any, as compared to the total NSF fees collected from all Class Members prior to EFT cancellations.  *Id.*

CashCall further agrees to release all Class Members from liability for all NSF fees CashCall charged prior to the cancellation, if any, of their respective authorizations to collect loan payments via EFT.  *Id.* ¶ 3.3; *see id.* ¶ 6.1(b).  The release shall apply to all Class Members, whether or not they paid NSF fees.  *Id.* ¶ 3.3.  If a Class Member has an open loan account that

includes unpaid charges for NSF fees, CashCall shall recalculate the loan account to eliminate such charges.  *Id.*

## C.       Distribution of Funds

The Settlement Administrator shall mail Class Members payment in the form of a check.  *Id.* ¶ 3.1.  Class Members shall have 60 days from the date of mailing to cash their checks.  *Id.* ¶ 4.13.

CashCall will provide the Settlement Administrator with, among other things, Class Members' contact information, including their last known mailing and email addresses.  *Id.* ¶ 4.3.  The Settlement Administrator shall update Class Members' addresses through the National Change of Address Database.  *Id.* ¶ 4.5.  If a Class Member cannot be located—i.e., email and mail notices are returned undeliverable—the Settlement Administrator will not attempt to mail that Class Member a check, but shall retain any payment due to that Class Member.  *Id.* ¶ 3.2.

Within ninety days of the initial distribution, the Settlement Administrator shall report to the parties the total amount of funds, if any, related to (1) Class Members who could not be located, and (2) checks that were mailed but were not cashed.  *Id.*; *id.* ¶ 4.13.  The Settlement requires the parties to meet and confer to discuss whether a second distribution is appropriate or whether the residual funds should be paid to the cy pres recipient(s) approved by the Court.  *Id.* (both).  The Court shall have final approval over whether to make a second distribution or to pay the cy pres recipient(s).  *Id.* ¶ 3.2.

## D.       Opt-Outs and Objections

Class Members may opt out of the Settlement by mailing a written request to both CashCall's and Plaintiffs' counsel.  *Id.* ¶ 4.7.  The opt out request must include (1) the Class Member's name, signature, address, and telephone number; and (2) a statement that the Class Member requests to be excluded or to opt out of the Settlement.  *Id.*  If more than 100 Class Members—that is, approximately 0.1% of the Class—request exclusion, CashCall shall have the option to rescind and void the Settlement before the Court finally approves the Settlement.  *Id.*

Class Members may also object to the Settlement and/or request to be heard at the final approval hearing.  *Id.* ¶¶ 4.8-4.9.  The Settlement requires Class Members to mail their objections

to the Settlement Administrator.  The objection must (1) state the Class Member's name, address, and telephone number; (2) include all documents or testimony supporting such objection; and (3) provide a detailed statement of any objection asserted, including the grounds therefor and reasons, if any, for requesting the opportunity to appear and be heard at the final approval hearing.  *Id.* ¶ 4.9.

### E.  Attorneys' Fees, Costs, and Service Awards

The Settlement Fund allocates a maximum of $650,000 for payment of Class Counsel's attorneys' fees and costs.  *Id.* ¶ 3.5.  If the Court awards less than $650,000, the amount by which $650,000 exceeds the awarded amount shall be included in the distribution to Class Members.  *Id.*

The Settlement further provides for $10,000 in service awards for each Ms. Kempley and Mr. De La Torre, subject to Court approval.  *Id.* ¶ 3.4.  Should the Court approve service awards totaling less than $20,000, the amount by which $20,000 exceeds the approved sum shall be distributed to Class Members.  *Id.*

### F.  Settlement Administrator and Administration Costs

Under the terms of the Settlement, CashCall shall pay all costs of notice and all other fees, costs, and expenses charged or incurred by the Settlement Administrator.  *Id.* ¶ 3.6.  CashCall shall pay these expenses in addition to the $1.5 million Settlement Fund.  *Id.*

Plaintiffs propose Kurtzman Carson Consultants ("KCC") as the Settlement Administrator.  Mot. at 18; Settlement ¶ 2.19.  KCC administered the 2012 class notice after the Court granted class certification.  *Id.*; Dkt. Nos. 128, 130.

### G.  Release of Claims

In exchange for benefits under the Settlement, Class Members

> shall be deemed to release and forever discharge the Released Parties from and shall be forever barred from instituting, maintaining, prosecuting or asserting any and all claims, liens, debts, demands, rights, actions, suits, causes of action, controversies, costs, expenses, attorneys' fees, obligations, damages or liabilities of any nature whatsoever, whether individual, class or representative, whether legal, equitable, administrative, direct, indirect, or otherwise, whether known or unknown, whether arising under any international, federal, state or local statute, ordinance, common law, regulation, principle of equity or otherwise, that actually were asserted in the Litigation relating to the Conditioning Claim or that

8

> could have been asserted based in any manner on an allegation that
> CashCall conditioned the extension of credit on an agreement by
> borrowers to use EFTs as the method of repaying their loans.

Settlement ¶ 6.1(a). "Released Parties" include "CashCall and its present and former subsidiaries,

parents, affiliates, divisions, officers, directors, members, managers, shareholders, insurers,

employees, agents, attorneys, legal representatives, heirs, predecessors, successors, and assigns."

*Id.* ¶ 2.18.

In addition, Plaintiffs and the Released Parties agree to

> mutually release and forever discharge each other from and shall be
> forever barred from instituting, maintaining, prosecuting or asserting
> any and all claims, liens, debts, demands, rights, actions, suits,
> causes of action, controversies, costs, expenses, attorneys' fees,
> obligations, damages or liabilities of any nature whatsoever, whether
> individual, class, or representative, whether legal, equitable,
> administrative, direct, indirect, or otherwise, and whether known or
> unknown, relating to the Conditioning Claim or in any manner
> relating to CashCall's conditioning the extension of credit on
> payments by EFTs, and in relation to every other claim that was
> asserted or could have been asserted in the Litigation other than the
> Unconscionability Claim.

*Id.* ¶ 6.2(a). Plaintiffs further waive their rights under California Civil Code section 1542. *Id.*

## H.    Effect on Unconscionability Claim

The Settlement does not affect or impair the Unconscionability Claim, including Plaintiffs'

rights to seek attorneys' fees and costs based on the Unconscionability Claim. *Id.* ¶ 7.1.

## MOTION FOR FINAL APPROVAL

## A.    Legal Standard

The Ninth Circuit maintains "a strong judicial policy that favors settlements, particularly

where complex class action litigation is concerned." *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th

Cir. 2015) (internal quotation marks omitted). "[S]ettlement class actions present unique due

process concerns for absent class members[.]" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026

(9th Cir. 1998); *see Allen*, 787 F.3d at 1223 ("[T]he district court has a fiduciary duty to look after

the interests of those absent class members."). There is, for instance, "the risk that class counsel

may collude with the defendants." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 944

(9th Cir. 2015) (internal quotation marks omitted).

United States District Court
Northern District of California

To guard against such risks, Federal Rule of Civil Procedure 23(e) requires courts to determine whether a proposed settlement "is fundamentally fair, adequate, and reasonable." *Hanlon*, 150 F.3d at 1026; Fed. R. Civ. P. 23(e)(2) ("If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate."). The Ninth Circuit has identified eight factors courts should consider in evaluating the fairness of a class action settlement:

> (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement.

*In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (citation omitted). "It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness." *Hanlon*, 150 F.3d at 1026. Courts cannot "delete, modify or substitute certain provisions"; rather, "[t]he settlement must stand or fall in its entirety." *Id.* (internal quotation marks omitted).

Where, as here, the court previously certified the class action "under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so." Fed. R. Civ. P. 23(e)(4).

## B. Adequacy of Notice[5]

Before assessing the fairness of the Settlement, the Court considers whether Class Members received adequate notice of it. *See* Fed. R. Civ. P. 23(c)(2)(B) ("For any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."). Notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present

[5] The Court certified the Class prior to settlement, and the parties do not request to alter the Class definition. The Court therefore does not revisit the Rule 23(b) analysis.

their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). "Notice is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 962 (9th Cir. 2009) (internal quotation marks omitted).

The Court approved the form and content of the proposed notice, as well as the method of providing notice. Prelim. Approval Order at 17-18. Pursuant to the terms of the Settlement, on July 6, 2017, CashCall provided Settlement Administrator KCC with an Excel file containing the names, mailing addresses, and email addresses of 95,688 individuals identified as Class Members. Perry Decl. ¶ 2, Dkt. No. 370-1. KCC reviewed the data; removed 1,852 duplicate and 2 incomplete records; and processed the names and addresses through the USPS National Change of Address ("NCOA") database. *Id.*; Suppl. Perry Decl. ¶ 2, Dkt. No. 376. KCC determined there were 94,736 unique Class Members. Suppl. Perry Decl. ¶ 2. After removing the three individuals who opted out of the Settlement, there remain 94,733 Class Members. *Id.*

On August 7, 2017, KCC took the following steps to provide notice to Class Members. *See id.* ¶¶ 3-6. First, KCC established a website and a toll free interactive voice recognition telephone line for the Settlement.[6] *Id.* ¶¶ 3-4. The website allows Class Members to download relevant case documents such as the long-form Class Notice, Settlement Agreement, Motion for Preliminary Approval, Preliminary Approval Order, and Motion for Attorneys' Fees; provides answers to frequently asked questions; and provides contact information. *Id.* ¶ 3. The telephone line also provides answers to frequently asked questions and includes all information and features as required by section 4.5 of the Settlement. *Id.* ¶ 4; *see id.*, Ex. A (telephone hotline script). Second, KCC sent the Long Form Email Notice to 85,027 Class Members whose email addresses KCC validated. *Id.* ¶ 5; *see id.*, Ex. B (email notice). KCC mailed the postcard Short Form Notice to the 9,707 Class Members for whom KCC did not have a valid email address. *Id.* ¶ 6; *see id.*, Ex. C (postcard notice).

On August 17, 2017, KCC mailed the Short Form Notice to 10,974 Class Members whose

---

[6] The website is available at www.cashcallconditioningclasssettlement.com.

validated Email Notice was returned as undeliverable. *Id.* ¶ 7. These postcards were sent to the mailing addresses provided in the Excel file, updated through a NCOA database search. *Id.*

KCC project manager Andrew Perry oversaw the notice administration for the Settlement. *Id.* ¶ 1. Mr. Perry declares that as of October 23, 2017, there were 4,471 Short Form Notices returned as undeliverable. *Id.* ¶ 8. KCC searched updated addresses for these Class Members and re-mailed the Short Form Notice to 3,981 Class Members at their updated address. *Id.*; *see id.*, Ex. D (October 16, 2017 Weekly Case Status Report identifying number of notices returned as undeliverable and re-mailed). A total of 463 Short Form Notices were returned as undeliverable after this mailing. *Id.* ¶ 9.

In addition, KCC has received a total of 32 requests for exclusion, 29 of which were received in 2012 after the Court certified the Class. Perry Decl. ¶ 10 & Ex. E (list of Class Members requesting exclusion). KCC has received no objections. *Id.* ¶ 11.

Under the circumstances, the Court is satisfied this method of providing notice was reasonably calculated, and the best practicable means, to notify Class Members of the Settlement. While 463 Class Members did not receive email or postcard notice, Rule 23 does not require actual notice of settlement to class members in time to opt out of the class. Rather, notice need only be "reasonably certain to inform the absent members of the plaintiff class[.]" *Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994) (internal quotation marks omitted); *see Mullane*, 339 U.S. at 319 ("[N]otice reasonably certain to reach most of those interested in objecting is likely to safeguard the interests of all, since any objections sustained would inure to the benefit of all. We think that under such circumstances reasonable risks that notice might not actually reach every beneficiary are justifiable.").

## C.  Fair, Adequate, and Reasonable

In preliminarily approving the Settlement, the Court found it was "fair, reasonable, and adequate" under Rule 23(e)(2). The preliminary approval stage is "an 'initial evaluation' of the fairness of the proposed settlement made by the court on the basis of written submissions and informal presentation from the settling parties." *In re High-Tech Emp. Antitrust Litig.*, 2013 WL 6328811, at *1 (N.D. Cal. Oct. 30, 2013) (citation omitted). The Court now considers each of the

*In re Bluetooth* factors to determine whether the Settlement is fair, adequate, and reasonable.

### 1. The Strength of Plaintiffs' Case

The Court granted summary judgment in favor of Plaintiffs on the Conditioning Claims. *See* MSJ Order. The Court found Plaintiffs are entitled to statutory damages. *See* FFCL. Plaintiffs thus have a strong claim, and this factor favors final approval.

### 2. The Risk, Expense, Complexity, and Likely Duration of Further Litigation

Despite the Court's rulings and findings, CashCall has consistently denied liability under the EFTA on the ground that § 1693k does not apply where, as here, the creditor allows the borrower to cancel EFT payments. Plaintiffs are confident "in this Court's ruling on the issue, [but] they cannot say that the issue is without appellate litigation risk because there is no appellate decision on this issue." Final Approval Mot. at 8. Regardless of its final outcome, any appeal on this issue is likely to be expensive and further delay relief to Class Members in this 2008 case; the Settlement provides Class Members with immediate relief. As such, this factor weighs in favor of final approval.

### 3. The Risk of Maintaining Class Action Status throughout Trial

The Court certified the Conditioning Class and held a bench trial on the Conditioning Claims. It did not decertify the Class. Accordingly, Plaintiffs have shown that they can maintain class action status throughout trial, and this factor favors final approval.

### 4. The Amount Offered in Settlement

The Settlement allocates $830,000 to Class Members and waives outstanding NSF fees CashCall charged prior to Class Members' cancellation, if any, of their authorizations to collect loan payments via EFT. Settlement ¶¶ 3.1, 3.3. The cash payment alone is $330,000 more than the Court awarded Plaintiffs after the bench trial. *See* FFCL.

There were 55,945 Class Members who paid NSF fees prior to cancellation. Suppl. Perry Decl. ¶ 3. KCC estimates the maximum payment to Class Members who paid NSF fees prior to cancellation would be $232.16, with an estimated average payment of $14.84. *Id.* ¶ 4. Approximately 5,594 Class Members who paid NSF fees prior to cancellation – 10% of the Class – would receive payments averaging $49.99 and ranging from $29.02 to $232.16. *Id.* ¶ 5.

Approximately 13,986 Class Members who paid NSF fees prior to cancellation – 25% of the Class – would receive payments averaging $33.80 and ranging from $17.41 to $232.16. *Id.*

For those Class Members who were charged but did not pay an NSF fee, CashCall will waive and will not engage in further action to collect such fees. Settlement ¶ 3.3. Ethan Post, CashCall's former Principal Architect, declares there are a total of 37,329 loans for which Class Members were charged but did not pay an NSF fee. Post Decl. ¶ 3, Dkt. No. 377. The total NSF fees charged but unpaid on these loans prior to the cancellation of the EFT authorization is $570,165. *Id.* CashCall currently owns 10 loans that are subject to collection by CashCall and that have a total of $405 in unpaid NSF fees. *Id.* ¶ 4. CashCall also outsourced collections to a third party on an additional 29 loans with $1,035 in unpaid NSF fees. *Id.* Thus, there are a total of 39 open loans with a total of $1,440 in unpaid NSF fees. *Id.* CashCall will recalculate the outstanding balances on these loans to eliminate the unpaid NSF fees. *Id.*

In light of these benefits, the Court finds this factor favors final approval.

### 5. The Extent of Discovery Completed and the Stage of the Proceedings

The parties negotiated the Settlement after years of litigation. CashCall and Class Counsel engaged in written discovery, depositions, and expert discovery; they briefed motions for class certification and summary judgment. They also litigated a bench trial on the Conditioning Claims and engaged in post-trial motion practice. Class Counsel is well-positioned to evaluate the strengths and weaknesses of the Conditioning Claims; they can make a fully informed decision regarding settlement.

### 6. The Experience and Views of Counsel

Class Counsel are experienced class action litigators. The following summarizes the declarations they filed attesting to their qualifications. Steven M. Tindall has served as lead or co-lead counsel in class action cases in federal and state courts, and obtained significant settlements for class members. Tindall Decl. ¶ 13, Dkt. No. 367-1. Arthur D. Levy has 36 years of litigation experience, including serving as lead counsel in several consumer class action cases. Levy Decl. ¶¶ 3, 6, Dkt. No. 367-4. Jessica Riggin focuses on litigating class and collective action lawsuits. Riggin Decl. ¶ 2, Dkt. No. 367-5. She and her firm, Rukin Hyland LLP, have been appointed

14

class counsel in numerous class actions. *Id.* ¶ 3. Damon M. Connolly has 28 years of litigation experience in government and private practice, with a focus on complex litigation matters. Connolly Decl. ¶ 3, Dkt. No. 367-6. James C. Sturdevant and his firm have been co-lead counsel in several class action cases. First Sturdevant Decl. ¶ 4, Dkt. No. 361-1.

That Plaintiffs' Counsel fully support the proposed Settlement as being in the best interests of the Conditioning Class strongly favors final approval.

### 7. The Presence of a Governmental Participant

No government entity participated in this action. This factor is therefore neutral.

### 8. The Reaction of Class Members of the Proposed Settlement

As noted, there are a total of 94,736 Class Members. Suppl. Perry Decl. ¶ 2. After accounting for the individuals who opted out from the Settlement, there remain 94,733 Class Members. *Id.*; *see* Final Approval Mot. at 7; Perry Decl. ¶ 10 & Ex. E. A list of those individuals is attached to this Order as Exhibit A. No Class Members objected or appeared at the final fairness hearing. Final Approval Mot. at 7; Perry Decl. ¶ 11. As so few Class Members seek exclusion and no one objects to the Settlement, this factor also favors final approval.

### 9. Summary

The *Bluetooth* factors strongly favor final approval.

## D. Summary

In light of the foregoing, the Court finds (1) Class Members received adequate notice of the Settlement; and (2) the Settlement is fair, adequate, and reasonable. Accordingly, the Court **GRANTS** the Motion for Final Approval.[7]

---

[7] Because the parties negotiated the Settlement after class certification, the Court does not consider whether the Settlement is the product of collusion. *See In re Bluetooth*, 654 F.3d at 946 ("Prior to formal class certification, there is an even greater potential for a breach of fiduciary duty owed the class during settlement. Accordingly, such agreements must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair."). The Court nevertheless examined the Settlement for signs of collusion at the preliminary approval stage, and found none. Prelim. Approval Order at 10-17. Nothing causes the Court to change that finding now.

Class Counsel request $650,000 in fees and costs incurred in litigating the Conditioning Claims. Fees Mot. at 1; *see* Settlement ¶ 3.5. Of that figure, $601,336.74 represents attorneys' fees and $48,663.25 represents costs. Fees Mot. at 3; Tindall Decl. ¶ 18.

## A.     Attorneys' Fees

The EFTA provides that a prevailing consumer is entitled to "the costs of the action, together with a reasonable attorney's fee as determined by the court." 15 U.S.C. § 1693m(a)(3). Counsel have spent 1,875.1 hours litigating the Conditioning Claims, with a total lodestar of $1,156,585.63. Tindall Decl. ¶ 18; *see* Levy Decl. ¶¶ 45, 52; Riggin Decl. ¶ 6; Connolly Decl. ¶¶ 9, 14; Second Sturdevant Decl. ¶¶ 8-9, Dkt. No. 367-8; Terrell Decl. ¶ 12, Dkt. No. 367-7. Thus, $601,336.74 represents approximately 40% of Class Counsel's lodestar. Fees Mot. at 1.

### 1.     Legal Standard

Courts may award attorneys' fees and costs in a certified class action as authorized by law or by the parties' agreement. Fed. R. Civ. P. 23(h). However, "courts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *In re Bluetooth*, 654 F.3d at 941.

"In this circuit, there are two primary methods to calculate attorneys fees: the lodestar method and the percentage-of-recovery method." *In re Online DVD*, 779 F.3d at 949. "[C]ourts have discretion to choose which calculation method they use[.]" *In re Bluetooth*, 654 F.3d at 942. But the Ninth Circuit "encourage[s] courts to guard against an unreasonable result by cross-checking their calculations against a second method." *Id.* at 944-45 (citations omitted).

In applying either method, courts evaluate the reasonableness of the award by balancing the *Kerr* factors:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar

cases.

*Resurrection Bay Conservation All. v. City of Seward, Alaska*, 640 F.3d 1087, 1095 & n.5 (9th Cir. 2011) (quoting *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975)).  "Foremost among these considerations, however, is the benefit obtained for the class."  *In re Bluetooth*, 654 F.3d at 942.

2.    Analysis

The Court first considers the request for attorneys' fees under a lodestar analysis, then confirms the result by applying a percentage-of-recovery analysis.

a.    *Lodestar*

"Use of the 'lodestar method' to calculate attorney's fees under a federal fee-shifting statute is proper."  *Tahara v. Matson Terminals, Inc.*, 511 F.3d 950, 955 (9th Cir. 2007) (citing *Staton*, 327 F.3d at 965).  "The lodestar figure is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer."  *In re Bluetooth*, 654 F.3d at 941.  This method therefore requires a two-step process: "First, a court calculates the lodestar figure by multiplying the number of hours reasonably expended on a case by a reasonable hourly rate."  *Kelly v. Wengler*, 822 F.3d 1085, 1099 (9th Cir. 2016).  "Second, the court determines whether to modify the lodestar figure, upward or downward, based on factors not subsumed in the lodestar figure."  *Id.*  "There is a strong presumption that the lodestar is a reasonable fee."  *Stetson v. Grissom*, 821 F.3d 1157, 1165 (9th Cir. 2016).

As noted, this case involved three types of claims: the Conditioning Claims, the Unconscionability Claim, and the claims relating to CashCall's collection practices.  The Unconscionability Claim is currently being litigated before the California Supreme Court, and the Court denied class certification as to claims regarding CashCall's collection practices.  The Settlement resolves only the Conditioning Claims, and Class Counsel seek compensation only for hours spent on these claims.  *See* Tindall Decl. ¶ 7; Riggin Decl. ¶ 8; Terrell Decl. ¶ 12; Second Sturdevant Decl. ¶ 6.  But in some instances, it is impractical to separate hours spent working on the Conditioning Claims from time spent working on the other claims; for example, Class Counsel

17

drafted pleadings and other motions regarding the Conditioning Claims and Unconscionability Claim. *See* Levy Decl. ¶ 46; Riggin Decl. ¶ 8.

As the Unconscionability Claim is the leading claim in this case, Counsel allocate half of the commonly spent hours to this claim. Levy Decl. ¶ 48; Riggin Decl. ¶ 8; Connolly Decl. ¶ 12; Second Sturdevant Decl. ¶ 6. They divide the remaining 50% of the commonly spent hours equally between the Conditioning Claims and the collection practices claim. *Id.* (all). Allocating 25% of all common hours to the Conditioning Claims is reasonable, if not conservative, given that Plaintiffs did not pursue the collection practices claims after the Court denied class certification on them. *Id.* (all). Indeed, the bulk of the litigation before the Court has concerned the Conditioning Claims: the motions for summary judgment did so in part; the bench trial and the post-trial motions exclusively so. The Court finds the 25% allocation of common hours to the Conditioning Claims is reasonable.

Class Counsel spent a total of 1,875 hours litigating the Conditioning Claims, broken down as follows:

| Firm | Hours (Conditioning Claims + 25% of Common Hours)[8] | Rate Range | Lodestar[9] |
|---|---|---|---|
| Gibbs Law Group LLP | 120.1 | $320-$720 | $66,730 |
| Law Office of Arthur D. Levy | 483.1 | $750 | $362,343.75 |
| Rukin Hyland LLP | 521.1 | $200-$720 | $302,537.13 |
| Law Offices of Damon Connolly | 79.9 | $525 | $41,947.50 |
| Terrell Marshall Law Group PLLC | 87.4 | $400 | $30,390 |
| The Sturdevant Law Firm | 583.5 | $200-$900 | $352,637.25 |

[8] These figures represent the total number of hours spent exclusively on the Conditioning Claim, plus 25% of the common hours. Mr. Levy, Ms. Riggins, Mr. Connolly, and Mr. Sturdevant provide breakdowns of these figures. *See* Levy Decl. ¶¶ 45, 52; Riggins Decl. ¶ 6; Connolly Decl. ¶¶ 9, 14; Second Sturdevant Decl. ¶ 7. Mr. Tindall and Ms. Terrell do not. *See* Tindall Decl.; Terrell Decl.

[9] The lodestar figures take into account the hours spent by the various attorneys working on the case. Where individuals other than the declarant worked on this case, counsel provide a breakdown of those hours and identify the various attorneys, the related staff, and their hourly rates. *See* Tindall Decl. ¶¶ 7-8; Riggin Decl. ¶ 6; Second Sturdevant Decl. ¶ 8.

| TOTALS | 1,875.1 | -- | $1,156,586 |
| --- | --- | --- | --- |

Tindall Decl. ¶ 7; Levy Decl. ¶ 52; Riggin Decl. ¶ 6; Connolly Decl. ¶ 14; Terrell Decl. ¶ 12;[10] Sturdevant Decl. ¶¶ 8-9.

i.     Hourly Rate and Hours Expended

"A reasonable hourly rate is ordinarily the 'prevailing market rate in the relevant community.'" *Kelly*, 822 F.3d at 1099 (quoting *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551 (2010)) (brackets omitted). In this case, the relevant community is the San Francisco Bay Area.

Plaintiffs' requested rates fall between $200 and $900, depending on the particular support staff, attorney, or partner. Class Counsel describe the skills, experience, and reputations of the attorneys and support staff who worked on this matter, as well as their involvement. First Sturdevant Decl. ¶ 4; Tindall Decl. ¶¶ 3, 7-8, 10-11, 13-17; Levy Decl. ¶¶ 6-9; Riggin Decl. ¶¶ 2-4, 10-12; Connolly Decl. ¶¶ 2-7; Terrell Decl. ¶ 7. The range of rates requested for attorneys and support staff identified in the declarations is consistent with the overall range of market rates in this District for attorneys and staff with commensurate experience. *See Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 455 (9th Cir. 2010) (district court did not abuse its discretion in awarding 2008 hourly rates for Bay Area attorneys of up to $875 for a partner, $700 for an attorney with 23 years of experience, $425 for an attorney with approximately five years of experience, and $190 for paralegals); *see also Gutierrez v. Wells Fargo Bank, N.A.*, 2015 WL 2438274, at *5 (N.D. Cal. May 21, 2015) (finding reasonable rates for Bay Area attorneys of between $475-$975 for partners, $300-$490 for associates, and $150-$430 for litigation support and paralegals). The requested hourly rates are reasonable.

"Beyond establishing a reasonable hourly rate, a party seeking attorneys' fees bears the

---

[10] In early 2015, Whitney Stark departed the Terrell Marshall Law Group LLC ("TMLG") and ceased her involvement in this matter. Suppl. Resp. ¶ 2, Dkt. No. 375. Beth Terrell assumed Ms. Starks' responsibilities for oversight of this matter on behalf of TMLG. *Id.* On November 9, 2017, Ms. Stark filed a notice of withdrawal as counsel. Dkt. No. 373. Ms. Terrell filed an appearance in this matter on November 14, 2017. Dkt. No. 374. The attorneys' fees and costs set forth in Ms. Terrell's declarations represent the hours and costs Ms. Stark expended on this litigation while at TMLG. *See* Terrell Decl.; Suppl. Terrell Decl.

burden to "document[ ] the appropriate hours expended." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). Counsel must exercise sound "billing judgment" as to the number of hours worked, eliminating excessive, redundant, or unnecessary hours, and provide billing records supporting the time claimed. *Id.* at 433-34. Class Counsel "is not required to record in great detail how each minute of his time was expended," but should "identify the general subject matter of his [or her] time expenditures." *Id.* at 437 n.12; *Fischer v. SJB-P.D. Inc.*, 214 F.3d 1115, 1121 (9th Cir. 2000) (quoting *id.*).

Class Counsel spent a total of 1,875.1 hours working on the Conditioning Claims. Tindall Decl. ¶ 18. This time was spent on motion practice, including drafting and arguing the motion for class certification, CashCall's Rule 23(f) petition, the motion for approval of notice, the motions for summary judgment, and the Rule 59 and 52 motions. Suppl. Resp. ¶ 3(a); Suppl. Levy Decl. ¶¶ 5-6, 9, 11-13, 16, Dkt. No. 375-1; Suppl. Sturdevant Decl. ¶¶ 3, 7, Dkt. No. 375-2; Suppl. Riggin Decl. ¶ 4(b), Dkt. No. 375-3; Suppl. Connolly Decl. ¶ 4, Dkt. No. 375-4; Suppl. Terrell Decl. ¶ 4, Dkt. No. 375-5. It also includes hours spent on discovery, trial, and settlement. Suppl. Resp. ¶ 3(b)-(d); Suppl. Levy Decl. ¶¶ 3-4, 7-8, 10, 15; Suppl. Sturdevant Decl. ¶¶ 3, 5-10; Suppl. Riggin Decl. ¶ 4; Suppl. Connolly Decl. ¶ 4. Counsel also spoke with Class Members regarding the Claims. Suppl. Terrell Decl. ¶ 7

Based on Class Counsel's declarations, the Court finds Class Counsel and related staff expended a reasonable number of hours on this litigation. *See Fox v. Vice*, 563 U.S. 826, 838 (2011) ("[T]rial courts need not, and indeed should not, become green-eyeshade accountants. The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection. So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time.").

ii.     Modification of Lodestar

Class Counsel do not seek a multiplier; rather, their request for $601,336.74 in attorneys' fees is a fraction of their lodestar. The *Kerr* factors confirm this request is reasonable. Few courts have considered violations of § 1693k, the EFTA's prohibition on conditioning the repayment of loans on EFT payments. *See, e.g.*, FFCL at 12-13. Indeed, "[o]nly one court seems to have

addressed both liability under section 1693k and assessed damages, but that court based its damages award on state laws rather than the EFTA's damages provision, section 1693m." *Id.* at 13 (citing *CashCall, Inc. v. Morrisey*, 2014 WL 2404300, at *4-5 (W. Va. May 30, 2014) (unpublished op.), *cert. denied sub nom. CashCall, Inc. v. Morrisey*, 135 S. Ct. 2050 (2015)). Despite the novelty of the issue presented, Class Counsel obtained favorable results for the Class: Counsel prevailed on the issue of liability on the Conditioning Claims at summary judgment and obtained a $500,000 award of actual damages following the bench trial.

The long duration of this case has limited at least some attorneys' ability to take on other cases. *See* Tindall Decl. ¶ 6; Riggin Decl. ¶ 16; Connolly Decl. ¶ 15. Class Counsel took this case on a contingent fee basis, with no guarantee of recovering fees or costs. Tindall Decl. ¶ 5; Levy Decl. ¶ 49; Riggin Decl. ¶ 16; Connolly Decl. ¶ 15; Terrell Decl. ¶ 11. Nevertheless, their collective skills, experience, and reputations aided them to obtain a settlement worth more than the damages award they obtained at trial.

For these reasons, the Court finds the *Kerr* factors weigh in favor of the modification of Class Counsel's lodestar.

        b.    *Percentage-of-Recovery*

"Under the percentage-of-recovery method, the attorneys' fees equal some percentage of the common settlement fund[.]" *In re Online DVD*, 779 F.3d at 949. In the Ninth Circuit, "courts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award, providing adequate explanation in the record of any 'special circumstances' justifying a departure." *In re Bluetooth*, 654 F.3d at 942. "The benchmark percentage should be adjusted, or replaced by a lodestar calculation, when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors." *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990).

Plaintiffs' request for $601,336.74 in attorneys' fees represents approximately 40% of the total $1.5 million Settlement Fund, significantly higher than the 25% benchmark for a reasonable award. The Court nevertheless finds it appropriate under the circumstances. First, no Class Members object to the proposed fee award. Second, as discussed above, the requested fees

21

represent work over a nine-year period and constitute a fraction of the lodestar. The percentage-of-recovery analysis therefore does not render the requested fees unreasonable. *See Edwards v. Nat'l Milk Producers Fed'n*, 2017 WL 3616638, at *9 (N.D. Cal. June 26, 2017) ("'Rather than abandon the percentage-of-recovery method, the best way to guard against a windfall is first to examine whether a given percentage represents too high a multiplier of counsel's lodestar.'" (quoting *In re: Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 4126533, at *6 (N.D. Cal. Aug. 3, 2016))).

### 3. Summary

Having considered the requested fees under the lodestar and the percentage-of-recovery analyses, the Court finds they are reasonable and **GRANTS** the Motion as to them.

## B. Costs

Plaintiffs also seek to recover the following costs:

| Firm | Costs |
|---|---|
| Gibbs Law Group LLP | $374.36 |
| The Law Office of Arthur D. Levy | $16,921.46 |
| Rukin Hyland LLP | $4,167.90 |
| The Law Offices of Damon Connolly | $729.64 |
| Terrell Marshall Law Group PLLC | $1,470 |
| The Sturdevant Law Firm | $24,999.90 |
| **TOTAL** | $48,663.26 |

Tindall Decl. ¶ 4; Levy Decl. ¶ 53; Riggin Decl. ¶ 17; Connolly Decl. ¶ 15; Terrell Decl. ¶ 10; Second Sturdevant Decl. ¶ 10.

Class Counsel calculated their costs incurred while litigating the Conditioning Claims with the same formula they used to determine their attorneys' fees. Counsel identified expenses incurred exclusively on the Unconscionability Claim and the Conditioning Claims, as well as Common Expenses. Suppl. Levy Decl. ¶ 18; Suppl. Sturdevant Decl. ¶ 13; Suppl. Riggin Decl. ¶ 6; Suppl. Connolly Decl. ¶ 6. Counsel then allocated 25% of the Common Expenses to the Conditioning Claims and added this figure to the costs devoted solely to the Conditioning Claim. *Id.* (all).

These expenses include out-of-pocket, unreimbursed fees incurred litigating the

United States District Court
Northern District of California

Conditioning Claims, including filing fees; mailing, service, copying of documents; travel costs; computer research; trial preparation costs; and transcript fees. Tindall Decl. ¶ 4; Suppl. Levy Decl. ¶ 17; Suppl. Sturdevant Decl. ¶ 12; Suppl. Riggin Decl. ¶ 6; Suppl. Connolly Decl. ¶ 6; Suppl. Terrell Decl. ¶ 8. Rukin Hyland also incurred $9,994.12 in KCC's administration costs and $1,418.53 in expert costs. Suppl. Riggin Decl. ¶ 6; *see* Settlement ¶ 3.6 (requiring CashCall to pay administration costs separately from settlement fund).

Having reviewed the requested costs, the Court finds they are reasonable and recoverable.

## C.     Service Awards

Service or incentive "awards are discretionary . . . , and are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez*, 563 F.3d at 958-59. "[D]istrict courts must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives." *Radcliffe*, 715 F.3d at 1164. "Many courts in the Ninth Circuit have . . . held that a $5,000 incentive award is 'presumptively reasonable.'" *Gaudin v. Saxon Mortg. Servs., Inc.*, 2015 WL 7454183, at *10 (N.D. Cal. Nov. 23, 2015) (collecting cases).

"To determine the reasonableness of a requested incentive payment, courts consider the proportionality between the incentive payment and the range of class members' settlement awards." *Willner v. Manpower Inc.*, 2015 WL 3863625, at *9 (N.D. Cal. June 22, 2015). Where there is a "very large differential in the amount of damage awards between the named and unnamed class members[,]" such differential record must be supported by the record. *Staton*, 327 F.3d at 978.

The Settlement provides for service awards of $10,000 each to Ms. Kempley and Mr. De La Torre. Settlement ¶ 3.4. A $10,000 service award falls within the range of service awards granted in this district. *See Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 267 (N.D. Cal. 2015) ("Incentive awards typically range from $2,000 to $10,000." (collecting cases)); *see also Nelson v. Avon Prods., Inc.*, 2017 WL 733145, at *7 (N.D. Cal. Feb. 24, 2017) ("Courts in this Circuit routinely grant requests for an award over $5,000 where the particular circumstances

23

1    warrant such an award.").

2        Ms. Kempley joined this action in February 2010.  Kempley Decl. ¶ 1, Dkt. No. 367-9.

3    She has traveled from her home in Sacramento to San Francisco to meet with her counsel and has

4    made herself available via telephone during trial and settlement conferences.  *Id.* ¶ 2.  In May

5    2010, she was deposed for several hours.  *Id.* ¶ 3.  This required several hours of preparation,

6    including gathering and reviewing documents.  *Id.*  Ms. Kempley has also reviewed papers with

7    her attorneys.  *Id.* ¶ 4.  She has devoted "a significant number of hours" to do this, but she has

8    done so "in order to do [her] job as class rep."  *Id.*  Ms. Kempley also worked with her counsel on

9    post-trial motions, reviewing her deposition transcript and preparing her declaration.  *Id.* ¶ 5.

10       Mr. De La Torre has been a Plaintiff in this action since its inception.  De La Torre Decl. ¶

11   1, Dkt. No. 367-10.  He has constantly stayed informed of developments; his counsel has sent him

12   reports and copies of briefs and Orders, which he has read to understand the status of the case.  *Id.*

13   ¶ 1.  Mr. De La Torre has also communicated with his counsel via telephone and email to discuss

14   the case and to make decisions.  *Id.*  Mr. De La Torre sat for a deposition in November 2009,

15   which required him to search for and produce documents to his counsel prior to and after the

16   deposition.  *Id.* ¶ 2.  In all, he has "spent a significant number of hours on discovery on this case."

17   *Id.*  After the trial, Mr. De La Torre reviewed his deposition transcript and provided a statement in

18   support of Plaintiffs' motion to present additional testimony.  *Id.* ¶ 3.  He has also made himself

19   available via telephone during settlement conferences and has consulted with his counsel about

20   settlement decisions.  *Id.*

21       The Court finds $10,000 service awards are appropriate under these circumstances.  Both

22   Ms. Kempley and Mr. De La Torre emphasize the long and arduous nature of this case.  *See*

23   Kempley Decl. ¶ 6; De La Torre Decl. ¶ 4.  Indeed, for nearly a decade, they have actively

24   participated in this litigation to assist their counsel.  Accordingly, the Court **GRANTS** Plaintiffs'

25   request for a $10,000 service award to each Ms. Kempley and Mr. De La Torre.

26   **C.    Summary**

27       Based on the foregoing, the Court **GRANTS** the Motion for Attorneys' Fees, Costs, and

28   Service Awards.

**CONCLUSION**

In light of the foregoing analysis, the Court **GRANTS** Plaintiffs' Motion for Final Approval of the Settlement and **GRANTS** Plaintiffs' Motion for Attorneys' Fees and Costs. The Court thus **ORDERS** the following:

1.     The Settlement is finally approved as fair, reasonable, and adequate for the reasons set forth above.

2.     Lori Kempley and Eduardo De La Torre are confirmed as Class Representatives.

3.     The Sturdevant Law Firm, APC; The Law Office of Arthur D. Levy; Gibbs Law Group, LPP; Rukin Hyland LLP; The Law Offices of Damon M. Connolly; and The Terrell Marshall Law Group PLLC are confirmed as Class Counsel.

4.     CashCall shall pay to Class Counsel $601,336.74 in attorneys' fees and $48,663.26 in costs, to be allocated in the amounts set forth above.

5.     Pursuant to paragraph 2.7 of the Settlement and as no Class Member has filed an objection, the Settlement shall become effective as of the date of this Order.

6.     Pursuant to paragraph 4.12 of the Settlement, CashCall shall fund the settlement within 10 days of this Order.

7.     Pursuant to paragraphs 3.1 and 4.12 of the Settlement, that is, not later than 20 days after funding, KCC shall distribute payments to Class Members, service awards to the Class Representatives, and attorneys' fees and costs to Class Counsel.

8.     The California Reinvestment Coalition, Consumer Federation of California, National Association of Consumer Advocates, and Consumer Federation of America are approved as cy pres nominees. The Court shall determine the amounts, if any, to be paid to these nominees.

9.     Each member of the Settlement Class not listed in Exhibit A to this Order shall be bound to the Settlement Agreement

10.     Each member of the Settlement Class not listed in Exhibit A to this Order is released from liability from all NSF fees CashCall charged prior to the cancellation, if any, of their respective authorizations to collect loan payments via EFT, regardless of whether the Class

Member actually paid such fees. CashCall shall not engage in any further action to collect such NSF fees with respect to any loans that are still owned by CashCall. If any Class Member has an open loan account that includes unpaid charges for NSF fees, CashCall will recalculate such loan account to eliminate such unpaid charges.

11. The individuals listed in Exhibit A to this Order have validly excluded themselves from the Settlement, will receive no benefits under the Settlement, and will not be bound by the Settlement.

12. This Order does not in any manner affect or impair (a) the Unconscionability Claim as defined in paragraph 2.21 of the Settlement; (b) Plaintiffs' Counsel's right to seek attorneys' fees, litigation expenses, and court costs based on the Unconscionability Claim; (c) any claims arising under any loan that is not covered by the Settlement Class definition; or (d) any claims by persons listed on Exhibit A to this Order.

13. The Court shall retain jurisdiction over all matters relating to the interpretation, administration, implementation, effectuation, and enforcement of all provisions of the Settlement.

14. This Order shall constitute a final judgment in this action.

15. The Court shall conduct a status conference on May 10, 2018 at 10:00 a.m. in Courtroom B, 450 Golden Gate Avenue, San Francisco, California. No later than seven days before the status conference, the parties shall file a joint status report that indicates (1) the number of Class Members who have cashed their settlement checks, (2) the amount of uncashed funds, (3) whether uncashed funds should be redistributed to Class Members or paid to the aforementioned cy pres recipients, (4) any issues the parties believe should be addressed, and (5) a proposed course of action for remedying such issues, if any.

**IT IS SO ORDERED.**

Dated: November 17, 2017

_____
MARIA-ELENA JAMES
United States Magistrate Judge